# EXHIBIT 1

Skip To MainContent

[Search]

Civil Court Case Information - Case History

## Case Information

| | | | |
|---|---|---|---|
| Case Number: | CV2016-013572 | Judge: | Stephens, Sherry |
| File Date: | 9/30/2016 | Location: | Downtown |
| Case Type: | Civil | | |

## Party Information

| Party Name | Relationship | Sex | Attorney |
|---|---|---|---|
| Anderson Phillips | Plaintiff | Unknown | Michael Poli |
| Jasmine Phillips | Plaintiff | Unknown | Michael Poli |
| State Farm Fire And Casualty Company | Defendant | | Robert Sullivan |

## Case Documents

| Filing Date | Description | Docket Date | Filing Party |
|---|---|---|---|
| 6/3/2019 | AMC - Amended Complaint | 6/4/2019 | |

**NOTE:** FIRST AMENDED CLASS ACTION COMPLAINT

| | | | |
|---|---|---|---|
| 5/31/2019 | 005 - ME: Hearing | 5/31/2019 | |
| 5/24/2019 | MOT - Motion | 5/29/2019 | |

**NOTE:** PLAINTIFFS' MOTION FOR LEAVE TO EXCEED PAGE LIMIT RE: PLAINTIFFS' REPLY TO THEIR MOTION FOR LEAVE TO AMEND COMPLAINT TO CLASS ACTION

| | | | |
|---|---|---|---|
| 5/24/2019 | REL - Reply | 5/29/2019 | |

**NOTE:** Plaintiffs' Reply In Support Of Plaintiffs' Motion For Leave to Amend Complaint to Class Action

| | | | |
|---|---|---|---|
| 5/13/2019 | NOT - Notice | 5/13/2019 | |

**NOTE:** RULE 7.1(g) NOTICE OF AGREED-TO EXTENSION OF TIME FOR PLAINTIFFS TO FILE A REPLY IN SUPPORT OF THEIR MOTION TO AMEND COMPLAINT (FIRST EXTENSION)

| | | | |
|---|---|---|---|
| 4/15/2019 | RES - Response | 4/16/2019 | |

**NOTE:** STATE FARM'S RESPONSE TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT TO CLASS ACTION

| | | | |
|---|---|---|---|
| 4/12/2019 | 094 - ME: Oral Argument Set | 4/12/2019 | |
| 4/9/2019 | ORD - Order | 4/9/2019 | |

**NOTE:** GRANTING STATE FARMS MOTION TO EXCEED PAGE LIMIT REGARDING STATE FARMS RESPONSE TO PLAINTIFFS MOTION FOR LEAVE TO AMEND COMPLAINT TO CLASS ACTION

| | | | |
|---|---|---|---|
| 4/5/2019 | MOT - Motion | 4/8/2019 | |

**NOTE:** STATE FARM'S MOTION TO EXCEED PAGE LIMIT REGARDING STATE FARM'S RESPONSE TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT TO CLASS ACTION

| | | | |
|---|---|---|---|
| 3/11/2019 | OFS - Order for Substitution of Counsel | 3/11/2019 | |

**NOTE:** counsel of record for Defendant

| | | | |
|---|---|---|---|
| 3/11/2019 | ORD - Order | 3/11/2019 | |

**NOTE:** GRANTING STIPULATION TO AMEND RESPONSE AND REPLY DATES REGARDING PLAINTIFFS MOTION FOR LEAVE TO AMEND COMPLAINT TO CLASS ACTION

| | | | |
|---|---|---|---|
| 3/6/2019 | APL - Application | 3/7/2019 | |

**NOTE:** Application for Substitution of Counsel

| | | | |
|---|---|---|---|
| 3/6/2019 | STP - Stipulation | 3/7/2019 | |

**NOTE:** STIPULATION TO AMEND RESPONSE AND REPLY DATES REGARDING PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT TO CLASS ACTION

| | | | |
|---|---|---|---|
| 2/4/2019 | NOT - Notice | 2/4/2019 | |

**NOTE:** Rule 7.1(g) Notice of Agreed-To Extension of Time for Defendant to File a Response to Motion for Leave to Amend Complaint to Class Action (First Extension)

| | | | |
|---|---|---|---|
| 1/25/2019 | MTA - Motion To Amend | 1/28/2019 | |

**NOTE:** Motion for Leave to Amend Complaint to Class Action

| | | | |
|---|---|---|---|
| 1/4/2019 | NOT - Notice | 1/7/2019 | |

**NOTE:** RULE 7.1(g) NOTICE OF AGREED-TO EXTENSION OF TIME FOR PLAINTIFF TO FILE A MOTION TO AMEND COMPLAINT (FIRST EXTENSION)

| | | | |
|---|---|---|---|
| 10/8/2018 | ORD - Order | 10/8/2018 | |

**NOTE:** that Plaintiffs shall file their Motion to Amend Complaint on or before January 11, 2018; Defendant shall file its Response on or before February 28, 2019; and Plaintiff shall file their Reply on or before March 29, 2019.

| | | | |
|---|---|---|---|
| 10/1/2018 | 005 - ME: Hearing | 10/1/2018 | |
| 9/28/2018 | STP - Stipulation | 10/1/2018 | |

**NOTE:** JOINT STIPULATION RE: DEADLINE FOR PLAINTIFFS' TO FILE MOTION TO AMEND COMPLAINT AND EXTENSION OF DEADLINES

| | | | |
|---|---|---|---|
| 9/26/2018 | ORD - Order | 9/26/2018 | |

**NOTE:** TO EXTEND DEADLINES

| | | | |
|---|---|---|---|
| 9/24/2018 | STP - Stipulation | 9/25/2018 | |

**NOTE:** Stipulation To Extend Deadlines

| | | | |
|---|---|---|---|
| 6/28/2018 | 022 - ME: Order Signed | 6/28/2018 | |

**NOTE:** EXTENDING EXPERT WITNESS DISCLOSURE DEADLINES

| | | | |
|---|---|---|---|
| 6/27/2018 | ORD - Order | 6/28/2018 | |
| 6/18/2018 | MOT - Motion | 6/20/2018 | |

**NOTE:** Motion to Extend Defendant's Deadline for Disclosure of Expert Opinions

| 5/25/2018 | 005 - ME: Hearing | 5/25/2018 |
| 5/21/2018 | 095 - ME: Oral Argument Reset | 5/21/2018 |
| 5/1/2018 | 094 - ME: Oral Argument Set | 5/1/2018 |
| 4/27/2018 | ORD - Order | 4/27/2018 |

**NOTE:** ORDER TO EXTEND DEADLINES

| 4/24/2018 | STP - Stipulation | 4/25/2018 |

**NOTE:** Stipulation to Extend Deadlines

| 4/17/2018 | 028 - ME: Status Conference Set | 4/17/2018 |
| 3/14/2018 | RES - Response | 3/16/2018 |

**NOTE:** RESPONSE TO PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

| 3/7/2018 | ORD - Order | 3/7/2018 |

**NOTE:** ORDER TO EXTEND DEADLINES

| 3/1/2018 | STP - Stipulation | 3/5/2018 |

**NOTE:** Stipulation to Extend Deadlines

| 2/23/2018 | MTA - Motion To Amend | 2/26/2018 |

**NOTE:** MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

| 2/23/2018 | NAR - Notice Of Appearance | 2/26/2018 |

**NOTE:** NOTICE OF APPEARANCE

| 2/23/2018 | NAR - Notice Of Appearance | 2/26/2018 |

**NOTE:** NOTICE OF APPEARANCE

| 8/1/2017 | SCO – Scheduling Order | 8/1/2017 |

**NOTE:** SCHEDULING Order

| 7/26/2017 | JSR – Joint Scheduling Report | 7/27/2017 |

**NOTE:** Joint Report

| 7/5/2017 | NPD - Notice Case on Dismissal Calendar | 7/5/2017 |
| 3/8/2017 | 311 - ME: 150 Day Minute Entry | 3/8/2017 |
| 12/9/2016 | | 12/12/2016 |

**NOTE:** Defendant State Farm Fire and Casualty Company's Answer to Plaintiffs' Complaint-EFILE BILLING $237.00

| 10/4/2016 | AFS - Affidavit Of Service | 10/12/2016 |

**NOTE:** State Farm Fire And Casualty Company

| 10/4/2016 | SUM - Summons | 10/6/2016 |
| 9/30/2016 | COM - Complaint | 10/4/2016 |
| 9/30/2016 | CCN - Cert Arbitration - Not Subject | 10/4/2016 |
| 9/30/2016 | CSH - Coversheet | 10/4/2016 |

## Case Calendar

| Date | Time | Event |
| --- | --- | --- |
| 3/15/2018 | 8:45 | Pre-Trial Conference |
| 4/16/2018 | 8:30 | Pre-Trial Conference |
| 5/23/2018 | 9:30 | Oral Argument |
| 5/24/2018 | 9:00 | Pre-Trial Conference |
| 9/26/2018 | 8:30 | Pre-Trial Conference |
| 4/11/2019 | 9:00 | Pre-Trial Conference |
| 5/30/2019 | 10:30 | Oral Argument |

## Judgments

**There are no judgments on file**

# EXHIBIT 2

MICHAEL K. JEANES
Clerk of the Superior Court
By Trista Shepardson, Deputy
Date 09/30/2016 Time 16:48:13
Description                          Amount
————— CASE# CV2016-013572 —————
CIVIL NEW COMPLAINT                  319.00
————————————————————————
TOTAL AMOUNT                         319.00
        Receipt# 25507288

Michael N. Poli (State Bar No. 006431)
mpoli@merlinlawgroup.com
Jeff G. Zane (State Bar No. 024172)
jzane@merlinlawgroup.com
MERLIN LAW GROUP P.A.
2999 North 44th Street, Suite 520
Phoenix, Arizona 85018
Telephone: (480) 315-9980
Facsimile: (480) 315-9984

*Counsel for Plaintiffs*

## ARIZONA SUPERIOR COURT

## MARICOPA COUNTY

ANDERSON PHILLIPS and JASMINE
PHILLIPS, husband and wife,

         Plaintiffs,

    vs.

STATE FARM FIRE AND CASUALTY
COMPANY, an Illinois corporation,

         Defendant.

No. CV2016-013572

**COMPLAINT**

Plaintiffs Anderson and Jasmine Phillips (the "Phillips") hereby allege as follows against Defendant State Farm Fire and Casualty Company ("State Farm").

## JURISDICTION AND VENUE ALLEGATIONS

1.    Anderson Phillips and Jasmine Phillips are a married couple who reside in Maricopa County, Arizona.

2.    Defendant State Farm is an Illinois corporation engaged in the business of insurance in Maricopa County, Arizona.

3.    The property insurance agreement that is the subject of this action was sold to the Phillips in Maricopa County, Arizona, by Defendant State Farm.

4.    This Court has jurisdiction over the subject matter of this action and the parties to this action. The amount of damages sought by the Plaintiffs exceeds the

T1476574.DOCX:1

minimum jurisdictional amount established for filing in this Court.  Venue is proper in this Court.

## FACTUAL ALLEGATIONS

5.      At all relevant times hereto, the Phillips resided at 614 West Desert Lane, Phoenix Arizona, 85041 (the "Residence").  The Residence and its contents were insured by State Farm under an insurance policy issued by State Farm and assigned the policy number 03-J4-4660-2 (the "Policy").

6.      On or about December 6, 2016, a fire occurred within the Residence, causing significant damage to the Residence and to the Phillips' personal property that was in the Residence at the time (collectively, the "Loss")

7.      At the time of the fire, the Policy was in full force and effect.

8.      The Phillips timely submitted a claim to State Farm regarding the Loss (collectively, the "Claim") and they performed all of their obligations and responsibilities under the Policy with respect to the Claim.

9.      State Farm assigned the Phillips' Claim the number 03-43H7-730.

10.     On December 14, 2016, State Farm inspected the Residence and the Phillips' personal property.

11.     The Phillips have timely responded to all reasonable inquiries and requests from State Farm and State Farm's agents regarding the Claim.

12.     The Phillips have also taken timely action to respond to all inquiries and requests from State Farm.

13.     The Phillips also retained the services of a public adjuster, Skipton & Associates, Inc. ("SAI").  SAI inspected the Property on December 28, 2015.

14.     On or about January 8, 2016, SAI submitted a scope of loss reflecting the cost to repair the Residence pursuant to the Policy, which is $203,114.69 (RCV).

15.     On or about January 22, 2016, State Farm conveyed its own estimate of repair costs, which was $153,759.64 (RCV).

16.     State Farm refuses to make payment of the full amount due and owing for the Phillips' insurance claim in bad faith.

17.     State Farm knows or should know that its failure to provide full payment to the Phillips for the Loss is not justified in light of the obvious damage to the Residence as a result of the fire.

18.     State Farm knows, or should know, that its unreasonable, incomplete and incompetent evaluation of the Loss is a breach of the duty and obligation of good faith and fair dealing owed to the Phillips under the Policy.

19.     State Farm's conduct complained of herein was, and continues to be, intentional, willful and wanton, and/or taken in conscious and deliberate disregard of the Plaintiff's rights, thus justifying the imposition of punitive damages.

20.     With respect to the events giving rise to this lawsuit, at various times and in various ways, State Farm acted through other agents and employees.

21.     State Farm' conduct complained of herein was intentional, willful and wanton, and/or taken in conscious and deliberate disregard of the Phillips' rights, thus justifying the imposition of punitive damages.

## Count 1 - Breach of Insurance Contract; Implied Duty of Good Faith and Fair Dealing

22.     The foregoing allegations are hereby incorporated by reference.

23.     State Farm agreed to provide property insurance coverage for the Phillips.

24.     State Farm was paid premiums in exchange for its indemnity obligations to the Phillips.

25.     The Policy, like all contracts within the State of Arizona, contains an implied covenant of good faith and fair dealing.

26.     The Phillips fulfilled all of their obligations under the Policy.

27.     State Farm failed to perform its obligations pursuant to the Policy.

28.     By wrongfully failing to process the claim in good faith and pay the Claim in full, State Farm breached the Policy, including the implied covenant of good faith and

fair dealing in that agreement, thereby depriving the Phillips of the benefits they were to have received under the contract.

29.     State Farm failed to handle the Phillips' Claim in a reasonable manner and has failed to make payments owed under the Policy.

30.     As a direct and proximate result of State Farm's breach of contract and breach of the implied covenant of good faith and fair dealing, the Phillips have sustained reasonably foreseeable damages, and continue to sustain such damages, in an amount to be proven at trial.

31.     The Phillips are entitled to an award of attorneys' fees under A.R.S. § 12-341.01.

WHEREFORE, on this claim, the Phillips request judgment against State Farm, as follows:

A.     For compensatory damages in a just and reasonable amount (including both contractual damages and extra-contractual or consequential damages);

B.     For attorneys' fees and costs, and in the event of a default judgment, for attorneys' fees in the amount of $4,500.00;

C.     For pre- and post-judgment interest;

D.     For taxable costs pursuant to A.R.S. §12-341; and

E.     For such other relief as the Court deems just and proper.

### <u>Count 2 – Tortious Bad Faith Claims Handling</u>

32.     The foregoing allegations are hereby incorporated by reference.

33.     In Arizona, "the tort of bad faith arises when the insurer 'intentionally denies, fails to process of pay a claim without a reasonable basis.'" *Zilisch v. State Farm Mutual Auto. Ins. Co.*, 196 Ariz. 234, ¶20 995 P.2d 276, 279 (2000) )(quoting *Noble v. National Am. Life Ins. Co.*, 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981)). "An insurance contract is not an ordinary commercial bargain; 'implicit in the contract and the relationship is the insurer's obligation to play fairly with its insured.'" *Id.* (quoting

*Rawlings v. Apodaca*, 151 Ariz. 149, 154, 726 P.2d 565, 570 (1986)). "The insurer has 'some duties of a fiduciary nature,' including '[e]qual consideration, fairness and honesty.'" *Id.* (quoting *Rawlings*, 151 Ariz. at 155, 726 P.2d at 571). "[T]he insurer's eventual performance of the express covenant — by paying the claim — does not release it from liability for 'bad faith.'" *Id.* (citing *Rawlings*, 151 Ariz. at 156, 726 P.2d at 572). "Thus, if an insurer acts unreasonably in the manner in which it processes a claim, it will be held liable for bad faith 'without regard to its ultimate merits.'" *Id.* (quoting *Deese v. State Farm Mutual Auto. Ins. Co.*, 172 Ariz. 504, 508, 838 P.2d 1265, 1270 (1992)). "The carrier has an obligation to immediately conduct an adequate investigation, act reasonably in evaluating the claim and act promptly in paying a legitimate claim." *Id.* at ¶ 21.

34. State Farm owed and continues to owe the Phillips a duty of good faith and fair dealing.

35. Pursuant to the terms of the Policy, State Farm is obligated to pay the Phillips for the Losses associated with and arising from the fire.

36. Without any reasonable justification for doing so, State Farm has failed to make payments to the Phillips for the full amount due under the Policy for the loss sustained as a result of the fire.

37. State Farm has breached its contractual obligation to Phillips and State Farm has refused to perform its duty to cooperate with the Phillips to, *inter alia*, adjust and negotiate the insurance claim fairly and in good faith.

38. As described herein, State Farm breached its contractual and quasi-fiduciary obligations to the Phillips.

39. Upon information and belief, State Farms' conduct has been self-serving and a ploy to protect State Farm's own financial interests, at the expense of the Phillips' rights.

40. Also upon information and belief, State Farm has consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others. Furthermore, State Farm acted to serve their own interests, rather than the interests of Phillips. Thus, Phillips are entitled to an appropriate award of punitive damages.

41. State Farm committed the above acts and omissions intentionally, maliciously, and fraudulently, and acted to further their own economic interests, at Phillips' expense.

42. As a result of State Farm's unjustified failure to pay for the Loss, in full, the Phillips have suffered and continue to suffer significant consequential losses, including but not limited to, expense and losses arising from items that should have been paid for or covered by the Policies.

43. WHEREFORE, on this claim, the Phillips request judgment against State Farm, as follows:

A. For compensatory damages in a just and reasonable amount (including both contractual damages and extra-contractual or consequential damages);

B. For punitive or exemplary damages in a just and reasonable amount;

C. For attorneys' fees and costs, and in the event of a default judgment, for attorneys' fees in the amount of $4,500.00;

D. For pre- and post-judgment interest;

E. For taxable costs pursuant to A.R.S. §12-341; and

F. For such other relief as the Court deems just and proper.

DATED this 30th day of September, 2016.

MERLIN LAW GROUP, P.A.

By _____
Michael N. Poli
Jeff Zane
2999 North 44th Street, Suite 520
Phoenix, Arizona 85018
*Counsel for Plaintiffs*

MICHAEL K. JEANES, CLERK
BY _____ DEP

*P. Shepardson*

T. SHEPARDSON, FILED

16 SEP 30 PM 4: 41

1   Michael N. Poli (State Bar No. 006431)
    mpoli@merlinlawgroup.com
2   Jeff G. Zane (State Bar No. 024172)
    jzane@merlinlawgroup.com
3   MERLIN LAW GROUP P.A.
    2999 North 44th Street, Suite 520
4   Phoenix, Arizona 85018
    Telephone: (480) 315-9980
5   Facsimile: (480) 315-9984

6   *Counsel for Plaintiffs*

7                    **ARIZONA SUPERIOR COURT**

8                      **MARICOPA COUNTY**

9   ANDERSON PHILLIPS and JASMINE          CV 2016-013572
    PHILLIPS, husband and wife,
10                                         No. _____
           Plaintiffs,
11
        vs.                               **CERTIFICATE OF**
12                                        **COMPULSORY ARBITRATION**
    STATE FARM FIRE AND CASUALTY
13  COMPANY, an Illinois corporation,

14         Defendant.

15

16         The undersigned certifies that he knows the dollar limits and any other limitations

17  set forth by the Local Rules of Practice for Maricopa County Superior Court, and further

18  certifies that this case is **not** subject to compulsory arbitration, as provided by Rules 72

19  through 76 of the Arizona Rules of Civil Procedure.

20         DATED this 30th day of September, 2016.

21                                    MERLIN LAW GROUP, P.A.

22

23                                    By _____
24                                        Michael N. Poli
                                          Jeff Zane
25                                        2999 North 44th Street, Suite 520
                                          Phoenix, Arizona 85018
26                                        *Counsel for Plaintiffs*

27

28

T1476577.DOCX;1

**Superior Court of Arizona**
**In Maricopa County**

## CV2016-013572

(Please Type or Print)

MICHAEL K. JEANES, CLERK
BY _____ DEP
_T. Shepardson._
T. SHEPARDSON. FILED

Is Interpreter Needed? ☐ Yes ☐ No  16 SEP 30  PM 4: 41

If yes, what language: _____

**Plaintiff's Attorney:**
    Michael N. Poli / Jeff G. Zane

To the best of my knowledge, all information is true and correct.

**Attorney's Bar Number:**    06431 / 024172

Attorney/Pro Per Signature (If no attorney, YOUR signature)

**Plaintiff's Name(s):  (List all)**
ANDERSON PHILLIPS

Plaintiff's Address:
c/o MERLIN LAW GROUP, P.A.

JASMINE PHILLIPS

2999 North 44th Street, Suite 520

Phoenix, Arizona 85018

(List additional plaintiffs on page two and/or attach a separate sheet).

**Defendant's Name(s):  (List all.)**
STATE FARM FIRE AND CASUALTY COMPANY

(List additional defendants on page two and/or attach a separate sheet).

EMERGENCY ORDER SOUGHT:
(if applicable)
☐ Temporary Restraining Order
☐ OSC – Order to Show Cause
☐ Employer Sanction
☐ Provisional Remedy
☐ Election Challenge
☐ Other _____

☐ RULE 8(i) COMPLEX LITIGATION DOES NOT APPLY.  (Mark appropriate box under **Nature of Action**).

☐ RULE 8(i) COMPLEX LITIGATION APPLIES   Rule 8(i) of the Rules of Civil Procedure defines a "Complex Case" as civil actions that require continuous judicial management. A typical case involves a large number of witnesses, a substantial amount of documentary evidence, and a large number of separately represented parties. (Mark appropriate box on page two as to complexity, **in addition** to the Nature of Action case category).

## NATURE OF ACTION

(Place an **"X"** next to the **one** case category that most accurately describes your primary case.)

**100 TORT MOTOR VEHICLE:**
☐ 101 Non-Death/Personal Injury
☐ 102 Property Damage
☐ 103 Wrongful Death
**110 TORT NON-MOTOR VEHICLE:**
☐ 111 Negligence
☐ 112 Product Liability – Asbestos
☐ 112 Product Liability – Tobacco
☐ 112 Product Liability – Toxic/Other
☐ 113 Intentional Tort
☐ 114 Property Damage
☐ 115 Legal Malpractice
☐ 115 Malpractice – Other professional
☐ 117 Premises Liability
☐ 118 Slander/Libel/Defamation
☐ 116 Other (Specify) _____

**120 MEDICAL MALPRACTICE:**
☐ 121 Physician M.D. ☐ 123 Hospital
☐ 122 Physician D.O ☐ 124 Other
**130 CONTRACTS:**
☐ 131 Account (Open or Stated)
☐ 132 Promissory Note
☐ 133 Foreclosure
☐ 138 Buyer-Plaintiff
☐ 139 Fraud
☑ 134 Other Contract (i.e. Breach of Contract)
☐ 135 Excess Proceeds - Sale
☐ Construction Defects (Residential/Commercial)
        ☐ 136 Six to Nineteen Structures
        ☐ 137 Twenty or More Structures

**150-199 OTHER CIVIL CASE TYPES:**                    Case No. _____

☐156 Eminent Domain/Condemnation
☐151 Eviction Actions (Forcible and Special Detainers)
☐152 Change of Name
☐153 Transcript of Judgment
☐154 Foreign Judgment
☐158 Quiet Title
☐160 Forfeiture
☐175 Election Challenge
☐179 Employer Sanction Action (A.R.S. §23-212)
☐180 Injunction against Workplace Harassment
☐181 Injunction against Harassment
☐182 Civil Penalty
☐186 Water Rights **(Not General Stream Adjudication)**
☐187 Real Property
☐Sexually Violent Persons (A.R.S. §36-3704)
  (Except Maricopa County)
☐Minor Abortion (See Juvenile in Maricopa County)
☐Special Action Against Lower Courts
  (See lower court appeal cover sheet in Maricopa)

**150-199 UNCLASSIFIED CIVIL CASE TYPES:**
☐Administrative Review
  (See lower court appeal cover sheet in Maricopa)
☐150 Tax Appeal
(All other tax matters must be filed in the AZ Tax
Court)

☐155 Declaratory Judgment
☐157 Habeas Corpus
☐184 Landlord Tenant Dispute - Other
☐159 Restoration of Civil Rights (Federal)
☐159 Clearance of Records (A.R.S. §13-4051)
☐190 Declaration of Factual Innocence**(A.R.S.§12-771)**
☐191 Declaration of Factual Improper Party Status
☐193 Vulnerable Adult (A.R.S. §46-451)
☐165 Tribal Judgment
☐167 Structured Settlement (A.R.S. §12-2901)
☐169 Attorney Conservatorships (State Bar)
☐170 Unauthorized Practice of Law (State Bar)
☐171 Out-of-State Deposition for Foreign Jurisdiction
☐172 Secure Attendance of Prisoner
☐173 Assurance of Discontinuance
☐174 In-State Deposition for Foreign Jurisdiction
☐176 Eminent Domain–Light Rail Only
☐177 Interpleader– Automobile Only
☐178 Delayed Birth Certificate (A.R.S. §36-333.03)
☐183 Employment Dispute - Discrimination
☐185 Employment Dispute - Other
☐163 Other

_____
(Specify)

## COMPLEXITY OF THE CASE

If you marked the box on page one indicating that Complex Litigation applies, place an "X" in the box of no less than one of the following:

☐ Antitrust/Trade Regulation
☐ Construction Defect with many parties or structures
☐ Mass Tort
☐ Securities Litigation with many parties
☐ Environmental Toxic Tort with many parties
☐ Class Action Claims
☐ Insurance Coverage Claims arising from the above-listed case types
☐ A Complex Case as defined by Rule 8(i) ARCP

Additional Plaintiff(s)
    N/A
_____

_____

Additional Defendant(s)
    N/A
_____

_____

7501 N. 16th Street, Suite 200
Phoenix, AZ 85020
(602) 285-9901

BY ____ DEP

*J. Baker*

J. BAKER, FILED

| Inv. # | SUPERIOR COURT OF THE STATE OF ARIZONA 2016 OCT -4  AM 10: 12 |
|---|---|
| **113364** | IN AND FOR THE COUNTY OF MARICOPA |

**ANDERSON PHILLIPS AND JASMINE PHILLIPS**

                                  **Plaintiff / Petitioner,**

vs.

**STATE FARM FIRE AND CASUALTY COMPANY**

                                **Defendant / Respondent.**

NO.  **CV2016-013572**

CERTIFICATE OF SERVICE

__Geoffrey Roberts__ _____, the undersigned certifies under penalty of perjury: That I am fully qualified pursuant to RCP 4 (d), 4 (e), 45 (b) and/or ARS 13-4072, to serve process in this case, and received for service the following documents in this action:

**SUMMONS & COMPLAINT, CERTIFICATE OF ARBITRATION**

from _____ __Jeff G. Zane c/o Merlin Law Group, P.A.__ _____ on ____**10/3/16**____ ;

that I personally served copies of these documents on those named below in the manner and time and place shown; and except where noted, all services were made in Maricopa County, Arizona.

**NAME:**    **STATE FARM FIRE AND CASUALTY COMPANY, c/o Arizona Department of Insurance**

**DATE & TIME:**  10/3/16 10:38am
**PLACE &**        2910 N. 44TH STREET  STE.210  PHOENIX, AZ 85018, which is his/her place of business.
**MANNER:**     By serving Yuliana Salinas, Fiscal Service Specialist, a person authorized to accept such service on their behalf, in person.

$15.00 service fee tendered. Description of the Named: Female, Age: 30's, Ht: 5' 4in., Wt: 180, Eyes: brown, Hair: black, Ethnicity: Hisp.

| Statement of Costs | | |
|---|---|---|
| Services | $16.00 | |
| Mileage | $24.00 | |
| Sp. Handl. | | |
| Witness | | |
| Advances | $334.00 | |
| Cert. Prep | $10.00 | S/C |
| Other | $33.40 | |
| **Total** | **$417.40** | |

Affiant  Registered in
Maricopa County

ORIGINAL

The above is covered by A.R.S. as amended 41-314 & 11-45 and Rules 4, 5 and 45.

MICHAEL K. JEANES, CLERK
BY
J. Baker, DEP

J. BAKER, FILED

2016 OCT -4   AM 10: 12

| | |
|---|---|
| 1 | Michael N. Poli (State Bar No. 006431) |
| 2 | mpoli@merlinlawgroup.com<br>Jeff G. Zane (State Bar No. 024172) |
| 3 | jzane@merlinlawgroup.com<br>MERLIN LAW GROUP P.A. |
| 4 | 2999 North 44th Street, Suite 520<br>Phoenix, Arizona 85018 |
| 5 | Telephone: (480) 315-9980<br>Facsimile:  (480) 315-9984 |

**ORIGINAL**

6    *Counsel for Plaintiffs*

7                    **ARIZONA SUPERIOR COURT**

8                       **MARICOPA COUNTY**

| | | |
|---|---|---|
| 9<br>10 | ANDERSON PHILLIPS and JASMINE PHILLIPS, husband and wife, | No. CV2016-013572 |
| 11 | Plaintiffs, | |
| 12 | vs. | **SUMMONS** |
| 13 | STATE FARM FIRE AND CASUALTY COMPANY, an Illinois corporation, | If you would like legal advice from a lawyer, Contact the Lawyer Referral Service at |
| 14 | Defendant. | 602-257-4434<br>or |
| 15 | | www.maricopalawyers.org<br>Sponsored by the<br>Maricopa County Bar Association |

16   **TO THE DEFENDANT:**

17          **STATE FARM FIRE AND CASUALTY COMPANY**
18          **c/o Its Statutory Agent, DIRECTOR OF INSURANCE**
             **2910 North 44th Street, 2nd Floor**
19          **Phoenix, Arizona 85018**

20          **YOU ARE HEREBY SUMMONED** and required to appear and defend, within the time applicable, this action in this Court. If served within Arizona, you shall appear
21   and defend within 20 days after the service of the summons and complaint upon you, exclusive of the day of service. If served out of the State of Arizona - whether by direct
22   service, by registered or certified mail, or by publication - you shall appear and defend within 30 days after the service of the Summons and Complaint upon you is complete,
23   exclusive of the day of service.  Where process is served upon the Arizona Director of Insurance as an insurer's attorney to receive service of legal process against it in this
24   state, the insurer shall not be required to appear, answer or plead until expiration of 40 days after date of such service upon the Director.  Service by registered or certified mail
25   without the State of Arizona is complete 30 days after the date of filing the receipt and affidavit of service with the Court.  Service by publication is complete 30 days after the
26   date of first publication.  Direct service is complete when made.  Service upon the Arizona Motor Vehicle Superintendent is complete 30 days after filing the Affidavit of
27   Compliance and return receipt or Officer's Return. **R.C.P. 4; A.R.S. §§ 20-222, 20-403, 28-502, 28-503.**
28

T1476776.DOCX;1

**YOU ARE HEREBY NOTIFIED** that if you fail to appear and defend within the time applicable, judgment by default may be rendered against you for the relief demanded in the complaint.

**YOU ARE CAUTIONED** that in order to appear and defend, you must file an answer or proper response in writing with the Clerk of this Court, accompanied by the necessary filing fee, within the time required, and you are required to serve a copy of any answer or response upon the plaintiffs' attorney. **RCP 10(d); A.R.S. § 12-311; RCP 5.**

The names and addresses of plaintiffs' attorneys are:

Michael N. Poli
Jeff G. Zane
MERLIN LAW GROUP, P.A.
2999 North 44th Street, Suite 520
Phoenix, Arizona 85018

Requests for reasonable accommodation for persons with disabilities must be made to the division assigned to the case by parties at least three (3) judicial days in advance of a scheduled court proceeding. Requests for an interpreter for persons with limited English proficiency must be made to the division assigned to the case by the party needing the interpreter and/or translator or his/her counsel at least ten (10) judicial days in advance of a scheduled court proceeding.

SEALED & DATED: _____ SEP 3 0 2016 _____, 2016.

MICHAEL JEANES, CLERK

By: _____
Deputy Clerk

T. SHEPARDSON



Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
K. Dyer, Deputy
12/9/2016 3:37:00 PM
Filing ID 7939880

STEPTOE & JOHNSON LLP
201 East Washington Street, Suite 1600
Phoenix, Arizona 85004-2382
Telephone: (602) 257-5200
Facsimile:  (602) 257-5299
Court E-Mail: phcourtnotices@steptoe.com
fbienstock@steptoe.com
ebradham@steptoe.com

Floyd P. Bienstock (6299)
Erin E. Bradham (022827)
Attorneys for Defendant State Farm Fire and
    Casualty Company

SUPERIOR COURT OF ARIZONA

MARICOPA COUNTY

| | |
|---|---|
| ANDERSON PHILLIPS and JASMINE PHILLIPS, husband and wife,<br><br>Plaintiffs,<br><br>vs.<br><br>STATE FARM FIRE AND CASUALTY COMPANY, an Illinois corporation,<br><br>Defendant. | No. CV2016-013572<br><br>**DEFENDANT STATE FARM AND CASUALTY COMPANY'S ANSWER TO PLAINTIFFS' COMPLAINT** |

State  Farm  Fire  and  Casualty  Company  ("State  Farm")  for  its  Answer  to
Plaintiffs' Complaint admits, denies, and alleges as follows:

1.      State Farm lacks sufficient information to admit or deny the allegations of
Paragraph 1.

2.      State Farm admits the allegations of Paragraph 2.

3.      State Farm admits the allegations of Paragraph 3.

4.      Responding  to  the  allegations  of  Paragraph  4,  State  Farm  admits  that
jurisdiction and venue are proper in this Court.

5.      State Farm admits that it issued policy no. 03-J4-4660-2 providing certain insurance coverage for personal and real property at 614 West Desert Lane, Phoenix Arizona 85041 ("the Property") subject to the terms, conditions, limitations and exclusions of the Policy, which speaks for itself.

6.      Responding to Paragraph 6, State Farm admits that a fire caused certain damage to the Property on December 6, 2015.  State Farm denies any other allegations of Paragraph 6.

7.      Responding to Paragraph 6, State Farm admits that December 6, 2015 was within the Policy's term.  State Farm denies any other allegations of Paragraph 6.

8.      Responding to Paragraph 7, State Farm admits that the Phillips submitted a claim under the Policy, but denies all other allegations of Paragraph 8.

9.      State Farm admits the allegations of Paragraph 9.

10.      State Farm admits the allegations of Paragraph 10.

11.      State Farm denies the allegations of Paragraph 11.

12.      State Farm denies the allegations of Paragraph 12.

13.      Upon information and belief, State Farm admits the allegations of the first sentence of Paragraph 13.  State Farm lacks information to either admit or deny the second sentence of Paragraph 13.

14.      Responding to the allegations of Paragraph 14, State Farm admits that it received a purported estimate of the costs of repair from Skipton & Associates, Inc. ("Skipton") but denies that the estimate reflected the true and accurate costs of repair.

15.      State Farm admits the allegations of Paragraph 15.

16.      State Farm denies the allegations of Paragraph 16.

17.      State Farm denies the allegations of Paragraph 17.

18.      State Farm denies the allegations of Paragraph 18.

19.      State Farm denies the allegations of Paragraph 19.

20.      State Farm denies the allegations of Paragraph 20.

21.      State Farm denies the allegations of Paragraph 21.

22.     Responding to the allegations of Paragraph 24, State Farm incorporates by reference all previous denials, admissions and allegations contained in its responses to Paragraphs 1-21 of the Complaint, as if set forth completely herein.

23.     Responding to the allegations of Paragraph 23, State Farm admits that it issued the Policy providing certain insurance coverage for personal and real property at the Property subject to the terms, conditions, limitations and exclusions of the Policy, which speaks for itself.  State Farm denies that Paragraph 23 provides a complete and accurate description of the Policy.

24.     Responding to the allegations of Paragraph 24, State Farm incorporates by reference all previous denials, admissions and allegations contained in its responses to Paragraphs 1-24 of the Complaint, as if set forth completely herein.

25.     State Farm admits that the Policy contains an implied covenant of good faith and fair dealing.

26.     State Farm denies the allegations of Paragraph 26.

27.     State Farm denies the allegations of Paragraph 27.

28.     State Farm denies the allegations of Paragraph 28.

29.     State Farm denies the allegations of Paragraph 29.

30.     State Farm denies the allegations of Paragraph 30.

31.     State Farm denies the allegations of Paragraph 31.

32.     Responding to the allegations of Paragraph 32, State Farm incorporates by reference all previous denials, admissions and allegations contained in its responses to Paragraphs 1-31 of the Complaint, as if set forth completely herein.

33.     Paragraph 33 does not contain factual allegations to which a response is required.   To the extent a response is required, State Farm denies that the quoted language in Paragraph 33 contains a complete and accurate summary of relevant law.

34.     State Farm denies that Paragraph 34 is a complete and accurate statement of its obligations to the Phillips.

35.     State Farm denies that Paragraph 35 is a complete and accurate statement of its obligations to the Phillips

36.     State Farm denies the allegations of Paragraph 36.

37.     State Farm denies the allegations of Paragraph 37.

38.     State Farm denies the allegations of Paragraph 38.

39.     State Farm denies the allegations of Paragraph 39.

40.     State Farm denies the allegations of Paragraph 40.

41.     State Farm denies the allegations of Paragraph 41.

42.     State Farm denies the allegations of Paragraph 42.

43.     State Farm denies the allegations of Paragraph 43.

**GENERAL ALLEGATIONS AND AFFIRMATIVE DEFENSES**

44.     State Farm denies each and every allegation contained in the Complaint, and each part or subpart thereof that is not expressly admitted above.

45.     State Farm alleges that the claims against State Farm contained in the Complaint fail to state a claim upon which relief may be granted.

46.     State Farm denies that it breached any legal, equitable, or contractual obligation or duty owed to plaintiffs, and asserts that, at all material times, it acted in good faith, in compliance with Arizona law, according to the terms of the Policy, without malice or intent to mislead or harm plaintiffs or in reckless disregard of plaintiffs' rights.

47.     Plaintiffs' claims are barred, in whole or in part, by failure to comply with requirements and provisions of the Policy, including, but not limited to, the terms of the Policy related to appraisal following a dispute about the amount of a loss.

48.     State Farm denies that it caused plaintiffs to suffer any damages and affirmatively alleges, upon information and belief, that any damages incurred by plaintiffs were proximately caused by the negligence, acts or omissions of plaintiffs and/or others.

49.     Plaintiffs' Complaint does not describe the claims or events with sufficient particularity to allow State Farm to ascertain what other defenses may exist.  State Farm, therefore, reserves its right to assert such defenses as may pertain to the claims and allegations contained in Complaint once the claims and allegations are ascertained.

50.     State Farm is entitled to an award of its reasonable attorneys' fees incurred herein pursuant to A.R.S. § 12-341.01(A), or other law entitling it to attorneys' fees.

WHEREFORE, State Farm respectfully requests judgment in its favor as follows:

A.      That the Complaint be dismissed with prejudice against State Farm and that plaintiff take nothing thereby;

B.      That State Farm be awarded its reasonable attorneys' fees and costs incurred herein; and

C.      That State Farm be awarded such other and further relief as the Court deems just and proper.

DATED this 9th day of December, 2016.

STEPTOE & JOHNSON LLP

By /s/ Erin E. Bradham
Floyd P. Bienstock
Erin E. Bradham
201 East Washington Street, Suite 1600
Phoenix, Arizona 85004-2382

Attorneys for Defendant State Farm Fire and Casualty Company

/ / /

/ / /

/ / /

- 5 -

1
2
3

ELECTRONICALLY FILED this
9th day of December, 2016, with
the Clerk of the Superior Court
and served electronically through
the Court's e-service system on:

4   Michael N. Poli, #006431
    mpoli@merlinlawgroup.com
5   Jeff Zane, #024172
    jzane@merlinlawgroup.com
6   MERLIN LAW GROUP, P.A.
    2999 North 44th Streeet, Suite 520
7   Phoenix, Arizona 85018
    *Attorneys for Plaintiff*
8

9   /s/ Diane Linn
    Employee of Steptoe & Johnson LLP
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



# SUPERIOR COURT OF ARIZONA
# MARICOPA COUNTY

**FILED**
03/08/2017
by Superior Court Admin
on behalf of Clerk of the
Superior Court

03/04/2017

COURT ADMINISTRATION

Ct. Admin
Deputy

**CASE NUMBER:** CV2016-013572

**Anderson Phillips**

**V.**

**State Farm Fire And Casualty Company**

---

The Judge assigned to this action is the Honorable Joshua Rogers

### 150 DAY ORDER

The purpose of this Order is to provide notice regarding the parties' obligations under Rule 16 of the Arizona Rules of Civil Procedure.  Failure to comply with Rule 16 will result in dismissal of this case.

    1.  If this case is <u>not</u> subject to compulsory arbitration, is <u>not</u> a medical malpractice case, and is <u>not</u> otherwise exempt under Rule 16(b)(1), the parties must comply with Rule 16(b) as follows.  The parties must meet and confer regarding the subjects set forth in Rule 16(d) no later than 60 days after any defendant has filed an answer or 180 days after the action commences, whichever is earlier, and must file a Joint Report and Proposed Scheduling Order for the court's approval within 14 days after they confer.  All parties, whether plaintiff or defendant, are jointly responsible for timely filing the Joint Report and Scheduling Order.  Parties should refer to Rule 16(b)(3) for what must be in the Joint Report and Scheduling Order.

    2.  If this case <u>is</u> a medical malpractice case, either a stipulated Scheduling Order must be filed or a Comprehensive Pretrial Conference must be scheduled.  See Rule 16(e).

    3.  If this case <u>is</u> subject to compulsory arbitration under Rule 72, a Joint Report and Proposed Scheduling Order are not required.

An extension of any deadline must be requested by filing a motion in sufficient time so that the court may consider the request and issue a ruling before the deadline.  Issuance of this order does not prevent dismissal for lack of service under Rule 4(i).

All documents required to be filed with the court should be electronically filed through Arizona Turbo Court at www.azturbocourt.gov.

# Superior Court of Maricopa County - integrated Court Information System
## Endorsee Party Listing
Case Number:  CV2016-013572

| Party Name | Attorney Name | |
| --- | --- | --- |
| State Farm Fire And Casualty Company | Erin E Bradham | Bar ID:  022827 |
| Anderson Phillips | Jeffrey Gregory Zane | Bar ID:  024172 |
| Jasmine Phillips | Jeffrey Gregory Zane | Bar ID:  024172 |


Office Distribution

# SUPERIOR COURT OF ARIZONA
# MARICOPA COUNTY

**FILED**
07/05/2017
by Superior Court Admin
on behalf of Clerk of the
Superior Court

Ct. Admin
Deputy

07/01/2017

### COURT ADMINISTRATION

**Case Number:** CV2016-013572

**Anderson Phillips**

**V.**

**State Farm Fire And Casualty Company**

The Judge assigned to this action is the Honorable Sherry K. Stephens

### NOTICE OF PLACEMENT ON THE DISMISSAL CALENDAR

Pursuant to Rule 38.1(d) of the Arizona Rules of Civil Procedure, the parties and counsel are notified that this case is being placed on the dismissal calendar on 7/5/17. This case will be dismissed **without further notice on** 09/05/2017 unless one of the following actions occurs prior to the date of dismissal:

1. A Joint Report and Proposed Scheduling order is filed;
2. A Comprehensive Pretrial Conference is set;
3. A final judgment, notice of decision, arbitration award, or dismissal is entered; or
4. A motion to continue on the dismissal calendar demonstrating good cause is filed and granted prior to the dismissal date.

See Rule 38.1(d)(2).

IT IS ORDERED placing this case on the dismissal calendar.

All documents required to be filed with the court should be electronically filed through Arizona Turbo Court at: www.azturbocourt.gov.

# Superior Court of Maricopa County - integrated Court Information System
## Endorsee Party Listing
Case Number: CV2016-013572

| Party Name | Attorney Name | |
|---|---|---|
| State Farm Fire And Casualty Company | Erin E Bradham | Bar ID: 022827 |
| Anderson Phillips | Jeffrey Gregory Zane | Bar ID: 024172 |
| Jasmine Phillips | Jeffrey Gregory Zane | Bar ID: 024172 |

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
M. Araiza, Deputy
7/26/2017 8:54:00 AM
Filing ID 8525878

MERLIN LAW GROUP, P.A.
Michael N. Poli (State Bar No. 006431)
mpoli@merlinlawgroup.com
Jeffrey G. Zane (State Bar No. 024172)
jzane@merlinlawgroup.com
2999 North 44th Street, Suite 520
Phoenix, Arizona 85018
Telephone: (480) 315-9980
*Attorneys for Plaintiffs*

## ARIZONA SUPERIOR COURT

## MARICOPA COUNTY

| | |
|---|---|
| ANDERSON PHILLIPS and JASMINE PHILLIPS, husband and wife,<br><br>        Plaintiffs,<br><br>     v.<br><br>STATE FARM FIRE AND CASUALTY COMPANY, an Illinois corporation,<br><br>        Defendant. | Case No.: CV2016-013572<br><br>**JOINT REPORT**<br><br>(Standard Case)<br><br>(Assigned to Hon. Sherry Stephens) |

The parties signing below certify that they have conferred about the matters set forth in Rule 16(d) and that this case is not subject to the mandatory arbitration provisions of Rule 72.  The parties are submitting a Proposed Scheduling Order with this Joint Report.  Each date in the Joint Report and in the Proposed Scheduling Order includes a calendar month, day, and year.

1.    ***Brief description of the case:***  This is a breach of contract and insurance bad faith case.  Plaintiffs, Anderson Phillips and Jasmine Phillips ("Plaintiffs") allege that Defendant, State Farm Fire and Casualty Company ("State Farm"), failed to pay Plaintiffs the full amount due and owing to them to repair their residence after significant fire damage.  State Farm denies any wrongdoing, claiming that Plaintiff's estimate for the cost of repair is higher than what State Farm estimates the cost of repair to be, and denies any liability or obligation to pay Plaintiff's estimation for the cost of repair.

***Current case status:*** Every defendant has been served or dismissed. [ X ] yes  [ ] no

2. ***Amendments:*** A party anticipates filing an amendment to a pleading that will add a new party to the case: [ ] yes  [ X ] no

3. ***Special Case Management:*** At this time, the parties are not aware of any special case management procedures that are appropriate for this case.

4. ***Settlement:*** The parties agree to engage in settlement discussions with [ ] a settlement judge assigned by the court, or [ X ] a private mediator.

5. ***Readiness:*** This case will be ready for trial by <u>September 10, 2018</u>.

6. ***Jury:*** A jury trial is demanded. [ X ] yes [ ] no

7. ***Length of Trial:*** The estimated length of trial is <u>3</u> days.

8. ***Summary Jury:*** The parties agree to a summary jury trial. [ ] yes [ X ] no

9. ***Preference:*** This case is not entitled to a preference for trial.

10. ***Special Requirements:*** At this time, the parties are not aware of any special requirements for a pretrial conference or at trial.

11. ***Scheduling Conference:*** The parties request a Rule 16(d) scheduling conference. [ ] yes [X] no

12. ***Other matters:*** At this time, there are no other matters that the parties wish to bring to the court's attention that may affect management of this case.

13. ***Items upon which the parties do not agree:***  None.

Undersigned counsel for Plaintiffs hereby certifies that counsel for the Defendant reviewed this Joint Report and its associated Proposed Scheduling Order, approved them and authorized Plaintiffs' counsel to file them.

DATED this 26th day of July, 2017.

MERLIN LAW GROUP, P.A.


/s/ Jeffrey G. Zane
Michael N. Poli
Jeffrey G. Zane
Counsel for Plaintiff

STEPTOE & JOHNSON, LLP

/s/ Erin Bradham
Floyd P. Bienstock
Erin Bradham
Counsel for State Farm Fire &
Casualty Company

Original of the foregoing e-filed
with a copy automatically routed to:
Honorable Sherry Stephens.

Copy of the foregoing mailed
this 26th day of July 2017, to:

Floyd P. Bienstock
Erin Bradham
STEPTOE & JOHNSON, LLP
201 East Washington Street, Suite 1600
Phoenix, Arizona 85004
Attorneys for Defendant State Farm Fire
and Casualty

  /s/ Linda Gundelach

3

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
T. DeRaddo, Deputy
8/1/2017 8:00:00 AM
Filing ID 8536840

MERLIN LAW GROUP, P.A.
Michael N. Poli (State Bar No. 006431)
mpoli@merlinlawgroup.com
Jeffrey G. Zane (State Bar No. 024172)
jzane@merlinlawgroup.com
2999 North 44th Street, Suite 520
Phoenix, Arizona 85018
Telephone: (480) 315-9980
*Attorneys for Plaintiffs*

## ARIZONA SUPERIOR COURT

## MARICOPA COUNTY

| | |
|---|---|
| ANDERSON PHILLIPS and JASMINE PHILLIPS, husband and wife,<br><br>     Plaintiffs,<br><br>v.<br><br>STATE FARM FIRE AND CASUALTY COMPANY, an Illinois corporation,<br><br>     Defendant. | Case No.: CV2016-013572<br><br>**SCHEDULING ORDER**<br><br>(Assigned to Hon. Sherry Stephens) |

Upon consideration of the parties' Joint Report, the court orders as follows:

1. ***Initial disclosure:*** The parties will exchange their initial disclosure statements no later than **August 21, 2017**.

2. ***Expert witness disclosure:*** The parties shall simultaneously disclose areas of expert testimony by **January 15, 2018**.

    Plaintiffs shall disclose the identity and opinions of experts by **April 6, 2018.**

    Defendants shall disclose the identity and opinions of experts by **May 18, 2018.**

    The plaintiffs shall disclose their rebuttal expert opinions by **June 15, 2018.**

All parties may disclose expert testimony regarding any subject area of expert testimony that has been properly disclosed by any other party.

**3.  *Lay (non-expert) witness disclosure:*** Each party shall disclose all lay witnesses by **March 4, 2018.**

**4.  *Final supplemental disclosure:*** Each party shall provide final supplemental disclosures by **July 13, 2018**.  This order does not replace the parties' obligation to seasonably disclose Rule 26.1 information on an on-going basis and as it becomes available.

**5.  *Discovery deadlines:*** The parties will serve all written discovery pursuant to Rules 33 through 36 by **March 4, 2018**.  The parties will complete the depositions of parties and lay witnesses by **April 6, 2018** and will complete depositions of expert witnesses by **July 27, 2018**.  The parties will complete all other discovery by **July 27, 2018**. ("Complete discovery" includes conclusion of all depositions and submission of full and final responses to written discovery.)

**6.  *Settlement conference or private mediation:***

[ ]  **Referral to ADR for a settlement conference:**  The clerk or the court will issue a referral to ADR by a separate minute entry.

[ X ]      **Private mediation:** The parties shall participate in mediation using a private mediator agreed to by the parties.  The parties shall complete the mediation by **March 2, 2018.**

All attorneys and their clients, all self-represented parties, and any non-attorney representatives who have full and complete authority to settle this case shall personally appear and participate in good faith in this mediation, even if no settlement is

expected. However, if a non-attorney representative requests a telephonic appearance and the mediator grants the request prior to the mediation date, a non-attorney representative may appear telephonically.

[ ] **No settlement conference or mediation:** A settlement conference or private mediation is not ordered.

7. ***Dispositive motions:*** The parties shall file all dispositive motions by **August 24, 2018.**

8. ***Trial setting conference:*** On **March 15, 2018 @ 8:45 a.m.**, the court will conduct a telephonic trial setting conference. Attorneys and self-represented parties shall have their calendars available for the conference. [x] Plaintiff [ ] Defendant will initiate the conference call by arranging for the presence of all other counsel and self-represented parties, and by calling this division at **602-506-4818** at the scheduled time.

9. ***Firm dates:*** No stipulation of the parties that alters a filing deadline or a hear date contained in this scheduling order will be effective without an order of this court approving the stipulation. Dates set forth in this order that govern court filings or hearings are firm dates, and may be modified only with this court's consent and for good cause. This court ordinarily will not consider a lack of preparation as good cause.

10. ***Further orders:*** The court further orders as follows:

_____          _____
Date                                                    Honorable Sherry Stephens
                                                           JUDGE OF THE SUPERIOR COURT

Filing ID: 8536840   Case Number: CV2016-013572
Original Filing ID: 8525878

_____

**Granted with Modifications**



/S/ Sherry Stephens Date: 7/31/2017
_____
Judicial Officer of Superior Court

# ENDORSEMENT PAGE

CASE NUMBER: CV2016-013572                SIGNATURE DATE: 7/31/2017

E-FILING ID #: 8536840                          FILED DATE: 8/1/2017 8:00:00 AM


ERIN E BRADHAM



JEFFREY GREGORY ZANE

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
S. Hughes, Deputy
2/23/2018 11:38:00 AM
Filing ID 9111972

Michael N. Poli (State Bar No. 006431)
MPoli@merlinlawgroup.com
Jeffrey G. Zane (State Bar No. 024172)
jzane@merlinlawgroup.com
MERLIN LAW GROUP, P.A.
2999 North 44th Street, Suite 520
Phoenix, Arizona 85018
Telephone: (480) 315-9980
Facsimile: (480) 315-9984

Stephen E. Silverman (No. 016757)
STEPHEN SILVERMAN LAW
steve@stephensilverman.com
6945 E. Sahuaro Dr., Ste. 125
Scottsdale, AZ 85254
Telephone: (480) 747-0850
Facsimile: (480) 400-1065

*Attorneys for Plaintiffs*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| ANDERSON PHILLIPS and JASMINE PHILLIPS, a married couple, | Case No.: CV2016-013572 |
| Plaintiffs, | |
| v. | **MOTION FOR LEAVE TO FILE AMENDED COMPLAINT** |
| STATE FARM FIRE AND CASUALTY COMPANY, an Illinois corporation, | (Assigned to Hon. Sherry K. Stephens) |
| Defendant. | |

Plaintiffs request leave to file their First Amended Complaint. This request is made under Arizona Rule of Civil Procedure 15(a)(2)("[l]eave to amend must be freely given when justice requires"). The proposed amended complaint adds a cause of action – consumer fraud – that

T1872599.DOCX;1

"arouse out of the conduct, transaction, or occurrence set forth … in the original pleading." Ariz.R.Civ. P. 15(c)(1).

Plaintiffs allege that State Farm breached the insurance policy, and breached the covenant of good faith and fair dealing, in connection with their claim for fire damage to their home and contents.   Plaintiffs' cause of action for breach of the covenant of good faith and fair dealing is, in part, based on State Farm's practice of secretly manipulating an estimating software program – Xactimate – to arbitrarily reduce the amount it pays on structure damage claims.  This conduct also violates the Arizona Consumer Fraud Statute.  *Schmidt v. American Leasco*, 139 Ariz. 509, 511-12 (App. 1983) (consumer fraud statute violated by the use or employment of deception, deceptive acts and practices, fraud, false pretenses, misrepresentations, concealments, suppression and omission of material facts in connection with providing goods or services).

Because the new cause of action arises of the same facts as the cause of action for breach of the covenant of good faith and fair dealing, the amendment is proper and the cause of action relates back to the original filing of the Complaint.   *Marshall v. Superior Court*, 131 Ariz. 379, 383 (1982).

A proposed amended complaint is attached as Exhibit 1.


DATED this 23rd day of February, 2018.



**STEPHEN SILVEMRAN LAW**

_____
Stephen Silverman
6945 E. Sahuaro Dr.
Scottsdale, AZ 85254
*Attorney for Plaintiffs*

2

COPY of the foregoing mailed
this 23rd day of February, 2018, to:

Karl M. Tilleman
Erin E. Bradham
STEPTOE & JOHNSON LLP
201 East Washington Street, Suite 1600
Phoenix, Arizona 85004-2382
*Attorneys for Defendant State Farm*
*Fire and Casualty Company*

Michael N. Poli, Esq.
Jeffrey G. Zane, Esq.
MERLIN LAW GROUP, P.A.
2999 N. 44TH Street, Ste. 520
Phoenix, AZ 85018
*Co-counsel for Plaintiffs*

_____

3

# Exhibit 1

1   Michael N. Poli (State Bar No. 006431)
    mpoli@merlinlawgroup.com
2   Jeff G. Zane (State Bar No. 024172)
    jzane@merlinlawgroup.com
3   MERLIN LAW GROUP P.A.
    2999 North 44th Street, Suite 520
4   Phoenix, Arizona 85018
    Telephone:  (480) 315-9980
5   Facsimile:  (480) 315-9984

6   Stephen E. Silverman (No. 016757)
7   STEPHEN SILVERMAN LAW
    steve@stephensilverman.com
8   6945 E. Sahuaro Dr., Ste. 125
9   Scottsdale, AZ 85254
    Telephone: (480) 747-0850
10  Facsimile: (480) 400-1065

11

12  *Counsel for Plaintiffs*

                    **ARIZONA SUPERIOR COURT**
13
                      **MARICOPA COUNTY**
14
    ANDERSON PHILLIPS and JASMINE
15  PHILLIPS, husband and wife,
                                          No. CV2016-013572
16              Plaintiffs,

17          vs.                           **[proposed]  FIRST  AMENDED
                                          COMPLAINT**
18  STATE FARM FIRE AND CASUALTY
    COMPANY, an Illinois corporation,
19
                Defendant.
20

21
         Plaintiffs Anderson and Jasmine Phillips (the "Phillips") hereby allege as follows
22
    against Defendant State Farm Fire and Casualty Company ("State Farm").
23
                   **JURISDICTION AND VENUE ALLEGATIONS**
24
         1.    Anderson Phillips and Jasmine Phillips are a married couple who reside in
25
    Maricopa County, Arizona.
26
         2.    Defendant State Farm is an Illinois corporation engaged in the business of
27
    insurance in Maricopa County, Arizona.
28

    T1476574.DOCX;1

---

Steve Silverman 2/23/2018 11:00 AM
**Formatted:** Line spacing:  single

Steve Silverman 2/23/2018 11:00 AM
*Deleted:* _ _ _

3.     The property insurance agreement that is the subject of this action was sold to the Phillips in Maricopa County, Arizona, by Defendant State Farm.

4.     This Court has jurisdiction over the subject matter of this action and the parties to this action.   The amount of damages sought by the Plaintiffs exceeds the minimum jurisdictional amount established for filing in this Court.  Venue is proper in this Court.

## FACTUAL ALLEGATIONS

5.     At all relevant times hereto, the Phillips resided at 614 West Desert Lane, Phoenix Arizona, 85041 (the "Residence").  The Residence and its contents were insured by State Farm under an insurance policy issued by State Farm and assigned the policy number 03-J4-4660-2 (the "Policy").

6.     On or about December 6, 2016, a fire occurred within the Residence, causing significant damage to the Residence and to the Phillips' personal property that was in the Residence at the time (collectively, the "Loss")

7.     At the time of the fire, the Policy was in full force and effect.

8.     The Phillips timely submitted a claim to State Farm regarding the Loss (collectively, the "Claim") and they performed all of their obligations and responsibilities under the Policy with respect to the Claim.

9.     State Farm assigned the Phillips' Claim the number 03-43H7-730.

10.     On December 14, 2016, State Farm inspected the Residence and the Phillips' personal property.

11.     The Phillips have timely responded to all reasonable inquiries and requests from State Farm and State Farm's agents regarding the Claim.

12.     The Phillips have also taken timely action to respond to all inquiries and requests from State Farm.

13.     The Phillips also retained the services of a public adjuster, Skipton & Associates, Inc. ("SAI").  SAI inspected the Property on December 28, 2015.

T1476574.DOCX;1                                         2

14.     On or about January 8, 2016, SAI submitted a scope of loss reflecting the cost to repair the Residence pursuant to the Policy, which is $203,114.69 (RCV).

15.     On or about January 22, 2016, State Farm conveyed its own estimate of repair costs, which was $153,759.64 (RCV).

16.     State Farm refuses to make payment of the full amount due and owing for the Phillips' insurance claim in bad faith.

17.     State Farm knows or should know that its failure to provide full payment to the Phillips for the Loss is not justified in light of the obvious damage to the Residence as a result of the fire.

18.     State Farm knows, or should know, that its unreasonable, incomplete and incompetent evaluation of the Loss is a breach of the duty and obligation of good faith and fair dealing owed to the Phillips under the Policy.

19.     State Farm's conduct complained of herein was, and continues to be, intentional, willful and wanton, and/or taken in conscious and deliberate disregard of the Plaintiff's rights, thus justifying the imposition of punitive damages.

20.     With respect to the events giving rise to this lawsuit, at various times and in various ways, State Farm acted through other agents and employees.

21.     State Farm' conduct complained of herein was intentional, willful and wanton, and/or taken in conscious and deliberate disregard of the Phillips' rights, thus justifying the imposition of punitive damages.

**Count 1 - Breach of Insurance Contract; Implied Duty of
Good Faith and Fair Dealing**

22.     The foregoing allegations are hereby incorporated by reference.

23.     State Farm agreed to provide property insurance coverage for the Phillips.

24.     State Farm was paid premiums in exchange for its indemnity obligations to the Phillips.

25.     The Policy, like all contracts within the State of Arizona, contains an

T1476574.DOCX;1

3

implied covenant of good faith and fair dealing.

26.    The Phillips fulfilled all of their obligations under the Policy.

27.    State Farm failed to perform its obligations pursuant to the Policy.

28.    By wrongfully failing to process the claim in good faith and pay the Claim in full, State Farm breached the Policy, including the implied covenant of good faith and fair dealing in that agreement, thereby depriving the Phillips of the benefits they were to have received under the contract.

29.    State Farm failed to handle the Phillips' Claim in a reasonable manner and has failed to make payments owed under the Policy.

30.    As a direct and proximate result of State Farm's breach of contract and breach of the implied covenant of good faith and fair dealing, the Phillips have sustained reasonably foreseeable damages, and continue to sustain such damages, in an amount to be proven at trial.

31.    The Phillips are entitled to an award of attorneys' fees under A.R.S. § 12-341.01.

WHEREFORE, on this claim, the Phillips request judgment against State Farm, as follows:

A.    For compensatory damages in a just and reasonable amount (including both contractual damages and extra-contractual or consequential damages);

B.    For attorneys' fees and costs, and in the event of a default judgment, for attorneys' fees in the amount of $4,500.00;

C.    For pre- and post-judgment interest;

D.    For taxable costs pursuant to A.R.S. §12-341; and

E.    For such other relief as the Court deems just and proper.

**Count 2 – Tortious Bad Faith Claims Handling**

32.    The foregoing allegations are hereby incorporated by reference.

33.    In Arizona, "the tort of bad faith arises when the insurer 'intentionally

denies, fails to process of pay a claim without a reasonable basis.'" *Zilisch v. State Farm Mutual Auto. Ins. Co.*, 196 Ariz. 234, ¶20 995 P.2d 276, 279 (2000) )(quoting *Noble v. National Am. Life Ins. Co.*, 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981)). "An insurance contract is not an ordinary commercial bargain; 'implicit in the contract and the relationship is the insurer's obligation to play fairly with its insured.'" *Id.* (quoting *Rawlings v. Apodaca*, 151 Ariz. 149, 154, 726 P.2d 565, 570 (1986)). "The insurer has 'some duties of a fiduciary nature,' including '[e]qual consideration, fairness and honesty.'" *Id.* (quoting *Rawlings*, 151 Ariz. at 155, 726 P.2d at 571). "[T]he insurer's eventual performance of the express covenant — by paying the claim — does not release it from liability for 'bad faith.'" *Id.* (citing *Rawlings*, 151 Ariz. at 156, 726 P.2d at 572). "Thus, if an insurer acts unreasonably in the manner in which it processes a claim, it will be held liable for bad faith 'without regard to its ultimate merits.'" *Id.* (quoting *Deese v. State Farm Mutual Auto. Ins. Co.*, 172 Ariz. 504, 508, 838 P.2d 1265, 1270 (1992)). "The carrier has an obligation to immediately conduct an adequate investigation, act reasonably in evaluating the claim and act promptly in paying a legitimate claim." *Id.* at ¶ 21.

34.    State Farm owed and continues to owe the Phillips a duty of good faith and fair dealing.

35.    Pursuant to the terms of the Policy, State Farm is obligated to pay the Phillips for the Losses associated with and arising from the fire.

36.    Without any reasonable justification for doing so, State Farm has failed to make payments to the Phillips for the full amount due under the Policy for the loss sustained as a result of the fire.

37.    State Farm has breached its contractual obligation to Phillips and State Farm has refused to perform its duty to cooperate with the Phillips to, *inter alia*, adjust and negotiate the insurance claim fairly and in good faith.

38.    As described herein, State Farm breached its contractual and quasi-

fiduciary obligations to the Phillips.

39.    Upon information and belief, State Farms' conduct has been self-serving and a ploy to protect State Farm's own financial interests, at the expense of the Phillips' rights.

40.    Also upon information and belief, State Farm has consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others. Furthermore, State Farm acted to serve their own interests, rather than the interests of Phillips.  Thus, Phillips are entitled to an appropriate award of punitive damages.

41.    State Farm committed the above acts and omissions intentionally, maliciously, and fraudulently, and acted to further their own economic interests, at Phillips' expense.

42.    As a result of State Farm's unjustified failure to pay for the Loss, in full, the Phillips have suffered and continue to suffer significant consequential losses, including but not limited to, expense and losses arising from items that should have been paid for or covered by the Policies.

## Count 3 – Consumer Fraud

43.    The foregoing allegations are hereby incorporated by reference.

44.    State Farm engaged in the act, use and employment of deception, deceptive acts and practices, fraud, false pretenses, false promises, misrepresentations, concealments, suppression and/or omission of material facts in connection with the sale of goods and services.

45.    State Farm's actions and omissions were made with the intent that others rely upon them.

46.    State Farm represents to its policyholders that it uses the Xactimate software program to "provide [its policyholders] with a detailed estimate of the scope of damages and the costs of repairs."

47.    State Farm does not disclose to its policyholders that it changes the

Steve Silverman 2/23/2018 11:00 AM
**Formatted:** Centered,  No bullets or numbering

Steve Silverman 2/23/2018 11:01 AM
***Deleted:***  .

Steve Silverman 2/23/2018 11:01 AM
**Formatted:** Font:Bold, Underline

T1476574.DOCX;1                                6

Xactimate program, which uses reconstruction costs as its default setting, to new construction costs, which are lower.

48.    State Farm arbitrarily reduces the amount of each Xactimate estimate produced using new construction costs by arbitrarily reducing labor costs.

49.    State Farm's actions misled and deceived Plaintiffs and its other policyholders who received an actual cash value payment for structure damage based on estimates produced by State Farm on the Xactimate software program using new construction labor costs instead of reconstruction costs, and doing so without notice to its policyholders.

50.    WHEREFORE, on this claim, the Phillips request judgment against State Farm, as follows:

A.    For compensatory damages in a just and reasonable amount (including both contractual damages and extra-contractual or consequential damages);

B.    For punitive or exemplary damages in a just and reasonable amount;

C.    For attorneys' fees and costs, and in the event of a default judgment, for attorneys' fees in the amount of $4,500.00;

D.    For pre- and post-judgment interest;

E.    For taxable costs pursuant to A.R.S. §12-341; and

F.    For such other relief as the Court deems just and proper.

DATED this ____ day _____.

MERLIN LAW GROUP, P.A.

By_____
      Michael N. Poli
      Jeff Zane
      2999 North 44th Street, Suite 520
      Phoenix, Arizona 85018
      *Counsel for Plaintiffs*

Steve Silverman 2/23/2018 11:18 AM
**Deleted:** 30th

Steve Silverman 2/23/2018 11:18 AM
**Deleted:** of September, 2016

T1476574.DOCX;1                                    7

1    STEPHEN SILVEMRAN LAW

2

3

4    Stephen Silverman
     6945 E. Sahuaro Dr.
5    Scottsdale, AZ 85254
     *Co-counsel for Plaintiffs*

6    COPY of the foregoing mailed
     this ____ day of _____ 2018, to:
7
     Karl M. Tilleman
8    Erin E. Bradham
     STEPTOE & JOHNSON LLP
9    201 East Washington Street, Suite 1600
     Phoenix, Arizona 85004-2382
10   Attorneys for Defendant State Farm
     Fire and Casualty Company
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

T1476574.DOCX;1                              8

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
M. De La Cruz, Deputy
2/23/2018 11:30:00 AM
Filing ID 9111925

Michael N. Poli (State Bar No. 006431)
MPoli@merlinlawgroup.com
Jeffrey G. Zane (State Bar No. 024172)
jzane@merlinlawgroup.com
MERLIN LAW GROUP, P.A.
2999 North 44th Street, Suite 520
Phoenix, Arizona 85018
Telephone: (480) 315-9980
Facsimile: (480) 315-9984

Stephen E. Silverman (No. 016757)
STEPHEN SILVERMAN LAW
steve@stephensilverman.com
6945 E. Sahuaro Dr., Ste. 125
Scottsdale, AZ 85254
Telephone: (480) 747-0850
Facsimile: (480) 400-1065

*Attorneys for Plaintiffs*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| ANDERSON PHILLIPS and JASMINE PHILLIPS, a married couple, | Case No.: CV2016-015809 |
| Plaintiffs, | |
| v. | **NOTICE OF APPEARANCE** |
| STATE FARM FIRE AND CASUALTY COMPANY, an Illinois corporation, | (Assigned to Hon. Sherry K. Stephens) |
| Defendant. | |

Undersigned counsel gives notice that he is associating as co-counsel for Plaintiffs with the Merlin Law Group.  Undersigned counsel's address is 6945 E. Sahuaro Dr., Ste. 125, Scottsdale, Arizona 85254, and his contact information is: Telephone (480) 747-0850; Facsimile (480) 400-1065; email steve@stephensilverman.com.

1

T1872599.DOCX;1

DATED this 23rd day of February, 2018.

**STEPHEN SILVEMRAN LAW**

Stephen Silverman
6945 E. Sahuaro Dr.
Scottsdale, AZ 85254
*Attorney for Plaintiffs*

ORIGINAL and ONE COPY
of the foregoing mailed
this 23rd day of February, 2018, to:

Karl M. Tilleman
Erin E. Bradham
STEPTOE & JOHNSON LLP
201 East Washington Street, Suite 1600
Phoenix, Arizona 85004-2382
*Attorneys for Defendant State Farm*
*Fire and Casualty Company*

Michael N. Poli, Esq.
Jeffrey G. Zane, Esq.
MERLIN LAW GROUP, P.A.
2999 N. 44TH Street, Ste. 520
Phoenix, AZ 85018
*Co-counsel for Plaintiffs*

T1872599.DOCX;1

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
M. Araiza, Deputy
2/23/2018 11:41:00 AM
Filing ID 9111997

Michael N. Poli (State Bar No. 006431)
MPoli@merlinlawgroup.com
Jeffrey G. Zane (State Bar No. 024172)
jzane@merlinlawgroup.com
MERLIN LAW GROUP, P.A.
2999 North 44th Street, Suite 520
Phoenix, Arizona 85018
Telephone: (480) 315-9980
Facsimile: (480) 315-9984

Stephen E. Silverman (No. 016757)
STEPHEN SILVERMAN LAW
steve@stephensilverman.com
6945 E. Sahuaro Dr., Ste. 125
Scottsdale, AZ 85254
Telephone: (480) 747-0850
Facsimile: (480) 400-1065

*Attorneys for Plaintiffs*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| ANDERSON PHILLIPS and JASMINE PHILLIPS, a married couple,<br><br>      Plaintiffs,<br><br>      v.<br><br>STATE FARM FIRE AND CASUALTY COMPANY, an Illinois corporation,<br><br>      Defendant. | Case No.: CV2016-013572<br><br>**NOTICE OF APPEARANCE**<br><br>(Assigned to Hon. Sherry K. Stephens) |

Undersigned counsel gives notice that he is associating as co-counsel for Plaintiffs with the Merlin Law Group.   Undersigned counsel's address is 6945 E. Sahuaro Dr., Ste. 125, Scottsdale, Arizona 85254, and his contact information is: Telephone (480) 747-0850; Facsimile (480) 400-1065; email steve@stephensilverman.com.

1

T1872599.DOCX;1

DATED this 23rd day of February, 2018.

**STEPHEN SILVEMRAN LAW**

_____

Stephen Silverman
6945 E. Sahuaro Dr.
Scottsdale, AZ 85254
*Attorney for Plaintiffs*

ORIGINAL and ONE COPY
of the foregoing mailed
this 23rd day of February, 2018, to:

Karl M. Tilleman
Erin E. Bradham
STEPTOE & JOHNSON LLP
201 East Washington Street, Suite 1600
Phoenix, Arizona 85004-2382
*Attorneys for Defendant State Farm*
*Fire and Casualty Company*

Michael N. Poli, Esq.
Jeffrey G. Zane, Esq.
MERLIN LAW GROUP, P.A.
2999 N. 44TH Street, Ste. 520
Phoenix, AZ 85018
*Co-counsel for Plaintiffs*

2

T1872599.DOCX;1

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
M. Cain, Deputy
3/1/2018 4:42:00 PM
Filing ID 9131012

1  STEPTOE & JOHNSON LLP
2  201 East Washington Street, Suite 1600
   Phoenix, Arizona 85004-2382
3  Telephone: (602) 257-5200
   Facsimile:  (602) 257-5299
4  Court Email: phcourtnotices@steptoe.com
   fbienstock@steptoe.com
5  ebradham@steptoe.com

6  Floyd P. Bienstock (006299)
   Erin E. Bradham (022827)

7  Attorneys for Defendant
8  State Farm Fire and Casualty Company

9             SUPERIOR COURT OF ARIZONA

10               IN MARICOPA COUNTY

11 Anderson Phillips and Jasmine Phillips,      No. CV2016-013572
   husband and wife,
12                                              **STIPULATION TO EXTEND**
                    Plaintiffs,                 **DEADLINES**
13
       vs.                                      (Assigned to the Honorable
14                                                Sherry Stephens)
   State Farm Fire and Casualty Company,
15 an Illinois corporation,

16                  Defendant.

17

18        The parties stipulate and agree to extend the following deadlines established in

19 this Court's August 1, 2017 Scheduling Order from March 4, 2018 to April 6, 2018: (1)

20 the deadline for each party to disclose all lay witnesses; and (2) the deadline to serve all

21 written discovery pursuant to Rules 33 through 36.  In addition, the parties stipulate to

22 extend the deadline for deposition lay witnesses from April 6, 2018 to April 30, 2018.

23 Finally, the parties ask that the trial setting conference currently set for March 15, 2018

24 be rescheduled either to after the parties' deadline to submit August 24, 2018 dispositive

25 motions or, if the Court prefers, after the proposed April 30, 2018 deadline for

26 completing lay depositions.

27        The parties participated in a mediation with mediator Larry Fleischman on

28 February 28, 2018. That mediation was unsuccessful but the parties continue to discuss

possible resolution, and may schedule a second mediation before Judge Fleischman on April 5, 2018. The requested extension would allow the parties to continue to pursue possible resolution of this case while providing an additional period to comply with the deadlines listed above. This stipulation will not change any other deadlines.

DATED this 1st day of March, 2018.

STEPTOE & JOHNSON LLP

/s/ Erin. E. Bradham
Floyd P. Bienstock
Erin E. Bradham
201 East Washington Street, Suite 1600
Phoenix, Arizona 85004-2382

Attorneys for Defendant State Farm Fire and Casualty Company

MERLIN LAW GROUP P.A.

/s/Michael N. Poli (with permission)
Michael N. Poli
Jeffrey G. Zane
2999 North 44th Street, Suite 520
Phoenix, Arizona 85018

Attorneys for Plaintiffs

COPY of the foregoing served by AZTurboCourt
this 1st day of March, 2018, on the following:

Michael N. Poli
Jeffrey G. Zane
2999 North 44th Street, Suite 520
Phoenix, Arizona 85018
*Attorneys for Plaintiffs*

/s/ Jackquelynne S. Davis
Employee of Steptoe & Johnson LLP

- 2 -

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
T. DeRaddo, Deputy
3/7/2018 8:00:00 AM
Filing ID 9139934

SUPERIOR COURT OF ARIZONA

IN MARICOPA COUNTY

| | |
|---|---|
| Anderson Phillips and Jasmine Phillips, husband and wife,<br><br>Plaintiffs,<br><br>vs.<br><br>State Farm Fire and Casualty Company, an Illinois corporation,<br><br>Defendant. | No. CV2016-013572<br><br>**ORDER TO EXTEND DEADLINES**<br><br>(Assigned to the Honorable Sherry Stephens) |

The Court, having considered the Stipulation to Extend Deadlines of the parties and good cause appearing therefor,

IT IS HEREBY ORDERED that the following deadlines are extended from March 4, 2018 to April 6, 2018: (1) the deadline for each party to disclose all lay witnesses; and (2) the deadline to serve all written discovery pursuant to Rules 33 through 36.

IT IS HERBY ORDERED that the deadline for completing depositions of lay witnesses is extended from April 6, 2018 to April 30, 2018.

IT IS HEREBY ORDERED THAT the trial setting conference is rescheduled to the following date and time to **April 16, 2018 at 8:30 a.m.** and vacating trial setting conference on March 15, 2018.

1    Dated: This _____ day of _____, 2018.

2

3                                              _____

4                                              Honorable Sherry Stephens

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# eSignature Page 1 of 1

Filing ID: 9139934   Case Number: CV2016-013572
Original Filing ID: 9131012

---

**Granted with Modifications**



/S/ Sherry Stephens Date: 3/6/2018
_____
Judicial Officer of Superior Court

# ENDORSEMENT PAGE

CASE NUMBER: CV2016-013572        SIGNATURE DATE: 3/6/2018

E-FILING ID #: 9139934        FILED DATE: 3/7/2018 8:00:00 AM


ERIN E BRADHAM



JEFFREY GREGORY ZANE

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
M. King, Deputy
3/14/2018 4:31:00 PM
Filing ID 9168913

1   STEPTOE & JOHNSON LLP
    201 East Washington Street, Suite 1600
2   Phoenix, Arizona 85004-2382
    Telephone: (602) 257-5200
3   Facsimile:  (602) 257-5299
    Court E-Mail: phcourtnotices@steptoe.com
4   fbienstock@steptoe.com
    ebradham@steptoe.com
5

6   Floyd P. Bienstock (6299)
    Erin E. Bradham (022827)
7   Attorneys for Defendant State Farm Fire and
       Casualty Company
8

9                   SUPERIOR COURT OF ARIZONA

10                        MARICOPA COUNTY

11   ANDERSON PHILLIPS and JASMINE
     PHILLIPS, husband and wife,              No. CV2016-013572
12
                      Plaintiffs,             **RESPONSE TO PLAINTIFFS'**
13                                            **MOTION FOR LEAVE TO FILE**
           vs.                                **AMENDED COMPLAINT**
14
15   STATE FARM FIRE AND CASUALTY
     COMPANY, an Illinois corporation,
16
                      Defendant.
17

18         Plaintiffs' Motion for Leave to File Amended Complaint should be denied for

19   two reasons: (1) the proffered amendment is futile because it would be subject to

20   immediate dismissal under Rules 9(b), 12(b) and 12(d); and (2) plaintiffs' unjustified

21   delay in seeking leave to amend will unduly prejudice State Farm.

22         Plaintiffs seek leave to add a consumer fraud claim alleging that State Farm used

23   the "new construction" price setting in a software program to evaluate the amount owed

24   on their homeowners' insurance claim without notifying them it was doing so.   But

25   Arizona's Consumer Fraud Act, which is the basis of plaintiffs' proposed new claim,

26   does not govern alleged fraud or deception in insurance claim handling.   Rather, the

27   Consumer Fraud Act is violated only when a party engages in fraudulent conduct ***in***

28   ***connection with the sale or advertisement*** of goods or services. Plaintiffs do not allege

that State Farm made any fraudulent statements or omissions in connection with the sale or advertisement of plaintiffs' insurance policy – or any other goods or services. Any attempt to amend the proposed claim to allege fraud in the sale of the policy would be time barred under the one-year statute of limitations for Consumer Fraud Act claims: such an amendment would not relate back to the existing breach of contract and bad faith Complaint, which arises from State Farm's claim handling, not the earlier sale of the policy. Thus, plaintiffs' proposed claim is, and will remain, deficient as a matter of law.

Moreover, contrary to plaintiffs' allegations in their Proposed First Amended Complaint, State Farm *did* tell plaintiffs it used new construction pricing to estimate the cost of repairing their property – in the same estimate plaintiffs refer to and quote from in their Complaint.  Plaintiffs understood State Farm used new construction pricing, and do not and cannot allege any detrimental reliance on any contrary representation.

Finally, plaintiffs have known about the basis for this claim (i.e. State Farm's use of new construction pricing) for over two years. Yet they waited almost 17 months after filing this action to seek leave to add the claim. That delay, plus plaintiffs' failure to satisfy Rule 9(b)'s particularity requirements, will unduly prejudice State Farm given key deadlines in the next six weeks.

For all those reasons, State Farm respectfully asks this Court to deny plaintiffs' Motion for Leave to File Amended Complaint.

## BACKGROUND

Plaintiffs filed their Complaint in this action on September 30, 2016, nearly a year-and-a-half ago, alleging that State Farm improperly handled their property insurance claim following a December 6, 2015 fire.  Plaintiffs' existing Complaint alleges that State Farm "breached the insurance policy, and breached the covenant of good faith and fair dealing, *in connection with [plaintiffs'] claim for fire damage to their home and contents*" by improperly using new construction pricing in its January 25,

2016 estimate of the cost of repairs.    (Pls.' Mot. for Leave to File Am. Compl. 2:3-5 (emphasis added)); *see generally* Pl's Compl. filed 9/30/16.

In the instant motion, plaintiffs seek to add a claim for violation of the Consumer Fraud Act (the "CFA," A.R.S. § 44-1521) based on the same allegations of improper claim handling at issue in their bad faith and breach of contract claim: State Farm's allegedly improper use of new construction pricing to estimate the repair costs owed under their insurance policy after the December 2015 fire.  (Pls.' Mot. for Leave to File Am. Compl. at 1-2.)  Specifically, plaintiffs allege that State Farm "secretly maniptulat[ed] an estimating software program – Xactimate" by using Xactimate's new construction pricing setting to calculate the repair costs for their fire damaged property without telling them it was doing so.  (*Id.* 2:5-15.)

The only purported misrepresentation plaintiff identify in their proposed Amended Complaint is a quote from the first page of the Xactimate repair estimate they were given after the December 2015 fire, stating that State Farm "will provide you with a detailed estimate of the scope of the damage and the cost of repairs."  (Proposed First Am. Compl. ("PFAC") ¶ 46; *quoting*, Ex. A at 1.)  Plaintiffs allege that State Farm "does not disclose" to its policyholders that it uses Xactimate's "new construction" pricing in generating Xactimate estimates. (PFAC ¶¶ 47, 49.)  But, ***the very next page*** of the estimate plaintiffs quote in their PFAC discloses that State Farm used Xactimate's "new construction" pricing list to prepare the estimate.  (Ex. A at 2198.)  Plaintiffs' response to that estimate confirms that plaintiffs, and the public adjuster they hired as their agent to represent them in connection with the claim, understood State Farm used new construction pricing to create the estimate.  (Ex. B at 1.)[1]  Nevertheless, plaintiffs

---

[1] State Farm attaches two documents as exhibits to its Response: the estimate plaintiffs identify (and quote from) as the predicate for their new CFA claim (Ex. A) and plaintiffs' response to that estimate (Ex. B).  Although not attached to plaintiffs' PFAC, both of these documents are "central to the plaintiff's claim" and therefore would be appropriately considered in a motion to dismiss plaintiffs' proposed new claims.  *See e.g., Cullen v. Koty-Leavitt Ins. Agency, Inc.,* 216 Ariz. 509, 513, ¶ 8 (Ct. App. 2007), *aff'd in part, vacated in part sub nom. on other grounds Cullen v. Auto-Owners Ins. Co.,* 218 Ariz. 417, ¶ 8 (2008) (document "central to the plaintiff's claim" is not a matter outside the pleadings for purposes of Rule 12(b)(6)").  Plaintiffs quote from the

waited more than two years to bring their new CFA claim based on use of new construction pricing.

This litigation has been pending for nearly a year and half.  Deadlines to propound written discovery and disclose lay witnesses in this litigation are April 6, 2018, less than a month away.  The lay witness deposition deadline is set for April 30, 2018, and the trial setting conference is set for April 16, 2018.

### ARGUMENT

"The right to amend [a complaint] is not automatic" and leave to amend is properly denied where the amendment would be futile, or "could not affect the outcome of the litigation, that is, when on its face it is legally insufficient."  *In re Estate of Torstenson v. Valley Nat'l Bank*, 125 Ariz. 373, 376-77 (Ct. App. 1980). Leave to amend is also properly denied when the amendment causes undue delay or prejudice. *Id.* at 376. Where, as here, the proffered amended claim is insufficiently pled as a matter of law; would be futile even if it were properly pled; and will cause undue delay and prejudice, leave to amend is properly denied. *See Cullen v. Auto-Owners Ins. Co.*, 218 Ariz. 417, 419 (2008) ("mere conclusory statements are insufficient to state a claim upon which relief can be granted"); *In re Estate of Torstenson*, 125 Ariz. at 376-77 (upholding trial court's denial of leave to amend where the proposed amendment "is insufficient to cure the defect" and plaintiffs' unduly delayed in seeking leave to amend over a year and a half after discovering need to amend); *Bishop v. State, Dep't of Corr.*, 172 Ariz. 472, 474–75 (Ct. App. 1992) (upholding properly denied motion to amend where amendment would have been futile because the plaintiff could not satisfy

---

estimate attached as Exhibit A (PFAC ¶ 46) in their Complaint.  Similarly, because plaintiffs allege that the estimate "deceived" them (PFAC ¶ 49), Plaintiffs' written response to the estimate, attached as Exhibit B, is also central to their claims. Alternatively, the court can take judicial notice of the relevant portions of both documents under Arizona Rule of Evidence 201(b)(2), as the relevant facts in those exhibits "can be accurately and readily determined" from the face of documents about which there is no question of authenticity.  At the least, Arizona Rule of Civil Procedure 12(b) would permit a Court to consider Exhibits A and B in response to a motion filed immediately after any grant of leave to amend.

essential element of proposed cause of action and plaintiff unduly delayed seeking leave to amend).

**I.     Plaintiffs' Motion for Leave to Amend should be denied because the proposed amendment is futile.**

Plaintiffs' proposed amendment to add an allegation that State Farm deceived plaintiffs about its use of new construction pricing is futile because (i) plaintiffs do not allege any fraud in connection with the *sale* of goods or services, as required under the CFA; (ii) the estimate plaintiffs rely on and quote in their Proposed Amended Complaint establishes that State Farm *did* disclose that its estimate was based on Xactimate's new construction price list; and (iii) plaintiffs do not and cannot plead their proposed new fraud claim with particularity as required under Arizona Rule of Civil Procedure 9(b).

**A.     Plaintiffs do not allege any fraud in connection with the sale of goods or services, as required to state a claim under the CFA.**

To prove their consumer fraud claim, plaintiffs must show that State Farm made "a false promise or misrepresentation [ ] *in connection with the sale or advertisement* of merchandise and consequent and proximate injury resulting from the promise." *See Kuehn v. Stanley*, 208 Ariz. 124, 129 (Ct. App. 2004) (emphasis added); *see also* A.R.S. § 44-1522(a) (prohibiting fraud and deceptive practices "in connection with *the sale or advertisement* of any merchandise") (emphasis added).   To state a claim for violation of the CFA in the insurance context, the insured must allege a misrepresentation in connection with the *sale* of the insurance policy; alleged improper handling of the settlement of an insurance claim after the policy was sold cannot support a claim under the Consumer Fraud Act.  *Enyart v. Transamerica Ins. Co.*, 195 Ariz. 71, 78 (Ct. App. 1998) (affirming grant of summary judgment for insurer on CFA claim alleging fraud in connection with settlement of an insurance claim, not the sale or advertisement of an insurance policy).  While allegations of improper claim handling may state a claim for breach of the duty of good faith and faith dealing, those same improper-claim-handling allegations cannot form the basis for a claim under the CFA – which addresses sale of

- 5 -

goods and services, not insurance claim handling. *Id*. (allowing bad faith claim to proceed but dismissing Consumer Fraud Act claim where party did not allege fraud in connection with the sale of insurance policy).[2]

Here, neither plaintiffs' Motion for Leave nor their Proposed Amended Complaint identify any alleged misrepresentation or omission in connection with the sale of the plaintiffs' homeowners' policy – or the sale of any other goods or services. Rather, plaintiffs' motion is predicated on a statement in the Xactimate estimate provided to plaintiffs during the handling of their claim (Ex. A) – ***after*** the policy was sold.  As plaintiffs make clear in their Motion, their new Consumer Fraud Act claim is based on the same alleged "conduct" as their bad faith claim: that State Farm used new construction pricing in connection with handling their claim, "without notice" that it was doing so. (PFAC ¶¶ 47, 49; Mot. at 2:7-13 ("the new cause of action arises out of the same facts as the cause of action for breach of the covenant of good faith and fair dealing.")  But alleged post-sale representations or omissions cannot support a claim under the CFA.  *Kuehn v. Stanley*, 208 Ariz. 124, 130, ¶ 20, (Ct. App. 2004) (alleged misrepresentations given to plaintiffs after they had already contractually committed to sale could not support CFA claim);  *Enyart*, 195 Ariz. at 78 (CFA governs fraud and deception in the sale of goods and services); A.R.S. § 44-1522(a) (same).

Plaintiffs' Motion to Amend misstates the holding of *Schmidt v. American Leasco*, incorrectly representing to this Court that *Schmidt* held the consumer fraud act applied to "deception, deceptive acts and practices, fraud, false pretenses, misrepresentations, concealments, suppression and omission of material facts in connection with ***providing*** goods or services." (Motion at 1:7-11.)  Neither *Schmidt*, nor any other Arizona case, has so held.  Rather, *Schmidt* held that the Consumer Fraud Act applied to "deception, deceptive acts or practices, fraud, false pretense, false promise,

---

[2] Claim handling is governed by a different statute, the Unfair Claim Settlement Practices Act, A.R.S. 20-461.

misrepresentation or concealment *in the sale* of services." *Schmidt v. Am. Leasco*, 139 Ariz. 509, 511–12 (Ct. App. 1983).

Here, plaintiffs have not alleged any deception, deceptive acts or practices, fraud or, false promise, misrepresentation or concealment in the *sale* of any goods or services – and therefore cannot state a claim under the Consumer Fraud Act.

**B.    Plaintiffs' new claim is subject to immediate dismissal because the estimate plaintiffs rely on shows State Farm *did* disclose its use of new construction pricing.**

Plaintiffs' proffered amendment also fails for the separate and independent reason that the same January 25, 2016 estimate plaintiffs quote and rely on as the predicate of their proposed CFA claim shows that State Farm ***did*** disclose that it used Xactimate's new construction pricing to estimate the costs of repairs.  The second page of the estimate identifies that a new construction pricing list was used to generate the estimate: "Price List: AZPH28_DEC15 *New Construction*."  (Ex. A at 2198.) Plaintiffs' public adjuster's response to the January 25, 2016 estimate, copying plaintiff Phillip Anderson, confirms that plaintiffs were not "deceived" into thinking new construction pricing had not been used, as they allege in paragraph 49 of their PFAC. (Ex. B.) To the contrary, plaintiffs' public adjuster explains that "[o]ur review of State Farm's [January 25, 2016] loss evaluation reveals that again State Farm continues with their purposeful misuse of the Xactimate's estimating program *by utilizing the 'New Construction' price database* …"  (Ex. B (emphasis added).)  Plaintiffs' proposed claim that State Farm used new construction pricing "without notice" (PFAC ¶ 47) and that they "were deceived" into believing new construction pricing had not been used (*id*. ¶ 49) fails as a matter of law: State Farm told plaintiffs it used new construction pricing, plaintiffs understood that, and plaintiffs never detrimentally relied on any assertion to the contrary.

Accordingly, if the proposed amendment were allowed, plaintiffs' new claim would be subject to immediate dismissal.  As discussed above (at n. 1), the Court could

consider both Exhibit A and Exhibit B in connection with a Motion to Dismiss under Rule 12(b)(6), as both of these documents are central to plaintiffs' claims, and their PFAC quotes from Exhibit A.  *See e.g., Cullen v. Koty-Leavitt Ins. Agency, Inc.*, 216 Ariz. 509, 513, ¶ 8 (Ct. App. 2007), *aff'd in part, vacated in part sub nom. on other grounds Cullen v. Auto-Owners Ins. Co.*, 218 Ariz. 417, ¶ 8 (2008) (document "central to the plaintiff's claim" is not a matter outside the pleadings for purposes of Rule 12(b)(6)").   On a motion to dismiss, Courts are "not required to accept as true allegations that contradict the documents referred to in the complaint." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295–96 (9th Cir. 1998); *see Cullen v. Auto-Owners Ins. Co.*, 218 Ariz. 417, 419 (2008) (only "well-pled" factual allegations are considered true on a motion to dismiss).   Alternatively, if the Court treated a motion attaching Exhibit A and Exhibit B as a summary judgment motion under Rule 12(d), State Farm would be entitled to summary adjudication in its favor on plaintiffs' new claim – which is directly contradicted by documents plaintiffs produced as to which there is no dispute about authenticity.  Either way, plaintiffs' new allegations can have no legal effect on the outcome of this case, and their Motion for Leave should be denied as futile.  *In re Estate of Torstenson v. Valley Nat'l Bank*, 125 Ariz. 373, 376-77 (Ct. App. 1980) (motion to amend should be denied where proposed new claim would have no legal effect on outcome).

### C.   Plaintiffs have not pled fraud with particularity, and cannot amend their Proposed First Amended Complaint to do so.

Plaintiffs' conclusory assertion that their claim satisfies the elements of the Consumer Fraud Act cannot save their proposed claim.  "[M]ere conclusory statements are insufficient to state a claim upon which relief can be granted." *See Cullen*, 218 Ariz. at 419.  The Court only considers "well pled" facts as true in evaluating a motion to dismiss – conclusory assertions have no bearing.  *Id.*  Accordingly, plaintiffs' conclusory assertion in paragraph 44 – that "State Farm engaged in" an unspecified "act,

use and employment of deception, deceptive acts and practices, fraud false pretenses, false promises, misrepresentations, concealments, suppression and/or omissions of material facts in connection with the sale of goods and services" – is of no value in assessing whether the allegations in their PFAC state a claim. *Id.*

Plaintiffs' conclusory allegations are particularly inadequate here, because they seek to add a consumer fraud claim, which must be pled with particularity to be legally sufficient under Ariz. R. Civ. P. 9(b). Plaintiffs have not identified any allegedly fraudulent statement or deception in connection with the ***sale*** of the insurance policy – much less pled facts that would permit a jury to find that they relied on any fraudulent statement or were damaged by such reliance. *Hall v. Romero*, 141 Ariz. 120, 123 (Ct. App. 1984) (dismissing case for failing to plead fraud with particularity).

As discussed in Section I.A above, the only fraudulent or misleading statement plaintiffs allege is in connection with the ***post-sale*** handling of their insurance claim – which is not governed by the CFA. *Kuehn*, 208 Ariz. at 130, ¶ 20; *Enyart*, 195 Ariz. at 78; A.R.S. § 44-1522(a).

And plaintiffs do not plead any facts to establish their reliance on any alleged statement or omission. *Id.* (dismissing claim for failure to comply with Rule 9(b), where plaintiff identified allegedly fraudulent statement but did not allege facts from which a jury could find detrimental reliance).  Instead, they make only a conclusory assertion that "State Farm's actions misled and deceived Plaintiffs."  (PFAC ¶ 49.)  Finally, plaintiffs do not identify any damage or harm from any alleged misstatement or omission, as required under the CFA. *Kuehn*, 208 Ariz. at 130, ¶ 20 (granting summary judgment on CFA claim where plaintiff could not show detrimental reliance on alleged misrepresentation in sale of goods or services).

Plaintiffs cannot cure this pleading defect by amending their PFAC to allege fraud in connection with the sale of the policy with particularity.  Rather, any claim that State Farm acted fraudulently in connection with its sale of the insurance policy would be barred by the one-year statute of limitations applicable to CFA claims. *Murry v. W.*

*Am. Mortg. Co.*, 124 Ariz. 387, 390 (Ct. App. 1979) (dismissing amended complaint on the ground that the proposed CFA claim was barred by the one-year period of limitations period for causes of action based on statute); A.R.S. § 12-541(5).   As plaintiffs' own Motion acknowledges (at 2:12-15) a new cause of action only "relates back" to the filing of the original Complaint if it "arises from the same facts as the [existing] cause of action for breach of the covenant of good faith and fair dealing." Ariz. R. Civ. P. 15(a).  Any claim based on alleged fraud in the sale of the policy would not arise from the same alleged facts as the existing bad faith and breach of contract claims:  The existing causes of action arise from State Farm's handling of plaintiffs' insurance claim after the policy was in place; they do not arise from the earlier sale of the policy or any facts in connection with that sale.  (See Compl. ¶ 5, 7 & generally.) Accordingly, any new claim arising from the sale of the policy would not "relate back" to the original Complaint and would be time barred under A.R.S. § 12-541(5)'s one year limitation for causes of action based on statute.

Similarly, as discussed in Section I.B above, plaintiffs cannot amend their claim to allege detrimental reliance on any alleged misrepresentation or concealment of the use of new construction pricing because State Farm disclosed it was using new construction pricing in the same estimate plaintiffs rely on and quote in their PFAC.

**II.    Plaintiffs' 1.5 year delay in seeking to add their consumer fraud claim will unduly prejudice State Farm.**

Courts also properly deny motions to amend when plaintiffs unduly delay bringing the motion or when the amendment would cause undue prejudice to the opposing party. *Bishop v. State, Dep't of Corr.*, 172 Ariz. 472, 474-75 (Ct. App. 1992). Plaintiffs' motion should be denied because plaintiffs delayed seeking to amend their Complaint for almost a year and a half after they filed this action, despite knowing about the basis for the proposed claim – State Farm's use of new construction pricing – for over two years. *See In re Estate of Torstenson*, 125 Ariz. at 377 (Ct. App. 1980) (undue delay where plaintiffs sought to amend over a year and a half after discovering need to

amend); *Bishop*, 172 Ariz. at 475, 837 P.2d at 1210 (undue delay where plaintiffs sought to amend two years after filing initial complaint). To allow this untimely motion, which seeks to add a vaguely stated claim for consumer fraud based on State Farm's claim handling and not the sale or advertisement of the policy, would fly in the face of justice and prejudice State Farm and its right to defend itself.

Plaintiffs' inexplicable delay in seeking to add its confusing consumer fraud claim will force State Farm to scramble to decipher the vague and inadequately pled claim and identify and conduct any additional discovery by this case's fast-approaching deadlines. For example, if plaintiffs can allege fraud in connection with the sale of the policy, which seems impossible under Rule 11, those allegations will require deposing new witnesses (i.e., anyone actually involved in the sale and advertisement of plaintiffs' policy) that have not been involved in this case thus far or disclosed by either party. Identifying these new witnessed and completing their depositions by the April 30 deadline will be nearly impossible. Thus, plaintiffs' undue delay, and their vague and inadequate allegations, will prejudice State Farm and the Court should deny plaintiffs' motion for leave to amend.

### CONCLUSION

For the above reasons, State Farm respectfully requests this Court deny plaintiffs' Motion for Leave to File Amended Complaint.

DATED this 14th day of March, 2018.

STEPTOE & JOHNSON LLP


By  /s/ Erin E. Bradham
    Floyd P. Bienstock
    Erin E. Bradham
    201 East Washington Street, Suite 1600
    Phoenix, Arizona 85004-2382

Attorneys for Defendant State Farm Fire and Casualty Company

1   ELECTRONICALLY FILED this
    14th day of March, 2018, with
2   the Clerk of the Superior Court
    and served electronically through
3   the Court's e-service system on:

4
    Michael N. Poli, #006431
5   mpoli@merlinlawgroup.com
    Jeff Zane, #024172
6   jzane@merlinlawgroup.com
    MERLIN LAW GROUP, P.A.
7   2999 North 44th Streeet, Suite 520
    Phoenix, Arizona 85018
8   *Attorneys for Plaintiff*

9
    Stephen E. Silverman, #016757
10  steve@stephensilverman.com
    Stephen Silverman Law
11  6945 E. Sahuaro Dr., Ste. 125
    Scottsdale, AZ 85254
12  *Attorneys for Plaintiffs*

13

14  /s/ Diane Linn
    Employee of Steptoe & Johnson LLP
15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

**State Farm Fire and Casualty Company**
*Home Office, Bloomington, IL*



January 25, 2016

Skipton & Associates Inc
8710 E Vista Bonita Dr
Scottsdale AZ 85255-4299

**State Farm Claims**
PO Box 52260
Phoenix AZ 85072-2260

RE:  Claim Number:   03-43H7-730
     Date of Loss:   December 06, 2015
     Our Insured:    Anderson V Phillips

Dear Mr. Skipton:

Enclosed is a draft for $131,829.17, which represents the Actual Cash Value settlement for the Coverage A repairs. This payment is based on the Xactimate estimate. A copy is included for your review.

Please notify me of any scoping discrepancies prior to starting repairs. In addition, please have the chosen contractor provide a construction schedule outlining the anticipated completion of trades.

If you have any questions, please contact me.

Sincerely,

Robert Gonzales
Claim Representative
(602) 885-4503
Fax: (888) 257-6080

State Farm Fire and Casualty Company

Enclosure(s):  draft
               estimate

SF-PHILCLAIM 002195

**From:**      GWES CLMS-FFAZLL
**Sent:**      Thursday, January 21, 2016 5:18 PM
**To:**        claims@skiptoninc.com
**Cc:**        DF - FIRE - Drop File Document
**Subject:**   03-43H7-730

Justin,

As we discussed, attached is a copy of our Xactimate estimate.

A hard copy and settlement will be sent via USPS.

If you have any questions, please contact me.

Thank you,

Robert Gonzales
Claim Representative
State Farm Fire and Casualty Company
PO Box 55260
Phoenix, AZ 85072
Bus: (602)885-4503
Fax: (888)257-6080


<<...OLE_Obj...>>

PHILLIPS, ANDERSON                                                                    03-43H7-730

# Structural Damage Claim Policy

When you have a covered structural damage claim to your real property, you should know:

- We want you to receive quality repair work to restore the damages to your property.

- We will provide you with a detailed estimate of the scope of the damage and costs of repairs. Should the contractor you select have questions concerning our estimate, they should contact your claim representative directly.

- Depending upon the complexity of your repair, our estimate may or may not include an allowance for general contractor's overhead and profit. If you have questions regarding general contractor's overhead and profit and whether general contractor services are appropriate for your loss, please contact your claim representative before proceeding with repairs.

- There may be building codes, ordinances, laws, or regulations that affect the repairs of your property. These items may or may not be covered by your policy. Please contact your claim representative if you have any questions regarding coverage which may be available under your policy.

- If you select a contractor whose estimate is the same as or lower than our estimate, based on the same scope of damages, we will pay based upon their estimate. If your contractor's estimate is higher than ours, you should contact your claim representative prior to beginning repairs.

- State Farm® cannot authorize any contractor to proceed with work on your property. Repairs should proceed only with your authorization.

- State Farm does not guarantee the quality of the workmanship of any contractor or guarantee that the work will be accomplished within any specific time frame.

- It is understood that the contractor is hired by you, our insured, and that they work for you - not State Farm.

If you have any questions or need additional information regarding your claim, please contact your claim representative immediately.

SF-PHILCLAIM 002197

## Claim Rep Draft

PHILLIPS, ANDERSON                                                                03-43H7-730

| | | | |
|---|---|---|---|
| Insured: | PHILLIPS, ANDERSON | Estimate: | 03-43H7-730 |
| Property: | 214 W Desert Ln | Claim Number: | 0343H7730 |
| | Phoenix, AZ 85041-8123 | Policy Number: | 03-J4-4660-2 |
| Cellular: | **Redacted** | Price List: | AZPH28_DEC15 |
| Type of Loss: | Fire | | New Construction |
| Deductible: | $1,000.00 | | |
| Date of Loss: | 12/6/2015 | | |
| Date Inspected: | 12/14/2015 | | |

## Summary for Coverage A - Dwelling - 33 Fire, Lightning, & Removal

| | |
|---|---|
| Line Item Total | 121,573.72 |
| General Contractor Overhead | 12,157.53 |
| General Contractor Profit | 12,157.53 |
| Sales Tax Prime Cont | 7,870.86 |
| Replacement Cost Value (Including General Contractor Overhead and Profit) | 153,759.64 |
| Less Depreciation (Including Taxes) | (17,441.93) |
| Less General Contractor Overhead & Profit on Recoverable & Non-recoverable Depreciation | (3,309.96) |
| Less Tax on General Contractor Overhead and Profit on Depreciation | (178.58) |
| Less Deductible | (1,000.00) |
| Net Actual Cash Value Payment | $131,829.17 |

## Maximum Additional Amounts Available If Incurred:

| | | | |
|---|---|---|---|
| Total Line Item Depreciation (Including Taxes) | 17,441.93 | | |
| General Contractor O&P on Depreciation | 3,309.96 | | |
| Tax on General Contractor O&P on Depreciation | 178.58 | | |
| Replacement Cost Benefits | | 20,930.47 | |
| Total Maximum Additional Amount Available If Incurred | | | 20,930.47 |
| Total Amount of Claim If Incurred | | | $152,759.64 |

## Sublimit Recap

| Description | Single Item Limit | Aggregate Limit | ACV | RCV | Overage |
|---|---|---|---|---|---|
| Dwelling Extension | $17,952.00 | $17,952.00 | $841.03 | $841.03 | $0.00 |
| | | | $841.03 | $841.03 | $0.00 |

Robert Gonzales
602-885-4503

**ALL AMOUNTS PAYABLE ARE SUBJECT TO THE TERMS, CONDITIONS AND LIMITS OF YOUR POLICY.**

SF-PHILCLAIM 002198

 **StateFarm**

## Explanation of Building Replacement Cost Benefits
## Homeowner Policy
## Coverage A - Dwelling - 33 Fire, Lightning, & Removal

To:  Name:      PHILLIPS, ANDERSON
      Address:    214 W Desert Ln
      City:        Phoenix
      State/Zip:   AZ, 85041-8123

Insured:        PHILLIPS, ANDERSON        Claim Number:   0343H7730
Date of Loss:   12/6/2015               Cause of Loss:   FIRE

Your insurance policy provides replacement cost coverage for some or all of the loss or damage to your dwelling or structures. Replacement cost coverage pays the actual and necessary cost of repair or replacement, without a deduction for depreciation, subject to your policy's limit of liability. To receive replacement cost benefits you must:

1. Complete the actual repair or replacement of the damaged part of the property within two years of the date of loss; and

2. Notify us within 30 days after the work has been completed.

3. Confirm completion of repair or replacement, by submitting invoices, receipts or other documentation to your agent or claim office.

Until these requirements have been satisfied, our payment(s) to you will be for the actual cash value of the damaged part of the property, which may include a deduction for depreciation.

Without waiving the above requirements, we will consider paying replacement cost benefits prior to actual repair or replacement if we determine repair or replacement costs will be incurred because repairs are substantially under way or you present a signed contract acceptable to us.

The estimate to repair or replace your damaged property is $153,759.64 . The enclosed claim payment to you of $131,829.17 is for the actual cash value of the damaged property at the time of loss, less any deductible that may apply. We determined the actual cash value by deducting depreciation from the estimated repair or replacement cost. Our estimate details the depreciation applied to your loss. Based on our estimate, the additional amount available to you for replacement cost benefits (recoverable depreciation) is $ 20,930.47 .

If you cannot have the repairs completed for the repair/replacement cost estimated, please contact your claim representative prior to beginning repairs.

All policy provisions apply to your claim.

**For your protection Arizona law requires the following statement to appear on this form: Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.**

SF-PHILCLAIM 002199

**Claim Rep Draft**

PHILLIPS, ANDERSON                                                                                                      03-43H7-730

**Main Level**

**Main Level**

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| **Ceiling** | | | | | | | |
| 1.  R&R 1/2" drywall - hung, taped, heavy texture, ready for paint | | | | | | | |
| | 1,385.54 SF | 1.67 | 149.81 | 462.76 | 2,926.42 | | 2,926.42 |
| 2.  R&R 5/8" drywall - hung, taped, heavy texture, ready for paint | | | | | | | |
| | 471.15 SF | 1.77 | 53.99 | 166.80 | 1,054.72 | | 1,054.72 |
| 3.  R&R Blown-in insulation - 10" depth - R26 | | | | | | | |
| | 1,856.69 SF | 1.12 | 134.63 | 415.90 | 2,630.02 | (140.29) | 2,489.73 |
| **Walls** | | | | | | | |
| 4.  Clean stud wall | | | | | | | |
| | 3,896.94 SF | 0.52 | 131.18 | 405.28 | 2,562.87 | | 2,562.87 |
| 5.  Seal stud wall for odor control (shellac) | | | | | | | |
| | 3,896.94 SF | 0.66 | 166.51 | 514.40 | 3,252.89 | | 3,252.89 |
| 6.  R&R 1/2" drywall - hung, taped, heavy texture, ready for paint | | | | | | | |
| | 4,214.54 SF | 1.67 | 455.65 | 1,407.66 | 8,901.59 | | 8,901.59 |
| 7.  Add for bullnose (rounded) corners | | | | | | | |
| | 4,214.54 SF | 0.09 | 24.55 | 75.86 | 479.72 | | 479.72 |
| 8.  Seal/paint interior - per SF of floor - 1 tone- New Const. | | | | | | | |
| | 1,856.69 SF | 2.79 | 335.36 | 1,036.04 | 6,551.57 | (3,494.18) | 3,057.39 |
| 9.  R&R Batt insulation - 4" - R11- unfaced batt | | | | | | | |
| | 1,789.67 SF | 0.57 | 66.05 | 204.04 | 1,290.20 | (68.82) | 1,221.38 |
| **Finish Carpentry** | | | | | | | |
| 10.  R&R Baseboard - 2 1/4" | | | | | | | |
| | 701.53 LF | 1.93 | 87.66 | 270.78 | 1,712.40 | | 1,712.40 |
| Less tubs and cabinets | | | | | | | |
| **Doors/Windows/Related Trimwork** | | | | | | | |
| 11.  R&R Exterior door - metal - insulated - flush or panel style | | | | | | | |
| | 1.00 EA | 256.38 | 16.61 | 51.28 | 324.27 | | 324.27 |
| 12.  R&R Exterior door - solid core lauan / mahogany or birch flush | | | | | | | |
| | 1.00 EA | 226.56 | 14.68 | 45.32 | 286.56 | | 286.56 |

SF-PHILCLAIM 002200

## Claim Rep Draft

PHILLIPS, ANDERSON                                                                                    03-43H7-730

### CONTINUED - Main Level

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 13. R&R French door - Interior - single - pre-hung unit | | | | | | | |
| | 1.00 EA | 331.63 | 21.47 | 66.34 | 419.44 | | 419.44 |
| 14. Door lockset & deadbolt - exterior | | | | | | | |
| | 3.00 EA | 78.02 | 15.16 | 46.82 | 296.04 | | 296.04 |
| 15. R&R Interior door unit | | | | | | | |
| | 6.00 EA | 134.82 | 52.38 | 161.78 | 1,023.08 | | 1,023.08 |
| 16. Door knob - interior | | | | | | | |
| | 6.00 EA | 35.77 | 13.90 | 42.92 | 271.44 | | 271.44 |
| 17. Door stop - wall or floor mounted | | | | | | | |
| | 6.00 EA | 9.70 | 3.77 | 11.64 | 73.61 | | 73.61 |
| 18. R&R Bypass (sliding) door set - Colonist | | | | | | | |
| | 3.00 EA | 138.93 | 26.98 | 83.36 | 527.13 | | 527.13 |
| 19. R&R Door opening (jamb & casing) - 36"to60"wide - paint grade | | | | | | | |
| | 3.00 EA | 96.45 | 18.73 | 57.88 | 365.96 | | 365.96 |
| 20. Clean window unit (per side) 10 - 20 SF | | | | | | | |
| | 8.00 EA | 10.28 | 5.33 | 16.44 | 104.01 | | 104.01 |
| **Window Treatments, Shelving, Closet Organization** | | | | | | | |
| 21. R&R Window blind - PVC - 3.5" - 7.1 to 14 SF | | | | | | | |
| | 7.00 EA | 91.66 | 41.55 | 128.32 | 811.49 | (649.19) | 162.30 |
| 22. R&R Window shade - roll up | | | | | | | |
| | 1.00 EA | 70.10 | 4.54 | 14.04 | 88.68 | (70.94) | 17.74 |
| 23. R&R Closet shelf and rod package | | | | | | | |
| | 24.33 LF | 14.26 | 22.45 | 69.40 | 438.80 | | 438.80 |
| 24. Seal & paint closet shelving | | | | | | | |
| | 24.33 LF | 5.45 | 8.58 | 26.52 | 167.70 | | 167.70 |
| 25. R&R Shelving - 16" - in place | | | | | | | |
| | 41.17 LF | 6.39 | 17.04 | 52.62 | 332.73 | | 332.73 |

SF-PHILCLAIM 002201

## Claim Rep Draft

PHILLIPS, ANDERSON                                                                                    03-43H7-730

### CONTINUED - Main Level

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 26. Seal & paint wood shelving, 12"- 24" width | | | | | | | |
| | 41.17 LF | 2.63 | 7.01 | 21.66 | 136.95 | (73.04) | 63.91 |
| **Electrical** | | | | | | | |
| 27. Rewire - average residence - copper wiring | | | | | | | |
| | 1,993.69 SF | 2.16 | 278.80 | 861.28 | 5,446.45 | (435.72) | 5,010.73 |
| 28. R&R Phone / low voltage copper wiring | | | | | | | |
| | 200.00 LF | 0.77 | 9.97 | 30.80 | 194.77 | | 194.77 |
| 29. General Demolition - per hour | | | | | | | |
| | 6.00 HR | 34.06 | 13.24 | 40.88 | 258.48 | | 258.48 |
| 30. R&R Outlet | | | | | | | |
| | 62.00 EA | 11.97 | 48.05 | 148.42 | 938.61 | | 938.61 |
| 31. R&R Door bell/chime button (button only) | | | | | | | |
| | 1.00 EA | 15.96 | 1.03 | 3.18 | 20.17 | | 20.17 |
| 32. R&R Phone, TV, or speaker outlet | | | | | | | |
| | 9.00 EA | 16.24 | 9.46 | 29.22 | 184.84 | | 184.84 |
| 33. R&R Ground fault interrupter (GFI) outlet | | | | | | | |
| | 3.00 EA | 30.25 | 5.88 | 18.16 | 114.79 | | 114.79 |
| 34. R&R Security system - contact w/wire (per opening) | | | | | | | |
| | 1.00 EA | 55.30 | 3.59 | 11.06 | 69.95 | | 69.95 |
| 35. R&R Security system - key pad | | | | | | | |
| | 1.00 EA | 158.00 | 10.24 | 31.60 | 199.84 | | 199.84 |
| 36. R&R Security system - motion detector | | | | | | | |
| | 1.00 EA | 152.12 | 9.85 | 30.44 | 192.41 | | 192.41 |
| 37. R&R Security system - control panel | | | | | | | |
| | 1.00 EA | 408.92 | 26.47 | 81.78 | 517.17 | | 517.17 |
| 38. R&R Door bell/chime | | | | | | | |
| | 1.00 EA | 102.76 | 6.66 | 20.56 | 129.98 | | 129.98 |

SF-PHILCLAIM 002202

**Claim Rep Draft**

PHILLIPS, ANDERSON                                                                                                    03-43H7-730

**CONTINUED - Main Level**

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 39. R&R Smoke detector | | | | | | | |
| | 6.00 EA | 46.12 | 17.91 | 55.34 | 349.97 | | 349.97 |
| **HVAC** | | | | | | | |
| 40. R&R Central air conditioning system - 3 ton - 14-15 SEER | | | | | | | |
| | 1.00 EA | 3,002.25 | 194.37 | 600.46 | 3,797.08 | (2,025.10) | 1,771.98 |
| 41. R&R Air handler - with heat element and A/C coil - 3 ton | | | | | | | |
| | 1.00 EA | 1,712.61 | 110.88 | 342.52 | 2,166.01 | (866.40) | 1,299.61 |
| 42. R&R Porcelain light fixture | | | | | | | |
| | 1.00 EA | 28.43 | 1.85 | 5.68 | 35.96 | (14.38) | 21.58 |
| 43. Light bulb - Incand. standard bulb - 1000 hr - mat. only | | | | | | | |
| | 1.00 EA | 0.50 | 0.04 | 0.10 | 0.64 | (0.51) | 0.13 |
| *Attic light* | | | | | | | |
| 44. R&R Ductwork system - hot or cold air - 1600 to 2199 SF home | | | | | | | |
| | 1.00 EA | 4,243.77 | 274.74 | 848.76 | 5,367.27 | | 5,367.27 |
| 45. Test & Balance - HVAC system | | | | | | | |
| | 1,571.00 SF | 0.09 | 9.16 | 28.28 | 178.83 | | 178.83 |
| 46. R&R Thermostat - High grade | | | | | | | |
| | 1.00 EA | 125.98 | 8.15 | 25.20 | 159.33 | | 159.33 |
| **Plumbing** | | | | | | | |
| 47. Rough in plumbing - supply & waste lines, w/PEX - Branched | | | | | | | |
| | 1,856.69 SF | 2.27 | 272.86 | 842.94 | 5,330.49 | (1,705.75) | 3,624.74 |
| 48. Plumber - per hour | | | | | | | |
| | 6.00 HR | 100.00 | 38.84 | 120.00 | 758.84 | | 758.84 |
| *Labor to remove plumbing* | | | | | | | |
| 49. R&R Water heater - 40 gallon - Electric - 6 yr | | | | | | | |
| | 1.00 EA | 604.07 | 39.11 | 120.82 | 764.00 | (611.19) | 152.81 |
| **Miscellaneous** | | | | | | | |

1/20/2016 4:22 PM                                                                                                    Page: 7

SF-PHILCLAIM 002203

**Claim Rep Draft**

PHILLIPS, ANDERSON                                                                                    03-43H7-730

**CONTINUED - Main Level**

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 50. Dumpster load - Approx. 40 yards, 7-8 tons of debris | | | | | | | |
| | 4.00 EA | 525.99 | 136.21 | 420.80 | 2,660.97 | | 2,660.97 |
| 51. Final cleaning - construction - Residential | | | | | | | |
| | 1,856.69 SF | 0.18 | 21.64 | 66.84 | 422.68 | | 422.68 |
| 52. Temporary toilet (per month) | | | | | | | |
| | 4.00 MO | 132.63 | 34.34 | 106.10 | 670.96 | | 670.96 |
| 53. Taxes, insurance, permits & fees (Bid item) | | | | | | | |
| | 1.00 EA | | | | | | ACTUAL |
| **Total:  Main Level** | | | **3,478.91** | **10,747.08** | **67,960.78** | **10,155.51** | **57,805.27** |



| | | Front Room | | | | | Height: 8' |
|---|---|---|---|---|---|---|---|
| | | 502.17 SF Walls | | | 355.83 SF Ceiling | | |
| | | 858.00 SF Walls & Ceiling | | | 355.83 SF Floor | | |
| | | 73.50 LF Ceil. Perimeter | | | 73.50 LF Floor Perimeter | | |

| Missing Wall | 3' 7" X 8' | Opens into HALLWAY |
|---|---|---|
| Window | 5' 10" X 5' | Opens into Exterior |
| Window | 5' 4" X 5' | Opens into Exterior |
| Window | 6' X 5' | Opens into Exterior |

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| **Electrical** | | | | | | | |
| 54. R&R Ceiling fan & light | | | | | | | |
| | 2.00 EA | 257.45 | 33.34 | 102.98 | 651.22 | (260.47) | 390.75 |
| 55. Light bulb - Incand. standard bulb - 1000 hr - mat. only | | | | | | | |
| | 8.00 EA | 0.50 | 0.26 | 0.80 | 5.06 | (4.05) | 1.01 |
| **Floor Covering** | | | | | | | |

SF-PHILCLAIM 002204

**Claim Rep Draft**

PHILLIPS, ANDERSON                                                                                03-43H7-730

**CONTINUED - Front Room**

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 56. R&R Tile floor covering | | | | | | | |
| | 355.83 SF | 8.13 | 187.29 | 578.60 | 3,658.79 | | 3,658.79 |
| 57. Remove Additional labor to remove tile from concrete slab | | | | | | | |
| | 355.83 SF | 1.00 | 23.04 | 71.16 | 450.03 | | 450.03 |
| **Totals: Front Room** | | | **243.93** | **753.54** | **4,765.10** | **264.52** | **4,500.58** |

**Hallway**                                                                                   Height: 8'

| | |
|---|---|
| 433.79 SF Walls | 110.21 SF Ceiling |
| 544.01 SF Walls & Ceiling | 110.21 SF Floor |
| 65.34 LF Ceil. Perimeter | 51.50 LF Floor Perimeter |

| | | |
|---|---|---|
| Door | 5' 10" X 6' 8" | Opens into HCLOSET |
| Missing Wall | 3' 7" X 8' | Opens into FRONT_ROOM |
| Missing Wall - Goes to Floor | 8' X 6' 8" | Opens into KITCHEN |

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| **Electrical** | | | | | | | |
| 58. R&R Light fixture | | | | | | | |
| | 2.00 EA | 58.92 | 7.63 | 23.56 | 149.03 | (59.63) | 89.40 |
| 59. Light bulb - Incand. standard bulb - 1000 hr - mat. only | | | | | | | |
| | 4.00 EA | 0.50 | 0.13 | 0.40 | 2.53 | (2.03) | 0.50 |
| **Floor Covering** | | | | | | | |
| 60. R&R Tile floor covering | | | | | | | |
| | 110.21 SF | 8.13 | 58.01 | 179.20 | 1,133.21 | | 1,133.21 |
| 61. Remove Additional labor to remove tile from concrete slab | | | | | | | |
| | 110.21 SF | 1.00 | 7.14 | 22.04 | 139.39 | | 139.39 |
| **Totals: Hallway** | | | **72.91** | **225.20** | **1,424.16** | **61.66** | **1,362.50** |

SF-PHILCLAIM 002205

**Claim Rep Draft**

PHILLIPS, ANDERSON                                                                                      03-43H7-730



| Kitchen | | | | | | Height: 8' |
|---|---|---|---|---|---|---|
| 444.17 SF Walls | | | | 197.82 SF Ceiling | | |
| 641.99 SF Walls & Ceiling | | | | 197.82 SF Floor | | |
| 61.77 LF Ceil. Perimeter | | | | 53.77 LF Floor Perimeter | | |

| Missing Wall - Goes to Floor | 8' X 6' 8" | Opens into HALLWAY |
|---|---|---|

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| **Electrical** | | | | | | | |
| 62. Recessed light fixture | | | | | | | |
| | 6.00 EA | 87.56 | 34.01 | 105.08 | 664.45 | (265.79) | 398.66 |
| 63. R&R Hanging light fixture | | | | | | | |
| | 1.00 EA | 69.02 | 4.47 | 13.80 | 87.29 | (34.92) | 52.37 |
| 64. Light bulb - Incand. standard bulb - 1000 hr - mat. only | | | | | | | |
| | 5.00 EA | 0.50 | 0.16 | 0.50 | 3.16 | (2.52) | 0.64 |
| 65. Light bulb - Compact Flrscnt spot/flood (R30) - mat. only | | | | | | | |
| | 6.00 EA | 8.99 | 3.49 | 10.78 | 68.21 | (54.56) | 13.65 |
| **Cabinetry/Countertops** | | | | | | | |
| 66. R&R Cabinetry - lower (base) units | | | | | | | |
| | 12.50 LF | 159.59 | 129.14 | 398.98 | 2,523.00 | (403.68) | 2,119.32 |
| 67. R&R Cabinetry - upper (wall) units | | | | | | | |
| | 17.50 LF | 112.60 | 127.57 | 394.10 | 2,492.17 | (398.74) | 2,093.43 |
| 68. Cabinet knob or pull | | | | | | | |
| | 23.00 EA | 5.95 | 8.86 | 27.38 | 173.09 | | 173.09 |
| 69. R&R Countertop - post formed plastic laminate | | | | | | | |
| | 26.67 LF | 42.53 | 73.42 | 226.86 | 1,434.56 | (765.10) | 669.46 |
| 70. Add-on for mitered corner (Countertop) | | | | | | | |
| | 3.00 EA | 47.12 | 9.16 | 28.28 | 178.80 | | 178.80 |
| 71. Cabinet panels - side, end, or back | | | | | | | |
| | 21.00 SF | 11.91 | 16.19 | 50.02 | 316.32 | | 316.32 |
| **Plumbing and Related Fixtures** | | | | | | | |
| 72. R&R Sink - double | | | | | | | |
| | 1.00 EA | 326.42 | 21.13 | 65.28 | 412.83 | (66.05) | 346.78 |

SF-PHILCLAIM 002206

**Claim Rep Draft**

PHILLIPS, ANDERSON                                                                                      03-43H7-730

**CONTINUED - Kitchen**

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 73. Sink strainer and drain assembly | | | | | | | |
| | 1.00 EA | 39.57 | 2.56 | 7.92 | 50.05 | (4.01) | 46.04 |
| 74. Sink faucet - Kitchen | | | | | | | |
| | 1.00 EA | 186.03 | 12.05 | 37.20 | 235.28 | (125.48) | 109.80 |
| 75. Angle stop valve | | | | | | | |
| | 2.00 EA | 25.58 | 3.31 | 10.24 | 64.71 | (5.17) | 59.54 |
| **Appliances** | | | | | | | |
| 76. R&R Dishwasher | | | | | | | |
| | 1.00 EA | 568.30 | 36.80 | 113.66 | 718.76 | (575.01) | 143.75 |
| 77. R&R Range - freestanding - electric | | | | | | | |
| | 1.00 EA | 616.89 | 39.94 | 123.38 | 780.21 | (480.15) | 300.06 |
| 78. R&R Range hood | | | | | | | |
| | 1.00 EA | 166.74 | 10.79 | 33.36 | 210.89 | (120.52) | 90.37 |
| 79. Garbage disposer | | | | | | | |
| | 1.00 EA | 206.49 | 13.37 | 41.30 | 261.16 | (174.12) | 87.04 |
| **Floor Covering** | | | | | | | |
| 80. Tile floor covering | | | | | | | |
| | 172.82 SF | 6.87 | 76.86 | 237.46 | 1,501.59 | | 1,501.59 |
| 81. Remove Additional labor to remove tile from concrete slab | | | | | | | |
| | 172.82 SF | 1.00 | 11.18 | 34.56 | 218.56 | | 218.56 |
| **Totals: Kitchen** | | | 634.46 | 1,960.14 | 12,395.09 | 3,475.82 | 8,919.27 |

SF-PHILCLAIM 002207

**Claim Rep Draft**

PHILLIPS, ANDERSON                                                                     03-43H7-730

| | | | | |
|---|---|---|---|---|
| **HBath** | | | **Height: 8'** | |
| 200.70 SF Walls | | 37.62 SF Ceiling | | |
| 238.32 SF Walls & Ceiling | | 37.62 SF Floor | | |
| 25.09 LF Ceil. Perimeter | | 25.09 LF Floor Perimeter | | |

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| **HVAC** | | | | | | | |
| 82.  R&R Bathroom ventilation fan | | | | | | | |
| | 1.00 EA | 78.96 | 5.12 | 15.78 | 99.86 | | 99.86 |
| 83.  R&R Ductwork - flexible - non-insulated - 3" round | | | | | | | |
| | 8.00 LF | 4.32 | 2.23 | 6.90 | 43.69 | | 43.69 |
| **Cabinetry/Hardware/Accessories** | | | | | | | |
| 84.  R&R Vanity | | | | | | | |
| | 2.50 LF | 122.24 | 19.77 | 61.12 | 386.49 | (61.85) | 324.64 |
| 85.  R&R Vanity top - one sink - cultured marble | | | | | | | |
| | 2.67 LF | 64.35 | 11.12 | 34.36 | 217.30 | | 217.30 |
| 86.  R&R Mirror - 1/4" plate glass | | | | | | | |
| | 8.75 SF | 10.02 | 5.67 | 17.54 | 110.89 | | 110.89 |
| 87.  R&R Medicine cabinet | | | | | | | |
| | 1.00 EA | 162.60 | 10.53 | 32.52 | 205.65 | (82.25) | 123.40 |
| **Plumbing and Related Fixtures** | | | | | | | |
| 88.  R&R P-trap assembly - ABS (plastic) | | | | | | | |
| | 1.00 EA | 46.61 | 3.02 | 9.32 | 58.95 | (18.87) | 40.08 |
| 89.  R&R Angle stop valve | | | | | | | |
| | 3.00 EA | 28.12 | 5.46 | 16.86 | 106.68 | (8.53) | 98.15 |
| 90.  Sink faucet - Bathroom | | | | | | | |
| | 1.00 EA | 163.85 | 10.61 | 32.78 | 207.24 | (82.91) | 124.33 |
| 91.  R&R Toilet | | | | | | | |
| | 1.00 EA | 362.73 | 23.49 | 72.56 | 458.78 | (24.49) | 434.29 |
| 92.  Toilet seat | | | | | | | |
| | 1.00 EA | 45.48 | 2.94 | 9.10 | 57.52 | (46.01) | 11.51 |

SF-PHILCLAIM 002208

## Claim Rep Draft

PHILLIPS, ANDERSON                                                                03-43H7-730

### CONTINUED - HBath

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 93.  R&R Fiberglass tub & shower combination | | | | | | | |
| | 1.00 EA | 822.37 | 53.25 | 164.48 | 1,040.10 | (166.41) | 873.69 |
| 94.  R&R Tub/shower faucet | | | | | | | |
| | 1.00 EA | 266.22 | 17.24 | 53.26 | 336.72 | (134.69) | 202.03 |
| 95.  R&R Towel bar | | | | | | | |
| | 1.00 EA | 26.56 | 1.71 | 5.32 | 33.59 | | 33.59 |
| 96.  R&R Shower curtain rod | | | | | | | |
| | 1.00 EA | 26.64 | 1.72 | 5.34 | 33.70 | | 33.70 |
| 97.  Toilet paper holder | | | | | | | |
| | 1.00 EA | 20.66 | 1.33 | 4.14 | 26.13 | | 26.13 |
| **Electrical** | | | | | | | |
| 98.  R&R Light bar - 4 lights | | | | | | | |
| | 1.00 EA | 80.54 | 5.22 | 16.10 | 101.86 | (40.74) | 61.12 |
| 99.  Light bulb - Incand. standard bulb - 1000 hr - mat. only | | | | | | | |
| | 4.00 EA | 0.50 | 0.13 | 0.40 | 2.53 | (2.03) | 0.50 |
| **Floor Covering** | | | | | | | |
| 100.  R&R Tile floor covering | | | | | | | |
| | 20.12 SF | 8.13 | 10.59 | 32.72 | 206.88 | | 206.88 |
| 101.  Remove Additional labor to remove tile from concrete slab | | | | | | | |
| | 21.00 SF | 1.00 | 1.36 | 4.20 | 26.56 | | 26.56 |
| **Totals:  HBath** | | | **192.51** | **594.80** | **3,761.12** | **668.78** | **3,092.34** |

SF-PHILCLAIM 002209

**Claim Rep Draft**

PHILLIPS, ANDERSON                                                                                          03-43H7-730



**BR1**                                                                                          **Height: 8'**

| | |
|---|---|
| 321.37 SF Walls | 100.85 SF Ceiling |
| 422.22 SF Walls & Ceiling | 100.85 SF Floor |
| 40.17 LF Ceil. Perimeter | 40.17 LF Floor Perimeter |

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| **Electrical** | | | | | | | |
| 102. R&R Ceiling fan & light | | | | | | | |
| | 1.00 EA | 257.45 | 16.66 | 51.50 | 325.61 | (130.25) | 195.36 |
| 103. Light bulb - Incand. standard bulb - 1000 hr - mat. only | | | | | | | |
| | 4.00 EA | 0.50 | 0.13 | 0.40 | 2.53 | (2.03) | 0.50 |
| **Floor Covering** | | | | | | | |
| 104. R&R Tile floor covering | | | | | | | |
| | 100.85 SF | 8.13 | 53.09 | 163.98 | 1,036.98 | | 1,036.98 |
| 105. Remove Additional labor to remove tile from concrete slab | | | | | | | |
| | 100.85 SF | 1.00 | 6.53 | 20.18 | 127.56 | | 127.56 |
| **Totals: BR1** | | | **76.41** | **236.06** | **1,492.68** | **132.28** | **1,360.40** |



**BR1Closet**                                                                                          **Height: 8'**

| | |
|---|---|
| 111.37 SF Walls | 9.92 SF Ceiling |
| 121.29 SF Walls & Ceiling | 9.92 SF Floor |
| 13.92 LF Ceil. Perimeter | 13.92 LF Floor Perimeter |

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| **Floor Covering** | | | | | | | |
| 106. R&R Tile floor covering | | | | | | | |
| | 9.92 SF | 8.13 | 5.22 | 16.14 | 102.01 | | 102.01 |
| 107. Remove Additional labor to remove tile from concrete slab | | | | | | | |
| | 9.92 SF | 1.00 | 0.65 | 1.98 | 12.55 | | 12.55 |

SF-PHILCLAIM 002210

**Claim Rep Draft**

PHILLIPS, ANDERSON                                                                                   03-43H7-730

**CONTINUED - BR1Closet**

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| **Totals: BR1Closet** | | | **5.87** | **18.12** | **114.56** | **0.00** | **114.56** |



**BR2**                                                                                   **Height: 8'**

| 389.24 SF Walls | 162.52 SF Ceiling |
|---|---|
| 551.76 SF Walls & Ceiling | 162.52 SF Floor |
| 53.52 LF Ceil. Perimeter | 47.68 LF Floor Perimeter |

**Door**                                  5' 10" X 6' 8"                        **Opens into BR2CLOSET**

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| **Electrical** | | | | | | | |
| 108. R&R Ceiling fan & light | | | | | | | |
| | 1.00 EA | 257.45 | 16.66 | 51.50 | 325.61 | (130.25) | 195.36 |
| 109. Light bulb - Incand. standard bulb - 1000 hr - mat. only | | | | | | | |
| | 4.00 EA | 0.50 | 0.13 | 0.40 | 2.53 | (2.03) | 0.50 |
| **Floor Covering** | | | | | | | |
| 110. R&R Tile floor covering | | | | | | | |
| | 162.52 SF | 8.13 | 85.55 | 264.26 | 1,671.10 | | 1,671.10 |
| 111. Remove Additional labor to remove tile from concrete slab | | | | | | | |
| | 162.52 SF | 1.00 | 10.52 | 32.50 | 205.54 | | 205.54 |
| **Totals: BR2** | | | **112.86** | **348.66** | **2,204.78** | **132.28** | **2,072.50** |

SF-PHILCLAIM 002211

**Claim Rep Draft**

PHILLIPS, ANDERSON                                                                                    03-43H7-730



**bR2Closet**                                                                                        **Height: 8'**

| | |
|---|---|
| 99.78 SF Walls | 13.33 SF Ceiling |
| 113.11 SF Walls & Ceiling | 13.33 SF Floor |
| 17.33 LF Ceil. Perimeter | 11.50 LF Floor Perimeter |

**Door**                              5' 10" X 6' 8"                    Opens into BR2

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| **Floor Covering** | | | | | | | |
| 112. R&R Tile floor covering | | | | | | | |
| | 13.33 SF | 8.13 | 7.02 | 21.68 | 137.08 | | 137.08 |
| 113. Remove Additional labor to remove tile from concrete slab | | | | | | | |
| | 13.33 SF | 1.00 | 0.86 | 2.66 | 16.85 | | 16.85 |
| **Totals: bR2Closet** | | | 7.88 | 24.34 | 153.93 | 0.00 | 153.93 |

**Master Bedroom**                                                                                  **Height: 8'**

| | |
|---|---|
| 637.24 SF Walls | 313.18 SF Ceiling |
| 950.41 SF Walls & Ceiling | 313.18 SF Floor |
| 79.65 LF Ceil. Perimeter | 79.65 LF Floor Perimeter |

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| **Electrical** | | | | | | | |
| 114. R&R Ceiling fan & light - High grade | | | | | | | |
| | 2.00 EA | 354.95 | 45.96 | 141.98 | 897.84 | (359.12) | 538.72 |
| 115. Light bulb - Incand. standard bulb - 1000 hr - mat. only | | | | | | | |
| | 8.00 EA | 0.50 | 0.26 | 0.80 | 5.06 | (4.05) | 1.01 |
| **Window Treatments, Shelving, Closet Organization** | | | | | | | |
| 116. R&R Shelving - 12" - in place | | | | | | | |
| | 6.25 LF | 5.71 | 2.30 | 7.14 | 45.13 | | 45.13 |
| **Floor Covering** | | | | | | | |

SF-PHILCLAIM 002212

**Claim Rep Draft**

PHILLIPS, ANDERSON                                                                                               03-43H7-730

**CONTINUED - Master Bedroom**

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 117. R&R Tile floor covering | | | | | | | |
| | 313.18 SF | 8.13 | 164.85 | 509.24 | 3,220.25 | | 3,220.25 |
| 118. Remove Additional labor to remove tile from concrete slab | | | | | | | |
| | 313.18 SF | 1.00 | 20.28 | 62.64 | 396.10 | | 396.10 |
| **Totals: Master Bedroom** | | | **233.65** | **721.80** | **4,564.38** | **363.17** | **4,201.21** |



| | MBath | | | | | | Height: 8' |
|---|---|---|---|---|---|---|---|

212.00 SF Walls                                          41.25 SF Ceiling
253.25 SF Walls & Ceiling                        41.25 SF Floor
26.50 LF Ceil. Perimeter                         26.50 LF Floor Perimeter

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| **HVAC** | | | | | | | |
| 119. R&R Bathroom ventilation fan | | | | | | | |
| | 1.00 EA | 78.96 | 5.12 | 15.78 | 99.86 | | 99.86 |
| 120. R&R Ductwork - flexible - non-insulated - 3" round | | | | | | | |
| | 8.00 LF | 4.32 | 2.23 | 6.90 | 43.69 | | 43.69 |
| **Cabinetry/Hardware/Accessories** | | | | | | | |
| 121. R&R Vanity | | | | | | | |
| | 3.00 LF | 122.24 | 23.74 | 73.34 | 463.80 | (74.19) | 389.61 |
| 122. R&R Vanity top - one sink - cultured marble | | | | | | | |
| | 3.00 LF | 64.35 | 12.49 | 38.60 | 244.14 | | 244.14 |
| 123. R&R Mirror - 1/4" plate glass | | | | | | | |
| | 10.50 SF | 10.02 | 6.82 | 21.04 | 133.07 | | 133.07 |
| 124. R&R Medicine cabinet | | | | | | | |
| | 1.00 EA | 162.60 | 10.53 | 32.52 | 205.65 | (82.25) | 123.40 |

SF-PHILCLAIM 002213

## Claim Rep Draft

PHILLIPS, ANDERSON                                                      03-43H7-730

### CONTINUED - MBath

| | QUANTITY UNIT PRICE | | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| **Plumbing and Related Fixtures** | | | | | | | |
| 125. P-trap assembly - ABS (plastic) | | | | | | | |
| | 1.00 EA | 42.81 | 2.77 | 8.56 | 54.14 | (17.33) | 36.81 |
| 126. R&R Angle stop valve | | | | | | | |
| | 3.00 EA | 28.12 | 5.46 | 16.86 | 106.68 | (8.53) | 98.15 |
| 127. Sink faucet - Bathroom | | | | | | | |
| | 1.00 EA | 163.85 | 10.61 | 32.78 | 207.24 | (82.91) | 124.33 |
| 128. R&R Toilet | | | | | | | |
| | 1.00 EA | 362.73 | 23.49 | 72.56 | 458.78 | (24.49) | 434.29 |
| 129. Toilet seat | | | | | | | |
| | 1.00 EA | 45.48 | 2.94 | 9.10 | 57.52 | (46.01) | 11.51 |
| 130. R&R Fiberglass tub & shower combination | | | | | | | |
| | 1.00 EA | 822.37 | 53.25 | 164.48 | 1,040.10 | (166.41) | 873.69 |
| 131. R&R Tub/shower faucet | | | | | | | |
| | 1.00 EA | 266.22 | 17.24 | 53.26 | 336.72 | (134.69) | 202.03 |
| 132. R&R Towel bar | | | | | | | |
| | 2.00 EA | 26.56 | 3.43 | 10.62 | 67.17 | | 67.17 |
| 133. R&R Shower curtain rod | | | | | | | |
| | 1.00 EA | 26.64 | 1.72 | 5.34 | 33.70 | | 33.70 |
| 134. Toilet paper holder | | | | | | | |
| | 1.00 EA | 20.66 | 1.33 | 4.14 | 26.13 | | 26.13 |
| **Electrical** | | | | | | | |
| 135. R&R Light bar - 4 lights | | | | | | | |
| | 1.00 EA | 80.54 | 5.22 | 16.10 | 101.86 | (40.74) | 61.12 |
| 136. Light bulb - Incand. standard bulb - 1000 hr - mat. only | | | | | | | |
| | 4.00 EA | 0.50 | 0.13 | 0.40 | 2.53 | (2.03) | 0.50 |
| **Floor Covering** | | | | | | | |

SF-PHILCLAIM 002214

**Claim Rep Draft**

PHILLIPS, ANDERSON                                                                 03-43H7-730

### CONTINUED - MBath

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 137. R&R Tile floor covering | | | | | | | |
| | 22.75 SF | 8.13 | 11.98 | 37.00 | 233.94 | | 233.94 |
| 138. Remove Additional labor to remove tile from concrete slab | | | | | | | |
| | 22.75 SF | 1.00 | 1.48 | 4.56 | 28.79 | | 28.79 |
| **Totals: MBath** | | | **201.98** | **623.94** | **3,945.51** | **679.58** | **3,265.93** |



**MCloset**                                                                          **Height: 8'**

| 165.30 SF Walls | 25.99 SF Ceiling |
|---|---|
| 191.29 SF Walls & Ceiling | 25.99 SF Floor |
| 20.66 LF Ceil. Perimeter | 20.66 LF Floor Perimeter |

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| **Electrical** | | | | | | | |
| 139. R&R Light fixture | | | | | | | |
| | 1.00 EA | 58.92 | 3.82 | 11.78 | 74.52 | (29.82) | 44.70 |
| 140. Light bulb - Incand. standard bulb - 1000 hr - mat. only | | | | | | | |
| | 1.00 EA | 0.50 | 0.04 | 0.10 | 0.64 | (0.51) | 0.13 |
| **Floor Covering** | | | | | | | |
| 141. R&R Tile floor covering | | | | | | | |
| | 25.99 SF | 8.13 | 13.68 | 42.28 | 267.26 | | 267.26 |
| 142. Remove Additional labor to remove tile from concrete slab | | | | | | | |
| | 25.99 SF | 1.00 | 1.68 | 5.20 | 32.87 | | 32.87 |
| **Totals: MCloset** | | | **19.22** | **59.36** | **375.29** | **30.33** | **344.96** |

SF-PHILCLAIM 002215

### Claim Rep Draft

PHILLIPS, ANDERSON                                                                                                03-43H7-730



| | HCloset | | | | Height: 8' |
|---|---|---|---|---|---|
| | 96.98 SF Walls | | | 12.98 SF Ceiling | |
| | 109.97 SF Walls & Ceiling | | | 12.98 SF Floor | |
| | 16.98 LF Ceil. Perimeter | | | 11.15 LF Floor Perimeter | |

**Door**                                          5' 10" X 6' 8"                        Opens into HALLWAY

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

**Floor Covering**

143.  R&R Tile floor covering

| | 12.98 SF | 8.13 | 6.83 | 21.12 | 133.47 | | 133.47 |
|---|---|---|---|---|---|---|---|

144.  Remove Additional labor to remove tile from concrete slab

| | 12.98 SF | 1.00 | 0.84 | 2.60 | 16.42 | | 16.42 |
|---|---|---|---|---|---|---|---|

| **Totals:  HCloset** | | | 7.67 | 23.72 | 149.89 | 0.00 | 149.89 |
|---|---|---|---|---|---|---|---|

| | Garage | | | | Height: 8' |
|---|---|---|---|---|---|
| | 600.44 SF Walls | | | 475.18 SF Ceiling | |
| | 1,075.62 SF Walls & Ceiling | | | 475.18 SF Floor | |
| | 89.06 LF Ceil. Perimeter | | | 73.06 LF Floor Perimeter | |

**Door**                                          16' X 7'                        Opens into Exterior

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

**Doors/Windows/Related Trimwork**

145.  R&R Overhead (garage) door opener

| | 1.00 EA | 299.02 | 19.35 | 59.82 | 378.19 | | 378.19 |
|---|---|---|---|---|---|---|---|

146.  R&R Overhead door & hardware - 16' x 7' - Standard grade

| | 1.00 EA | 837.51 | 54.22 | 167.52 | 1,059.25 | | 1,059.25 |
|---|---|---|---|---|---|---|---|

147.  R&R Attic entrance cover and trim

| | 1.00 EA | 42.93 | 2.78 | 8.58 | 54.29 | | 54.29 |
|---|---|---|---|---|---|---|---|

**Electrical**

SF-PHILCLAIM 002216

**Claim Rep Draft**

PHILLIPS, ANDERSON                                                                                  03-43H7-730

**CONTINUED - Garage**

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 148. R&R Porcelain light fixture | | | | | | | |
| | 1.00 EA | 28.43 | 1.85 | 5.68 | 35.96 | (14.38) | 21.58 |
| 149. Light bulb - Incand. standard bulb - 1000 hr - mat. only | | | | | | | |
| | 1.00 EA | 0.50 | 0.04 | 0.10 | 0.64 | (0.51) | 0.13 |

**Window Treatments, Shelving, Closet Organization**

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 150. R&R Shelving - 12" - in place | | | | | | | |
| | 4.00 LF | 5.71 | 1.48 | 4.58 | 28.90 | | 28.90 |
| 151. R&R Shelving - 24" - in place | | | | | | | |
| | 4.00 LF | 7.24 | 1.87 | 5.80 | 36.63 | | 36.63 |

**Plumbing and Related Fixtures**

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 152. R&R Washing machine outlet box with valves | | | | | | | |
| | 1.00 EA | 184.26 | 11.93 | 36.84 | 233.03 | | 233.03 |
| 153. R&R Clothes dryer vent - installed | | | | | | | |
| | 1.00 EA | 50.50 | 3.28 | 10.12 | 63.90 | | 63.90 |

**Floor Covering**

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 154. Clean concrete the floor | | | | | | | |
| | 475.18 SF | 0.22 | 6.77 | 20.90 | 132.21 | | 132.21 |

| | | | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| **Totals: Garage** | | | 103.57 | 319.94 | 2,023.00 | 14.89 | 2,008.11 |

Area Totals:  Main Level

| | | |
|---|---|---|
| 4,214.54 SF Walls | 1,856.69 SF Ceiling | 6,071.23 SF Walls and Ceiling |
| 1,856.69 SF Floor | 1,993.69 Total Area | 528.16 LF Floor Perimeter |
| 1,856.69 Floor Area | 220.83 Exterior Perimeter | 583.50 LF Ceil. Perimeter |
| 1,789.67 Exterior Wall Area | of Walls | 4,214.54 Interior Wall Area |

| | | | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| **Total: Main Level** | | | 5,391.83 | 16,656.70 | 105,330.27 | 15,978.82 | 89,351.45 |

roof

roof

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

SF-PHILCLAIM 002217

**Claim Rep Draft**

PHILLIPS, ANDERSON                                                                        03-43H7-730

**CONTINUED - roof**

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 155. R&R Truss - 4/12 slope | | | | | | | |
| | 942.10 LF | 5.78 | 352.54 | 1,089.06 | 6,886.94 | | 6,886.94 |
| 156. R&R Girder truss - 4/12 slope | | | | | | | |
| | 89.52 LF | 8.97 | 51.98 | 160.60 | 1,015.58 | | 1,015.58 |
| 157. R&R Mono truss - 4/12 slope | | | | | | | |
| | 201.32 LF | 7.24 | 94.35 | 291.50 | 1,843.41 | | 1,843.41 |
| 158. R&R Overbuild/Valley Truss - 4/12 slope | | | | | | | |
| | 60.42 LF | 7.73 | 30.24 | 93.40 | 590.68 | | 590.68 |
| 159. R&R Sheathing - plywood - 1/2" - treated | | | | | | | |
| | 2,675.94 SF | 1.94 | 336.09 | 1,038.26 | 6,565.67 | | 6,565.67 |
| 160. Crane and operator - 14 ton capacity - 65' extension boom | | | | | | | |
| | 8.00 HR | 179.44 | 92.94 | 287.10 | 1,815.56 | | 1,815.56 |
| **Total:  roof** | | | **958.14** | **2,959.92** | **18,717.84** | **0.00** | **18,717.84** |



**Roof**

| | |
|---|---|
| 2,675.94 Surface Area | 26.76 Number of Squares |
| 268.07 Total Perimeter Length | 60.69 Total Ridge Length |
| 66.54 Total Hip Length | |

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 161. Remove Tear off, haul and dispose of comp. shingles - Laminated | | | | | | | |
| | 26.76 SQ | 35.09 | 60.79 | 187.80 | 1,187.60 | | 1,187.60 |
| 162. Laminated - comp. shingle rfg. - w/ felt | | | | | | | |
| | 31.00 SQ | 191.31 | 383.95 | 1,186.12 | 7,500.68 | (2,000.18) | 5,500.50 |
| 163. Ridge cap - High profile - composition shingles | | | | | | | |
| | 60.69 LF | 4.70 | 18.47 | 57.04 | 360.75 | | 360.75 |

SF-PHILCLAIM 002218

**Claim Rep Draft**

PHILLIPS, ANDERSON                                                                          03-43H7-730

**CONTINUED - Roof**

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 164. Steel bird stop eave closure strip - granular coated | | | | | | | |
| | 268.07 LF | 5.72 | 99.26 | 306.68 | 1,939.30 | | 1,939.30 |
| 165. Drip edge | | | | | | | |
| | 268.07 LF | 1.54 | 26.72 | 82.56 | 522.11 | | 522.11 |
| 166. Furnace vent - rain cap and storm collar, 5" | | | | | | | |
| | 4.00 EA | 46.88 | 12.14 | 37.50 | 237.16 | | 237.16 |
| 167. R&R Flashing, 14" wide | | | | | | | |
| | 8.00 LF | 3.05 | 1.59 | 4.88 | 30.87 | | 30.87 |

**flashing at bottom of dormer**

| | | | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| **Totals: Roof** | | | 602.92 | 1,862.58 | 11,778.47 | 2,000.18 | 9,778.29 |

Area Totals: roof

| 160.91 Exterior Wall Area | | |
|---|---|---|
| 2,675.94 Surface Area | 26.76 Number of Squares | 536.15 Total Perimeter Length |
| 60.69 Total Ridge Length | 66.54 Total Hip Length | |

| | | | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| **Total: roof** | | | 1,561.06 | 4,822.50 | 30,496.31 | 2,000.18 | 28,496.13 |

**Front Elevation**                                                          **Formula Elevation 39' 2" x 8' x 6'**

| 430.83 SF Walls | 0.00 SF Ceiling | 430.83 SF Walls & Ceiling |
|---|---|---|
| 0.00 SF Floor | 430.83 SF Short Wall | 39.17 LF Floor Perimeter |
| 430.83 SF Long Wall | | 40.96 LF Ceil. Perimeter |

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 168. Prime & paint exterior fascia - wood, 4"- 6" wide | | | | | | | |
| | 74.75 LF | 1.01 | 4.88 | 15.10 | 95.48 | (50.93) | 44.55 |
| 169. Prime & paint exterior soffit - exposed rafters | | | | | | | |
| | 50.00 SF | 1.95 | 6.31 | 19.50 | 123.31 | (65.77) | 57.54 |
| 170. Prime & paint exterior soffit - wood | | | | | | | |
| | 20.00 SF | 1.36 | 1.76 | 5.44 | 34.40 | (18.34) | 16.06 |

SF-PHILCLAIM 002219

**Claim Rep Draft**

PHILLIPS, ANDERSON                                                                                               03-43H7-730

**CONTINUED - Front Elevation**

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 171. R&R Metal lath & stucco - Standard grade | | | | | | | |
| | 430.83 SF | 4.04 | 112.68 | 348.10 | 2,201.34 | (176.11) | 2,025.23 |
| 172. R&R Rigid foam insulation board - 1" | | | | | | | |
| | 430.83 SF | 0.82 | 22.87 | 70.66 | 446.81 | (23.85) | 422.96 |
| 173. Seal & paint stucco | | | | | | | |
| | 430.83 SF | 0.91 | 25.38 | 78.42 | 495.86 | (264.46) | 231.40 |
| *Entry* | | | | | | | |
| 174. R&R 1/2" drywall - hung, taped, floated, ready for paint | | | | | | | |
| | 56.93 SF | 1.44 | 5.32 | 16.40 | 103.69 | | 103.69 |
| 175. Seal/prime then paint the surface area (2 coats) | | | | | | | |
| | 56.93 SF | 0.60 | 2.21 | 6.84 | 43.21 | (23.04) | 20.17 |
| 176. R&R Exterior light fixture | | | | | | | |
| | 1.00 EA | 78.49 | 5.08 | 15.70 | 99.27 | (39.72) | 59.55 |
| 177. Light bulb - Incand. standard bulb - 1000 hr - mat. only | | | | | | | |
| | 1.00 EA | 0.50 | 0.04 | 0.10 | 0.64 | (0.51) | 0.13 |
| 178. Detach & Reset Spot light fixture - double | | | | | | | |
| | 2.00 EA | 31.11 | 4.03 | 12.44 | 78.69 | | 78.69 |
| **Totals: Front Elevation** | | | **190.56** | **588.70** | **3,722.70** | **662.73** | **3,059.97** |

**Right Elevation**                                                                    **Formula Elevation 58' x 8' x 0"**

| 464.00 SF Walls | 0.00 SF Ceiling | 464.00 SF Walls & Ceiling |
|---|---|---|
| 0.00 SF Floor | 464.00 SF Short Wall | 58.00 LF Floor Perimeter |
| 464.00 SF Long Wall | | 58.00 LF Ceil. Perimeter |

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 179. Prime & paint exterior fascia - wood, 4"- 6" wide | | | | | | | |
| | 58.67 LF | 1.01 | 3.84 | 11.86 | 74.96 | (39.98) | 34.98 |
| 180. Prime & paint exterior soffit - exposed rafters | | | | | | | |
| | 58.67 SF | 1.95 | 7.40 | 22.88 | 144.69 | (77.17) | 67.52 |

SF-PHILCLAIM 002220

**Claim Rep Draft**

PHILLIPS, ANDERSON                                                                    03-43H7-730

**CONTINUED - Right Elevation**

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 181. R&R Metal lath & stucco - Standard grade | | | | | | | |
| | 464.00 SF | 4.04 | 121.35 | 374.90 | 2,370.81 | (189.68) | 2,181.13 |
| 182. R&R Rigid foam insulation board - 1" | | | | | | | |
| | 464.00 SF | 0.82 | 24.63 | 76.08 | 481.19 | (25.66) | 455.53 |
| 183. Seal & paint stucco | | | | | | | |
| | 464.00 SF | 0.91 | 27.34 | 84.44 | 534.02 | (284.81) | 249.21 |
| **Totals: Right Elevation** | | | **184.56** | **570.16** | **3,605.67** | **617.30** | **2,988.37** |

**Rear Elevation**                                                   **Formula Elevation 39' 2" x 8' x 6'**

**Subroom 1: Offset**                                               **Formula Elevation 4' 8" x 8' x 0"**

| 468.17 SF Walls | 0.00 SF Ceiling | 468.17 SF Walls & Ceiling |
|---|---|---|
| 0.00 SF Floor | 468.17 SF Short Wall | 43.83 LF Floor Perimeter |
| 468.17 SF Long Wall | | 45.63 LF Ceil. Perimeter |

| | QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 184. Prime & paint exterior fascia - wood, 4"- 6" wide | | | | | | | |
| | 60.50 LF | 1.01 | 3.96 | 12.22 | 77.29 | (41.22) | 36.07 |
| 185. Prime & paint exterior soffit - exposed rafters | | | | | | | |
| | 4.67 SF | 1.95 | 0.59 | 1.82 | 11.52 | (6.15) | 5.37 |
| 186. Prime & paint exterior soffit - wood | | | | | | | |
| | 55.83 SF | 1.36 | 4.92 | 15.18 | 96.03 | (51.23) | 44.80 |
| 187. R&R Metal lath & stucco - Standard grade | | | | | | | |
| | 468.17 SF | 4.04 | 122.45 | 378.28 | 2,392.13 | (191.37) | 2,200.76 |
| 188. R&R Rigid foam insulation board - 1" | | | | | | | |
| | 468.17 SF | 0.82 | 24.85 | 76.78 | 485.53 | (25.91) | 459.62 |
| 189. Seal & paint stucco | | | | | | | |
| | 468.17 SF | 0.91 | 27.58 | 85.20 | 538.81 | (287.37) | 251.44 |
| **Totals: Rear Elevation** | | | **184.35** | **569.48** | **3,601.31** | **603.25** | **2,998.06** |

SF-PHILCLAIM 002221

### Claim Rep Draft

PHILLIPS, ANDERSON                                                                      03-43H7-730

**Left Elevation**                                              **Formula Elevation 85' 3" x 8' x 0"**

| | | | |
|---|---|---|
| 682.00 SF Walls | 0.00 SF Ceiling | 682.00 SF Walls & Ceiling |
| 0.00 SF Floor | 682.00 SF Short Wall | 85.25 LF Floor Perimeter |
| 682.00 SF Long Wall | | 85.25 LF Ceil. Perimeter |

| QUANTITY | UNIT PRICE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|
| 190. Prime & paint exterior fascia - wood, 4"- 6" wide | | | | | | |
| 67.58 LF | 1.01 | 4.42 | 13.66 | 86.34 | (46.04) | 40.30 |
| 191. Prime & paint exterior soffit - exposed rafters | | | | | | |
| 67.58 SF | 1.95 | 8.53 | 26.36 | 166.67 | (88.89) | 77.78 |
| 192. R&R Metal lath & stucco - Standard grade | | | | | | |
| 682.00 SF | 4.04 | 178.38 | 551.06 | 3,484.72 | (278.76) | 3,205.96 |
| 193. R&R Rigid foam insulation board - 1" | | | | | | |
| 682.00 SF | 0.82 | 36.21 | 111.84 | 707.29 | (37.72) | 669.57 |
| 194. Seal & paint stucco | | | | | | |
| 682.00 SF | 0.91 | 40.18 | 124.12 | 784.92 | (418.63) | 366.29 |
| *Patio* | | | | | | |
| 195. R&R 1/2" drywall - hung, taped, floated, ready for paint | | | | | | |
| 165.28 SF | 1.44 | 15.41 | 47.60 | 301.01 | | 301.01 |
| 196. Seal/prime then paint the surface area (2 coats) | | | | | | |
| 165.28 SF | 0.60 | 6.42 | 19.84 | 125.43 | (66.89) | 58.54 |
| 197. R&R Ceiling fan & light | | | | | | |
| 1.00 EA | 257.45 | 16.66 | 51.50 | 325.61 | (130.25) | 195.36 |
| 198. Light bulb - Incand. standard bulb - 1000 hr - mat. only | | | | | | |
| 2.00 EA | 0.50 | 0.06 | 0.20 | 1.26 | (1.01) | 0.25 |
| *Dwelling Extension* | | | | | | |
| 199. Clean with pressure/chemical spray | | | | | | |
| 937.95 SF | 0.29 | 17.60 | 54.40 | 344.01 | | 344.01 |
| 200. R&R Wood gate 5'- 6' high - treated | | | | | | |
| 5.00 LF | 34.00 | 11.01 | 34.02 | 215.03 | | 215.03 |
| 201. R&R Block - 8" x 8" x 16" - in place | | | | | | |
| 8.44 SF | 6.93 | 3.79 | 11.70 | 73.98 | | 73.98 |
| **Totals: Left Elevation** | | **338.67** | **1,046.30** | **6,616.27** | **1,068.19** | **5,548.08** |

SF-PHILCLAIM 002222

**Claim Rep Draft**

PHILLIPS, ANDERSON                                                                                03-43H7-730

### Labor Minimums Applied

| | QUANTITY UNIT PRICE | | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| * 202. Door labor minimum | | | | | | | |
| | 1.00 EA | 30.52 | 1.98 | 6.10 | 38.60 | | 38.60 |
| * 203. Tile / marble labor minimum | | | | | | | |
| | 1.00 EA | 62.64 | 4.06 | 12.52 | 79.22 | | 79.22 |
| * 204. Mirror/shower door labor minimum | | | | | | | |
| | 1.00 EA | 48.45 | 3.13 | 9.70 | 61.28 | | 61.28 |
| * 205. Fencing labor minimum | | | | | | | |
| | 1.00 EA | 28.48 | 1.85 | 5.70 | 36.03 | | 36.03 |
| * 206. Masonry labor minimum | | | | | | | |
| | 1.00 EA | 135.97 | 8.81 | 27.20 | 171.98 | | 171.98 |
| **Totals: Labor Minimums Applied** | | | **19.83** | **61.22** | **387.11** | **0.00** | **387.11** |

| **Line Item Totals: 03-43H7-730** | **7,870.86** | **24,315.06** | **153,759.64** | **20,930.47** | **132,829.17** |
|---|---|---|---|---|---|

### Grand Total Areas:

| | | |
|---|---|---|
| 6,259.54 SF Walls | 1,856.69 SF Ceiling | 8,116.23 SF Walls and Ceiling |
| 1,856.69 SF Floor | 2,045.00 SF Short Wall | 754.41 LF Floor Perimeter |
| 2,045.00 SF Long Wall | | 813.34 LF Ceil. Perimeter |
| 1,856.69 Floor Area | 1,993.69 Total Area | 4,214.54 Interior Wall Area |
| 1,950.58 Exterior Wall Area | 220.83 Exterior Perimeter of Walls | |
| 2,675.94 Surface Area | 26.76 Number of Squares | 536.15 Total Perimeter Length |
| 60.69 Total Ridge Length | 66.54 Total Hip Length | |

SF-PHILCLAIM 002223



Main Level

SF-PHILCLAIM 002224





1/20/2016 4:22 PM

SF-PHILCLAIM 002225

roof

# Exhibit B



**SKIPTON**
claims management

PH 602.957.8800 | FX 602.992.2514
TOLL FREE: 877.992.7577
www.SkiptonInc.com

CORPORATE OFFICE
8710 E. Vista Bonita Dr.
Scottsdale, AZ 85255

*SENT VIA U.S. MAIL*

February 23, 2016

State Farm Insurance Company
Claim#: 0343H7730
P.O. BOX 52260
Phoenix, AZ 85072-2260

  Client/Insured: Anderson Phillip
  Loss Location: 214 West Desert Lane Phoenix , AZ 85041
  Date of Loss: December 6, 2015
  Policy #: 03J446602
  Claim #: 0343H7730

Dear Mr. Gonzalez:

  This correspondence will serve to confirm receipt of State Farm's structure evaluation of January 25, 2016 and will address our concerns with this evaluation.

  Our review of State Farm's loss evaluation reveals that again State Farm continues with their purposeful misuse of the Xactimate estimating program by utilizing the "New Construction" price database despite the fact that this loss is unquestionably a "Restoration/Service/Remodel" project. Xactware which is the mother company of Xactimate issued a White Paper entitled "Pricing Methodology" dated April 17, 2015 that is intended to clarify the use of their estimating software products. This document explains that Xactimate offers two pricing options: 1- Restoration, Service and Remodel, and 2- New Construction. The "Restoration, Service, and Remodel" option is *"used in partial loss restoration and remodeling work."* On the other hand, the "New Construction" option is reserved for *"Total ground up reconstruction or in some cases portions of a large partial loss."*

  In Xactimate 27's product description, they explain the use of "New Construction" as follows: *"The New Construction setting employs the fastest labor productivity of the two options. This is due to the fact that new construction requires less set-up and cleanup time, drive time is typically not paid to most trades, and the work generally goes faster as the tradesperson is not working in a home that is occupied, has furnishings, etc. In other words, accessibility is not a major consideration."*

  Further, on March 12, 2015, Xactware produced a document entitled "New Construction vs. Reconstruction" which sheds further light on this issue. Three areas are highlighted as pertinent to deciding what pricing option is best to use for a given project: Accessibility, Customer Service, and Economies of Scale.

ARIZONA . CALIFORNIA . FLORIDA . ILLINOIS . NEVADA . TEXAS

03012016

SF-PHILCLAIM 002127

SF-PHILCLAIM 002128

State Farm Insurance Company:
Re: Anderson Phillip: Claim #: 0343H7730
February 23, 2016
Page 2 of 3

For "Accessibility", Xactware notes that a newly built home may have *"distinct differences"* verses an older home, such as *"landscaping, driveways, walkways, fences or other neighboring structures that were not present at the time the home was originally built."* These factors have an obvious negative impact on labor productivity: *"Labor productivity decreases as workers must walk around fences and other obstacles; adjust work schedules to minimize homeowner or neighborhood disruption; go outdoors to prep or cut materials; and protect undamaged areas, surfaces, and amenities. This results in added costs related to additional tasks, and a generally slower work environment for many trades (as more care is taken not to cause additional damage). These added costs account for some differences between new construction pricing and reconstruction pricing."* Clearly, the Labor productivity environment at the home of the Phillips is severely hindered by both the existing structures as referenced above and the trades need to tie into existing dated portions of the structure.

With regards to the often overlooked aspect of "Customer Service", Xactware states the following: *"Reconstruction, by nature, involves working with homeowners who have just incurred a tremendous (and sometimes tragic) loss. Contractors who specialize in reconstruction understand this, and realize the need to provide an additional level of service not normally found in the new construction environment. This includes hiring individuals who have not only the construction skills needed, but also the 'people skills'. Additional training is often provided and required. It is also not uncommon for contractors who specialize in reconstruction to have a larger full time staff to work the job from start to finish (e.g. Project Manager or Supervisor). The result is a higher labor cost due to higher wages being paid and loss of productivity. These higher labor costs also contribute to the difference between new construction pricing and reconstruction pricing."*

The third area highlighted by Xactware is "Economies of Scale". This topic is addressed as follows: *"Large production contractors specializing in new construction tend to have multiple jobs running at one time. Contractors who run multiple jobs concurrently realize significant discounts from material suppliers and from sub-contractors that they keep busy for long periods of time. (In other words, a plumber will provide a better price per home when they know they will be plumbing 30 homes for you this year.) Economies of scale and the cost savings associated with them are often seen in new construction, but not necessarily in a reconstruction environment."*

It is clear that the conditions found at the Phillips home do not meet Xactware's stated "New Construction" pricing criteria with regards to Accessibility, Customer Service or Economies of Scale. State Farm has failed to properly apply all three of the critical parameters highlighted by Xactware's pricing selection guide quoted above. It is our understanding that this is a recent directive by the management at State Farm, wherein they have instructed their field adjusters to misuse the Xactware software in an attempt to deliberately underpay claimant policyholders for the fair values of loss. The use of the "New Construction" database on the Phillip's claim yields a significant difference in the amount of State Farm's liability for payment. Using the Restoration price database the replacement cost value of the Phillip's claim is $202,165.52; using the New Construction price database the replacement cost value is $182,779.86, a difference $19,385.66 or nearly 10% of the total claim value. With this sort of savings on just one claim, it is easy to see why State Farm has chosen to change the manner in which they evaluate and pay claims.

We say this because in reviewing our previous State Farm claims, we note that none of these claims until just recently attempted to use the "New Construction" pricing database for fire and water restoration

ARIZONA . CALIFORNIA . FLORIDA . ILLINOIS . NEVADA . TEXAS

03012016

SF-PHILCLAIM 002129

SF-PHILCLAIM 002130

State Farm Insurance Company:
Re: Anderson Phillip: Claim #: 0343H7730
February 23, 2016
Page 3 of 3

work. We have enclosed the title pages for a dozen prior State Farm claims that specify the use of the "Restoration" price database. Kindly explain the logic State Farm is now employing in their determination that the Phillips' claim is "New Construction" pricing while the other enclosed claims of similar nature somehow do not fit this label.

It is clear that State Farm's misuse of the Xactimate estimating software is designed to save State Farm *millions of dollars by deliberately underpaying their policyholders' claims. While it is ultimately up to a jury to* decide whether or not this conduct is a bad faith claims handling practice, we cannot see how they could not come to this conclusion, given these facts. This will serve as our request that State Farm revise their loss evaluation to properly and fairly indemnify the Assureds' for their dwelling loss by utilizing the restoration pricing database. Should State Farm feel that their conduct is justified, then we look forward to State Farm's explanation for their questionable use of "New Construction" pricing database.

Additionally, we note that despite our agreement at the loss site, the windows in the front portion of the Phillips home were not included. As you may recall, we were replacing all of the windows less the back bedrooms. Please revise your scope accordingly.

Lastly, with regards to the Assureds personal property loss evaluation, we are in the process of reviewing our replacement cost pricing research with the Assureds. We anticipate submitting the personal property claim within the upcoming week.

Thank you for your continuing efforts to resolve this claim. We look forward to reaching a fair resolution to this matter.

Sincerely,

Justin Skipton T.N.

Justin Skipton
Executive General Adjuster for
Skipton & Associates, Inc.

Enclosure(s)
- Historical records of State Farm structure evaluations showing "Restoration/Service/Remodel" database pricing

CC: Mr. Anderson Phillip via email to: andersonphillips5@gmail.com

ARIZONA . CALIFORNIA . FLORIDA . ILLINOIS . NEVADA . TEXAS

03012016

SF-PHILCLAIM 002131

SF-PHILCLAIM 002132

Chris DeRose, Clerk of Court
*** Electronically Filed ***
04/17/2018 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2016-013572                                04/16/2018


                                         CLERK OF THE COURT
HON. SHERRY K. STEPHENS                        T. DeRaddo
                                                 Deputy


ANDERSON PHILLIPS, et al.               JEFFREY GREGORY ZANE

v.

STATE FARM FIRE AND CASUALTY            ERIN E BRADHAM
COMPANY

                                        MICHAEL N POLI
                                        STEPHEN E SILVERMAN


            TELEPHONIC TRIAL SETTING CONFERENCE SET


        East Court Building - Courtroom 712

        8:30 a.m.  This is the time set for a telephonic Trial Setting Conference.  Counsel,
Michael Poli and Stephen Silverman are present telephonically for counsel, Jeffrey G. Zane, on
behalf of Plaintiffs.  Counsel, Erin E. Bradham and Karl Tilleman are present telephonically on
behalf of Defendants.

        A record of the proceedings is made digitally in lieu of a court reporter.

        Discussion is held regarding the status of the case. The parties report that discovery is
ongoing, and they are not ready to set a trial.  The parties request to have a 30-day extension for
discovery.  Counsel states that they want to conduct an inspection of the property.

        Plaintiffs report that they may seek to amend their Complaint and file a class-action
lawsuit.

        The parties report that they will submit an amended scheduling order.


Docket Code 028                      Form V000A                              Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2016-013572                                          04/16/2018


     IT IS ORDERED setting a telephonic Trial Setting Conference on **May 24, 2018 at 9:00 a.m.**

     The parties are expected to be prepared with their calendars as well as the calendars of any primary witnesses so the Court can set a firm trial date for this matter.

     Counsel for Plaintiff shall initiate the call by arranging the presence of all parties and contacting this division at 602-506-4818.

     8:34 a.m.  Matter concludes.

Chris DeRose, Clerk of Court
*** Electronically Filed ***
K. Vega, Deputy
4/24/2018 2:39:00 PM
Filing ID 9285429

1
2
3
4
5
6
7
8

STEPTOE & JOHNSON LLP
201 East Washington Street, Suite 1600
Phoenix, Arizona 85004-2382
Telephone: (602) 257-5200
Facsimile:  (602) 257-5299
Court Email: phcourtnotices@steptoe.com
fbienstock@steptoe.com
ebradham@steptoe.com

Floyd P. Bienstock (006299)
Erin E. Bradham (022827)

Attorneys for Defendant
State Farm Fire and Casualty Company

9

## SUPERIOR COURT OF ARIZONA

10

## IN MARICOPA COUNTY

| | |
|---|---|
| Anderson Phillips and Jasmine Phillips, husband and wife,<br><br>     Plaintiffs,<br><br>  vs.<br><br>State Farm Fire and Casualty Company, an Illinois corporation,<br><br>     Defendant. | No. CV2016-013572<br><br>**STIPULATION TO EXTEND DEADLINES**<br><br>(Assigned to the Honorable Sherry Stephens) |

As discussed with the Court at the April 16, 2018 Scheduling Conference, the parties stipulate and agree to extend the deadlines established in this Court's August 1, 2017 Scheduling Order and March 6, 2018 Order to Extend Deadlines as follows:

| Description | Current Due Date | Extended Due Date |
|---|---|---|
| Complete depositions of lay witnesses and property inspection | April 30, 2018 | May 30, 2018 |
| Deadlines for defendants to disclose the identify and opinions of experts | May 18, 2018 | June 18, 2018 |
| Deadline for plaintiffs to disclose their rebuttal expert opinions | June 15, 2018 | July 16, 2018 |
| Trial Setting Conference | April 16, 2018 at 8:30 am | May 24, 2018 at 9:00 am |

| Description | Current Due Date | Extended Due Date |
|---|---|---|
| Final supplemental disclosures by all parties | July 13, 2018 | August 17, 2018 |
| Deadline to complete expert witness depositions | July 27, 2018 | August 27, 2018 |
| Discovery deadline | July 27, 2018 | August 27, 2018 |
| Dispositive motion deadline | August 24, 2018 | September 24, 2018 |

The requested extension would allow the parties to complete depositions and a property inspection at times that work for the parties, third party witnesses, and their counsel.

DATED this 24th day of April, 2018.

STEPTOE & JOHNSON LLP

/s/ Erin E. Bradham
Floyd P. Bienstock
Erin E. Bradham
201 East Washington Street, Suite 1600
Phoenix, Arizona 85004-2382

Attorneys for Defendant State Farm Fire and Casualty Company

STEPHEN SILVERMAN LAW

/s/ Stephen E. Silverman (w/permission)
Stephen E. Silverman
6945 E. Sahuaro Drive, Suite 125
Scottsdale, Arizona 85254

Attorneys for Plaintiffs

COPY of the foregoing electronically filed
and served using AZTurboCourt this 24th day of
April, 2018, on the following:

Michael N. Poli, #006431
mpoli@merlinlawgroup.com
Jeff Zane, #024172
jzane@merlinlawgroup.com

MERLIN LAW GROUP, P.A.
2999 North 44th Street, Suite 520
Phoenix, Arizona 85018
*Attorneys for Plaintiffs*

Stephen E. Silverman, #016757
steve@stephensilverman.com
Stephen Silverman Law
6945 E. Sahuaro Dr., Ste. 125
Scottsdale, AZ 85254
*Attorneys for Plaintiffs*

/s/ Beth Hardin
Employee of Steptoe & Johnson LLP

Chris DeRose, Clerk of Court
*** Electronically Filed ***
N. Johnson, Deputy
4/27/2018 8:00:00 AM
Filing ID 9292080

SUPERIOR COURT OF ARIZONA

IN MARICOPA COUNTY

| Anderson Phillips and Jasmine Phillips, husband and wife, | No. CV2016-013572 |
|---|---|
| Plaintiffs, | **[PROPOSED] ORDER TO EXTEND DEADLINES** |
| vs. | (Assigned to the Honorable Sherry Stephens) |
| State Farm Fire and Casualty Company, an Illinois corporation, | |
| Defendant. | |

The Court, having considered the Stipulation to Extend Deadlines of the parties and good cause appearing therefor,

IT IS HEREBY ORDERED that the current deadlines are extended as follows:

| Description | Current Due Date | Extended Due Date |
|---|---|---|
| Complete depositions of lay witnesses and property inspection | April 30, 2018 | May 30, 2018 |
| Deadlines for defendants to disclose the identify and opinions of experts | May 18, 2018 | June 18, 2018 |
| Deadline for plaintiffs to disclose their rebuttal expert opinions | June 15, 2018 | July 16, 2018 |
| Trial Setting Conference | April 16, 2018 at 8:30 am | May 24, 2018 at 9:00 am |
| Final supplemental disclosures by all parties | July 13, 2018 | August 17, 2018 |

| Description | Current Due Date | Extended Due Date |
|---|---|---|
| Deadline to complete expert witness depositions | July 27, 2018 | August 27, 2018 |
| Discovery deadline | July 27, 2018 | August 27, 2018 |
| Dispositive motion deadline | August 24, 2018 | September 24, 2018 |

IT IS HEREBY ORDERED THAT the trial setting conference is scheduled for the following date and time:   May 24, 2018 at 9:00 am

- 2 -

Filing ID: 9292080   Case Number: CV2016-013572
Original Filing ID: 9285429

_____

**Granted as Submitted**



/S/ Sherry Stephens Date: 4/26/2018
_____
Judicial Officer of Superior Court

## ENDORSEMENT PAGE

CASE NUMBER: CV2016-013572                    SIGNATURE DATE: 4/26/2018

E-FILING ID #: 9292080                              FILED DATE: 4/27/2018 8:00:00 AM


ERIN E BRADHAM



JEFFREY GREGORY ZANE

Chris DeRose, Clerk of Court
*** Electronically Filed ***
05/01/2018 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2016-013572                                       04/27/2018


                                       CLERK OF THE COURT
HON. SHERRY K. STEPHENS                       T. DeRaddo
                                             Deputy


ANDERSON PHILLIPS, et al.           JEFFREY GREGORY ZANE

v.

STATE FARM FIRE AND CASUALTY        ERIN E BRADHAM
COMPANY




                    **ORAL ARGUMENT SET**


     The Court has received Plaintiff's February 23, 2018 *Motion for Leave to File Amended Complaint.*

     **IT IS ORDERED** setting Oral Argument on **May 23, 2018 at 9:30 a.m. (Time allotted: 30 minutes)** in this division.

                    **Honorable Sherry Stephens**
                **Maricopa County Superior Court**
        **101 W. Jefferson, East Court Building, Suite 712**
                        **Phoenix, 85003**
                        **(602) 506-4818**

     **NOTE**:  All court proceedings are recorded by audio and video method and not by a court reporter.  Should you want an unofficial copy of the proceedings, the parties or counsel may request a CD of the proceedings for a $30.00 charge.  If a CD is requested, please obtain a form from the Self Service Center to request a daily copy of a court hearing or trial proceeding being conducted.  Pay the applicable fee **at the Self Service Center**.  **For copies of hearings or trial proceedings recorded previously, please call Electronic Records Services at 602-506-**

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2016-013572                                            04/27/2018

**7100**.  Should an official transcript be required, you may request that the court prepare it.  The party ordering the transcript must pay for it.  To request a transcript, call 602-506-7100 and provide the date of the proceeding, the case number, the case caption, if the transcript is for an appeal, and your name, address, and telephone number.

**NOTE:**  Pursuant to Local Rule 2.22, if a party desires a court reporter for any proceeding in which a court reporter is not mandated by Arizona Supreme Court Rule 30, the party must submit a written request to the assigned judicial officer at least ten (10) judicial days in advance of the hearing, and must pay the authorized fee to the Clerk of the Court at least two (2) judicial days before the proceeding.  The fee is $140 for a half-day and $280 for a full day.

Effective February 15, 2017, Rule 9.8 of the Maricopa County Superior Court Local Rules of Practice (Reporting of Oral Arguments and Hearings) has been abrogated. See Arizona Supreme Court Order No. R-16-0044.

Failure to timely request a court reporter will be deemed consent to proceed without a court reporter.

Chris DeRose, Clerk of Court
*** Electronically Filed ***
05/21/2018 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2016-013572                                           05/18/2018


                                              CLERK OF THE COURT
HON. SHERRY K. STEPHENS                              T. DeRaddo
                                                      Deputy


ANDERSON PHILLIPS, et al.              JEFFREY GREGORY ZANE

v.

STATE FARM FIRE AND CASUALTY          ERIN E BRADHAM
COMPANY



ORAL ARGUMENT RESET


        By stipulation of the parties,

        IT IS ORDERED vacating Oral Argument on May 23, 2018 at 9:30 a.m. and resetting
same to **May 24, 2018 at 9:00 a.m.** in this division.

                        **Honorable Sherry Stephens**
                      **Maricopa County Superior Court**
               **101 W. Jefferson, East Court Building, Suite 712**
                              **Phoenix, 85003**
                              **(602) 506-4818**


        Argument will be presented to the Court on Plaintiff's February 23, 2018 *Motion for
Leave to File Amended Complaint*.

        Additionally, a Trial Setting Conference will be held.

        The parties are expected to be prepared with their calendars as well as the calendars of
any primary witnesses so the Court can set a firm trial date for this matter.


Docket Code 095                        Form V000A                              Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2016-013572                                    05/18/2018

**NOTE**:  All court proceedings are recorded by audio and video method and not by a court reporter.  Should you want an unofficial copy of the proceedings, the parties or counsel may request a CD of the proceedings for a $30.00 charge.  To request a transcript, call 602-506-7100 and provide the date of the proceeding, the case number, the case caption, if the transcript is for an appeal, and your name, address, and telephone number.

**NOTE:**  Pursuant to Local Rule 2.22, if a party desires a court reporter for any proceeding in which a court reporter is not mandated by Arizona Supreme Court Rule 30, the party must submit a written request to the assigned judicial officer at least ten (10) judicial days in advance of the hearing, and must pay the authorized fee to the Clerk of the Court at least two (2) judicial days before the proceeding.  The fee is $140 for a half-day and $280 for a full day.

Effective February 15, 2017, Rule 9.8 of the Maricopa County Superior Court Local Rules of Practice (Reporting of Oral Arguments and Hearings) has been abrogated. See Arizona Supreme Court Order No. R-16-0044.

Failure to timely request a court reporter will be deemed consent to proceed without a court reporter.

Chris DeRose, Clerk of Court
*** Electronically Filed ***
05/25/2018 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2016-013572                                      05/24/2018


HON. SHERRY K. STEPHENS                    CLERK OF THE COURT
                                                   T. DeRaddo
                                                     Deputy


ANDERSON PHILLIPS, et al.              JEFFREY GREGORY ZANE

v.

STATE FARM FIRE AND CASUALTY           ERIN E BRADHAM
COMPANY



**TELEPHONIC STATUS CONFERENCE SET**


East Court Building - Courtroom 712

9:24 a.m.  This is the time set for Oral Argument on Plaintiffs' February 23, 2018 *Motion for Leave to File Amended Complaint,* and for a Trial Setting Conference. Appearing on behalf of Plaintiffs Anderson Phillips and Jasmine Phillips are counsel, Michael Poli and Stephen Silverman. Appearing on behalf of Defendant State Farm and Casual Company are counsel, Erin Bradham and Karl Tilleman.

A record of the proceedings is made digitally in lieu of a court reporter.

The Court has read all briefing on Plaintiffs' Motion for Leave to File Amended Complaint.

Counsel for Plaintiffs, Mr. Silverman, informs that Court that there is a possibility that this matter will go forward as a class-action claim.  Thus, Plaintiffs are withdrawing their Motion for Leave to File Amended Complaint at this time until all depositions, including 3-(b)(6) depositions.  After examining the information brought forth in these depositions, Plaintiffs will either refile their Motion for Leave to File Amended Complaint, or go forward in seeking class certification in this matter.

Docket Code 005                    Form V000A                         Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2016-013572                                                05/24/2018

Defendant opposes a class claim and any type of class-related discovery.

Due to Plaintiffs withdrawing their motion and not informing counsel for Defendant, Defendant requests that attorneys' fees be granted to Defendant against Plaintiffs for fees accrued in defending this motion.

The Court defers ruling on the issue of attorneys' fees at this time, but Defendant may re-urge the issue at the end of the trial.

Discussion is held regarding the possibility of setting a trial date.

Plaintiffs report that they are not ready to set a trial date.

**IT IS ORDERED** resetting a telephonic Trial Setting Conference on **September 26, 2018 at 8:30 a.m.** (Time allotted: 15 minutes)

The parties are expected to be prepared with their calendars as well as the calendars of any primary witnesses so the Court can set a firm trial date for this matter.

Counsel for Plaintiff shall initiate the call by arranging the presence of all parties and contacting this division at 602-506-4818.

**IT IS ORDERED** that if the parties have a discovery dispute, they shall first meet and confer in an attempt to settle the matter(s) on their own. Otherwise, counsel for the movant shall contact the Court's Judicial Assistant and all other counsel to advise them of his/her request for a telephonic hearing. The parties shall thereafter e-mail to the Court's Judicial Assistant a one-paragraph summary of the dispute. Once the Court receives a summary, the Court's Judicial Assistant will contact the parties to schedule a telephonic conference, or instruct counsel to file a motion.

9:46 a.m.  Matter concludes.

Chris DeRose, Clerk of Court
*** Electronically Filed ***
M. King, Deputy
6/18/2018 5:07:00 PM
Filing ID 9443449

1  STEPTOE & JOHNSON LLP
   201 East Washington Street, Suite 1600
2  Phoenix, Arizona 85004-2382
   Telephone: (602) 257-5200
3  Facsimile:  (602) 257-5299
   Court Email: phcourtnotices@steptoe.com
4  ktilleman@steptoe.com
   ebradham@steptoe.com
5
   Karl M. Tilleman (013435)
6  Erin E. Bradham (022827)

7  Attorneys for Defendant
   State Farm Fire and Casualty Company
8

9                    SUPERIOR COURT OF ARIZONA

10                      IN MARICOPA COUNTY

11 | Anderson  Phillips  and  Jasmine  Phillips,    No. CV2016-013572
   | husband and wife,
12 |                                                **MOTION TO EXTEND
   |                 Plaintiffs,                    DEFENDANT'S DEADLINE FOR
13 |                                                DISCLOSURE OF EXPERT
   |        vs.                                     OPINIONS**
14 |
   | State Farm Fire and Casualty Company,         (Assigned to the Honorable
15 | an Illinois corporation,                        Sherry Stephens)
16 |
   |                 Defendant.
17

18         Defendant State Farm moves for an extension of its deadline for disclosing expert

19 opinions, currently set for today, June 18, 2018.  State Farm seeks to extend the deadline

20 to August 14, 2018 to (1) allow the parties' to resolve two discovery issues that will

21 significantly affect State Farm's disclosure, (2) allow for a key deposition, after which

22 plaintiffs have said they will make a decision about whether they intend to try to amend

23 their Complaint to assert a class claim, and (3) allow time for plaintiffs to make a late

24 disclosure of their experts if plaintiffs intend to move for leave to do so.  State Farm has

25 sent two emails asking if plaintiffs will agree to stipulate for extension of this deadline

26 (see 6/14/18 email, attached as **Ex. A**, and 6/18/18 email, attached as **Ex. B**) but has not

27 yet had any response from plaintiffs' counsel to those emails. Similarly, State Farm has

28 not had any response to its multiple emails asking whether plaintiffs intend to move for

leave to make late disclosures of their own expert witnesses, as plaintiffs' deadline for making disclosures has passed.

### BACKGROUND

The parties agreed on a staggered schedule for disclosing experts. Plaintiffs were to disclose their experts on April 6, 2018 under the Court's August 2, 2017 Order granting the parties' agreed upon scheduling deadlines, with State Farm to disclose its experts approximately 45 days later. However, plaintiffs did not disclose any experts by their due date. After plaintiffs' April 6 deadline passed, on April 27, 2018 the parties amended their scheduling order to allow additional time for all remaining pretrial deadlines, including State Farm's deadline to disclose experts. However, the stipulation did not provide a new deadline for plaintiffs to disclose their experts, as that deadline had already passed. State Farm has sent multiple emails asking plaintiffs to confirm whether they intend to make a late disclosure of experts, so the schedule can be amended to allow them to do so. (6/14/18 email attached as **Ex. A**; 5/23/18 email, attached as **Ex. C**) As of yet, State Farm has not had a response to those emails.

At the parties' last scheduling conference, on May 24, plaintiffs' counsel told the Court that plaintiffs may try to amend their Complaint to add class claims after a key 30(b)(6) deposition takes place on July 31. (5/24/18 Hrg. Tr. 8:11-15, 19:11-14, attached as **Ex. D**.) Also in that scheduling conference, State Farm noted that some discovery disputes had arisen very recently – one the day before on May 23 – that might need Court resolution (**Ex. D** at 19:24-20:1), and the Court provided a procedure for resolving such disputes in its May 24, 2018 Minute Entry. As discussed below, State Farm expects to have exhausted efforts to resolve those discovery disputes this week or early next week, and believes that, unfortunately, the Court's intervention will likely be needed. These discovery disputes relate to critical evidence needed for State Farm's disclosures of its experts' opinions.

Doc. # DC-11759084 v.1

**I.      An Extension of State Farm's Expert Disclosure Deadline is Needed to Resolve Two Discovery Disputes About Information Critical to the Disclosures.**

State Farm asks the Court to extend its deadline for identifying experts to allow the parties to resolve two discovery disputes, which will avoid the need for piecemeal supplemental disclosures and create more efficient litigation.   This case involves a dispute about whether State Farm's construction estimate reasonably estimated the cost of labor.   State Farm anticipates likely disclosing an expert who will testify that State Farm's estimate of the cost of repairs was accurate and reasonable – and in line with the actual labor costs of subcontractors and others.   However, State Farm has sought two key categories of information critical to its expert opinions for which it has not yet received a response, and as to which the parties will likely need to seek assistance from the Court.

First, in February 2018, State Farm sought information about the actual costs of repair from plaintiffs and their contractor.   State Farm believes those records will show that the contractor's actual labor costs were less than, or reasonably in line with, State Farm's estimate.   Responses to both the discovery and the subpoena were due in March 2018 – months before State Farm's expert disclosure deadline, which would have given State Farm's expert plenty of time to review the records.   At her March 30 deposition, plaintiff Jasmine Phillips testified that she responded to State Farm's request for receipts showing the cost of repairs and alterations by "asking [her contractor] Adanac to give [State Farm] the documents they had and were holding on [her] behalf."   (**Ex. E**, J. Phillips Depo. 117:19-118:10.)   However, Adanac produced very few documents showing the actual cost of repairs, and no documents showing actual labor costs.   Just before Adanac's owner was deposed on May 4 – and months after its subpoena responses and objections were due – Adanac told State Farm for the first time that it had documents showing all of its actual costs, which it was refusing to produce on confidentiality grounds. State Farm began its efforts to meet and confer with Adanac's counsel immediately after the deposition, and has had multiple conversations with

- 3 -

Adanac's counsel.  State Farm has offered to stipulate to a Confidentiality Order and sought Adanac's suggestions for the contours of that Order.  However, at this point it appears unlikely that Adanac will agree to produce the documents voluntarily, even under a Confidentiality Order, and the issue will need to be decided by the Court.   State Farm believes that Adanac's documents will be critical to its expert's opinions that State Farm's estimate was reasonable, as actual cost of repairs in line with State Farm's estimate will be very significant relevant evidence.

Second, State Farm has also sought to inspect the plaintiffs' residence which State Farm believes will show (1) no damage to the brick pavers plaintiffs' public adjuster claims were damaged by the fire but which were not replaced and (2) extensive remodeling done at the property by plaintiffs' contractor at no extra charge.  State Farm will likely ask its expert to opine as to whether there is any remaining damage to brick pavers.  And State Farm anticipates its expert opining that the significant upgrades would ordinarily have cost tens of thousands of dollars and that plaintiffs were only able to do them at no charge because State Farm's estimate substantially exceeded the cost of making the actual repairs.

After unsuccessfully soliciting convenient dates for the inspection from plaintiffs' counsel, State Farm noticed the inspection to occur May 24 – which would have given State Farm's expert sufficient time to review and address information obtained from the inspection.  On May 23, the day before the inspection was to go forward, plaintiffs told State Farm that they would not allow the inspection, and anticipated possibly objecting to the inspection. (**Ex. F**) After email exchanges on the subject, State Farm has proposed 11:00 on June 20 to meet and confer with plaintiffs' counsel, but has not yet heard back from plaintiffs' counsel as to that date.

State Farm anticipates that meet and confer efforts will be complete this week or early next week and that these disputes will be ready to address with the Court at that time according to the procedure set out in the Court's May 24, 2018 Minute Entry, if they are not resolved.  State Farm asks the Court to allow additional time for its expert

- 4 -

Doc. # DC-11759084 v.1

disclosures to resolve these two discovery disputes.  State Farm's requested extension will avoid a piecemeal process under which State Farm's expert would need to submit a supplemental disclosure, likely resulting in supplemental rebuttal disclosures and possibly even multiple depositions of the same witnesses.

**II.     The Requested Extension Will Also Allow State Farm to Know Whether Plaintiffs Intend to Amend Their Claims to Add Class Claims Before Making its Expert Disclosures, and Will Allow State Farm's Expert to Review the Deposition of Tom Moss.**

State Farm's 30(b)(6) witness, Tom Moss, is scheduled to be deposed on July 31. In the parties' May 24, 2018 scheduling conference, plaintiffs' counsel asked the Court to allow plaintiffs to withdraw their Motion to Amend so that they could potentially refile a different motion seeking to add class action claims after they have completed Mr. Moss's deposition.  (**Ex. D**, 5/24/18 Hrg. Tr. 8:11-15, 19:11-14.)   State Farm's requested extension will allow it to know whether plaintiffs intend to try to add class claims before State Farm is required to make its disclosure.   Both the amount in controversy and the issues in the case may be very different if class claims are to be added.  The Court's Scheduling Order only gives State Farm one opportunity to disclose its experts' opinions and it should not be forced to do so before knowing whether plaintiffs will attempt to transform this litigation into a class action.  Even if the Court later permitted State Farm to amend its expert disclosure if class claims were allowed, such a process would necessarily require piecemeal disclosures, and might necessitate State Farm going to the expense of hiring and disclosing an expert whose testimony might ultimately be superseded if class claims were allowed.

**III.    The Requested Extension Will Also Allow Plaintiffs a Chance to Move for Leave to Disclose Experts After Their Deadline Passed.**

The parties agreed on a staggered schedule for disclosing experts.  Plaintiffs' deadline to disclose their experts passed on April 6, but, plaintiffs did not disclose any experts by their due date.  After plaintiffs' April 6 deadline passed, on April 27, 2018 the parties amended their scheduling order to allow additional time for all remaining

- 5 -

pretrial deadlines, including State Farm's deadline to disclose their experts' opinions. However, the stipulation did not provide a new deadline for plaintiffs to disclose their experts' opinions, as that deadline had already passed.   State Farm has sent multiple emails asking plaintiffs to confirm whether they intend to make a late disclosure of experts, so the schedule can be amended to allow them to do so. (**Ex. A, Ex. C**)  As of yet, State Farm has not heard back from those emails.  To the extent plaintiffs wish to make a late disclosure, State Farm remains willing to stipulate to adjust the scheduling order to permit that to happen while keeping in place the staggered schedule for disclosing experts the parties agreed upon.  However, State Farm should not be required to make its expert disclosures before it knows whether plaintiffs intend to attempt to make a late disclosure of experts. Doing so will create prejudice to State Farm, as the Scheduling Order gives State Farm only one chance to disclose its expert's opinions. Accordingly, if plaintiffs intend to move for leave to name experts after the deadline, State Farm asks that the staggered disclosure schedule be preserved and that it be allowed to disclose its expert's opinions within 45 days of plaintiffs' disclosure.

**IV.    Alternatively, State Farm Asks the Court to Allow it Two Weeks From the Date of Resolving this Motion to Make its Expert Disclosures.**

Alternatively, if the Court denies this Motion, State Farm asks the Court to allow it two weeks from the date of resolution to determine whether it will identify any experts and submit its expert disclosures, so that it may prepare expert disclosures based on the information obtained in discovery so far.

DATED this 18th day of June, 2018.

STEPTOE & JOHNSON LLP

/s/ Erin E. Bradham
Karl M. Tilleman
Erin E. Bradham
201 East Washington Street, Suite 1600
Phoenix, Arizona 85004-2382
Attorneys for Defendant State Farm Fire and
Casualty Company

- 6 -

COPY of the foregoing served by AZTurboCourt
this 18th day of June, 2018, on the following:

Michael N. Poli, #006431
mpoli@merlinlawgroup.com
Jeff Zane, #024172
jzane@merlinlawgroup.com
MERLIN LAW GROUP, P.A.
2999 North 44th Street, Suite 520
Phoenix, Arizona 85018
*Attorneys for Plaintiff*

Stephen E. Silverman, #016757
steve@stephensilverman.com
Stephen Silverman Law
6945 E. Sahuaro Dr., Ste. 125
Scottsdale, AZ 85254
*Attorneys for Plaintiffs*

/s/ Beth Hardin
Employee of Steptoe & Johnson LLP

- 7 -

Doc. # DC-11759084 v.1

# Exhibit A

| | |
|---|---|
| **From:** | Bradham, Erin |
| **Sent:** | Thursday, June 14, 2018 10:34 AM |
| **To:** | Steve Silverman; Linda Gundelach |
| **Cc:** | Tilleman, Karl; Michael N. Poli; Lawrence R. Moon |
| **Subject:** | Phillips v. State Farm |

Counsel:

     According to our records, State Farm's deadline for identifying its experts is June 18.  Would you agree to additional time for our expert disclosures, so that we can resolve our discovery disputes regarding the Rule 34(b) inspection and regarding Adanac's subpoenaed files before needing to identify experts, and so that if we disclose an expert, he or she would have the opportunity to review Tom Moss's deposition before making opinions.  We propose our expert disclosures be due on August 14 (two weeks after Tom's deposition), with plaintiffs' rebuttal expert disclosures due 30 days thereafter.

     As we have previously raised with you, plaintiffs did not identify any experts before their April 6 deadline for doing so. If plaintiffs intend to identify experts, please let us know so that we can incorporate a new deadline for that to be done.

Best,
Erin


**Erin E. Bradham**
Partner
EBradham@steptoe.com

**Steptoe**

+1 602 257 5251 direct      Steptoe & Johnson LLP
+1 602 452 0922 fax         201 E. Washington Street
                            Suite 1600
                            Phoenix, AZ 85004
                            www.steptoe.com

This message and any attached documents contain information from the law firm Steptoe & Johnson LLP that may be confidential and/or privileged. If you are not the intended recipient, please do not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

# Exhibit B

**From:** Bradham, Erin
**Sent:** Monday, June 18, 2018 11:17 AM
**To:** Steve Silverman; Linda Gundelach
**Cc:** Tilleman, Karl; Michael N. Poli; Lawrence R. Moon
**Subject:** RE: Phillips v. State Farm

Counsel:

     I'm writing to follow up on our email below, requesting an extension of State Farm's deadline for disclosing experts – which would otherwise be due today.  In addition to the reasons articulated in our email below, we also note that plaintiffs indicated at the last scheduling conference that they would decide whether to try to amend their Complaint to bring a class claim after Tom Moss's deposition.  We do not think it makes sense for State Farm to be required to disclose its experts before we know whether plaintiffs intend to try to add class claims to the litigation.

     Please let us know by 3:30 today whether you agree to the requested extension, so we know whether we need to file a motion with the Court.  Thank you for considering our request.

Best,
Erin

**Erin E. Bradham**
Partner
EBradham@steptoe.com

**Steptoe**

+1 602 257 5251 direct     Steptoe & Johnson LLP
+1 602 452 0922 fax       201 E. Washington Street
                      Suite 1600
                      Phoenix, AZ 85004
                      www.steptoe.com

This message and any attached documents contain information from the law firm Steptoe & Johnson LLP that may be confidential and/or privileged. If you are not the intended recipient, please do not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

**From:** Bradham, Erin
**Sent:** Thursday, June 14, 2018 10:34 AM
**To:** 'Steve Silverman'; Linda Gundelach

Cc: Tilleman, Karl; Michael N. Poli; Lawrence R. Moon
**Subject:** Phillips v. State Farm

Counsel:

According to our records, State Farm's deadline for identifying its experts is June 18. Would you agree to additional time for our expert disclosures, so that we can resolve our discovery disputes regarding the Rule 34(b) inspection and regarding Adanac's subpoenaed files before needing to identify experts, and so that if we disclose an expert, he or she would have the opportunity to review Tom Moss's deposition before making opinions. We propose our expert disclosures be due on August 14 (two weeks after Tom's deposition), with plaintiffs' rebuttal expert disclosures due 30 days thereafter.

As we have previously raised with you, plaintiffs did not identify any experts before their April 6 deadline for doing so. If plaintiffs intend to identify experts, please let us know so that we can incorporate a new deadline for that to be done.

Best,
Erin


**Erin E. Bradham**
Partner
EBradham@steptoe.com

## Steptoe

+1 602 257 5251 direct    Steptoe & Johnson LLP
+1 602 452 0922 fax      201 E. Washington Street
                             Suite 1600
                             Phoenix, AZ 85004
                             www.steptoe.com

This message and any attached documents contain information from the law firm Steptoe & Johnson LLP that may be confidential and/or privileged. If you are not the intended recipient, please do not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

# Exhibit C

**Exhibit C**

| | |
|---|---|
| **From:** | Bradham, Erin |
| **Sent:** | Wednesday, May 23, 2018 10:20 AM |
| **To:** | Linda Gundelach; Steve Silverman |
| **Cc:** | Tilleman, Karl; Michael N. Poli; Lawrence R. Moon |
| **Subject:** | Phillips v. State Farm |

Counsel:

Plaintiffs have not identified any experts, and the deadline for plaintiffs identifying experts passed on April 6. Do plaintiffs intend to identify experts in this case?  If so, please let us know so the parties can raise this with the Court tomorrow in connection with discussion of the remaining pre-trial activities and trial setting.

Best,
Erin


**Erin E. Bradham**
Partner
EBradham@steptoe.com

## Steptoe

+1 602 257 5251 direct      Steptoe & Johnson LLP
+1 602 452 0922 fax          201 E. Washington Street
                                      Suite 1600
                                      Phoenix, AZ 85004
                                      www.steptoe.com

This message and any attached documents contain information from the law firm Steptoe & Johnson LLP that may be confidential and/or privileged. If you are not the intended recipient, please do not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

# Exhibit D

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

ANDERSON PHILLIPS, et al.,

           Plaintiffs,

vs.

STATE FARM FIRE AND CASUALTY
COMPANY,

           Defendant.

No.  CV 2016-013572

Phoenix, Arizona
May 24, 2018
9:24 a.m.

BEFORE THE HONORABLE SHERRY K. STEPHENS

TRANSCRIPT OF PROCEEDINGS

Oral Argument

Proceedings recorded by electronic sound recording; transcript produced by eScribers, LLC.

TAMI S. MAYES
Transcriptionist
CET-547



2

<u>I N D E X</u>

<u>April 16, 2018</u>

| <u>PLAINTIFFS' WITNESSES</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> | <u>VD</u> |
|---|---|---|---|---|---|
| None | | | | | |

| <u>DEFENDANT'S WITNESSES</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> | <u>VD</u> |
|---|---|---|---|---|---|
| None | | | | | |

<u>M I S C E L L A N E O U S</u>

| | <u>PAGE</u> |
|---|---|
| Ruling on Motion for Attorneys' Fees Deferred | 19 |
| Telephonic Trial Setting Conference Set | 20 |

<u>APPEARANCES</u>

<u>May 24, 2018</u>

Judge: Sherry K. Stephens

For the Plaintiffs:

Michael N. Poli

Stephen E. Silverman

Witnesses:

None

For the Defendant:

Erin E. Bradham

Karl Tilleman

Witnesses:

None

```
 1                                    Phoenix, Arizona

 2                                    May 24, 2018

 3              (The Honorable Sherry K. Stephens Presiding)

 4   ORAL ARGUMENT:

 5              THE COURT:  Our judicial assistant is out today, so

 6   we're doing the best we can without her.

 7              All right.  This is number 2.  I apologize for the

 8   late start.  This is CV2016-013572, Anderson and Jasmine

 9   Phillips versus State Farm Fire and Casualty.  This is the time

10   set for oral argument on a motion.  Appearance for the record,

11   please?

12              MR. SILVERMAN:  Stephen Silverman and Michael Poli

13   for the Plaintiffs.

14              MR. TILLEMAN:  Your Honor, Karl Tilleman and Erin

15   Bradham for the Defense.

16              THE COURT:  Thank you.

17              THE COURT:  Good morning.   This is Judge Stephens.

18   This is CV2016-013572, Anderson and Jasmin Phillips versus

19   State Farm Fire and Casualty.  This is the time set for trial

20   setting conference.  Appearances for the record, please.

21              MR. POLI:  Michael Poli and Steve Silverman for the

22   Plaintiff, Your Honor.

23              THE COURT:  Good morning.

24              MS. BRADHAM:  And Erin Bradham and Karl Tilleman for

25   the Defendant.
```



1          THE COURT:  Thank you.  All right.  I have read the

2     motion for leave to file the amended complaint and the

3     response.  There was no reply filed, correct?

4          MR. SILVERMAN:  Yes, Your Honor.  And that was an

5     oversight on my part.  I apologize.

6          THE COURT:  That's okay.  I just wanted to make sure

7     I didn't miss it or that it didn't make it to the docket.

8     Sometimes things don't make it.

9          All right.  You may proceed.

10          MR. SILVERMAN:  Yeah, Your Honor.  There's a bigger

11    -- the motion for leave is actually a smaller issue in

12    comparison to the bigger issue that we've been discussing with

13    State Farm.  And that is, we're considering adding a allegation

14    of class action related to the -- the conduct in this case.

15    What the -- this case is about a practice that State Farm began

16    using, using cost of repair estimating software to, in our

17    opinion, secretly defraud policy holders 10 to 15 percent of

18    what the value of their claim is.  And the way this works is,

19    most of the insurance industry, most of their contractors that

20    do insurance work, use a program called Xactimate.  And

21    Xactimate, the default setting is something called

22    reconstruction pricing or restoration pricing.  And that's what

23    everybody uses, and that's the default.  State Farm, six or

24    seven years ago, started using new construction -- a new

25    construction pricing option, and that has a lower labor cost

1    and the net effect on estimates, which, then, directly impact

2    the actual cash value payments.  It's about 10 to 15 percent.

3              There are -- with respect to what we proposed as the

4    amended complaint, we could do a better job of more fully

5    specifying the allegations related to consumer fraud as well as

6    a related allegation to 20-433, which is a -- the kind of

7    consumer fraud statute in the insurance context.

8              MR. POLI:  443.

9              MR. SILVERMAN:  443?

10             MR. POLI:  Yeah, I believe it's 20-443.

11             MR. SILVERMAN:  Sorry.  I misstated the statute.

12             So and part of our discussions with State Farms

13    counsel, we've been working on scheduling depositions and doing

14    discovery that is tailored to allowing us to make a decision as

15    to whether we're going to go in that direction or not.  Because

16    if we -- if we do seek to add a class-action count and the

17    Court allows that to go forward, it's very likely that State

18    Farm will remove the case to federal court under the -- under

19    CAPA.

20             So right now, kind of at the tail end of -- the book

21    end of -- the other end of this book end is as of July 30th

22    when we're -- we have a plan to do the Rule 30(b)(6) deposition

23    of State Farm, my suggestion might be for -- for us just to

24    withdraw the motion for leave to amend, have a deadline in

25    middle of August for us to make a decision as to what direction

1     we're going to go in.  And if we're going to -- if we're not

2     going to file a class-action allegation, the we could very

3     readily resolve the rest of the discovery.  Because, otherwise,

4     if this case doesn't proceed as a class-action, it's a

5     relatively simple case that doesn't require a lot of extra

6     discovery to get to -- to get to the jury.

7              THE COURT:  So what's the downside to just filing a

8     whole separate lawsuit?  Why do you need to attach it to this

9     one?

10             MR. SILVERMAN:  Well, it would be -- well, if the

11    Phillips -- the Phillips can't have two lawsuits at the same

12    time.  So they would -- so they can't have a lawsuit alleging

13    that they were harmed as a result of this practice with how

14    State Farm uses this estimating software and then file a

15    lawsuit seeking class-action status for the same facts.  So --

16    so we need to have the same --

17             MR. POLI:  Transaction and occurrence.

18             MR. SILVERMAN:  -- yeah, we have the same transaction

19    and occurrence.  And the harm arises when the customer gets the

20    estimate.  And we don't know, because of the way that the

21    language is presented, that they're getting shorted by

22    significant amounts.  And the full range of claims that we're

23    talking about, according to the discovery we've gotten from

24    State Farm so far, is approximately a thousand claims that --

25    that would be impacted by this policy.  So we're not talking

1   about an unwieldy amount of information, either.  And the

2   conduct is the same.

3          Either -- you know, State Farm is going to contest

4   that they are acting inappropriately.  They're going to contest

5   that they have a policy of doing this arbitrarily.  And that's

6   a fact issue.  And if we establish that as a matter of fact,

7   then everybody who has had one of these claims that has had the

8   software used in this manner has suffered the same damage

9   caused by the same conduct, and very easily to discern what the

10  damages are.

11         THE COURT:  So what I hear your saying is that you

12  want to withdraw your motion for leave to file an amended

13  complaint at this time, and you want the opportunity to file it

14  after you've completed your 30(b)(6) deposition at the end of

15  July?

16         MR. SILVERMAN:  That's correct, Your Honor.

17         THE COURT:  Okay.  Well --

18         MS. BRADHAM:  Yes, Your Honor.  I'll address -- I

19  came here today thinking we were arguing about Plaintiffs'

20  motion to amend.  They asked just recently to move that

21  argument to today's date and didn't tell us until just now that

22  they're actually planning to withdraw that motion.  But I do

23  want some time to address the other issues that were raised by

24  Plaintiff, including this anticipated class claim.

25         The Court asked what I think is a very good question,

1   why this claim.  There are a lot of reasons why not this claim.

2   We will plan to vigorously oppose any anticipated amendment for

3   a class claim.  The Plaintiffs have been saying for now, gosh,

4   more than a year I think that they're going to add a class

5   claim.  They don't do that.  They haven't done that.  And we

6   think there are very good reasons why a class claim doesn't

7   make any sense in this case or on this issue.

8           The first of them is, Mr. Silverman says, well, this

9   is all about not telling Plaintiffs that you're using this --

10  what's called a new construction type of a pricing, which the

11  documents show -- the documents from the company that creates

12  this product, that has this pricing schedule, they show that

13  pricing is absolutely appropriate for a big, large loss here.

14  Of course, that goes to the merits of the issue.

15          But what Mr. Silverman said is that the Plaintiffs

16  were deceived and that these other folks were deceived.  Well,

17  the Plaintiffs weren't deceived here, and that's what we --

18  they weren't deceived about anything.  They absolutely knew

19  that new construction pricing was used on their -- on their

20  claim.  It's the second page of the estimate, and they held a

21  public adjustor who is representing them.  So he's sort of

22  standing in their shoes, vis-à-vis State Farm, to make this

23  claim.  And he, within a month after receiving this -- the

24  estimate showing new construction pricing was used, he

25  challenged that use of new construction pricing, copying the

1    Plaintiffs.  So the Plaintiffs in this case weren't deceived by

2    anything.

3           The other reason -- the other reasons this case is

4    not appropriate for class certification, and for it having any

5    class claims added, is that there are individualized issues.

6    In the end instance, the ultimate question is whether State

7    Farm's estimate of the cost of repairs is reasonable.  In this

8    case, there's evidence that not only was the estimate

9    reasonable, but that the Plaintiffs were able to both do all of

10   the repairs from the fire damage, and extensive remodeling,

11   moving around walls that we're damaged, vaulted ceilings, all

12   of this remodeling, for the exact amount in State Farm's

13   estimation.  And that's compelling evidence that we think makes

14   a lot of difference in this case if you're trying to figure out

15   is the estimate accurate.  What you really want to know is,

16   well, what did it actually cost?  Was the estimate enough to

17   actually do these repairs?  Here, it was.  In every instance,

18   there are going to be individualized issues about whether the

19   estimate was enough to do repairs.  So that issue, of course,

20   is not before the Court today, whether to allow an amendment to

21   assert class claims.  We will vigorously oppose it.

22          We also oppose any class discovery that's done when

23   there's not a class claim pending.  So the Plaintiffs had the

24   opportunity to add a class claim to -- if they wanted to make

25   those claims, to their original complaint when they filed it I



1    think it's now two years ago.  They didn't do that.  We've been

2    operating without any kind of a class claim.  We don't have any

3    kind of class allegations here.  And before allowing class

4    discovery, the case law all says you have to, at the very

5    least, have a actual class-action claim that's been brought in

6    the litigation, and then you have to go forward and say, well,

7    should this be certified or not.

8            So the notion that the Plaintiffs -- and the

9    Plaintiffs talk about whether State Farm would remove this case

10   to federal court.  I don't know right now whether we would or

11   not because I don't have a -- even a proposed amended class

12   claim that's been proposed by the Plaintiffs.  But the notion

13   that the Plaintiffs, I think, could be suggesting that we sort

14   of use the state court, this court's proceeding, to do

15   discovery on a class claim that they're going to add, and then

16   going to want to take to federal court, that just doesn't make

17   any sense to me at all.

18           So in terms of what we're here for today, the

19   Plaintiffs have withdrawn their motion.  They have withdrawn

20   that motion after requiring us to file a response.  They then

21   did not file a reply.  They required us to prepare for this

22   hearing, specifically to address their motion to amend.  Didn't

23   tell us they were actually going to withdraw that motion.  So

24   we think, under those circumstances, attorneys' fees are

25   appropriate here.  This was a motion that was filed and then

1    withdrawn.  We've done a lot of work.  They haven't done any

2    work on it.  They've admitted that they could have done a

3    better job on -- on the claim in any event.  They could -- they

4    had a number of points where they could have withdrawn that

5    claim that they think they could have done a better job making

6    in their motion to amend, including when we filed our response,

7    including when they decided not to file a reply, including when

8    they asked the Court to change the hearing date to today rather

9    than yesterday.  At no point did they do that, and all of that

10   has required us to do work to prepare for a claim that they

11   weren't really intending, apparently, to bring.

12            THE COURT:  Okay.  Thank you.

13            MR. POLI:  I'd like to make a few comments, Your

14   Honor.

15            THE COURT:  Sure.  Go right ahead.

16            MR. POLI:  First, on the fraud, there are two stages

17   to the -- and there's almost two forks in the road, two either

18   ways to go in a case like this; the fraud claim versus the

19   class-action claims.  And there a little bit -- there's tension

20   between them because the individualized issues associated with

21   fraud don't necessarily lend themselves to the commonality

22   necessary for class action.

23            Okay.  But let's talk about the fraud claim.  You

24   know, and it could be under the consumer fraud statute or it

25   could also be under A.R.S. 20-443, which is a really expansive

1    fraud statute where there's a private right of action under the

2    Sparks case going all the way back 25, 30 years.  Either one.

3    And, actually, 20-443 is probably an easier claim, and it

4    allows a private right of action for any fraud in connection

5    with the -- you know, the business of insurance.

6             There's two phases to that fraud.  One is the

7    inception of the insurance contract.  Like a good neighbor,

8    State Farm is there.  When that -- when this policy, like every

9    other State Farm policy, is sold, it's sold with a panoply of

10   explicit and implicit promises, including the, you know,

11   advertising jargon that we've all heard for the last -- I mean,

12   for our entire lives.

13            And then what makes a lot of that is, when they come

14   along, the entire industry uses Xactimate.  Xactimate is put

15   out by a company called Xactware that was created by the

16   insurance industry.  I'm not sure, but I think State Farm might

17   have been one of the companies that created it.  The -- and

18   it's got these two settings.  It's got like a restoration

19   setting where you can figure out the cost to repair something

20   after a loss of something that already existed, and it's go t a

21   new construction setting where it's like your building -- what

22   does it cost to build a brand-new subdivision where there's

23   economies of scale, and where you send in a crew to do framing,

24   and they do a whole block at a time.  Okay?  No one -- no other

25   industry, no other company, no other carrier in the industry is

1    doing what State Farm is doing.  Okay?  That's the class issue.

2         I mean, you know, I deposed the one guy, the adjustor

3    on this case.  And he basically said, yeah, we always did it

4    the way the rest of the people did it, and then this new

5    directive came down from, you know, State Farm headquarters a

6    number of years ago, and all of a sudden, you know, it was the

7    new construction directive, and we had to do it this way.

8    Steve Silverman deposed his boss, and there's a 30(b)(6) coming

9    up.  Okay?  So, you know, they know that this has class-claim

10   potential.  If it didn't have class-claim potential, Steptoe

11   wouldn't be in the case.  It would be with a firm that's a

12   whole lot cheaper, okay?  They put Steptoe on -- because this

13   is not a big case.  I mean, you know, the 15 percent is not

14   even that much money.  They wouldn't put Steptoe on this case

15   for, you know, 20- or 30-, $40,000 claim.

16        Ms. Bradham says, oh, gee, we managed to get it done

17   for the amount of money they gave us.  That's not actually very

18   accurate, okay?  The only way these people got back in their

19   home is the contractor literally deferred part of the money

20   that's owed to him and got them back in their home.  If they

21   didn't happen to have contractor who was going to be that nice,

22   which there aren't that many of them around, they would still

23   be out of their home or they would have had to cut corners and

24   not get back to what they had.

25        So there's a fraud prong, or idea, here, and there's



1   a class-action idea.  Our intention, and I think we should make

2   a decision after the 30(b)(6), I deposed the adjustor, Steve

3   deposed his boss.  His boss came in and said, oh, it's all

4   discretionary. It's all discretionary.  There's no standard

5   approach.  You know, and that was simply because he was

6   prepared to try to beat the class action.  They are in this

7   case for one reason.  They, being the Steptoe lawyers.  They

8   are in this case for one reason and one reason only, defeat the

9   idea of a class action.  They never would have been given a 20-

10  or 40- or $50,000 case otherwise, because they'll spend more

11  than that in a heartbeat, okay?

12              So, you know, we should take the 30(b)(6) deposition,

13  and then we should decide -- we, the Plaintiffs, should decide

14  which direction we go.  If we're going to limit it to this

15  case, then I strongly believe that it would be based on fraud

16  claims.  Everything -- if everything relates back and it's the

17  same transaction or occurrence.  And broadly speaking, all this

18  arises out of the same transaction or occurrence.  They sell

19  insurance and explicitly and implicitly promised that they will

20  be there like a good neighbor.  And then when they come along

21  and pull this stunt, that's not -- that gives -- that makes

22  everything that was said when they sold the policy a lie.

23              THE COURT:  Do you want to address the request for

24  attorney fees?

25              MR. POLI:  Sure.  I would.  And I'd like to say that



 1    normally a fee issue like this -- it's not like this falls

 2    under Rule 11.  This is not a Rule 11 issues.  It's not -- it

 3    doesn't fall under Rule 37 on some sort of discovery issue.

 4    Obviously, the Court has the inherent authority to award fees

 5    at any point where it thinks it should, but it doesn't neatly

 6    fall under Rule 11 or -- or Rule 37.  And, normally, fees,

 7    under 12-341.01, would be at the end of the case.  And all that

 8    -- it's just inappropriate.  You know, I mean, we have to get

 9    through this case, and it's the kind of tactic that I think

10    just undercuts the ability of counsel to work together.  I

11    think it should be denied.

12              THE COURT:  Did you want to respond?

13              MS. BRADHAM:  Your Honor, thank you.

14              We are entitled to know what claims are being brought

15    against us, to have those claims actually alleged in this case,

16    and to understand what -- what the case is about as we're

17    defending it.  That just -- that's just the -- that just goes

18    to the fundamental due process in any case.  What we've had

19    happen here today is, Mr. Poli is now talking about all sorts

20    of other claims that haven't been made -- that have never been

21    raised; a fraud claim under a different statute that's not the

22    one they brought it under.  You know, it's frankly bewildering

23    to even understand from moment to moment what are the claims

24    they're making against my client.  We are entitled to address

25    any motion to amend that they want to bring, particularly a

1    motion to amend to add class claims before we are forced to

2    defend allegations that haven't been made against us, class

3    allegations that haven't been made against us.

4              And many of the things that Mr. Poli has said in

5    describing this Xactimate program are simply untrue.  He talks

6    about economies of scale where -- he gets those - that

7    language, economies of scale, from a document the Plaintiffs'

8    public adjustor relied on.  That was actually about a whole

9    different program, not Xactimate.  Xactimate has nothing to do

10   -- the new construction pricing, the Xactimate has nothing to

11   do with economies of scale and what a contractor like Del Webb

12   is doing.  This Del Webb contractor is not even, as I

13   understand it, using the Xactimate program.  It's used for

14   insurance adjustors.

15             And these two pricing settings, new construction and

16   restoration, are based on the extensive loss.  There's no

17   question here that there was extensive damage to this house.

18   State Farm paid for that damage.  The Plaintiffs got it done.

19   Mr. Poli says, well, their contractor deferred payment.  That's

20   absolutely not what happened.  We've got the contract from the

21   contractor where he says the cost of these repairs is the exact

22   amount of the State Farm estimate.  And when we deposed him and

23   we asked him, well, what did you do for that amount, he says

24   not only did I do all of these repairs, but it's my goal, every

25   time I'm doing a fire restoration, to also make the insureds

1    feel that they're getting a remodel, that I'm also making their

2    house a whole lot better than it was before the fire.  Which is

3    not what insurance is about.  Insurance is about paying for the

4    repairs.

5         So we have a situation here where, in this claim,

6    what happened is, State Farm paid the full amount needed to do

7    the repairs, the repairs and then a whole lot of extra stuff

8    were done for that amount.  And now the Plaintiffs are talking

9    to us about fraud and deception when there's no deception of

10   fraud here.  Their public adjustor understood throughout,

11   because it said on the document -- the estimate that State Farm

12   prepared, it said what pricing was used.  The public adjustor

13   knew that throughout.

14        If there's an issue here about whether that -- a

15   dispute about whether that pricing was enough to do the

16   repairs, that's one thing.  But all of this -- new allegations

17   of fraud under various different statutes that we haven't even

18   -- haven't even been raised until today, and that the class

19   allegations that keep coming up every time we come before the

20   Court -- this came up last time.  We were before the Court a

21   month ago.  We're going to add a class claim.  Well, there's

22   still not been a class claim added.  This -- we need to be able

23   to defend the claim that we -- that has been brought against

24   us.

25        And on the attorneys' fees, I'll just say very



1    briefly, I think what happened here was very inappropriate, to

2    continue to lead us to believe that they were moving to amend

3    on a fraud claim, and then tell us the first moment we get into

4    the court, in fact, we didn't do a really good job on -- on

5    pleading our fraud claim.  We want to plead some other fraud

6    claim or some other facts that we didn't plea.  And so we would

7    ask that those attorneys' fees be awarded.

8              THE COURT:  Okay.  Well, I am going to defer a

9    decision on the attorney fees related to this issue until the

10   end of the case.

11             The motion to amend has been withdrawn, so the Court

12   does not need to take any action with respect to that.  I made

13   notes regarding Plaintiffs' position that they want until the

14   end of July to decide how they're going to proceed.

15             We do have the trial setting conference set for

16   today.  Obviously, the parties are not in a position to set

17   this matter for trial.  Am I correct?

18             MR. SILVERMAN:  Correct.

19             THE COURT:  So we need to reset the trial setting

20   conference.  I'm thinking maybe September?

21             MR. POLI:  Yes, Your Honor.

22             THE COURT:  Does everybody agree with that?

23             MR. POLI:  Plaintiffs do.

24             MS. BRADHAM:  Your Honor, the reason I'm pausing here

25   is because there are some discovery issues that have arisen



1    just recently, as early as yesterday.

2           THE COURT:  Okay.

3           MS. BRADHAM:  And I'm trying to make sure that we'll

4    have enough time to get through those.  If I could just briefly

5    tell the Court what they are, they won't --

6           THE COURT:  No, it's okay.  You think you need more

7    time.  October, November?

8           MR. POLI:  That's fine with Plaintiffs, Your Honor.

9           MS. BRADHAM:  You know what?  I think it -- I think

10    September works for us as long as -- we just want to make sure

11    the Court is aware that there are discovery issues, and we'll

12    do everything we can to get them --

13           MR. POLI:  I'll defer to Steve on the discovery

14    issues if those comes up.  What's your procedure?  Do you allow

15    phone calls by counsel?

16           THE COURT:  Absolutely.

17           MR. POLI:  Okay.  So if discovery issues come up, as

18    they no doubt will, we'll reach out to you.

19           THE COURT:  Okay.  That sounds good.

20           Let's set then, the trial setting conference, for

21    late September.  How about September 26th, 8:30 a.m.?  And it

22    is telephonic.

23           All right.  Anything else for today?

24           MR. SILVERMAN:  No, Your Honor.

25           THE COURT:  Okay.  Thank you.  I will make a note

1   that I have deferred ruling on a request for attorney fees.

2              MR. SILVERMAN:  Thank you.

3              THE COURT:  Thank you.

4         (Proceedings concluded at 9:47 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              CERTIFICATE

 2    eScribers has a current transcription contract with the

 3    Maricopa County Superior Court under contract # 13010-001, as

 4    such, eScribers is an "authorized Transcriber."

 5

 6    I, Tami S. Mayes, CET-547, a court approved transcriber, do

 7    hereby certify that the foregoing is a correct transcript from

 8    the official electronic sound recording of the proceedings in

 9    the above-entitled matter, to the best of my professional

10    skills and abilities.

11

12

13

14            /s/
      _____
15
      TAMI S. MAYES, CET-547        June 1, 2018
16    Transcriber

17

18

19

20

21

22

23

24

25
```



# Exhibit E

# In The Matter Of:

*Phillips vs.*
*State Farm Fire and Casualty*

---

*Jasmine Phillips*
*March 30, 2018*
*Videotaped*

---

*Griffin & Associates Court Reporters, LLC*
*2398 E. Camelback Road*
*Suite 260*
*Phoenix, AZ 85016*

Original File JP033018.txt
**Min-U-Script® with Word Index**

117

1    Q.    Okay.  Did you consider renting an apartment for

2  that -- that period?

3    A.    Yeah.  We looked into renting the same place that

4  we were in for the first month after the fire, in like a -- a

5  hotel, like long-stay --

6    Q.    Uh-huh.

7    A.    -- hotel, but it was way too expensive.

8    Q.    Do you remember how much it was?

9    A.    I -- I think it was close to 150 a night.

10   Q.    Okay.  Where was your furniture during that May

11  to -- May 20 -- end of May 2017 to June 25th, 2017, period?

12   A.    What was restorable was with Adanac at their

13  storage facility.

14   Q.    Okay.  Were you charged anything for that?

15   A.    Not that I'm aware of.

16   Q.    Okay.  Do you know if State Farm paid for that

17  storage?

18   A.    I don't know.

19   Q.    Okay.  One of the things we asked for was -- was

20  all invoices, records of payment, and receipts from any --

21  from any repairs or alterations that were done on the

22  property after the fire.

23            Do you -- do you remember that we asked for

24  that?

25   A.    Yes.

118

1      Q.    Okay.  And what did you do to look for those --
2    those documents?
3      A.    Well, everything was provided to -- well, given
4    from Adanac, so ...
5      Q.    Okay.  So the way you responded to that particular
6    request was by asking Adanac to give us the documents that
7    they had and were holding on your behalf --
8      A.    Yeah.
9      Q.    -- is that right?
10     A.    Yes.
11     Q.    Okay.  And, as far as you know, there's no
12   documents that Adanac has but didn't give to us?
13     A.    I don't -- not that I know of.
14     Q.    Okay.  There aren't any invoices, records of
15   payments, or receipts from repairs or alterations that you
16   and your husband have that you haven't given to us?
17     A.    No.
18     Q.    Okay.  Did you -- at some point, you hired an -- an
19   attorney to help you in connection with this insurance
20   loss --
21     A.    Yes.
22     Q.    -- is that right?
23           When did you do that?
24     A.    I don't remember.
25     Q.    Okay.  You realized at some point in the claim

# Exhibit F

**From:**        Steve Silverman <steve@stephensilverman.com>
**Sent:**        Wednesday, May 23, 2018 9:33 AM
**To:**          Bradham, Erin; Linda Gundelach
**Cc:**          Tilleman, Karl; Michael N. Poli; Lawrence R. Moon
**Subject:**     Re: Phillips v. State Farm

Erin:

Thank you for sending the e-mail.  I had flagged a deadline of June 11 to respond to the Rule 34 request.  As it stands, I anticipate that we will be objecting to the inspection.  I do not see how an inspection of the Phillips' home would be relevant to any of the claims or defenses in this case.  We are open to receiving an explanation as to how an inspection would be relevant, who would be conducting and/or present at the inspection and what precisely will occur at the inspection. At a minimum, this email is to confirm that the inspection will not take place tomorrow.

# STEVE SILVERMAN

## STEPHEN SILVERMAN LAW

6945 E. Sahuaro Drive, Suite 125

Scottsdale, Arizona 85254

(480) 747-0850 phone

(480) 400-1065 fax

www.stephensilverman.com

Disclaimers and disclosure: Please delete this e-mail and notify me at steve@stephensilverman.com if you received it in error.   This may contain privileged or confidential communications and misaddressed or misdelivered e-mail does not waive privilege or confidentiality.  Unauthorized use of this information can result in forced disqualification and other sanctions.  If you are a client, the attorney-client privilege protects this e-mail so long as you do not share it with anyone else.  This e-mail may have been sent via a document tracking service to make sure only the intended recipient received it.  Finally, neither this nor any other communication is intended to constitute an opinion on any tax-related manner.

1

**From:** "Bradham, Erin" <EBradham@steptoe.com>
**Date:** Wednesday, May 23, 2018 at 8:15 AM
**To:** Linda Gundelach <lgundelach@merlinlawgroup.com>, Steve Silverman <steve@stephensilverman.com>
**Cc:** "Tilleman, Karl" <KTillema@steptoe.com>, Michael Poli <mpoli@merlinlawgroup.com>, "Lawrence R. Moon" <LMoon@merlinlawgroup.com>
**Subject:** RE: Phillips v. State Farm

Counsel:

This email is to confirm that the inspection at the Phillips property will take place tomorrow at 11:00.

Best,
Erin

Chris DeRose, Clerk of Court
*** Electronically Filed ***
06/28/2018 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2016-013572                                               06/27/2018

                                            CLERK OF THE COURT
HON. SHERRY K. STEPHENS                          T. DeRaddo
                                                  Deputy

ANDERSON PHILLIPS, et al.               JEFFREY GREGORY ZANE

v.

STATE FARM FIRE AND CASUALTY            ERIN E BRADHAM
COMPANY

MINUTE ENTRY

        The Court has received and considered Defendant's *Motion to Extend Defendant's Deadline for Disclosure of Expert Opinions*, filed on June 18, 2018.

        Good cause appearing,

        IT IS ORDERED granting Defendant's Motion to Extend Defendant's Deadline for Disclosure of Expert Opinions, all in accordance with the formal written ***Order Extending Expert Witness Disclosure Deadlines***, signed by the Court on June 27, 2018 and filed (entered) by the Clerk on June 27, 2018.

FILED
6-27-18  4:07p.m.
CHRIS DEROSE, Clerk
F. DeRaddo
DeRaddo, Deputy

1   STEPTOE & JOHNSON LLP
    201 East Washington Street, Suite 1600
2   Phoenix, Arizona 85004-2382
    Telephone: (602) 257-5200
3   Facsimile:  (602) 257-5299
    Court Email: phcourtnotices@steptoe.com
4   ktilleman@steptoe.com
    ebradham@steptoe.com
5
    Karl M. Tilleman (013435)
6   Erin E. Bradham (022827)

7   Attorneys for Defendant
    State Farm Fire and Casualty Company
8

9                  SUPERIOR COURT OF ARIZONA

10                    IN MARICOPA COUNTY

11  Anderson Phillips and Jasmine Phillips,    No. CV2016-013572
    husband and wife,
12                                             ORDER EXTENDING
                         Plaintiffs,           EXPERT WITNESS DISCLOSURE
13                                             DEADLINES
         vs.
14                                             (Assigned to the Honorable
    State Farm Fire and Casualty Company,       Sherry Stephens)
15  an Illinois corporation,

16                       Defendant.

17

18       Pursuant to the Motion to Extend Defendant's Deadline for Disclosure of Expert

19  Opinions, and good cause appearing,

20       IT IS HEREBY ORDERED that the Motion to Extend Defendant's Deadline for

21  Disclosure of Expert Opinions is granted, as follows:

22       1.      Defendants shall have through and including **August 14, 2018** to disclose

23  the identity and opinions of experts.

24       2.      Plaintiffs shall have through and including **September 13, 2018** to

25  disclose their rebuttal expert opinions.

26       3.      The parties shall have through and including **October 15, 2018** to

27  complete expert witness depositions.

28  . . .

Doc. # DC-11761562 v.1

1  DATED this 27ᵗʰ day of June, 2018.

2

3  Hon. Sherry Stephens
   Maricopa County Superior Court

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -

Chris DeRose, Clerk of Court
*** Electronically Filed ***
K. Vega, Deputy
9/24/2018 4:21:00 PM
Filing ID 9733946

1  STEPTOE & JOHNSON LLP
   201 East Washington Street, Suite 1600
2  Phoenix, Arizona 85004-2382
   Telephone: (602) 257-5200
3  Facsimile:  (602) 257-5299
   Court Email: phcourtnotices@steptoe.com
4  ktilleman@steptoe.com
   ebradham@steptoe.com
5
   Karl M. Tilleman (013435)
6  Erin E. Bradham (022827)
7  Attorneys for Defendant
   State Farm Fire and Casualty Company
8

9            SUPERIOR COURT OF ARIZONA

10              IN MARICOPA COUNTY

11  Anderson Phillips and Jasmine Phillips,   No. CV2016-013572
    husband and wife,
12                                            **STIPULATION TO EXTEND
                  Plaintiffs,                 DEADLINES**
13
        vs.                                   (Assigned to the Honorable
14                                              Sherry Stephens)
    State Farm Fire and Casualty Company,
15  an Illinois corporation,
16                Defendant.
17

18        The parties stipulate and agree to extend the deadlines established in this Court's

19  April 27, 2018 Order to Extend Deadlines and June 27, 2018 Order Extending Expert

20  Witness Disclosure Deadlines as described below.  At the last trial setting conference in

21  this case, on May 24, 2018, plaintiffs' counsel stated that they would decide whether to

22  re-file their withdrawn motion to amend, or move to amend to try to assert class claims,

23  after the deposition of State Farm witness Tom Moss.  On September 21 Plaintiffs'

24  counsel informed State Farm that plaintiffs intend to move to amend to assert class

25  claims.  State Farm intends to oppose that motion.

26        Accordingly, the parties ask that the Court extend the current deadlines, as

27  outlined below, for 60 days to allow the parties to engage in anticipated motions

28  practice.  This case is currently set for trial setting conference on September 26, 2018 at

8:30 a.m., at which the parties will ask the Court to enter a briefing schedule for plaintiffs' anticipated motion to amend and State Farm's response.

| Description | Current Due Date | Extended Due Date |
|---|---|---|
| Dispositive motion deadline | September 24, 2018 | November 26, 2018 |
| Deadline to complete depositions of expert witnesses | October 15, 2018 | December 17, 2018 |

DATED this 24th day of September, 2018.

STEPTOE & JOHNSON LLP

/s/ Erin E. Bradham
Karl M. Tilleman
Erin E. Bradham
201 East Washington Street, Suite 1600
Phoenix, Arizona 85004-2382

Attorneys for Defendant State Farm Fire and Casualty Company

MERLIN LAW GROUP, P.A.

/s/ Michael N. Poli (with permission)
Michael N. Poli
Jeff Zane
2999 North 44th Street, Suite 520
Phoenix, Arizona 85018

STEPHEN SILVERMAN LAW
Stephen E. Silverman
6945 East Sahuaro Drive, Suite 125
Scottsdale, Arizona 85254

Attorneys for Plaintiffs

COPY of the foregoing electronically filed
and served using AZTurboCourt this 24th day
of September, 2018, on the following:

Michael N. Poli, #006431
mpoli@merlinlawgroup.com
Jeff Zane, #024172
jzane@merlinlawgroup.com
MERLIN LAW GROUP, P.A.
2999 North 44th Street, Suite 520
Phoenix, Arizona 85018
*Attorneys for Plaintiffs*

Stephen E. Silverman, #016757
steve@stephensilverman.com
Stephen Silverman Law
6945 E. Sahuaro Dr., Ste. 125
Scottsdale, AZ 85254
*Attorneys for Plaintiffs*

/s/ Diane Linn
Employee of Steptoe & Johnson LLP

Chris DeRose, Clerk of Court
*** Electronically Filed ***
T. DeRaddo, Deputy
9/26/2018 8:00:00 AM
Filing ID 9738023

STEPTOE & JOHNSON LLP
201 East Washington Street, Suite 1600
Phoenix, Arizona 85004-2382
Telephone: (602) 257-5200
Facsimile:  (602) 257-5299
Court Email: phcourtnotices@steptoe.com
ktilleman@steptoe.com
ebradham@steptoe.com

Karl M. Tilleman (013435)
Erin E. Bradham (022827)

Attorneys for Defendant
State Farm Fire and Casualty Company

SUPERIOR COURT OF ARIZONA

IN MARICOPA COUNTY

| | |
|---|---|
| Anderson Phillips and Jasmine Phillips, husband and wife,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>State Farm Fire and Casualty Company, an Illinois corporation,<br><br>                    Defendant. | No. CV2016-013572<br><br>**[PROPOSED] ORDER TO EXTEND DEADLINES**<br><br>(Assigned to the Honorable Sherry Stephens) |

The Court, having considered the Stipulation to Extend Deadlines of the parties and good cause appearing therefor,

IT IS HEREBY ORDERED that the current deadlines are extended as follows:

| Description | Current Due Date | Extended Due Date |
|---|---|---|
| Dispositive motion deadline | September 24, 2018 | November 26, 2018 |
| Deadline to complete depositions of expert witnesses | October 15, 2018 | December 17, 2018 |

Filing ID: 9738023   Case Number: CV2016-013572
Original Filing ID: 9733946

---

**Granted as Submitted**



/S/ Sherry Stephens Date: 9/25/2018
Judicial Officer of Superior Court

## ENDORSEMENT PAGE

CASE NUMBER: CV2016-013572                     SIGNATURE DATE: 9/25/2018

E-FILING ID #: 9738023                         FILED DATE: 9/26/2018 8:00:00 AM


ERIN E BRADHAM


JEFFREY GREGORY ZANE

Chris DeRose, Clerk of Court
*** Electronically Filed ***
10/01/2018 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2016-013572                                    09/26/2018


HON. SHERRY K. STEPHENS

CLERK OF THE COURT
K. Cabral/A. Durda
Deputy


ANDERSON PHILLIPS, et al.                   JEFFREY GREGORY ZANE

v.

STATE FARM FIRE AND CASUALTY               ERIN E BRADHAM
COMPANY


MICHAEL N POLI
STEPHEN E SILVERMAN
KARL M TILLEMAN
JUDGE STEPHENS


MINUTE ENTRY


Courtroom 712 – East Court Building

8:37 a.m.  This is the time set for a telephonic Trial Setting Conference.  Plaintiffs, Anderson Phillips and Jasmine Phillips, are represented by counsel, Michael N. Poli and Stephen E. Silverman for Jeffrey G. Zane.  Defendant, State Farm Fire and Casualty Company, is represented by counsel, Erin E. Bradham and Karl M. Tilleman.

A record of the proceedings is made digitally in lieu of a court reporter.

Discussion is held regarding status.

Docket Code 005                    Form V000A                         Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2016-013572                                    09/26/2018

For the reasons as stated on the record,

**IT IS ORDERED** that the parties shall file an Amended Scheduling Order.

8:39 a.m.  Matter concludes.

Chris DeRose, Clerk of Court
*** Electronically Filed ***
T. Hays, Deputy
9/28/2018 9:19:00 AM
Filing ID 9748042

1   Michael N. Poli (State Bar No. 006431)
    mpoli@merlinlawgroup.com
2   Lawrence R. Moon (State Bar No. 017000)
    lmoon@merlinlawgroup.com
3   **MERLIN LAW GROUP, P.A.**
    2999 N. 44th Street, Suite 520
4   Phoenix, Arizona 85018
    Telephone:   (480) 315-9980
5   Facsimile:   (480)315-9984

6   Stephen E. Silverman (State Bar No. 016757)
    steve@stephensilverman.com
7   **STEPHEN SILVERMAN LAW**
    6945 E. Sahuaro Drive, Sutte 125
8   Scottsdale, Arizona 85254
    Telephone:   (480) 747-0850
9   Facsimile:   (480) 400-1065

10  Attorneys for Plaintiffs

11                  SUPERIOR COURT OF ARIZONA

12                     IN MARICOPA COUNTY

13  Anderson Phillips and Jasmine Phillips,        No. CV2016-013572
    husband and wife,
14                                                 **JOINT STIPULATION RE:**
                   Plaintiffs,                     **DEADLINE FOR PLAINTIFFS' TO**
15                                                 **FILE MOTION TO AMEND**
             vs.                                   **COMPLAINT AND EXTENSION OF**
16                                                 **DEADLINES**
    State Farm Fire and Casualty Company,
17  an Illinois corporation,                       (Assigned to the Honorable
                                                     Sherry Stephens)
18                 Defendant.

19

20       Pursuant to the terms of the telephonic scheduling conference held September 26,

21  2018, and by agreement of Plaintiffs and Defendant, the parties hereby submit this Joint

22  Stipulation Re: Deadline for Plaintiffs' to File Motion to Amend Complaint and

23  Extension of Deadlines.  The parties agree as follows:

24       Plaintiff shall file their Motion to Amend Complaint on or before **January 11,**

25  **2019**.

26       Defendant shall file its Response on or before **February 28, 2019**.

27       Plaintiff shall file their Reply on or before **March 29, 2019**.

28

T2039918.DOCX;1

1    If Plaintiffs' Motion to Amend Complaint is denied, the parties shall have 45

2    days from the date of the Order to complete all outstanding discovery, including expert

3    depositions, and resolve outstanding discovery disputes.   The deadline for filing

4    dispositive motions will be 30 days after the completion of all discovery.

5    If Plaintiffs' Motion to Amend Complaint is granted, the parties will request a

6    scheduling conference with the Court to discuss establishing new deadlines.

7    DATED this 28th day of September, 2018.

8                                          MERLIN LAW GROUP P.A.

9                                                       -and-
                                           STEPHEN SILVERMAN LAW
10

11                                         /s/ Stephen E. Silverman
                                           Michael N. Poli
12                                         Lawrence R. Moon
                                           Stephen E. Silverman
13                                         2999 North 44th Street, Suite 520
                                           Phoenix, Arizona 85018
14                                         Attorneys for Plaintiffs

15

16                                         STEPTOE & JOHNSON LLP

17                                          /s/ Erin E. Bradham
                                           Karl M. Tilleman
18                                         Erin E. Bradham
                                           201 East Washington Street, Suite 1600
19                                         Phoenix, Arizona 85004-2382
                                           Attorneys for Defendant
20

21

22   ORIGINAL of the foregoing e-filed this
     28th day of September, 2018, with a copy
23   routed to:

24   The Honorable Sherry Stephens

25

26   /  /  /

27   /  /  /

28

1

2    COPY of the foregoing emailed this
     28th day of September, 2018, to:

3

4    Karl M. Tilleman
     Erin E. Bradham
5    STEPTOE & JOHNSON, LLP
     201 East Washington Street, Suite 1600
6    Phoenix, Arizona  85004-2382

7

8
     /s/ Linda Gundelach
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Granted with Modifications
***See eSignature page***
Case 2:19-cv-01695-GMS   Document 1-3   Filed 07/01/19   Page 181 of 518   Chris DeRose, Clerk of Court
*** Electronically Filed ***
T. DeRaddo, Deputy
10/8/2018 8:00:00 AM
Filing ID 9766250

1   Michael N. Poli (State Bar No. 006431)
    mpoli@merlinlawgroup.com
2   Lawrence R. Moon (State Bar No. 017000)
    lmoon@merlinlawgroup.com
3   **MERLIN LAW GROUP, P.A.**
    2999 N. 44th Street, Suite 520
4   Phoenix, Arizona 85018
    Telephone:  (480) 315-9980
5   Facsimile:  (480)315-9984

6   Stephen E. Silverman (State Bar No. 016757)
    steve@stephensilverman.com
7   **STEPHEN SILVERMAN LAW**
    6945 E. Sahuaro Drive, Sutte 125
8   Scottsdale, Arizona 85254
    Telephone:   (480) 747-0850
9   Facsimile:    (480) 400-1065

10  Attorneys for Plaintiffs

11              SUPERIOR COURT OF ARIZONA

12                IN MARICOPA COUNTY

13  Anderson Phillips and Jasmine Phillips,      No. CV2016-013572
    husband and wife,
14                                               **ORDER**
                        Plaintiffs,
15                                               (Assigned to the Honorable
            vs.                                    Sherry Stephens)
16
    State Farm Fire and Casualty Company,
17  an Illinois corporation,
18                      Defendant.
19

20          The Court having reviewed the parties' Joint Stipulation Re: Deadline for

21  Plaintiffs' to File Motion to Amend Complaint and Extension of Deadlines, and good

22  cause appearing,

23          IT IS HEREBY ORDERED that the Joint Stipulation is granted.

24          IT IS FURTHER ORDERED that Plaintiffs shall file their Motion to Amend

25  Complaint on or before **January 11, 2018;** Defendant shall file its Response on or

26  before **February 28, 2019**; and Plaintiff shall file their Reply on or before **March 29,**

27  **2019**.

28

    T2039944.DOCX;1

1    IT IS FURTHER ORDERED, if Plaintiffs' Motion to Amend Complaint is
2 denied, the parties shall have 45 days from the date of the Order to complete all
3 outstanding discovery, including expert depositions, and resolve outstanding discovery
4 disputes.

5    IT IS FURTHER ORDERED the deadline for filing dispositive motions will be
6 30 days after the completion of all discovery.

7    IT IS FURTHER ORDERED if Plaintiffs' Motion to Amend Complaint is
8 granted, a scheduling conference will be held on **April 11, 2019 at 9:00 a.m.**.

9    DATED this _____ day of _____, 2018.

10

11

12                                        _____
                                          THE HONORABLE SHERRY STEPHENS
13                                        JUDGE OF THE SUPERIOR COURT

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# eSignature Page 1 of 1

Filing ID: 9766250   Case Number: CV2016-013572
Original Filing ID: 9748042

_____

**Granted with Modifications**



/S/ Sherry Stephens Date: 10/4/2018
_____
Judicial Officer of Superior Court

**ENDORSEMENT PAGE**

CASE NUMBER: CV2016-013572                    SIGNATURE DATE: 10/4/2018

E-FILING ID #: 9766250                             FILED DATE: 10/8/2018 8:00:00 AM

ERIN E BRADHAM

JEFFREY GREGORY ZANE

Clerk of the Superior Court
*** Electronically Filed ***
T. Hays, Deputy
1/4/2019 4:57:00 PM
Filing ID 10030917

**MERLIN LAW GROUP P.A.**
Michael N. Poli (State Bar No. 006431)
mpoli@merlinlawgroup.com
Lawrence R. Moon (State Bar No. 017000)
lmoon@merlinlawgroup.com
2999 North 44th Street, Suite 520
Phoenix, Arizona 85018
Telephone: (480) 315-9980
Facsimile:  (480) 315-9984

**STEPHEN SILVERMAN LAW**
Stephen E. Silverman (State Bar No. 016757)
steve@stephensilverman.com
6945 E. Sahuaro Dr., Ste. 125
Scottsdale, AZ  85254
Telephone:  (480) 747-0850
Facsimile:  (480) 400-1065

*Attorneys for Plaintiff*

## ARIZONA SUPERIOR COURT

## MARICOPA COUNTY

| | |
|---|---|
| ANDERSON PHILLIPS and JASMINE PHILLIPS, husband and wife,<br><br>              Plaintiffs,<br><br>v.<br><br>STATE FARM FIRE AND CASUALTY CORPORATION, an Illinois corporation,<br><br>              Defendant. | Case No.  CV2016-013572<br><br>**RULE 7.1(g) NOTICE OF AGREED-TO EXTENSION OF TIME FOR PLAINTIFF TO FILE A MOTION TO AMEND COMPLAINT (FIRST EXTENSION)**<br><br>(Assigned to Hon. Sherry K. Stephens) |

Pursuant to Arizona Rule of Civil Procedure 7.1(g), the parties have agreed to extend the deadline for Plaintiffs to file its Motion to Amend the Complaint, originally stipulated by the parties to be due January 11, 2019, to Friday, January 25, 2019.

1

T2107896.DOCX;1

This agreement is appropriate under Rules 7.1(g)(1) and (3):  it does not conflict with other deadlines set by the Court, the subject motion is not set for any hearing or oral argument, and the Motion to Amend the Complaint is not yet due.

The foregoing request is for good cause and said extension is not being made for purposes of delay.

DATED this 4th day of January, 2019.

MERLIN LAW GROUP, P.A.

- and -

STEPHEN SILVERMAN LAW

By:___/s/ Michael N. Poli_____
        Michael N. Poli
        Lawrence R. Moon
        Stephen E. Silverman
        Attorneys for Plaintiffs

ORIGINAL of the foregoing
emailed this 4th day of January, 2019, to:

Karl Tilleman
Erin Bradham
STEPTOE & JOHNSON, LLP
201 East Washington Street, Suite 1600
Phoenix, Arizona 85004
Attorneys for Defendant State Farm Fire and Casualty


_____/s/ Linda Gundelach_____

2

Clerk of the Superior Court
*** Electronically Filed ***
T. Hays, Deputy
1/25/2019 2:28:00 PM
Filing ID 10098060

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Michael N. Poli (State Bar No. 006431)
mpoli@merlinlawgroup.com
Michael J. Ponzo (State Bar No. 028092)
mponzo@merlinlawgroup.com
MERLIN LAW GROUP P.A.
2999 North 44th Street, Suite 520
Phoenix, Arizona 85018
Telephone:  (480) 315-9980
Facsimile:  (480) 315-9984
*Counsel for Plaintiffs*

Stephen E. Silverman (State Bar No. 016757)
steve@stephensilvermanlaw.com
STEPHEN SILVERMAN LAW
6945 E Sahuaro Drive, Suite 125
Scottsdale, Arizona 85254
Telephone:  (480) 747-0850
Fax:  (480) 400-1065
*Counsel for Plaintiffs*

# ARIZONA SUPERIOR COURT

## MARICOPA COUNTY

| | |
|---|---|
| ANDERSON PHILLIPS and JASMINE PHILLIPS, husband and wife,<br><br>Plaintiffs,<br><br>vs.<br><br>STATE FARM FIRE AND CASUALTY COMPANY, an Illinois corporation,<br><br>Defendant. | No. CV2016-013572<br><br>**MOTION FOR LEAVE TO AMEND COMPLAINT TO CLASS ACTION**<br><br>(Assigned to the Honorable Sherry Stephens) |

Plaintiffs Anderson and Jasmine Phillips (the "Phillips") request leave to file their Second Amended Complaint converting this from the Philips action to a class action against Defendant State Farm Fire and Casualty Company ("State Farm"), wherein the Philips will serve as the class representative.   A redlined version of the proposed First Amended Complaint is attached as **Exhibit 1**.  This request is made under Rule 15(a)(2) Ariz.R.Civ.P. ("leave to amend must be freely given when justice requires") and in

conjunction with Rule 23, Ariz.R.Civ.P.[1]  The proposed class action complaint addresses acts that "arose out of the conduct, transaction, or occurrence set forth . . . in the original pleading," Rule 15(c)(1), Ariz.R.Civ.P.,[2] but through discovery have been determined not only to impact the Philips, but a significant number of State Farm policy holders in Arizona.

## INTRODUCTION

The Xactimate is the predominate software program utilized to provide building cost data for the insurance repair market.  Xactimate provides cost data bases for various markets in two forms only: "New Construction" and "Restoration/Service/Remodel."  The "New Construction" database provides for shorter labor times associated with a true "grounds-up" construction than the "Restoration/Service/Remodel" database, which results in lower Replacement Cost Values (RCV's), by 10% or more.

State Farm abuses the Xactimate software program by improperly using the New Construction database in property claims where grounds up pricing is inappropriate.  The net-net to State Farm underpays on Replacement Cost Claims, that do not reach policy limits, by 10% or more.  And since the RCV figure is the basis for claims where the insured does not rebuild or replace the lost property, the Actual Cost Value paid is understated by 10% or more.[3]  The result is State Farm underpays claims: breaching the policy provision, acting is bad faith, and violating A.R.S. § 20-443, which prohibits an insurance company from "[m]isrepresenting the terms of any policy issued or to be issued."

In this matter, Plaintiffs deposed Mr. Robert Gonzales, a claims handler who has

---

[1] *See also* Joint Stipulation for Plaintiffs' to File Motion to Amend Complaint and Extension of Deadlines, filed September 28, 2018.

[2] Because the new cause of action arises of the same facts as the cause of action for breach of the covenant of good faith and fair dealing, the amendment is proper, and the cause of action relates back to the original filing of the Complaint. *Marshall v. Superior Court*, 131 Ariz. 379, 383 (1982).

[3] Under standard property policies, the insurance company pays the ACV until it receives the property has been replaced.  The ACV is calculated by depreciating the RCV.  Thus, artificially reducing the RCV by using the New Construction database, reduces the amount the insured receives for the unreplaced loss.

worked for State Farm for the past 29 years.  *See* Deposition of Robert Gonzales, attached hereto as **Exhibit 2** at pg.  26:5-13.  For the past 16-17 years Mr. Gonzales worked on large loss claims.  *Id*. at pg. 27:1-4.    Mr. Gonzales was familiar with the price differences between "New Construction" pricing and "Restoration Pricing," and testified New Construction pricing uses the same labor and material rate as Restoration Pricing, it just takes less labor time to complete the task.  *Id*. at pg. 30:7-18.  Mr. Gonzales testified the average projected cost difference between using New Construction Pricing and Restoration Pricing is 8-12%.  *Id*. at pgs.  36:20-37:14.

Mr. Gonzales admitted "true new construction" means there's never been a structure on the property.  Pg. 39:2-14.  And while New Construction pricing was used on the Phillips' loss, Mr. Gonzales admitted their project was not true new construction pricing.  Pg. 40:9-20.

But the Phillips are not unique in the use of New Construction Pricing on property losses that are not grounds up construction.  Approximately 6-7 years ago, the adjusters in Mr. Gonzales large loss unit were instructed to use new construction pricing for all large losses.  Mr. Gonzales further testified:

> Q.    And consistent with the orders you were given, all the large losses with maybe very limited exceptions were done with the new construction setting, right?
>
> . . .
>
> A.    As far as I recall, yes.
>
> Q.    And that's also the way the three people that you interacted with on your team at different times. They were doing the same thing, they were following the same orders?
>
> . . .
>
> A.    I'm going to struggle with the word "order."   I'm going to say direction.
>
> Q.    Directive.
>
> A.    Okay.
>
> Q.    Let's use directive.

A.    Okay.

Q.    The same people that you interacted with over those six or seven years, you know, Mr. Johnson, Mr. Vaughn and Mr. Donner, where you were looking at each other's work, looking at each other's estimates,  just like you, they were following the directive from Mr. Costales about using, with only very, very limited exceptions using the new construction setting on large losses, correct?

A.    Yes.

*Id.* at pgs. 55:1-56:21.

In a subsequent matter, involving State Farm's misuse of New Construction Pricing, a 30(b)(6) representative from Kowalski Construction testified State Farm was unique in using New Construction Pricing on projects that were not ground up.  *See* Deposition of Tony Taylor, *Morris v. State Farm and Casualty*, at pgs. 108-109, attached hereto as **Exhibit 3**.  He testified insurance companies other than State Farm use restoration/service/remodel pricing in restoration or non-grounds up construction.  Id. at pgs. 108:18-109:10.  Mr. Taylor testified the only insurance company he was aware of that used new construction pricing was State Farm.  *Id.*

The Philips were victimized by State Farm's improper use of New Construction pricing for a large loss that did not require a grounds-up construction.   The Philips, on behalf of themselves and all others similarly situated, (collectively, Plaintiffs or the "Class") bring this class action complaint against State Farm.  The Class alleges State Farm breached the insurance policy, the covenant of good faith and fair dealing, and the Arizona Consumer Fraud Statute[4] in connection with property damage claims.  "Whether or not a suit should be allowed to proceed as a class action is left to the trial court's discretion."  *Carpinterio v. Tucson School Dist. No 1 of Pima County,* 18 Ariz.App. 283, 286

---

[4] *Schmidt v. American Leasco*, 139 Ariz. 509, 511-12 (App. 1983) (consumer fraud statute violated by the use or employment of deception, deceptive acts and practices, fraud, false pretenses, misrepresentations, concealments, suppression and omission of material facts in connection with providing goods or services).

(1972)(citations omitted).   One seeking to maintain a class action has the burden of showing that the prerequisites are satisfied—merely calling it a class action does not make it one. *ESI Ergonomic Solutions, LLC v. United Artists Theatre Circuit, Inc*., 203 Ariz. 94, ¶ 11, (App.2002) (citations omitted).[5]

As early as possible, the Court must determine whether the Philips may sue as representatives of all members, and to do so the Philips must show numerosity, commonality, typicality, and adequacy.[6]   The determination of whether a class action should be allowed does not depend on whether the plaintiff has stated a cause of action or will prevail on the merits. *Home Federal Sav. And Loan Ass'n v. Pleasants*, 23 Ariz.App. 467 (1975) (citing *Miller v. Mackey International, Inc*., 452 F.2d 424 (5th Cir. 1971); *Kahan v. Rosenstiel*, 424 F.2d 161 (3rd Cir. 1970)).

## NUMEROSITY

Plaintiffs estimate that more than one thousand policy holders, who received filed property loss claims in Arizona over the past six years, would fall into one of two defined classes:

1. **Class 1** – ("ACV Class") - All State Farm policy holders who received an Actual Cash Value (ACV) payment from State Farm in a large loss using an Xactimate estimate prepared with the New Construction" labor pricing database, and did not request a Replacement Cost Value ("RCV") payment.[7]

2. **Class 2** – ("RCV Class") – All State Farm policy holders who received a

---

[5] Because state class action rule is identical to federal Rule, the Court of Appeals views federal cases construing the federal rule as authoritative. *ESI Ergonomic Solutions, LLC v. United Artists Theatre Circuit, Inc*., 203 Ariz. 94, ¶ 11, (App.2002); *see also* Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.; Ariz. Rules Civ.Proc., Rule 23.

[6] *See* Rule 23(a), Ariz.R.Civ.P. "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."

[7] This class would exclude all "builders risk" policies but include homeowners and commercial claims.  This class would also exclude property claims where there was true grounds up construction.

full Replacement Cost Value (RCV) payment for a large loss based on Xactimate New Construction Pricing, within policy limits where the loss was not true grounds up reconstruction.

The class members would be readily identifiable by State Farm through a straight forward search of their database.  In both the ACV Class and RCV Class matters, State Farm was "unjustly enriched" by receiving illicit profits by using the New Construction Pricing.   Further in both the ACV Class and RCV Class, injunctive relief is appropriate where State Farm could be ordered to notify each class member of the payment they are entitled to receive.

The central issue is the improper use of the new construction pricing leading to an 8-12% windfall on all large claims that did not involve grounds up construction.

## COMMONALITY

"Maintenance of a class action does not depend upon commonality of all questions of fact and law, but only that such questions predominate over questions affecting individual members of the class." *Home Federal Savings and Loan Ass'n v. Pleasants*, 23 Ariz.App. 467, 469 (1975) (citing *Like v. Carter*, 448 F.2d 798 (8th Cir. 1971); *Goldstein v. Regal Crest, Inc*., 59 F.R.D. 396 (D.C.1973).  However, these "common questions need not be dispositive of the entire action."  *Esplin v. Hirschi*, 402 F.2d 94 (10th Cir. 1968). To establish commonality, "[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies." *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1019 (9th Cir.1998).    The plaintiff's necessary showing to satisfy commonality is "minimal" and "less rigorous than the companion requirements of [predominance and superiority]." *Hanlon*, 150 F.3d at 1019–20.    To establish commonality, "[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies." *Id*.

Here, State Farm took a singular action as it relates to class members, the improper

use of the New Construction Database.  In all cases, simply selecting the Restoration Database, is all that is needed to show the amount of illicit profit retained by State Farm. The predominate question is whether the use of the New Construction Database was appropriate.

## TYPICALITY

Rule 23(a)(3) requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). Under the rule's permissive standards, a plaintiff's claims need not be substantially identical, but only "reasonably co-extensive with those of absent class members." *Hanlon,* 150 F.3d at 1020. "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.' " *Hanon v. Dataproducts Corp*, 976 F.2d 497,508 (9th Cir. 1992)(quotation omitted).

The court looks to "the nature of the claim or defense of the class representative, and not to the specific facts from which it arose, or the relief sought." *Id.* (internal quotation omitted). "[T]he typicality inquiry involves comparing the injury asserted in the claims raised by the named plaintiffs with those of the rest of the class." *Armstrong v. Davis*, 275 F.3d at 869.   Rule 23(a)(3) only requires representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical.[8]

Here, the Plaintiffs incurred a loss where State Farm improperly utilized the New Construction Database and not the Restoration Database.  As a result, they received a lower

---

[8] *See* Fed.R.Civ.P. 23(a)(3); *Parsons*, 754 F.3d at 686 ("Rule 23(a)(3) requires only that their claims be 'typical' of the class, not that they be identically positioned to each other or to every class member."); *Armstrong v. Davis*, 275 F.3d at 869; Hanlon, 150 F.3d at 1020; *Hanon v. Dataproducts Corp*., 976 F.2d 497, 508 (9th Cir.1992) (typicality analysis "refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought" (internal quotation marks omitted)).

payment, due to the inherent labor cost reductions in the New Construction Database.  As a result, Plaintiffs were not fully compensated for their loss under the terms of the policy. This is not only typical of the class members, but essentially the same activities that lead to class members damages.

## ADEQUACY

A plaintiff must also demonstrate that she "will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). The court must examine two issues: (1) whether the named plaintiff and her counsel have any conflicts of interest with other class members, and (2) whether the named plaintiff and her counsel will "prosecute the action vigorously on behalf of the class." *Hanlon*, 150 F.3d at 1020. In determining the latter issue, the court can consider the competency of counsel. *Id*. at 1021.

Here, Plaintiffs' do not foresee any conflicts of interest.  Plaintiffs have no conflicting relationships with other policy holders; and, counsel do not represent the interests of State Farm or Xactimate.  In addition, Plaintiffs' counsel have experience representing class actions in Arizona and are fully prepared, as are Plaintiffs to vigorously prosecute this claim.

## PROSECUTING SEPARATE CLAIMS

Having met the criteria pursuant to Rule 23(a) a class action may be maintained if "prosecuting separate actions by or against individual class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.   Rule 23(b)(1), Ariz.R.Civ.P.

Allowing the prosecution of separate claims would significantly impede the

interests of other members.  While some of the class members may have damages that could potentially justify a singular action, a vast majority of the class members damages would be insufficient to enable those class members to bring a separate claim.  While State Farm derives illicit profits from each and every class member, State Farm knows standing alone class members would be unable to obtain justice bringing an individual suit.  Damages would be absorbed in expert and legal fees, such that many class members would be in a deficit position.

## INJUNCTIVE RELIEVE IS APPROPRIATE 23(b)(2)

The party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.  Rule 23(b)(2), Ariz.R.Civ.P.  State Farm has and continues to utilize new construction pricing on restoration losses to the continued detriment of their insured.  Injunctive relief is necessary to preclude State Farm from continuing to obtain illicit profits from their insured.  In addition, the Court should issue an Order requiring State Farm to notify all insured who received an RCV or ACV settlement based upon New Construction Pricing instead of restoration pricing, including a statement that this pricing database resulted in lower damage estimates than would have resulted from a Restoration Database Pricing.

## PREDOMINANCE

The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623.  This analysis presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2); thus, the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3). In contrast to Rule 23(a)(2), Rule 23(b)(3) focuses on the relationship between the common and individual issues. "When common questions present a significant aspect of the case and they can be resolved

for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." Wright, Miller & Kane, supra, § 1778.

As previously stated, the fundamental question posed in all cases is the selection of the New Construction Database versus the Restoration Database for all claims that did not require a grounds-up build.  Plaintiffs are not challenging the individual components of the Xactimate estimate – only the database selection.  The common questions of fact and law presented are a significant and dominant aspect of this case, and a finding that using the New Construction Database was improper allowing for illicit profits should be handled on a representative basis.

DATED this 25th day of January, 2019.

MERLIN LAW GROUP, P.A.

By____/s/ Michael N. Poli_____
Michael N. Poli
Michael J Ponzo
2999 North 44th Street, Suite 520
Phoenix, Arizona 85018
*Counsel for Plaintiffs*

STEPHEN SILVERMAN LAW

By____/s/ Stephen E. Silverman_____
Stephen E. Silverman
6945 E Sahuaro Drive, Suite 125
Scottsdale, Arizona 85254
*Counsel for Plaintiffs*

COPY of the foregoing emailed / mailed
This 25th day of January, 2019, to:

Karl M. Tilleman
Erin E. Bradham
STEPTOE & JOHNSON LLP
201 East Washington Street, Suite 1600
Phoenix, Arizona 85004-2382
ebradham@steptoe.com
ktilleman@steptoe.com
*Attorneys for Defendant State Farm Fire*
*And Casualty Company*

_/s/ Linda Gundelach_____

# EXHIBIT 1

Michael N. Poli (State Bar No. 006431)
mpoli@merlinlawgroup.com
~~Jeff G. Zane~~Michael Ponzo (State Bar No. 02~~1172~~80924)
~~mponzo~~~~jzane~~@merlinlawgroup.com
MERLIN LAW GROUP P.A.
2999 North 44th Street, Suite 520
Phoenix, Arizona 85018
Telephone:  (480) 315-9980
Facsimile:  (480) 315-9984

*Counsel for Plaintiffs*

Stephen Silverman
steve@stephensilvermanlaw.com
Stephen Silverman Law
6945 E Sahuaro Drive, Suite 125
Scottsdale, Arizona 85254
Telephone:  (480) 747-0850
Fax:  (480) 400-1065
*Counsel for Plaintiffs*

**ARIZONA SUPERIOR COURT**

**MARICOPA COUNTY**

| | |
|---|---|
| ANDERSON PHILLIPS and JASMINE PHILLIPS, husband and wife,<br><br>        Plaintiffs,<br><br>    vs.<br><br>STATE FARM FIRE AND CASUALTY COMPANY, an Illinois corporation,<br><br>        Defendant. | No. _____<br><br>~~COMPLAINT~~ **FIRST AMENDED CLASS ACTION COMPLAINT** |

Plaintiffs Anderson and Jasmine Phillips (the "Phillips"), on behalf of themselves and all others similarly situated (collectively, "Plaintiffs" or the "Class") bring this class action complaint against ~~hereby allege as follows against~~ Defendant State Farm Fire and Casualty Company ("State Farm").

**JURISDICTION AND VENUE ALLEGATIONS**

1.    Anderson Phillips and Jasmine Phillips are a married couple who reside in Maricopa County, Arizona.

2.    Defendant State Farm is an Illinois corporation engaged in the business of

T2124852.DOCX;1

insurance in Maricopa County, Arizona.

3.     The property insurance agreement that is the subject of this action was sold to the Phillips in Maricopa County, Arizona, by Defendant State Farm.

4.     This Court has jurisdiction over the subject matter of this action and the parties to this action.   The amount of damages sought by the Plaintiffs exceeds the minimum jurisdictional amount established for filing in this Court.  Venue is proper in this Court.

**FACTUAL ALLEGATIONS COMMON TO PHILLIPS**

5.     At all relevant times hereto, the Phillips resided at 614 West Desert Lane, Phoenix Arizona, 85041 (the "Residence").  The Residence and its contents were insured by State Farm under an insurance policy issued by State Farm and assigned the policy number 03-J4-4660-2 (the "Policy").

6.     On or about December 6, 2016, a fire occurred within the Residence, causing significant damage to the Residence and to the Phillips' personal property that was in the Residence at the time (collectively, the "Loss")

7.     At the time of the fire, the Policy was in full force and effect.

8.     The Phillips timely submitted a claim to State Farm regarding the Loss (collectively, the "Claim") and they performed all of their obligations and responsibilities under the Policy with respect to the Claim.

9.     State Farm assigned the Phillips' Claim the number 03-43H7-730.

10.     On December 14, 2016, State Farm inspected the Residence and the Phillips' personal property.

11.     The Phillips have timely responded to all reasonable inquiries and requests from State Farm and State Farm's agents regarding the Claim.

12.     The Phillips have also taken timely action to respond to all inquiries and requests from State Farm.

13.     The Phillips also retained the services of a public adjuster, Skipton &

Associates, Inc. ("SAI").  SAI inspected the Property on December 28, 2015.

14.     On or about January 8, 2016, SAI submitted a scope of loss reflecting the cost to repair the Residence pursuant to the Policy, which is $203,114.69 (RCV).

15.     On or about January 22, 2016, State Farm conveyed its own estimate of repair costs, which was $153,759.64 (RCV).

16.     State Farm refuses to make payment of the full amount due and owing for the Phillips' insurance claim in bad faith.

17.     State Farm knows or should know that its failure to provide full payment to the Phillips for the Loss is not justified in light of the obvious damage to the Residence as a result of the fire.

18.     State Farm knows, or should know, that its unreasonable, incomplete and incompetent evaluation of the Loss is a breach of the duty and obligation of good faith and fair dealing owed to the Phillips under the Policy.

19.     State Farm's conduct complained of herein was, and continues to be, intentional, willful and wanton, and/or taken in conscious and deliberate disregard of the Plaintiff's rights, thus justifying the imposition of punitive damages.

20.     With respect to the events giving rise to this lawsuit, at various times and in various ways, State Farm acted through other agents and employees.

21.     State Farm's conduct complained of herein was intentional, willful and wanton, and/or taken in conscious and deliberate disregard of the Phillips' rights, thus justifying the imposition of punitive damages.

FACTUAL ALLEGATIONS COMMON TO ALL CLASS MEMBERS

22.     Xactimate sells a structure damage estimate program that is used by contractors, insurance companies and public adjusters.

23.     State Farm utilizes the Xactimate estimating tool to adjust residential and commercial property loss claims.

24.     State Farm accepts the list from Xactimate as an accurate predictor or

property loss estimates.

25.     The Xactimate estimating tool has two different data bases: a restoration database and new construction database.

26.     The new construction database is utilized when the property damage is so extensive that a ground up rebuild is required.

27.     The restoration database us utilized when the property damage required renovation or repairs, but not a ground up reconstruction.

28.     The new construction data base includes efficiencies in labor cost associated with ground up construction and produces a lower cost estimate than the "Renovation/Repair Pricing" data base would produce for the same scope of work.

29.     The State Farm Adjuster selects which of the two databases to utilize when adjusting a claim.

30.     State Farm is aware the insured would not be aware that Xactimate had two data bases,

31.     State Farm is aware the insured would not be aware that an Xactimate estimate using the new construction database produces a lower estimate than an estimate using the restoration database.

32.     State Farm utilized the new construction database on claims that did not require a ground up rebuild.

33.     State Farm paid numerous claims requiring restoration based upon the new construction database.

34.     State Farm knowingly and intentionally utilized the new construction database to fraudulently lower the amount paid on Replacement Cost Value Claims.

35.     State Farm knowingly and intentionally underpaid on Replacement Cost Value Claims to the detriment of the insured and benefit of State Farm.

36.     State Farm was unjustly enriched by retaining an illicit profit from resulting from utilizing the new construction database.

37.     State Farm misrepresented the replacement cost value the class members were entitled to by using the new construction database for restoration property claims.

38.     State Farm knew the replacement cost value, based upon the new construction database for renovation losses, misstated the actual amount necessary to make the covered repairs, harming the Class Members and unjustly enriching State Farm.

39.     State Farm knew the insured was ignorant of the impact of the new construction database on the renovation losses, and resultant paid replacement cost value.

40.     State Farm intended the insured to rely on the replacement cost value estimate based upon the new construction database.

41.     The Class Members reasonably relied upon State Farm's representations as to replacement cost values.

42.     The Class Members were ignorant to the fact State Farm's representations as to replacement cost values based upon new construction databases undervalued the claim.

43.     The Class Members sustained consequent and proximate damage based upon the misrepresentations made by State Farms.

## CLASS ALLEGATIONS

### A.  Class Definition

44.     Plaintiffs bring this action against Defendants pursuant to Rule 23 of the Arizona Rules of Civil Procedure on behalf of themselves and all other persons similarly situated. Plaintiffs seek to represent the following class:

Statewide Class:

All persons or entities, within the applicable statutes of limitation, who purchased a commercial or residential property insurance policy from State Farm or its affiliates, entities, or subsidiaries, who suffered a covered property loss requiring repair or renovation, for whom State Farm provided Xactimate estimates for RCV or ACV using New Construction labor pricing date.

62.     Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

63.     Defendants subjected Plaintiffs and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

**B.     Numerosity**

64.     The proposed class is so numerous that joinder of all members would be impracticable. State Farm sold and serviced hundreds of commercial and residential property insurance policies though out Arizona where the insured incurred a covered loss and were provided estimates and settlement payments based upon a lower labor cost data base. The individual Class members are ascertainable, as the names and addresses of all Class members can be identified in the business records maintained by State Farm.  The precise number of Class members for the Class is at least in the hundreds and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring a suit individually. Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

**C.     Commonality**

65.     There are questions of law and fact that are common to Plaintiffs' and Class members' claims. These common questions predominate over any questions that go particularly to any individual member of the Class. Among such common questions of law and fact are the following:

a.   Whether State Farm engages in the fraudulent practice of underestimating either repair or renovation losses, for covered losses, by utilizing a cost model associated with a new builds data base and not repairs or renovations data base;

e.   Whether State Farm concealed the fraudulent nature of the Xactimate cost estimating program using a new build data base on repairs and renovations;

f.   Whether State Farm had a duty to disclose material facts to the Class about the fraudulent nature of the Xactimate cost estimating program using a new build data base on repairs and renovations;

h.   Whether Defendants have been unjustly enriched at the expense of Plaintiffs and the Class members;

i.   Whether Plaintiffs and the Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, or other relief;

j.   The amount and nature of such relief to be awarded to Plaintiffs and the Class; and

k.   Whether any applicable statute of limitations should be tolled due to Defendants' concealment of the fraudulent nature of the Xactimate cost estimating program using a new build data base on repairs and renovations.

**D.      Typicality**

66.     Plaintiffs are members of the Class they seeks to represent. Plaintiffs' claims are typical of the Class members' claims because of the similarity, uniformity, and common purpose of the Defendants' unlawful conduct. Each Class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of Defendants' wrongful conduct.

**E.      Adequacy of Representation**

67.     Plaintiffs are adequate representatives of the Class they seek to represent and will fairly and adequately protect the interests of the Class. Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them. There is no hostility between Plaintiffs and the unnamed Class members. Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

68.     To prosecute this case, Plaintiffs have chosen the undersigned law firms, which are very experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

**F.      Requirements of Ariz. R. Civ. P. 23(b)(3)**

69.    The questions of law or fact common to Plaintiffs' and each Class members' claims predominate over any questions of law or fact affecting only individual members of the class. All claims by Plaintiffs and the unnamed Class members are based on Defendants' scheme regarding use of the Xactimate cost estimating program using a new build data base on repairs and renovations and their deceptive and egregious actions involved in fraudulently underpaying insurance claims.

70.    Common issues predominate where, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

71.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

**G.    Superiority**

72.    A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

(a)    Joinder of all class members would create extreme hardship and inconvenience for the affected customers as they reside all across the states;

(b)    Individual claims by class members are impractical because the costs to pursue individual claims exceed the value of what any one class member has at stake. As a result, individual class members have no interest in prosecuting and controlling separate actions;

(c)    There are no known individual class members who are interested in individually controlling the prosecution of separate actions;

(d)    The interests of justice will be well served by resolving the common disputes of potential class members in one forum;

(e)    Individual suits would not be cost effective or economically maintainable as individual actions; and

(f)    The action is manageable as a class action.

**H.     Requirements of Ariz. R. Civ. P. 23(b)(1) & (2)**

73.     Prosecuting separate actions by or against individual Class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

74.     Defendants have acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

**COUNT I**
**BREACH OF INSURANCE CONTRACT; IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING**
~~**Count 1 - Breach of Insurance Contract; Implied Duty of Good Faith and Fair Dealing**~~

~~21.~~45. The foregoing allegations are hereby incorporated by reference.

~~22.~~46. State Farm agreed to provide property insurance coverage for the ~~Phillips~~ Plaintiffs.

~~23.~~47. State Farm was paid premiums in exchange for its indemnity obligations to the ~~Phillips~~ Plaintiffs.

~~24.~~48. The Polic~~y~~ies, like all contracts within the State of Arizona, contains an implied covenant of good faith and fair dealing.

~~25.~~49. The ~~Phillips~~ Plaintiffs fulfilled all of their obligations under the Polic~~y~~ies.

~~26.~~50. State Farm failed to perform its obligations pursuant to the Polic~~y~~ies.

~~27.~~51. By wrongfully failing to process the claim in good faith and pay the Claim in full, State Farm breached the Polic~~y~~ies, including the implied covenant of good faith and fair dealing in that agreement, thereby depriving the ~~Phillips~~ Plaintiffs of the benefits they were to have received under the contract.

~~28.~~52. State Farm failed to handle the ~~Phillips'~~ Plaintiffs' Claim~~s~~ in a reasonable manner and ~~has~~ failed to make payments owed under the Polic~~y~~ies.

~~29.~~53. As a direct and proximate result of State Farm's breach of contract and breach

T2124852.DOCX;1

9

1  of the implied covenant of good faith and fair dealing, the ~~Phillips~~ Plaintiffs ~~have~~ sustained

2  reasonably foreseeable damages, and continue to sustain such damages, in an amount to be

3  proven at trial.

4  ~~30.~~54.  The ~~Phillips~~ Plaintiffs are entitled to an award of attorneys' fees under A.R.S.

5  § 12-341.01.

6  ~~WHEREFORE, on this claim, the Phillips request judgment against State Farm, as~~

7  ~~follows:~~

8  ~~A.      For compensatory damages in a just and reasonable amount (including both~~

9  ~~contractual damages and extra-contractual or consequential damages);~~

10  ~~B.      For attorneys' fees and costs, and in the event of a default judgment, for~~

11  ~~attorneys' fees in the amount of $4,500.00;~~

12  ~~C.      For pre- and post-judgment interest;~~

13  ~~D.      For taxable costs pursuant to A.R.S. §12-341; and~~

14  ~~E.      For such other relief as the Court deems just and proper.~~

15  **COUNT~~ount 2~~ II–**

16  **TORTIOUS BAD FAITH CLAIMS HANDLING ~~Tortious Bad Faith Claims~~**

17  **~~Handling~~**

18

19  55.     The foregoing allegations are hereby incorporated by reference

20  ~~31.~~56.  In Arizona, "the tort of bad faith arises when the insurer 'intentionally denies,

21  fails to process of pay a claim without a reasonable basis.'" *Zilisch v. State Farm Mutual*

22  *Auto. Ins. Co*., 196 Ariz. 234, ¶20 995 P.2d 276, 279 (2000) )(quoting *Noble v. National*

23  *Am. Life Ins. Co.*, 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981)).  "An insurance contract

24  is not an ordinary commercial bargain; 'implicit in the contract and the relationship is the

25  insurer's obligation to play fairly with its insured.'" *Id.* (quoting *Rawlings v. Apodaca*, 151

26  Ariz. 149, 154, 726 P.2d 565, 570 (1986)).  "The insurer has 'some duties of a fiduciary

27  nature,' including '[e]qual consideration, fairness and honesty.'"  *Id.* (quoting *Rawlings*,

28

151 Ariz. at 155, 726 P.2d at 571).  "[T]he insurer's eventual performance of the express covenant — by paying the claim — does not release it from liability for 'bad faith.'"  *Id.* (citing *Rawlings*, 151 Ariz. at 156, 726 P.2d at 572).  "Thus, if an insurer acts unreasonably in the manner in which it processes a claim, it will be held liable for bad faith 'without regard to its ultimate merits.'"  *Id.* (quoting *Deese v. State Farm Mutual Auto. Ins. Co*., 172 Ariz. 504, 508, 838 P.2d 1265, 1270 (1992)).  "The carrier has an obligation to immediately conduct an adequate investigation, act reasonably in evaluating the claim and act promptly in paying a legitimate claim."  *Id.* at ¶ 21.

32.57.  State Farm owed and continues to owe the ~~Phillips~~ Plaintiffs a duty of good faith and fair dealing.

33.58.  Pursuant to the terms of the Policy, State Farm is obligated to pay the ~~Phillips~~ Plaintiffs for the Losses associated with and arising from the fire.

34.59.  Without any reasonable justification for doing so, State Farm has failed to make payments to the ~~Phillips~~ Plaintiffs for the full amount due under the Policy for the loss sustained as a result of the fire.

35.60.  State Farm has breached its contractual obligation to ~~Phillips~~ Plaintiffs and State Farm has refused to perform its duty to cooperate with the ~~Phillips~~ Plaintiffs to, *inter alia*, adjust and negotiate the insurance claim fairly and in good faith.

36.61.  As described herein, State Farm breached its contractual and quasi-fiduciary obligations to the ~~Phillips~~ Plaintiffs.

37.62.  Upon information and belief, State Farms' conduct has been self-serving and a ploy to protect State Farm's own financial interests, at the expense of the ~~Phillips'~~ Plaintiffs' rights.

38.63.  Also upon information and belief, State Farm has consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others. Furthermore, State Farm acted to serve their own interests, rather than the interests of

PhillipsPlaintiffs.  Thus, Phillips Plaintiffs are entitled to an appropriate award of punitive damages.

39.64. State Farm committed the above acts and omissions intentionally, maliciously, and fraudulently, and acted to further their own economic interests, at Phillips' Plaintiffs' expense.

65.     As a result of State Farm's unjustified failure to pay for the Loss, in full, the Phillips Plaintiffs have suffered and continue to suffer significant consequential losses, including but not limited to, expense and losses arising from items that should have been paid for or covered by the Policies.

### COUNT III
### UNJUST ENRICHMENT

66.     The foregoing allegations are hereby incorporated by reference.

67.     Plaintiffs and each member of the Class conferred a direct benefit on State Farm through payments for the Property Insurance Policies allowing State Farm to enrich itself to the determent of Plaintiffs and the Class.

68.     State Farm appreciated, accepted, and retained this benefit, as it garnered profits by virtue of its scheme to use new construction costing on renovation losses, allowing State Farm to unjustly enrich itself.

69.     Under the circumstances, it would be unjust and inequitable to allow State Farm to retain this benefit.

40.70. Plaintiffs and the Class suffered damages as a result of State Farm's unjust enrichment

**WHEREFORE**, on this claim, the Phillips Plaintiffs, in behalf of themselves and the Class, demand an award against State Farm in the amounts by which it has been unjustly enriched at Plaintiffs' and the Class members' expense, costs incurred to bring this action, and any other relief as this Court deems just and proper.

request judgment against State Farm, as follows:

## COUNT IV

## MISREPRESENTATIONS AND FALSE DISCLOSURES -A.R.S.20-443

71.     The foregoing allegations are hereby incorporated by reference.

72.     State Farm made false and misleading statements as to the benefits available to the Plaintiff and Class Members under the policy.

73.     State Farm made these false and misleading statements to induce the Plaintiffs and Class Members to accept settlement payments for RCV or ACV based upon false labor costs.

74.     State Farm made, issued, circulated or caused to be made or circulated estimated, illustrations, circulars, sales material or statements misrepresenting the terms of the policy issued.

75.     Plaintiffs and the Class suffered damages as a result of State Farm's misrepresentations and false disclosures resulting in State Farm obtaining illicit profits.

**WHEREFORE**, on this claim, the Plaintiffs, in behalf of themselves and the Class, demand an award against State Farm in the amounts by which it improperly benefited at Plaintiffs' and the Class members' expense, costs incurred to bring this action, and any other relief as this Court deems just and proper.

## PRAYER FOR RELIEF

**Plaintiffs accordingly respectfully request the Court enter its Orders and Judgment:**

A.     Certify this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2) or Rule 23(b)(3), Arizona Rules of Civil Procedure, and appointing Plaintiffs as representatives of the Class(es), and appointing undersigned as counsel as Class Counsel:

B.     Enjoining State Farm from continuing the acts and practices challenged by the Plaintiff, including an order requiring State Farm to make full disclosure to all insureds who received settlements based upon new construction pricing

T2124852.DOCX;1                                    13

versus renovation pricing for either Replacement Cost Value Settlements or Actual Cost Value Settlements.

C.   Awarding Plaintiffs and the Class damages, injunctive relief, declaratory relief, attorneys' fees, and costs;

D.   Awarding pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

E.   Awarding Plaintiffs and Class members costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class Counsel and experts, and reimbursement of expenses;

F.   Awarding such other relief as the Court deems just, equitable and proper;

A.G.   For Awarding compensatory damages in a just and reasonable amount (including both contractual damages and extra-contractual or consequential damages);

B.H.   For Awarding punitive or exemplary damages in a just and reasonable amount;

C.   For attorneys' fees and costs, and in the event of a default judgment, for attorneys' fees in the amount of $4,500.00;

D.   For pre- and post-judgment interest;

E.I.   For taxable costs pursuant to A.R.S. §12-341; and

F.J.   For such other relief as the Court deems just and proper.

DATED this 30th 25th day of September January, 201 96.

MERLIN LAW GROUP, P.A.


By_____
Michael N. Poli
Jeff Zane Michael J Ponzo
2999 North 44th Street, Suite 520
Phoenix, Arizona 85018
*Counsel for Plaintiffs*

STEPHEN SILVERMAN LAW

By _____

Stephen E. Silverman
6945 E Sahuaro Drive, Suite 125
Scottsdale, Arizona 85254

*Counsel for Plaintiffs*

COPY of the foregoing emailed / mailed
This 25th day of January, 2019, to:

Karl M. Tilleman
Erin E. Bradham
STEPTOE & JOHNSON LLP
201 East Washington Street, Suite 1600
Phoenix, Arizona 85004-2382
ebradham@steptoe.com
ktilleman@steptoe.com
*Attorneys for Defendant State Farm Fire*
*And Casualty Company*

 /s/ Linda Gundelach _____

# EXHIBIT 2

ARIZONA SUPERIOR COURT

MARICOPA COUNTY

ANDERSON PHILLIPS and JASMINE  )  No. CV2016-015809
PHILLIPS, husband and wife,    )
                               )
                               )
                Plaintiffs,    )
                               )
v.                             )
                               )
STATE FARM FIRE AND CASUALTY   )
CORPORATION, an Illinois       )
corporation,                   )
                               )
                               )
                Defendants.    )
_____)

VIDEOTAPED DEPOSITION OF ROBERT GONZALES

Phoenix, Arizona
April 4, 2018
9:46 a.m.

PREPARED BY:

Donna DeLaVina, RPR
Certified Reporter
Certificate No. 50468

SEYMOUR REPORTING SERVICES
Arizona RRF No. R1000
137 East Elliot Road
Suite 2473
Gilbert, Arizona 85299
P 602.258.5800
F 888.881.5440
www.SRSreporting.com

ROBERT GONZALES   APRIL 04, 2018

```
 1                         INDEX

 2   WITNESS                                        PAGE

 3   ROBERT GONZALES

 4       Examination by Mr. Poli                      5

 5

 6

 7   EXHIBIT              DESCRIPTION               PAGE

 8   17      360Value - New Construction vs.         18
             Reconstruction (2 pages)
 9
     18      Operation Guide Structural Loss         25
10           Claim Handling (10 pages)

11   19      State Farm Certified Policy            103
             (45 pages)
12
     20      1/25/2016 Letter to Skipton &          114
13           Associates from Robert Gonzales,
             copy of payment, draft and estimate
14           (64 pages)

15

16

17          ITEMS REQUESTED MARKED BY MR. POLI

18          PAGE      LINE      PAGE      LINE

19           27        21       100        7

20           31        25       102       11

21           64        17       112        1

22           67        16       127       16

23           94         5       140       22

24

25
```

1  guide.

2      Q.  Okay.  Is this a -- I mean, you must be, I

3  forgot to get into your background, why don't we

4  quickly do it.

5          You've been a claims handler a long time,

6  right?

7      A.  Yes.

8      Q.  How long have you worked in insurance claims

9  total?

10     A.  29 years.

11     Q.  A long time.  Have you been with State Farm the

12  whole time?

13     A.  Yes.

14     Q.  Gee, you must be getting close to retirement,

15  aren't you?

16     A.  No.

17     Q.  You've got to keep working, huh?

18     A.  Yes.

19     Q.  Okay.  So 29 years doing insurance claims with

20  State Farm, have they all been property claims?

21     A.  Yes.

22     Q.  At some point, did you move to large loss

23  claims?

24     A.  I left our catastrophe services and came into

25  large loss claims.

ROBERT GONZALES   APRIL 04, 2018

1   Q.   So how long have you been in large loss claims,

2   large property losses, how many years?

3   A.   I did it while I was on cat also, so probably

4   16 years, 16, 17 years.

5   Q.   Okay.  And these are approximate numbers, but

6   give me your best estimate, about how long were you

7   working so-called catastrophe or cat claims?

8   A.   Eight years.

9        MS. BRADHAM:   Form.

10   Q.   BY MR. POLI:   And it's always been State Farm.

11   29 years with State Farm, you have to be pretty

12   familiar with your operation guides, right?

13   A.   Yes.

14   Q.   This excerpt that I just handed you, Exhibit

15   18, it's something that you're very familiar with,

16   correct?

17   A.   Yes.

18   Q.   It's something that you use on a routine, if

19   not daily basis, at least a routine basis, right?

20   A.   Yes.

21        MR. POLI:   Okay.  Mark it.

22   Q.   BY MR. POLI:   Okay.  Are you aware that -- if

23   you turn to -- you know what Bates numbers are, right?

24   A.   Yes.

25   Q.   So I'm just going to use the last four digits.

ROBERT GONZALES   APRIL 04, 2018

1   Xactimate system has an option to use new construction

2   pricing versus restoration pricing when preparing an

3   Xactimate estimate, right?

4       A.   I'm going to agree, but I don't know if I

5   necessarily -- with what you said, but I don't know if

6   I necessarily agree with how you're using it.

7       Q.   Well, tell me what your disagreement is so we

8   explore it.

9       A.   So it's not new construction and restoration

10  and remodel is the environment in which the work is

11  being done.  So if you look at Xactimate, it doesn't

12  change the labor rate and it doesn't change the

13  material price, what it changes is the amount of work

14  that you can do in that time.  So it doesn't really

15  change -- when you say new construction pricing, it

16  doesn't change those labor rates or material costs,

17  what it does is just say this person can work in this

18  environment quicker.

19           So I kind of struggle with your

20  terminology and I just want to make sure that when

21  we're talking the same thing that we are on the

22  same. . .

23      Q.   Let's see if we can clear up any ambiguity.

24           When Xactimate is used to produce an

25  estimate, and we'll look at your estimate in this case,

1    Q.   And if I refer to the restoration setting or

2    the restoration environment, I'll be referring to the

3    alternative option in Xactimate to not build in those

4    supposed extra efficiencies, where the estimate is

5    going to have a higher dollar amount.  Are we on the

6    same page with those two defined terms?

7    A.   Yes.

8    Q.   Okay.  So I'll keep going back to those as we

9    go through the deposition.  One option, it will be new

10   construction setting or new construction environment.

11   The other option under Xactimate will be a restoration

12   setting or the restoration environment, at least we

13   know what we each mean by that, right?

14   A.   Yes.

15   Q.   Okay.  So we've established that any time

16   anyone uses Xactimate, if they use the new construction

17   setting, instead of the restoration setting, the

18   numbers will always be lower, right?

19   A.   I would suspect, yes.

20   Q.   Well, you didn't say you suspected before, you

21   said based on your 29 years of experience and you've

22   been using Xactimate for 15 to 20 years, you said that

23   every time anyone does an estimate using the new

24   construction setting versus the restoration setting,

25   the numbers will be lower, correct?

ROBERT GONZALES   APRIL 04, 2018

1    A.   Yes.

2    Q.   Okay.  Here's what it says, quote, "The New

3 Construction option provides a cost for each line item

4 based upon the most efficient labor productivity

5 available.  This option is intended to be used for

6 true," emphasize that word, sir, "true new construction

7 applications or for jobs in which a total," quote,

8 "'ground up,'" unquote, "rebuild is necessary."

9         Did I read that correctly?

10   A.   Yes.

11   Q.   Now, by definition, true new construction, is

12 where there's never been a structure on the property

13 that's what that means, right?

14   A.   I would agree with that.

15   Q.   Okay.  So with respect to the Phillips' home,

16 that obviously doesn't apply to the Phillips' home,

17 right?

18   A.   Correct.

19   Q.   They had a home in a sub -- it was in a

20 subdivision, you understand that, right?

21   A.   Yes.

22   Q.   The homes are fairly close together in that

23 subdivision, correct?

24   A.   Define "fairly close."  I don't know what you

25 define --

1    Q.  Well, it's not like Paradise Valley with

2  one-acre lots.  That's not the Phillips' subdivision,

3  correct?

4    A.  Correct.

5    Q.  Okay.  It's a more traditional subdivision with

6  a lot of homes, relatively spaced close together and

7  it's a fully developed subdivision, right?

8    A.  Yes.

9    Q.  Okay.  All right.  So clearly the idea of true

10  or new construction, that would not apply to the

11  Phillips' loss, right?

12    A.  I would agree.

13    Q.  Okay.  So let's see if the Phillips' loss would

14  be so-called, quote, total ground up rebuild, unquote.

15  You see that I'm referring to the language in State

16  Farm's own policy, do you see that?

17    A.  Yes.

18    Q.  Was the Phillips' project what you would

19  consider, quote, a total ground up rebuild, unquote?

20    A.  No.

21    Q.  Well, then I guess you're admitting here right

22  now, that it was improper to use new construction

23  pricing or I guess what you would call a new

24  construction setting on the Phillips' claim; is that

25  right?

ROBERT GONZALES   APRIL 04, 2018

1    Q.   Okay.   And you've had many claims with
2  Mr. Skipton over the years where there was serious
3  damage, even though it wasn't a so-called ground up
4  rebuild, correct?
5    A.   Yes.
6    Q.   And until the last couple of years, there was
7  never any question of using the new construction
8  database to lower the dollar amount of the estimate,
9  correct?
10       MS. BRADHAM:   Form.
11   Q.   BY MR. POLI:   In your claims with Mr. Skipton?
12   A.   I don't know exactly when we started using the
13  new construction environment.   But it may have been
14  longer than a couple of years.
15   Q.   When did you guys, as best you know, start
16  using what you refer to as the new construction
17  environment, when did that happen, roughly?   Two years?
18  Three years?
19   A.   Maybe six, seven, I'm thinking 2011, 2012.   I
20  don't remember exactly.
21   Q.   So it could be as long as six to seven years?
22   A.   Yeah, I don't remember exactly.
23   Q.   Now, you actually had a conversation with
24  Mr. Skipton where he challenged you on the use of the
25  new construction pricing or new setting or environment

1   or whatever the heck you want to call it, and you told

2   him you didn't have any choice, that it was a mandate

3   from corporate headquarters, right?

4               MS. BRADHAM:  Form.

5               THE WITNESS:  I believe that's what I

6   said.

7       Q.  BY MR. POLI:  Okay.  So tell me about that.

8   Let's flesh that out.  When you told Mr. Skipton that

9   you had no choice about using the new construction

10  pricing, that it was a mandate or an order from on high

11  from corporate headquarters, how did that order come

12  about?

13              MS. BRADHAM:  Form.

14              THE WITNESS:  In a unit -- not even a

15  unit -- yeah, it was a unit meeting.  Abel, my team

16  manager at the time, explained to us that on our large

17  losses we would start using the new construction

18  environment.

19      Q.  BY MR. POLI:  On all large losses?

20      A.  All our large losses fit that partial loss,

21  yeah, on all of them.  I mean, it's all -- every one is

22  handled on its own merits.  But some large losses that

23  came into our unit were, very rarely, were water

24  claims.  But for the majority of them, they're

25  significantly damage by fire, as far the claims that we

# EXHIBIT 3

# In The Matter Of:

*Morris vs.*
*State Farm Fire and Casualty*

---

*30(b)(6) Tony Taylor*
*December 4, 2018*
*Kowalski Construction*

---

*Griffin & Associates Court Reporters, LLC*
*2398 E. Camelback Road*
*Suite 260*
*Phoenix, AZ 85016*

Original File TT120418.txt
Min-U-Script® with Word Index

1

1     IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2          IN AND FOR THE COUNTY OF MARICOPA

3

4     Joseph Morris and Marylou          )
      Morris, a married couple,          )
5                                         )
                      Plaintiffs,         )
6                                         )
            vs.                           )No. CV2017-002633
7                                         )
      State Farm Fire and Casualty        )
8     Company, an Illinois                )
      corporation, K&R                    )
9     Refrigeration, Inc., an             )
      Arizona corporation,                )
10                                        )
                      Defendants.         )
11                                        )

12

13        30(b)(6) DEPOSITION OF KOWALSKI CONSTRUCTION

14              BY:  TONY TAYLOR

15

16              Phoenix, Arizona
                December 4, 2018
17                10:04 a.m.

18

19

20

21   REPORTED BY:
     PAMELA J. MAYER, RMR, CRR
22   Certified Reporter
     Certificate No. 50207
23
     PREPARED FOR:
24   ASCII/CONDENSED

25   (Copy)

108

1     Q.   Okay.  And how do you -- how would it -- would

2  there be a difference between an estimate prepared using

3  the restoration/service/remodel and an estimate using new

4  construction?

5            MR. KLOCKE:  Form, foundation.

6            THE WITNESS:  Yes.

7  BY MR. SILVERMAN:

8     Q.   And what would that difference be?

9     A.   The -- I don't know what that exact percentage

10  is.

11     Q.   Is one higher than the other?

12     A.   The -- the new construction would be lesser.

13     Q.   And -- okay.

14         Now, you -- with respect to the majority of the

15  work that you do that -- the majority of your work is

16  insurance work.  Right?

17     A.   Yes.

18     Q.   And so you work with a lot of insurance

19  companies.  Yes?

20            MR. KLOCKE:  Form.

21            THE WITNESS:  Yes.

22  BY MR. SILVERMAN:

23     Q.   What labor efficiency setting do insurance

24  companies other than State Farm use?

25            MR. KLOCKE:  Form, foundation.

109

1              THE WITNESS:  The same as we do.  So --

2   BY MR. SILVERMAN:

3       Q.   That's restoration/service/remodel?

4       A.   Restoration, yes.

5       Q.   So the --

6       A.   I can't say that I've seen it -- seen anybody

7   else use the new construction.

8       Q.   And when you say "anybody else," the -- the only

9   insurance company that you're aware of that will price an

10  estimate using new construction is State Farm.  True?

11              MR. KLOCKE:  Form, foundation.

12              THE WITNESS:  That I'm aware of and recall,

13  yes.

14  BY MR. SILVERMAN:

15      Q.   Now, back to Exhibit 3.

16      A.   Okay.

17      Q.   Now, at the time that this estimate was prepared

18  in 2016, you see that the -- from the -- from the

19  document, Kowalski believed that the restoration/service/

20  remodel labor efficiency was going to be used.  True?

21              MR. KLOCKE:  Form, foundation.

22              THE WITNESS:  That, I don't know the answer

23  to that.

24  BY MR. SILVERMAN:

25      Q.   Do you see where it says, "Labor Efficiency:

Clerk of the Superior Court
*** Electronically Filed ***
K. Vega, Deputy
2/4/2019 12:26:00 PM
Filing ID 10125616

1   STEPTOE & JOHNSON LLP
2   201 East Washington Street, Suite 1600
    Phoenix, Arizona 85004-2382
3   Telephone: (602) 257-5200
    Facsimile:  (602) 257-5299
4   Court Email: phcourtnotices@steptoe.com
    ktilleman@steptoe.com
5   ebradham@steptoe.com

6   Karl M. Tilleman (013435)
    Erin E. Bradham (022827)

7   Attorneys for Defendant
    State Farm Fire and Casualty Company

8

9                    SUPERIOR COURT OF ARIZONA

10                     IN MARICOPA COUNTY

11  Anderson Phillips and Jasmine Phillips,       No. CV2016-013572
    husband and wife,
12                                                **RULE 7.1(g) NOTICE OF AGREED-
                        Plaintiffs,               TO EXTENSION OF TIME FOR
13                                                DEFENDANT TO FILE A
                 vs.                              RESPONSE TO MOTION FOR
14                                                LEAVE TO AMEND COMPLAINT
    State Farm Fire and Casualty Company,         TO CLASS ACTION (FIRST
15  an Illinois corporation,                      EXTENSION)**

16                      Defendant.                (Assigned to the Honorable
                                                   Sherry K. Stephens)
17

18

19          Pursuant to Arizona Rules of Civil Procedure 7.1(g), the parties have agreed to

20  extend the deadline for Defendant to file its response to Plaintiffs' Motion to Amend the

21  Complaint, originally due February 28, 2019 to March 14, 2019.  The purpose of this

22  extension is to adjust defendant's response deadline in light of a 2-week extension the

23  parties' previously agreed upon for plaintiffs to file their Motion to Amend the

24  Complaint.

25          The agreement is appropriate under Rule 7.1(g)(1) and (3); it does not conflict

26  with other deadlines set by the Court, the subject motion it is not set for any hearing or

27  oral argument and Defendant's response to the Motion to Amend the Complaint is not

28  yet due.

1  The foregoing request is for good cause and said extension is not being made for

2  purposes of delay.

3  DATED this 4th day of February, 2019.

4  STEPTOE & JOHNSON LLP

5  /s/  Erin E. Bradham
   Karl M. Tilleman

6  Erin E. Bradham

7  201 East Washington Street, Suite 1600
   Phoenix, Arizona 85004-2382

8
   Attorneys for Defendant State Farm Fire and
9  Casualty Company

10

11 ELECTRONICALLY filed this 4th day
   of February, 2019, with the Clerk of the
12 Superior Court and served electronically
   through the Court's e-service system.
13

14 /s/ Diane Linn
   Employee of Steptoe & Johnson LLP
15

16

17

18

19

20

21

22

23

24

25

26

27

28

Clerk of the Superior Court
*** Electronically Filed ***
K. Vega, Deputy
3/6/2019 3:00:00 PM
Filing ID 10225987

LAW OFFICES
BROENING OBERG WOODS & WILSON
PROFESSIONAL CORPORATION
2800 NORTH CENTRAL AVENUE, SUITE 1600
PHOENIX, ARIZONA 85004
(602) 271-7700

Robert T. Sullivan (022719)
rts@bowwlaw.com
Alicyn M. Freeman (023916)
amf@bowwlaw.com
Minute Entries/Orders
cjg@bowwlaw.com

*Attorneys for Defendant State Farm Fire
and Casualty Company*

## SUPERIOR COURT OF THE STATE OF ARIZONA

## COUNTY OF MARICOPA

| | |
|---|---|
| ANDERSON PHILLIPS AND JASMINE PHILLIPS, husband and wife, | NO. CV2016-013572 |
| Plaintiffs, | **APPLICATION FOR SUBSTITUTION OF COUNSEL** |
| vs. | |
| STATE FARM FIRE AND CASUALTY COMPANY, an Illinois corporation, | |
| Defendant. | (Honorable Sherry Stephens) |

The undersigned, pursuant to Rule 5.3(a)(2)(B)(i), Ariz. R. Civ. P., hereby request that Robert T. Sullivan and Alicyn M. Freeman, of the law firm Broening, Oberg, Woods & Wilson, PC, be substituted as counsel of record for Defendant State Farm Fire and Casualty Company, in place of Erin E. Bradham and Karl M. Tilleman of Steptoe & Johnson LLP. Defendant has consented to the substitution of counsel by Broening, Oberg, Woods & Wilson, PC, as confirmed below. Trial has not been scheduled in this matter. Accordingly, Defendant does not believe any party will be prejudiced by this substitution of counsel.

1

Robert T. Sullivan or Alicyn Freeman can be reached at:

2

3

Robert T. Sullivan
Alicyn M. Freeman
BROENING OBERG WOODS & WILSON, PC
2800 N. Central Ave., Suite 1600
Phoenix, Arizona 85004
Telephone:  602-271-7700
Facsimile:  602-258-7785
rts@bowwlaw.com
amf@bowwlaw.com

4

5

6

7

On behalf of myself and State Farm Fire and Casualty Company, I hereby consent to

8

the substitution of counsel by Broening, Oberg, Woods & Wilson, PC.

9

10

By: _____

11

Abel Costales

12

A proposed Order is filed herewith.

13

RESPECTFULLY SUBMITTED this 6th day of March, 2019.

14

BROENING OBERG WOODS & WILSON, P.C.

15

16

By: /s/ Alicyn M. Freeman
Robert T. Sullivan
Alicyn M. Freeman
2800 North Central Avenue, Suite 1600
Phoenix, Arizona 85004
Attorneys for Defendant State Farm Fire and
Casualty Company

17

18

19

20

21

22

23

24

25

26

2

1    EFILED via AZTurboCourt this
     6th day of March, 2019,
2    with an electronic copy to:

3
   Hon. Sherry Stephens
4    Maricopa County Superior Court

5    COPY emailed/mailed this 6th
6    day of March, 2019, to:

7    Michael N. Poli
     Jeff G. Zane
8    MERLIN LAW GROUP P.A.
9    2999 North 44th Street, Suite 520
     Phoenix, AZ 85018
10   mpoli@merlinlawgroup.com
11   jzane@merlinlawgroup.com
     *Attorneys for Plaintiffs*
12

13   Stephen E. Silverman
     STEPHEN SILVERMAN LAW
14   6945 E Sahuaro Drive, Suite 125
     Scottsdale, Arizona 85254
15   steve@stephensilverman.com
16   *Counsel for Plaintiffs*

17

18   By */s/ Suzanne Beard*

19

20

21

22

23

24

25

26

3

of the Superior Court
*** Electronically Filed ***
M. De La Cruz, Deputy
3/6/2019 3:37:00 PM
Filing ID 10226258

LAW OFFICES
BROENING OBERG WOODS & WILSON
PROFESSIONAL CORPORATION
2800 NORTH CENTRAL AVENUE, SUITE 1600
PHOENIX, ARIZONA 85004
(602) 271-7700

Robert T. Sullivan (022719)
rts@bowwlaw.com
Alicyn M. Freeman (023916)
amf@bowwlaw.com
Minute Entries/Orders
cjg@bowwlaw.com

*Attorneys for Defendant State Farm Fire
and Casualty Company*

## SUPERIOR COURT OF THE STATE OF ARIZONA

## COUNTY OF MARICOPA

| | |
|---|---|
| ANDERSON PHILLIPS AND JASMINE PHILLIPS, husband and wife,<br><br>Plaintiffs,<br><br>vs.<br><br>STATE FARM FIRE AND CASUALTY COMPANY, an Illinois corporation,<br><br>Defendant. | NO. CV2016-013572<br><br>**STIPULATION TO AMEND RESPONSE AND REPLY DATES REGARDING PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT TO CLASS ACTION**<br><br>(Honorable Sherry Stephens) |

It is hereby stipulated by and among the parties to this action through their respective counsel of record and requested that the Defendant's Response deadline to Plaintiffs' Motion for Leave to Amend Complaint to Class Action be extended by thirty (30) days from March 15, 2019 to April 15, 2019 and that Plaintiffs' Reply deadline be extended to May 15, 2019.

/ / /

/ / /

DATED this 6th day of March, 2019.

BROENING OBERG WOODS & WILSON, P.C.

By: _/s/ Alicyn M. Freeman_____
    Robert T. Sullivan
    Alicyn M. Freeman
    2800 North Central Avenue, Suite 1600
    Phoenix, Arizona 85004
    *Attorneys for Defendant State Farm Fire and*
    *Casualty Company*

MERLIN LAW GROUP, P.A.

By: _/s/ Michael N. Poli (with permission)_____
    Michael N. Poli
    Jeff G. Zane
    2999 North 44th Street, Suite 520
    Phoenix, Arizona 85018
    *Attorneys for Plaintiffs*

STEPHEN SILVERMAN LAW

By: _/s/ Stephen e. Silverman (with permission)_
    Stephen E. Silverman
    6945 E Sahuaro Drive, Suite 125
    Scottsdale, Arizona 85254
    *Attorneys for Plaintiffs*

2

EFILED via AZTurboCourt this
6th day of March, 2019,
with an electronic copy to:

Hon. Sherry Stephens
Maricopa County Superior Court

COPY e-served via AZTurbocourt this
6th day of March, 2019, to:

Michael N. Poli
Jeff G. Zane
MERLIN LAW GROUP P.A.
2999 North 44th Street, Suite 520
Phoenix, AZ 85018
mpoli@merlinlawgroup.com
jzane@merlinlawgroup.com
*Attorneys for Plaintiffs*

Stephen E. Silverman
STEPHEN SILVERMAN LAW
6945 E Sahuaro Drive, Suite 125
Scottsdale, Arizona 85254
steve@stephensilverman.com
*Counsel for Plaintiffs*


By */s/ Suzanne Beard*

Granted as Submitted
***See eSignature page***
Case 2:19-cv-04605-GMS   Document 1-3   Filed 07/01/19   Page 237 of 518

End of the Superior Court
*** Electronically Filed ***
T. DeRaddo, Deputy
3/11/2019 8:00:00 AM
Filing ID 10231035

LAW OFFICES
BROENING OBERG WOODS & WILSON
PROFESSIONAL CORPORATION
2800 NORTH CENTRAL AVENUE, SUITE 1600
PHOENIX, ARIZONA 85004
(602) 271-7700

Robert T. Sullivan (022719)
rts@bowwlaw.com
Alicyn M. Freeman (023916)
amf@bowwlaw.com
Minute Entries/Orders
cjg@bowwlaw.com

*Attorneys for Defendant State Farm Fire
and Casualty Company*

## SUPERIOR COURT OF THE STATE OF ARIZONA

## COUNTY OF MARICOPA

| | |
|---|---|
| ANDERSON PHILLIPS AND JASMINE PHILLIPS, husband and wife,<br><br>Plaintiffs,<br><br>vs.<br><br>STATE FARM FIRE AND CASUALTY COMPANY, an Illinois corporation,<br><br>Defendant. | NO. CV2016-013572<br><br>**ORDER GRANTING SUBSTITUTION OF COUNSEL**<br><br><br><br><br><br>(Honorable Sherry Stephens) |

The Court, having reviewed Defendant's Application to Substitute Counsel with Client Consent, and good cause appearing therefor;

IT IS HEREBY ORDERED that Robert T. Sullivan and Alicyn M. Freeman, of the law firm Broening, Oberg, Woods & Wilson, PC, be substituted as counsel of record for Defendant State Farm Fire and Casualty Company, in place of Erin E. Bradham and Karl M. Tilleman of Steptoe & Johnson LLP.

1    DATED this ___ day of _____, 2019.

2

3

4                                              _____
                                               Honorable Sherry Stephens
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Filing ID: 10231035   Case Number: CV2016-013572
Original Filing ID: 10225987

_____

**Granted as Submitted**



/S/ Sherry Stephens Date: 3/7/2019
_____
Judicial Officer of Superior Court

# ENDORSEMENT PAGE

CASE NUMBER: CV2016-013572                    SIGNATURE DATE: 3/7/2019

E-FILING ID #: 10231035                       FILED DATE: 3/11/2019 8:00:00 AM


JEFFREY GREGORY ZANE



ROBERT THOMAS SULLIVAN



DOCKET-CIVIL-CCC

Granted as Submitted
***See eSignature page***

Case 2:19-cv-04605-GMS   Document 1-3   Filed 07/01/19   Page 241 of 518

Clerk of the Superior Court
*** Electronically Filed ***
T. DeRaddo, Deputy
3/11/2019 8:00:00 AM
Filing ID 10231026

LAW OFFICES
BROENING OBERG WOODS & WILSON
PROFESSIONAL CORPORATION
2800 NORTH CENTRAL AVENUE, SUITE 1600
PHOENIX, ARIZONA 85004
(602) 271-7700

Robert T. Sullivan (022719)
rts@bowwlaw.com
Alicyn M. Freeman (023916)
amf@bowwlaw.com
Minute Entries/Orders
cjg@bowwlaw.com

*Attorneys for Defendant State Farm Fire
and Casualty Company*

## SUPERIOR COURT OF THE STATE OF ARIZONA

## COUNTY OF MARICOPA

| | |
|---|---|
| ANDERSON PHILLIPS AND JASMINE PHILLIPS, husband and wife,<br><br>Plaintiffs,<br><br>vs.<br><br>STATE FARM FIRE AND CASUALTY COMPANY, an Illinois corporation,<br><br>Defendant. | NO. CV2016-013572<br><br>**ORDER REGARDING STIPULATION TO AMEND RESPONSE AND REPLY DATES REGARDING PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT TO CLASS ACTION**<br><br>(Honorable Sherry Stephens) |

Pursuant to the Stipulation of the Parties,

IT IS HEREBY ORDERED that Defendant's Response deadline to Plaintiffs' Motion for Leave to Amend Complaint to Class Action is extended by thirty (30) days from March 15, 2019 to April 15, 2019 and that Plaintiffs' Reply deadline is extended to May 15, 2019.

_____

Honorable Sherry Stephens

Filing ID: 10231026   Case Number: CV2016-013572
Original Filing ID: 10226258

_____

**Granted as Submitted**



/S/ Sherry Stephens Date: 3/7/2019
_____
Judicial Officer of Superior Court

## ENDORSEMENT PAGE

CASE NUMBER: CV2016-013572                    SIGNATURE DATE: 3/7/2019

E-FILING ID #: 10231026                          FILED DATE: 3/11/2019 8:00:00 AM


JEFFREY GREGORY ZANE



ROBERT THOMAS SULLIVAN

*** Superior Court
*** Electronically Filed ***
T. Hays, Deputy
4/5/2019 12:59:00 PM
Filing ID 10326537

LAW OFFICES
BROENING OBERG WOODS & WILSON
PROFESSIONAL CORPORATION
2800 NORTH CENTRAL AVENUE, SUITE 1600
PHOENIX, ARIZONA 85004
(602) 271-7700

Robert T. Sullivan (022719)
rts@bowwlaw.com
Alicyn M. Freeman (023916)
amf@bowwlaw.com
Minute Entries/Orders
cjg@bowwlaw.com

*Attorneys for Defendant State Farm Fire
and Casualty Company*

## SUPERIOR COURT OF THE STATE OF ARIZONA

## COUNTY OF MARICOPA

| | |
|---|---|
| ANDERSON PHILLIPS AND JASMINE PHILLIPS, husband and wife, | NO. CV2016-013572 |
| Plaintiffs, | **STATE FARM'S MOTION TO EXCEED PAGE LIMIT REGARDING STATE FARM'S RESPONSE TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT TO CLASS ACTION** |
| vs. | |
| STATE FARM FIRE AND CASUALTY COMPANY, an Illinois corporation, | |
| Defendant. | (Honorable Sherry Stephens) |

Pursuant to 7.1(3), Arizona Rules of Civil Procedure, Defendant State Farm Fire and Casualty Company ("Defendant"), by and through undersigned counsel, respectfully request leave to exceed the 17-page limitations of Rule 7.1(3) for the purposes of briefing their Response to Plaintiffs' Motion to Amend Complaint to Class Action.

Defendant requires twenty-five (25) pages to fully respond to the issues outlined in Plaintiffs' Motion for Leave to Amend Complaint to Class Action.  This request is made in good faith due to the complexity of the legal issues and the futility of the claims Plaintiffs

seek to add to their Complaint.

Defendant therefore respectfully requests leave to exceed the page limitation by an additional eight (8) pages pursuant to the proposed form of order enclosed herewith.

RESPECTFULLY SUBMITTED this 5th day of April, 2019.

BROENING OBERG WOODS & WILSON, P.C.

By: _/s/ Alicyn M. Freeman_
Robert T. Sullivan
Alicyn M. Freeman
2800 North Central Avenue, Suite 1600
Phoenix, Arizona 85004
*Attorneys for Defendant State Farm Fire and Casualty Company*

EFILED via AZTurboCourt this
5th day of April, 2019,
with an electronic copy to:

Hon. Sherry Stephens
Maricopa County Superior Court

COPY emailed/mailed this 5th
day of April, 2019, to:

Michael N. Poli
Jeff G. Zane
MERLIN LAW GROUP P.A.
2999 North 44th Street, Suite 520
Phoenix, AZ 85018
mpoli@merlinlawgroup.com
jzane@merlinlawgroup.com
*Attorneys for Plaintiffs*

2

1

Stephen E. Silverman
STEPHEN SILVERMAN LAW

2

6945 E Sahuaro Drive, Suite 125

3

Scottsdale, Arizona 85254
steve@stephensilverman.com

4

*Counsel for Plaintiffs*

5

6

By */s/ Suzanne Beard*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Clerk of the Superior Court
*** Electronically Filed ***
T. DeRaddo, Deputy
4/9/2019 8:00:00 AM
Filing ID 10331530

LAW OFFICES
BROENING OBERG WOODS & WILSON
PROFESSIONAL CORPORATION
2800 NORTH CENTRAL AVENUE, SUITE 1600
PHOENIX, ARIZONA  85004
(602) 271-7700

Robert T. Sullivan (022719)
rts@bowwlaw.com
Alicyn M. Freeman (023916)
amf@bowwlaw.com
Minute Entries/Orders
cjg@bowwlaw.com

*Attorneys for Defendant State Farm Fire
and Casualty Company*

## SUPERIOR COURT OF THE STATE OF ARIZONA

## COUNTY OF MARICOPA

| | |
|---|---|
| ANDERSON PHILLIPS AND JASMINE PHILLIPS, husband and wife,<br><br>Plaintiffs,<br><br>vs.<br><br>STATE FARM FIRE AND CASUALTY COMPANY, an Illinois corporation,<br><br>Defendant. | NO. CV2016-013572<br><br>**ORDER GRANTING STATE FARM'S MOTION TO EXCEED PAGE LIMIT REGARDING STATE FARM'S RESPONSE TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT TO CLASS ACTION**<br><br>(Honorable Sherry K. Stephens) |

Pursuant to Defendant State Farm Fire and Casualty Company's Motion to Exceed Page Limit Regarding Plaintiffs' Response to Plaintiffs' Motion for Leave to amend Complaint to Class Action,

**IT IS HEREBY ORDERED** that Defendant has eight (8) additional pages, for a total of twenty-five (25) to fully respond to the issues outlined in Plaintiffs' Motion for Leave to Amend Complaint to Class Action.

1

DATED this 8th day of April, 2019.

2

3

4

_____

5

Honorable Sherry K. Stephens

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Filing ID: 10331530   Case Number: CV2016-013572
Original Filing ID: 10326537

_____

**Granted with Modifications**



/S/ Sherry Stephens Date: 4/8/2019
_____
Judicial Officer of Superior Court

# ENDORSEMENT PAGE

CASE NUMBER: CV2016-013572                    SIGNATURE DATE: 4/8/2019

E-FILING ID #: 10331530                        FILED DATE: 4/9/2019 8:00:00 AM


JEFFREY GREGORY ZANE



ROBERT THOMAS SULLIVAN

Clerk of the Superior Court
*** Electronically Filed ***
04/12/2019 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2016-013572                                              04/11/2019

                                               CLERK OF THE COURT
HON. SHERRY K. STEPHENS                            T. DeRaddo
                                                     Deputy

ANDERSON PHILLIPS, et al.              JEFFREY GREGORY ZANE

v.

STATE FARM FIRE AND CASUALTY           ROBERT THOMAS SULLIVAN
COMPANY

                                       JUDGE STEPHENS

## ORAL ARGUMENT SET

East Court Building - Courtroom 712

8:58 a.m.  This is the time set for a telephonic Trial Setting Conference. Counsel, Stephen Silverman appears for counsel, Jeffrey G. Zane, on behalf of Plaintiffs, Anderson Phillips and Jasmine Phillips.  Counsel, Allison Freeman, appears for counsel, Robert T. Sullivan, on behalf of Defendant, State Farm Fire and Casualty Company.

A record of the proceedings is made digitally in lieu of a court reporter.

Pending is Plaintiffs' *Motion for Leave to Amend Complaint to Class Action*, filed on January 25, 2019.

The parties have stipulated to the following deadlines:  Defendant's Response is due on or before April 15, 2019.  Plaintiffs' Reply is due by not later than May 15, 2019.

IT IS ORDERED setting Oral Argument on **May 30, 2019 at 10:30 a.m.**  (Time allotted: 30 minutes) in this division.

The parties are not ready to set a trial date.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2016-013572                                        04/11/2019

9:01 a.m.  Matter concludes.

**NOTE**:  All court proceedings are recorded by audio and video method and not by a court reporter.  The parties or counsel may request a CD of the proceedings.  For copies of hearings or trial proceedings recorded previously, please call Electronic Records Services at 602-506-7100.

Pursuant to Local Rule 2.22, if a party desires a court reporter for any proceeding in which a court reporter is not mandated by Arizona Supreme Court Rule 30, the party must submit a written request to the assigned judicial officer at least ten (10) judicial days in advance of the hearing, and must pay the authorized fee to the Clerk of the Court at least two (2) judicial days before the proceeding. The fee is $140 for a half-day and $280 for a full day.

Clerk of the Superior Court
*** Electronically Filed ***
K. Vega, Deputy
4/15/2019 4:16:00 PM
Filing ID 10357583

LAW OFFICES
BROENING OBERG WOODS & WILSON
PROFESSIONAL CORPORATION
2800 NORTH CENTRAL AVENUE, SUITE 1600
PHOENIX, ARIZONA 85004
(602) 271-7700

Robert T. Sullivan (022719)
rts@bowwlaw.com
Alicyn M. Freeman (023916)
amf@bowwlaw.com
Minute Entries/Orders
cjg@bowwlaw.com

*Attorneys for Defendant State Farm Fire
and Casualty Company*

## SUPERIOR COURT OF THE STATE OF ARIZONA

## COUNTY OF MARICOPA

| | |
|---|---|
| ANDERSON PHILLIPS AND JASMINE PHILLIPS, husband and wife,<br><br>Plaintiffs,<br><br>vs.<br><br>STATE FARM FIRE AND CASUALTY COMPANY, an Illinois corporation,<br><br>Defendant. | NO. CV2016-013572<br><br>**STATE FARM'S RESPONSE TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT TO CLASS ACTION**<br><br>(Assigned to the Honorable Sherry Stephens) |

The Court should deny Plaintiffs' motion for leave to amend its Complaint for three primary reasons. First, Plaintiffs fail to explain their delay in seeking leave to amend: this motion comes over **two and a half years** into this case after the parties have substantially completed fact discovery, participated in a mediation, and were on the cusp of filing dispositive motions. Plaintiffs' motion is based almost exclusively on deposition testimony they have had for 10 months, with no explanation for waiting until the eleventh hour to seek leave to amend.  Even if Plaintiffs argue they were waiting until they completed the deposition

of State Farm claim consultant, Thomas Moss, to file the motion for leave to amend, there is still a significant **six month** delay between the Moss deposition and Plaintiffs' seeking leave to amend the Complaint to add class claims.

Second, Plaintiffs' proposed amendment will unduly prejudice State Farm because it seeks to add a claimed 1,000 new class members and two new claims for unjust enrichment and misrepresentation and false disclosures under A.R.S. § 20-443—all of which will require additional discovery in the form of a claim-by-claim inquiry, exponentially expanding the inconvenience and cost of this action and significantly delaying its resolution.

Third, even setting aside the undue delay or prejudice, the Plaintiffs' proposed amendment would be futile. Neither Plaintiffs nor the purported class members can state a claim for which relief could be granted for unjust enrichment or misrepresentation and false disclosures under A.R.S. § 20-443, and thus leave to amend would be futile for these claims. Additionally, assuming Plaintiffs can show the putative class members have a claim to compensable damages, Plaintiffs would not be members of the putative class they seek to represent as Plaintiffs have admitted they have no breach of contract damages.  Regardless, the putative class members' claims are not typical or common as required for class action certification.  Thus, the class could not ultimately be certified. Plaintiffs' proposed class action similarly does not qualify under any of Ariz. R. Civ. P. 23(b)'s subsections. Because Plaintiffs cannot meet their burden of satisfying Rule 23's prerequisites, allowing them to amend the Complaint to assert class claims would be futile.

## BACKGROUND

Plaintiffs' house was damaged by a fire on December 6, 2015. Plaintiffs made a claim under State Farm Policy Number 03-J4-4660-2 ("Policy"). Given the extent of the damage, Plaintiffs, State Farm's representative, Robert Gonzales ("Gonzales"), and Plaintiffs' contractor, David Fix ("Fix"), agreed that the interior finishes would have to be completely gutted and the house rebuilt from the framing studs up. As Fix explained: the fire "caused so

2

much damage that we are taking everything down to the studs … and replacing from that point back." [*See* Ex. 1, D. Fix Dep. 71:22-72:17; *see also* Ex. 2, R. Gonzales Dep. 91:24-92:5 (describing the estimate covered taking the house "down to sticks").] Repairs from the "studs up" generally follow the same processes as those utilized for a new construction; however, they begin at the stage where the framing is already in place. [*See* Ex. 3, D. Fix Dep. 85:1-:19 (testifying that repairs on a full gut project generally follow the process for building a new construction that already has the studs in place).]

Accordingly, State Farm prepared an Xactimate estimate[1] for the repairs using the new construction setting, which takes into account the labor efficiencies that are present during this kind of "studs up" rebuild. [*See* Ex. 4, R. Gonzales Dep. 97:2-100:22; Ex. 5, T. Moss Dep. 104:12-:23.] State Farm's Operation Guide contemplates using the "new construction" setting in this kind of situation, where the repair process retains significant new construction efficiencies:

> The New Construction option provides a cost for each line item based upon the most efficient labor productivity available. This option is intended to be used for true new construction applications or for jobs in which a total "ground-up" rebuild is necessary. Additionally, it is possible that some portions of a large partial loss may be addressed using this efficiency setting. For example, as the rebuild process progresses, it is possible that a certain phase may be reached in which the remaining portions of the repair are more in line with a new construction scenario.

[Ex. 6, Operation Guide – Claim Practices, Fire, at PHILA00001223PROD.] In contrast, the alternate "restoration" setting is inappropriate for the kind of extensive repairs necessary here:

> this option provides a cost for each line item based upon a labor productivity that includes such things as drive time, mobilization costs, material delivery, and the overall reduction in productivity that occurs when repair professionals address the complex issues

---

[1] Xactimate is a software tool that utilizes industry standard pricing and aids State Farm adjusters in creating estimates for structure losses. The Xactimate estimate is an initial estimate and the amount ultimately paid by State Farm in each individual claim varies based on the information provided by the insured, other estimates submitted and the expenses incurred by the insured.

3

found in restoration and remodeling jobs (for example, matching drywall texture or working in an occupied home).

[*Id.*]

State Farm initially estimated the actual cash value ("ACV") of the loss at $131,829.17 and the replacement cost value ("RCV") of the house at $153,759.64. [Ex. 7, 1/20/16 Claim Rep Draft, PHILA00000125PROD.] Subsequently, State Farm revised these estimates and determined the replacement cost value to be $165,905.16. [*See* Ex. 8 (4/17/17 Claim Rep Draft, SF-PHILCLAIM 004746).] Under their Policy, Plaintiffs were entitled to immediate payment of the ACV—which takes into account depreciation for age and use—with the higher RCV amount to be paid once repairs were actually completed. [Ex. 9, R. Gonzales Dep. 31:8-:24.] Accordingly, State Farm promptly paid Plaintiffs the initial ACV amount and likewise later paid the submitted RCV amount. [*See* Ex. 7 (listing the ACV/RCV amounts); Ex. 8 (reflecting revised RCV amount); Ex. 10, Financial Information on Phillips' claim (showing the amounts paid by State Farm on the Phillips' claim); Ex. 11, A. Phillips Dep., 76:20-77:7 (admitting State Farm does not owe any money under the Policy for the structure repair).][2]

Plaintiffs, who were represented by a public adjuster, challenged State Farm's use of new construction pricing. In response, State Farm explained that new construction pricing was appropriate under these circumstances:

> According to Xactware, restoration service and remodeling work is done in existing structures, often with people still living in the buildings. In this environment, construction workers must work with existing features and additional time is often required to make sure the work does not cause additional damage.
>
> Xactware indicates new construction is more efficient because work moves forward in a logical sequence and workers don't need to worry about protecting existing features so

---

[2] The Plaintiffs' Policy provides coverage for both personal property and the structure. All of the potential class claims relate only to structure coverage.

4

restoration service and remodeling work often takes longer than
it does when doing the same work on a new construction.

[Ex. 12, 3/7/16 Letter from R. Gonzales to J. Skipton, PHILA00000266PROD.]

The Plaintiffs contracted with David Fix of Adanac Enterprises to repair their house. [Ex. 13, Authorization to Proceed with Work, Phillips 000590; Ex. 14, D. Fix Dep. 68:8-70:8.] Plaintiffs have conceded that Adanac made all necessary repairs from the fire, that they only paid out of pocket for certain upgrades not covered by the Policy,[3] and that State Farm does not owe them any more money for their structure claim. [Ex. 11; Ex. 16, A. Phillips Dep. 6:16-7:14, 26:23-27:11, 57:18-:20.]

Nevertheless, Plaintiffs sued State Farm for breach of contract and bad faith for its allegedly improper use of the new construction labor efficiency. They filed this action on September 30, 2016, more than two and a half years ago. Plaintiffs then delayed the litigation. Due to Plaintiffs' inactivity, the Court placed this case on the Dismissal Calendar on July 5, 2017.

Now, a year and a half later and based on deposition testimony that Plaintiffs have had for 10 months, Plaintiffs seek to amend the Complaint, demanding the Court's prompt attention: "the Court **must** determine whether the Philips (sic) may sue as representative of all members … [a]s early as possible." [Pls.' Mot. for Leave to Amd. at 5:5-6; emphasis added.] Yet, as discussed below, Plaintiffs offer no explanation for their own substantial delay in seeking to amend to add putative class claims. Their motion to amend fails to acknowledge the delay or offer any reason to justify the delay. Plaintiffs' motion comes **after** the parties have conducted all fact witness depositions, completed nearly all fact discovery, participated in a mediation, and were on the verge of filing dispositive motions. Now Plaintiffs seek to convert their individual action into a class action for what they "estimate" would be "more

---

[3] David Fix testified he made upgrades to the Phillips' home for free. [Ex. 15, D. Fix. Dep. 87:4-:12, 95:4-:10.]

5

than one thousand policy holders," [Pls.' Mot. for Leave to Amd. at 5:13-14], and assert new claims for unjust enrichment and misrepresentations and false disclosures under A.R.S. § 20-443, [Pls.' Mot. for Leave to Amd. at Ex. 1, Counts III and IV]. As further explained below, Plaintiffs' efforts not only come too late in this litigation, but would ultimately be futile even if permitted.

## ARGUMENT

**I.    THE COURT SHOULD NOT ALLOW LEAVE TO AMEND BECAUSE PLAINTIFFS UNDULY DELAYED IN SEEKING LEAVE AND AMENDMENT TO ADD CLASS CLAIMS AT THIS LATE STAGE WOULD UNDULY PREJUDICE STATE FARM.**

"A court may deny leave to amend if it finds 'undue delay … or undue prejudice to the opposing party.'" *Carranza v. Madrigal*, 237 Ariz. 512, ¶ 13 (2015) (quoting *Owen v. Superior Court*, 133 Ariz. 75, 80 (1982)). Undue delay and undue prejudice often go hand in hand: "Prejudice is 'the inconvenience and delay suffered when the amendment raises new issues or inserts new parties in the litigation.'" *Id*. (quoting *Owen*, 133 Ariz. at 80). Here, Plaintiffs' motion should be denied because of both undue delay and prejudice.

### A.    Plaintiffs identify no "compelling reason" for their delay in seeking to add class claims.

Under Arizona law, courts appropriately deny leave to amend where a party offers no "compelling reason" for its delay in seeking leave. *See In re Torstenson's Estate*, 125 Ariz. 373, 377 (Ct. App. 1980) (affirming denial of leave to amend where party seeking leave failed to provide "compelling reason for the delay"). Here, Plaintiffs do not even attempt to explain their delay of nearly ***two and a half years*** in seeking to add putative class claims. Arizona courts have properly denied leave to amend for shorter delays. *See, e.g.*, *Bishop v. State, Dep't of Corr.*, 172 Ariz. 472, 475 (Ct. App. 1992) (affirming denial of leave to amend for undue delay when plaintiff "sought to amend her complaint more than two years after filing her original complaint"); *In re Torstenson's Estate*, 125 Ariz. at 377 (same); *see also*

6

*Costello*, 520 F.3d 737, 743 (7th Cir. 2008) ("[T]he longer the delay, the greater presumption against granting leave to amend.") (internal quotation omitted).

But the more peculiar delay—for which Plaintiffs also offer no justification—is the 10-month period between the Gonzales deposition on April 4, 2018, and this motion, which they filed on January 25, 2019, where Gonzales' testimony is the alleged factual basis for the proposed class claims.[4] [*See* Pls.' Mot. for Leave to Amd. at 2-4.] *See J.P. Morgan Chase Bank, N.A. v. Drywall Service & Supply Co., Inc.*, 265 F.R.D. 341, 347 (N.D. Ind. 2010) ("If the moving party fails to provide any explanation for not filing its amendment sooner or if the explanation it provides is inadequate, that will weigh towards denying leave to amend."). Plaintiffs may argue that they wanted to take the deposition of State Farm claims consultant Thomas Moss prior to seeking amendment to add class claims to the Complaint. First, the motion for leave to amend the Complaint relies on the deposition of Gonzales, not Moss. Second Thomas Moss was deposed on July 31, 2018 [*see* Ex. 18 (excerpt from T. Moss's deposition)], six months prior to the filing of the current motion. Plaintiffs provide no explanation any of their delays.

### B.   Plaintiffs' undue delay significantly prejudices State Farm and this Court.

"Denial of leave to amend is 'a proper exercise of the court's discretion when the amendment comes late and raises new issues requiring preparation for factual discovery which would not otherwise have been necessitated nor expected, thus requiring delay in the decision of the case.'" *Carranza*, 237 Ariz. 512, ¶ 13 (quoting *Owen*, 133 Ariz. at 81). Here, Plaintiffs seek to add two new theories of liability and an "estimate[d] … more than one

---

[4] Both Abel Costales and Thomas Moss testified that, contrary to Gonzales' testimony, State Farm did not "mandate" the use of new construction pricing for all large fire losses. [Ex. 17, A. Costales Dep. 35:8-36:19; 66:5-17; Ex. 18, T. Moss Dep. 99:4-100:4.] Rather, Mr. Costales explained to his team that "this labor efficiency option [was] available" and could be used if there were "losses that fit that kind of criteria." [Ex. 17, A. Costales Dep. 35:8-36:19.] Each claim "has its own set of facts and circumstances" that must be considered to "determine how best to apply the policy." [Ex. 17, A. Costales Dep. 66:5-:17.]

thousand policy holders" after the parties have already completed fact discovery, lay witness depositions, and a mediation. Indeed, the parties were on the eve of dispositive motion practice when Plaintiffs raised their desire to seek leave to amend. Those facts, coupled with Plaintiffs' extended delay and failure to explain that delay, warrant denial. *See, e.g.*, *Soloman v. North American Life & Cas. Ins. Co.*, 151 F.3d 1132, 1139 (9th Cir. 1998) (concluding district court acted within its discretion by denying late motion to amend made "on the eve of the discovery deadline" that would have required re-opening discovery); *Sonoran Truck & Diesel Sales LLC v. Bank of the W.*, No. 1 CA-CV 17-0209, 2018 WL 1278251, at *2, ¶ 6 (Ariz. Ct. App. Mar. 13, 2018) (mem. decision) (affirming denial of leave to amend that sought to add a new claim after the parties participated in two mediations, discovery was soon to close, and a dispositive motion had been filed).

Plaintiffs' proposed amendment should also be disallowed because it will unduly prejudice State Farm. Plaintiffs are trying to add a class that they "estimate" would be "more than one thousand policy holders." [Pls.' Mot. for Leave to Amd. at 5:13-14.] The addition of 1,000 putative class members' claims will require the parties to conduct substantial additional discovery. Even setting aside the myriad of individual issues outlined in the sections below, at the least, Plaintiffs would need to be re-deposed to assess the extent to which they can be adequate representatives of the class, and substantial discovery would be necessary on Rule 23's requirements. Rule 23 requires class certification "at an early practicable date" after the suit is filed to avoid the exact redundancies Plaintiffs' proposed amendment would cause in this case. *See* Ariz. R. Civ. P. 23(c)(1)(A); *Hardy v. U.S. Steel Corp.*, 289 F. Supp. 200, 202 (N.D. Ala. 1967) (noting that an early class certification "determination conditioned upon a clear definition of the class in the complaint will avoid undue complications or conflicts in subsequent proceedings in this case").

Another "purpose of [Rule 23] is to protect the defendants from prejudice caused by a late expansion of the class." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 131 (1st Cir.

8

1985). Many federal courts have affirmed the need for early determination of class certification, citing "[f]undamental fairness, as well as the orderly administration of justice requires that defendants haled into court not remain indefinitely uncertain as to the bedrock litigation fact of the number of individuals or parties to whom they may ultimately be held liable for money damages." *McCarthy v. Kleindienst*, 741 F.2d 1406, 1412 (D.C. Cir. 1984) (affirming denial of class certification motion "as a simple matter of justice" where "plaintiffs' three-year delay in moving for class certification indisputably thwarted the[] policies" of fair notice and judicial economy); *see also Walton v. Eaton Corp.*, 563 F.2d 66, 74–75 (3d Cir. 1977) (affirming denial of motion for class determination because it was filed 21 months after the first complaint was filed); *Lyon v. State of Ariz.*, 80 F.R.D. 665, 667 (D. Ariz. 1978) (collecting cases refusing class certification on basis of undue delay).

Additionally, Plaintiffs are trying to assert new claims for unjust enrichment and misrepresentation and false disclosures under A.R.S. § 20-443. [Pls.' Mot. for Leave to Amd. at Ex. 1, Counts III and IV.] Separate and apart from the new class allegations, the insertion of those new claims would entail redoing a large portion of the discovery to date and conducting new discovery on these claims. *See Czarnecki v. Volkswagen of Am.*, 172 Ariz. 408, 418 (Ct. App. 1991) (affirming denial of leave to amend following discovery when "[a]llowing such an amendment adding an entirely new theory of liability at that late date would have required additional research and discovery, resulting in substantial delays").

For example, Plaintiffs' disclosures in this case do not include any factual allegations of alleged misrepresentations to Plaintiffs by State Farm in the sale of their policy to support a claim under A.R.S. § 20-443. [*See* Ex. 19 (Plaintiff's Third Supplemental Disclosure Statement).] As discussed in further detail below, *see infra* Section II, A.R.S. § 20-443 is limited to misrepresentations made in connection with the sale of a policy. Thus, any possible misrepresentation claim under this statute would have to relate to when the Phillips bought their Policy. Plaintiffs would have had knowledge of such alleged misrepresentations at the

time they filed their original Complaint and were obligated to disclose these facts. *See* Ariz. R. Civ. P. 26.1(a). But they have not done so to date. If this claim for relief was now permitted, disclosure and discovery on this claim would have to start at square one. This is highly prejudicial to State Farm as the content of any statements to support such a claim should have been alleged and explored two and half years ago, prior to the likely fading memories of such communications. *See* *J.P. Morgan Chase Bank*, 265 F.R.D. at 347 (stating undue delay usually results in undue prejudice when there is "delay in proceedings without explanation, no change in the facts since the filing of the original complaint, and new theories that require additional discovery"). Additionally, the parties would have to flesh out those issues for every putative class member, which would require significant new discovery and fundamentally change the landscape of this case. That alone makes it clear that this late request for amendment will unduly prejudice State Farm and waste substantial judicial resources.

## II.     THIS COURT SHOULD DENY LEAVE TO AMEND TO ADD AN UNJUST ENRICHMENT CLAIM BECAUSE IT IS FUTILE; NEITHER THE PHILLIPS NOR ANY PUTATIVE CLASS MEMBER CAN BRING THIS CLAIM.

"To prevail on an unjust enrichment claim in Arizona, a plaintiff must prove five elements: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) absence of justification for the enrichment and the impoverishment and (5) *an absence of a remedy provided by law*." *Stratton v. Am. Med. Sec., Inc.*, 266 F.R.D. 340, 353-54 (D. Ariz. 2009) (emphasis added). "'[W]here there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application.'" *Johnson v. American Nat. Ins. Co.*, 126 Ariz. 219, 223 (Ct. App. 1980) (quoting *Brooks v. Valley National Bank*, 113 Ariz. 169, 174 (1976)). Plaintiffs and all putative class members have a contract with State Farm. Accordingly, their only recourse is pursuing a breach of contract claim. *See* *Trustmark Ins. Co. v. Bank One, Arizona, NA*, 202 Ariz. 535, 542, ¶ 34 (Ct. App. 2002). The Plaintiffs and putative class members may not "avoid possible contractual limitations on [their] recovery by resorting to an unjust

enrichment cause of action." *Id.* at ¶ 37. Accordingly, it is futile to amend the complaint to add an unjust enrichment claim for the Plaintiffs or putative class members.

**III.   THE COURT SHOULD DENY LEAVE TO AMEND TO ADD THE CLAIM FOR MISREPRESENTATION AND FALSE DISCLOSURES UNDER A.R.S. § 20-443 BECAUSE IT IS FUTILE FOR BOTH PUTATIVE CLASS MEMBERS AND THE PLAINTIFFS.**

Plaintiffs have failed to state a claim under A.R.S. § 20-443 for which relief can be granted for either Plaintiffs or putative class members. Plaintiffs allege that "State Farm misrepresented the replacement cost value the class members were entitled to by using the new construction database for restoration of property claims" to support their claim for misrepresentation under A.R.S. § 20-443. [Pls.' Mot. for Leave to Amd. at Ex. 1, ¶ 37.] Section 20-443 provides, in relevant part, that "[a] person shall not make, issue or circulate, or cause to be made, issued or circulated, any estimate, illustration, circular, sales material or statement … [m]isrepresenting the terms of any policy issued or to be issued or the benefits or advantages promised …." This statute does not apply to alleged misrepresentations or false statements made during the adjustment of a claim and prohibits only "misrepresentations and false or misleading statements about the *sale or advertisement of an insurance policy*." *Enyart v. Transamerica Ins. Co.*, 195 Ariz. 71, 78, ¶ 21 (Ct. App. 1998) (emphasis added). Instead, Arizona courts have provided a tort of bad faith to raise those types of claims (which has already been alleged in this case in the original complaint). *See Noble v. National American Life Ins. Co.*, 128 Ariz. 188, 189-90 (1981).

In a later section within the same article, § 20-461, the Legislature specifically prohibited misrepresentations during the adjustment of insurance claims, and specified that these types of misrepresentations *do not* "provide any private right or cause of action," § 20-461(D). Plaintiffs are attempting to circumvent this restriction by citing A.R.S. § 20-433, which has been interpreted to allow a private right of action. *See Sparks v. Republic Nat. Life Ins. Co.,* 132 Ariz. 529, 541 (1982). However, section 20-443 does not apply to alleged

misrepresentations of claims during the adjustment process.[5] Such an interpretation would circumvent the Legislature's clear intent that there be no private right of action under § 20-461 and render it a nullity.[6] *See Pinal Vista Properties, L.L.C. v. Turnbull*, 208 Ariz. 188, 190, ¶ 10 (Ct. App. 2004) ("Statutes related to the same subject or having the same general purpose, i.e., statutes that are in *pari materia*, should be read in connection with, or should be construed with other related statutes, as though they constituted one law.") (internal quotation omitted); *see also Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 397 (1984) (referencing A.R.S. § 20-443 in discussion of duties owed by insurers and insurance agents while *selling* insurance policies). Accordingly, Plaintiffs have not stated a claim for relief under A.R.S. § 20-443 and leave to amend the Complaint to add this claim for Plaintiffs and putative class members is futile.

In addition, the Plaintiffs cannot assert an individual claim for misrepresentations and false disclosures under A.R.S. § 20-443 because this claim would be barred by the one-year statute of limitations. A.R.S. § 12-541(5); *see also Spark*, 132 Ariz. at 541. The facts disclosed in support of the original Complaint do not allege any misrepresentation made with the sale of the policy. Thus, any new misrepresentations claim under § 20-433 would not "relate back"

---

[5] Plaintiff's motion erroneously alleges that underpayment of claims is a misrepresentation under A.R.S. § 20-443. [Pls.' Mot. for Leave to Amd. at 2:18-:20.]

[6] The statutory scheme also reflects the Legislature's intent that § 20-443 is limited to the misrepresentations made during the issuance or sales of policies. *See City of Casa Grande v. Arizona Water Co.*, 199 Ariz. 547, 550, ¶ 6 (Ct. App. 2001) (providing statutes must be considered "in the context of the entire statutory scheme of which it is a part") (internal quotation omitted). The next statutory provision, § 20-443.01, provides, "It is unlawful for a person to knowingly make any misrepresentations as proscribed by § 20-443 in the sale of insurance" and that such conduct constitutes a class 5 felony. This provision shows that the misrepresentations listed in § 20-443 all relate to the *sale* of insurance, and if done knowingly, then the misrepresentations are a crime. Further, provisions around § 20-443 discuss regulating trade practices in "the business of insurance," *see* A.R.S. §§ 20-441, -444, while the provisions of § 20-461 relate to the "general business practice" of insurance, reflecting the distinction between the sale of insurance policies (business of insurance) and the settlement of claims under policies (general business practice).

to the filing of the original Complaint. *See* Ariz. R. Civ. P. 15(a). Thus, leave to amend to add this claim for Plaintiffs is futile for this additional reason.

## IV. THE COURT SHOULD DENY LEAVE TO AMEND AS THE PROPOSED CLASS CLAIMS ARE FUTILE BECAUSE PLAINTIFFS CANNOT ADEQUATELY REPRESENT THE CLASS OR ESTABLISH RULE 23'S REQUIREMENTS.

Leave to amend "need not be granted when it would be futile." *Stair v. Maricopa Cty.*, 245 Ariz. 357, ¶ 37 (Ct. App. 2018). Rule 23 "does not set forth a mere pleading standard." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).[7] "Plaintiffs seeking class certification must meet all the requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)." *Ferrara v. 21st Century North America Insurance Company*, 245 Ariz. 377, ¶ 6 (App. 2018). The party seeking class certification has the burden of demonstrating that "the prerequisites are satisfied—merely calling it a class action does not make it one." *Ferrara*, 245 Ariz. at ¶ 6 (quoting *Carpinteiro v. Tucson Sch. Dist. No. 1*, 18 Ariz. App. 283, 286 (1972)); *accord Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

### A. The proposed class action is futile because Plaintiffs admit they have no damages: they thus cannot represent the putative class.

First, Plaintiffs have not presented anything to suggest any class members have suffered any injury at all—the proposed class definitions do not even discuss any injury or loss suffered by class members. [Pls.' Mot. for Leave to Amd. at 5:16-6:3.] Second, even putting aside the fact that the purported class members may have no claim for damages, Plaintiffs have admitted they have no damages from State Farm's use of the new construction labor efficiency. Plaintiffs are therefore not members of the class they seek to represent.

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Dukes*, 564 U.S. at 348-49 (quoting *Califano*

---

[7] As Plaintiffs recognize, Arizona courts view federal cases construing Rule 23 of the Federal Rules of Civil Procedure as authoritative. [Pls.' Mot. for Leave to Amd. at 5 n.5.] *See ESI Ergonomic Solutions, LLC v. United Artists Theatre Circuit, Inc.*, 203 Ariz. 94, 98, ¶ 11, n.2 (Ct. App. 2002).

*v. Yamasaki*, 442 U.S. 682, 700–701 (1979)). "In order to justify a departure from that rule, 'a class representative *must be part of the class* and possess the same interest and *suffer the same injury* as the class members.'" *Id.* at 348-49 (quoting *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)) (emphasis added); *see also Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) ("a class representative must be part of the class and possess the same interest and *suffer the same injury as the class members*") (emphasis added) (internal quotation marks omitted). And where a plaintiff has "suffered no injury … they were, therefore, simply not eligible to represent a class of persons who did allegedly suffer injury." *Falcon*, 457 U.S. at 156.

Here, Plaintiffs have admitted they have no damages and State Farm owes no additional contract-based reimbursement related to the structural aspect of their insurance claim. [*See* Ex. 11, A. Phillips Dep. 76:20-77:7 (admitting State Farm does not owe any money under the Policy except for some personal property items); Ex. 16, A. Phillips Dep. 57:18-20 (admitting he is unaware of any needed repair for which State Farm has not paid); Ex. 20, J. Phillips Dep. 55:8-:15 (admitting she does not know of any amounts State Farm owed for repairs to the Phillips's house that State Farm has not paid).] State Farm denies that any putative class member exists who could assert a valid claim for damages. But even assuming *arguendo* such a class exists, without any damages, the Plaintiffs cannot represent the putative class. *See Falcon*, 457 U.S. at 156. Thus, allowing amendment to add the class claims would be futile, and the Court should deny the Phillips' motion.

**B.     Plaintiffs cannot establish commonality or typicality to certify their putative class action, so amendment would be futile.**

To maintain a class action under Rule 23, the Phillipses must prove their putative class satisfies the following factors: (1) "the class is so numerous that Joinder of all members is impracticable" (*i.e.*, numerosity); (2) "there are questions of law or fact common to the class" (*i.e.*, commonality); (3) "the claims or defenses of the representative parties are typical of the

claims or defenses of the class" (*i.e.*, typicality); (4) "the representative parties will fairly and adequately protect the interests of the class" (i.e., adequacy of representation). *See* Ariz. R. Civ. P. 23(a). "The trial court has broad discretion to certify a class action but must conduct a "rigorous analysis" of whether the Rule 23 requirements have been met." *Winkler v. DTE, Inc.*, 205 F.R.D. 235, 239 (D. Ariz. 2001) (quoting *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1186 (9th Cir.2001)). "The commonality and typicality requirements of Rule 23(a) tend to merge." *Dukes*, 564 U.S. at 349 n.5 (internal quotation and alteration omitted).

Plaintiffs cannot establish the typicality or commonality requirements here, and thus their class claims are futile. "The test for typicality 'is *whether other members have the same or similar injury*, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Sandoval v. Cty. of Sonoma*, 912 F.3d 509, 518 (9th Cir. 2018) (emphasis added). "Typicality under Rule 23(a)(3) also has a qualitative aspect, related to the commonality and adequacy of representation requirements, that requires a named representative to be a member of the class he seeks to represent." *Pipes v. Life Inv'rs Ins. Co. of Am.*, 254 F.R.D. 544, 549 (E.D. Ark. 2008). To prove commonality, a plaintiff must demonstrate "that the class members 'have suffered the same injury.'" *Ferrara*, 245 Ariz. at ¶ 10 (quoting *Dukes*, 564 U.S. at 350). Commonality requires that a class's "claims must depend upon a common contention … of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Under *Dukes*, a party cannot establish commonality where resolution of "the varying claims presented by the proposed class will require an intensive, individual fact-finding…." *Martin v. State Farm Mut. Auto. Ins. Co.*, 809 F. Supp. 2d 496, 510 (S.D.W. Va. 2011).

Here, the putative class claims do not depend on the common issue identified in the proposed Amended Complaint: "whether the use of the New Construction Database was

appropriate." [Pls.' Mot. for Leave to Amd. at 7:3-4.]. Regardless of the "appropriateness" of using New Construction pricing, the breach of contract claim depends on whether State Farm complied with the terms of the policy.[8] In other words, the issue of whether State Farm paid what was owed under the policy is not dependent upon the method used for creating an initial estimate. Whether there was a breach of the insurance policy or whether State Farm paid what was owed under the policy is not a common issue. In addition, the issue in a claim for bad faith is whether an insurance company intentionally denied coverage or delayed or failed to fully pay a claim without a reasonable basis for doing so. *Tritschler v. Allstate Ins. Co.*, 213 Ariz. 505, 516, ¶ 32 (Ct. App. 2006), as corrected (Dec. 19, 2006). The issue of whether an insured's conduct in adjusting a claim amounts to bad faith also cannot be a common issue. First, State Farm evaluates and estimates each claim based on its own unique facts. [*See* Ex. 22, A. Costales Dep. 66:5-:17 ("Every claim has its own set of facts and circumstances, and we're supposed to consider all of that and determine how to best apply the policy."), 120:22-121:6 ("Obviously as different claims come up we apply individual specific aspects of different claims … and what [labor] efficiency is more appropriate for those individual losses…"); Ex. 23, T. Moss Dep. 98:15-99:3 ("There are multiple considerations that State Farm would look at to see when the new construction setting would be used … we would utilize the new construction setting based on the unique factors of that loss"), 120:7-:14 ("we're [State Farm] going to look at that loss based on the unique facts of that loss…").] To determine the propriety of State Farm's actions and state of mind related to those actions in adjusting a claim will require "intensive, individual fact-finding" for all purported claims.

Moreover, an insurer does not breach a policy simply by inaccurately *estimating* the value of a loss. Instead, an insurer breaches the contract only when it actually fails to *pay* the

---

[8] The Policy covers accidental direct physical loss to property pursuant to its terms, conditions, exclusions and limitations. [Ex. 21 (relevant excerpts of Phillips' Policy).]. Section 1- Loss Settlement provides the contractual agreement regarding payment calculation under the Policy. [*Id.*]

proper amount owed under the policy. *See Nelson v. Am. Family Mut. Ins. Co.*, 262 F. Supp. 3d 835, 857 (D. Minn. 2017), *aff'd*, 899 F.3d 475 (8th Cir. 2018) ("Liability for breach of contract requires proof that damages resulted from or were caused by the breach.") (internal quotation omitted). An insurer's initial estimate of a loss is just that—an estimate. It is a starting point that the parties use to arrive at a fair and equitable settlement amount. In fact, if a repair estimate is received that is different, State Farm will make a good-faith effort to revise the initial estimate. Further, even when an insured believes an insurer has underpaid based on a repair valuation, the insured has available under the policy the appraisal provision. *See Echanove v. Allstate Ins. Co.*, 752 F. Supp. 2d 1105, 1108 (D. Ariz. 2010). Because of those provisions, courts are wary of insureds trying to "obtain additional funds by contending that the actual cash value payment was too low" when they "failed to avail themselves of the appraisal and supplemental payment provisions of the policy and having failed to produce any evidence that their repair costs exceeded [the insurer's] actual cash value payment." *Echanove*, 752 F. Supp. 2d at 1108 (internal quotation omitted). Allowing class certification that would eviscerate State Farm's contractual right to appraisal under the policies would additionally cause prejudice to State Farm.

In addition, to resolve the issue of whether State Farm breached the policies or acted in bad faith would involve another set of fact-intensive inquiries into the merits of each individual claim. At a minimum, the court would need to determine the following for *each class members' claim*: the facts of the claim;  whether State Farm's adjustment of the claim was proper in light of those facts; whether there are applicable exclusions or defenses for policy breach or misrepresentation by the insured; the extent of damage to the property; the necessary repairs; the cost of those repairs; the actual amount State Farm paid; whether the parties participated in, or still could participate in an appraisal under the Policy; whether the insured actually repaired or replaced the damaged property; and whether the insured was able to repair or replace for the amount State Farm actually paid.

At bottom, the resolution of the putative class members' breach of contract and bad faith claims are not possible on a class-wide basis. Resolving the "common issue" identified by Plaintiffs (whether the use of the New Construction Database was appropriate) does nothing to resolve the class members' claims. Instead, the Court will have to conduct a thousand mini-trials to resolve the claim-specific issues. Accordingly, the Phillipses cannot establish commonality, and the Court should deny their motion because the proposed amendment would be futile.

### C. The Phillips's proposed class claims are also futile because they do not qualify as a proper class action type under Rule 23(b).

Along with satisfying all four requirements under Rule 23(a), Plaintiffs must also prove that the action is a proper type of class action under Rule 23(b). Based on the facts alleged in Plaintiffs' complaint, they cannot satisfy any of the three subsections under Rule 23(b). *See Stratton v. Am. Med. Sec., Inc.*, 266 F.R.D. 340, 354 (D. Ariz. 2009) (denying class certification where even though moving party satisfied four requirements of Rule 23(a) he could not satisfy any requirements of Rule 23(b))

### 1. Certification is improper under Rule 23(b)(3) because individualized questions of fact and law predominate over common questions, thereby making class action an inferior method for the resolving the putative class members' claims.

Under Rule 23(b)(3), Plaintiffs must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." "The first criterion—predominance of common questions—'is far more demanding' than the showing required for commonality." *Lowe v. Maxwell & Morgan PC*, 322 F.R.D. 393, 402 (D. Ariz. 2017) (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 624 (1997)). Thus, because Plaintiffs cannot show commonality, they cannot show predominance. But even assuming *arguendo* Plaintiffs have sufficiently shown commonality,

the individual questions that permeate every claim prevent them from establishing common questions predominate over individual ones.

### a. Individual issues predominate Plaintiffs' breach of contract and bad faith claims.

Courts around the country have found that common questions rarely predominate in proposed class actions over insurance breach of contract and bad faith claims. *See, e.g., Stratton*, 266 F.R.D. at 353 (refusing to certify class for breach of contract and bad faith claim because both claims require "consideration of the reasonable expectations of each insured" and the "individual issues would outweigh any common ones"); *Coastal Neurology, Inc. v. State Farm Mut. Auto. Ins. Co.*, 271 F.R.D. 538, 544 (S.D. Fla. 2010), aff'd, 458 F. App'x 793 (11th Cir. 2012) (concluding that allegation insurer engaged in allegedly improper pattern and practice does not establish predominance where each putative class member "will still have to introduce individualized evidence to prevail in its breach of contract claim"). Specifically, courts are reluctant to certify class actions in insurance cases because insurance claims require fact-specific adjudication. *See, e.g., Mills v. Foremost Ins. Co.*, 269 F.R.D. 663, 676 (M.D. Fla. 2010) (finding no predominance in insurance breach of contract case because claims would require "claim by claim review" and be subject to "individualized defenses"); *Johnson v. GEICO Cas. Co.*, 310 F.R.D. 246, 255 (D. Del. 2015), aff'd, 672 F. App'x 150 (3d Cir. 2016) (finding no predominance where "individualized determinations regarding entitlement to relief and damages owed would predominate over any common questions of law and/or fact").

Insurance claims also generally require individualized damages calculations, which further weigh against predominance. *See, e.g., Mills*, 269 F.R.D. at 676 ("[I]f damages across the class cannot be computed by 'some formula, statistical analysis, or other easy or essentially mechanical method[],' that too may be sufficient to preclude a finding of predominance.") (alteration in original); *Pipes*, 254 F.R.D. at 552 ("Although individualized

damages inquiries do not preclude class certification in all cases, the predominance requirement is not met where damage determinations will involve variations in proof for each plaintiff."); *Johnson*, 310 F.R.D. at 255 (finding no predominance where "individualized determinations regarding entitlement to relief and damages owed would predominate over any common questions of law and/or fact").

Here, individualized issues would predominate common ones. For example, to address *each* new class member's breach of contract and bad faith claims would require an individualized inquiry into, among other things, (1) whether State Farm actually underpaid ACV/RCV amounts; (2) whether the insured actually repaired or replaced the damaged property thereby entitling them to the RCV amount; (3) whether an appraisal was or could still be demanded to resolve a valuation dispute; and (4) whether State Farm has any defenses against the particular insured's claims, e.g., fraudulent misrepresentation by the insured, breach of the policy by the insured or application of a policy exclusion. For this reason, a class action would be an inferior method of adjudication, and class certification cannot be maintained under Rule 23(b)(3).

> **b.  Resolution of a proposed A.R.S. § 20-443 misrepresentation claim will require individualized inquiry into the alleged misrepresentations and the class members' reliance.**

As previously discussed, Plaintiffs' allegation that "State Farm misrepresented the replacement cost value the class members were entitled to by using the new construction database for restoration of property claims" cannot support a claim for misrepresentation under A.R.S. § 20-443. [Pls.' Mot. for Leave to Amd. at Ex. 1, ¶ 37.] And even assuming the purported class members could allege a proper claim under A.R.S. § 20-443, individual issues would predominate common ones for the putative class's claims. *See Simon v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 482 F.2d 880, 882-83 (5th Cir. 1973) (concluding differences in misrepresentations alleged as well as degrees of reliance thereon made class suit

inappropriate). To satisfy their burden of proof on the insurance fraud claim[9] under Arizona law, "each class member must still show that he actually relied on a false designation or misrepresentation." *Stratton*, 266 F.R.D. at 349-50 ("the overwhelming authority in Arizona specifically requires proof of actual reliance"). This claim will involve case-by-case determinations of the alleged misrepresentations made to each class member and whether those statements induced reliance. As previously discussed, the undue delay in seeking the late amendment highly prejudices State Farm because of the lengthy passage of time and likely fading memories. *See id.* at 350 (discussing individual issues that predominate class claim brought under A.R.S. § 20-443: "Although Plaintiffs' proposed class may share a common legal issue, the fact finder must determine whether each class member relied on Defendants' representations of the group policy … [and] the fact finder would need to make individualized inquiries as to each class member's reliance on the group representation"). Because the misrepresentations claim necessarily requires individualized inquiries into each putative class members' claim, Plaintiffs cannot show predominance. *See id.* ("As the fact finder would need to make individualized inquiries as to each class member's reliance on the group representation, the Court finds that the proposed class's individual issues predominate over any common ones.").

All in all, Plaintiffs cannot carry their burden of proving that their proposed class claims are proper under Rule 23(b)(3), so the Court should deny their motion as futile. *See Mills*, 269 F.R.D. at 681 (finding superiority of class action procedure not established "[g]iven the individualized inquiries and proof that will be necessary to litigate the class members' claims"); *Coastal Neurology*, 271 F.R.D. at 545 (finding no superiority where claims "would require the Court to scrutinize individually the details of each class member's claim for reimbursement" and the" management of a class action containing thousands of such claims

---

[9] *See, e.g., Moreno v. Minnesota Life Ins. Co.*, 2015 WL 1457419, *4 (D. Ariz. March 30, 2015) (referring to A.R.S. § 20-443 as "the insurance fraud statute").

21

would prove difficult"); *Johnson*, 310 F.R.D. at 255 (finding "a class action is not a superior method of handling these claims" where "the trial would collapse into individual mini-trials on the merits of and defenses to each class member's claim.").

> **2.    Plaintiffs' proposed amendment fails because they do not allege a class that could be certified under Rule 23(b)(1) or (b)(2).**

Rule 23(b)(1) allows a class action where "prosecuting separate actions … would create a risk of: (A) inconsistent or varying adjudications … that would establish incompatible standards of conduct for the party opposing the class; or (B) adjudications … that … would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede the other members' ability to protect their interests" Ariz. R. Civ. P. 23(b)(1). Rule 23(b)(2) requires that "injunctive relief or corresponding declaratory relief is appropriate for the class as a whole." Ariz. R. Civ. P. 23(b)(2).

Plaintiffs are not entitled to class certification under either Rule 23(b)(1) or (2) because they have individualized monetary claims for damages. The Supreme Court has stated that claims for individualized monetary damages cannot be raised under Rule 23(b)(1) or (2) because the "absence of notice and opt-out" provisions in these rules violates due process. *Dukes*, 564 U.S. at 362-63; *see also Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1193 (9th Cir. 2001), opinion amended on denial of reh'g, 273 F.3d 1266 (9th Cir. 2001) ("Certification under Rule 23(b)(1)(A) is therefore not appropriate in an action for damages.") (citing *Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1340 (9th Cir. 1976)).

Further, the risks identified in Rule 23(b)(1)(A) and (B) are not present in this case. "Given the individual-specific nature of the [putative class] claims for compensatory and punitive damages, [there is] no risk of inconsistent adjudications or incompatible standards of conduct in having those claims adjudicated separately" and class certification would not be warranted under subsection (A). *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 421 n.16 (5th Cir. 1998). Subsection (B) is focused on the "effect of an action on behalf of an individual

on the interests of those who have rights similar to those of the individual bringing suit." *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 466 (9th Cir. 1973). The success or failures of the purported class members in their individual cases "will not inescapably alter the rights of other similarly situated" and "[t]heir claims are left untouched by separate actions." *Id.* at 467. And, the mere "possibility that an individual suit will have either precedential or stare decisis effect on later [suits] is not sufficient for (b)(1)(B) class certification." *Cohen v. Office Depot, Inc.*, 204 F.3d 1069, 1078 n.7 (11th Cir. 2000) (internal quotation omitted).

Moreover, Plaintiffs' additional claims for injunctive relief do not make this case more amenable to class certification. When monetary damages are the primary relief sought, class certification under Rule 23(b)(1) and (2) is not appropriate. *See Dukes*, 564 U.S. at 360 (holding class certification inappropriate under Rule 23(b)(2) when "monetary relief is not incidental to the injunctive or declaratory relief"); *Babineau v. Fed. Exp. Corp.*, 576 F.3d 1183, 1195 (11th Cir. 2009) (affirming denial of class certification under Rule 23(b)(1) "when plaintiffs requested both compensatory damages and injunctive relief"); *Kartman v. State Farm Mut. Ins. Co.*, 634 F.3d 883, 888-95 (7th Cir. 2011) (concluding claims arising from claimed underpayment of insurance claims for hail damages to roofs were predominantly actions for damages and a separate request for injunctive relief did not render case certifiable under Rule 23(b)(2)); *McDonnell-Douglas Corp. v. U.S. Dist. Court for Cent. Dist. of California*, 523 F.2d 1083, 1087 (9th Cir. 1975) (declining to certify class under Rule 23(b)(2) in action for money damages and declaratory relief where "the declaratory relief sought by plaintiffs adds nothing to their claim for damages").

Here, Plaintiffs cannot establish that their primary goal in bringing their class claims is injunctive or declaratory relief. Without the possibility of monetary damages, no reasonable plaintiff would sue for *underpayment of an insurance claim*. *See Kartman*, 634 F.3d at 888-89 (stating the alleged injury of underpayment of insurance claims is only remedied by damages, not prospective injunctive relief). To illustrate that Plaintiffs are seeking mainly

money damages, six of the eight categories of relief sought are for monetary damages. [Pls.' Mot. for Leave to Amd. at Ex. 1, 13-14.] *See Markarian v. Connecticut Mut. Life Ins. Co., 202 F.R.D. 60, 71 (D. Mass. 2001)* (finding certification under Rule 23(b)(2) improper where four of the six requested forms of relief were monetary); *see also, e.g., Rothwell v. Chubb Life Ins. Co. of Am., 191 F.R.D. at 25, 29 (D.N.H. 1998)* (declining to certify class where "[i]t is readily apparent … that their primary objective is money damages. Plaintiffs assert an array of state law claims seeking compensatory and punitive damages, as well as costs and fees. Although plaintiffs also seek equitable relief in the form of an injunction … any such relief is secondary to their claims for money damages."); *Mills, 269 F.R.D. at 674* (denying class certification under Rule 23(b)(2) where class representative sought primarily to recover monetary damages from underpaid insurance claims even though injunction relief was also sought); *Pipes, 254 F.R.D. at 551* ("The primary and ultimate relief sought by Plaintiffs is monetary, and the monetary relief sought is not incidental to the requested declaratory and injunctive relief. This finding alone precludes certification under Rule 23(b)(2).").

Ignoring that Plaintiffs were primarily seeking money damages, the injunctive or declaratory relief sought would be unnecessary even if Plaintiffs succeeded on the merits. *See McDonnell-Douglas, 523 F.2d at 1087* (declining to certify class under Rule 23(b)(2) in action for money damages and declaratory relief where "the declaratory relief sought by plaintiffs adds nothing to their claim for damages"). Any harm the putative class members suffered because of State Farm's allegedly improper underpayment has already happened and cannot be remedied by injunction. *See Mogel v. UNUM Life Ins. Co. of Am., 646 F. Supp. 2d 177, 184 (D. Mass. 2009)* (finding certification improper under Rule 23(b)(2) where "absent the prospect of monetary recovery, the named plaintiffs and class members have no incentive to pursue their claims. Any harm suffered as a result of UNUM's alleged violations of ERISA has already occurred, and no class members are likely to face further harm in the absence of

injunctive or declaratory relief"). Thus, class certification is improper under Rule 23(b)(1) or (b)(2).

## **CONCLUSION**

In sum, each of the following provides an independent basis for this Court to deny Plaintiffs' Motion for Leave to Amend:

(1) Plaintiffs unduly delayed seeking leave to amend;

(2) Plaintiffs' undue delay significantly prejudices State Farm and this Court;

(3) The proposed unjust enrichment claim by Phillips and purported class members is futile;

(4) The proposed claim by Phillips and purported class members for misrepresentation and false disclosures under A.R.S. § 20-443 is futile; and

(5) The proposed class claims for breach of contract and bad faith are futile because:

(a) Plaintiffs cannot represent the putative class when they admit they have no damages if the class they purport to represent did, indeed, suffer damages;

(b) Plaintiffs cannot establish commonality or typicality under Rule 23(a); and

(c) Plaintiffs cannot show certification would be proper under Rule 23(b)(1), (2), or (3).

State Farm respectfully requests that this court deny Plaintiff's Motion for Leave to Amend.

1

2       RESPECTFULLY SUBMITTED this 15th day of April, 2019.

3                         BROENING OBERG WOODS & WILSON, P.C.

4

5                   By: */s/ Alicyn M. Freeman*

6                     Robert T. Sullivan
                         Alicyn M. Freeman

7                     2800 North Central Avenue, Suite 1600
                         Phoenix, Arizona 85004

8                     *Attorneys for Defendant State Farm Fire and*
                         *Casualty Company*

9

10

11

12  EFILED via AZTurboCourt this

13  15th day of April, 2019,
     with an electronic copy to:

14

15  Hon. Sherry Stephens
     Maricopa County Superior Court

16

17  COPY e-served via AZTurboCourt this
     15th day of April, 2019, and mailed

18  via first-class mail, April 16, 2019, to:

19

20  Michael N. Poli
     Jeff G. Zane

21  MERLIN LAW GROUP P.A.
     2999 North 44th Street, Suite 520

22  Phoenix, AZ 85018
     mpoli@merlinlawgroup.com

23  jzane@merlinlawgroup.com
     *Attorneys for Plaintiffs*

24

25

26

Stephen E. Silverman
STEPHEN SILVERMAN LAW
6945 East Sahuaro Drive, Suite 125
Scottsdale, Arizona 85254
steve@stephensilverman.com
*Counsel for Plaintiffs*


By */s/ Suzanne Beard*

# Index of Exhibits
# State Farm's Response to Plaintiffs' Motion for Leave to Amend Complaint to Class Action

Exhibit 1.    Deposition of D. Fix 71:22-72:17.

Exhibit 2.    Deposition of R. Gonzales 91:24-92:5.

Exhibit 3.    Deposition of D. Fix 85:1-:19.

Exhibit 4.    Deposition of R. Gonzales 97:2-100:22.

Exhibit 5.    Deposition of T. Moss 104:12-:23.

Exhibit 6.    Operation Guide–Claim Practices, Fire, PHILA00001216PROD-PHILA00001225PROD.

Exhibit 7.    1/20/16 Claim Rep Draft, PHILA00000125PROD.

Exhibit 8.    4/7/17 Claim Rep Draft, SF-PHILCLAIM 004776.

Exhibit 9.    Deposition of R. Gonzales 31:8-:24.

Exhibit 10.   Financial Information on Phillips' claim, SF-PHILCLAIM 000163-64.

Exhibit 11.   Deposition of A. Phillips 76:20-77:7.

Exhibit 12.   3/7/16 Letter from R. Gonzales to J. Skipton, PHILA00000266PROD.

Exhibit 13.   Authorization to Proceed with Work, Phillips 000590

Exhibit 14.   Deposition of D. Fix 68:8-70:8.

Exhibit 15.   Deposition of D. Fix 87:4-:12, 95:4-:10.

Exhibit 16.   Deposition of A. Phillips 6:16-7:14; 26:23-27:11, 57:18-:20.

Exhibit 17.   Deposition of A. Costales 35:8-36:19, 66:5-17.

Exhibit 18.   Deposition of T. Moss 99:4-100:4.

Exhibit 19.   Plaintiffs' Third Supplemental Disclosure Statement.

Exhibit 20.   Deposition of J. Phillips 55:8-:15.

Exhibit 21.   Excerpts of State Farm Policy Number 03-J4-4660-2.

Exhibit 22.   Deposition of A. Costales, 66:5-:17, 120:22-121:6.

Exhibit 23.   Deposition of T. Moss, 98:15-99:3, 120:7-:14.

# EXHIBIT 1

1

1            SUPERIOR COURT OF ARIZONA

2                IN MARICOPA COUNTY

3

4   Anderson Phillips and Jasmine      )No. CV2016-013572
    Phillips, husband and wife         )
5                                      )
            Plaintiffs,                )
6                                      )
                vs.                    )
7                                      )
    State Farm Fire and Casualty       )
8   Company, an Illinois corporation,  )
                                       )
9           Defendants.                )
    _____)
10

11

12        VIDEOTAPED DEPOSITION OF DAVID FIX

13

14                Phoenix, Arizona
                  May 4, 2018
15                9:00 a.m.

16

17

18

19

20   Reported by:
     JENNIFER HANSSEN, RPR
21   Certified Reporter No. 50165

22   PREPARED FOR:
     ASCII/CONDENSED
23

24   (Certified Copy)

25

David Fix - May 4, 2018

71

1   but I did not find it.

2       Q.    You didn't find it for the Phillips?

3       A.    Correct.

4       Q.    Okay.  "Or within four months from the

5   issuance of a permit if noticed by Adanac is not

6   created prior to completion."

7             So if I understand right, the default is

8   four months from issuing of the permit; if it's going

9   to be different than that, you're going to give them a

10  notice of completion?

11      A.    Correct.

12      Q.    Okay.  Just thinking back on it now, how long

13  would you think it would take from issuance of the --

14  of the permit to do the repairs to the Phillips'

15  property?

16            MR. BARRETT:  Objection, form.

17            MR. SILVERMAN:  Join.

18      A.    From the issuance of the permit?

19      Q.    BY MS. BRADHAM:  Yes.

20            MR. BARRETT:  Again, objection noted.

21            MR. SILVERMAN:  Joined.

22      A.    Every -- every job is different, but I'm going

23  to tell you a standard we use for a -- we call a full

24  gut fire --

25      Q.    BY MS. BRADHAM:  Okay.

David Fix - May 4, 2018

72

1    A.     -- is nine months.

2    Q.     Okay.  And that's issuing of which permit?

3    A.     The rebuild permit.

4    Q.     Okay.  So nine months from issuing the rebuild

5    permit is the standard for a full gut fire?

6    A.     Pretty typical, yes.

7    Q.     Okay.  And I'll ask you about "full gut."

8    What do you mean by that?

9    A.     It's a house or a fire or a structure, I

10   should say, where a fire or water has caused so much

11   damage that we are taking everything down to the

12   studs --

13   Q.     Uh-huh.

14   A.     -- and replacing from that point back.

15   Q.     And that's what you were doing on the

16   Phillips' property; right?

17   A.     It was.

18   Q.     And you -- you actually went out and saw the

19   damage to the Phillips' property?

20   A.     I did.

21   Q.     And in addition to going down to the -- to the

22   framing studs and the wall studs, you were also taking

23   off all the roof trusses?

24   A.     Don't recall if they were all of the roof

25   trusses, but it was certainly a large portion of the

# EXHIBIT 2

ARIZONA SUPERIOR COURT

MARICOPA COUNTY

ANDERSON PHILLIPS and JASMINE ) No. CV2016-015809
PHILLIPS, husband and wife,   )
                              )
                              )
            Plaintiffs,       )
                              )
v.                            )
                              )
STATE FARM FIRE AND CASUALTY  )
CORPORATION, an Illinois      )
corporation,                  )
                              )
                              )
            Defendants.       )
_____)

VIDEOTAPED DEPOSITION OF ROBERT GONZALES

Phoenix, Arizona
April 4, 2018
9:46 a.m.

PREPARED BY:

Donna DeLaVina, RPR
Certified Reporter
Certificate No. 50468

SEYMOUR REPORTING SERVICES
Arizona RRF No. R1000
137 East Elliot Road
Suite 2473
Gilbert, Arizona 85299
P 602.258.5800
F 888.881.5440
www.SRSreporting.com

1          MS. BRADHAM:  Form; foundation.

2      Q.  BY MR. POLI:  Right?

3      A.  As far as I know, yes.

4          MR. POLI:  Let's take a quick break.

5          THE VIDEOGRAPHER:  The time is 11:30 a.m.

6  We're now going off record, ending Media 2.

7          (Whereupon, a brief recess ensued from 11:30

8  a.m. to 11:48 a.m.)

9          THE VIDEOGRAPHER:  The time is 11:48 a.m.

10 We're now back on record, beginning Media 3.

11     Q.  BY MR. POLI:  So with respect to the Phillips'

12 home, you did inspect it at one point, right?

13     A   Yes.

14     Q.  There was a major fire at the Phillips' home,

15 correct?

16     A.  Yes.

17     Q.  But the exterior walls were still standing,

18 right?

19     A.  Correct.

20     Q.  The interior walls were still standing, right?

21     A.  Yes.

22     Q.  What was the repair?  What did it involve?  Was

23 it mostly like roofing and drywall?

24     A.  From what I recall from the estimate, it was we

25 were going to take the entire truss system off, which

ROBERT GONZALES   APRIL 04, 2018

1   would then take all the roofing material off.  Gutting

2   the interior and removing all the stucco around the

3   exterior of the house.  And then I think some windows

4   and all the flooring.  So, yeah, it was just going to

5   be down to sticks.

6       Q.  But you left the exterior and interior walls in

7   place?

8       A.  Correct.  They weren't damaged.

9       Q.  All right.  I'm about ready to go on from this

10  document.  But go back to Exhibit 18 and I think you're

11  at the right page, the page about new construction

12  versus restoration pricing, page Bates 1223.  Are you

13  still on that page?

14      A.  Yes.

15      Q.  We've asked you quite a few questions about

16  Paragraph 1, new construction.  I want to ask you some

17  questions about the language in Paragraph 2,

18  restoration.

19          It says that restoration, the restoration

20  option, quote, "is for jobs other than total losses or

21  new construction," do you see that language, unquote?

22      A.  Yes.

23      Q.  Let's take each of those.  Total losses, based

24  on your training and experience with State Farm, you

25  have an understanding of what that would refer to,

# EXHIBIT 3

David Fix - May 4, 2018

1

1       SUPERIOR COURT OF ARIZONA

2            IN MARICOPA COUNTY

3

4   Anderson Phillips and Jasmine      )No. CV2016-013572
    Phillips, husband and wife         )
5                                      )
             Plaintiffs,               )
6                                      )
                  vs.                  )
7                                      )
    State Farm Fire and Casualty       )
8   Company, an Illinois corporation,  )
                                       )
9            Defendants.               )
    _____)
10

11

12       VIDEOTAPED DEPOSITION OF DAVID FIX

13

14                 Phoenix, Arizona
                    May 4, 2018
15                  9:00 a.m.

16

17

18

19

20  Reported by:
    JENNIFER HANSSEN, RPR
21  Certified Reporter No. 50165

22  PREPARED FOR:
    ASCII/CONDENSED
23

24  (Certified Copy)

25

85

1     Q.   BY MS. BRADHAM:  And is there anything about

2  that order that we just went through that would be

3  different if you were in a new construction, building

4  the house brand-new, but you had -- you had already,

5  you know, started with the stud walls and the -- and

6  the slab?

7             MR. SILVERMAN:  Form, foundation.

8             MR. BARRETT:  Join.

9    A.   Different with the order?

10    Q.   BY MS. BRADHAM:  Right.

11    A.   Not necessarily.

12    Q.   Okay.  And you go through that order in the

13  full gut process because that's the kind of logical

14  order that makes sense; right?  That's why you're doing

15  that the same way on -- on most of these full gut

16  projects you've got; right?

17             MR. SILVERMAN:  Form, foundation.

18             MR. BARRETT:  Join.

19    A.   Correct.

20    Q.   BY MS. BRADHAM:  Certainly doesn't make sense

21  to do trim plumbing before you do rough plumbing, if

22  that's even possible?

23             MR. SILVERMAN:  Form, foundation.

24             MR. BARRETT:  Join.

25    A.   Correct.

# EXHIBIT 4

ARIZONA SUPERIOR COURT

MARICOPA COUNTY

ANDERSON PHILLIPS and JASMINE ) No. CV2016-015809
PHILLIPS, husband and wife,   )
                              )
                              )
            Plaintiffs,       )
                              )
v.                            )
                              )
STATE FARM FIRE AND CASUALTY  )
CORPORATION, an Illinois      )
corporation,                  )
                              )
                              )
            Defendants.       )
_____)

VIDEOTAPED DEPOSITION OF ROBERT GONZALES

Phoenix, Arizona
April 4, 2018
9:46 a.m.

SEYMOUR REPORTING SERVICES
Arizona RRF No. R1000
PREPARED BY:                137 East Elliot Road
                             Suite 2473
                            Gilbert, Arizona 85299
Donna DeLaVina, RPR           P 602.258.5800
Certified Reporter            F 888.881.5440
Certificate No. 50468       www.SRSreporting.com

ROBERT GONZALES   APRIL 04, 2018

```
 1              MS. BRADHAM:  Form.

 2              THE WITNESS:  No, I would disagree with

 3  you.

 4      Q.  BY MR. POLI:  Okay.  So in your view, as a

 5  representative of State Farm, a 29-year representative

 6  of State Farm, it's perfectly okay to make this

 7  decision about new construction versus restoration

 8  pricing by only reading one of the two paragraphs that

 9  addresses the issue; is that your testimony?

10              MS. BRADHAM:  Form.

11              THE WITNESS:  No.  I'm saying that in this

12  case Mr. Phillips, it fit, Number 1, new construction.

13      Q.  BY MR. POLI:  Great.  That's not my question so

14  let me rephrase it so you understand what my question

15  is.

16              As a 29-year representative of State Farm,

17  looking at this page in Exhibit 18 that has two

18  paragraphs dealing with the new construction versus

19  restoration issue, Paragraph 1 is entitled "New

20  construction."  Paragraph 2 is entitled "Restoration."

21              Is it your testimony that on behalf of

22  State Farm, that you can look at one paragraph and

23  ignore the other in terms of figuring this issue out?

24              MS. BRADHAM:  Form.

25              THE WITNESS:  I don't believe that I'm
```

1   ignoring one.

2        Q.  BY MR. POLI:  Okay.  You wouldn't do that,

3   would you?

4        A.  No.  I'm not ignoring it.

5        Q.  Okay.  I mean, obviously, if you've got two

6   related paragraphs, One and Two, dealing with the exact

7   same issue, you're not going to ignore one and pay only

8   sole attention to the other, right?

9        A.  Well, I don't know as far as that goes.  It's

10  almost like an if then type of situation.  So if it

11  doesn't meet new construction, then can we go down to

12  restoration remodel?  But based on this OG and the

13  guide, it was a large partial loss.  So if it fits in

14  One, why would I then go to Two.

15       Q.  Maybe because they're right next to each other

16  and they address the exact same issue in a converse

17  fashion so it would seem logical to look at both

18  paragraphs, that might be one reason to look at both of

19  them?

20       A.  I would disagree with you.

21       Q.  Okay.  All right.  I just want to know what

22  your position is.  You're here as a representative of

23  State Farm.  You're a 29-year career professional for

24  State Farm.  It's your position that on this new

25  construction pricing issue, it's perfectly okay to look

1   at Paragraph 1 on Bates 1223, and pay little or no

2   regard to Paragraph 2, this is all in Exhibit 18.  Have

3   I understood your testimony correctly?

4             MS. BRADHAM:  Form.

5             And, Mike, I need to clarify something

6   here for the record.  You've said a couple of times

7   that Robert is here as a representative of State Farm

8   testifying on behalf of State Farm.  This is not a Rule

9   30(b)(6) deposition.

10            MR. POLI:  I think I'm aware of that.

11      Q.  BY MR. POLI:  Are you here --

12            MS. BRADHAM:  And I need to clarify that

13   because you've said it a number of times.

14      Q.  BY MR. POLI:  Are you here doing your best to

15   represent the company you've spent 29 years working

16   for?

17            MS. BRADHAM:  Form.

18            THE WITNESS:  Yes.

19      Q.  BY MR. POLI:  Are you loyal to your company?

20      A.  Yes.

21      Q.  Do you try to put forth the best possible

22   representation of your company, whether it's in this

23   deposition or any other time acting on behalf of your

24   company?

25      A.  Yes.

1          MR. POLI:  Okay.  All right.  Now see if

2   can find the question I asked before, Donna, and let's

3   pose it back so we get an answer.

4          (Whereupon, the question was read.)

5          MS. BRADHAM:  Form.

6          THE WITNESS:  Yes.

7          MR. POLI:  Mark it.

8      Q.  BY MR. POLI:  So in Paragraph 2, where it

9   refers to new construction, you can tell us what that

10  means, right?

11         Or do you not know what that means either?

12     A.  Again, looking at it, right, so they use true

13  new construction versus new construction down at the

14  bottom.  I mean, for me to look at it, you know, I look

15  at Number 1, just looking at the environment, is it the

16  most efficient labor available, the productivity.  So

17  if that's the case, then restoration remodel is not

18  most effective or the most efficient labor productivity

19  available.  And in this situation it was most efficient

20  productivity available.  So why would I then go to

21  Number 2 is my question.  So they're separate.  I don't

22  see how they're together.

23     Q.  Okay.  Now, let's return to my question.

24         Where Paragraph 2 refers to new

25  construction, do you have an understanding of what that

# EXHIBIT 5

**Page 1**

```
 1                ARIZONA SUPERIOR COURT
                    MARICOPA COUNTY
 2
 3   ANDERSON PHILLIPS and        )
     JASMINE PHILLIPS, husband    )
 4   and wife,                    )
                                  )
 5      Plaintiffs,               )
                                  )
 6      -vs-                      )   No. CV-2016-015809
                                  )
 7   STATE FARM FIRE AND          )
     CASUALTY CORPORATION, an     )
 8   Illinois corporation,        )
                                  )
 9      Defendant.                )
10
11
12
13
               THE VIDEOTAPED DEPOSITION of THOMAS
14   E. MOSS, the deponent herein, called by the
     Plaintiff for examination pursuant to notice and
15   pursuant to the provisions of the Code of Civil
     Procedure and the Rules of the Supreme Court
16   thereof pertaining to the taking of depositions,
     taken before me, Jill A. Bleskey, CSR-RPR, License
17   No. 084-004430, a Notary Public in and for the
     State of Illinois, at Eastland Suites, 1801
18   Eastland Suites, in the City of Bloomington, County
     of McLean, and State of Illinois on the 31st day of
19   July, A.D., 2018, commencing at 10:02 a.m.
20
21   -------------------------------------------
22                Jill A. Bleskey, RPR
                    CSR #084-004430
23
```

**Page 2**

```
 1                 APPEARANCES
 2   For the Plaintiff:
 3      STEPHEN SILVERMAN LAW
        Attorneys at Law
 4      6945 East Sahuaro Drive, Suite 125
        Scottsdale, Arizona 85254
 5      (480)747-0850
        steve@stephensilverman.com
 6      BY:  Mr. Stephen SIlverman
 7   For the Defendant:
 8      STEPTOE & JOHNSON, LLP
        Attorneys at Law
 9      201 East Washington Street, Suite 1600
        Phoenix, Arizona 85004
10      (602)257-5244
        ktilleman@steptoe.com
11      BY:  Mr. Karl M. Tilleman
12   Videographer:
13      Mr. Tim Coverstone
14                 I N D E X
15   EXAMINATION CONDUCTED              PAGE
16   Mr. Silverman                        4
17              E X H I B I T S
18   Exhibit No.   Description          Page
19   1   Not Identified                   3
     2   Not Identified                   3
20   3   November 2014 Operation Guide 7505,    129
         Structural Loss Claim Handling
21   4   February 2012 Operation Guide 7505,    133
         Structural Loss Claim Handling
22
     NOTE:  Exhibits attached to transcripts
23
```

**Page 3**

```
 1         (At which time, Moss Deposition
 2   Exhibit Numbers 1 and 2 were marked for
 3   identification, and the following proceedings were
 4   conducted;)
 5         THE VIDEOGRAPHER:  This is Tape
 6   Number 1 to the videotaped deposition of State
 7   Farm's corporate designee, Tom Moss, in the matter
 8   of Anderson and Jasmine Phillips versus State Farm
 9   Fire and Casualty Corporation being heard before
10   the Arizona Superior Court for Maricopa County,
11   Case Number CV-2016-015809.
12         This deposition is being held at 1801
13   Eastland Drive in Bloomington, Illinois.  Today's
14   date is July the 31st, 2018 and the time indicated
15   on the video screen is 10:02 a.m.  My name is Tim
16   Coverstone, I'm the Videographer, and our Court
17   Reporter is Jill Bleskey.  Counsel please introduce
18   themselves and state their affiliations after which
19   our witness be sworn in.
20         MR. SILVERMAN:  Stephen Silverman for
21   the plaintiff.
22         MR. TILLEMAN:  Karl Tilleman for the
23   defendant State Farm.
```

**Page 4**

```
 1         THOMAS E. MOSS,
 2         The witness, having been first duly
 3   sworn upon his oath, testified as follows:
 4         EXAMINATION CONDUCTED
 5         BY:  MR. SILVERMAN
 6   Q.    State your name, sir.
 7   A.    Thomas Edward Moss.
 8   Q.    And what do you do?
 9   A.    I work for State Farm Insurance.
10   Q.    And what's your title?
11   A.    Claim consultant.
12   Q.    What is a claim consultant?
13   A.    My primary role as a claim consultant
14   is to provide oversight and guidance for our claim
15   associates.
16   Q.    How long have you been a claim
17   consultant?
18   A.    In October it will be ten years.
19   Q.    What's your area of -- what area do
20   you work in, nationwide or just a particular
21   region?
22   A.    So that's a little bit of a mix
23   there.  So primarily I work with Texas.  So --
```



Page 101

1  testimony?
2      A.      So Mr. Gonzales, in the portion I
3  read of his deposition -- again, I don't have it in
4  front of me.  As I recall, he said that he was told
5  that that had to be used on all large losses.  Is
6  that an accurate representation of what he said?
7      Q.      That's my understanding.
8      A.      Okay.  And so that's never been the
9  guidance we've provided at State Farm around the
10  new construction setting, the labor efficiency new
11  construction setting.
12      Q.      When you -- strike that.  Do you know
13  if the use of new construction pricing, or
14  restoration service remodel pricing, is something
15  that is looked at in a closed file process?
16      A.      There are many things that are looked
17  at in a closed file review process, --
18      Q.      Just that --
19      A.      -- the estimate being part of that.
20  I can tell you my experience, having been on the
21  claim review team and also in my current role as I
22  review closed files, I look at many things within
23  the estimate including did they use the correct

Page 102

1  labor efficiency.
2      Q.      And is this the -- is that the
3  practice for all Xactimate estimates at State Farm?
4  In other words, is there -- with an estimate that
5  Robert Gonzales produced, it's going to be an
6  Arizona estimate.  When you're looking at an
7  estimate like the Phillips' estimate, is there a
8  difference based on the state the person's in?
9      A.      As I review a closed file, if there
10  are any state laws that apply specific to things, I
11  would apply those to my review of the estimate.
12  But the way I review the estimate would apply
13  across all states.
14      Q.      Do -- have you heard the phrase top
15  down construction versus bottom up construction?
16      A.      I haven't heard that phrase top down
17  or bottom up construction.  I've heard the phrase
18  of how to scope a loss starting at the top working
19  your way up or starting at the bottom -- excuse me,
20  starting at the top working your way down or
21  starting at the bottom working your way up as you
22  scope a loss.
23      Q.      I want to read something, I just want

Page 103

1  to know if you agree or disagree.  New construction
2  begins at the foundation and builds upwards.
3  Repairing a house that isn't totally destroyed
4  often means removing the roof and rebuilding from
5  the top down, a far more time consuming and labor
6  intensive procedure.  Do you agree or disagree?
7          MR. TILLEMAN:  Form and foundation.
8          THE WITNESS:  Could you read it to me
9  one more time, sir?
10          BY:  MR. SILVERMAN
11      Q.      New construction begins at the
12  foundation and builds upward.  Repairing a house
13  that isn't totally destroyed often means removing
14  the roof and rebuilding from the top down, a far
15  more time consuming and labor intensive procedure.
16          MR. TILLEMAN:  Same objections.
17          THE WITNESS:  So as you read that,
18  true new construction, so starting when there's
19  nothing there, a home that didn't exist and you're
20  building a new home.  With that it would not be as
21  labor intensive as when you are restoring a home
22  using either the new construction setting or the
23  reconstruction -- service remodel -- restoration

Page 104

1  service remodel setting.
2          BY:  MR. SILVERMAN
3      Q.      So you agree with that statement?
4      A.      So I agree if it's a true new
5  construction where you're building from the dirt up
6  or you're repairing a home that it would be more
7  efficient to build that true new home.
8      Q.      Now, you said true new construction
9  and new construction in your answer.  What's your
10  -- what is your definition of what the difference
11  between the two is?
12      A.      So new construction is a setting
13  within labor efficiency, within Xactimate, and
14  there are many things that fall into new
15  construction, this setting within Xactimate.  One
16  of those being true new construction, meaning the
17  house that never existed before.  Also within that
18  new construction setting it might be a house that
19  is completely gutted out and it's basically from a
20  foundation up or maybe a foundation and studs up or
21  it could be a large partial loss.  And all of those
22  things Xactware defines within their new
23  construction setting.



# EXHIBIT 6

OG 75-07, Structural Loss Claim Handling

OPERATION GUIDE

| DATE | GENERAL CLASSIFICATION | SUBJECT | NUMBER |
|------|------------------------|---------|--------|
| 11-19-2014 | **Claim Practices**<br>Fire | **Structural Loss<br>Claim Handling** | **75-07** |

## I.   PURPOSE

This Operation Guide establishes guidelines and procedures for handling first party structural losses.

## II.   GENERAL INFORMATION

It is the intention of State Farm® to pay what we owe promptly, courteously, and efficiently.

To ensure the attainment of this goal, reasonably consistent investigative patterns, interpretations, and reporting procedures should be followed.

Not all claims require a physical inspection of the loss by a claim representative. Claims that may be handled to conclusion over the phone and do not require an inspection are the primary responsibility of the claim handlers in In-Office Claims. If needed, claim representatives may estimate damages over the phone with a policyholder or complete a task assignment to a field claim representative to inspect and write an estimate of damages.

Further details on first party claim handling guidelines and requirements can be found in OG 75-01.

## III.   STRUCTURAL LOSS CLAIM HANDLING PROCEDURES

A.   Investigation of Structural Losses

　　1.   State Farm Premier Service® Program (SFPSP)

　　　　The claim representative may be working to conclude claims in the SFPSP to the policyholder on losses that qualify for the program (See: OG 71-40).

　　2.   Inspection

　　　　a.   Inspections should be conducted when necessary.

　　　　b.   Carefully note the source of the loss, as well as when the loss occurred. It is important to note the date of loss, whether one or more occurrences caused the loss, and whether subrogation or salvage potential exists.

　　　　c.   When inspecting buildings, it is recommended to follow a consistent routine to be sure relevant parts of the building are inspected. For example, start at the front or street side of the house, and go clockwise until returning to the start spot. Use similar routines in inspecting roofs and interiors.

　　　　d.   Record the date of inspection in the file, along with pertinent comments on the loss.

　　　　e.   Losses involving roofs should include an on-roof inspection (where safe and practical to do so).

Phillips, Anderson, et al. v. SFF & CC

PHILA00001216PROD

    f.     For losses involving flooring replacement, samples of the flooring materials should be collected and sent to ITEL to determine specifications and replacement values. See: ITEL Workflow

3.     Photographs

    Take pictures to preserve facts, illustrate any unusual features, or more clearly reflect damaged and undamaged areas. This would include unique situations (such as total loss fires, mudslides, tornados) where little of the physical structure remains.

4.     Diagrams/Measurements

    a.     When appropriate, complete a diagram of the damaged area. It is preferable that diagrams be completed using the Sketch function within Xactimate. When Sketch is used, it is not necessary to create both a handwritten diagram and sketch.

    b.     Diagrams should include room measurements, ceiling heights, room dimensions, siding dimensions, location of damage, origin of loss, missing walls, and other features of the structure. Diagram any other areas, or the entire risk, as needed to explain the loss. Note any relevant areas that are not damaged.

    c.     Complete accurate measurements and insert the measurements on the diagram.

B.    Evaluation of Structural Losses
    1.     Agree with the insured as to scope of damage.
        a.     What is damaged?
        b.     What is not damaged?

    2.     Complete Xactimate or itemized handwritten estimate when appropriate. Consider first contact settlements on appropriate losses within the claim representative's authority. When ITEL is used to evaluate flooring, an estimate can be prepared using the Xactimate selector code NFCP (per specs from independent analysis). The labor allowance would be included in a first contact settlement. A subsequent payment for the materials would be made once the ITEL report is received.

    3.     Review the estimate with the insured and/or their contractor, item by item.

    4.     Advise the insured it is their responsibility to contract for any repair or replacement. Claim sections can maintain a directory of contractors and sources of repair firms in the area. When requested, the claim representative may provide names of several contractors. The claim representative should not recommend a specific contractor. The insured selects the contractor of their choice to perform the repairs.

    5.     If the insured desires another estimate, advise them it is their right to have a detailed estimate completed by a contractor or repair firm of their choice.

    6.     Agree with the insured as to Replacement Cost and Actual Cash Value (ACV), and explain applicable depreciation.

    Claim representatives have sufficient flexibility to permit exceptions that would allow a full Replacement Cost payment before restoration is complete. These exceptions generally present themselves in cases where repairs are substantially

underway, or a contract for repairs has been entered into between the insured and repair firm that is acceptable to us. We encourage the claim representative to exercise sound judgment in each instance.

7. Estimates

    a. Generally, an estimate should be prepared or secured on all losses.

    b. Claim representatives and estimators may prepare a handwritten or Xactimate estimate of the damage on structural losses.

    c. The following are recommendations for claim handlers prior to using Xactimate:

        1. Successful completion of the 21 courses 5CLM11200 through 5CLM11214 within Module 2 of the Fire Claim Representative Curriculum.

        2. Successful completion of the 12 "Complete an Estimate" courses within Module 4 of the Fire Claim Representative Curriculum.

        3. Successful completion of Fire Claim Representative School (5CLM15000)

        4. Demonstrate to the team manager a thorough understanding of Estimatics skills.

    d. Claim management is responsible for developing the estimating skills for each claim representative. Co-adjustments should be done periodically by management to ensure accuracy and competency of estimate writers.

    e. When the policyholder has an itemized contractor's estimate, the claim representative is still responsible for scoping the loss and reviewing the contractor's estimate in relation to the damages.

    f. If working in In-Office Claims, attempts should be made to scope the loss over the phone and write an Xactimate estimate for the damages. If an estimate is not written, the scope should be documented in the claim file. If unable to phone scope, consider a task assignment.

    g. Thoroughly explain the estimate to the insured, and give a copy of the estimate to the insured. Explain any replacement cost available to the insured after repairs are completed.

    h. At the insured's request, the claim representative will be available to discuss the scope of damages and estimate with the insured's contractor.

8. Structural Damage Claim Policy

The Structural Damage Claim Policy should be provided to policyholders with all building estimates written by claim handlers. This document provides policyholders with information to assist them with their estimated building repairs, including contractor selection and the policyholder's relation with the contractors of their choice. This automatically prints with an Xactimate estimate.

9. Estimate Reconciliation

a. If another estimate is received, compare it with the claim representative's estimate and reconcile any differences. The claim representative should verify if:

1. The scope of the loss is the same.
2. All measurements are the same.
3. The unit costs are in line with usual and customary costs in the area.
4. Quantities of materials are justified.

b. Resolve any discrepancies by checking the building estimate. Carefully review the claim representative's original figures, scope notes, or Xactimate estimate to make certain all measurements are proper. Determine the quantities and prices of materials are realistic, and the hours of labor are correctly calculated to establish a basis for discussion with the insured and/or contractor to resolve differences.

c. Details of the reconciliation should be recorded in one or more of the following places:

1. File notes
2. Revised estimate
3. Contractors estimate

d. For a review of the reconciliation training, review the Estimate Reconciliation Course (Course Code 5CLM13400). A job aid for Estimate Reconciliation is provided in the training.

10. Xactimate/XactAnalysis Reports

Claim management should become familiar with and review the various reports available in Xactimate including:

- Price List Variation Usage Report - indicates when there are deviations from the Xactimate price list.

- Inspection Audit Summary - when estimates are marked "complete," the system will run a rules-based check for common errors (such as, overlap). The report can provide the reviewer with the types of rules that were triggered, as well as any reasons for them being overridden as indicated by the estimate writer.

- Material Labor Summary - provides a summary of the material and labor for an estimate. This report can be used as an indicator of the appropriateness of the estimate, given the amount of damage sustained based on a review of the file material.

11. Facilities Management

Facilities Management Services has construction consultants available to partner with Claims personnel to conduct on-site inspections and assist the claim representative on larger, unusual, or complex losses. Their role is to consult with the claim representative on any of the following:

- Scope of damage
- Repair estimates
- Pricing for specialty items
- Specialty construction.

Requests to use the services of a construction consultant should take place by the claim section manager contacting the P&C Claims Consultant.

Phillips, Anderson, et al. v. SFF & CC

PHILA00001219PROD

12.   Loss Settlement

Review the loss settlement provisions of the policy and guidelines outlined in OG 75-50 Betterment, Depreciation, and Actual Cash Value, to determine settlement of covered structural losses. If replacement cost coverage is available, explain to the policyholder the applicable time frame and what information or documentation they will need to provide in order to obtain replacement cost. Complete the appropriate Explanation of Building Replacement Cost Benefits form (available on State Farm Forms under P&C Claims, Fire). The basis for depreciation should be explained to the policyholder and documented in the claim file note.

13.   Mortgagees

Mortgagee(s) should be protected on drafts as outlined in OG 74-04.

C.   Applicable Sales Tax

1.   Normally, estimates will be written using Xactimate pricing regardless of who completes the work. Sales tax, if applicable, should be included in the estimate.

2.   Sales tax is a component of the loss, and we must take care that our payments reflect the sales tax applicable to the loss location. Some jurisdictions tax materials but not labor, while others tax both. In some areas sales tax is applicable to the "bottom line" of the estimate. Other jurisdictions will exempt certain trades from sales tax and will draw distinctions between taxable repairs and non-taxable "improvements." It is not possible to discuss all possible variations in statutes throughout the U.S. and Canada. If there are questions about the local tax applicability, contact your P&C Claims Consultant.

3.   Xactimate unit prices do not include applicable tax on materials and labor. Since Xactimate prices cannot incorporate the peculiarities of each state's or province's sales and use tax system, the claim section managers are charged with making sure estimating practices are modified to reflect any locally-specific issues. Refer to OG 783-100 for further information on Xactimate.

4.   Contractors' bids and estimates may make different pricing and tax assumptions. Make sure these assumptions are understood so payments will be proper, and Xactimate and contractor estimates are properly compared.

D.   Overhead and Profit

1.   General Information

In addition to incurring costs for labor and materials, contractors incur overhead costs. Examples of overhead costs include office space and materials, depreciation, utilities, property and liability insurance, telephone, office employee expenses, etc. Such overhead must be considered when estimating property losses. It is difficult to determine the amount of overhead applicable to any one job. For this reason it has become customary in many areas to express overhead charges as a fixed percentage of the total cost of the job.

In addition, a contractor is entitled to profit. Generally, profit is expressed as a fixed percentage of the job cost. Consider negotiating the percentage of profit on larger, more competitive jobs. Because of economies of scale, a contractor may be willing to work at a lower profit margin on a large reconstruction project than on a minor repair.

2.   Overhead and Profit Considerations

Phillips, Anderson, et al. v. SFF & CC

PHILA00001220PROD

a.   Contractor's Overhead and Profit

Individual tradespersons are entitled to overhead and profit. In general the unit prices used in our Xactimate software include overhead and profit, so an additional calculation is not necessary.

When evaluating a contractor's estimates, however, it is important to compare prices and to note whether the contractor's prices include overhead and profit to avoid duplication of payment.

b.   General Contractor's Overhead and Profit

In some instances, as repairs become more complex and as more trades become involved, a policyholder may choose to engage a general contractor. A general contractor coordinates and schedules the efforts of various subcontractors and is entitled to overhead and profit above the cost of individual subcontractors.

c.   Actual Cash Value (ACV) Settlements
   1)   Calculation of ACV

ACV should be determined consistent with local case law or statute. When not in variance with case law, ACV is defined as Replacement Cost less depreciation. OG 75-50, Betterment, Depreciation, and Actual Cash Value, provides specific guidelines.

   2)   ACV and General Contractor's Overhead and Profit

When it is reasonably likely that a covered repair will require the services of a general contractor to coordinate and supervise the repair, the general contractor's overhead and profit payment shall be paid with the ACV payment. The appropriate percentage charge should be added to the bottom line ACV calculation. Evaluate the need for a general contractor using good judgment on each loss according to the complexity of the repair, the degree to which trades require coordination, and the number of trades involved. If judgment dictates the use of a general contractor is unnecessary, the costs associated with such use will not be paid with the ACV payment.

When the need for a general contractor is questionable, the cost associated with a general contractor's overhead and profit is payable only if the property is repaired or restored by means of a general contractor. Overhead and profit should not be paid with the ACV payment in this case.

   3)   Replacement Cost Claims and General Contractor's Overhead and Profit

Under Replacement Cost policies, the difference between ACV and Replacement Cost is payable upon completion of repairs when costs have been necessarily incurred. The difference between the general contractor's overhead and profit amounts paid with the ACV and Replacement Cost is payable at this time.

The claim representative has the latitude to issue Replacement

Phillips, Anderson, et al. v. SFF & CC

PHILA00001221PROD

Cost before completion of the repairs when the insured presents an acceptable signed contract to repair the damage or when the repairs are substantially underway. The acceptability of the contract is a matter of judgment for the claim representative on a case-by-case basis.

4)  Replacement Cost Claim Payment When the Policyholder Does the Work

Claim estimates are written or evaluated on the basis of Xactimate pricing. The deductible and appropriate depreciation is applied to the Replacement Cost estimate, and an ACV payment should be made.

When the insured establishes the work is completed, the supplemental payment for Replacement Cost is then made based on the Replacement Cost estimate that was used to make the ACV payment.

If a decision had been made that it was reasonably likely a general contractor would be necessary to supervise and coordinate the repairs, the remainder of the general contractor overhead and profit allowance is paid at the time the Replacement Cost is paid.

5)  Amount Spent Exceeds the Explanation of Building Replacement Cost Benefits Allowance

There will be cases where the amount actually and necessarily spent will exceed the amount shown on the Explanation of Building Replacement Cost Benefits. Use good judgment in determining the reason for this discrepancy. If there is an error in our estimate, or hidden damages were found, consider further payment. The situations can be minimized if the insured is instructed to call the claim representative as soon as errors are noted and before the work is done, so any appropriate changes can be made.

6)  Valued Policy Statutes

When the state in which the loss occurs has a Valued Policy Law with provisions in conflict with policy provisions, handle the loss in accordance with provisions of the statute as applicable to the loss situation.

E.  Building Permit Fees

When it is reasonably likely that a covered repair will require a building permit, the full cost of the building permit fee shall be paid with the ACV payment. Claim representatives should consider all factors when evaluating the need for a building permit fee, using good judgment and considering the requirements of the local municipality. The costs associated with building permit fees vary depending upon the municipality. Information regarding building permit fees can be obtained from the municipalities building official(s). If judgment dictates the repair will not require a building permit, the costs associated with such may not be paid with the ACV payment. If the claim representative is unable to determine the cost of a building permit fee; however, their judgment indicates a building permit fee may be incurred, the claim representative should discuss the potential fee with the policyholder(s) and let the

PHILA00001222PROD

policyholder(s) know the payment for the fee will be considered when the amount is determined. Should this occur, the claim representative may indicate the building permit fee as an open item within the building estimate.

F.    Labor Efficiencies—New Construction and Restoration/Service/Remodel

Claim Representatives should consider labor efficiencies when writing an estimate within Xactimate.

Labor is generally the largest variable in construction-related tasks. Factors such as job size and complexity, accessibility, and whether the structure is occupied all have a significant effect on the time needed to complete the work. While labor productivity often varies between jobs, it is generally accepted in the industry that jobs can be categorized into one of two groups: 1) new construction and 2) restoration or remodeling. Within an estimate, customers can easily change their productivity default from Restoration/Service/Remodel to New Construction by checking the "New Construction" box on the Parameters screen in Xactimate.

1.    New Construction

The New Construction option provides a cost for each line item based upon the most efficient labor productivity available. This option is intended to be used for true new construction applications or for jobs in which a total "ground-up" rebuild is necessary. Additionally, it is possible that some portions of a large partial loss may be addressed using this efficiency setting. For example, as the rebuild process progresses, it is possible that a certain phase may be reached in which the remaining portions of the repair are more in line with a new construction scenario.

2.    Restoration / Service / Remodel

The Restoration/Service/Remodel option is for jobs other than total losses or new construction. When selected, this option provides a cost for each line item based upon a labor productivity that includes such things as drive time, mobilization costs, material delivery, and the overall reduction in productivity that occurs when repair professionals address the complex issues found in restoration and remodeling jobs (for example, matching drywall texture or working in an occupied home).

3.    Labor Minimums

In addition to performing the tasks required by a job, each tradesperson must also account for drive time, picking up materials, tool and equipment setup and take down, etc. Labor costs related to the time needed to perform these peripheral tasks are generally factored into each individual unit price. For example, the price per square foot quoted by a drywall installer will already account for the costs of performing these tasks based on the standard unit price for a job of moderate size. Since these peripheral tasks account for a very small portion of the overall time on the job, they average out over time when included in the unit price.

When a very small task or repair is required, however, these peripheral tasks can constitute a major portion of the overall time. Take the example of a small drywall repair of one square foot or less: The actual time spent performing the repair itself may be only 45 minutes. However, by the time all of these peripheral issues are taken into account, the tradesperson may have two to three hours involved in the repair.

For this reason, most trades have developed a minimum price or minimum amount of labor for which they must charge to effectively address these inefficiencies. Their standard unit price (square foot of drywall, square foot of paint, linear foot of baseboard, etc.) is therefore subject to this labor minimum

charge.

Each labor efficiency setting provides the option to apply an automated minimum charge to the task being performed. Using labor minimums, users can add standard line items containing materials as needed (DRY1/2, PNTSP, etc.). Xactimate will then supplement the labor portion of each trade until the predefined minimum charge is achieved. This is accomplished, when needed, by making a post-estimate adjustment to labor.

G.    Valuation (Xactimate)
      1.    Valuation Overview

            Valuation is a tool within the Xactimate application. It provides the detail needed to determine the approximate reconstruction costs.

            Valuation allows for quick entry of information to create a valuation using an interview tool. Information about the structure is used to build a dynamic model that determines which items and quantities are needed for reconstruction. Construction decisions are made based on combinations of information entered. The materials, labor, and equipment needed to build the structure are priced using the same area-specific pricing found in Xactimate.

      2.    Use of Valuation

            Valuation is an approximate reconstruction cost based on assumptions in the application and should not be considered as a final reconstruction estimate. As much information as is available should be entered into the application using the interview tool.

            Recommended Uses

            a.    States with valued policies

                  Valuation can be used to determine the approximate reconstruction cost when a Valued Policy law is involved. The payment should be supported by either a line-by-line estimate or a contractor's estimate.

            Non-Recommended Uses

            In losses where buildings are partially damaged, Valuation should not be used to obtain a replacement cost on the damaged portion of the building.

            Valuation should not be used in any other situation unless approved by the Zone P&C Claims Consultant.

            If there are any questions on the use of Valuation, contact your Estimatics Consultant.

H.    ITEL Workflow

      ITEL provides independent and objective evaluation services to determine specifications and replacement values of damaged flooring.  Claim handlers should use ITEL to help them in the evaluation process for flooring losses.  ITEL should be used on flooring losses involving carpet, vinyl flooring (both sheet and tile), laminate flooring, wood flooring and tile (in limited situations) flooring.

OG 75-07, Structural Loss Claim Handling

If replacement of flooring is necessary, the claim representative should make arrangements to obtain a sample of the carpet, pad, vinyl, wood, or laminate flooring.

Sample sizes needed for analysis are:

| | |
|---|---|
| Carpet: | 10" x 10" |
| Pad: | 6" x 6" |
| Vinyl: | 2" x 2" |
| Hardwood and Laminate: | 10" long x full width, including locking system on both edges |
| Tile: | 6" x 6" |

The claim representative should complete the State Farm Test Request Form showing the office address, their name and claim unit, and fax number. This will indicate to ITEL where to return the analysis report.

ITEL furnishes prepaid shipping envelopes and forms used for sending the samples. The shipping labels are pre-marked for overnight delivery and should not be changed. Requests for State Farm's mailing packets should be made through ITEL customer service (800-890-4835)

ITEL will perform an evaluation, prepare a report, and fax the report to the claim representative. Results of the evaluation will be reported on a next day service basis.

Top of Page

FOR INTERNAL STATE FARM USE ONLY
Contains information that may not be disclosed outside State Farm without authorization

Phillips, Anderson, et al. v. SFF & CC

PHILA00001225PROD

# EXHIBIT 7

## Claim Rep Draft

PHILLIPS, ANDERSON                                                                                   03-43H7-730

| | | | |
|---|---|---|---|
| Insured: | PHILLIPS, ANDERSON | Estimate: | 03-43H7-730 |
| Property: | 214 W Desert Ln | Claim Number: | 0343H7730 |
| | Phoenix, AZ 85041-8123 | Policy Number: | 03-J4-4660-2 |
| Cellular: | **Redacted** | Price List: | AZPH28_DEC15 |
| Type of Loss: | Fire | | New Construction |
| Deductible: | $1,000.00 | | |
| Date of Loss: | 12/6/2015 | | |
| Date Inspected: | 12/14/2015 | | |

### Summary for Coverage A - Dwelling - 33 Fire, Lightning, & Removal

| | |
|---|---|
| Line Item Total | 121,573.72 |
| General Contractor Overhead | 12,157.53 |
| General Contractor Profit | 12,157.53 |
| Sales Tax Prime Cont | 7,870.86 |
| Replacement Cost Value (Including General Contractor Overhead and Profit) | 153,759.64 |
| Less Depreciation (Including Taxes) | (17,441.93) |
| Less General Contractor Overhead & Profit on Recoverable & Non-recoverable Depreciation | (3,309.96) |
| Less Tax on General Contractor Overhead and Profit on Depreciation | (178.58) |
| Less Deductible | (1,000.00) |
| Net Actual Cash Value Payment | $131,829.17 |

### Maximum Additional Amounts Available If Incurred:

| | | | |
|---|---|---|---|
| Total Line Item Depreciation (Including Taxes) | 17,441.93 | | |
| General Contractor O&P on Depreciation | 3,309.96 | | |
| Tax on General Contractor O&P on Depreciation | 178.58 | | |
| Replacement Cost Benefits | | 20,930.47 | |
| Total Maximum Additional Amount Available If Incurred | | | 20,930.47 |
| Total Amount of Claim If Incurred | | | $152,759.64 |

### Sublimit Recap

| Description | Single Item Limit | Aggregate Limit | ACV | RCV | Overage |
|---|---|---|---|---|---|
| Dwelling Extension | $17,952.00 | $17,952.00 | $841.03 | $841.03 | $0.00 |
| | | | $841.03 | $841.03 | $0.00 |

Robert Gonzales
602-885-4503

**ALL AMOUNTS PAYABLE ARE SUBJECT TO THE TERMS, CONDITIONS AND LIMITS OF YOUR POLICY.**

Phillips, Anderson, et al. v. SFF & CC

PHILA00000125PROD

# EXHIBIT 8

## Claim Rep Draft

PHILLIPS, ANDERSON                                                                                      03-43H7-730

| | | | |
|---|---|---|---|
| Insured: | PHILLIPS, ANDERSON | Estimate: | 03-43H7-730 |
| Property: | 214 W Desert Ln | Claim Number: | 0343H7730 |
| | Phoenix, AZ 85041-8123 | Policy Number: | 03-J4-4660-2 |
| Cellular: | 602-332-2225 | Price List: | AZPH28_DEC15 |
| Type of Loss: | Fire | | New Construction |
| Deductible: | $1,000.00 | | |
| Date of Loss: | 12/6/2015 | | |
| Date Inspected: | 12/14/2015 | | |

### Summary for Coverage A - Dwelling - 33 Fire, Lightning, & Removal

| | |
|---|---:|
| Line Item Total | 131,774.94 |
| General Contractor Overhead | 12,891.96 |
| General Contractor Profit | 12,891.96 |
| Sales Tax Prime Cont | 8,346.30 |
| Replacement Cost Value (Including General Contractor Overhead and Profit) | 165,905.16 |
| Less Depreciation (Including Taxes) | (17,441.93) |
| Less General Contractor Overhead & Profit on Recoverable & Non-recoverable Depreciation | (3,309.96) |
| Less Tax on General Contractor Overhead and Profit on Depreciation | (178.58) |
| Less Deductible | (1,000.00) |
| Less Prior Claim Payment | (138,127.57) |
| Net Actual Cash Value Payment | $5,847.12 |

### Maximum Additional Amounts Available If Incurred:

| | | |
|---|---:|---:|
| Total Line Item Depreciation (Including Taxes) | 17,441.93 | |
| General Contractor O&P on Depreciation | 3,309.96 | |
| Tax on General Contractor O&P on Depreciation | 178.58 | |
| Replacement Cost Benefits | | 20,930.47 |
| Total Remaining Maximum Additional Amount Available If Incurred | | 20,930.47 |
| Total Amount of Claim If Incurred | | $164,905.16 |

### Sublimit Recap

| Description | Single Item Limit | Aggregate Limit | ACV | RCV | Overage |
|---|---:|---:|---:|---:|---:|
| Dwelling Extension | $17,952.00 | $17,952.00 | $841.03 | $841.03 | $0.00 |
| | | | $841.03 | $841.03 | $0.00 |

Robert Gonzales
602-885-4503

**ALL AMOUNTS PAYABLE ARE SUBJECT TO THE TERMS, CONDITIONS AND LIMITS OF YOUR POLICY.**

SF-PHILCLAIM 004746

# EXHIBIT 9

ARIZONA SUPERIOR COURT

MARICOPA COUNTY

ANDERSON PHILLIPS and JASMINE   )  No. CV2016-015809
PHILLIPS, husband and wife,     )
                                )
                                )
              Plaintiffs,        )
                                )
v.                               )
                                )
STATE FARM FIRE AND CASUALTY    )
CORPORATION, an Illinois        )
corporation,                     )
                                )
                                )
              Defendants.        )
_____)

VIDEOTAPED DEPOSITION OF ROBERT GONZALES

Phoenix, Arizona
April 4, 2018
9:46 a.m.

SEYMOUR REPORTING SERVICES
Arizona RRF No. R1000
PREPARED BY:                    137 East Elliot Road
                                Suite 2473
                                Gilbert, Arizona 85299
Donna DeLaVina, RPR              P 602.258.5800
Certified Reporter               F 888.881.5440
Certificate No. 50468            www.SRSreporting.com

ROBERT GONZALES   APRIL 04, 2018

1  it produces dollar amounts, right?

2      A.   Correct.

3      Q.   It produces -- assuming it's an RCV policy and

4  you know what RCV means, right?

5      A.   Correct.

6      Q.   Replacement cost value, right?

7      A.   Correct.

8      Q.   And so the concept of a replacement cost value

9  policy is you calculate what it would take to replace

10  the structure as if it was new, and then you depreciate

11  it to get what's called actual cash value, correct?

12      A.   Yes.

13      Q.   And those terms are often shorthand references

14  for those terms are, RCV, replacement cost value and

15  ACV, namely, actual cost value, right?

16      A.   Yes.

17      Q.   And the delta, the difference between them, is

18  called depreciation, correct?

19      A.   Correct.

20      Q.   So you figure out the cost to replace the

21  building new, as if it was new.  You deduct

22  depreciation for how worn out it might be and you end

23  up with ACV, actual cash value, correct?

24      A.   Correct.

25              MR. POLI:  Okay.  Mark it.

# EXHIBIT 10



**RBZ000I5**
**State Farm Fire and Casualty Company**
# Fire Claim File Print
# Financial Information

Route To:

---

## BASIC CLAIM INFORMATION

Claim Number: 03-43H7-730
Date of Loss: 12-06-2015
Policy Number: 03-J4-4660-2
Named Insured: PHILLIPS, ANDERSON V

---

## FINANCIAL SUMMARY

### Lines of Coverage

| Line | Coverage | Coverage Amount | Risk Amount |
|------|----------|-----------------|-------------|
| 001 | HO1WGH | 179,515 | 178,800 |
| 002 | JF WGH | 2,500 | 2,500 |

**Named Insured(s)**
33 / 001 - Fire/Lightning - Building

| Status | Reserve Amount | Last Reserve | Comment Code |
|--------|----------------|--------------|--------------|
| OPN - 10-03-2016 | **Redacted** | **Redacted** | NC - NonClass/NonCum Inj/Prop Damage |

| Indemnity Paid | Sub/Salvage | Net Indemnity | Expenses Paid |
|----------------|-------------|---------------|---------------|
| $145,473.63 | $0.00 | $145,473.63 | $900.00 |

| Assigned To | Unit | Location | SOJ | Suit/ADR: Yes |
|-------------|------|----------|-----|---------------|
| Robert Gonzales (CJNA) | HCCS Prox AZ Unit FG | HCCS Proximity Office | AZ | Negotiation: |

**Named Insured(s)**
34 / 001 - Fire/Lightning - Personal Property

| Status | Reserve Amount | Last Reserve | Comment Code |
|--------|----------------|--------------|--------------|
| OPN - 08-04-2016 | **Redacted** | **Redacted** | NC - NonClass/NonCum Inj/Prop Damage |

| Indemnity Paid | Sub/Salvage | Net Indemnity | Expenses Paid |
|----------------|-------------|---------------|---------------|
| $77,315.83 | $0.00 | $77,315.83 | $0.00 |

| Assigned To | Unit | Location | SOJ | Suit/ADR: |
|-------------|------|----------|-----|-----------|
| Delann Anglada (GOQF) | HCCS Prox AZ Unit FG | HCCS Proximity Office | AZ | Negotiation: |

**Named Insured(s)**
69 / 001 - Additional Living Expense

| Status | Reserve Amount | Last Reserve | Comment Code |
|--------|----------------|--------------|--------------|
| OPN - 12-08-2015 | **Redacted** | **Redacted** | NC - NonClass/NonCum Inj/Prop Damage |

| Indemnity Paid | Sub/Salvage | Net Indemnity | Expenses Paid |
|----------------|-------------|---------------|---------------|
| $32,750.55 | $0.00 | $32,750.55 | $2,238.29 |

| Assigned To | Unit | Location | SOJ | Suit/ADR: |
|-------------|------|----------|-----|-----------|
| Delann Anglada (GOQF) | HCCS Prox AZ Unit FG | HCCS Proximity Office | AZ | Negotiation: |

---

STATE FARM CONFIDENTIAL INFORMATION
Distribution on a Business Need to Know Basis Only

SF-PHILCLAIM 000163

## CLAIM TOTALS

| COL/Line/Participant | Indemnity Paid | Ded Refund | Sub/Salvage | Net Indemnity | Expenses Paid |
|---|---|---|---|---|---|
| 33 / 001 / Named Insured(s) | $145,473.63 | $0.00 | $0.00 | $145,473.63 | $900.00 |
| 34 / 001 / Named Insured(s) | $77,315.83 | $0.00 | $0.00 | $77,315.83 | $0.00 |
| 69 / 001 / Named Insured(s) | $32,750.55 | $0.00 | $0.00 | $32,750.55 | $2,238.29 |
| **Totals:** | **$255,540.01** | **$0.00** | **$0.00** | **$255,540.01** | **$3,138.29** |

## PAYMENTS

C denotes consolidated payment
E denotes EFT payment

| Payment Number | | Issued Date | Payee | Status | Amount | Auth ID |
|---|---|---|---|---|---|---|
| 124646266J | | 10-06-2016 | ANDERSON V. PHILLIPS & BANK OF AMERICA NA ISAOA ATIMA & SKIPTON & ASSOCIATES INC | Outstanding | $2,990.18 | CJNA |
| 124630737J | | 09-22-2016 | ALE SOLUTIONS | Paid | $2,574.36 | GOQF |
| 124609655J | | 09-01-2016 | ALE SOLUTIONS | Paid | $2,784.36 | GOQF |
| 124579694J | | 08-04-2016 | ANDERSON V. PHILLIPS & SKIPTON & ASSOCIATES INC | Paid | $3,499.18 | GOQF |
| 124563377K | E | 07-19-2016 | ALE SOLUTIONS INC | Paid | $2,784.36 | HQ35 |
| 124531917K | E | 06-16-2016 | ALE SOLUTIONS INC | Paid | $2,784.36 | HQ35 |
| 124504263K | E | 05-18-2016 | ALE SOLUTIONS | Paid | $2,784.36 | HQ35 |
| 124494541J | | 05-09-2016 | ANDERSON V. PHILLIPS & BANK OF AMERICA NA ISAOA ATIMA & SKIPTON & ASSOCIATES INC | Paid | $6,298.40 | CJNA |
| 124490172J | | 05-04-2016 | ANDERSON V. PHILLIPS & SKIPTON & ASSOCIATES INC | Paid | $24,368.95 | HQ35 |
| 124474416K | E | 04-19-2016 | ALE SOLUTIONS INC | Paid | $2,784.36 | HQ35 |
| 124467675J | | 04-13-2016 | ANDERSON V. PHILLIPS & SKIPTON & ASSOCIATES INC | Paid | $2,037.92 | CJNA |
| 124442086K | E | 03-17-2016 | ALE SOLUTIONS INC | Paid | $2,784.36 | HQ35 |
| 124434786J | | 03-10-2016 | ANDERSON V. PHILLIPS & SKIPTON & ASSOCIATES INC | Paid | $41,547.70 | HQ35 |
| 124417139J | | 02-23-2016 | ANDERSON V. PHILLIPS & SKIPTON & ASSOCIATES INC | Paid | $2,317.96 | CJNA |
| 124411480J | | 02-17-2016 | ALE SOLUTIONS INC | Paid | $2,784.36 | CJNA |
| 124389051J | | 01-27-2016 | ALE SOLUTIONS INC | Paid | $5,404.66 | CJNA |
| 124385672J | | 01-25-2016 | ANDERSON V. PHILLIPS & BANK OF AMERICA NA ISAOA ATIMA & SKIPTON & ASSOCIATES INC | Paid | $131,829.17 | CJNA |
| 124386251J | | 01-25-2016 | ALE SOLUTIONS INC | Paid | $7,665.80 | CJNA |
| 124362604J | | 12-31-2015 | SKIPTON & ASSOCIATES INC & ANDERSON V. PHILLIPS | Paid | $2,900.00 | CJNA |
| 124356947J | | 12-24-2015 | FORENSIC FIRE CONSULTANTS | Paid | $900.00 | CJNA |
| 524737702Q | | 12-07-2015 | ANDERSON V. PHILLIPS | Paid | $5,000.00 | CJNA |
| | | | **Grand Total:** | | **$258,824.80** | |

## RECOVERIES

| Check Number | Status | Entered Date | Recovery Amount | Expense Withheld | Type of Recovery |
|---|---|---|---|---|---|
| EFT0909942  E | Posted | 04-18-2016 | $146.50 | $0.00 | Indemnity/Expense/Other |
| | | **Grand Total:** | **$146.50** | **$0.00** | |

STATE FARM CONFIDENTIAL INFORMATION
Distribution on a Business Need to Know Basis Only

SF-PHILCLAIM 000164

# EXHIBIT 11

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

ANDERSON PHILLIPS and JASMINE        )
PHILLIPS, husband and wife,          )
                                     )
                Plaintiffs,          )
                                     )
          vs.                        ) No. CV 2016-013572
                                     )
STATE FARM FIRE and CASUALTY         )
COMPANY, an Illinois corporation,    )
                                     )
                Defendant.           )
_____ )

VIDEOTAPED DEPOSITION OF ANDERSON PHILLIPS

Phoenix, Arizona
March 30, 2018
12:36 p.m.

REPORTED BY:
CATHY J. TAYLOR, RPR, CRR, CRC
Certified Reporter
Certificate No. 50111

PREPARED FOR:
ASCII/CONDENSED

(CERTIFIED COPY)

1   about stress from the situation?

2       A.   I probably see my mother once a month.  So she

3   would always ask for updates about how everything's going,

4   and it would come up in conversation.

5       Q.   Okay.  And how about -- how about your sister?  Did

6   you -- and I'm going to -- I'm going to again ask the -- the

7   more narrow question.

8                Did you talk to your sister about stress that

9   you had because of State Farm's handling of the -- of your

10  insurance claim?

11      A.   No.  There's no difference in the conversation

12  between my mother and my sister.

13      Q.   Okay.  Do you all have an accountant that does your

14  taxes, or do you -- do you do them yourselves?

15      A.   We do them ourself.

16      Q.   And has that been the same since December of 2015?

17      A.   I don't know when it switched.  We were using

18  H&R Block for some time.  And at some point we switched to

19  TurboTax, but I'm not sure what year that was.

20      Q.   Okay.  Is there any money that you think State Farm

21  owes you under the insurance policy that it hasn't paid you?

22      A.   Can you ask that one more time, please.

23      Q.   Sure.  Is there any money that you think State Farm

24  owes you under the insurance policy --

25      A.   Under the insurance policy?

77

1      Q.     -- that it hasn't paid you?

2             Yes.

3      A.     Yes, in terms of the personal property that still

4  has not been recouped.

5      Q.     Okay.  Any other money State Farm owes you under

6  the insurance policy that hasn't -- hasn't been paid?

7      A.     To me, to my family under the policy, no.

8             MS. BRADHAM:  Okay.  Okay.  If we could take a

9  break, I'll look at my notes.  I will probably have a few

10 more questions for you --

11            THE WITNESS:  Okay.

12            MS. BRADHAM:  -- but they'll go faster if I'm

13 more organized.

14            THE WITNESS:  Okay.

15            THE VIDEOGRAPHER:  Going off the record.  The

16 time is 2:20 p.m.  This is the end of media 1.

17            (Recess from 2:20 p.m. to 2:39 p.m.)

18            (Exhibit 16 marked for identification.)

19            THE VIDEOGRAPHER:  Back on the record.  The

20 time is 2:39 p.m.  This begins media 2.

21 BY MS. BRADHAM:

22     Q.     Okay.  What's your understanding of what caused the

23 fire?

24     A.     A faulty extension cord that was connected to the

25 Christmas lights.  The extension cord caught on fire.  The

# EXHIBIT 12

**State Farm®**
Providing Insurance and Financial Services
Home Office, Bloomington, Illinois 61710



March 7, 2016

**State Farm Fire Claims**
PO Box 106169
Atlanta, GA 30348-6169

Justin Skipton
8710 E. Vista Bonita Dr.
Scottsdale, AZ 85255

RE:   Claim Number:      03-43H7-730
      Date of Loss:       December 8, 2015
      Insured Location:   214 W. Desert Lane
                          Phoenix, AZ 85041

Dear Mr. Skipton:

This is in response to your letter dated March 1, 2016.

Regarding the New Construction pricing, as you indicated and I agree, Xactware provides an option to show costs based on restoration, service, and remodeling or new construction environments.

According to Xactware, restoration, service, and remodeling work is done in existing structures, often with people still living in the buildings. In this environment, construction workers must work with existing features and additional time is often required to make sure the work does not cause additional damage.

Xactware indicates new construction is more efficient because work moves forward in a logical sequence and workers don't need to worry about protecting existing features so restoration service and remodeling work often takes longer than it does when doing the same work in new construction.

Based on the amount of damage to Mr. Phillips' home, the required repairs will be completed in a new construction environment.

If you have any questions, please contact me.

Sincerely,

Robert Gonzales
Claim Representative
602 885-4503
State Farm Fire and Casualty Company

Phillips, Anderson, et al. v. SFF & CC

PHILA00000266PROD

# EXHIBIT 13

602 332 2225 (c)
602 299 9089 (c)
Jasmine

A. ANDERSON

# adanac

ENTERPRISES CORPORATION
G E N E R A L   C O N T R A C T I N G
9299 W. Olive Suite 814, Peoria, AZ 85345
Ofc:623.266.2761/Cell:602.292.3987/Fax:623.328.5186
License# - 189034-KB01

## AUTHORIZATION TO PROCEED WITH WORK

This is to certify that I, **A. Anderson Phillips** (Owner) hereby authorize Adanac Enterprises Corp. (Adanac) to proceed with the repair and replacement of damaged property and begin any emergency services regarding the property located at **2441 W DESERT LN  PHOENIX AZ  85041**. Owner and Adanac agree that this authorization covers the scope of repairs as agreed and approved by Owner and their insurance company, as well as any additional work agreed to verbally or in writing. The cost of repairs is $ **53,759.64** but later to be changed to the final agreed scope amount.

Owner agrees to pay the deductible and all the monies designated for repair of the structure, including depreciations, supplements or charges as may be determined by the insurance company or any governing authorities. Adanac will begin work promptly after, (1) approval of insurance scope, (2) issuance of permit, (if required by a governing body) and (3) upon receiving the initial insurance payment and deductible. Completion of all three items shall constitute the start date. The completion date will be commensurate with the amount of work to be completed from the agreed scope and given to Owner by way of 'Notice of Completion Date' by Adanac or within four (4) months from issuance of a permit if notice by Adanac is not created prior to completion.  Weather, delays from inspections or any changes made to this agreed scope during the course of construction will automatically extend the completion date.

Owner agrees that upon receipt of any insurance draft for the structure they will endorse and deliver to Adanac within five days of receipt. Owner understands that Adanac will incur costs if any monies are owed, outstanding and delinquent. Accordingly, for any unpaid balance owed by Owner for more than 15 days, Owner agrees to pay a service charge if 1-1/2% per month of their total obligation to Adanac Enterprises Corp. for any attorney's fees, collection agency's and court costs incurred to collect any unpaid balance. Owner gives Dave Fix and/or Sue Fix of Adanac Limited Power of Attorney to sign or endorse for, and on behalf of Owner, any documents or proceed checks designated for repair and all phase of the claim on the subject property. (initials)_____  (X)

<u>Authorization to name Adanac as an Additional Payee & For Direct Contact:</u> By signing below, Owner hereby authorizes all insurance and/or mortgage companies and all adjusters to name Adanac as an additional payee on all checks for repairs in connection with this agreement and allow David or Sue Fix, Tammy Adams or Mark Riggs to communicate directly with you regarding inspections, payments/drafts or financial arrangements of any kind regarding this claim on my/our behalf.

State Mandatory information: Should any Provision of this contract be held to be invalid of Unenforceable, the validity and enforceability of the remaining provisions shall not be affected thereby. Owner has right to file written complaint with ROC for an alleged violation of section 32-1154, Subsection A. Any complaint must be made within the applicable time period set forth in section 32-1155- <u>www.azroc.gov</u>, 602-542-1525.

BY SIGNING BELOW AGREES TO HAVE READ, UNDERSTAND AND AGREE TO ALL OF THE ABOVE TERMS

| | | |
|---|---|---|
| X _____ | 2-15-16 | |
| Owner/Agent (signature) | Date | Mortgage Co. & Loan |
| ANDERSON PHILLIPS | 2/15/16 | |
| Owner/Agent (printed) | Date | Insurance Co & Policy # |
| Owner Email _____ | Owner Phone | Claim #        SS#        Date of Loss # |
| _____ | 2/15/16 | DAVID  FIX        2/15/16 |
| Adanac Enterprises Corp. (signature) | Date | Adanac Enterprises Corp. (printed) |

Phillips 000590

# EXHIBIT 14

1

1          SUPERIOR COURT OF ARIZONA

2              IN MARICOPA COUNTY

3

4    Anderson Phillips and Jasmine      )No. CV2016-013572
     Phillips, husband and wife         )
5                                       )
             Plaintiffs,                )
6                                       )
                   vs.                  )
7                                       )
     State Farm Fire and Casualty       )
8    Company, an Illinois corporation,  )
                                        )
9              Defendants.              )
     _____)

10

11

12         VIDEOTAPED DEPOSITION OF DAVID FIX

13

14                 Phoenix, Arizona
                    May 4, 2018
15                  9:00 a.m.

16

17

18

19

20   Reported by:
     JENNIFER HANSSEN, RPR
21   Certified Reporter No. 50165

22   PREPARED FOR:
     ASCII/CONDENSED
23

24   (Certified Copy)

25

David Fix - May 4, 2018

68

1    agreement not in writing to do upgrades to the

2    Phillips' property?

3                    MR. SILVERMAN:  Foundation.

4        A.    May have been verbal, but I believe were

5    followed up with a -- put onto a change order form.

6        Q.    BY MS. BRADHAM:  Okay.  Okay.  So -- and we'll

7    get to some of those -- those in a moment.

8                    So then you say, this next sentence here

9    looking back on Exhibit 3, "The cost of repairs is

10   $153,759.64, but later to be changed to the final

11   agreed scope amount."

12                   Did I read that right?

13       A.    Yes.

14       Q.    Okay.  And so as of the point this contract

15   was signed in February 2016, you knew that the Phillips

16   and State Farm had agreed to a scope with a cost of

17   repairs of $153,759.64; right?

18                    MR. BARRETT:  Objection to form and

19   foundation.

20                    MR. SILVERMAN:  Join.

21       A.    Most likely, yes.

22       Q.    BY MS. BRADHAM:  Okay.  And -- and so you say

23   "most likely" because typically what you'd do is you'd

24   put the insurance company's agreed amount in here as

25   the cost of repairs; right?

David Fix - May 4, 2018

69

```
1              MR. BARRETT:  Again, objection, form and
2       foundation.
3              MR. SILVERMAN:  Join.
4       A.    Usually, yes.
5       Q.    BY MS. BRADHAM:  Okay.  And then it's later to
6  be changed to the final agreed scope amount, so that
7  means if the Phillips and State Farm later agree to a
8  greater scope, this contract that you have with the
9  Phillips would be changed to reflect that greater
10 agreed-upon scope; right?
11             MR. BARRETT:  Objection, form,
12      foundation.
13             MR. SILVERMAN:  Join.
14      A.    Correct.
15      Q.    BY MS. BRADHAM:  Okay.  And did you ever have
16 any contract with the Phillips for work you did on the
17 fire repairs where they agreed to pay you more than
18 State Farm's agreed-upon scope amount?
19             MR. BARRETT:  Form, foundation.
20             MR. SILVERMAN:  Join.
21      A.    For the fire repairs?
22      Q.    BY MS. BRADHAM:  Yes.
23             MR. BARRETT:  Again, noted objection.
24             MR. SILVERMAN:  Join.
25      A.    Can you state it again?
```

David Fix - May 4, 2018

70

1     Q.    BY MS. BRADHAM:  Sure.

2              Did you ever have any contract with the

3     Phillips for the fire repairs, work you were doing to

4     repair damage from the fire, where they agreed to pay

5     you more than State Farm's agreed-upon scope?

6              MR. BARRETT:  Again, form, foundation.

7              MR. SILVERMAN:  Join.

8     A.    I would say no.

9     Q.    BY MS. BRADHAM:  Okay.  And you're not aware

10    of any other contract that you've got with the Phillips

11    for the fire repairs other than this Exhibit 3 we're

12    looking at; right?

13    A.    Correct.

14    Q.    Okay.  All right.  Now, looking down at the

15    second paragraph, second to last sentence of the second

16    paragraph, "The completion date will be commensurate

17    with the amount of work to be completed from the

18    agreed-upon scope and given to the owner by way notice

19    of completion date by Adanac."

20              And I didn't see in -- in what you or the

21    insureds have produced to us any kind of notice of

22    completion date document.  Did you find a document like

23    that in your files?

24    A.    I didn't, but we usually do -- we do have that

25    document that we usually have filled out and submitted,

# EXHIBIT 15

1

1           SUPERIOR COURT OF ARIZONA

2               IN MARICOPA COUNTY

3

4   Anderson Phillips and Jasmine      )No. CV2016-013572
    Phillips, husband and wife         )
5                                      )
            Plaintiffs,                )
6                                      )
                vs.                    )
7                                      )
    State Farm Fire and Casualty       )
8   Company, an Illinois corporation,  )
                                       )
9           Defendants.                )
    _____)

10

11

12        VIDEOTAPED DEPOSITION OF DAVID FIX

13

14               Phoenix, Arizona
                 May 4, 2018
15               9:00 a.m.

16

17

18

19

20  Reported by:
    JENNIFER HANSSEN, RPR
21  Certified Reporter No. 50165

22  PREPARED FOR:
    ASCII/CONDENSED

23

24  (Certified Copy)

25

87

1   with a line through it.

2                   Do you see that?

3       A.    Correct.

4       Q.    So you didn't charge the Phillips anything

5   extra for doing these particular upgrades?

6       A.    Correct.

7       Q.    Okay.  And then it says, "Funds for this

8   change order are to be credited from the scope of work

9   known as," and then there's a -- there's a blank line

10  there.

11                  Do you see that?

12      A.    Correct.

13      Q.    And so you didn't -- if I understand right,

14  sometimes someone might say, "Well, you know, I don't

15  -- I want -- I want to put in tile instead of carpet,"

16  and so you're crediting out some -- you know, the cost

17  of the carpet against the cost of the tile.  Is that

18  something that sometimes happens?

19                  MR. BARRETT:  Objection, form,

20  foundation.

21                  MR. SILVERMAN:  Join.

22      A.    That is correct.

23      Q.    BY MS. BRADHAM:  And in this case, there was

24  nothing from -- oh, let me ask this:  The scope of work

25  you're referring to here is that State Farm agreed

95

1    Adanac, your company, to do the things that are listed

2    here on Exhibit 1?

3        A.    I do not.

4        Q.    Okay.  Why did you agree to do these things

5    for the Phillips that are listed on Exhibit 1 at no

6    charge?

7        A.    You know, a lot of times, it's -- it's a

8    relationship with them, if you like the customer and

9    you don't think it's going to be that costly -- costly

10   to you.  Sometimes it's to maybe get the job.

11       Q.    Okay.

12       A.    You know, I don't recollect exactly, but...

13       Q.    And so you don't recollect in this particular

14   instance with the Phillips why you agreed to do the

15   things listed on Exhibit 1 for free?

16       A.    Other than it's customary that we do do that

17   type of thing, no.

18       Q.    Okay.  So typically, in your work, you will do

19   those sort of extras for your insureds who have fire

20   damage at no cost?

21                  MR. SILVERMAN:  Form.

22                  MR. BARRETT:  And foundation.

23       A.    Not just fire.  I mean, it could be any job.

24   I've done new jobs where we've made changes and not

25   charged.

# EXHIBIT 16

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

ANDERSON PHILLIPS and JASMINE       )
PHILLIPS, husband and wife,         )
                                    )
                Plaintiffs,         )
                                    )
          vs.                       ) No. CV 2016-013572
                                    )
STATE FARM FIRE and CASUALTY        )
COMPANY, an Illinois corporation,   )
                                    )
                Defendant.          )
_____)

VIDEOTAPED DEPOSITION OF ANDERSON PHILLIPS

Phoenix, Arizona
March 30, 2018
12:36 p.m.

REPORTED BY:
CATHY J. TAYLOR, RPR, CRR, CRC
Certified Reporter
Certificate No. 50111

PREPARED FOR:
ASCII/CONDENSED

(CERTIFIED COPY)

**Anderson Phillips - March 30, 2018**
**Videotaped**

6

1              Will you agree to do that for me?

2      A.    Yes, I do.

3      Q.    Thank you.

4              Okay.  So in your wife's deposition, we talked

5  about various improvements that were made to the property

6  after the fire.

7              Are there any improvements that you know about

8  that were made to the property after the fire that we didn't

9  talk about in your wife's deposition?

10     A.    No.  All the improvements that were made were

11 mentioned in the previous deposition.

12     Q.    Okay.  And now I want to talk to -- a little bit

13 about some of the questions that your wife couldn't answer

14 that -- that you might be able to answer.  And one of those

15 is about -- about payment.

16             Have you ever paid any -- any money to Skipton

17 out of your own pocket?

18     A.    Yes.

19     Q.    Okay.  And tell me -- tell me what you've paid to

20 Skipton out of your own pocket.

21     A.    We paid for the windows to be replaced.

22     Q.    Okay.

23     A.    We also paid for the countertops in the kitchen.

24             Those are, I think, the two main things at

25 this time that I can remember that we did pay out of pocket.

**Anderson Phillips - March 30, 2018**
**Videotaped**

7

1     Q.    Okay.  And, again, you understand what I mean when

2  I say out of pocket, meaning payments that you're making,

3  whether from literally cash in a pocket or -- or a check

4  versus payments that State Farm's making --

5     A.    Absolutely.

6     Q.    -- on your behalf?

7     A.    Yes.

8     Q.    Okay.  And when I asked my original question, I

9  asked about payments out of pocket to Skipton.  And I just

10 want to clarify here.  For the windows and the countertops,

11 were those payments made to Skipton or to Adanac and the

12 supplier of the countertops?

13    A.    Sorry.  Those payments were made to Adanac and the

14 suppliers, not to Skipton.

15    Q.    Okay.  Thank you.

16          So let's go through those.  So the -- the

17 windows.  Who did you pay on the windows?

18    A.    I can't remember if it was Don or Mirko.  I believe

19 it was Don who we paid.

20    Q.    Okay.  All right.  And how did you make that

21 payment?

22    A.    I believe it was cash.

23    Q.    How much was it?

24    A.    Right around $4,000.

25    Q.    Okay.  Did --

1   various things where -- where you've said you might have paid

2   cash.

3                  Is that cash that you -- you had received from

4   the contents payments and that's why you had cash -- that

5   much cash on hand?

6       A.    We had cash before as well.

7       Q.    Okay.

8       A.    I just like to keep cash in the house.

9       Q.    Okay.  So how much cash do you tend to just keep in

10  the house, not -- not in the bank?

11      A.    Five to 7,000.

12      Q.    Okay.  Do you recall -- what happened to that

13  receipt that you got from -- from the windows, from the

14  payment on the windows?

15      A.    I don't know.  I know we looked for it through our

16  files while we were out of the home, our -- our -- the file

17  cabinet has moved around a couple of times, but I don't know

18  exactly where the -- where the receipt is.  I did not reach

19  out to Adanac directly to ask for it.

20      Q.    Okay.

21      A.    They may or should have a copy of it.  But we

22  looked for it at home, and we weren't able to find it.

23      Q.    Okay.  Okay.  So is there anything else apart

24  from -- we've got -- we've got certain appliances purchased

25  at Lowe's, we've got the Ivan countertop payment, and we've

Anderson Phillips - March 30, 2018
Videotaped

27

1   got the Adanac window payment.

2                   Any -- any -- any other payments that you all

3   made out of pocket for the repairs or in connection with

4   repairs or improvements?

5       A.    Not that I can remember at this time.

6       Q.    Okay.  And let me ask -- I didn't ask that question

7   very well.  I just want to make clear I'm talking about both

8   the repairs and the improvements.

9                   Is there anything else you remember that you

10  paid out of pocket?

11      A.    No, not that I can remember at this time.

12      Q.    Okay.

13                  (Exhibit 14 marked for identification.)

14  BY MS. BRADHAM:

15      Q.    Okay.  Exhibit 14 is a document that was produced

16  to us by Adanac in response to a request that we made that

17  they give us all the documents having to do with the work

18  that they had done on your house.  And so I just want to

19  go -- go through this.

20                  It looks to me like this document contains

21  certain selections that you all had made for different things

22  in the house, you know, appliances and -- and tile, and

23  there's -- there's some pictures of the bathroom tile --

24      A.    Uh-huh.

25      Q.    -- and so forth.

Anderson Phillips - March 30, 2018
Videotaped

57

1     Q.    Sure.  At least at the time of this contract --

2     A.    Yes.

3     Q.    -- Adanac is estimating four months from the

4   issuance of the permit to complete repairs; right?

5     A.    Yes.

6     Q.    So at the time of this contract, Adanac wasn't

7   telling you it's, in fact, going to take more time to

8   complete the repairs because of some chain reaction from --

9     A.    Right.

10    Q.    -- from not being paid enough?

11    A.    No.  There was no expectation that it would take

12   longer.

13    Q.    Okay.  All right.  Is there any particular delay

14   you can point to that you say that delay is because of a

15   chain reaction from State Farm not paying enough on the

16   claim?

17    A.    Specifically, no.

18    Q.    Okay.  Is there any repair that you think needed to

19   be done but that State Farm didn't pay for?

20    A.    Not that I know of specifically, no.

21    Q.    Is it possible that the reason Adanac couldn't meet

22   the four-month estimate was because of its own internal

23   operational problems --

24              MR. MOON:  Object to the form.

25              (Next page, please.)

**EXHIBIT 17**

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

ANDERSON PHILLIPS and JASMINE            )
PHILLIPS, husband and wife,              )
                                         )
               Plaintiffs,               )
                                         ) No. CV2016-015809
vs.                                      )
                                         )
STATE FARM FIRE AND CASUALTY             )
CORPORATION, an Illinois                 )
corporation,                             )
                                         )
               Defendant.                )
_____ )

VIDEOTAPED DEPOSITION OF ABEL COSTALES

Scottsdale, Arizona

May 18, 2018

9:35 a.m.

PREPARED BY:               SEYMOUR REPORTING SERVICES
                           Arizona RRF No.  R1000
Kelly R. Rexroat, RPR      137 East Elliot Road, #2473
Certified Reporter         Gilbert, Arizona 85299
Arizona CCR No. 50940      (P) 602.258.5800
                           (F) 888.881.5440

ABEL COSTALES   MAY 18, 2018

1   see that?

2        A.   Yes.

3        Q.   Okay.  And so I'm going to read from 135

4   line 2 to 135 line 12 and just to listen as I read,

5   and I'm going to ask you if I've read it correctly

6   after I'm done.

7        A.   Okay.

8        Q.   "Question, you received that directive from

9   your team manager in that meeting six to seven years

10  ago Abel Costales; correct?  Answer correct.

11            When you received that directive that new

12  construction directive, your understanding from your

13  team manager back then six to seven years ago is that

14  this was a new change in corporate policy by

15  corporate headquarters of State Farm; correct?

16  Answer, I don't know if I said it was a new change in

17  policy.  I don't believe I used those terms."

18            I'll read on to line 18.  "Well, when asked

19  about that until the new construction directive came

20  down six to seven years ago the normal routine for

21  you and the other people that you worked with on your

22  team was to use restoration pricing on large loss

23  fire claims, right?  Answer yes."

24            Did I read that correctly from his

25  deposition?

ABEL COSTALES  MAY 18, 2018

1    A.  Yes.

2    Q.  So what I want to ask you is -- now, you've

3  testified that it is not correct that you did not

4  give a directive six to seven years ago to

5  Mr. Gonzales to use new construction pricing on

6  Xactimate estimates.  Did I understand that's your

7  testimony?

8    A.  I did not give a directive.

9    Q.  Did you give something other than a

10  directive?

11    A.  Yes, what I recall from that time was that

12  I -- it was explained to me and I explained it to my

13  team, I shared the information with my team, that

14  Xactimate had this labor efficiency option available.

15    I kind of talked about kind of what that

16  meant to my understanding, and then I told my team

17  that if we have losses that fit that kind of criteria

18  that should be considered with using, but I never

19  gave a directive.

20    Q.  Now, you said explained to me.  Who

21  explained to you?

22    MS. BRADHAM:  Form.

23    THE WITNESS:  Sorry.

24    MS. BRADHAM:  Go ahead.

25    A.  That information would have been provided to

1   answered.

2        Q.  (By Mr. Silverman)  Let me just add.  Do you

3   have anything to add to your prior answer?

4                  MS. BRADHAM:  Form.

5        A.  I would just say again that from my

6   understanding and from how I explained it, there was

7   never any mandate to say we have to do one thing or

8   another on any particular claim.  I think at least I

9   try to be in the company the way I get my information

10  is that there is nothing definitive.  Every claim has

11  its own set of facts and circumstances, and we're

12  supposed to consider all of that and determine how

13  best to apply the policy.

14           So to say there was a mandate, I would say,

15  well, we never had a mandate and that's why I'm just

16  having difficulty with saying, yeah, there was no

17  mandate.

18       Q.  (By Mr. Silverman)  Well, now, if somebody

19  thought that there was a mandate -- well, strike

20  that.

21           Do you know -- well, have you had

22  discussions with any adjustors you supervise about

23  whether the use of pricing software would be

24  appropriate or not appropriate in that particular

25  claim?

# EXHIBIT 18

THOMAS E. MOSS
PHILLIPS vs STATE FARM

July 31, 2018
1–4

**Page 1**

```
1              ARIZONA SUPERIOR COURT
                  MARICOPA COUNTY
2

3   ANDERSON PHILLIPS and           )
    JASMINE PHILLIPS, husband       )
4   and wife,                       )
                                    )
5      Plaintiffs,                  )
                                    )
6      -vs-                         )  No. CV-2016-015809
                                    )
7   STATE FARM FIRE AND             )
    CASUALTY CORPORATION, an        )
8   Illinois corporation,           )
                                    )
9      Defendant.                   )
10
11
12
13
              THE VIDEOTAPED DEPOSITION of THOMAS
14  E. MOSS, the deponent herein, called by the
    Plaintiff for examination pursuant to notice and
15  pursuant to the provisions of the Code of Civil
    Procedure and the Rules of the Supreme Court
16  thereof pertaining to the taking of depositions,
    taken before me, Jill A. Bleskey, CSR-RPR, License
17  No. 084-004430, a Notary Public in and for the
    State of Illinois, at Eastland Suites, 1801
18  Eastland Suites, in the City of Bloomington, County
    of McLean, and State of Illinois on the 31st day of
19  July, A.D., 2018, commencing at 10:02 a.m.
20
21  ---------------------------------------------
22              Jill A. Bleskey, RPR
                   CSR #084-004430
23
```

**Page 2**

```
1                  APPEARANCES
2   For the Plaintiff:
3      STEPHEN SILVERMAN LAW
       Attorneys at Law
4      6945 East Sahuaro Drive, Suite 125
       Scottsdale, Arizona 85254
5      (480)747-0850
       steve@stephensilverman.com
6      BY:  Mr. Stephen SIlverman
7   For the Defendant:
8      STEPTOE & JOHNSON, LLP
       Attorneys at Law
9      201 East Washington Street, Suite 1600
       Phoenix, Arizona 85004
10     (602)257-5244
       ktilleman@steptoe.com
11     BY:  Mr. Karl M. Tilleman
12  Videographer:
13     Mr. Tim Coverstone
14               I N D E X
15  EXAMINATION CONDUCTED              PAGE
16  Mr. Silverman                        4
17             E X H I B I T S
18  Exhibit No.   Description          Page
19  1    Not Identified                   3
    2    Not Identified                   3
20  3    November 2014 Operation Guide 7505,   129
         Structural Loss Claim Handling
21  4    February 2012 Operation Guide 7505,   133
         Structural Loss Claim Handling
22
    NOTE:  Exhibits attached to transcripts
23
```

**Page 3**

1        (At which time, Moss Deposition
2   Exhibit Numbers 1 and 2 were marked for
3   identification, and the following proceedings were
4   conducted;)
5        THE VIDEOGRAPHER:  This is Tape
6   Number 1 to the videotaped deposition of State
7   Farm's corporate designee, Tom Moss, in the matter
8   of Anderson and Jasmine Phillips versus State Farm
9   Fire and Casualty Corporation being heard before
10  the Arizona Superior Court for Maricopa County,
11  Case Number CV-2016-015809.
12        This deposition is being held at 1801
13  Eastland Drive in Bloomington, Illinois.  Today's
14  date is July the 31st, 2018 and the time indicated
15  on the video screen is 10:02 a.m.  My name is Tim
16  Coverstone, I'm the Videographer, and our Court
17  Reporter is Jill Bleskey.  Counsel please introduce
18  themselves and state their affiliations after which
19  our witness will be sworn in.
20        MR. SILVERMAN:  Stephen Silverman for
21  the plaintiff.
22        MR. TILLEMAN:  Karl Tilleman for the
23  defendant State Farm.

**Page 4**

1        THOMAS E. MOSS,
2        The witness, having been first duly
3   sworn upon his oath, testified as follows:
4        EXAMINATION CONDUCTED
5        BY:  MR. SILVERMAN
6   Q.    State your name, sir.
7   A.    Thomas Edward Moss.
8   Q.    And what do you do?
9   A.    I work for State Farm Insurance.
10  Q.    And what's your title?
11  A.    Claim consultant.
12  Q.    What is a claim consultant?
13  A.    My primary role as a claim consultant
14  is to provide oversight and guidance for our claim
15  associates.
16  Q.    How long have you been a claim
17  consultant?
18  A.    In October it will be ten years.
19  Q.    What's your area of -- what area do
20  you work in, nationwide or just a particular
21  region?
22  A.    So that's a little bit of a mix
23  there.  So primarily I work with Texas.  So --



Page 97

1  settings new construction, comparing that to
2  restoration service remodel, there are
3  considerations within that new construction setting
4  where labor efficiencies -- things are looked at
5  for those labor efficiencies such as does the
6  contractor have access to the home, is the home
7  still occupied by the policyholder, can they leave
8  their equipment and have it set up every day, do
9  they have to do clean up every day.  So those are
10  the things that I'm aware of under that new
11  construction setting that Xactware considers.
12      Q.     Is that different than how the new
13  construction pricing data is used at State Farm
14  now?
15          MR. TILLEMAN:  Form, foundation.
16          THE WITNESS:  So I'll share with you
17  my understanding.  So within the labor efficiency
18  settings there's new construction and there's
19  restoration service remodel.  Both of those
20  settings use the same labor price regardless,
21  that's a reconstruction labor price that they use.
22  But new construction setting and restoration
23  service remodel allow for different labor times

Page 98

1  based on efficiencies that can be gained.  So if
2  it's that new construction setting then there are
3  assumptions made that a contractor can be more
4  efficient doing that work.
5      Q.     Well, I guess my question is this.
6  When -- do you agree with me that the new
7  construction setting should only be used when
8  there's going to be less set up and clean up time
9  and you don't have accessibility as a
10  consideration?
11          MR. TILLEMAN:  Form and foundation.
12          BY:  MR. SILVERMAN
13      Q.     Agree or disagree?
14          MR. TILLEMAN:  Same objections.
15          THE WITNESS:  There are multiple
16  considerations that State Farm would look at to see
17  when the new construction setting would be used.
18          BY:  MR. SILVERMAN
19      Q.     So -- additional to what I just read?
20      A.     As I stated earlier, we would look to
21  see if there are efficiencies that could be gained
22  with the work based on the extent of damage that
23  was done to the home.  If we felt that those

Page 99

1  efficiencies would be gained by a contractor then
2  we would utilize the new construction setting based
3  on the unique factors of that loss.
4      Q.     Now, you are familiar that Robert
5  Gonzales said that the new construction setting was
6  to be used on all large loss fire claims?
7          MR. TILLEMAN:  Form.
8          THE WITNESS:  I have read through
9  parts of his deposition one time.  Without seeing
10  that in front of me, I couldn't tell you
11  specifically.  I believe that's what he said that
12  it was to be used on all.
13          BY:  MR. SILVERMAN
14      Q.     Is that a correct statement of what
15  State Farm's practice is?
16      A.     That is not a correct statement.
17      Q.     Is the new construction setting used
18  by adjusters other than large loss adjusters?
19      A.     That setting would be used by any
20  adjuster that's writing an estimate for a home when
21  it's a large partial loss or constructed total loss
22  or total loss.  So we have -- and I'm not trying to
23  be evasive.  We have adjusters that are part of

Page 100

1  large loss teams and we have other adjusters that
2  aren't part of the team but based on their
3  territory they might handle a large loss.  And so
4  that's why I phrased the answer the way I did.
5          MR. SILVERMAN:  We have to change
6  tapes so why don't we take a break.
7          THE WITNESS:  Thank you.
8          THE VIDEOGRAPHER:  Sure.  This is the
9  Videographer.  We're going to go off the record at
10  12:11 p.m.  We're off the record.
11          (At this point in the proceedings, a
12  short recess was taken, after which the following
13  proceedings were conducted;)
14          THE VIDEOGRAPHER:  This is the
15  Videographer.  Going back on the record at 1:00
16  p.m.
17          BY:  MR. SILVERMAN
18      Q.     Now, right before the break I had
19  asked you about Robert Gonzales and you told me
20  that he -- his testimony about when new
21  construction issues started was incorrect.  And
22  then I was about to ask you so what is the --
23  what's your correction of Robert Gonzales's



# EXHIBIT 19

1

**MERLIN LAW GROUP P.A.**
2   Michael N. Poli (State Bar No. 006431)
mpoli@merlinlawgroup.com
3   Lawrence R. Moon (State Bar No. 017000)
lmoon@merlinlawgroup.com
4   2999 North 44th Street, Suite 520
Phoenix, Arizona 85018
5   Telephone: (480) 315-9980
Facsimile:  (480) 315-9984
6

7

**STEPHEN SILVERMAN LAW**
8   Stephen E. Silverman (State Bar No. 016757)
steve@stephensilverman.com
9   6945 E. Sahuaro Dr., Ste. 125
Scottsdale, AZ  85254
10   Telephone:  (480) 747-0850
Facsimile:  (480) 400-1065
11

12   *Attorneys for Plaintiff*

13
**ARIZONA SUPERIOR COURT**
14
**MARICOPA COUNTY**
15

16
| | |
|---|---|
| ANDERSON PHILLIPS and JASMINE PHILLIPS, husband and wife, | Case No.  CV2016-015809 |
| Plaintiffs, | **PLAINTIFFS' THIRD SUPPLEMENTAL RULE 26.1 DISCLOSURE STATEMENT** |
| v. | (Assigned to Hon. Sherry K. Stephens) |
| STATE FARM FIRE AND CASUALTY CORPORATION, an Illinois corporation, | |
| Defendant. | |

24

25        Pursuant to Arizona Rule of Civil Procedure 26.1, Plaintiffs Anderson Phillips and

26   Jasmine  Phillips  (Plaintiffs")  hereby  supplements  their  disclosures  as  follows  (*new*

27   *information appears in bold italic font*):

28

1

I.     **FACTUAL BASIS FOR THE CLAIM.**

On December 6, 2016, a fire occurred at Plaintiffs' residence located at 614 West Desert Lane, Phoenix, Arizona (the "Residence"), causing significantly damaged to the Residence and all of Plaintiffs' personal property located within the Residence (the "Loss). The Residence was insured against the damage that resulted from the Loss by Defendant State Farm Fire and Casualty Corporation, an Illinois corporation ("State Farm") under State Farm policy number 03-J4-4660-2 (the "Policy"). The Plaintiffs' timely submitted a claim, and State Farm acknowledged the Plaintiffs' claim and assigned it the claim number 03-43H7-730 (the "Claim).

On or about December 14, 2016, State Farm inspected the Residence and the Phillips' personal property. Plaintiffs' retained the services of a public adjuster, Skipton & Associates, Inc. ("SAI"), who inspected the property on December 28, 2015. SAI subsequently submitted a scope of loss reflecting the cost to repair the Residence to be $203,114.69.

On or about January 22, 2016, State Farm conveyed its own estimate of repair costs to be $153,759.64. Despite evidence that the cost of repair is higher than State Farm's estimate, State Farm continues to refuse to make payment of the full amount due and owing for the Phillips' insurance claim in bad faith.

Plaintiffs have incurred attorneys' fees and costs in connection with this action.

II.    **LEGAL THEORY UPON WHICH EACH CLAIM IS BASED.**

A.     **Breach of Insurance Contract.**

"To bring an action for the breach of [a] contract, the plaintiffs have the burden of proving the existence of the contract, its breach and the resulting damage." *Graham v. Asbury*, 540 P.2d 656, 657, 112 Ariz. 184 (1975). The terms of the Policy, particularly ambiguous and undisclosed terms, are subject to the policyholder's "reasonable

2

T1956451.DOCX;1

expectations" of them.  *See Gordinier v. Aetna Casualty & Surety Co.*, 154 Ariz. 266, 271-74, 742 P.2d 277, 282-85 (1987) (discussing the enforcement of an insured's "reasonable expectations" based on representations not included in, or that conflict with, the insured's written policy).  *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 153, 854 P.2d 1134, 1139 (1993) (holding that in interpreting a contract, "a court may consider surrounding circumstances, including negotiation, prior understandings, and subsequent conduct"); RESTATEMENT (2d) Contracts § 206 (discussing the interpretation of contracts against the drafter); *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 389, 682 P.2d 388, 394 (1984) ("One of the most prominent of these methods [of ambiguity resolution] is the well-recognized principle of resolving ambiguities against the insurer.") (citation omitted).

In addition, under traditional rules for interpreting insurance contracts, including the rule of *contra proferentem*, to the extent of any ambiguity in the contract of insurance represented by the Policy, all such ambiguities should be strictly construed against the issuer of the insurance, which is the master of the insurance contract.  These rules of interpretation require that in the event of any ambiguity, all reasonable presumptions should be in favor of coverage and exclusions should be interpreted as narrowly as is reasonable.

State Farm was paid premiums by Plaintiffs in exchange for its obligations under the Policy.  Plaintiffs' Loss is a loss covered under the policy.  The Policy, like all agreements within the State of Arizona, contains an implied covenant of good faith and fair dealing.  By wrongfully failing to pay Plaintiffs the full amount due and owing to

3

T1956451.DOCX;1

them, State Farm has breached the Policy, including the implied covenant of good faith and fair dealing in that insuring agreement, thereby depriving Plaintiffs of the benefits they are entitled to and is to receive under the Policy.

As a direct and proximate result of State Farm's breach of contract and breach of the implied covenant of good faith and fair dealing, Plaintiffs have sustained reasonably foreseeable damages in an amount to be proven at trial.  Plaintiffs are also entitled to an award of attorneys' fees under A.R.S. § 12-341.01.

**B.**      <u>**Tortious Bad-Faith Claims Handling.**</u>

In Arizona, "the tort of bad faith arises when the insurer 'intentionally denies, fails to process or pay a claim without a reasonable basis.'" *Zilisch v. State Farm Mutual Auto. Ins. Co.*, 196 Ariz. 234, 995 P.2d 276, 279 ¶ 20 (2000) (quoting *Noble v. National Am. Life Ins. Co.,* 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981)).  "An insurance contract is not an ordinary commercial bargain; 'implicit in the contract and the relationship is the insurer's obligation to play fairly with its insured." *Id.* (quoting *Rawlings v. Apodaca*, 151 Ariz. 149, 154, 726 P.2d 565, 570 (1986)).  "The insurer has 'some duties of a fiduciary nature,' including '[e]qual consideration, fairness and honesty.'"  *Id.* (quoting *Rawlings*, 151 Ariz. at 155, 726 P.2d at 571).  "[T]he insurer's eventual performance of the express covenant — by paying the claim — does not release it from liability for 'bad faith.'" Id. (citing *Rawlings*, 151 Ariz. at 156, 726 P.2d at 572).  "Thus, if an insurer acts unreasonably in the manner in which it processes a claim, it will be held liable for bad faith 'without regard to its ultimate merits.'" *Id.* (quoting *Deese v. State Farm Mutual Auto. Ins. Co.*, 172 Ariz. 504, 508, 838 P.2d 1265, 1270 (1992)).

4

T1936451.DOCX,1

In particular, "[t]he carrier has an obligation to immediately conduct an adequate investigation, act reasonably in evaluating the claim and act promptly in paying a legitimate claim." Id. at ¶ 21. "Where coverage is not contested but the amount of the loss is disputed, the insurer is under a duty to pay any undisputed portion of the claim promptly. Failure to do so amounts to bad faith." *Borland v. Safeco Ins. Co. of America*, 147 Ariz. 195, 200, 709 P.2d 552, 557 (App. 1985) (citations omitted).

"The core of the duty of good faith and fair dealing is that the insurer act *reasonably* towards its insured." *Deese v. State Farm Mut. Auto. Ins. Co.*, 172 Ariz. 504, 508, 838 P.2d 1265, 1269 (1992)(emphasis in original). An insurer acts in bad faith when it unreasonably investigates, evaluates, or processes a claim, and either knows it is acting unreasonably or acts with such reckless disregard that such knowledge may be imputed to it. *Zilisch, supra*, 196 Ariz. at 238, 995 P.2d at 280. *See also Miel v. State Farm Mut. Auto. Ins. Co.*, 185 Ariz. 104, 110, 912 P.2d 1333, 1339 (App. 1995); *Trus Joist Corp. v. Safeco Ins. Co. of Am.*, 153 Ariz. 95, 104, 735 P.2d 125, 134 (App. 1986).

As stated by the Ninth Circuit Court of Appeals in *Anderson v. Allstate Ins. Co.*, 45 Fed.Appx. 754 (9th Cir. 2002), "[the] 'ultimate test of bad faith liability in the first party cases is whether the refusal to pay policy benefits . . . was unreasonable' and not as a result of mere negligence or bad judgment." *Id.* at 758 (citations omitted). *Cf. Trus Joist*, 153 Ariz. at 103 (citing California case law in support of Arizona's adoption of equal standards of good faith in first- and third-party bad faith cases); *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal.3d 809, 169 Cal.Rptr. 691, 620 P.2d 141, 145 (1979) (an insurer

"must give at least as much consideration to the [insured's] interests as it does to its own").

### III.   NAMES, ADDRESSES AND TELEPHONE NUMBERS OF ANY WITNESSES WHOM PLAINTIFF EXPECTS TO CALL AT TRIAL, WITH DESIGNATION OF THE SUBJECT MATTER ABOUT WHICH EACH WITNESS MIGHT BE CALLED TO TESTIFY.

1.   Anderson Phillips
c/o Merlin Law Group
2999 N. 44th Street, Suite 520
Phoenix, AZ  85018

SUBJECT MATTER:  Mr. Phillips is expected to testify regarding the Loss and the Claim.

2.   Jasmine Phillips
c/o Merlin Law Group
2999 N. 44th Street, Suite 520
Phoenix, AZ  85018

SUBJECT MATTER:  Ms. Phillips is expected to testify regarding the Loss and the Claim.

3.   Justin Skipton
Skipton & Associates, Inc.
710 E. Vista Bonita Drive
Scottsdale, AZ  85255
602-957-8800

SUBJECT MATTER:  Mr. Skipton is the Public Adjuster whom Plaintiffs hired after the Loss.  He has knowledge of the Loss, the cost of repair of the Residence, and the Claim.

4.   Robert Gonzalez
State Farm Insurance Company
P.O. Box 52260
Phoenix, AZ  85072-2260

6

SUBJECT MATTER:  Mr. Gonzalez is the insurance adjuster with State Farm who handled the Claim.  He is expected to testify regarding his handling of the Claim.

     5.     Rule 30(b)(6) Representatives of State Farm Insurance Company
c/o Erin E. Bradham
Steptoe & Johnson
201 E. Washington Street, Suite 1600
Phoenix, AZ  85004

SUBJECT MATTER:  These witnesses are expected to testify regarding facts and circumstances pertaining to State Farm's handling of the Claim and similar claims by other of its insureds, including, without limitation, its investigation and processing of the Claim, the proper standards for processing such claims generally, interpretation of State Farm's Policy, and State Farm's refusal to make payments owed to Plaintiff.

     6.     Any and all custodians of records necessary to provide a foundation for documents and/or exhibits at trial.

     7.     Any and all witnesses as listed or mentioned in discovery, depositions or disclosure statements.  By listing such witnesses, Plaintiff does not waive evidentiary and discovery objections to the same.

     8.     Any witness listed by any other party.  By listing such witnesses, Plaintiff does not waive evidentiary and discovery objections to the same.

     9.     David Fix
Adanac Enterprises Corp.
9299 W. Olive Avenue, Suite 506i
Peoria, AZ  85345
623.266.2761

7

T1956451.DOCX;1

SUBJECT MATTER:  Mr. Fix is expected to testify regarding the damage to the Property after the fire, and the scope of his repairs.

**IV.   NAMES AND ADDRESSES OF ALL OTHER PERSONS WHOM PLAINTIFF BELIEVES MAY HAVE KNOWLEDGE RELEVANT TO THE EVENTS, TRANSACTIONS, OR OCCURRENCES THAT GIVE RISE TO THE ACTION, AND THE NATURE OF THE KNOWLEDGE OR INFORMATION EACH SUCH INDIVIDUAL IS BELIEVED TO POSSESS.**

Plaintiff is not aware of any at this time.

**V.   NAMES AND ADDRESSES OF ALL PERSONS WHO HAVE GIVEN STATEMENTS, WHETHER WRITTEN OR RECORDED, SIGNED OR UNSIGNED, AND THE CUSTODIAN OF THE COPIES OF THE STATEMENT.**

The Plaintiff does not have knowledge of anyone who may have given statements in relation to this case, but upon discovery of such knowledge will disclose all necessary information to the Defendants' counsel in accordance with Rule 26.1.

**VI.   NAMES AND ADDRESSES OF EACH PERSON WHOM THE PLAINTIFF EXPECTS TO CALL AS AN EXPERT WITNESS AT THE TRIAL, THE SUBJECT MATTER ON WHICH THE EXPERT IS EXPECTED TO TESTIFY, THE SUBSTANCE OF THE FACTS AND OPINIONS TO WHICH THE EXPERT IS EXPECTED TO TESTIFY, A SUMMARY OF THE GROUNDS FOR EACH OPINION, THE QUALIFICATIONS OF THE WITNESSES, AND THE NAME AND ADDRESS OF THE WITNESS, AND THE NAME AND ADDRESS OF THE CUSTODIAN OF COPIES OF ANY REPORTS PREPARED BY THE EXPERT.**

1.   *Cheney Hines*
     *Quality Aire, LLC*
     *4116 E. Superior Ave Suite 5E,*
     *Phoenix, AZ 85040*
     *(602) 717-8917*

*Mr. Hines is an Xactware Xactimate Certified Trainer.  He reviewed and compared estimates provided by Skipton and Associates, Adanac General Contracting,*

8

T1956451.DOCX,1

*and State Farm in relation to the reconstruction scope for Anderson Phillips for differences in pricing.   His opinion is the State Farm estimates under-valued the cost of repairs by use of the incorrect pricing database for labor costs.    Each of the estimates was prepared using Xactimate, an estimating computer program sold by Xactware.  Xactimate's default labor pricing is for restoration/service/remodel, which is the proper setting for the repairs to the Phillips' home.   Skipton and Associates and Adanac   General   Contracting   used   the   correct   labor   pricing   setting: restoration/service/remodel.  The reason for the difference in price is State Farm used the incorrect setting – new construction.  State Farm's use of the new construction labor pricing resulted in an estimate that undervalued the cost of repair.*

*Xactimate is a software program that is used by insurance companies and contractors.  Xactimate collects and analyzes pricing and cost data based on actual prices and transactions in more than 500 geographic regions.   The standard in the insurance industry is to rely upon Xactimate's labor pricing data to estimate the cost of repairs.*

*New construction and restoration/service/remodel are pricing models based on labor efficiencies, which accounts the differences in pricing between the estimates. Labor costs for new construction are much cheaper than restoration/service/remodel since all labor for trades can perform work efficiently due to not having to work around the finishes of a fully constructed home.*

*Restoration/service/remodel has greater inefficiencies of labor due to working in the restoration or remodel environment causing for greater labor costs related to all*

9

services provided i.e. drywall repairs, electrical work, clean up after a water damage, etc. Fire damage to a home would be a restoration or remodel environment regardless of how extensive the damages may have been.

New construction is based on efficiencies of labor which result from working on constructing a home from the soil up. The best example of this would be literally a home that is being newly constructed i.e. true new construction. Labor is less because there is less set-up and cleanup time, drive time is typically not paid to most trades and work generally goes faster because accessibility is not a major consideration.

In relation to the damages that had occurred at the home of Anderson Phillips the reconstruction estimate should be completed using the restoration/service/remodel pricing which utilizes labor inefficiencies due to working in a restoration environment. Despite the home having all the interior materials and roofing structure replaced it would not qualify as new construction. The only scenario acceptable for new construction pricing is if the home was demolished which would be removal of the entire structure including the slab and rebuilt from the dirt up as a true new construction.

State Farm's estimate undervalued the cost of repair by using the incorrect labor pricing setting. The difference between State Farm's estimate is its use of new construction pricing. The proper pricing to utilize is the restoration/service/remodel since the repairs for the property would not fall under the definition of a true new construction as repairs are being performed on an existing structure. To determine

10

*the correct cost of repair, State Farm would only need to access the Phillips estimate using its Xactimate program, change the labor pricing setting to the correct, default setting – restoration/service/remodel, and Xactimate will re-calculate the estimate with the proper cost of repair.*

*Mr. Hines' CV is attached, Bates stamped PHILLIPS 001750.*

## VII.   COMPUTATION AND MEASURE OF DAMAGES.

Plaintiffs are seeking money damages against the Defendant as follows:

A.      For Plaintiffs' compensatory damages, and extra-contractual or consequential damages, to be supported by this and subsequent disclosures;

B.      For exemplary or punitive damages in a just and reasonable amount to be established at trial;

C.      For prejudgment interest pursuant to A.R.S. § 20-462(A) and/or § 44-1201(A) [*see Metzler v. BCI Coca-Cola Bottling Co. of Los Angeles, Inc.*, 235 Ariz. 141, 144, ¶ 11, 329 P.3d 1043, 1046 (2014) ("prejudgment interest on a liquidated claim is a matter of right in an action on a contract or in tort."); *Scottsdale Ins. Co. v. Cendejas*, 220 Ariz. 281, 288, ¶ 32, 205 P.3d 1128, 1135 (App. 2009); *Design Trend Int'l Interiors, Ltd. v. Cathay Enterprises, Inc.*, 103 F.Supp.3d 1051, 1060 (D. Ariz. 2015) (similar or related holdings)];

E.      For Plaintiff's reasonable attorneys' fees and costs; and

F.      For Plaintiff's taxable costs.

## VIII.   THE EXISTENCE, LOCATION, CUSTODIAN AND GENERAL DESCRIPTION OF ANY TANGIBLE EVIDENCE OR RELEVANT

11

**DOCUMENTS THAT THE PLAINTIFF PLANS TO USE AT TRIAL AND RELEVANT INSURANCE AGREEMENTS**

1.     Plaintiffs' records and files regarding State Farm, the insurance at issue in this action, and Plaintiff's Claim, including Skipton files (Phillips 000001-001216)

2.     Photos of the Property (Phillips 1217-1631).

3.     Pertinent excerpts from any and all depositions taken in this matter.

4.     Relevant and material answers to Uniform and Non-Uniform Interrogatories, Requests for Production, and/or Requests for Admissions.

5.     Any and all depositions and/or reports of any expert listed by any party.

6.     Any and all exhibits listed by any other party.  By listing the other parties' exhibits, Plaintiff does not waive evidentiary and discovery objections to the same.

7.     Miscellaneous State Farm Documents, Bates stamped STATE FARM 000001-005149.

8.     *Cheney Hines CV, Bates stamped PHILLIPS 001750.*

IX.   **A LIST OF DOCUMENTS, OR IN THE CASE OF VOLUMINOUS DOCUMENTARY INFORMATION, A LIST OF THE CATEGORIES OF DOCUMENTS, KNOWN BY PLAINTIFF TO EXIST WHETHER OR NOT IN THE PLAINTIFF'S POSSESSION, CUSTODY OR CONTROL, WHICH MAY BE RELEVANT TO THE SUBJECT MATTER OF THE ACTION, AND THOSE WHICH APPEAR REASONABLY CALCULATED TO LEAD TO THE DISCOVERY OF ADMISSIBLE EVIDENCE.**

*See generally* Section VIII of this disclosure statement, above.

DATED this 18th day of June, 2018.

/  /  /

/  /  /

12

T1956451.DOCX,1

MERLIN LAW GROUP, P.A.

- and -

STEPHEN SILVERMAN LAW


By:   */s/ Stephen E. Silverman*
               Michael N. Poli
               Lawrence R. Moon
               Stephen E. Silverman
               Attorneys for Plaintiffs

ORIGINAL of the foregoing
emailed this 18th day of June, 2018, to:

Karl Tilleman
Erin Bradham
STEPTOE & JOHNSON, LLP
201 East Washington Street, Suite 1600
Phoenix, Arizona 85004
Attorneys for Defendant State Farm Fire and Casualty


     */s/ Linda Gundelach*

13

T1956451.DOCX;1

**Resume**

Cheney Hines

4116 E. Superior Ave Suite 5E, Phoenix, AZ 85040

cheney@qualityaireaz.com

602-717-8917

Professional Background:

2000-2005 Service Master Long Beach; Long Beach, CA

- Supervisor in charge of assigned jobs which mainly pertained to mold abatement, water damage, fire damage, hazardous material clean up, general demolition with job sizes ranging from $500 to $50,000

2005-2010 Service Master by Disaster Professionals; Phoenix, AZ

- Operations manager in charge of overall company operations and all jobs performed by company.  Project management of job sizes ranging from $10,000 to $250,000.

2010-Current Quality Aire, LLC; Phoenix, AZ

- Owner and general manager of overall company with project management of all projects performed by company regardless of size.  Asbestos abatement, lead abatement, trauma clean up, general demolition, and mold abatement are our main services performed.

2008-Current Winners' Circle Training Center; Phoenix, AZ

- Consultation services provided for large commercial losses, estimating insurance claims for specific damages and reconstruction, business consultation provided for construction companies, and equipment rental.
- Xactimate certified trainer teaching Xactimate 28 to contractors and insurance professionals

Education and Training:

- Bachelor of Science Business Management from Arizona State University
- Xactimate Certified Trainer
- Xactimate Certifications level 1, 2, 3
- IICRC WRT, ASD, FSRT, OCT
- Licensed Contractor

T1928741.DOCX;1

PHILLIPS 001750

# EXHIBIT 20

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

Anderson Phillips and Jasmine      )
Phillips, husband and wife,        )
                                   )
                Plaintiffs,        )
                                   )
            vs.                    ) No. CV 2016-013572
                                   )
State Farm Fire and Casualty       )
Company, an Illinois corporation,  )
                                   )
                Defendant.         )
_____)

VIDEOTAPED DEPOSITION OF JASMINE PHILLIPS

Phoenix, Arizona
March 30, 2018
8:59 a.m.

REPORTED BY:
CATHY J. TAYLOR, RPR, CRR, CRC
Certified Reporter
Certificate No. 50111

PREPARED FOR:
ASCII/CONDENSED

(CERTIFIED COPY)

55

1    A.    I don't know.

2    Q.    Okay.  Do you know whether there was any point when

3  State Farm should have paid you money and it didn't?

4    A.    No.  I don't know.

5    Q.    Okay.  Is there any -- did you review State Farm's

6  line-by-line repair estimate?

7    A.    No.

8    Q.    Okay.  Do you -- do you know of any repairs that

9  needed to be made on your property that weren't included in

10  State Farm's estimate?

11    A.    No.

12    Q.    Do you know of any amounts of money that State Farm

13  owed you for repairs to your house that it didn't pay?

14              MR. MOON:  Object to form.

15              THE WITNESS:  I don't know.

16  BY MS. BRADHAM:

17    Q.    Okay.  Okay.  I want to talk more about criticisms

18  of State Farm.  You said one criticism is -- is you attribute

19  some delay to State Farm?

20    A.    Yes.

21    Q.    Okay.  What other criticisms do you have of State

22  Farm's handling of your claim?

23    A.    There's a period of time when Justin Skipton was

24  trying to reach out for some additional clarification, and

25  there was -- State Farm was being unresponsive.

**EXHIBIT 21**





## Certified Policy Record

I, the undersigned, do hereby confirm that I am custodian of the records pertaining to the issuance of policies by State Farm Fire and Casualty Company.

I certify that the attached documents represent a true and accurate record of the terms and conditions of Policy Number 03-J4-4660-2 including any endorsements, if applicable, for the policy term(s) 06/01/2015-06/01/2016 and insuring Phillips, Anderson V of 214 W Desert Ln, Phoenix AZ 85041-8123 based on available records.

The following endorsements are included:
FP7955
FE3419
FE3243

The policy was in effect on the loss date of 12/06/2015.

Nicola Bird
Underwriting Team Manager
Date: 1·9·17

State of Arizona
County of Maricopa

Subscribed and sworn to before me this _____9th_____ day of ___January___, 2017.

JULIE CORMANY
Notary Public - Arizona
Maricopa County
My Commission Expires
March 4, 2018

Notary Public

My Commission Expires: March 4, 2018

1004516

2000 143551 200 03-21-2012



**State Farm Fire and Casualty Company**
2700 South Sunland Drive
Tempe, AZ 85282-3387

| RENEWAL CERTIFICATE | |
| --- | --- |
| POLICY NUMBER      03-J4-4660-2 | |
| Homeowners Policy JUN 01 2015 to JUN 01 2016 | |

A-24- 2153-FAB8      H  W   F

002357  0001
PHILLIPS, ANDERSON V
214 W DESERT LN
PHOENIX AZ   85041-8123



ST-
02E4-0060

TO BE PAID BY MORTGAGEE

**Coverages and Limits**

**Section I**

| | | |
| --- | --- | --- |
| A  Dwelling | | $178,800 |
|    Dwelling Extension | Up To | 17,880 |
| B  Personal Property | | 134,100 |
| C  Loss of Use | | Actual Loss Sustained |

**Deductibles - Section I**

| | |
| --- | --- |
| All Losses  1/2%  (MIN) | 1,000 |

Location:  Same as Mailing Address

**Section II**

| | |
| --- | --- |
| L  Personal Liability | $100,000 |
|    Damage to Property of Others | 500 |
| M  Medical Payments to Others (Each Person) | 1,000 |

**Loss Settlement Provisions (See Policy)**
A1  Replacement Cost - Similar Construction
B1  Limited Replacement Cost - Coverage B

**Forms, Options, and Endorsements**

| | |
| --- | --- |
| Homeowners Policy | FP-7955 |
| Increase Dwlg up to $35,760 | OPT  ID |
| Ordinance/Law  10%/ $17,880 | OPT  OL |
| Jewelry and Furs $1,500/$2,500 | OPT  JF |
| Homeowners Policy Endorsement | FE-3419 |
| Amendatory Endorsement | FE-3243 |

| **Annual Premium** | **$986.00** |
| --- | --- |

**Premium Reductions**

| | |
| --- | --- |
| Utility Rating Credit | 173.00 |
| Claim Record Discount | 254.00 |

Inflation Coverage Index:   225.2

Please help us update the data used to determine your premium. Contact your agent with the year each of your home's utilities (heating/cooling, plumbing, or electrical) and roof were last updated.

:3Z5-3076.1.6  10-11-2010  (o1S309c)

*Thanks for letting us serve you. We appreciate our long term customers.*
**Agent** LUPITA FERNANDEZ
**Telephone** (602) 633-2088

5758      4011
N   DR.NP.6R.9Y
014

REB

Moving? See your State Farm agent.
See reverse for important information.
Prepared  APR 08 2015

SF-PHILCLAIM 004302

loss is the direct and immediate cause of the collapse of the building.

This coverage does not increase the limit applying to the damaged property.

12. **Locks.** We will pay the reasonable expenses you incur to re-key locks on exterior doors of the dwelling located on the **residence premises**, when the keys to those locks are a part of a covered theft loss.

No deductible applies to this coverage.

## INFLATION COVERAGE

The limits of liability shown in the **Declarations** for Coverage A, Coverage B and, when applicable, Option ID will be increased at the same rate as the increase in the Inflation Coverage Index shown in the **Declarations**.

To find the limits on a given date:

1. divide the Index on that date by the Index as of the effective date of this Inflation Coverage provision; then

2. multiply the resulting factor by the limits of liability for Coverage A, Coverage B and Option ID separately.

The limits of liability will not be reduced to less than the amounts shown in the **Declarations**.

If during the term of this policy the Coverage A limit of liability is changed at your request, the effective date of this Inflation Coverage provision is changed to coincide with the effective date of such change.

# SECTION I - LOSSES INSURED

## COVERAGE A - DWELLING

We insure for accidental direct physical loss to the property described in Coverage A, except as provided in **SECTION I - LOSSES NOT INSURED.**

## COVERAGE B - PERSONAL PROPERTY

We insure for accidental direct physical loss to property described in Coverage B caused by the following perils, except as provided in **SECTION I - LOSSES NOT INSURED:**

1. **Fire or lightning.**

2. **Windstorm or hail.** This peril does not include loss to property contained in a building caused by rain, snow, sleet, sand or dust. This limitation does not apply when the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

   This peril includes loss to watercraft of all types and their trailers, furnishings, equipment, and outboard motors, only while inside a fully enclosed building.

3. **Explosion.**

4. **Riot or civil commotion.**

5. **Aircraft,** including self-propelled missiles and spacecraft.

6. **Vehicles,** meaning impact by a vehicle.

7. **Smoke,** meaning sudden and accidental damage from smoke.

   This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

8. **Vandalism or malicious mischief,** meaning only willful and malicious damage to or destruction of property.

9. **Theft,** including attempted theft and loss of property from a known location when it is probable that the property has been stolen.

   This peril does not include:

   a. loss of a precious or semi-precious stone from its setting;

   b. loss caused by theft:

      (1) committed by an **insured** or by any other person regularly residing on the **insured location.** Property of a student who is an **insured** is covered while located at a residence away from home, if the theft is committed by a person who is not an **insured;**

      (2) in or to a dwelling under construction or of materials and supplies for use in the construction until the dwelling is completed and occupied; or

7

FP-7955

SF-PHILCLAIM 004314

b. defect, weakness, inadequacy, fault or unsoundness in:

(1) planning, zoning, development, surveying, siting;

(2) design, specifications, workmanship, construction, grading, compaction;

(3) materials used in construction or repair; or

(4) maintenance;

of any property (including land, structures, or improvements of any kind) whether on or off the **residence premises**; or

c. weather conditions.

However, we do insure for any resulting loss from items a., b. and c. unless the resulting loss is itself a Loss Not Insured by this Section.

## SECTION I - LOSS SETTLEMENT

Only the Loss Settlement provisions shown in the **Declarations** apply. We will settle covered property losses according to the following.

### COVERAGE A - DWELLING

1. **A1 - Replacement Cost Loss Settlement - Similar Construction.**

   a. We will pay the cost to repair or replace with similar construction and for the same use on the premises shown in the **Declarations**, the damaged part of the property covered under **SECTION I - COVERAGES, COVERAGE A - DWELLING**, except for wood fences, subject to the following:

      (1) until actual repair or replacement is completed, we will pay only the actual cash value at the time of the loss of the damaged part of the property, up to the applicable limit of liability shown in the **Declarations**, not to exceed the cost to repair or replace the damaged part of the property;

      (2) when the repair or replacement is actually completed, we will pay the covered additional amount you actually and necessarily spend to repair or replace the damaged part of the property, or an amount up to the applicable limit of liability shown in the **Declarations**, whichever is less;

      (3) to receive any additional payments on a replacement cost basis, you must complete the actual repair or replacement of the damaged part of the property within two years after the date of loss, and notify us within 30 days after the work has been completed; and

      (4) we will not pay for increased costs resulting from enforcement of any ordinance or law regulating the construction, repair or demolition of a building or other structure, except as provided under **Option OL - Building Ordinance or Law Coverage.**

   b. Wood Fences: We will pay the actual cash value at the time of loss for loss or damage to wood fences, not to exceed the limit of liability shown in the **Declarations** for COVERAGE A - DWELLING EXTENSION.

2. **A2 - Replacement Cost Loss Settlement - Common Construction.**

   a. We will pay the cost to repair or replace with common construction and for the same use on the premises shown in the **Declarations**, the damaged part of the property covered under **SECTION I - COVERAGES, COVERAGE A - DWELLING**, except for wood fences, subject to the following:

      (1) we will pay only for repair or replacement of the damaged part of the property with common construction techniques and materials commonly used by the building trades in standard new construction. We will not pay the cost to repair or replace obsolete, antique or custom construction with like kind and quality;

      (2) until actual repair or replacement is completed, we will pay only the actual cash value at the time of the loss of the damaged part of the property, up to the applicable limit of liability shown in the **Declarations**, not to exceed the cost to repair or

FP-7955

SF-PHILCLAIM 004318

# EXHIBIT 22

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

ANDERSON PHILLIPS and JASMINE      )
PHILLIPS, husband and wife,        )
                                   )
              Plaintiffs,          )
                                   ) No. CV2016-015809
vs.                                )
                                   )
STATE FARM FIRE AND CASUALTY       )
CORPORATION, an Illinois           )
corporation,                       )
                                   )
              Defendant.           )
_____    )

VIDEOTAPED DEPOSITION OF ABEL COSTALES

Scottsdale, Arizona

May 18, 2018

9:35 a.m.

PREPARED BY:              SEYMOUR REPORTING SERVICES
                         Arizona RRF No.  R1000
Kelly R. Rexroat, RPR    137 East Elliot Road, #2473
Certified Reporter       Gilbert, Arizona 85299
Arizona CCR No. 50940    (P) 602.258.5800
                         (F) 888.881.5440

ABEL COSTALES   MAY 18, 2018

1   answered.

2       Q.   (By Mr. Silverman)   Let me just add.   Do you

3   have anything to add to your prior answer?

4               MS. BRADHAM:   Form.

5       A.   I would just say again that from my

6   understanding and from how I explained it, there was

7   never any mandate to say we have to do one thing or

8   another on any particular claim.   I think at least I

9   try to be in the company the way I get my information

10  is that there is nothing definitive.   Every claim has

11  its own set of facts and circumstances, and we're

12  supposed to consider all of that and determine how

13  best to apply the policy.

14          So to say there was a mandate, I would say,

15  well, we never had a mandate and that's why I'm just

16  having difficulty with saying, yeah, there was no

17  mandate.

18      Q.   (By Mr. Silverman)   Well, now, if somebody

19  thought that there was a mandate -- well, strike

20  that.

21          Do you know -- well, have you had

22  discussions with any adjustors you supervise about

23  whether the use of pricing software would be

24  appropriate or not appropriate in that particular

25  claim?

1  determining pricing, is this something that has been

2  constant from that management meeting?

3          In other words, has this always been your

4  understanding, or has your understanding of when to

5  use new construction and when to use restoration has

6  that changed over the last period of years?

7                    MS. BRADHAM:  Form.

8      A.  Not recalling specifics of that meeting, I

9  don't know that we talked about ground-up rebuilds

10  terminology.  I just kind of remember talking about

11  how construction is done because we were talking more

12  in terms of labor efficiencies the different ways the

13  rebuilds are done.  That's kind of my knowledge, and

14  I think based on that from that point it hasn't

15  really changed in terms of my understanding of that

16  aspect of it.

17      Q.  (By Mr. Silverman)  So your understanding of

18  this policy about new construction or restoration

19  pricing options has been the same from when you first

20  learned about it with Debbie Smith?

21                    MS. BRADHAM:  Form.

22      A.  Well, I think what I said was my

23  understanding of the labor efficiency issue has been

24  the same.  Obviously as different claims come up and

25  we apply individual specific aspects of different

1  claims, we kind of talk about, well, how does that

2  apply to these things, and what efficiency is more

3  appropriate for those individual losses, but just in

4  terms of labor -- the aspect of labor efficiencies in

5  the construction, I think that's been pretty

6  consistent from that point.

7      Q.   (By Mr. Silverman)  Okay.  Well, if we talk

8  about labor efficiencies, one of those efficiencies

9  with new construction is large economies of scale if

10  you're building in a subdivision; right?

11              MS. BRADHAM:  Form.

12      A.   From here?  I don't know.

13      Q.   (By Mr. Silverman)  No, just in general.

14      A.   In general.  Okay, so I'm sorry.  Go ahead.

15  I apologize.

16      Q.   I'll get over it.  If you're building -- you

17  got real new home construction and what we have here

18  in Maricopa County with the subdivisions that sort of

19  spring out along the edges, you're going to have one

20  home builder building, you know, a significant number

21  of homes to the same general specifications; right?

22  Do you understand?

23      A.   Yes.

24      Q.   Okay.  So in that kind of construction there

25  is going to be some labor efficiency with that work;

# EXHIBIT 23

Page 1

```
1              ARIZONA SUPERIOR COURT
                 MARICOPA COUNTY
2
3   ANDERSON PHILLIPS and        )
    JASMINE PHILLIPS, husband    )
4   and wife,                    )
                                 )
5        Plaintiffs,             )
                                 )
6        -vs-                    )  No. CV-2016-015809
                                 )
7   STATE FARM FIRE AND          )
    CASUALTY CORPORATION, an     )
8   Illinois corporation,        )
                                 )
9        Defendant.              )
10
11
12
13
              THE VIDEOTAPED DEPOSITION of THOMAS
14  E. MOSS, the deponent herein, called by the
    Plaintiff for examination pursuant to notice and
15  pursuant to the provisions of the Code of Civil
    Procedure and the Rules of the Supreme Court
16  thereof pertaining to the taking of depositions,
    taken before me, Jill A. Bleskey, CSR-RPR, License
17  No. 084-004430, a Notary Public in and for the
    State of Illinois, at Eastland Suites, 1801
18  Eastland Suites, in the City of Bloomington, County
    of McLean, and State of Illinois on the 31st day of
19  July, A.D., 2018, commencing at 10:02 a.m.
20
21  -----------------------------------------
22            Jill A. Bleskey, RPR
                 CSR #084-004430
23
```

Page 2

```
1                  APPEARANCES
2   For the Plaintiff:
3      STEPHEN SILVERMAN LAW
       Attorneys at Law
4      6945 East Sahuaro Drive, Suite 125
       Scottsdale, Arizona 85254
5      (480)747-0850
       steve@stephensilverman.com
6      BY:  Mr. Stephen SIlverman
7   For the Defendant:
8      STEPTOE & JOHNSON, LLP
       Attorneys at Law
9      201 East Washington Street, Suite 1600
       Phoenix, Arizona 85004
10     (602)257-5244
       ktilleman@steptoe.com
11     BY:  Mr. Karl M. Tilleman
12  Videographer:
13     Mr. Tim Coverstone
14               I N D E X
15  EXAMINATION CONDUCTED            PAGE
16  Mr. Silverman                      4
17             E X H I B I T S
18  Exhibit No.   Description        Page
19  1   Not Identified                 3
    2   Not Identified                 3
20  3   November 2014 Operation Guide 7505,  129
        Structural Loss Claim Handling
21  4   February 2012 Operation Guide 7505,  133
        Structural Loss Claim Handling
22
    NOTE:  Exhibits attached to transcripts
23
```

Page 3

```
1         (At which time, Moss Deposition
2   Exhibit Numbers 1 and 2 were marked for
3   identification, and the following proceedings were
4   conducted;)
5         THE VIDEOGRAPHER:  This is Tape
6   Number 1 to the videotaped deposition of State
7   Farm's corporate designee, Tom Moss, in the matter
8   of Anderson and Jasmine Phillips versus State Farm
9   Fire and Casualty Corporation being heard before
10  the Arizona Superior Court for Maricopa County,
11  Case Number CV-2016-015809.
12         This deposition is being held at 1801
13  Eastland Drive in Bloomington, Illinois.  Today's
14  date is July the 31st, 2018 and the time indicated
15  on the video screen is 10:02 a.m.  My name is Tim
16  Coverstone, I'm the Videographer, and our Court
17  Reporter is Jill Bleskey.  Counsel please introduce
18  themselves and state their affiliations after which
19  our witness will be sworn in.
20         MR. SILVERMAN:  Stephen Silverman for
21  the plaintiff.
22         MR. TILLEMAN:  Karl Tilleman for the
23  defendant State Farm.
```

Page 4

```
1         THOMAS E. MOSS,
2         The witness, having been first duly
3   sworn upon his oath, testified as follows:
4         EXAMINATION CONDUCTED
5         BY:  MR. SILVERMAN
6   Q.    State your name, sir.
7   A.    Thomas Edward Moss.
8   Q.    And what do you do?
9   A.    I work for State Farm Insurance.
10  Q.    And what's your title?
11  A.    Claim consultant.
12  Q.    What is a claim consultant?
13  A.    My primary role as a claim consultant
14  is to provide oversight and guidance for our claim
15  associates.
16  Q.    How long have you been a claim
17  consultant?
18  A.    In October it will be ten years.
19  Q.    What's your area of -- what area do
20  you work in, nationwide or just a particular
21  region?
22  A.    So that's a little bit of a mix
23  there.  So primarily I work with Texas.  So --
```



THOMAS E. MOSS
PHILLIPS vs STATE FARM

July 31, 2018
97–100

Page 97

1  settings new construction, comparing that to
2  restoration service remodel, there are
3  considerations within that new construction setting
4  where labor efficiencies -- things are looked at
5  for those labor efficiencies such as does the
6  contractor have access to the home, is the home
7  still occupied by the policyholder, can they leave
8  their equipment and have it set up every day, do
9  they have to do clean up every day.  So those are
10  the things that I'm aware of under that new
11  construction setting that Xactware considers.
12      Q.     Is that different than how the new
13  construction pricing data is used at State Farm
14  now?
15         MR. TILLEMAN:  Form, foundation.
16         THE WITNESS:  So I'll share with you
17  my understanding.  So within the labor efficiency
18  settings there's new construction and there's
19  restoration service remodel.  Both of those
20  settings use the same labor price regardless,
21  that's a reconstruction labor price that they use.
22  But new construction setting and restoration
23  service remodel allow for different labor times

Page 98

1  based on efficiencies that can be gained.  So if
2  it's that new construction setting then there are
3  assumptions made that a contractor can be more
4  efficient doing that work.
5      Q.     Well, I guess my question is this.
6  When -- do you agree with me that the new
7  construction setting should only be used when
8  there's going to be less set up and clean up time
9  and you don't have accessibility as a
10  consideration?
11         MR. TILLEMAN:  Form and foundation.
12         BY:  MR. SILVERMAN
13      Q.     Agree or disagree?
14         MR. TILLEMAN:  Same objections.
15         THE WITNESS:  There are multiple
16  considerations that State Farm would look at to see
17  when the new construction setting would be used.
18         BY:  MR. SILVERMAN
19      Q.     So -- additional to what I just read?
20      A.     As I stated earlier, we would look to
21  see if there are efficiencies that could be gained
22  with the work based on the extent of damage that
23  was done to the home.  If we felt that those

Page 99

1  efficiencies would be gained by a contractor then
2  we would utilize the new construction setting based
3  on the unique factors of that loss.
4      Q.     Now, you are familiar that Robert
5  Gonzales said that the new construction setting was
6  to be used on all large loss fire claims?
7         MR. TILLEMAN:  Form.
8         THE WITNESS:  I have read through
9  parts of his deposition one time.  Without seeing
10  that in front of me, I couldn't tell you
11  specifically.  I believe that's what he said that
12  it was to be used on all.
13         BY:  MR. SILVERMAN
14      Q.     Is that a correct statement of what
15  State Farm's practice is?
16      A.     That is not a correct statement.
17      Q.     Is the new construction setting used
18  by adjusters other than large loss adjusters?
19      A.     That setting would be used by any
20  adjuster that's writing an estimate for a home when
21  it's a large partial loss or constructed total loss
22  or total loss.  So we have -- and I'm not trying to
23  be evasive.  We have adjusters that are part of

Page 100

1  large loss teams and we have other adjusters that
2  aren't part of the team but based on their
3  territory they might handle a large loss.  And so
4  that's why I phrased the answer the way I did.
5         MR. SILVERMAN:  We have to change
6  tapes so why don't we take a break.
7         THE WITNESS:  Thank you.
8         THE VIDEOGRAPHER:  Sure.  This is the
9  Videographer.  We're going to go off the record at
10  12:11 p.m.  We're off the record.
11         (At this point in the proceedings, a
12  short recess was taken, after which the following
13  proceedings were conducted;)
14         THE VIDEOGRAPHER:  This is the
15  Videographer.  Going back on the record at 1:00
16  p.m.
17         BY:  MR. SILVERMAN
18      Q.     Now, right before the break I had
19  asked you about Robert Gonzales and you told me
20  that he -- his testimony about when new
21  construction issues started was incorrect.  And
22  then I was about to ask you so what is the --
23  what's your correction of Robert Gonzales's



THOMAS E. MOSS
PHILLIPS vs STATE FARM

July 31, 2018
117–120

Page 117

1    Q.    Now, the circumstances you described
2    were all circumstances that really were -- would
3    all be present if the home was not occupied, right?
4         MR. TILLEMAN:  Form, foundation.
5         THE WITNESS:  I'm not sure I
6    understand your question, sir.
7         BY: MR. SILVERMAN
8    Q.    Well, if the home isn't occupied then
9    there's not an issue about when they start, the
10   property doesn't have to be cleaned up every day,
11   there's no issue with respect to access of the
12   home?
13   A.    But there would be considerations of
14   working around existing items within the home that
15   might still lend that to being restoration service
16   remodel.  So there are many variables that go into
17   that decision.
18   Q.    Other than the operation guide, is
19   there any direction that is provided to adjusters
20   about when to use new construction versus when to
21   use restoration service remodel?
22        MR. TILLEMAN:  Form.
23        THE WITNESS:  Claims adjusters have

Page 118

1    multiple resources available to them including the
2    operation guides.  They have trainers, they have
3    access to their team manager, section manager.  So
4    there are questions about that, there are multiple
5    resources available to our claims adjusters.
6         BY: MR. SILVERMAN
7    Q.    Well, do you agree that -- are you
8    familiar with the model Unfair Claims Practices
9    Act?
10        MR. TILLEMAN:  Form and foundation.
11        THE WITNESS:  I have read the model
12   Unfair Claim Practices Act sometime ago, yes.
13        BY: MR. SILVERMAN
14   Q.    And are you familiar with specific
15   states' Unfair Claims Practices Act?
16        MR. TILLEMAN:  Form.
17        THE WITNESS:  With the states that I
18   have had responsibility for I have read through
19   their unfair claim practices, yes.
20        BY: MR. SILVERMAN
21   Q.    Do you agree it's a policy at State
22   Farm to adjust claims in compliance with the Unfair
23   Claims Practices Act in the state that the claim is

Page 119

1    in?
2         MR. TILLEMAN:  Form and foundation.
3         THE WITNESS:  State Farm, the way we
4    adjust our claims is we want to pay what we owe, we
5    want to comply with the state laws.  And so we
6    provide guidance in our operation guides to help
7    our adjusters do that.
8         BY: MR. SILVERMAN
9    Q.    My question is a little more specific
10   and that is in a state like Arizona that has an
11   Unfair Claims Practices Act, is it State Farm's
12   policy that claims are adjusted in compliance with
13   the act?
14        MR. TILLEMAN:  Form and foundation.
15        THE WITNESS:  Again, I don't know the
16   Arizona Unfair Claims Practices Act.  State Farm's
17   policy would be to pay what we owe to adjust the
18   claim efficiently and courteously, take care of our
19   customers and pay what we owe, comply with the
20   state laws.  And so I can tell you that's what
21   we're going to do each time we go out.
22        BY: MR. SILVERMAN
23   Q.    So then yes, the Unfair Claims

Page 120

1    Practices Act is part of the standards that State
2    Farm follows in adjusting claims, true?
3         MR. TILLEMAN:  Form and foundation.
4         BY: MR. SILVERMAN
5    Q.    True or not true?
6         MR. TILLEMAN:  Same objections.
7         THE WITNESS:  State Farm is going to
8    go out and comply with the state laws, we're going
9    to pay what we owe, we're going to look at that
10   loss based on the unique facts of that loss, apply
11   the coverage to it.  We're going to make every
12   reasonable effort there to take care of our
13   customer.  But I can't give you a true or not true
14   answer.
15        BY: MR. SILVERMAN
16   Q.    Well, if I'm an adjuster and I'm at
17   my desk and I'm trying to figure out what my --
18   what standards apply to my claims adjusting, one
19   place I can look is the operation guide, right?
20   A.    That is correct.
21   Q.    Now, is another place I can look is
22   my state's Unfair Claims Practices Act?
23        MR. TILLEMAN:  Form and foundation.



Clerk of the Superior Court
*** Electronically Filed ***
T. Hays, Deputy
5/13/2019 10:42:00 AM
Filing ID 10448429

1

**MERLIN LAW GROUP P.A.**

2

Michael N. Poli (State Bar No. 006431)

mpoli@merlinlawgroup.com

3

Lawrence R. Moon (State Bar No. 017000)

lmoon@merlinlawgroup.com

4

2999 North 44th Street, Suite 520

5

Phoenix, Arizona 85018

Telephone: (480) 315-9980

6

Facsimile:  (480) 315-9984

7

8

**STEPHEN SILVERMAN LAW**

Stephen E. Silverman (State Bar No. 016757)

9

steve@stephensilverman.com

6945 E. Sahuaro Dr., Ste. 125

10

Scottsdale, AZ  85254

Telephone:  (480) 747-0850

11

Facsimile:  (480) 400-1065

12

*Attorneys for Plaintiff*

13

**ARIZONA SUPERIOR COURT**

14

**MARICOPA COUNTY**

15

16

| | |
|---|---|
| ANDERSON PHILLIPS and JASMINE PHILLIPS, husband and wife, | Case No.  CV2016-013572 |
| Plaintiffs, | **RULE 7.1(g) NOTICE OF AGREED-TO EXTENSION OF TIME FOR PLAINTIFFS TO FILE A REPLY IN SUPPORT OF THEIR MOTION TO AMEND COMPLAINT (FIRST EXTENSION)** |
| v. | |
| STATE FARM FIRE AND CASUALTY CORPORATION, an Illinois corporation, | |
| Defendant. | (Assigned to Hon. Sherry Stephens) |

17

18

19

20

21

22

23

24

25

        Pursuant to Arizona Rule of Civil Procedure 7.1(g), the parties have agreed to

26

extend the deadline for Plaintiffs to file a Reply in support of their Motion to Amend the

27

Complaint, originally due May 15, 2019, and now extended to May 24, 2019.

28

T2217347.DOCX;1

This agreement is appropriate under Rules 7.1(g):  it does not conflict with other deadlines set by the Court, and the Motion to Amend the Complaint is not yet due.

The foregoing request is for good cause and said extension is not being made for purposes of delay.

DATED this 13th day of May, 2019.

MERLIN LAW GROUP, P.A.

- and -

STEPHEN SILVERMAN LAW


By:   */s/ Michael N. Poli*
       Michael N. Poli
       Lawrence R. Moon
       Stephen E. Silverman
       Attorneys for Plaintiffs

ORIGINAL of the foregoing efiled this
13th day of May, 2019, with a copy
routed to the Honorable Sherry Stephens

COPY of the foregoing emailed this
13th day of May, 2019, to:

Robert T. Sullivan
rts@bowwlaw.com
Alicyn M. Freeman
amf@bowwlaw.com
BROENING OBERG WOODS & WILSON
2800 N. Central Avenue, Suite 1600
Phoenix, Arizona  85004


    */s/ Linda Gundelach*

2

of the Superior Court
*** Electronically Filed ***
M. King, Deputy
5/24/2019 11:23:00 PM
Filing ID 10493835

1  **MERLIN LAW GROUP, P.A.**
   Michael N. Poli, #006431
2  MPoli@merlinlawgroup.com
   Lawerence R. Moon, #017000
3  lmoon@merlinlawgroup.com
   2999 North 44th Street, Suite 520
4  Phoenix, Arizona 85018
   Telephone: (480) 315-9980
5  Facsimile:  (480) 315-9984

6  *Attorneys for Plaintiffs*

7

8                          **ARIZONA SUPERIOR COURT**

9                            **MARICOPA COUNTY**

10 ANDERSON  PHILLIPS  and  JASMINE          Case No. CV2016-013572
   PHILLIPS, husband and wife,
11
                   Plaintiffs,
12
                                              **PLAINTIFFS' MOTION FOR LEAVE**
13     vs.                                    **TO EXCEED PAGE LIMIT RE:**
                                              **PLAINTIFFS' REPLY TO THEIR**
14 STATE FARM FIRE AND CASUALTY               **MOTION FOR LEAVE TO AMEND**
   CORPORATION, an Illinois corporation,      **COMPLAINT TO CLASS ACTION**
15
                   Defendant.
16

17
           Pursuant to LRCiv 7.2(e)(1), Plaintiffs seeks this Court's permission to exceed the
18
   17-page limitation applicable to motions.  Plaintiffs request permission to exceed page
19
   limits by 6 pages (excluding the caption, signature block, and certificate of service).
20
           Plaintiffs have attempted to reduce its reply as much as possible, but due to the
21
   sheer number of arguments raised and the significant number of facts necessary to oppose
22
   Defendant's response, Plaintiffs have exceeded the page limit.
23
           Plaintiffs respectfully requests leave to exceed the page limit.
24
           RESPECTFULLY SUBMITTED this 24th day of May 2019.
25
26 / / /

27 / / /
28

T2227003.DOCX;1

MERLIN LAW GROUP, P.A.


By:   /s/Michael N. Poli
                    Michael N. Poli
                    Lawrence R. Moon
                    *Attorneys for Plaintiffs*


ORIGINAL of the foregoing e-filed
this 24th day of May 2019.

COPY of the foregoing e-served
this 24th day of May 2019, to:

Robert T. Sullivan
Alicyn M. Freeman
BROENING OBERG WOODS & WILSON
2800 North Central Avenue, Suite 1600
Phoenix, AZ 85004
Attorneys for Defendant State Farm Fire and Casualty


        /s/ Gracie Dobratz

Superior Court
*** Electronically Filed ***
T. Danielson, Deputy
5/24/2019 11:10:00 PM
Filing ID 10493803

1   **MERLIN LAW GROUP, P.A.**
    Michael N. Poli, #006431
2   MPoli@merlinlawgroup.com
    Lawrence R. Moon, #017000
3   lmoon@merlinlawgroup.com
    2999 North 44th Street, Suite 520
4   Phoenix, Arizona 85018
    Telephone: (480) 315-9980
5   Facsimile: (480) 315-9984

6   *Attorneys for Plaintiffs*

7                    **ARIZONA SUPERIOR COURT**

8                       **MARICOPA COUNTY**

9   ANDERSON PHILLIPS and JASMINE          Case No. CV2016-013572
    PHILLIPS, husband and wife,
10
11                          Plaintiffs,     **PLAINTIFFS' REPLY IN SUPPORT
                                            OF PLAINTIFFS' MOTION FOR
12          vs.                             LEAVE TO AMEND COMPLAINT TO
                                            CLASS ACTION**
13  STATE FARM FIRE AND CASUALTY
    CORPORATION, an Illinois corporation,  (Assigned to the Hon. Sherry Stephens)
14
                            Defendant.      <u>Oral Argument</u>:
15                                          **May 30, 2019**

16                       <u>**INTRODUCTION**</u>

17          Plaintiffs hereby reply in support of their Motion for Leave to Amend Complaint to

18  Class Action (the "Motion"). Much of State Farm's response (the "Response") to the

19  Motion addresses matters that are inapposite to the only legitimate grounds for

20  challenging a motion to amend, *i.e.*, undue delay, prejudice, and futility. State Farm's

21  arguments should be rejected.

22          First, Plaintiffs did not delay in filing their Motion. Plaintiffs fully disclosed to the

23  Court and State Farm that they were considering seeking class action status after

24  conducting discovery, and the parties explicitly addressed that issue in multiple scheduling

25  orders.  State Farm's prior counsel never objected.  Plaintiffs timely filed the Motion

26  pursuant to the Court's scheduling order, as amended.  Second, State Farm has not been

27  prejudiced. The Motion's legal theories do not expand the scope of discovery into State

28  Farm's practices and the class action procedure is a proper vehicle to resolve the claims

asserted in Plaintiffs' proposed amended complaint. Finally, State Farm's "futility" argument lacks merit, partly because the class certification issues raised by State Farm are inappropriate in connection with a Rule 15 motion to amend. As summarized below, there are sufficient substantive grounds to allow the requested amendment to assert the class claim.

## STANDARD OF REVIEW

Rule 15(a)(2) provides that leave to amend "must be freely given when justice requires."  "[A]mendments of pleadings should be allowed with great liberality." *Frank v. Solomon*, 94 Ariz. 55, 57 (1963) (citation and quotation marks omitted). "Denial of leave to amend is generally considered an abuse of discretion where the amendment merely seeks to add a new legal theory supported by factual issues already in the case." *Walls v. Arizona Dept. of Public Safety*, 170 Ariz. 591, 597 (App. 1991).

A party is not "prejudiced" by being "forced to litigate the merits of the [plaintiffs'] claim." *Spitz v. Bache & Co., Inc.*, 122 Ariz. 530, 531 (1979). Plaintiffs did not prejudice State Farm by conducting limited discovery before seeking class action relief. "Prejudice" for Rule 15 purposes is prejudice caused by the *delay*, if any, litigating the issues on the merits. Plaintiffs timely put State Farm on notice that they might seek leave to add a new class action theory; thus, there is no undue prejudice in allowing the amended complaint. *See, e.g.*, *Marshall v. Superior Court*, 131 Ariz. 379, 382-83 (1982) (abuse of discretion to not allow new causes of action against the same defendant). In determining whether the class action allegations are "futile," the Court is to accept all the well-pled factual allegations as true, including the class action allegations. *In re Paincare Holdings Securities Lit.*, 541 F.Supp.2d 1283, 1292 (M.D. Fla. 2008).[1]

---

[1] Holding that in a putative class action, "the court must consider the weight of *all* inferences arising from all the facts well pled." *Id.* (emphasis in original). *See also Wilson v. Bernstock*, 195 F.Supp.2d 619, 623 (D.N.J. 2002) ("the Court must accept as true the facts as alleged in Plaintiffs' Amended Class Action Complaint and any reasonable inferences which can be drawn therefrom").

As discussed on pages 16-17, below, in deciding a Rule 15 motion on a proposed class action, the Court should not evaluate whether the proposed class will be **_certified_**. Yet State Farm's Response is almost entirely devoted to arguing that the class theory is improper here. Indeed, State Farm implicitly acknowledges this at page 13:

> Rule 23 "does not set forth a mere pleading standard." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). "Plaintiffs seeking class certification must meet all the requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)." *Ferrara v. 21st Century North America Insurance Company*, 245 Ariz. 377, ¶ 6 (App. 2018). The party seeking class certification has the burden of demonstrating that "the prerequisites are satisfied—merely calling it a class action does not make it one." *Ferrara*, 245 Ariz. at ¶ 6 (quoting *Carpinteiro v. Tucson Sch. Dist. No. 1*, 18 Ariz. App. 283, 286 (1972)); *accord Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) [Response, at 13 (note omitted).]

The *Comcast* and *Ferrara* cases cited by State Farm, above, address the question of whether to **_grant_** *class certification*.[2] State Farm does not challenge the legal sufficiency of the facts pled in Plaintiffs' proposed amended complaint.  By ignoring the standard of review and filing what is actually a premature opposition to a (non-existent) motion for class certification, State Farm implicitly concedes that the proposed amended complaint adequately sets forth facts supporting the class theory.

## **RELEVANT FACTS**

Xactimate is a property damage estimating program used by contractors, insurance companies, and public adjusters. State Farm uses the Xactimate estimating tool to adjust residential and commercial property loss claims and accepts the pricing as an accurate estimate. Xactimate has two different data bases: a "new construction" database for

---

[2] The order appealed in *Comcast* was the trial court's grant of a motion for class certification made *after* class action discovery had occurred and after the plaintiffs submitted expert witness testimony in favor of their class certification motion. 596 U.S. at 30-32. *Ferrara* makes this even more plain: "Following extensive discovery and argument, the trial court … denied class certification." 245 Ariz. at 379-80.

ground-up (re)builds and a "restoration" database for all other losses. *See* Plaintiffs' Proposed Amended Complaint ("Prop. Am. Compl.") at ¶¶ 22-27. The "new construction" database produces a lower estimate for the same items or scope of work because it makes across-the-line reductions in labor costs based on labor efficiencies only realized in true "new construction" or ground-up rebuild projects. But State Farm misuses the Xactimate program by applying "new construction" pricing on claims for which "restoration" pricing is appropriate, thereby arbitrarily paying less than the amount it reasonably knows should be paid to the respective policyholder to rebuild his or her home or other structure. *Id.* at ¶¶ 28-29, 32-34, 37-38.

State Farm knows its customers are unaware that Xactimate contains two different pricing databases. State Farm fraudulently represents to its policyholders that it prepares estimates intended to determine the **<u>correct</u>** amount to return their property to a pre-loss condition. But State Farm intentionally underpays the proposed class members' claims and it unjustly enriches itself by paying less than what it knows it owes on losses. *Id.* at ¶¶ 30-31, 35-36, 40-43.

State Farm adjusters literally click a button on the Xactimate software and, by doing so, they arbitrarily reduce the amount of the estimate (and the subsequent payment to the policyholder). Plaintiffs' estimate, for example, was originally prepared using the "restoration" database. While implementing the scheme has been easy for State Farm – it saves approximately 10-20% on what it knows it owes – it is just as easy to determine the amount State Farm actually owes on the subject losses. It would literally take one computer stroke per loss to re-price the estimates to the appropriate amount.

Plaintiffs have been damaged by State Farm's conduct. Plaintiffs still owe their contractor $67,045.36, the amount State Farm wrongfully withheld, plus interest.

## <u>ARGUMENT</u>

### A.   <u>State Farm's "Delay" and "Prejudice" Arguments Should be Rejected.</u>

State Farm was on notice that Plaintiffs were considering adding a class action theory and it **<u>stipulated</u>** to the scheduling order allowing Plaintiffs to file the Motion by

January 25, 2019.[3] Plaintiffs provided notice to the Court and State Farm on April 16, 2018, that they might seek to amend their Complaint to add a class action claim. *See* Order, April 16, 2018. The parties conferred and agreed on the discovery Plaintiffs would conduct before Plaintiffs decided whether to add a class action claim to this case. The parties originally stipulated to a November 26, 2018 deadline to file the Motion for Leave. At the September 26, 2018 Status Conference, the parties agreed to submit a new scheduling order, allowing Plaintiffs to file the Motion by January 11, 2019.

State Farm not only agreed to the date for Plaintiffs to file the Motion, State Farm asked that its response date be pushed back until the end of February. **Exhibit 1**, 9/28/18 email from Bradham to Gundelach at 1-2. On January 4, 2019, State Farm agreed to a two-week extension for Plaintiffs to file the Motion. State Farm then asked if its response deadline could be pushed back from February 28, 2019 to March 14, 2019. State Farm's new counsel requested an additional extension, that was granted. **Exhibit 2**, 2/2/19 email from Bradham to Gundelach at 1-3.

State Farm contends Plaintiffs should have filed the Motion immediately after Robert Gonzales' deposition on April 4, 2018. Response at 7. In that regard, State Farm misstates the procedural history. Plaintiffs informed State Farm and the Court that they were considering seeking leave to add the class action allegations on April 16, 2018, but they wanted to take a Rule 30(b)(6) deposition of State Farm's representative on Xactimate issues before deciding whether to seek leave to proceed as a class action.[4]

With State Farm's consent and agreement, the Court amended the scheduling order to allow Plaintiffs to take a Rule 30(b)(6) deposition before the deadline to file the Motion

---

[3] "Delay alone is not usually cause to deny a request to amend." *Uyleman v. DS Rentco*, 194 Ariz. 300, 303, ¶ 11 (App. 1999).

[4] State Farm contends that because Plaintiffs did not include citations to any of the Rule 30(b)(6) deposition in their motion to leave, this somehow proves that the Rule 30(b)(6) deposition was not material to considering whether to add a class action claim in this case. *See* Response at 7. This argument further shows that State Farm is mistakenly treating Plaintiffs' Motion for Leave as a motion for class certification. State Farm's Rule 30(b)(6) witness' testimony will be important during class action discovery and will be used to support Plaintiffs' motion for class certification down the road.

to Amend.  After that scheduling conference, State Farm's counsel wrote:

> Consistent with our discussion today with the Court about extending deadlines, please let us know if there are any dates or weeks in May that you know do not work for you for depositions, and we will provide dates that work on our end for the depositions you have requested….

**Exhibit 3**, 4/16/18 email from E. Bradham at 1-2.

Later that day, Plaintiffs' noticed the 30(b)(6) deposition for April 27, 2018, knowing the deposition date would likely need to move.[5] State Farm indicated that the Rule 30(b)(6) deposition would need to take place in Illinois, and on May 2, 2018, Plaintiffs' counsel asked if the deposition could go forward during the week of June 4, 2018. **Exhibit 5**, 5/2/18 email from Silverman to Bradham, at 1-4.

On May 10, 2018, State Farm told Plaintiff that the Rule 30(b)(6) deposition would need to be postponed: "Tom Moss was originally going to be our 30(b)(6) designee, but he has been out of the office recently on an unexpected medical leave. We are determining whether we may need to designate someone else, and will get back to you next week." **Exhibit 6**, 5/10/18 email from Bradham to Silverman, at 2-3.

On May 17, 2018, State Farm proposed June 20 or 21 for the Rule 30(b)(6) deposition (dates when Plaintiffs' counsel was not available). The same day, Plaintiffs' counsel asked whether State Farm's witness would be available any day on the following week. On May 18, 2018, State Farm stated that the Rule 30(b)(6) witness would not be available after June 21, until July 23, 2018. *Id*. at 1-2. The parties then agreed on July 30, 2018, for the Rule 30(b)(6) deposition.

The parties then agreed on a briefing schedule for the Motion to Amend (as indicated above). State Farm, after asking for an extension of time through March 14, 2019 to file its response to the Motion, then changed counsel, and on March 6, 2019, its new counsel asked for the response deadline to be further extended, to April 15, 2019.

---

[5] Plaintiffs' counsel stated: "I understand we are looking for a new day for the Rule 30(b)(6) deposition, so while this notice keeps the same day as the original, we will amend it once we have an agreed upon date." **Exhibit 4**, 4/16/18 email from Silverman to Bradham, at 1.

**B.**   **State Farm's "Futility" Argument on Unjust Enrichment Should be Rejected.**

State Farm should not be allowed to profit from engaging in fraudulent conduct. While plaintiffs typically cannot claim unjust enrichment/restitution when they have an enforceable right under a contract, opportunistic breach and the prevention doctrine are exceptions to that general rule.

**1.**   **Opportunistic Breach.** "It has long been good contract law that if the happening of such a condition is caused by the conduct of the promisor it will not terminate the duty of the promisor.  This is but an application of the established principle that equity will not permit one to rely on his own wrongful act." *Christensen v. Felton*, 322 F.2d 323, 327 (9th Cir. 1963) (citations omitted). As noted by the RESTATEMENT:

> In exceptional cases, a party's profitable breach of contract may be a source of unjust enrichment at the expense of the other contracting party. The law of restitution treats such cases in the same way that it treats other instances of intentional and profitable interference with another person's legally protected interests, authorizing a claim by the injured party to the measurable benefit realized as a result of the defendant's wrong.

RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 39 (2011).

> The common rationale of every instance in which restitution allows a recovery of profits from wrongdoing, in the contractual context or any other, is the reinforcement of an entitlement that would be inadequately protected if liability for interference were limited to provable damages. Cases in which restitution reaches the profits from a breach of contract are those in which the promisee's contractual position is vulnerable to abuse. Vulnerability in this context stems from the difficulty that the promisee may face in recovering, as compensatory damages, a full equivalent of the performance for which the promisee has bargained. A promisor who was permitted to exploit the shortcomings of the promisee's damage remedy could accept the price of the promised performance, then deliver something less than what was promised. Such an outcome results in unjust enrichment as between the parties. The mere possibility of such an outcome undermines the stability of any contractual exchange in which one party's performance may be neither easily compelled nor easily valued.
>
> A promisor who recognizes this possibility and attempts to profit by it commits what is here called an "opportunistic breach."

*Id.*

State Farm wrongfully gained profits through collecting premiums paid by its insureds, and from cost savings realized through its use of the New Construction estimates on large loss restoration projects. These profits are greater than what State Farm would have realized had it provided its insureds with the benefits those insureds were entitled to under their insurance contracts. As set forth below, Plaintiffs believe they have a proper contract claim. But in the event Plaintiffs' contract remedies are insufficient to make them whole, Plaintiffs (and class members) should be able to pursue an equitable remedy through a claim for restitution and unjust enrichment.

**2.** **The Prevention Doctrine.** State Farm cannot engage in fraudulent practices designed to conceal and prevent the proposed class from receiving full replacement cost coverage and then argue that the proposed class has failed to fulfill a condition precedent for receiving full replacement coverage. *See Utica Mut. Ins. Co. v. Cincinnati Ins. Co.*, No.18-cv-1646 (E.D. P.A. 2019).[6]  "The doctrine of prevention states that where a promisor prevents, hinders, or renders impossible the occurrence of a condition precedent to his or her promise to perform, the promisor is not relieved of the obligation to perform and may not invoke the other party's nonperformance as a defense when sued upon the contract. In short, under the doctrine of prevention, where a party to a contract is the cause of the failure of the performance of the obligation due him or her, that party cannot in any way take advantage of that failure." *D & S Realty, Inc. v. Markel Ins. Co.*, 816 N.W.2d 1, 13 (Neb. 2012).

So long as the insurance company's conduct "contributed materially' to the non-occurrence of the condition, the prevention doctrine waives or excuses compliance with the condition. *Jeb Stuart Auction Srvs. v. West Am. Ins. Co.*, 4:14-cv-00047 (D. Va. 10/1/2015). Here, the unjust enrichment claim is based on the original facts alleged in the complaint, and equity demands that Plaintiffs' unjust enrichment claim be available to

---

[6] "[T]his Court predicts that under Pennsylvania law, an insured would be able to recover replacement cost despite noncompliance with a replacement requirement where the insurer's denial of liability and failure to pay actual cash value prevents the insured from replacing the property."

ensure that every class member can claim their legal right to full replacement cost value, and to ensure that State Farm does not profit from its own fraudulent wrongdoing. Any other result would reward State Farm for its inequitable conduct.

**C.     State Farm's "Futility" Argument on Statutory Fraud Should be Rejected.**

**1.     Private Right of Action.** The proposed Amended Complaint seeks to add a statutory fraud claim under A.R.S. § 20-443. In *Sparks v. Republic Nat'l Life Ins. Co.,* 132 Ariz. 529, 540-41 (1982), our Supreme Court held that a private right of action exists under this statute; therefore, Plaintiffs have a private right of action for that claim. *Id.*

**2.     Arizona Law Regarding Fraudulent Omissions.** A.R.S. § 20-443(A)(1) prohibits "[m]isrepresenting the terms of any policy issued or to be issued . . ." According to the Supreme Court in *Sparks,* § 20-443 "deals with unfair practices and frauds in the transaction of the insurance business." *Id.* at 541. A.R.S. § 20-443 is similar to the Arizona Consumer Fraud Act, A.R.S. § 44-1522, which also provides a private right of action. *See Sellinger v. Freeway Mobile Home Sales, Inc.,* 110 Ariz. 573, 576 (1974). "'The Arizona Consumer Fraud Act … and the Unfair Insurance Practices Act, A.R.S. § 20-443 … are both statutory fraud claims and have identical elements.'" *Moreno v. Minnesota Life Ins. Co.,* 2015 WL 1457419, at *4 (D. Ariz. 2015) (quotation omitted). With respect to the Consumer Fraud Act, Arizona law is clear that a material omission can constitute a misrepresentation, *State ex rel. Horne v. AutoZone, Inc.,* 229 Ariz. 358, 361 (2012), and an omission is material if it is "logically related to the transaction in which it occurs and rationally significant to the parties in view of the nature and circumstances of the transaction." *Demaree v. Wal-Mart Stores, Inc.,* 511 Fed.Appx. 660, 661 (9th Cir. 2013) (applying Arizona law).

**3.     The Fraudulent Omission Here.** The Proposed Amended Complaint alleges that State Farm misrepresented the Replacement Cost Value and the Actual Cash Value that the class members were entitled to by using the new construction database for restoration property claims, where the restoration database should have been used. State Farm violated A.R.S. § 20-443 by mispresenting its replacement cost policy to the

Plaintiffs, and to all proposed class members, when it represented that the policy provides for a replacement cost valuation for reconstruction/restoration projects, even though State Farm knew that it would not pay the full replacement cost values for large loss claims, since it would be using the new construction database to adjust those types of claims.

The factual allegations underlying the misrepresentation claim are the same factual allegations raised in the original complaint. The allegations will not entail redoing a large portion of the discovery and State Farm is not prejudiced. State Farm sold Plaintiffs a replacement cost policy. State Farm represented to Plaintiffs, at the time it sold the policy, that they would be paid the full replacement cost for any losses. But State Farm has systematically used new construction pricing on all large loss claims, thereby improperly increasing its profits and harming Plaintiffs (and class members).

Plaintiffs' policy provides: "We will pay the cost to repair or replace the damaged part of the property covered under Section 1- COVERAGES, COVERAGE A- DWELLING." While State Farm represented to Plaintiffs that it would pay proper repair and replacement costs, State Farm constructed a common scheme of deliberately failing to follow the Xactware manual in adjusting losses. The Xactware manual states, "The New Construction option provides a cost for each line item based upon the most efficient labor productivity available. **This option is intended to be used for true new construction applications or for jobs in which a total 'ground-up' rebuild is necessary**." [Emphasis added.] Additionally, the Xactware manual states, "The Restoration / Service / Remodel option is for jobs other than total losses or new construction.  When selected, this option provides a cost for each line item based upon a labor productivity that includes such things a drive time, mobilization costs, material delivery, and the overall reduction in productivity that occurs when repair professionals address the complex issues found in restoration and remodeling jobs (for example, matching drywall texture or working in an occupied home.)"

Even a liberal reading of the policy gives no indication that State Farm would use new construction pricing for restoration and remodeling jobs when it is common

knowledge that restoration projects are less cost efficient than new construction projects. Mr. Phillips testified that from some simple online research, he learned the reasons why restoration projects would cost more than new construction. **Exhibit 7**, A. Phillips Depo., 44:17-45:17. Any reasonable person reading the policy would never be led to believe that State Farm would rework its own procedures to swindle people out of ten percent, or more, of the actual repair costs. State Farm's own adjuster even admitted that the Plaintiffs' loss was neither a "true new construction" nor "a total 'ground-up' rebuild." **Exhibit 8**, R. Gonzalez Depo., 40:18-20.

State Farm misrepresented the terms of the policy it issued to the Plaintiffs. Moreover, Plaintiffs will seek permission to add an additional claim for State Farm's violation of the Arizona Consumer Fraud Act.

### 4.  The Fraud Theory "Relates Back" to the Original Complaint.

Plaintiffs' proposed amended complaint relates back to the original complaint because the original complaint alleged a common scheme of conduct and links together otherwise distinct transactions; also, the original complaint provided defendant adequate notice of the conduct upon which Plaintiffs base their claim. *See Marshall v. Maricopa Cnty.*, 131 Ariz. 379 at 382 (1982). As Federal Rule 15 is substantially similar to Arizona Rule 15, it is helpful to look to federal law for guidance on whether the rule allows relation back where a party amends the complaint to assert a class action.

> Although Rule 15(c) does not expressly apply to a new pleading adding or dropping plaintiffs, the Advisory Committee Note to the 1966 amendment of the rule indicates that the problem of relation back generally is easier to resolve in this context than when it is presented by a change in defendants and that the approach adopted in Rule 15(c) toward amendments affecting defendants extends by analogy to amendments changing plaintiffs. **As long as defendant is fully apprised of a claim arising from specified conduct and has prepared to defend the action, defendant's ability to protect itself will not be prejudicially affected if a new plaintiff is added, and defendant should not be permitted to invoke a limitations defense**. This seems particularly sound inasmuch as the courts will require the scope of the amended pleading to stay within the ambit of the conduct, transaction, or occurrence set forth in the original pleading.

6 WRIGHT & MILLER, *Federal Practice and Procedure* § 1501 (emphasis added).

Thus, under federal law, Rule 15 principles related to pleadings substituting defendants applies by analogy to adding plaintiffs. *Raynor Bros. v. American Cyanimid Co.*, 695 F.2d 382, 384 (9th Cir., 1982). Rule 15(c) also allows relation back when a party amends the complaint to assert a class action. *Sokolski v. Trans Union Corp.*, et. al., 178 F.R.D. 393, (E.D.NY 1998). In *Sokolski*, a debtor plaintiff filed a complaint against a credit bureau and a bank alleging that they engaged in deceptive and unfair practices via written communications to plaintiff to collect a debt allegedly owed by plaintiff in violation of the Fair Debt Collection Practices Act. *Id.* Subsequently, plaintiff moved to amend the complaint to assert a class action to include a class of all persons who received similar letters to that received by the plaintiff. *Id.*

In the amended complaint, plaintiff alleged "it is believed that communications similar, if not identical to the demand form letter received by the plaintiffs, have also been received by all Class members." *Id.* The defendants opposed the motion to amend on the grounds that it was "prejudicial, untimely and futile. Defendants argue[d] the motion [was] futile because (1) the statute of limitations bars any claims made by the proposed class ...." *Id.* Addressing the defendants' futility argument, the court stated:

> A motion to amend the complaint may be considered futile if the claims sought to be added are barred by the relevant statute of limitations. However, under Rule 15(c) of the Federal Rules of Civil Procedure, **an otherwise time-barred claim may be deemed timely based on the "relation back" doctrine**. Rule 15(c)(2) provides, in pertinent part, that "[a]n amendment of a pleading relates back to the date of the original pleading when ... the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." In deciding whether the claims relate back, the court must also examine if "the factual allegations set forth in the original complaint gave the defendants adequate notice of the new claims."

*Id.* at 397 (citations omitted, emphasis added).

Consequently, the two prongs to consider under the relation back doctrine are: 1) whether the claims arise out of a common scheme, and 2) whether the defendant had adequate notice of the potential for additional claims. *Raynor Bros. v. American Cyanimid Co.*, 695 F.2d 382, 384 (9th Cir. 1982).

**a.**   **Common Scheme.**   The relation back doctrine operates when "there is a common core of operative facts linking the amendments and the original complaint." *Sokolski* at 397 (citation omitted). "The existence of an underlying common scheme or course of conduct which is the basis of the original action and links otherwise distinct transactions provides grounds for relation back under Rule 15(c)." *Id.*; *see also Marshall v. Maricopa Cnty.*, 131 Ariz. 379, 382 (1982).

Upon examining the facts of the original complaint and the new claims proposed in the amended complaint, *Sokolski* found the new claims were a "natural offshoot" of the "basic scheme" to defraud the original plaintiff debtor, and, therefore, the new claims related back and were not futile as barred by the statute of limitations. *Sokolski* at 397. Like *Sokolski*, Plaintiffs alleged in their original complaint specific conduct of State Farm, that is, using the New Construction database rather than the Restoration / Remodel database to generate Replacement Cost Values and Actual Cash Values. *See id.* Additional class members are a "natural offshoot" of State Farm's "basic scheme" to generate lower Replacement Cost Values and Actual Cash Values for their insureds who required Restoration / Remodel projects. This "common core of operative facts linking the amendment and the original complaint" provides sufficient ground for relation back under Rule 15(a). *See id.*

**b.**   **Adequate Notice**. Next, *Sokolski* addressed whether defendants had adequate notice of the existence of additional possible plaintiffs and claims based on "a liberal reading of the complaint." *Id.* at 398.  Under Rule 15(c)(3), an amendment relates back if the defendant knew or should have known that it could be called on to defend against claims asserted by the newly-added plaintiff, unless the defendant would be unfairly prejudiced in maintaining a defense against the newly-added plaintiff. *Plubell v. Merck & Co., Inc.*, 434 F.3d 1070, 1072 (8th Cir. 2006) (citations omitted). "As long as a defendant is fully apprised of a claim arising from specific conduct and has prepared to defend the actions against him, he will not be prejudiced by the addition of a new plaintiff and thus should not be allowed to raise a limitations defense. ***As long as the original***

***complaint gives the defendant adequate notice, an amendment relating back is proper even if it exposes a defendant to greater damages***. The principal inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party by the general fact situation alleged in the original pleading." *Sokolski* at 398 (emphasis added). "Allegations which simply 'amplify the facts alleged in the original pleading or set forth those facts with greater specificity' will relate back." *In re Chaus Securities Litigation*, 801 F. Supp 1257, 1264 (S.D.N.Y. 1992)(quotation omitted).

The original complaint in *Sokolski* alleged defendants "intended to induce plaintiff *and others* to send money to Bank One Corporation by sending, encouraging and/or authorizing the letter in its name and/or on its letterhead." *Sokolski* at 398 (emphasis in original). Also, the complaint alleged "that Trans Union Corp. authorized Bank One Corp. to use Trans Union Corporation's letterhead or name and collection package to send dunning letters to consumers, and Plaintiff, Robert E. Sokolski." *Id.* The Court found "the defendants had sufficient notice that a class action could be filed against them and that the conduct complained of affected other persons." *Id.* Based on this finding, the Court found that the amended complaint to assert a class action related back to the filing of the original complaint. *Id.*

While certainly helpful to impute notice to the defendant in *Soloski*, mentioning "others" in the original complaint is not necessary to satisfy the adequate notice requirement. *Chaus* found that the original complaint provided sufficient notice where it alleged specific facts that made up a basic scheme of financial and accounting manipulations so that the allegations in the amended complaint were a "natural offshoot" of the "basic scheme." *Chaus* at 1264.

Here, State Farm had adequate notice that it could face a class action because Plaintiffs alleged a basic scheme used by State Farm to generate lower Replacement Cost Values and Actual Cash Values for restoration claims.  Furthermore, Plaintiffs alleged the following in the original complaint, "State Farm has consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to ***others***."

Complaint, at 6:1-2 (emphasis added). State Farm knew its course of conduct was not isolated to just the Plaintiffs because it was common practice for State Farm to use the New Construction database for all large reconstruction claims in lieu of the Restoration / Remodel database. *See* **Exhibit 8**, R. Gonzales Depo., at 32:20-33:3, 68:3-69:18, 76:11-15, 83:2-84:12, 88:25-89:9.

Plaintiffs' original complaint sufficiently stated the facts that made up State Farm's basic scheme of generating lower Replacement Cost Values and Actual Cash Values. The additional class members and claims in the Proposed Amended Complaint are a "natural offshoot" of State Farm's "basic scheme." *See Chaus at* 1264. Plaintiffs' allegations in the Proposed Amended Complaint "constitute neither a new transaction or occurrence nor a new claim." *See Chaus* at 1264.

In this case, the adequate notice requirement is satisfied because Plaintiffs' original complaint alleged that State Farm engaged in a course of conduct it knew was harmful to others, and State Farm knew that it engaged in this unlawful course of conduct with a great many substantially similar claims over the course of several years. State Farm is not prejudiced just because class members are added and it is exposed to greater damages. *See Sokolski at* 398. Because State Farm was "fully apprised of the claim arising from specified conduct and has prepared to defend the action, defendant's ability to protect itself will not be prejudicially affected if a new plaintiff is added." *See* 6 Wright & Miller, Federal Practice and Procedure § 1501.

Under Rule 15(c), this Court should hold that Plaintiffs' Proposed Amended Complaint relates back to the original Complaint because the new claims arise out of the same course of conduct complained of in the original pleading, and State Farm had adequate notice that it could be called on to defend against the same claims from additional plaintiffs.

**D.**   **State Farm's "Futility" Argument Based on Plaintiffs Purportedly Having no Damages Should Be Rejected.**

While State Farm argues "Plaintiffs admit they have no damages," Plaintiffs have

T2227424.DOCX;1                                    15

clearly sustained special damages.  Although ADANAC Builders Corp. was authorized to repair the Phillips' home and completed the repairs of the fire damage to the property, the Plaintiffs still sustained special damages as a result of State Farm's tortious conduct and breach of contract — namely, Plaintiffs still owe ADANAC $67,045.34.  *See* **Exhibit 9**, Decl. of David Fix. Thus, a breach of contract action is entirely proper here.

**E.**   **State Farm's "Futility" Argument on Class Certification Should be Rejected.**

    **1.**   **Relevance of Federal Law and Class Presumptions.**

The parties agree Arizona Courts are deferential to federal law addressing Rule 23. *ESI Ergonomic Solutions, LLC v. United Artists Theatre Circuit, Inc.,* 203 Ariz. 94, 98, ¶ 11, n.2 (App. 2003). *ESI* also establishes the **<u>liberal</u>** presumption in favor of class actions. There, the trial court denied class certification, but the Court of Appeals reversed, holding that Rule 23 "should be construed liberally, and doubts concerning whether to certify a class action should be resolved in favor of certification." *Id.* at 98, ¶ 11.  This liberal presumption applies to the commonality requirement under Rule 23, and any "'common questions need not be dispositive of the entire action.'" *Godbey v. Roosevelt School Dist.,* 131 Ariz. 13, 18 (App. 1981) (quotation omitted).

    **2.**   **Class Certification Should Not be Tested on a Motion to Amend.**

Plaintiffs filed a straightforward Rule 15 Motion to Amend, running less than 10 pages. On the basis of a "futility" argument, State Farm's 27 page Response is the equivalent of a full-scale opposition to a motion for class certification, albeit without mentioning that no motion for class certification has been filed (and no detailed class discovery has taken place). "Futility" is narrowly defined. If the Plaintiffs' "*allegations* set forth sufficient facts to establish a real dispute based upon an actual controversy," it is an abuse of discretion to deny leave to amend. *Yes On Prop 200 v. Napolitano*, 215 Ariz. 458, 471, ¶ 43 (App. 2007). Leave to amend "should be granted if the underlying facts or circumstances relied upon … may be a proper subject of relief." *Id.* ¶ 40 (citation and quotation marks omitted).

In this procedural setting (a motion to amend), federal law holds that substantive

arguments under Rule 23 are "more properly raised on a motion for summary judgment or in opposition to a motion for class certification." *Barnett v. County of Contra Costa,* 2010 WL 2528523, at *4 (N.D. Cal. 2010).  Under *Barnett,* a denial of leave to amend based on futility should be ordered "only if the proposed amendment would be subject to dismissal under [Rule] 12(b)(6)" and "the Ninth Circuit long ago explained that 'compliance with Rule  23 is **not** to be tested by a motion to dismiss for failure to state a claim,'" and, thus, "Rule 23 should also not be tested on a motion for leave to amend." *Id.* (emphasis added).[7]

### 3.    There is Sufficient Record Support for a Class Action Here.

#### a.    The Rule 23(a) Prerequisites are Met.

Finally, if the Court wishes to entertain State Farm's premature opposition to class certification, there is record support here for a class action. A class action must meet the four prerequisites in Rule 23(a), and it must fit within one of the class types set forth in Rule 23(b). All four of the Rule 23(a) prerequisites are met here, at least for purposes of defeating State Farm's "futility" argument.

**Numerosity.** Under Rule 23(a)(1), the class must be so numerous that joinder of all members is impracticable. Courts have certified classes with fewer than 20 members. *See, e.g., Jackson v. Danberg,* 240 F.R.D. 145, 147-48 (D. Del. 2007) (numerosity in § 1983 claim satisfied by 16 members).[8] While a class size of less than 20 is a more difficult decision, it is "generally accepted that when a proposed class has at least forty members, joinder is presumptively impracticable based on numbers alone." *In re Banc of California Securities Litigation,* 2018 WL 3868922 (C.D. Cal. 2018).[9]

---

[7] Citing and quoting *Gillibeau v. City of Richmond,* 417 F.2d 426, 432 (9th Cir. 1969). *Cf. Presser v. Key Food Stores, Inc.,* 218 F.R.D. 53, 57 (E.D.N.Y. 2003) ("the court may limit its inquiry into the class action requirements at the amendment stage" and "defendant's arguments against certification are 'more appropriately addressed in the context of motions to certify the proposed classes'").

[8] *See also Bublitz v. E.I. du Pont de Nemours & Co.,* 202 F.R.D. 251, 255-56 (S.D. Iowa 2001) (ERISA class certified with 17 members); *Gaspar v. Linvatec Corp.,* 167 F.R.D. 51, 55-57 (N.D. Ill. 1996) (18 class members satisfied numerosity).

[9] *Accord, Corley v. Google, Inc.,* 316 F.R.D. 277, 290-91 (N.D. Cal. 2016) ("As a

The class sought to be certified is for State Farm insureds **in Arizona** who experienced major losses (typically fire losses), where State Farm sought to save money by using Xactimate's "new construction" database. The testimony of State Farm Adjuster Robert Gonzales, the adjuster in the Arizona large loss unit who handled the Plaintiffs' claim, supports numerosity.[10] Gonzales testified that before 2011 or 2012, on all large losses, the Arizona large loss unit used the ***restoration*** setting; but in 2011 or 2012, the team manager told the unit that a new directive from State Farm headquarters required them to use the ***new construction*** setting for all large losses. **Exhibit 8** at 55:12 to 58:14 & 63:12-20. *See also id.* at 72:13-21 (for the last 6-7 years, every large fire loss that came into the unit would "automatically" trigger the new construction pricing under Xactimate).

Gonzales testified that he handled about 30 large losses per year, equating to 180 large loss claims over six years. *Id.* at 68:3 to 69:18. Gonzales worked in a team with another adjuster who handled the same numbers of claims. *Id.* at 76:11-15. As the bulk of the losses in the unit were fires, Gonzales estimated he handled 160 large fire losses since State Farm's new directive was issued. *Id.* at 83:2 to 84:12 & 88:25 to 89:9. Finally, Gonzales testified there were four adjusters in his unit, *id.* at 59:10-19, meaning if we take four times 160 large loss fire claims, the Arizona class is approximately 640 insureds; and, if we go with Gonzales' estimate of 180 total claims over six years, times four, we have a class of approximately 720 insureds. *Cf. P.P v. Compton Unified School Dist.,* 2015 WL 5752770, at *8 (C.D. Cal. 2015) ("a good-faith estimate of the class size is sufficient when the precise number of class members is not readily ascertainable").

**Commonality**. Unlike predominance under Rule 23(b), which is a somewhat

---

general guideline … a class of 40 or more members raises a presumption of impracticability of joinder"). This same presumption was noted by the District of Arizona in *Collings v. IntelliQuick Delivery, Inc.,* 2015 WL 1292444, at *11 & n.104 (D. Ariz. 2015).

[10] Gonzales (a 29-year adjuster with State Farm) met five times with State Farm attorneys to prepare for his deposition (two outside attorneys from the Steptoe firm and an in-house attorney), for a total of 15-18 hours. Gonzales Depo., **Exhibit 8**, at 9:7-21, 11:9-20, 12:22-25, 14:17 to 15:3, & 26:8-13.

higher burden, "[t]he thresholds for commonality and typicality under Rule 23(a) are not high." *Gene & Gene LLC v. BioPay LLC,* 541 F.3d 318, 325 (5th Cir. 2008).[11] "So long as there is 'even a single common question,' a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." *Parsons v. Ryan,* 754 F.3d 657, 675 (9th Cir. 2014) (quotations omitted). And the common issue can be factual **or** legal. *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir. 1998) ("The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies.").  Here, the proposed class focuses on whether it is proper for State Farm to use the new construction database on large losses (mostly fire losses). The commonality prerequisite is satisfied here.

**Typicality.** The typicality prerequisite in Rule 23(a)(3) simply requires that the class representative "be a member of the class and have claims similar to those of other class members." *P.P v. Compton Unified School Dist.,* 2015 WL 5752770, at *18 (C.D. Cal. 2015).  Mr. and Mrs. Phillips had their claim reduced by over $50,000 because of the directive from State Farm requiring the use of new construction pricing on all large fire losses. *See* **Exhibit 9**. What happened to Mr. and Mrs. Phillips is typical of what happened to the other proposed class members. Gonzales testified that in **every single instance** where he and his unit used the new construction pricing, the claim amount was reduced. *See* **Exhibit 8**, R. Gonzales Depo., at 32:20 to 33:3 ("Q. *** in all instances the new construction setting will produce lower dollar amounts, right? A. Yes.").[12]

**Adequacy of Representation.** The final Rule 23(a) prerequisite is adequacy of representation by the class representative (the adequacy of class counsel is now addressed in Rule 23(g)). As with the other Rule 23(a) prerequisites, this is a minimal standard.

---

[11] *See also Bond v. Liberty Ins. Corp.,* 2017 WL 1628956, at *9 (W.D. Mo. 2017) ("Commonality is easily satisfied in most cases."); *In re Chinese-Manufactured Drywall Products Liability Litigation,* 2013 WL 499474, at *8 (E.D. La. 2013) ("The Rule 23(a)(2) commonality 'requirement is easily met in most cases.'").

[12] *Cf. Deering v. Galena Biopharma, Inc.,* 2014 WL 4954398, at *9 (D. Or. 2014) ("The majority of class action decisions support the view that when it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is met.").

Adequacy simply requires that "the proposed representative Plaintiffs do not have conflicts of interest with the proposed class …." *In re Conseco Life Ins. Sales & Marketing Litigation,* 270 F.R.D. 521, 531 (N.D. Cal. 2010). Moreover, "Adequate representation is usually presumed in the absence of contrary evidence." *Californians for Disability Rights, Inc. v. California Dep't of Transp.,* 249 F.R.D. 334, 349 (N.D. Cal. 2008). Plaintiffs have the educational background, work experience and motivation to help process this claim. *See* **Exhibit 7**, Depo. of A. Phillips, at 45:2-10 & 49:16-23 (after he received the estimate for his fire loss, he conducted independent on-line research about the new construction/restoration issue and he concluded the restoration of his home was "not a new build" … [and] "I just didn't see the logic behind why it would be considered a new build if it was clearly a restoration").

### b. This Case is Proper Under Rule 23(b)(3).

A Rule 23(b)(3) class action is a money damages class action, and there must be a showing that the common issue(s) predominate, and a class action would be superior to other available litigation methods.

**Predominance.** While predominance is a higher burden than commonality under Rule 23(a), it is easily met here. Predominance is aimed at assessing whether the interests of the class are "sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 623 (1997). If the "common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues," then there is predominance. *Blair v. Transam Trucking, Inc.,* 2015 WL 5006076, at *3 (D. Kan. 2015). To put it differently, "the predominance test asks whether a class suit for the unitary adjudication of common issues is economical and efficient in the context of all the issues in the suit." *Verma v. 3001 Castor, Inc.,* 2014 WL 2957453, at *14 (E.D. Pa. 2014). As stated by one federal court, "'Common issues will predominate if individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria – thus

rendering unnecessary an evidentiary hearing on each claim.'" *Souter v. Equifax Information Services, LLC,* 307 F.R.D. 183, 214 (E.D. Va. 2015) (quoting NEWBERG ON CLASS ACTIONS).

Applying these principles here, the common issue is whether State Farm acted improperly when it changed its procedures by issuing a directive that all large losses be estimated using new construction pricing, without any notice to insureds. If that was indeed an improper way for State Farm to treat its insureds, then the individual issue will be the amount of damages for each class member. As to that individual inquiry, Gonzales admitted that such a damages calculation would be exceedingly simple; namely, for each class member, "you use that same exact [State Farm] estimate, literally you flip a switch and the system will run a new estimate with larger dollar amounts using the restoration setting." **Exhibit 8**, R. Gonzales Depo., at 66:2-24.

**Superiority.** The final issue with respect to a Rule 23(b)(3) class action is whether it will be superior to other litigation methods. The classic example for this is where many individuals have relatively small claims compared to the cost of litigation. *See, e.g., Matter of Rhone -Poulenc Rorer, Inc.,* 51 F.3d 1293, 1299 (7th Cir. 1995) (class actions are "most compelling" when "individual suits are infeasible because the claim of each class member is tiny relative to the expense of litigation"); *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 860 (1999) ("One great advantage of class action treatment of mass tort cases is the opportunity to save the enormous transaction costs of piecemeal litigation."). State Farm will save around 10 to 20 percent (plus or minus) on a claim through its new directive. Thus, on a typical claim, the damages would be tens of thousands of dollars. While such sums are not insignificant, the important point is that few if any insureds will file suit against the largest property and casualty insurer in the country over such sums.

The other critical aspect of the superiority issue is deterrence. As stated in a leading treatise on class actions, "'the most important point, from an economic perspective, is that the violator be confronted with the costs of his violation -- this achieves the allocative purpose of the suit – not that he pays them to his victims.'" This is because "'[i]f each

[victim] is left to assert his rights alone if and when he can, there will be at best a random and fragmentary enforcement, if there is any at all. This result is not only unfortunate in the particular case, but it will operate seriously to impair the deterrent effect of the sanctions which underlie much contemporary law.'" 2 NEWBERG ON CLASS ACTIONS § 4:64, at n.10 (quoting two law review articles, one by noted economist and former Judge Richard Posner of the Seventh Circuit).

**State Farm's "Reliance" Argument Should be Rejected.** State Farm argues that the element of reliance will vary among the class members and, therefore, the statutory fraud claim cannot proceed as a class claim. However, as noted above, Plaintiffs intend to allege a claim for violations of the Consumer Fraud Act, which has the same elements as A.R.S. § 20-443. In consumer fraud cases, the proposed class representative's claims are generally held to be typical of the class members' claims if the allegations can be traced to the same overall fraud, even if class members' specific claims are factually distinct. In *re Prudential Ins. Com. America Sales Practice Litigation Agent Actions*, 148 F.3d 283, 310-311 (3d Cir., 1998).[13]

Furthermore, in a fraud-based class action, reliance is not a bar to class action where a defendant has a duty to speak. Under *Zilisch v. State Farm Mutual Auto. Ins. Co.*, the duty that an insurer owes to its insured is a quasi-fiduciary duty. 196 Ariz. 234, 237 (2000). While Plaintiffs must rely on defendant's misrepresentations, "reliance need not be reasonable." *Correa v. Pecos Valley Development Corp.*, 126 Ariz. 601, 605 (App., 1980). In this case, defendants misrepresented material information related to the insurance policy they sold Plaintiffs through omissions and failure to disclose their claims handling practices. The proposed class of plaintiffs relied on the misrepresentations and

---

[13] Finding typicality in an action by insurance policyholders alleging insurer had defrauded its customers, even though the class members had suffered from a wide variety of non-overlapping fraudulent practices, including "churning" investments to generate premiums, falsely promising that premiums would vanish through growth of investment, and marketing fraudulent investment plans. *See also Marcus v. BMW of North America, LLC*, 2010 WL 4853308, at 6 (D.N.J., 2008) (finding typicality in an action by purchasers alleging tire manufacturers misrepresented and omitted product information, even though "class members … bought products that differ from products the plaintiff bought").

this is evidenced by their purchasing of policies from State Farm, since no insured would have purchased the policy if they had been told by State Farm that, in the event of a large loss, State Farm would underpay them by 10% to 20%.

### CONCLUSION

The Court should grant Plaintiffs' Motion, allowing the class claim to proceed. State Farm knowingly acted to deprive its insureds of the benefits they were entitled to under their insurance policy. Further, the Court should only address the issue before the Court, that being the Motion to Amend. Plaintiffs are not presently seeking to certify a class and State Farm's focus on that issue is procedurally inappropriate before class discovery has taken place. However, if the Court chooses to consider State Farm's certification argument, the Court should find that Plaintiffs Amended Complaint is sufficient to overcome State Farm's untimely and procedurally inappropriate challenge.

RESPECTFULLY SUBMITTED this 24th day of May 2019.

MERLIN LAW GROUP, P.A.

By:   /s/Michael N. Poli
        Michael N. Poli
        Lawrence R. Moon
        *Attorneys for Plaintiffs*

ORIGINAL of the foregoing e-filed
this 24th day of May 2019, and

COPY of the foregoing sent via
e-serve this 24th day of May 2019, to:

Robert Sullivan
Alicyn Freeman
BROENING OBERG WOODS & WILSON
2800 North Central Avenue, Suite 1600
Phoenix, Arizona 85004
Attorneys for Defendant State Farm Fire and Casualty

        /s/ Graciela Dobratz

T2227424.DOCX;1                                    23

Exhibit 1

| From: | Bradham, Erin <EBradham@steptoe.com> |
|---|---|
| Sent: | Friday, September 28, 2018 9:00 AM |
| To: | Linda Gundelach; Tilleman, Karl |
| Cc: | Michael N. Poli; Lawrence R. Moon; Stephen Silverman - Stephen Silverman Law (steve@stephensilverman.com) |
| Subject: | RE: Phillips v. SF |

Thanks Linda.  Please send me the "about to be filed" version with track changes accepted and proposed order before you file, just so we can take one final look.

Best,
Erin

---

**From:** Linda Gundelach [mailto:lgundelach@merlinlawgroup.com]
**Sent:** Friday, September 28, 2018 8:45 AM
**To:** Bradham, Erin; Tilleman, Karl
**Cc:** Michael N. Poli; Lawrence R. Moon; Stephen Silverman - Stephen Silverman Law (steve@stephensilverman.com)
**Subject:** RE: Phillips v. SF

Erin,

Your proposed changes are fine.  I will finalize the stipulation and e-file today.

Thank you,

Linda



*The Policyholder's Advocate* ®
website | Property Blog | Condo Blog

Connect with us: 

Linda Gundelach
Paralegal
Merlin Law Group
2999 North 44th Street Suite 520
Phoenix, Arizona 85018
Tel:  (480) 315-9980
Fax: (480) 315-9984

Privilege and Confidentiality Notice:
The information contained in this e-mail and any attachments may be legally privileged and confidential. If you are not the intended recipient or the employee or agent responsible for delivering the transmittal to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify the sender and permanently delete the e-mail and any attachment immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the content to any person. Thank you

**From:** Bradham, Erin [mailto:EBradham@steptoe.com]
**Sent:** Thursday, September 27, 2018 2:00 PM
**To:** Linda Gundelach <lgundelach@merlinlawgroup.com>; Tilleman, Karl <KTillema@steptoe.com>
**Cc:** Michael N. Poli <MPoli@merlinlawgroup.com>; Lawrence R. Moon <LMoon@merlinlawgroup.com>; Stephen

Silverman - Stephen Silverman Law (steve@stephensilverman.com) <steve@stephensilverman.com>
**Subject:** RE: Phillips v. SF

Linda,

We are fine with moving plaintiffs' deadline to January to avoid Steve's scheduling issues.  However, I've proposed that we would have until the end of February for our  Response.

Best,
Erin

---

**From:** Linda Gundelach [mailto:lgundelach@merlinlawgroup.com]
**Sent:** Wednesday, September 26, 2018 6:40 PM
**To:** Bradham, Erin; Tilleman, Karl
**Cc:** Michael N. Poli; Lawrence R. Moon; Stephen Silverman - Stephen Silverman Law (steve@stephensilverman.com)
**Subject:** Phillips v. SF

Erin and Karl:

Steve Silverman notified me that he has a trial scheduled to start in another state on December 3rd, and will most likely be out of town a week or two before trial getting ready.  Additionally, the November 26th deadline for Plaintiff to file their Motion to Amend actually conflicts with Thanksgiving.  Can we push our deadline to file the Motion to amend back to after the first week in January, and adjust the dates accordingly?  See attached draft.

Linda



*The Policyholder's Advocate* ®
website | Property Blog | Condo Blog

Connect with us:  

Linda Gundelach
Paralegal
Merlin Law Group
2999 North 44th Street Suite 520
Phoenix, Arizona 85018
Tel:  (480) 315-9980
Fax: (480) 315-9984

Privilege and Confidentiality Notice:
The information contained in this e-mail and any attachments may be legally privileged and confidential  If you are not the intended recipient or the employee or agent responsible for delivering the transmittal to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this e-mail is strictly prohibited  If you have received this e-mail in error, please notify the sender and permanently delete the e-mail and any attachment immediately. You should not retain, copy or use this e-mail or any attachment for any purpose  nor disclose all or any part of the content to any person. Thank you.

Exhibit 2

**Subject:** RE: Phillips v. State Farm
**Date:** Saturday, February 2, 2019 at 12:45:17 PM Mountain Standard Time
**From:** Bradham, Erin
**To:** Tilleman, Karl, Michael N. Poli, Steve Silverman, Lawrence R. Moon, Linda Gundelach, Michael Ponzo

Counsel, We previously agreed to a two week extension of plaintiffs' deadline for filing their Motion to Amend, which cut into our reply time under the briefing schedule.  Accordingly, may we also have a two-week extension on our deadline for responding to your Motion, from 2/28 to 3/14?

Best,
Erin

**From:** Tilleman, Karl
**Sent:** Friday, January 4, 2019 2:55 PM
**To:** Michael N. Poli; steve@stephensilverman.com; Lawrence R. Moon; Linda Gundelach; Michael Ponzo
**Cc:** Bradham, Erin
**Subject:** RE: Phillips v. State Farm

Yes.

**From:** Michael N. Poli [mailto:MPoli@merlinlawgroup.com]
**Sent:** Friday, January 4, 2019 2:54 PM
**To:** Tilleman, Karl; steve@stephensilverman.com; Lawrence R. Moon; Linda Gundelach; Michael Ponzo
**Cc:** Bradham, Erin
**Subject:** RE: Phillips v. State Farm

Karl and Erin,

Michael Ponzo has been working on the motion to amend, which is due on January 11, but he has been out of the country.  Could we please get a two week extension?

Thanks.

Mike





Michael Poli
West Coast Managing Attorney
Merlin Law Group
2999 North 44th Street Suite 520
Phoenix, Arizona. 85018
Tel: (480) 315-9980
Fax: (480) 315-9984

*The Policyholder's Advocate* ®
<u>website</u> | <u>Property Blog</u> | <u>Condo Blog</u>

Connect with us: 

Privilege and Confidentiality Notice
The information contained in this e-mail and any attachments may be legally privileged and confidential. If you are not the intended recipient or the employee or agent responsible for delivering the transmittal to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify the sender and permanently delete this e-mail and any attachment immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the content to any person. Thank you.

**From:** Tilleman, Karl <KTillema@steptoe.com>
**Sent:** Friday, September 21, 2018 12:13 PM
**To:** Michael N. Poli <mpoli@merlinlawgroup.com>; steve@stephensilverman.com; Lawrence R. Moon <lmoon@merlinlawgroup.com>; Linda Gundelach <lgundelach@merlinlawgroup.com>; Michael Ponzo <mponzo@merlinlawgroup.com>
**Cc:** Bradham, Erin <EBradham@steptoe.com>
**Subject:** RE: Phillips v. State Farm

Thanks, Michael. Stip on its way here shortly.

**From:** Michael N. Poli [mailto:MPoli@merlinlawgroup.com]
**Sent:** Friday, September 21, 2018 12:12 PM
**To:** Tilleman, Karl; steve@stephensilverman.com; Lawrence R. Moon; Linda Gundelach; Michael Ponzo
**Cc:** Bradham, Erin
**Subject:** RE: Phillips v. State Farm

I just spoke with Karl and explained that we intend to amend to assert class claims, but we are waiting to hear from a class action firm that we have looped in.  We agreed to shove all of the deadlines by 60 days and proceed with the telephonic status conference next week.





Michael Poli
West Coast Managing Attorney
Merlin Law Group
2999 North 44th Street Suite 520
Phoenix, Arizona. 85018
Tel:  (480) 315-9980
Fax: (480) 315-9984

*The Policyholder's Advocate* ®
<u>website</u> | <u>Property Blog</u> | <u>Condo Blog</u>

Connect with us: 

Privilege and Confidentiality Notice
The information contained in this e-mail and any attachments may be legally privileged and confidential. If you are not the intended recipient or the employee or agent responsible for delivering the transmittal to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify the sender and permanently delete this e-mail and any attachment immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the content to any person. Thank you.

**From:** Tilleman, Karl <KTillema@steptoe.com>

**Sent:** Friday, September 21, 2018 9:20 AM
**To:** steve@stephensilverman.com; Michael N. Poli <mpoli@merlinlawgroup.com>; Lawrence R. Moon <lmoon@merlinlawgroup.com>; Linda Gundelach <lgundelach@merlinlawgroup.com>
**Cc:** Bradham, Erin <EBradham@steptoe.com>
**Subject:** Phillips v. State Farm

Good morning, Steve, Mike. Lawrence and Linda:

I just left a VM for Steve inquiring about the status of the case. We have a trial-setting conference next Wednesday morning, and our records show a dispositive motion deadline of Monday. We were wondering whether you would be willing to agree to bump the deadline for dispositive motions until we are able to discuss this with the Court on Monday and figure out what direction this case is going. We would be interested in knowing your thoughts about whether or not you intend to file a motion seeking to add class claims. We are also interested in whether you object to the limited discovery we have outstanding.

So the bottom line is that I am recommending that we bump the dispositive motion deadline until we can address with each other, and the Court, what your intended scope of this case is going to be. If you would be so kind as to let us know whether you agree today, I would appreciate it.

All the best,

Karl

LAW OFFICES

# BROENING OBERG WOODS & WILSON

Professional Corporation

| **Website:** | **Address:** | **ROBERT T. SULLIVAN** |
| www.bowwlaw.com | 2800 North Central Avenue | (602) 271-7738 |
| | Suite 1600 | rts@bowwlaw.com |
| | Phoenix, Arizona  85004 | |
| | (602) 271-7700 | |
| | Fax (602) 258-7785 | |

March 6, 2019

*Via E-Mail* steve@stephensilverman.com

Stephen Silverman
Stephen Silverman Law
6945 E. Sahuaro Dr., Suite 125
Scottsdale, AZ  85254-6722

> Re:   State Farm adv. Phillips
>        CV2016-013572

Dear Steve:

Thank you for taking my call yesterday. As we discussed, Broening, Oberg, Woods & Wilson will be filing a substitution of counsel in the above-referenced matter in the near future. Presently, there is a deadline of March 14, 2019 to file a response to Plaintiff's Motion for Leave to Amend Complaint to include claims of behalf of a putative class. Based on our conversation yesterday, you granted us an extension through April 14, 2019 to file a response to that motion for leave. Given that April 14, 2019 is a Sunday, I prepared the stipulation, absent any objection from you, for the response to be due on or before April 15, 2019 and extend the reply deadline accordingly. I am attaching a draft of the stipulation and proposed order for your approval.

I appreciate your professional courtesies. Please contact me if you have any questions.

Very truly yours,

*Robert T. Sullivan*

ROBERT T. SULLIVAN
For the Firm

RTS/lmb
Attachments

cc:      Michael Poli (MPoli@merlinlawgroup.com)
          Alicyn Freeman, Karleen Johnston, Suzanne Beard

Exhibit 3

**Subject:** RE: Phillips v. State Farm
**Date:** Monday, April 16, 2018 at 9:25:54 AM Mountain Standard Time
**From:** Bradham, Erin
**To:** Linda Gundelach
**CC:** Michael N. Poli, Lawrence R. Moon, Steve Silverman, Tilleman, Karl

Counsel:

Consistent with our discussion today with the Court about extending deadlines, please let us know if there are any dates or weeks in May that you know do not work for you for depositions, and we will provide dates that work on our end for the depositions you have requested, and let you know if you will need to subpoena Greg Pyne. We no longer intend to call Delann Anglada as a witness; we named her out of an abundance of caution and now don't think we need her testimony. Given that we don't intend to call her, we assume you will not need to depose her. We also may want to depose Victor Castillo, and will let you know by the end of the week whether we decide to do that.

Please also let us know what dates work for you for an inspection of the residence.

Best,
Erin

**From:** Linda Gundelach [mailto:lgundelach@merlinlawgroup.com]
**Sent:** Monday, April 09, 2018 3:25 PM
**To:** Bradham, Erin
**Cc:** Michael N. Poli; Lawrence R. Moon
**Subject:** Phillips v. State Farm

Erin,

You recently disclosed Tom Moss, Delann Anglada, and Greg Pyne as witnesses. Please provide me with available dates to take these depositions. Also, please advise if Greg Pyne will appear without a subpoena.

Thank you,

Linda



Linda Gundelach
Paralegal
Merlin Law Group

*The Policyholder's Advocate* ®
website | Property Blog | Condo Blog

2999 North 44th Street Suite 520
Phoenix, Arizona 85018
Tel:  (480) 315-9980
Fax: (480) 315-9984

Connect with us:

Privilege and Confidentiality Notice:
The information contained in this e-mail and any attachments may be legally privileged and confidential. If you are not the intended recipient or the employee or agent responsible for delivering the transmittal to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify the sender and permanently delete the e-mail and any attachment immediately. You should not retain  copy or use this e-mail or any attachment for any purpose  nor disclose all or any part of the content to any person. Thank you.

Exhibit 4

**Subject:** Phillips v State Farm: Amended Rule 30(b)(6) deposition notice
**Date:** Monday, April 16, 2018 at 2:41:10 PM Mountain Standard Time
**From:** Steve Silverman
**To:** Bradham, Erin
**CC:** Linda Gundelach, Tilleman, Karl, Michael N. Poli, Lawrence R. Moon

Erin:

An amended Rule 30(b)(6) deposition notice is enclosed.  I understand we are looking for a new day for the Rule 30(b)(6) deposition, so while this notice keeps the same date as the original, we will amend it once we have an agreed-upon date.

# STEVE SILVERMAN

## STEPHEN SILVERMAN LAW
6945 E. Sahuaro Drive, Suite 125
Scottsdale, Arizona 85254

(480) 747-0850 phone

(480) 400-1065 fax

www.stephensilverman.com

Disclaimers and disclosure: Please delete this e-mail and notify me at steve@stephensilverman.com if you received it in error.   This may contain privileged or confidential communications and misaddressed or misdelivered e-mail does not waive privilege or confidentiality. Unauthorized use of this information can result in forced disqualification and other sanctions.  If you are a client, the attorney-client privilege protects this e-mail so long as you do not share it with anyone else.  This e-mail may have been sent via a document tracking service to make sure only the intended recipient received it.  Finally, neither this nor any other communication is intended to constitute an opinion on any tax-related manner.

Exhibit 5

**Subject:** Re: Phillips v. SF
**Date:** Wednesday, May 2, 2018 at 10:57:59 AM Mountain Standard Time
**From:** Steve Silverman
**To:** Bradham, Erin
**CC:** Lawrence R. Moon, Michael N. Poli, Linda Gundelach, Tilleman, Karl

I've had a conflict come up for May 29 or 30., but is there a way we could do the Xactimate deposition in Utah on May 31?  Can we look to do the 30(b)(6) the week of June 4?

# STEVE SILVERMAN
# STEPHEN SILVERMAN LAW
6945 E. Sahuaro Drive, Suite 125
Scottsdale, Arizona 85254

(480) 747-0850 phone

(480) 400-1065 fax

www.stephensilverman.com

Disclaimers and disclosure: Please delete this e-mail and notify me at steve@stephensilverman.com if you received it in error.   This may contain privileged or confidential communications and misaddressed or misdelivered e-mail does not waive privilege or confidentiality. Unauthorized use of this information can result in forced disqualification and other sanctions.  If you are a client, the attorney-client privilege protects this e-mail so long as you do not share it with anyone else.  This e-mail may have been sent via a document tracking service to make sure only the intended recipient received it.  Finally, neither this nor any other communication is intended to constitute an opinion on any tax-related manner.

**From:** "Bradham, Erin" <EBradham@steptoe.com>
**Date:** Thursday, April 26, 2018 at 2:45 PM
**To:** Steve Silverman <steve@stephensilverman.com>
**Cc:** "Lawrence R. Moon" <LMoon@merlinlawgroup.com>, Michael Poli <mpoli@merlinlawgroup.com>, Linda Gundelach <lgundelach@merlinlawgroup.com>, "Tilleman, Karl" <KTillema@steptoe.com>
**Subject:** Re: Phillips v. SF

May 18 will work for Abel Costales. I think May 29 may work for the 30(b)(6) but will be able to confirm soon.

Sent from my iPhone

On Apr 25, 2018, at 4:37 PM, Steve Silverman <steve@stephensilverman.com> wrote:

> Yes we do want to depose Mr. Costales, thank you.

## STEVE SILVERMAN
## STEPHEN SILVERMAN LAW
6945 E. Sahuaro Drive, Suite 125
Scottsdale, Arizona 85254

(480) 747-0850 phone

(480) 400-1065 fax

www.stephensilverman.com

Disclaimers and disclosure: Please delete this e-mail and notify me at steve@stephensilverman.com if you received it in error.  This may contain privileged or confidential communications and misaddressed or misdelivered e-mail does not waive privilege or confidentiality.  Unauthorized use of this information can result in forced disqualification and other sanctions.  If you are a client, the attorney-client privilege protects this e-mail so long as you do not share it with anyone else.  This e-mail may have been sent via a document tracking service to make sure only the intended recipient received it.  Finally, neither this nor any other communication is intended to constitute an opinion on any tax-related manner.

**From:** "Bradham, Erin" <EBradham@steptoe.com>
**Date:** Tuesday, April 24, 2018 at 4:56 PM
**To:** Steve Silverman <steve@stephensilverman.com>
**Cc:** "Lawrence R. Moon" <LMoon@merlinlawgroup.com>, Michael Poli <mpoli@merlinlawgroup.com>, Linda Gundelach <lgundelach@merlinlawgroup.com>, "Tillema, Karl" <KTillema@steptoe.com>
**Subject:** RE: Phillips v. SF

Thanks Steve.  I will get back to you shortly with dates. Do you still want to depose Abel Costales? If so, we will get dates for his deposition as well, that work with the dates you've outlined below.

Best,
Erin

**From:** Steve Silverman [mailto:steve@stephensilverman.com]
**Sent:** Tuesday, April 24, 2018 12:21 PM
**To:** Bradham, Erin
**Cc:** Lawrence R. Moon; Michael N. Poli; Linda Gundelach; Tillema, Karl
**Subject:** Re: Phillips v. SF

Erin:

I have a number of other depositions to schedule in other cases, but I am holding off on setting those until we get the State Farm and Xactiamte depositions on the calendar.  Right now, the only dates that will not work for me are May 1-4, May 7, May 14, May 17, and May 21.

You can sign the stipulation for plaintiffs, and file it.

## STEVE SILVERMAN

# STEPHEN SILVERMAN LAW

6945 E. Sahuaro Drive, Suite 125
Scottsdale, Arizona 85254

(480) 747-0850 phone

(480) 400-1065 fax

www.stephensilverman.com

Disclaimers and disclosure: Please delete this e-mail and notify me at steve@stephensilverman.com if you received it in error.   This may contain privileged or confidential communications and misaddressed or misdelivered e-mail does not waive privilege or confidentiality.  Unauthorized use of this information can result in forced disqualification and other sanctions.   If you are a client, the attorney-client privilege protects this e-mail so long as you do not share it with anyone else.  This e-mail may have been sent via a document tracking service to make sure only the intended recipient received it.  Finally, neither this nor any other communication is intended to constitute an opinion on any tax-related manner.

**From:** "Bradham, Erin" <EBradham@steptoe.com>
**Date:** Tuesday, April 24, 2018 at 9:55 AM
**To:** Steve Silverman <steve@stephensilverman.com>
**Cc:** "Lawrence R. Moon" <LMoon@merlinlawgroup.com>, Michael Poli <mpoli@merlinlawgroup.com>, Linda Gundelach <lgundelach@merlinlawgroup.com>, "Tilleman, Karl" <KTillema@steptoe.com>
**Subject:** RE: Phillips v. SF

Steve,

I sent the attached email on April 16 asking for the dates or weeks when plaintiffs' counsel will be out of pocket, so we could provide dates that are more likely to work, as  Lawrence indicated plaintiffs' counsel might have limited availability. Please let me know what weeks or time periods generally work (or don't work) and we will get these scheduled.  Please note that State Farm's 30(b)(6) witness is in Illinois and the Xactimate witness is in Utah.

Please also let us know what date works for the inspection of the Phillips residence.

Finally, I've attached a Proposed Order and Stipulation to Extend Deadlines by 30-days, as discussed with the Court at the April 16 Scheduling Conference. Please let us know if we have permission to sign and file.

Best,
Erin

**From:** Steve Silverman [mailto:steve@stephensilverman.com]
**Sent:** Monday, April 23, 2018 10:12 AM
**To:** Bradham, Erin

**Cc:** Lawrence R. Moon; Michael N. Poli; Linda Gundelach
**Subject:** Re: Phillips v. SF

Erin:

Where are we with respect to scheduling the Rule 30(b)(6) deposition, as well as the Xactimate deposition?

# STEVE SILVERMAN

## STEPHEN SILVERMAN LAW

6945 E. Sahuaro Drive, Suite 125
Scottsdale, Arizona 85254

(480) 747-0850phone

(480) 400-1065 fax

www.stephensilverman.com

Disclaimers and disclosure: Please delete this e-mail and notify me at steve@stephensilverman.com if you received it in error.   This may contain privileged or confidential communications and misaddressed or misdelivered e-mail does not waive privilege or confidentiality.  Unauthorized use of this information can result in forced disqualification and other sanctions.  If you are a client, the attorney-client privilege protects this e-mail so long as you do not share it with anyone else.  This e-mail may have been sent via a document tracking service to make sure only the intended recipient received it.  Finally, neither this nor any other communication is intended to constitute an opinion on any tax-related manner.

Exhibit 6

**Subject:** RE: Phillips v. State Farm
**Date:** Friday, May 18, 2018 at 8:05:46 AM Mountain Standard Time
**From:** Bradham, Erin
**To:** Steve Silverman
**CC:** Tilleman, Karl, Linda Gundelach (lgundelach@merlinlawgroup.com), Michael N. Poli (mpoli@merlinlawgroup.com) (mpoli@merlinlawgroup.com), Lawrence R. Moon (lmoon@merlinlawgroup.com)

Steve,

The Rule 30(b)(6) witness is out of the office the week following the dates I gave you, and for several weeks in the beginning of July.  Are there any dates the week of July 23 that would work for you?

Best,
Erin

---

**From:** Steve Silverman [mailto:steve@stephensilverman.com]
**Sent:** Thursday, May 17, 2018 9:48 AM
**To:** Bradham, Erin
**Cc:** Tilleman, Karl; Linda Gundelach (lgundelach@merlinlawgroup.com); Michael N. Poli (mpoli@merlinlawgroup.com) (mpoli@merlinlawgroup.com); Lawrence R. Moon (lmoon@merlinlawgroup.com)
**Subject:** Re: Phillips v. State Farm

Can you find a date on the following week?

# STEVE SILVERMAN

## STEPHEN SILVERMAN LAW
6945 E. Sahuaro Drive, Suite 125
Scottsdale, Arizona 85254

(480) 747-0850 phone

(480) 400-1065 fax

www.stephensilverman.com

Disclaimers and disclosure: Please delete this e-mail and notify me at steve@stephensilverman.com if you received it in error.   This may contain privileged or confidential communications and misaddressed or misdelivered e-mail does not waive privilege or confidentiality. Unauthorized use of this information can result in forced disqualification and other sanctions.  If you are a client, the attorney-client privilege protects this e-mail so long as you do not share it with anyone else.  This e-mail may have been sent via a document tracking service to make sure only the intended recipient received it.  Finally, neither this nor any other communication is intended to constitute an opinion on any tax-related manner.

---

**From:** "Bradham, Erin" <EBradham@steptoe.com>
**Date:** Thursday, May 17, 2018 at 7:41 AM
**To:** Steve Silverman <steve@stephensilverman.com>
**Cc:** "Tilleman, Karl" <KTillema@steptoe.com>, "Linda Gundelach (lgundelach@merlinlawgroup.com)"

<lgundelach@merlinlawgroup.com>, Michael Poli <mpoli@merlinlawgroup.com>, "Lawrence R. Moon (lmoon@merlinlawgroup.com)" <lmoon@merlinlawgroup.com>
**Subject:** RE: Phillips v. State Farm

Steve,

June 20 or June 21 will work with us for the Rule 30(b)(6) deposition in Illinois. We will hold those dates open for the next week.

Best,
Erin


**Erin E. Bradham**
Partner
EBradham@steptoe.com

## Steptoe

+1 602 257 5251 direct          Steptoe & Johnson LLP
+1 602 452 0922 fax             201 E. Washington Street
                                Suite 1600
                                Phoenix, AZ 85004
                                www.steptoe.com

This message and any attached documents contain information from the law firm Steptoe & Johnson LLP that may be confidential and/or privileged. If you are not the intended recipient, please do not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.


**From:** Bradham, Erin
**Sent:** Thursday, May 10, 2018 2:59 PM
**To:** 'Steve Silverman'
**Cc:** Tilleman, Karl; Linda Gundelach (lgundelach@merlinlawgroup.com); Michael N. Poli (mpoli@merlinlawgroup.com) (mpoli@merlinlawgroup.com); Lawrence R. Moon (lmoon@merlinlawgroup.com)
**Subject:** Phillips v. State Farm

Steve,

On Phillips scheduling:

-- Tom Moss was originally going to be our 30(b)(6) designee, but he has been out of the office recently on an unexpected medical leave. We are determining whether we may need to designate someone else, and will get back to you next week.

-- For the Xactware deposition in Utah, Karl and I are not available May 31 but would be available June 12, 13, 14 or 15.  Xactware has asked that you go ahead and serve a subpoena and if the date selected does not work for them they will identify dates that do work.

-- Finally, as you know, we would like to inspect and take photographs of the Phillips' property as-repaired.  Attached is a Rule 34 Request.  If the date and time identified do not work for plaintiffs, we are happy to choose a different date or time.

Best,
Erin

**Erin E. Bradham**
Partner
EBradham@steptoe.com

Steptoe

+1 602 257 5251 direct
+1 602 452 0922 fax

Steptoe & Johnson LLP
201 E. Washington Street
Suite 1600
Phoenix, AZ 85004
www.steptoe.com

This message and any attached documents contain information from the law firm Steptoe & Johnson LLP that may be confidential and/or privileged. If you are not the intended recipient, please do not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

Exhibit 7

# In The Matter Of:

*Phillips vs.*
*State Farm Fire and Casualty*

---

*Anderson Phillips*
*March 30, 2018*
*Videotaped*

---

*Griffin & Associates Court Reporters, LLC*
*2398 E. Camelback Road*
*Suite 260*
*Phoenix, AZ 85016*

Original File AP033018.txt
Min-U-Script® with Word Index

Case 2:19-cv-04605-GMS   Document 1-3   Filed 07/01/19   Page 438 of 518

**Page 3**

1]        THE VIDEOTAPED DEPOSITION OF ANDERSON PHILLIPS

2] was taken at 12:36 p.m., on March 30, 2018, at the Law

3] Offices of STEPTOE & JOHNSON, 201 East Washington Street,

4] Suite 1600, Phoenix, Arizona, 85004-2382, before CATHY J.

5] TAYLOR, a Certified Reporter in and for the State of Arizona,

6] County of Maricopa, pursuant to the Rules of Civil Procedure.

7]

8] COUNSEL APPEARING:

9] For the Plaintiffs:

10]       MERLIN LAW GROUP, P.A.
        By:  Mr. Lawrence Moon

11]       2999 North 44th Street
      Suite 520

12]       Phoenix, Arizona  85018

13]

14] For the Defendant:

15]       STEPTOE & JOHNSON
        By:  Mr. Karl Tilleman

16]       201 East Washington Street
      Suite 1600

17]       Phoenix, Arizona  85004-2382

18]

19]       Also present:  Chris Eichler, videographer
              Jasmine Phillips

20]

21]

22]

23]

24]

25]

---

**Page 1**

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

```
ANDERSON PHILLIPS and JASMINE      )
PHILLIPS, husband and wife,        )
                                   )
                Plaintiffs,        )
                                   )
        vs.                        ) No. CV 2016-013572
                                   )
STATE FARM FIRE and CASUALTY       )
COMPANY, an Illinois corporation,  )
                                   )
                Defendant.         )
_____)
```

VIDEOTAPED DEPOSITION OF ANDERSON PHILLIPS

Phoenix, Arizona
March 30, 2018
12:36 p.m.

REPORTED BY:
CATHY J. TAYLOR, RPR, CRR, CRC
Certified Reporter
Certificate No. 50111

PREPARED FOR:
ASCII/CONDENSED

(CERTIFIED COPY)

---

**Page 2**

1]             I N D E X

2] WITNESS:                   PAGE:

3] ANDERSON PHILLIPS

4]     Examination by Ms. Bradham     5

5]

6]

7]

8]            E X H I B I T S

9] NUMBER      DESCRIPTION           PAGE:

10] 14     Production documents from Adanac  27
        (ADANAC000038 - ADANAC000053)

11]         (16 pages)

12] 15     Adanac change order dated 5/24/17  34
        (ADANAC000003) (1 page)

13]

14]  16    Personal property list      78
        (PHILA00000307PROD -

15]         PHILA00000361PROD) (55 pages)

16]

17]

18]

19]

20]

21]

22]

23]

24]

25]

---

**Page 4**

1] P R O C E E D I N G S

2]

3]     THE VIDEOGRAPHER: We're on the record.  This

4] is the videotaped deposition of Anderson Phillips taken by

5] the defendant in Case Number CV2016-013572 styled Anderson

6] Phillips, et al., versus State Farm Fire and Casualty

7] Company.  Today's date is March 30th, 2018.  The time is

8] 12:36 p.m.

9]     Counsel, would you please identify yourself

10] for the record at this time starting with the plaintiffs'

11] counsel first, please.

12]     MR. MOON: Lawrence Moon from Merlin Law Group

13] representing the plaintiffs.

14]     MS. BRADHAM: Erin Bradham with Steptoe &

15] Johnson representing Defendant State Farm Fire and Casualty

16] Company.

17]     THE VIDEOGRAPHER: Thank you, counsel.

18]     The court reporter will now swear in the

19] witness.

20]

21]

22]

23]

24]

25]     (Next page, please.)

Page 5

1]    ANDERSON PHILLIPS,
2] a witness herein, having been first duly sworn to speak the
3] truth and nothing but the truth, was examined and testified
4] as follows:
5]
6]    E X A M I N A T I O N
7]    BY MS. BRADHAM:
8] Q.  Please state your name for the record.
9] A.  Anderson Phillips.
10] Q.  And, Mr. Phillips, you were here during your wife's
11]    deposition; right?
12] A.  I was.
13] Q.  So you know a little bit about how a deposition
14]    works from that; right?
15] A.  Now I do.
16] Q.  Now you do.
17]    Had -- had you ever been deposed before --
18] A.  I have not.
19] Q.  -- before today?
20] A.  No.
21] Q.  Okay.  So the -- I'll tell you the same thing
22]    that -- that I told your wife, which is that the most
23]    important thing that I need you to do in the deposition is if
24]    I ask a question that you don't understand, please let me
25]    know so I can try to fix the question.

Page 6

1]    Will you agree to do that for me?
2] A.  Yes, I do.
3] Q.  Thank you.
4]    Okay.  So in your wife's deposition, we talked
5] about various improvements that were made to the property
6] after the fire.
7]    Are there any improvements that you know about
8] that were made to the property after the fire that we didn't
9] talk about in your wife's deposition?
10] A.  No.  All the improvements that were made were
11] mentioned in the previous deposition.
12] Q.  Okay.  And now I want to talk to -- a little bit
13] about some of the questions that your wife couldn't answer
14] that -- that you might be able to answer.  And one of those
15] is about -- about payment.
16]    Have you ever paid any -- any money to Skipton
17] out of your own pocket?
18] A.  Yes.
19] Q.  Okay.  And tell me -- tell me what you've paid to
20]    Skipton out of your own pocket.
21] A.  We paid for the windows to be replaced.
22] Q.  Okay.
23] A.  We also paid for the countertops in the kitchen.
24]    Those are, I think, the two main things at
25] this time that I can remember that we did pay out of pocket.

Page 7

1] Q.  Okay.  And, again, you understand what I mean when
2]    I say out of pocket, meaning payments that you're making,
3]    whether from literally cash in a pocket or -- or a check
4]    versus payments that State Farm's making --
5] A.  Absolutely.
6] Q.  -- on your behalf?
7] A.  Yes.
8] Q.  Okay.  And when I asked my original question, I
9]    asked about payments out of pocket to Skipton.  And I just
10]    want to clarify here.  For the windows and the countertops,
11]    were those payments made to Skipton or to Adanac and the
12]    supplier of the countertops?
13] A.  Sorry.  Those payments were made to Adanac and the
14]    suppliers, not to Skipton.
15] Q.  Okay.  Thank you.
16]    So let's go through those.  So the -- the
17]    windows.  Who did you pay on the windows?
18] A.  I can't remember if it was Don or Mirko.  I believe
19]    it was Don who we paid.
20] Q.  Okay.  All right.  And how did you make that
21]    payment?
22] A.  I believe it was cash.
23] Q.  How much was it?
24] A.  Right around $4,000.
25] Q.  Okay.  Did --

Page 8

1] A.  Maybe a little more.
2] Q.  -- they give you -- okay.
3]    Did -- did you get any kind of bill in
4]    connection with that payment?
5] A.  We received a receipt, I believe, but also we
6]    signed a change order with -- with Adanac that I believe
7]    served as a receipt.
8] Q.  Okay.  And -- and then did you -- I -- maybe I'm
9]    making an assumption, but I -- I assumed you had to take
10]    money out of an account in order to get that $4,000, that you
11]    didn't have the cash, you know, on hand in cash form?
12] A.  I don't remember, because at the time we did have
13]    some cash on reserve, and I don't know of the timing as far
14]    as when we received the funds for the property --
15] Q.  Okay.
16] A.  -- the personal contents --
17] Q.  Okay.
18] A.  -- because that may have been used for it as well.
19]    I'm not sure.
20] Q.  And when you say "cash in reserve," you mean
21]    literally cash?
22] A.  Yeah, literally cash in our safe.
23] Q.  Okay.  And who gave you the receipt for that
24]    payment?
25] A.  It would have been Don.

Phillips vs.
State Farm Fire and Casualty

Videotaped

Anderson Phillips
March 30, 2018

---

Page 9

1] Q. It would have been Don?

2] A. It would have been Don, but I don't remember who

3] actually handed me the receipt for it.

4] Q. But it was -- was it an Adanac receipt?

5] A. It was an Adanac receipt.

6] Q. Okay. If we could take a look at Exhibit 1, which

7] is the plans.

8]     You've got it?

9] A. Uh-huh.

10] Q. So which windows -- I -- I believe your -- your

11] wife told us that the -- the only window you all didn't pay

12] for out of pocket was the one next to the front door right --

13] right there by the front door; is that correct?

14] A. I don't remember specifically one or two windows

15] that we did not pay for.

16] Q. Okay.

17] A. I believe we paid to have all the windows replaced.

18] Q. Okay. And ultimately, regardless of who paid for

19] it, all of the windows in the house were replaced?

20] A. Yes.

21] Q. Why were all of the windows in the house replaced?

22] A. The windows in the front had to be replaced due to

23] the fire damage. And we knew that the remaining windows were

24] not necessarily in scope, so we decided to pay out of pocket

25] to, of course, have all the windows match. The original

---

Page 10

1] windows were of poor quality.

2] Q. And when you say "not in scope," you mean not part

3] of the scope of the fire repairs?

4] A. Correct.

5] Q. Okay.

6] A. It's essentially out of the budget.

7] Q. Okay. Which ones -- which windows did you think

8] had to be replaced?

9] A. All of the windows in the great room.

10] Q. Okay.

11] A. I don't -- I don't know if it was all of the

12] windows in the master suite, but some of the windows would

13] have been broken out from the fire. I can't remember exactly

14] which ones. I do know all of the great room and then a

15] couple of others throughout the house.

16] Q. Okay. And the -- the great room and then a couple

17] others throughout the house were the ones you thought needed

18] to be replaced from the fire?

19] A. Yes, because they were actually broken.

20] Q. Okay. If we look in -- and I apologize for this

21] being hard to -- hard to see, but it's -- it's at least

22] blown-up rather than smaller.

23]     If you look on the second page of Exhibit 1,

24] and then if -- if you look in the great room, do you see a

25] window that's marked 9, number 9?

---

Page 11

1] A. Yes.

2] Q. Oh, do you know who prepared this -- this document,

3] Exhibit 1?

4] A. I do not.

5] Q. Okay. So if we look at -- at 9, and then if we

6] look over, and there's a key on the right-hand side called

7] New Floor Plan and El- -- Elevations Key Notes.

8]     Do you see what I'm talking about?

9] A. Uh-huh.

10] Q. And then there next to number 9, it says, "Existing

11] 72-by-60-inch window in good condition to remain at great

12] room."

13]     Did I read that right?

14] A. According to what this paper says, yes.

15] Q. Okay. And do you know who made that notation?

16] A. I do not.

17] Q. Okay. Let's see. Okay. So we're talking about

18] the windows.

19]     And then the countertops. The payment for the

20] countertops was made not to Skipton but to Ivan or his

21] company; is that right?

22] A. That is right.

23] Q. And this -- is it correct those were for the

24] countertops in the kitchen?

25] A. Correct.

---

Page 12

1] Q. Okay. And -- and what was -- was it granite? Was

2] it marble? What was it?

3] A. Quartz.

4] Q. In this -- quartz. Okay.

5]     And then before the fire, there weren't quartz

6] countertops in the kitchen. It was a standard laminate in

7] the kitchen?

8] A. Formica.

9] Q. Formica.

10]     Do you know what the difference would have

11] been between paying for Formica countertops versus quartz

12] countertops?

13] A. I do not.

14] Q. Okay. All right. And you would agree with me that

15] the quartz is an upgrade from the standard Formica?

16] A. Yes.

17] Q. Okay. Any other pay -- are there any other

18] payments that you made out of your own pocket for any repairs

19] or improvements to the house?

20] A. Not that I can remember.

21] Q. If you -- if you had made payments out of your --

22] out of your -- oh, let me ask you about the countertops.

23]     How did you make that payment?

24] A. My wife paid for the countertops.

25] Q. Ah. And do you know if she paid check or cash --

---

Page 13

1] I'm sorry -- check or -- or credit card?
2] A. I actually think the countertops were cash as well.
3] Q. Okay. All right. Okay. Now, when I'm talking
4] about payments out of your own pocket for the repairs, I also
5] mean things like getting plans drawn up.
6] Did you -- did you make any payment out of
7] your own pocket to get plans drawn up?
8] A. No.
9] Q. Did you make any payments out of your own pocket
10] for permitting?
11] A. No.
12] Q. Okay. Did you make any payment out of your own
13] pocket for any supplies or materials other than the windows
14] and countertops we talked about?
15] A. No.
16] Q. Okay. Now, thinking about Skipton & Associates --
17] and first, just to make sure we're on the same page,
18] Skipton & Associates was your public adjuster; right?
19] A. They were our claims management company.
20] Q. Okay. Claims management company.
21] What was their job from -- from your point of
22] view?
23] A. Their job was to essentially be a liaison between
24] us and the insurance company and conduct all communication
25] with the insurance company --

Page 14

1] Q. Uh-huh.
2] A. -- on our behalf.
3] Q. Okay. And was it also part of their job to help
4] you present your claim to the insurance company?
5] A. Yes.
6] Q. Okay. Did you ever -- have you ever made any
7] payments to Skipton & Associates out of your own pocket?
8] A. No.
9] Q. Okay. Do you know if Skipton & Associates has been
10] paid in connection with your claim?
11] A. I don't know.
12] Q. Okay. Is it possible that -- and let me -- let me
13] sort of talk through this just to make sure we're on the same
14] page.
15] So State Farm issued checks that had on the
16] checks your name, Skipton's name, Adanac's name, and then
17] your mortgage company's name; right?
18] A. Right.
19] Q. And you had a mortgage on the property at the time
20] of this fire; right?
21] A. Right.
22] Q. And that -- that means the mortgage company -- I
23] think it was Bank of America; is that right?
24] A. Correct.
25] Q. Bank of America had an interest in the property and

Page 15

1] in seeing it get fixed; right?
2] A. Right.
3] Q. And so the -- State Farm's funds would be paid in a
4] check with -- with all those folks on it, you, Adanac,
5] Skipton, and the mortgage company, and then the mortgage
6] company released funds as the repairs were made on the
7] property, is that -- is that right?
8] A. I don't -- I don't know how the process actually --
9] actually worked between the company and the mortgage --
10] Q. Okay.
11] A. -- company.
12] Q. Do you know whether any of the funds that the
13] mortgage company released were paid to Skipton?
14] A. I don't know.
15] Q. Okay. It's possible that they were.
16] A. It's --
17] Q. You just don't know?
18] A. Yeah, it's possible. I just don't know for sure.
19] Q. Has Skipton & Associates told you that you owe them
20] money?
21] A. Not that I owe them directly money, no.
22] Q. Okay. Has Skipton & Associates told you that you
23] owe Adanac money?
24] A. I am told that Adanac is still unpaid for services
25] that they performed.

Page 16

1] Q. Okay.
2] A. As far as who is responsible for paying them, I'm
3] not sure.
4] Q. Okay. So you're not sure whether you're
5] responsible for paying Adanac, whether -- whether you owe
6] them anything?
7] A. Correct.
8] Q. Okay. Okay. So thinking back to that day of the
9] fire, December 6th, do you remember the meeting you had
10] with the representative of Skipton & Associates there out at
11] your house?
12] A. For the most part, I do, yes.
13] Q. Okay. And was it Paula?
14] A. It was.
15] Q. Okay. Do you remember whether you had spoken to
16] anyone from State Farm before you had that meeting with
17] Paula?
18] A. I had not.
19] Q. Okay. So I take it State Farm hadn't -- let me --
20] let me ask this a little different.
21] I take it at that point, when you talked to
22] Paula on December 6th, you didn't have any criticisms of
23] anything State Farm had done in connection with your fire
24] loss claim?
25] A. At that time, no.

Phillips vs.
State Farm Fire and Casualty

Case 2:19-cv-04605-GMS   Document 1-3   Filed 07/01/19   Page 442 of 518

Videotaped

Anderson Phillips
March 30, 2018

Page 17

1] Q.  Okay.  So nothing State Farm did caused you to have
2]   to hire Skipton & Associates?
3] A.  At that time, no.
4] Q.  Okay.  Did you ever speak to -- to anyone at State
5]   Farm about your fire claim?
6] A.   Shortly after I signed the documents with Skipton,
7]   I received a call from State Farm, and I notified them that I
8]   had signed with a claims management company and they will be
9]   handling all the communications going forward.
10] Q.  Okay.  Was there anything about -- oh, so do you
11]   remember if you talked to a man or a woman in that phone
12]   call?
13] A.  I believe it was a woman.
14] Q.  Okay.  Was there anything about what she did in
15]   that phone call that -- that -- that you criticize at all?
16] A.  No.
17] Q.  Okay.  Let's go to Exhibit 4.
18]      Is Exhibit 4 the contract that you signed with
19]   Skipton & Associates?
20] A.  It is.
21] Q.  Okay.  I'm looking at -- I'm looking at the third
22]   paragraph.  "We agree to pay SAI" -- and that's -- that's
23]   Skipton Associates, Inc., I think.
24]      Is that -- do you understand SAI to refer to
25]   Skipton?

Page 18

1] A.  I do.
2] Q.  Okay.  "We agree to pay SAI a fee equal to
3]   10 percent of all amounts in settlement, or equivalent value,
4]   to be paid to the insurance company or other party in
5]   resolution of (my)(our) claims arising out of or in
6]   connection with the above stated loss occurrence."
7]      Did I get that right?
8] A.  You did.
9] Q.  Okay.  Was it your understanding when you signed
10]   this contract that Skipton would be paid from the insurance
11]   proceeds that -- that State Farm paid out?
12] A.  Yes.
13] Q.  Okay.  So did Paula, or anyone else from Skipton,
14]   tell you before you signed the contract that you would
15]   actually have to pay any out-of-pocket costs to Skipton?
16] A.  No.
17] Q.  Okay.  And, in fact, what they told you was you --
18]   you wouldn't be paying out-of-pocket costs to Skipton,
19]   that -- that Skipton's fee would be paid from --
20] A.  From insurance.
21] Q.  -- the insurance proceeds?
22] A.  Correct.
23] Q.  Okay.  Did you look at your insurance policy to see
24]   whether, in fact, it covered fees from a claim management
25]   company like Skipton?

Page 19

1] A.  I did not.
2] Q.  Okay.  Did you ever see any estimate or bid for the
3]   costs of the various improvements that were made to the house
4]   after the fire?
5] A.  Can you say that -- ask that question again,
6]   please.
7] Q.  Sure.  Okay.  So thinking just about the
8]   improvements made to the house after the fire and not about
9]   the fire -- the repairs, things that needed to be done
10]   because of the fire.
11] A.  Uh-huh.
12] Q.  Do you -- do you understand that distinction I'm
13]   making?
14] A.  I do.
15] Q.  Okay.  So thinking about the improvements after the
16]   fire, did you ever receive any estimate or bid from Adanac or
17]   anyone else of the cost of making those improvements?
18] A.  In terms of the windows, we knew what the
19]   additional cost was, which we took care of.
20] Q.  Okay.
21] A.  In terms of opening the hallway or the vaulted
22]   ceilings, my understanding that -- is that there was no
23]   additional cost, but I don't have any, like, invoice or cost
24]   sheet that -- that would explain an additional --
25] Q.  Okay.

Page 20

1] A.  -- cost.
2] Q.  So, for example, no one told you that it costs more
3]   to prepare plans that show modifications like a vaulted
4]   ceiling and moving --
5] A.  No.
6] Q.  -- walls and that kind of thing?
7] A.  No.
8] Q.  So --
9] A.  I was not aware of that.
10] Q.  And did you have any understanding about the extent
11]   to which the stud -- the stud walls, meaning the wood framing
12]   of the walls of the house, were damaged from the fire?
13] A.  No.  No, I -- I have no idea --
14] Q.  Okay.
15] A.  -- about the extent of damage.
16] Q.  Okay.  So you -- you don't know whether if -- for
17]   example, let's -- let's talk about it more concretely.  Look
18]   in here at Exhibit 1 and the second page again.
19]      The wall that was moved between the kitchen
20]   and the garage to open up that pantry area?
21]      And just -- I'm just asking you if you -- if
22]   you see where I am?
23] A.  Yeah.  I'm guessing the drawing isn't correct, but
24]   I know which wall you're referring to.
25] Q.  Right.  The drawing's pointing to the wall there

Videotaped

Page 21

1]  behind the stove, but really it's -- it's the wall on the
2]  other side of the door?
3]  A.  Correct.
4]  Q.  Okay.  And so did you -- did you know whether -- if
5]  you hadn't moved that wall, whether the stud wall, that --
6]  that stud wall, the wood framing, could have remained in
7]  place?
8]  A.  That was never brought up in any -- any
9]  conversation.  I didn't know anything as far as stud walls
10]  needed to be moved or ...
11]  Q.  Okay.  So you don't know one -- one way or the
12]  other?
13]  A.  No.
14]  Q.  Okay.  Now, we've talked about the kitchen
15]  countertops.  I'm talking about the bathroom countertops.
16]      Did you ever get any estimate for the
17]  difference in cost to upgrade to the -- the marble
18]  countertops in the bathrooms from the -- the standard
19]  countertops that you'd had?
20]  A.  No.
21]  Q.  Okay.  It's -- is it your understanding that the --
22]  the new countertops are -- are a more expensive type of
23]  countertop than -- than the ones you had before?
24]  A.  Yes.
25]  Q.  Okay.  And to the extent that upgrade has been paid

Page 22

1]  for, it's been paid for from the State Farm insurance
2]  proceeds; right?
3]      MR. MOON: Object to the form.
4]      THE WITNESS: There were other places in the
5]  home essentially where that -- that money was taken from to
6]  be able to do the countertops in the bathroom.
7]      BY THE WITNESS:
8]  Q.  Okay.  Where -- where are the other places in the
9]  home where that money was taken from?
10]  A.  So before the fire, the entire home was porcelain
11]  tile.
12]  Q.  Okay.
13]  A.  After the fire, only the great room, kitchen, and
14]  hallway were porcelain tile.  So there were -- all of the
15]  rooms before were porcelain tile.  And the cost to change
16]  that to carpet was less than to replace it with more
17]  porcelain tile.
18]  Q.  Did somebody then give you an estimate to say,
19]  here's the cost -- cost savings from the carpet, here's the
20]  cost increases from the countertops?
21]      And did -- did you -- did you see those
22]  documents?
23]  A.  I didn't physically see any documents that I --
24]  Q.  Okay.
25]  A.  -- can remember, no.

Page 23

1]  Q.  So who told you that those costs offset?
2]  A.  I believe it was Mirko.
3]  Q.  Okay.  All right.  And then how about the -- well,
4]  let -- let me ask this:  Did you get any estimate from Adanac
5]  or anyone else about the amount of additional time it would
6]  take to -- to do these improvements --
7]  A.  No.
8]  Q.  -- to the house?
9]  A.  No.
10]  Q.  Okay.  And do you know how much additional time it
11]  took to do the improvements to the house?
12]  A.  No.
13]  Q.  Okay.  Then thinking about the shower in the master
14]  bath and then the guest bath that was changed in both of
15]  those bathrooms from fiberglass to the -- the tile with the
16]  design --
17]  A.  Uh-huh.
18]  Q.  -- did you ever have any estimate of the cost to
19]  make that change?
20]  A.  There were talks about it being more expensive.  I
21]  can't remember much more than that out- -- outside of, you
22]  know, how it was going to be covered --
23]  A.  Uh-huh.
24]  A.  -- but, yes, we were aware that it was more
25]  expensive than the --

Page 24

1]  Q.  Okay.
2]  A.  -- shower/tub combo.
3]  Q.  I'm sorry?
4]  A.  It was more expensive than the shower/tub combo
5]  that we had before.
6]  Q.  Gotcha.  And so -- but -- and you didn't pay for
7]  that, for either of those -- let me just start this one --
8]  this question over.
9]  A.  Uh-huh.
10]  Q.  You didn't pay for the shower/tub upgrades from
11]  your own pocket?
12]  A.  We didn't necessarily pay for them for our own --
13]  from our own pocket, but there were -- for example, like the
14]  appliances that were in the scope to be repaired --
15]  Q.  Uh-huh.
16]  A.  -- my wife and I paid for those out of pocket.
17]  Q.  Okay.  So I want to talk about everything that you
18]  paid for in connection with the house out of pocket.
19]  A.  Okay.
20]  Q.  Okay.  So we've got the windows, we've got the --
21]  we've got the countertops --
22]  A.  Yes.
23]  Q.  -- the upgraded countertops, and then -- and then
24]  now we've got appliances?
25]  A.  Yes.

Phillips vs.
State Farm Fire and Casualty

Case 2:19-cv-04605-GMS   Document 1-3   Filed 07/01/19   Page 444 of 518

Videotaped

Anderson Phillips
March 30, 2018

Page 25

1] Q.   What appliances did you pay for out of pocket?
2] A.   I'd have to go back and double-check, but I know we
3] paid for the refrigerator out of pocket. I can't remember if
4] it was also the stove and -- and washing machine, because I
5] know one of those was covered and one we had to pay out of
6] pocket, but I can't remember which one was which.
7] Q.   Okay.   Where did you buy those appliances?
8] A.   Lowe's.
9] Q.   Okay.   Did you use a credit card there at Lowe's?
10] A.   We didn't use a credit card.  I forget exactly if
11] it was a debit card or cash for those appliances.
12] Q.   Okay.   And so let's talk about the debit card.
13] What debit card would it have been, or could it have been,
14] that you put the appliances on?
15] A.   Either my debit card or our shared debit card.
16] Q.   Okay.   And who is your -- what -- what bank did you
17] have your -- your account -- your bank account with?
18] A.   Bank of America.
19] Q.   Okay.   And that was all throughout this time after
20] the fire?
21] A.   Yes.
22] Q.   And then what about the shared account?  What bank
23] is that with?
24] A.   That is Arizona Federal.
25] Q.   Okay.   And I want to talk a little bit about the

Page 26

1] various things where -- where you've said you might have paid
2] cash.
3]     Is that cash that you -- you had received from
4] the contents payments and that's why you had cash -- that
5] much cash on hand?
6] A.   We had cash before as well.
7] Q.   Okay.
8] A.   I just like to keep cash in the house.
9] Q.   Okay.   So how much cash do you tend to just keep in
10] the house, not -- not in the bank?
11] A.   Five to 7,000.
12] Q.   Okay.   Do you recall -- what happened to that
13] receipt that you got from -- from the windows, from the
14] payment on the windows?
15] A.   I don't know.  I know we looked for it through our
16] files while we were out of the home, our -- our -- the file
17] cabinet has moved around a couple of times, but I don't know
18] exactly where the -- where the receipt is.  I did not reach
19] out to Adanac directly to ask for it.
20] Q.   Okay.
21] A.   They may or should have a copy of it.  But we
22] looked for it at home, and we weren't able to find it.
23] Q.   Okay.   Okay.   So is there anything else apart
24] from -- we've got -- we've got certain appliances purchased
25] at Lowe's, we've got the Ivan countertop payment, and we've

Page 27

1] got the Adanac window payment.
2]     Any -- any -- any other payments that you all
3] made out of pocket for the repairs or in connection with
4] repairs or improvements?
5] A.   Not that I can remember at this time.
6] Q.   Okay.   And let me ask -- I didn't ask that question
7] very well.  I just want to make clear I'm talking about both
8] the repairs and the improvements.
9]     Is there anything else you remember that you
10] paid out of pocket?
11] A.   No, not that I can remember at this time.
12] Q.   Okay.
13]     (Exhibit 14 marked for identification.)
14] BY MS. BRADHAM:
15] Q.   Okay.   Exhibit 14 is a document that was produced
16] to us by Adanac in response to a request that we made that
17] they give us all the documents having to do with the work
18] that they had done on your house.  And so I just want to
19] go -- go through this.
20]     It looks to me like this document contains
21] certain selections that you all had made for different things
22] in the house, you know, appliances and -- and tile, and
23] there's -- there's some pictures of the bathroom tile --
24] A.   Uh-huh.
25] Q.   -- and so forth.

Page 28

1]     So I'm hoping you can just look through this
2] document for me, and then my question is going to be whether
3] this is a document that documents selections that you made
4] for various fixtures in the house.
5] A.   Yes, this is.
6] Q.   Okay.   Okay.   And then let's maybe go page by page
7] here.  So starting with page 38, are these the cabinets that
8] you -- that you ultimately went with?
9] A.   Yes, I believe so.
10] Q.   Okay.   Then on the next page, 39, the steel
11] bar/bull copper that looks like cabinet pulls, are those the
12] ones you ultimately went with?
13] A.   I can't really see the design in the picture,
14] but -- I can't tell by the picture.
15] Q.   Okay.   And how about this Arabescato Venato -- I'm
16] probably not pronouncing that wrong [sic] -- marble?
17] A.   We did not go with that marble.
18] Q.   Okay.   Do you remember why?
19] A.   I want to say they didn't have other designs that
20] matched with this or --
21] Q.   Okay.
22] A.   -- or maybe quantity.  I'm not sure.
23] Q.   Gotcha.  Okay.
24]     Then the next page, page 40, has a whole bunch
25] of doorknobs.  And I think we've -- we've seen the picture of

Phillips vs.
State Farm Fire and Casualty

Case 2:19-cv-04605-GMS   Document 1-3   Filed 07/01/19   Page 445 of 518

Videotaped

Anderson Phillips
March 30, 2018

Page 29

1]  the doorknob on the actual door that you all went with.
2]      Do you know if it was any one of these?
3]  A.  I don't know.
4]  Q.  Okay.  Then the next one, page 41, has got pictures
5]  of various appliances.
6]      Are -- let's just start with the washer/dryer.
7]  Is that the washer/dryer you went with?
8]  A.  No.
9]  Q.  Okay.  How about the stove?
10] A.  Yes.
11] Q.  Okay.  How about the refrigerator?
12] A.  Yes.
13] Q.  And the dishwasher?
14] A.  Yes.
15] Q.  And then the microwave?
16] A.  Yes.
17] Q.  Okay.  And why didn't you go with that washer and
18] dryer as pictured here?
19] A.  I think we found a -- a -- another set.  I'm not
20] exactly sure why we didn't go with the Whirlpool.  We decided
21] to go with a different brand.
22] Q.  Okay.  Then on page 42, let's see.  I think we
23] can -- I think page 42 and then 43 discusses the tile in the
24] shower.
25]      And is that -- is that what you all ended up

Page 30

1]  doing --
2]  A.  Yes.
3]  Q.  -- as outlined here on 42 and 43?
4]  A.  Yes.
5]  Q.  Okay.  Then 44 has a vanity.  Is that the vanity
6]  you -- you ended up going with in the bathrooms?
7]  A.  No.
8]  Q.  Okay.  And why didn't you end up going with that
9]  vanity?
10] A.  I believe the dimensions didn't fit --
11] Q.  Okay.
12] A.  -- the bathroom.
13] Q.  Gotcha.
14]      Okay.  Then page 45, is that the medicine
15] cabinet you went with?
16] A.  Yes.
17] Q.  46, are these the lighting features that you ended
18] up going with for the -- it looks like the hall and master
19] bathroom?
20] A.  I believe so.  These are the fixtures in the
21] bathrooms.
22] Q.  Okay.  Then 47, are these the -- the toilet and
23] then -- well, let me ask it as a -- not a compound question.
24]      Is this the toilet that you ended up going
25] with?

Page 31

1]  A.  Yes.
2]  Q.  For both of the bathrooms?
3]  A.  Yes.
4]  Q.  And then it looks like the ceiling fan.  Is that
5]  the ceiling fan --
6]  A.  Yes.
7]  Q.  -- you went with?
8]      Okay.  All right.  And then 40 -- I guess it's
9]  40 -- 48 and 49, did you end up going with the Hampton Bay
10] cabinets?
11] A.  Yes.
12] Q.  Okay.  And which finish?
13] A.  I believe it's the same as the first page, the
14] Java.
15] Q.  Okay.  Oh, I see it circled there.  Uh-huh.  All
16] right.  Java finish.  Okay.
17]      And 50, is that the sink that you ended up
18] going with, the one that's circled there?
19] A.  Yes.
20] Q.  Okay.  Then on page 51, I guess did you -- did you
21] end up doing the Fulham redwood plank ceramic tile, or
22] something different there?
23] A.  I believe that's what we went with.
24] Q.  Okay.  And then how -- the -- the kitchen -- the
25] Arabescato Venato marble slab?

Page 32

1]      Is that the one you did quartz instead?
2]  A.  Yeah, we -- we didn't go with that --
3]  Q.  Okay.
4]  A.  -- marble slab.
5]  Q.  Okay.  And then we've got the carpet outlined here,
6]  and that was for the bedrooms?
7]  A.  Yes.
8]  Q.  Is that the carpet that you actually went with?
9]  A.  I'm not 100 percent sure.
10] Q.  Okay.  For everything that we've gone through here,
11] other than the -- possibly some of the appliances that you
12] got at Lowe's, did Adanac -- did you go through Adanac to
13] actually make the purchases?
14] A.  We did not go through Adanac for the kitchen
15] countertops.
16] Q.  Ah, sorry.  Thank you.
17]      So other than the kitchen countertops and then
18] possibly some of the appliances, did you go through Adanac
19] for everything else that we've seen here in Exhibit 14?
20] A.  Yes.  Yes, we did.
21]      I believe we went through Adanac for the
22] kitchen -- for the bathroom vanities as well.
23] Q.  Okay.
24] A.  So, yeah.
25] Q.  Why do you keep so much cash on hand?  Like why did

Page 33

1] you have so much cash on hand to be able to pay this?
2] A.  Because I don't gain any interest from my regular
3] savings account --
4] Q.  Okay.
5] A.  -- anyway.  And my wife and I were trying to put
6] together a -- a savings plan to -- to buy a couple of things.
7] Q.  Okay.
8] A.  If it's in my bank account, I'll spend it.
9] Q.  Did you all have the garage floor painted with
10] epoxy paint as -- after the fire?
11] A.  Yes.
12] Q.  And had there been epoxy paint before the fire?
13] A.  There was not.
14] Q.  Okay.  So that would be another improvement?
15] A.  I wouldn't necessarily call that an improvement.
16] And I don't know if that was part of the insurance or not,
17] but, yes, the floor is painted.
18] Q.  Okay.  And that's something that Adanac did for
19] you?
20] A.  See, I don't know.  As we were approaching the --
21] moving back into the home, Mirko felt bad about --
22] Q.  Uh-huh.
23] A.  -- it taking so long.  So I don't know if that's
24] something that was submitted through Adanac or if he did that
25] on his own just acting in good faith.

Page 34

1] MS. BRADHAM: Okay.  Let's see.  I'll mark
2] this as the next exhibit.
3] (Exhibit 15 marked for identification.)
4] BY MS. BRADHAM:
5] Q.  Okay.  Exhibit 15 is a change order that Adanac
6] provided to us, and it includes the bathroom shower and tub
7] wall tiles that I think we've already talked about; right?
8] A.  Uh-huh.
9] Q.  Uh-huh.  And then it also includes the garage floor
10] epoxy paint?
11] A.  Okay.
12] Q.  And then if I understand right, you think that some
13] other change you made in the -- in the house ended up
14] offsetting this additional expense?
15] A.  Not based off of this document, no.
16] Q.  Okay.  Tell me what you think based off of this
17] document.
18] A.  Based off of this document, we -- it looks like we
19] were on short funding and still wanted to do a couple things,
20] so we paid 3346 to get it done.
21] Q.  Okay.  And how did you make that payment?
22] A.  I don't know.  This document doesn't look familiar
23] to me.
24] Q.  Okay.  And so just thinking about your own
25] memory --

Page 35

1] A.  Uh-huh.
2] Q.  -- how did you make that payment?
3] A.  I don't know.  I would have to ask my wife since
4] she signed the document.
5] Q.  Okay.  As far as -- as far as -- let's go through
6] then your bank accounts.  I think we talked about your bank
7] accounts.
8] Are there -- did you -- I don't remember if I
9] asked you for the shared bank account which bank that is.
10] A.  Arizona Federal.
11] Q.  Arizona Federal.
12] Okay.  Is there any other bank account that
13] you had other than Arizona Federal and Bank of America?
14] A.  No.  Just a credit card at Arizona Federal.
15] Q.  Okay.  Credit card at Arizona Federal.
16] And then no other credit cards?
17] A.  Not for purposes of -- of this, no.
18] Q.  And when you say "not for purposes of this," do you
19] have other credit cards but you know you wouldn't have used
20] them --
21] A.  Correct.
22] Q.  -- to --
23] A.  Uh-huh.
24] Q.  -- to do any of the improvements that we're talking
25] about here?

Page 36

1] A.  Yes.
2] Q.  Did you save the Lowe's receipt for the appliances?
3] A.  I should be able to find them --
4] Q.  Okay.  Thank you.  And I -- would -- do you have
5] any problem with looking for that and --
6] A.  Absolutely not.
7] Q.  -- giving it to us?
8] A.  Absolutely not.
9] Q.  Okay.
10] A.  I will.
11] Q.  Apart from going from porcelain tile to carpet in
12] the bedrooms, is there anything else that you recall that you
13] did that -- that saved money, a change you made that saved
14] money in the house?
15] A.  Other than buying the appliances, nothing comes to
16] mind right now.
17] Q.  Okay.  When you were thinking about having a change
18] order for the windows, is it possible you were thinking about
19] this document we're looking at here, Exhibit 15, instead?
20] A.  No.  The document that I believe I signed for the
21] windows, I don't -- I don't think my wife signed --
22] Q.  Okay.
23] A.  -- clearly stated on it that it was for windows.
24] Q.  Okay.  And I don't believe that document's been
25] produced to us.

Page 37

1] A.  Okay.
2] Q.  Have you all looked for that document?
3] A.  That's another document that I'll have to look for
4]   when we're done here.
5] Q.  Okay.
6] A.  I -- I did look for it before, but I -- I was not
7]   able to find it.  I'll continue to look.
8] Q.  Okay.  And then also I think the receipt from
9]   Ivan's company for the counter --
10] A.  Yes.
11] Q.  -- tops?
12] A.  Yes, that's something that we'll need to find.
13] Q.  Is Ivan someone that you all knew?
14] A.  No.
15] Q.  Okay.  How did you find him?
16] A.  I believe Mirko --
17] Q.  Okay.
18] A.  -- knew him.
19] Q.  Looking back at Exhibit 1 on page 2 of Exhibit 1,
20]   so one of the improvements that -- that you all made after
21]   the fire was to move the wall in the hallway back in order to
22]   make more room for the hallway; right?
23] A.  Are you referring to the wall in between the side
24]   yard and the kitchen?
25] Q.  Yes.

Page 38

1] A.  Yes.
2] Q.  Okay.  And doing that converted 84.5 square feet of
3]   porch to livable space; is that right?
4] A.  That is right.
5] Q.  And did you ever get any estimate of either the
6]   time or the cost of making that move?
7] A.  No.
8] Q.  Okay.  And do you know whether anything would have
9]   had to be done with the framing of that wall in -- if the
10]   move hadn't been made?
11] A.  Not that I'm aware of.
12] Q.  Okay.  Do you know what it actually cost to move
13]   that wall --
14] A.  No.
15] Q.  -- and create that additional livable space?
16] A.  No.
17] Q.  Okay.  And whatever that cost was, you and your
18]   wife haven't paid that cost out of your own pocket?
19] A.  No.
20] Q.  Okay.  All right.  Having been here when -- when I
21]   asked your wife questions in her deposition, was there
22]   anything she said that you thought was incorrect?
23] A.  Yes.
24] Q.  Okay.
25] A.  I do remember scaffolding at the house --

Page 39

1] Q.  Okay.
2] A.  -- directly where the fire was on the side of the
3]   house where stucco needed to be repaired.
4] Q.  Okay.  So you remember the scaffolding being on --
5]   looking back at Exhibit 1, on the side of the house where
6]   that -- where that porch was that was converted?
7] A.  No.  So it would be right around -- so right on the
8]   side of the great room.
9] Q.  Okay.  So on the -- if you're -- if you're -- if
10]   I'm looking -- if I'm standing in your front yard looking at
11]   your front door, it would be on the left side?
12] A.  It will be on the left side.
13] Q.  The left side of the great room --
14] A.  Right.
15] Q.  -- is where you recall seeing scaffolding?
16] A.  Yeah.
17] Q.  Okay.
18] A.  It's right behind the side gate.
19] Q.  Okay.  Anything else from your wife's deposition
20]   that you recall that -- that you thought was not correct?
21] A.  No.
22] Q.  Okay.  And what is your job?
23] A.  I'm a director of Finance.
24] Q.  Okay.  Where -- where do you work?
25] A.  The company is Dream Center Education Holdings.

Page 40

1] Q.  Dream Center Education?
2] A.  Holdings.
3] Q.  Holdings.
4]     What does that company do?
5] A.  That company is a parent company of -- of four
6]   postsecondary institutions.
7] Q.  Ah, like charter colleges?
8] A.  No.  Nonprofit colleges.
9] Q.  Oh, colleges.  Okay.  Okay.  Gotcha.
10]   Postsecondary.
11] A.  Yeah.
12] Q.  And were you the director of Finance for them back
13]   at the time of the fire, December 2015?
14] A.  No.  I was a finance manager at the time.
15] Q.  Okay.  But for that same company?
16] A.  Yes.  The parent company was different.  The school
17]   was the same.
18] Q.  Okay.  And I'll ask you this -- this question now,
19]   because it's probably easier to answer.  How much do you make
20]   a year now?
21] A.  95,500.
22] Q.  Okay.  And then how about back in 2015 -- 2015?
23] A.  55 to 60,000.
24] Q.  Okay.  And when did -- did you -- did you sort of
25]   get incremental raises over that period of time, or -- or

Page 41

1] when you -- when you got the promotion, did it -- did it come
2] with a bigger salary?
3] A. Promotion. Bigger salary.
4] Q. Okay. When did you get the promotion?
5] A. October of last year.
6] Q. So October --
7] A. Oh, sorry. October 2016. So it's been a year and
8] about four months, five months.
9] Q. Okay. Are you happy with the house the way it
10] looks now?
11] A. I am.
12] Q. Okay. And is it fair to say the house -- this
13] house has been upgraded since the fire?
14] A. Yes.
15] Q. Okay. We talked a little bit about -- about some
16] delay issues, and I'm going to ask you some -- some of those
17] questions --
18] A. Uh-huh.
19] Q. -- as well.
20] Do you know why -- why Don, the
21] superintendent, was fired?
22] A. I have no idea.
23] Q. Okay.
24] A. I didn't even know if he was fired or replaced. I
25] don't --

Page 42

1] Q. Okay.
2] A. I don't really know what happened to him in this
3] situation.
4] Q. Do you recall Adanac ever providing you with a
5] precise estimate of when the repairs would be done?
6] A. No, not before this -- this deposition, no.
7] Q. Okay. And when you say "not before this
8] deposition," are you saying you've -- you're now thinking
9] of -- are you thinking about that four-month --
10] A. Uh-huh.
11] Q. -- that we saw in the contract?
12] A. Yes.
13] Q. All right. And they did not meet that four-month
14] estimate in -- in the -- in the contract that they gave you?
15] MR. MOON: Object to the form.
16] THE WITNESS: It took longer than four months
17] for them to complete the home.
18] BY MS. BRADHAM:
19] Q. Right. Okay. And do you also recall that Adanac
20] was continually changing the time frame of when -- when the
21] home would likely be completed and -- and pushing it out
22] further?
23] A. Yeah. I'm not sure of what caused the delays, but,
24] yes, the date did change several times.
25] Q. Even after the repairs had begun, the date

Page 43

1] continued to change and get pushed back?
2] A. That is correct.
3] Q. Do you know what caused that final delay when -- at
4] one point Adanac had thought it would be done by May of 2017
5] and ended up going into June?
6] A. I'm not exactly sure. I know Justin had made
7] comments previously about funds being short. But to the
8] extent of that, I'm not sure.
9] Q. Okay. And so to the extent -- any information you
10] have about funds being short is because Justin told you that
11] was the explanation; right?
12] A. Yes. I --
13] Q. Uh-huh.
14] A. I don't know what happened to the money.
15] Q. If, in fact, the explanation wasn't that funds were
16] short but instead of Adanac, due to its own operational
17] issues, was -- was -- was causing delays, it wouldn't be
18] right for Justin to have told you it was really short funds?
19] A. Yes.
20] Sorry. You're saying if that was not the
21] case, would it have been right for Justin to say it was the
22] case?
23] Q. Right.
24] A. No, that wouldn't be right.
25] Q. Right. Okay. Right, it wouldn't be right for

Page 44

1] Justin to blame delays caused by Adanac on State Farm?
2] A. That is correct. That would not be right.
3] Q. And it wouldn't be right for Adanac to blame delays
4] it caused on State Farm?
5] A. Correct.
6] Q. Oh, do you know what Xactimate is?
7] A. I do.
8] Q. Okay. And when did you -- when did you learn what
9] Xactimate is?
10] A. I heard the term when -- kind of early in the
11] process --
12] Q. Uh-huh.
13] A. -- when -- when there were some discrepancies
14] between what Adanac thought it would cost to repair the home
15] compared to what State Farm was estimating it would cost to
16] repair the home.
17] Q. Okay. And what do you remember about -- about
18] Xactimate?
19] A. You put in information about the home, what's wrong
20] with the home, and it estimates the cost to repair.
21] Q. What -- do you remember what the differences are,
22] meaning what was different about Adanac's estimate versus
23] State Farm's?
24] A. There weren't any particular items within the
25] house, but just in general new -- new build versus

Page 45

1] restoration.
2] Q. Okay. And did you do any of your own research in
3] terms of new construction versus restoration pricing?
4] A. I did.
5] Q. Okay. What research did you do?
6] A. Just looking into the difference between the two
7] and why one would be more than the other in terms of new
8] construction starting from the ground up and starting from
9] scratch, and with restoration needing to tear down and
10] rebuild, working around certain items.
11] Just the -- the whole process being more
12] inconvenient than a new build, starting from scratch.
13] Q. Okay. And where did you find that information?
14] A. Online.
15] Q. Okay. And then thinking about restoration and
16] needing to work around certain items --
17] A. Uh-huh.
18] Q. -- have you ever had any painting work done on your
19] house at -- in any house you've ever been in or done any
20] painting work on the house?
21] A. Painting work?
22] Q. Right.
23] A. I painted the interior of my home before the fire.
24] Q. Okay. And when you did that, was -- was the tile
25] in place?

Page 46

1] A. No. I painted before the tile.
2] Q. Okay.
3] A. The home was all carpet at the time.
4] Q. Ah, the home was carpet. Right.
5] So would the -- with the carpet there, did you
6] have to tape off the -- the floor, the carpeting area before
7] you painted?
8] A. I had to tape off the baseboards --
9] Q. Right.
10] A. -- yeah.
11] Q. And put down, like, tarps on the floor, and that
12] kind of thing?
13] A. Uh-huh. Dropcloth.
14] Q. Uh-huh. Okay. And then probably tape off the --
15] the -- the edges of -- of the wall?
16] I'm trying to remember the time I did
17] painting. I think there was some taping along the edges; is
18] that right?
19] A. That's right.
20] Q. Okay. And that added time to your painting process
21] when -- when you painted your own house?
22] A. Yeah.
23] Q. All right. If -- if you'd been painting the walls
24] before the tile was laid down, you wouldn't have -- have had
25] to have done that taping and -- and covering the -- covering

Page 47

1] the floors, and that kind of thing?
2] A. Not necessarily. You would still have to paint --
3] or, sorry, mask off between the ceiling and the wall --
4] Q. Okay.
5] A. -- since those are two different colors.
6] And are you speaking, like, with no
7] baseboards, just --
8] Q. Right. No baseboards.
9] A. -- drywall --
10] Q. Painting --
11] A. -- wall.
12] Q. Painting before the baseboards are installed in,
13] yeah.
14] A. Yeah, that would make it slightly easier.
15] Q. Okay.
16] A. It doesn't take all the labor away, though.
17] Q. Right. It certainly doesn't take all the labor
18] away --
19] A. Yeah.
20] Q. -- but you'd be able to do it a little faster?
21] A. A little. It'll help you paint the bottom of the
22] wall, but out -- outside of that, where, you know, you have
23] doors and also, like I said, the ceiling to the -- to the
24] wall, you would still need to mask off all of those things.
25] Q. And what if -- what if you're painting before --

Page 48

1] before cabinets get put in? Would that make it a little
2] faster?
3] A. It could.
4] Q. Right. And -- okay. Thank you. That -- that's --
5] that's helpful.
6] Do you remember whether the documents you
7] found online related to Xactimate or to a different program
8] called 360 Value made by the same company?
9] A. I don't remember anything about 360 Value.
10] Q. Okay. When did you do that -- that online search?
11] A. Huh? I don't know to be exact. It was -- it was
12] definitely during the rebuild process.
13] Q. Okay. Did you ever see -- and, well, let me ask
14] you this: What computer did you do the search on?
15] A. I don't -- I don't know if it was between my -- my
16] work laptop or -- or my personal. I can't remember exactly.
17] Q. Okay. How long did you spend looking in -- online
18] on that --
19] A. 30 minutes.
20] Q. -- restoration pricing?
21] A. Probably 30 minutes to an hour.
22] Q. Okay.
23] A. And it wasn't exactly based off of Xactimate,
24] the -- the program, but just in general what we were going
25] through and -- and understanding the -- the conflict between

Phillips vs.
State Farm Fire and Casualty

Case 2:19-cv-04605-GMS   Document 1-3   Filed 07/01/19   Page 450 of 518

Videotaped

Anderson Phillips
March 30, 2018

---

Page 49

1] restoration and new build.  I wanted to see what that really
2] meant and how we could be impacted from that.
3] Q.  Okay.  So what you were looking at wasn't specific
4] to the Xactimate program?
5] A.  Correct.  Correct.
6] Q.  It was just generally trying to understand whether
7] it's more efficient when you're doing a -- a -- a restoration
8] versus --
9] A.  Yeah.
10] Q.  -- a rebuild?
11] A.  What causes the difference --
12] Q.  Uh-huh.
13] A.  -- between the two estimates.
14] Q.  Okay.  Okay.  Did you look at any -- okay.  Well,
15] I -- I think you've answered my questions there.
16]      Did you come to any conclusion about whether
17] State Farm -- whether State Farm or Adanac was right in
18] the -- the way they calculated labor costs?
19] A.  I have my -- my personal opinions on it.  I know
20] it's not a new build.  The house was a new build in 2007,
21] so -- and that was the process.  I've had new builds.  So I
22] just didn't see the logic behind why it would be considered a
23] new build if it was clearly a restoration.
24] Q.  Okay.  So I take it you weren't aware that in the
25] Xactimate program what they call new construction --

---

Page 50

1] A.  Uh-huh.
2] Q.  -- is pricing they've developed not -- not for,
3] like, a new build in a subdivision but instead for taking a
4] house that's had a large fire loss and reconstructing that
5] house?
6] A.  I'm not aware of that.
7] Q.  Okay.  And what you read wasn't specific to
8] Xactimate?
9] A.  Correct.
10] Q.  Okay.  Do you think that if somebody's coming in
11] and has to remove all of the drywall and all of the cabinets
12] and countertops and all those interior fixtures out of the
13] house that -- that they can probably work a little faster
14] than somebody that's just removing the drywall and doesn't
15] have to also take out -- have to worry about protecting
16] counter -- countertops, cabinets, and things like that?
17] A.  You're comparing taking out drywall when you have
18] to -- when you don't have cabinets versus when you do have
19] cabinets --
20] Q.  Yes.
21] A.  -- or --
22] Q.  Yeah.  Does it seem like one of those might go a
23] little faster when you're talking about just the drywall part
24] of it?
25] A.  I mean, it would make sense for it to go faster if

---

Page 51

1] you didn't have those things in the way, but I don't work in
2] construction.  So I'm not sure.
3] Q.  Okay.  Okay.  So I'd like for you to tell me
4] everything you think State Farm did wrong in handling your
5] claim.
6] A.  Just the -- the -- what I believe State Farm did
7] wrong was classify the build as a new construction versus a
8] restoration, which ultimately resulted in a reduced payment,
9] which then forced Adanac to finish the job out of their own
10] pocket, which I think, in turn, possibly caused some delays
11] too.
12] Q.  Okay.  Anything else State Farm did wrong in
13] handling your claim?
14] A.  No.  Just the reduced payment caused a chain
15] reaction to -- to impact other things, which ultimately
16] resulted in us sleeping in a trailer in the middle of the
17] summer, essentially being kicked out of a house that we were
18] renting.  And just the -- the delays, which ultimately
19] resulted in why we weren't able to meet the four-month
20] deadline.
21] Q.  Okay.  And I just want to make sure I've got
22] everything, and I'm going to ask you more.
23]      Is there anything else that State Farm did
24] wrong in handling your claim that we haven't talked about?
25] A.  Not that I can think of.

---

Page 52

1] Q.  Okay.  All right.  Did you ever get a bid from
2] any -- a bid or an estimate from any contractor other than
3] Adanac for repairs on the house?
4] A.  I spoke to other contractors.  I don't think we got
5] a bid.
6] Q.  Okay.  If you had gotten a bid, you would have
7] produced that --
8] A.  Absolutely.
9] Q.  -- when I asked you to give me the bids?
10] A.  Absolutely.
11] Q.  Okay.  So do you know whether another contractor
12] might have been able to do the work on time for the amount
13] State Farm paid on the claim?
14] A.  I don't know.
15] Q.  Don't -- you don't know one way or the other?
16] A.  I don't know one way or the other.
17] Q.  Okay.  Okay.  Now, you said Adanac had to -- had to
18] fix various things out of their own pocket.
19]      What did Adanac pay out of their own pocket?
20]      MR. MOON: Object to form.
21]      THE WITNESS: I don't know specific items.  I
22] do know the money that they received -- from what I heard,
23] the money that they received was not enough, and Dave took it
24] upon himself to finish the house so we can get back in and --
25] and we would try to recoup the money afterwards.

---

Page 53

1]     BY MS. BRADHAM:
2]  Q.  And is Dave the one that told you that?
3]  A.  I believe it was Justin.
4]  Q.  Justin.  Okay.
5]     Take a look back at Exhibit 4.  Oh, I'm sorry.
6]  It's Exhibit 3.  I apologize.
7]     Okay.  So this is the contract you signed with
8]  Adanac; right?
9]  A.  Yes.
10] Q.  And did you ever sign any other contract with
11] Adanac in connection with repairs or improvements?
12] A.  Not that I can remember.
13] Q.  Okay.  Did you ever agree to a -- agree orally to a
14] change in this contract?
15] A.  I don't remember.
16] Q.  Okay.  It says -- I'm looking at the first
17] paragraph, last sentence.  It says, "The cost of repairs is
18] 153,759.64 but later to be changed to the final agreed
19] scope."
20]     Did I read that right?
21] A.  You did.
22] Q.  Okay.  And do you know whether State Farm has
23] already paid more than $153,759.64 on this claim?
24] A.  I do not know exactly --
25] Q.  Okay.

Page 54

1]  A.  -- what State Farm has paid.
2]  Q.  Okay.  Your contract with Adanac -- let's see.  I
3]  want to talk through a little bit this contract.
4]     As far as you know, there was never any change
5]  in the amount of the cost of repairs in this contract you
6]  have here with Adanac?
7]  A.  In this contract -- I -- I don't know if there's
8]  been any changes after this contract.
9]  Q.  Okay.  So for there to be a change in a contract
10] you have with somebody else, you've got to agree to that
11] change; right?
12] A.  Correct.
13] Q.  And do you deal with contracts at all in your job
14] as director of Finance?
15] A.  No.
16] Q.  Okay.  But you do understand that both parties have
17] to agree for a change?
18] A.  Absolutely.
19] Q.  Okay.  And -- and so you don't recall ever agreeing
20] to any change in the cost of repairs beyond what's outlined
21] here, 153,759.64?
22] A.  I don't remember if I signed another contract at a
23] higher amount or not.
24] Q.  Okay.  If you had signed another contract at a
25] higher amount, you would have produced that to me when I

Page 55

1]  asked for --
2]  A.  Yes.
3]  Q.  -- the contracts?
4]  A.  Yes.
5]  Q.  Okay.  All right.  So right now, according to this
6]  contract, the most Adanac would get paid, according to this
7]  contract, is $153,759.64; right?
8]     MR. MOON: Object to the form.
9]     THE WITNESS: According to this contract, yes.
10]     BY MS. BRADHAM:
11] Q.  Okay.  And so unless there's some other contract,
12] if Adanac's already been paid 1,000 -- 100 -- okay.  Let me
13] start over on that question.
14]     Unless there's some other contract that --
15] that hasn't been produced, if Adanac has already been paid
16] $153,759.64, you don't owe them anything more on this
17] contract?
18]     MR. MOON: Object to the form.
19]     THE WITNESS: I don't owe them anything else?
20]     BY MS. BRADHAM:
21] Q.  Correct.
22] A.  I don't -- I don't know.
23] Q.  Okay.  Where in this contract does it say that
24] you're going to pay Adanac more than the cost of repairs that
25] they've -- that they've got here, 153,000 and some odd

Page 56

1]  dollars?
2]  A.  It doesn't say it here.
3]  Q.  Okay.  Okay.  Now, well, we talked about the delays
4]  that caused Adanac's repair time to very far exceed -- well,
5]  let me ask this question:  At the -- the four-month repair
6]  time is -- that we were talking about earlier is -- is talked
7]  about here in -- in this contract, the -- the Exhibit 3, the
8]  second paragraph; right?
9]  A.  Right.
10] Q.  I'm sorry.  I didn't hear.
11] A.  Right.
12] Q.  Right.  Okay.  Thank you.
13]     Okay.  And at the time of this contract, are
14] you aware that Adanac knew what State Farm's estimate was
15] to -- to repair the -- the -- the property?
16]     MR. MOON: Object to the form.
17]     THE WITNESS: I'm not familiar with that.
18]     BY MS. BRADHAM:
19] Q.  Okay.
20] A.  I'm not aware of that.
21] Q.  Okay.  At least at the time of this contract,
22] Adanac wasn't telling you, it's going to take us more than
23] four months because we think State Farm's not paid enough
24] on -- on -- on your claim?
25] A.  Can you ask that question again, please.

Phillips vs.
State Farm Fire and Casualty

Case 2:19-cv-04605-GMS   Document 1-3   Filed 07/01/19   Page 452 of 518

Videotaped

Anderson Phillips
March 30, 2018

Page 57

1] Q.  Sure.  At least at the time of this contract --
2] A.  Yes.
3] Q.  -- Adanac is estimating four months from the
4]   issuance of the permit to complete repairs; right?
5] A.  Yes.
6] Q.  So at the time of this contract, Adanac wasn't
7]   telling you it's, in fact, going to take more time to
8]   complete the repairs because of some chain reaction from --
9] A.  Right.
10] Q.  -- from not being paid enough?
11] A.  No.  There was no expectation that it would take
12]   longer.
13] Q.  Okay.  All right.  Is there any particular delay
14]   you can point to that you say that delay is because of a
15]   chain reaction from State Farm not paying enough on the
16]   claim?
17] A.  Specifically, no.
18] Q.  Okay.  Is there any repair that you think needed to
19]   be done but that State Farm didn't pay for?
20] A.  Not that I know of specifically, no.
21] Q.  Is it possible that the reason Adanac couldn't meet
22]   the four-month estimate was because of its own internal
23]   operational problems --
24]      MR. MOON: Object to the form.
25]      (Next page, please.)

Page 58

1]      BY MS. BRADHAM:
2] Q.  -- that were creating delays?
3] A.  I don't know.  I'm not familiar with any of their
4]   internal operating problems.
5] Q.  So you don't care one way or the other why Adanac
6]   didn't meet that four-month estimate?
7] A.  I don't.
8] Q.  Okay.  Let's go to Exhibit Number 13.
9]      Actually, I'm sorry.  Before we get there, let
10]   me go through my notes from the things that I -- that I noted
11]   that your wife didn't know that I noted to ask you.
12]      So this -- this might be -- I might be sort of
13]   jumping around a little bit here.
14] A.  No problem.
15] Q.  Okay.  Why didn't you buy the countertops through
16]   Adanac?  Why did you go through this -- this Ivan?
17] A.  I believe it was because we were running low on
18]   money.
19] Q.  Okay.
20] A.  And -- and they could put the Formica in, but if we
21]   wanted granite, we would pretty much have to come out of
22]   pocket for that.
23] Q.  Okay.  All right.  We talked about this.
24]      Do you recall the name of the builder that you
25]   bought the house from in 2007?

Page 59

1] A.  I believe the construction company was Darmor
2]   Construction.
3] Q.  Okay.  D-A-R --
4] A.  D-A-R-M-O-R.
5] Q.  Okay.  Okay.  And do you remember anything about
6]   your purchase of the State Farm policy?
7] A.  I don't.  It was -- I've had State Farm since I
8]   bought the home in 2007.
9] Q.  Okay.  Okay.  Do you know who your State Farm agent
10]   is?
11] A.  No.  It's changed several times.
12] Q.  Okay.  Have you ever spoken to any State Farm agent
13]   about a homeowners policy?
14] A.  Years ago.
15] Q.  Okay.  Back in 2007 or -- or maybe even before
16]   that?
17] A.  No.  It was after that.
18] Q.  Okay.
19] A.  I forget the -- the woman's name.  I think it was
20]   Laura Gonzales or Lisa Gonzales.
21] Q.  Uh-huh.
22] A.  Sorry.  I believe the woman's name, the agent's
23]   name, was Lisa Gonzales --
24] Q.  Okay.
25] A.  -- that I talked to years ago.

Page 60

1] Q.  And why did you talk to her?
2] A.  I believe it was when there was -- we had a very
3]   bad hailstorm that caused damage to a shed in my backyard
4]   that I made a claim on.
5] Q.  And was this also at the 214 West Desert?
6] A.  It was.
7] Q.  Okay.  And what do you remember about that
8]   discussion you had with -- with Ms. Gonzales?
9] A.  Nothing in particular.
10] Q.  Okay.
11] A.  Let them know what happened.  They brought out an
12]   inspector --
13] Q.  Uh-huh.
14] A.  -- and they -- the -- the weather did cause damage.
15] Q.  Uh-huh.
16] A.  They assessed the cost of the damages, and I paid
17]   to get the damages fixed.
18] Q.  Okay.  So they -- they assessed the cost of the
19]   damages --
20] A.  Yeah.
21] Q.  -- and then they paid you the --
22] A.  They did.
23] Q.  -- covered -- the covered costs?
24] A.  They did.
25] Q.  And did you have any problem with the way State

Videotaped

Page 61

1]   Farm handled that --
2] A.  No.
3] Q.  -- to your shed?
4] A.  No.
5] Q.  Okay. Are you making any claim in this litigation
6]   that State Farm owes you additional amounts for personal
7]   property damage?
8] A.  There are some personal property items that we have
9]   not been reimbursed for.
10] Q.  Okay.
11] A.  I don't have the documents right in front of me,
12]   but I know a leather couch, a leather sofa, and a leather
13]   ottoman that were in the house at the time. No compensation
14]   was given for those.
15]     And I want to say there was also some -- some
16]   other outstanding items. I don't know if it was -- I know it
17]   was appliance, but I don't know if it was washer and dryer or
18]   stove/refrigerator. I'm not exactly sure. But there were a
19]   couple of higher ticket items that no cost was associated
20]   with, so they were not paid out. And they still not -- have
21]   not been paid on.
22] Q.  Okay. Do you know if anyone has ever raised that
23]   issue on your behalf with State Farm?
24] A.  I believe it was something Justin was looking into,
25]   but I'm not --

Page 62

1] Q.  Okay.
2] A.  I don't know where we are with that. Yeah.
3] Q.  Okay. You don't know whether he's -- whether he's
4]   raised that with State Farm?
5] A.  I don't know. I don't know --
6] Q.  Okay.
7] A.  -- where we are with that. I know we brought it to
8]   his attention. And he said he would look into it, and that's
9]   pretty much where we are with it a year and a half later --
10] Q.  Okay.
11] A.  -- two years.
12] Q.  Do you know whether payments for appliances were
13]   made as part of State Farm's payments on the structure?
14] A.  I don't know.
15] Q.  Okay. If State Farm already paid for appliances as
16]   part of the structure, it wouldn't also pay for appliances
17]   as -- a second time as part of the -- the personal property;
18]   right?
19] A.  That would make sense.
20] Q.  Okay. And you said something when we were talking
21]   about the contents, the -- the leather couch and the other
22]   leather items. You said something I think like that you --
23]   that you don't have the documentation in front of you right
24]   now?
25] A.  Yeah. So there was a pricing sheet that we had

Page 63

1]   that had --
2] Q.  Uh-huh.
3] A.  -- a lot of our personal contents listed out with
4]   the cost associated with them, depreciation values and things
5]   like that. And there were several items on that list that
6]   did not have a cost and were not paid off.
7] Q.  Okay. Other than the leather items that you --
8]   that you mentioned, anything else you can -- you can
9]   remember?
10] A.  Like I said, I -- I don't know if the appliances --
11]   if the appliances were part of the structure or not, but --
12]   but I believe there were some appliances that were not
13]   included in that as well.
14] Q.  Okay. Okay. Thank you. I -- yeah, I'm sorry.
15]   You'd already told me that. I appreciate that.
16]     Now, the next day after the fire, State Farm
17]   hand-delivered to Mr. Skipton a advanced check for -- for you
18]   for $7,900.
19]     Do you remember that happening?
20] A.  I don't.
21] Q.  Okay. You don't have any problem with State Farm's
22]   decision to -- to make an advance payment to you, if that's
23]   what happened?
24] A.  No.
25] Q.  Okay. That's a reasonable thing for them to do?

Page 64

1] A.  Yes.
2] Q.  Do you remember State Farm advancing the $2,900 to
3]   cover the security deposit on the Melody Drive property?
4] A.  I do remember that.
5] Q.  Okay. And you thought that was reasonable for them
6]   to do?
7] A.  I do.
8] Q.  Okay. I'm not sure if I -- did you ever speak to
9]   anyone at State Farm about this claim?
10] A.  Shortly after --
11] Q.  Oh.
12] A.  -- signing with Adanac, I got a call. I don't
13]   remember who I spoke with, but -- but I referred them to --
14]   to Adanac --
15] Q.  Okay.
16] A.  -- since we were taking them on as a --
17] Q.  Thank you.
18] A.  -- representation.
19] Q.  I apologize. You had told me that. I didn't mean
20]   to ask you the same question twice. Thank you.
21] A.  No problem.
22] Q.  Thank you for being patient with me.
23]     Okay. I'd like to also ask you to tell me all
24]   of the either entities or people who were involved in any way
25]   with making repairs or improvements on your house after

Page 65

1] the -- after the fire.
2] A.  Everything was done through Adanac.
3] Q.  Okay.
4] A.  Everything.
5] Q.  So you don't remember any -- any other names other
6]    than the Adanac and Don and Mirko?
7] A.  No.
8] Q.  Okay.
9] A.  We mentioned Ivan for the countertops, but --
10] Q.  Uh-huh.
11] A.  -- no.
12] Q.  Okay.  Is there any time when you needed some
13]    information or an answer from State Farm and felt that you
14]    didn't get it?
15] A.  Not from State Farm, no.
16] Q.  Okay.  Was there ever a time that you felt you
17]    needed some information or an answer from Adanac and felt you
18]    didn't get it?
19] A.  I didn't get it in the time frame that I expected.
20] Q.  Okay.  And what was the information that -- that
21]    you wanted that you didn't get in the time frame you
22]    expected?
23] A.  I think it's in the text messages.  I don't
24]    remember specifically, but just trying to get an update on --
25]    on when it would be done.  And a couple days go by, a day or

Page 66

1] two goes by, and didn't hear anything --
2] Q.  Uh-huh.
3] A.  -- as a follow-up.
4] Q.  Okay.  What about Skipton?  Was there ever any
5]    information or answer you needed from Skipton & Associates
6]    that -- that you didn't get?
7] A.  No.  Justin was always pretty fast and responsive.
8] Q.  And what about that appraisal process?  Did
9]    you -- did Skipton & Associates ever tell you anything about
10]    an appraisal process under your insurance policy?
11] A.  No.
12] Q.  Okay.  Did they ever tell you about any process
13]    under your insurance policy for resolving disagreements about
14]    the amount paid -- the amount that should be paid for -- for
15]    repairs without going to litigation?
16] A.  I don't believe so.
17] Q.  Okay.
18] A.  No.
19] Q.  Would you have been -- would you have been
20]    interested in -- in knowing that that was a possibility?
21] A.  Sure.  I want to know about all options.
22] Q.  Sure.  Okay.  Do you know what the difference was
23]    in -- in money, you know, the amount difference --
24] A.  Uh-huh.
25] Q.  -- between State Farm's estimate and Adanac's

Page 67

1] estimate?
2] A.  Not exactly, no.
3] Q.  Okay.  Do you have a ballpark idea?
4] A.  40, 50,000.
5] Q.  Okay.  And is it your understanding that all of
6]    that difference was because of using Xactimate's new
7]    construction pricing rather than restoration pricing?
8] A.  I don't know if it was all associated with that,
9]    but I believe that was the -- the main issue in the cost
10]    difference.
11] Q.  Do you know whether any asbestos test was ever done
12]    by Adanac on the house?
13] A.  I'm not sure.
14] Q.  Okay.  Do you know whether scaffolding was needed
15]    in order to create the vault to the ceiling?
16] A.  I don't know.
17] Q.  Okay.  Do you know whether scaffolding would have
18]    been needed if you didn't have a vault to the ceiling?
19] A.  I mean, it's 8-foot ceilings.  So I don't -- I
20]    don't remember anybody being that tall in there, so they
21]    would have -- I don't -- I don't know.
22] Q.  They'd have to have some kind of ladder?
23] A.  They'd have to have something to get up there.  As
24]    far as it needing to be a scaffold, I don't -- I don't know.
25] Q.  Okay.  When you all were in the Melody house, it

Page 68

1] had that finished basement; right?
2] A.  It did.
3] Q.  And the basement had a bedroom down there --
4] A.  Uh-huh.
5] Q.  -- and -- and, like, a separate living area down
6]    there?
7] A.  Uh-huh.
8] Q.  Who stayed in the basement when you were in the
9]    Melody house?
10] A.  Nobody.  It was vacant.
11] Q.  Okay.
12] A.  There was no -- not even one piece of furniture
13]    down there.
14] Q.  Okay.  Why not?
15] A.  Because we don't feel safe with our kids being on a
16]    different floor, and it was space really that we didn't need.
17] Q.  Okay.  So your -- your aunt or -- was it your aunt
18]    or your wife's aunt that lived --
19] A.  My aunt.
20] Q.  Okay.  So your aunt was -- was up on the -- on the
21]    main floor as well?
22] A.  Yes.
23] Q.  Did that Melody house have views of South Mountain
24]    from the front?
25] A.  Yes.

Page 69

1] Q. Okay.

2] A. Our current residence does too.

3] Q. Okay. Were they in a similar area of town?

4] A. Uh-huh.

5] Q. Okay. Did you deal at all with Bank of America in

6] connection with releasing the funds for the repairs?

7] A. No.

8] Q. Okay. Do you know who did deal with them?

9] A. I do not.

10] Q. Okay. Would it have been either Adanac or -- or

11] Skip- -- or Skipton & Associates, one or the other?

12] A. It would have to be one of them.

13] Q. Okay. Do you have social media accounts?

14] A. I do.

15] Q. Okay. And I'm going to go through from my memories

16] of social -- Facebook?

17] A. I have one.

18] Q. Okay. How about Instagram?

19] A. Yes.

20] Q. Snapchat?

21] A. Nothing after that. Just Facebook and Instagram.

22] Q. Okay. Facebook and -- thank you.

23] Are there any documents related to the

24] improvements that were done on the house after the fire

25] that -- that you haven't given us?

Page 70

1] A. Not that we haven't discussed here that we're now

2] going to look for when we're done.

3] Q. Okay. Thank you. So you weren't intentionally not

4] providing --

5] A. Absolutely not.

6] Q. -- those documents?

7] A. No.

8] Q. Okay. Thank you.

9] Since the improvements we talked about that

10] were done between December 2015 and when you all moved back

11] in in June 2017, have you made any other improvements or

12] upgrades to the house?

13] A. Yes.

14] Q. Okay. Tell me about those.

15] A. We put -- after we moved back in the house,

16] probably about three, four months after that we put up a

17] covered patio in the back.

18] Q. Okay. Okay. And is that -- it looked like there

19] had been that covered patio that's kind of a -- kind of

20] indented in.

21] A. Uh-huh.

22] Q. And so this is an additional covered patio beyond

23] that area?

24] A. Correct. Since we made the outside patio smaller,

25] we put a covered patio to extend -- to the side of the house

Page 71

1] to extend the outdoor area.

2] Q. Okay. And who did you have do that work?

3] A. I forget the guy's name. I forget his -- his

4] company's name.

5] Q. It wasn't Adanac --

6] A. No.

7] Q. -- or Mirko?

8] A. No, no, no. It was something totally different

9] after this.

10] Q. Okay. And -- okay. And do you remember the cost

11] of -- of doing that covered porch?

12] A. Around $3,500.

13] Q. Okay. How did you pay for that?

14] A. I don't remember.

15] Q. Okay. All right. Now, are all of your bank

16] accounts with Bank of America including savings and checking,

17] apart from the shared account we talked about, Arizona

18] Federal?

19] A. Bank accounts, yes.

20] Q. Okay. Do you have investment accounts as well?

21] A. No. Just 401(k), a couple of stocks and bonds.

22] Q. So the investment accounts are all retirement

23] investment accounts?

24] A. Yeah.

25] Q. Okay. Did State Farm do anything in handling your

Page 72

1] claim that caused -- that prevented you from properly doing

2] your -- your job at work?

3] A. No.

4] Q. Okay. Did State Farm do anything in handling your

5] claim that prevented you from taking care of your family?

6] A. No.

7] Q. Did State Farm do anything in handling your claim

8] that caused you to lose sleep?

9] A. Yes, indirectly. With the reduced payment, just

10] the whole process of us having to sleep in a trailer, I

11] definitely lost sleep over that whole experience.

12] Q. Okay. If, in fact, the delays that -- that caused

13] the repairs to extend into June were not State Farm's fault,

14] then all of that stress you had about that trailer wouldn't

15] have been State Farm's fault; right?

16] A. Correct. If they were not at fault for the delays,

17] then they would not be at fault for the loss of sleep.

18] Q. Okay. Right.

19] And if Mr. Skipton never told State Farm that

20] the repairs were still ongoing past May, that you all living

21] in the trailer would -- would not have been State Farm's

22] fault; is that right?

23] MR. MOON: Object to the form.

24] THE WITNESS: I'm sorry. Can you ask that

25] again?

Phillips vs.
State Farm Fire and Casualty

Case 2:19-cv-04605-GMS   Document 1-3   Filed 07/01/19   Page 456 of 518

Videotaped

Anderson Phillips
March 30, 2018

Page 73

1]     BY MS. BRADHAM:
2] Q.  Right. If Skipton & Associates told State Farm
3]  that the repairs were complete by the end of May and never
4]  told State Farm that, in fact, the repairs were still gone --
5]  ongoing into June, that would have been Skipton's fault for
6]  not telling State Farm what was going on; right?
7] A.  If they didn't tell them, yes.
8] Q.  Right. Because you hired Skipton specifically
9]  to -- for the purpose of communicating relevant and important
10]  information to State Farm?
11] A.  Yes.
12] Q.  Okay. Do you have any documents that relate to
13]  your purchase of the homeowners policy, like any -- any
14]  materials that were given to you at the time you -- you
15]  purchased the policy?
16] A.  I don't believe so.
17] Q.  Okay. Okay. And did you see any healthcare
18]  professionals, that could be a doctor or a therapist or --
19]  or, you know, anyone for emotional distress or stress or
20]  physical problems caused by State Farm?
21] A.  No.
22] Q.  How about just any kind of emotional distress or --
23]  or stress after the fire?
24] A.  No.
25] Q.  Okay. How about before the fire?

Page 74

1] A.  No.
2] Q.  Do you remember anyone named Victor Castillo that
3]  was involved at all in repairs?
4] A.  No.
5] Q.  Okay. Did you make any payments out of pocket to
6]  anyone for preparing any plans?
7] A.  No.
8] Q.  Okay. Did you make any payments out of pocket to
9]  any engineer for doing any engineering work --
10] A.  No.
11] Q.  -- on the property?
12]     Okay. Here we go.
13]     Okay. Did you have any discussion with your
14]  mother about stress caused by straight -- by State Farm's
15]  handling of your claim?
16] A.  I talked to my mother about the situation that we
17]  were in and the frustration and stress that comes with that.
18] Q.  Okay. Was that specific to something State Farm
19]  had done?
20] A.  It -- the conversation wasn't, Mom, this is the
21]  stress that State Farm has caused me. It was more
22]  situational.
23] Q.  Okay. The situation of having had a fire, being
24]  out of your house, and not knowing when you're -- you're
25]  going to move back in?

Page 75

1] A.  Yeah, everything. I mean, extended stay, living in
2]  a hotel for a month, and then uprooting from there and moving
3]  to another home. Seeing the delays every day driving past
4]  our house to work every day. My daughter constantly being
5]  reminded of the house that caught on fire and her bringing
6]  that up, even to this day.
7] Q.  Uh-huh. And your daughter was in the house as well
8]  when the fire started?
9] A.  Absolutely.
10] Q.  Yeah. And so I want to -- I want to just go
11]  through those things. Maybe we'll start with -- with your
12]  daughter being reminded of -- of the house being on fire.
13]     That's not obviously a stress that State Farm
14]  created? It didn't -- it didn't --
15] A.  State Farm didn't start the fire.
16] Q.  -- cause that fire?
17]     Right. And the same with having to move into
18]  extended stay and -- and -- and then move -- uproot and move
19]  into --
20] A.  Yeah.
21] Q.  -- a rental?
22] A.  Situation, not -- not State Farm --
23] Q.  Okay.
24] A.  -- causing.
25] Q.  How often would you talk to your -- your mother

Page 76

1]  about stress from the situation?
2] A.  I probably see my mother once a month. So she
3]  would always ask for updates about how everything's going,
4]  and it would come up in conversation.
5] Q.  Okay. And how about -- how about your sister? Did
6]  you -- and I'm going to -- I'm going to again ask the -- the
7]  more narrow question.
8]     Did you talk to your sister about stress that
9]  you had because of State Farm's handling of the -- of your
10]  insurance claim?
11] A.  No. There's no difference in the conversation
12]  between my mother and my sister.
13] Q.  Okay. Do you all have an accountant that does your
14]  taxes, or do you -- do you do them yourselves?
15] A.  We do them ourself.
16] Q.  And has that been the same since December of 2015?
17] A.  I don't know when it switched. We were using
18]  H&R Block for some time. And at some point we switched to
19]  TurboTax, but I'm not sure what year that was.
20] Q.  Okay. Is there any money that you think State Farm
21]  owes you under the insurance policy that it hasn't paid you?
22] A.  Can you ask that one more time, please.
23] Q.  Sure. Is there any money that you think State Farm
24]  owes you under the insurance policy --
25] A.  Under the insurance policy?

Page 77

1]  Q.  -- that it hasn't paid you?
2]       Yes.
3]  A.  Yes, in terms of the personal property that still
4]    has not been recouped.
5]  Q.  Okay.  Any other money State Farm owes you under
6]    the insurance policy that hasn't -- hasn't been paid?
7]  A.  To me, to my family under the policy, no.
8]       MS. BRADHAM:  Okay.  Okay.  If we could take a
9]    break, I'll look at my notes.  I will probably have a few
10]   more questions for you --
11]      THE WITNESS:  Okay.
12]      MS. BRADHAM:  -- but they'll go faster if I'm
13]   more organized.
14]      THE WITNESS:  Okay.
15]      THE VIDEOGRAPHER:  Going off the record.  The
16]   time is 2:20 p.m.  This is the end of media 1.
17]      (Recess from 2:20 p.m. to 2:39 p.m.)
18]      (Exhibit 16 marked for identification.)
19]      THE VIDEOGRAPHER:  Back on the record.  The
20]   time is 2:39 p.m.  This begins media 2.
21]      BY MS. BRADHAM:
22]  Q.  Okay.  What's your understanding of what caused the
23]   fire?
24]  A.  A faulty extension cord that was connected to the
25]   Christmas lights.  The extension cord caught on fire.  The

Page 78

1]    fire went under the eave and caused an attic fire.
2]  Q.  Okay.  And it wasn't anything to do with, like --
3]    like ashes or charcoal or anything?
4]  A.  No.
5]  Q.  Okay.  Okay.  Looking at what's been marked as
6]    Exhibit 16, you had talked earlier about lists you would get
7]    of various personal property items --
8]  A.  Uh-huh.
9]  Q.  -- and then amounts paid.
10]      Is this the -- the list you're talking about?
11]  A.  I don't know if this is the exact list, but it
12]   looks familiar.  It looks similar --
13]  Q.  Okay.
14]  A.  -- to the list.
15]  Q.  This is the type of list that --
16]  A.  This is the type of list --
17]  Q.  -- that you would get?
18]  A.  -- yes.
19]  Q.  Okay.  And I don't know if this is the latest one,
20]   but I -- I think it -- it might at least allow me to -- to
21]   ask the questions that I need to ask here.
22]      So before we take a look at it, did you
23]   understand that initially State Farm paid the value of your
24]   personal property taking into account its age and condition
25]   at the time of the fire?

Page 79

1]  A.  Yes.
2]  Q.  And then if you replace an item and then submit
3]    receipts and say, okay, we've replaced this item, State Farm
4]    pays additional amounts to -- to -- to -- to bring you up to
5]    the cost of buying that item new?
6]  A.  Yes.
7]  Q.  Okay.  And so I want to see if I found what you
8]    were talking about.
9]       I believe it's two -- you see the item numbers
10]   on the -- on the side on the far left?  When you get to,
11]   like, page 309, there's these item numbers --
12]  A.  Yes.
13]  Q.  -- on the far left.  I believe it is 291.
14]       Ah, okay.  291, Flash Furniture.  And then
15]   there's, like, a serial number, contemporary brown vintage
16]   leather recliner, an ottoman with -- and I'm not sure what
17]   the SWI is.
18]       Do you know what the SWI is?
19]  A.  I do not.
20]  Q.  Okay.  Is this the -- one of the pieces of -- of
21]   leather furniture that you were talking about?
22]  A.  No.
23]  Q.  Okay.
24]  A.  It was a tan leather.
25]  Q.  Tan leather?

Page 80

1]  A.  Yes.
2]  Q.  And was it a couch?
3]  A.  Couch, chair, and ottoman.
4]  Q.  Couch, chair, and ottoman.  Okay.
5]       Did you also have a brown leather?
6]  A.  We did.
7]  Q.  So a brown leather and a tan leather.  Okay.
8]       The other one I -- I noted was 518.  Item
9]    number 518, which is page 328.
10]      Is this one of the items you were talking
11]   about?
12]  A.  It's not a brown leather couch.
13]  Q.  Okay.  Would you please take a look through this
14]   list and see if -- if you see anywhere the items you were
15]   talking about.
16]  A.  Okay.
17]      The breakdown that we had separated the items
18]   by room.
19]  Q.  Ah.
20]  A.  I don't think this one does that, so it might be a
21]   little harder for me to find.
22]  Q.  Okay.  I'm seeing if I can get a copy I can search
23]   that may help us get there.
24]  A.  Okay.  This copy has the -- the leather couch, tan.
25]  Q.  Okay.  Where are you looking?  Which item number?

Phillips vs.
State Farm Fire and Casualty

Case 2:19-cv-04605-GMS   Document 1-3   Filed 07/01/19   Page 458 of 518

Videotaped

Anderson Phillips
March 30, 2018

Page 81

1] A. 789.

2] Q. 789. Thank you.

3] A. It says that it was paid, but I don't remember

4]   that.

5] Q. Okay. So this copy is showing State Farm having

6]   paid $1,430 on the -- the tan leather couch; is that right?

7] A. According to this, yes.

8] Q. Okay.

9] A. So, yeah, according -- sorry. I'm sorry.

10] Q. Ah. And then is 791, item number 791, the ottoman

11]   that -- the tan ottoman?

12] A. Yes.

13] Q. Okay. And so this copy is showing the tan ottoman

14]   having been paid $349.91; is that right?

15] A. Yes. Just looking through some of these items, for

16]   example, 1320, the Nikon camera, hasn't been reimbursed.

17] Q. And is that your memory?

18]   So I'm not certain that -- and, in fact, I

19]   know this is not the latest version.

20] A. Okay.

21] Q. It was just the quickest version I could find.

22] A. Okay.

23] Q. So I was wondering if that's from your memory or --

24]   or just from looking at this document?

25] A. Sorry. That's from looking at the document.

Page 82

1] Q. Okay. Thank you.

2] A. Yeah, from the document that I -- I had to this

3]   one, this one does look a little bit different, because it

4]   had more open items than what this one shows.

5] Q. Okay. Anything else from your memory that you

6]   remember as not having been paid?

7] A. No.

8] Q. Okay. Did you review any line item estimate by

9]   Adanac or Skipton?

10] A. Can you ask that again?

11] Q. Did you review any line item estimate for the cost

12]   of repairs by Adanac or Skipton?

13] A. No.

14] Q. Okay. And I'm not sure if I asked you already. I

15]   apologize if I did.

16]   Did you review any line item es- -- estimate

17]   by State Farm for the cost of repairs?

18] A. No.

19] Q. Okay. And just -- just to make sure it's clear in

20]   the record, of the items you could remember that you thought

21]   nothing had been paid on for personal property, we were able

22]   to find those items here on Exhibit 13 -- 16. And at least

23]   on Exhibit 16, it looks like those items have been paid for;

24]   is that right?

25] A. According to Exhibit 16, yes.

Page 83

1]        MS. BRADHAM: Okay. All right. Those are all

2]   the questions I have.

3]        MR. MOON: We have none. So we'll read and

4]   sign.

5]        THE VIDEOGRAPHER: This concludes the

6]   videotape deposition of Anderson Phillips, and we are off the

7]   record at 2:49 p.m.

8]        (Deposition concluded at 2:49 p.m.)

9]

10]

11]                              _____

12]                              Anderson Phillips

13]

14]

15]

16]

17]

18]

19]

20]

21]

22]

23]

24]

25]

Page 84

1] STATE OF ARIZONA    )
                        )  ss.
2] COUNTY OF MARICOPA   )

3]        BE IT KNOWN that the foregoing proceedings were
     taken before me; that the witness before testifying was duly
4]   sworn by me to testify to the whole truth; that the foregoing
     pages are a full, true, and accurate record of the
5]   proceedings, all done to the best of my skill and ability;
     that the proceedings were taken down by me in shorthand and
6]   thereafter reduced to print under my direction.
        I CERTIFY that I am in no way related to any of the
7]   parties hereto, nor am I in any way interested in the outcome
     hereof.
8]        [X] Review and signature was requested; any changes
     made by the witness will be attached to the original
9]   transcript.

10]        [ ] Review and signature was waived/not requested.

11]        [ ] Review and signature not required.

12]

13]        I CERTIFY that I have complied with the ethical
     obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
14]  J(1)(g)(1) and (2).
        Dated at Phoenix, Arizona, this 15th day of April,
15]  2018.

16]

17]                              _____

18]                              CATHY J. TAYLOR, RPR, CRR, CRC
                                    Certified Reporter
19]                                 Certificate No. 50111

20]        *      *      *      *      *

21]        I CERTIFY that GRIFFIN & ASSOCIATES, LLC, has
     complied with the ethical obligations set forth in ACJA
22]  7-206(J)(1)(g)(1) through (6).

23]                              _____

24]                              GRIFFIN & ASSOCIATES, LLC
                                   Registered Reporting Firm
25]                                Arizona RRF No. R1005

Exhibit 8

ROBERT GONZALES   APRIL 04, 2018

---

**1**

```
 1              ARIZONA SUPERIOR COURT
 2                 MARICOPA COUNTY
 3
 4 ANDERSON PHILLIPS and JASMINE  )  No. CV2016-015809
   PHILLIPS, husband and wife,    )
 5                                )
 6          Plaintiffs,           )
 7 v.                             )
 8 STATE FARM FIRE AND CASUALTY   )
   CORPORATION, an Illinois       )
 9 corporation,                   )
10                                )
            Defendants.           )
11 _____)
12
13
14     VIDEOTAPED DEPOSITION OF ROBERT GONZALES
15               Phoenix, Arizona
                 April 4, 2018
16                  9:46 a.m.
17
18
19
20
21
22                        SEYMOUR REPORTING SERVICES
                          Arizona RRF No. R1000
   PREPARED BY:           137 East Elliot Road
23                        Suite 2473
                          Gilbert, Arizona 85299
24 Donna DeLaVina, RPR    P 602.258.5800
   Certified Reporter     F 888.881.5440
25 Certificate No. 50468  www.SRSreporting.com
```

---

**2**

```
 1                    INDEX
 2 WITNESS                              PAGE
 3 ROBERT GONZALES
 4    Examination by Mr. Poli            5
 5
 6
 7 EXHIBIT        DESCRIPTION           PAGE
 8 17   360Value - New Construction vs.  18
      Reconstruction (2 pages)
 9
   18   Operation Guide Structural Loss  25
10      Claim Handling (10 pages)
11 19   State Farm Certified Policy     103
        (45 pages)
12
   20   1/25/2016 Letter to Skipton &   114
13      Associates from Robert Gonzales,
        copy of payment, draft and estimate
14      (64 pages)
15
16
17        ITEMS REQUESTED MARKED BY MR. POLI
18      PAGE    LINE     PAGE    LINE
19       27      21      100      7
20       31      25      102      11
21       64      17      112      1
22       67      16      127      16
23       94       5      140      22
24
25
```

---

**3**

```
 1      VIDEOTAPED DEPOSITION OF ROBERT GONZALES,
 2 taken at 9:46 a.m., on April 4, 2018, at the Law
 3 Offices of MERLIN LAW GROUP, P.A., 2999 North 44th
 4 Street, Suite 520, Phoenix, Arizona, before DONNA
 5 DELAVINA, Certified Court Reporter No. 50468 in and for
 6 the State of Arizona.
 7
 8 APPEARANCES:
 9
          For the Plaintiffs:
10
              MERLIN LAW GROUP, P.A.
11            By:  Michael N. Poli, Esq.
              2999 North 44th Street, Suite 520
12            Phoenix, Arizona 85018
13
              STEPHEN SILVERMAN LAW
14            By:  Stephen E. Silverman, Esq.
              6945 East Sahuaro Drive, Suite 125
15            Scottsdale, Arizona 85254
16
17      For the Defendants:
18            STEPTOE & JOHNSON, LLP
              By:  Erin E. Bradham, Esq.
19            201 East Washington Street, Suite 1600
              Phoenix, Arizona 85004
20
21 ALSO PRESENT:
22            Craig Onuschak, Videographer
              Legal Video Specialists
23            3033 North Central Avenue
              Suite 100
24            Phoenix, Arizona 85012
25            Dave Skipton, Public Adjuster
```

---

**4**

```
 1          P R O C E E D I N G S
 2
 3      THE VIDEOGRAPHER:  This is the videotaped
 4 deposition of Robert Gonzales, taken by the plaintiffs
 5 in Cause Number CV2016-015809, styled Anderson
 6 Phillips, et al., versus State Farm Fire and Casualty
 7 Corporation, filed in the Superior Court of the State
 8 of Arizona, in and for the County of Maricopa.
 9      Today is April 4th, 2018 at 9:46 a.m.  Our
10 location is 2999 North 44th, Phoenix, Arizona.
11      Donna DeLaVina is the certified shorthand
12 reporter with Seymour Reporting Services, 137 East
13 Elliot Road, Gilbert, Arizona.
14      Craig Onuschak is the certified legal
15 video specialist with Legal Video Specialists, 3033
16 North Central Avenue, Phoenix, Arizona.
17      Counsel may state their name, firm and
18 whom they represent, beginning with plaintiffs'
19 counsel, please.
20      MR. POLI:  Michael Poli of Merlin Law
21 Group, representing the plaintiff.  Here with me is my
22 co-counsel Steve Silverman, who may only be here for
23 part of the deposition and, also Dave Skipton, the
24 public adjuster.
25      MS. BRADHAM:  Erin Bradham, from Steptoe &
```

ROBERT GONZALES   APRIL 04, 2018

5

1  Johnson, representing the Defendant State Farm Fire and
2  Casualty.
3         THE VIDEOGRAPHER:  Thank you.
4         You may swear the witness.
5         (Whereupon, Mr. Robert Gonzales was duly sworn
6  by the court reporter.)
7         MR. POLI:  Okay.  Before we start the
8  deposition, rather, Ms. Bradham and I have agreed to do
9  consecutive numbering of exhibits, deposition exhibits
10  in this case.  So in the prior two deposition they did
11  consecutive numbering and the last exhibit was 16.
12         So I'm not going to use any of those
13  exhibits at this deposition.  But, nonetheless, we'll
14  pick up with Exhibit 17.
15         That's acceptable, right?
16         MS. BRADHAM:  That's fine.
17
18         ROBERT GONZALES,
19  called as a witness herein, having been first duly
20  sworn, was examined and testified as follows:
21
22         EXAMINATION
23  BY MR. POLI:
24     Q.  Go ahead and state your name for the record,
25  sir.

6

1     A.  It's Robert Gonzales.
2     Q.  I understand you've had your deposition taken
3  before?
4     A.  Yes.
5     Q.  About how many times have you been deposed?
6     A.  Five or six, I guess.
7     Q.  Okay.
8     A.  I don't know.  It's like. . .
9     Q.  And you've also testified at trial, I
10  understand?
11     A.  Yes.
12     Q.  How many times have you testified at trial?
13     A.  Twice.
14     Q.  Let me cover ground rules that you probably are
15  familiar with, but let's just get them out there so
16  we're both on the same page.
17         First, let me get my question completely
18  out before you answer that, so that we're not talking
19  over each other.  Do you understand that?
20     A.  Correct.
21         I need a correction.  It was actually
22  three times.  I forgot one of them, so three times.
23     Q.  At trial?
24     A.  Yes.
25     Q.  Okay.  So anyway, so can we agree that we will

7

1  do our best not to speak over each other?
2     A.  Yes.
3     Q.  And that's so that we can have the best record
4  possible.  Do you understand that?
5     A.  Yes.
6     Q.  Okay.  Next, please respond to any questions I
7  pose verbally.  Try and avoid responding with ambiguous
8  terms like "huh-uh" or "uh-huh" and try and avoid
9  responding with simply, you know, body language like
10  shaking your head one way or the other, so that we,
11  again, have a clear and understandable record.  Do you
12  understand that?
13     A.  Yes.
14     Q.  Okay.  Next, I'll be asking -- some of these
15  questions, no doubt, will ask for your recollection of
16  something, whether it's timing, a conversation, State
17  Farm procedures, whatever it might be.  Any time I ask
18  for a question that calls for your recollection, I'm
19  looking for your best recollection.
20         That means if you're the perfect -- if
21  you're the rare human being that has perfect memory,
22  give us that.  But if you're like pretty much everyone
23  else on the planet, you may not have total recall, but
24  you can give us your recollection, whatever it might
25  be.

8

1         If it's a conversation, you can paraphrase
2  it.  If it's a timing question, you can give us a range
3  or an approximate time.  Whatever your best
4  recollection is, that's what I'm seeking.  Do you
5  understand?
6     A.  Yes.
7     Q.  Okay.  Next, your lawyer may make objections
8  during the deposition.  She's preserving her rights for
9  the record.  When she's done with the objection, go
10  ahead and answer the question.  The only exception
11  would be if she instructs you not to answer a question.
12  Do you understand that?
13     A.  Yes.
14     Q.  Finally, but also critically, this is a formal
15  proceeding.  Since you've had a lot of experience with
16  these types of proceedings, I would think you realize
17  this.  The court reporter is an officer of the court.
18  She's empowered to administer an oath and she's done
19  so.  And that means, to use the phrase we see on
20  television or read in books, you're sworn to the tell
21  the truth, the whole truth and nothing but the truth,
22  subject to penalties for perjury.  Do you understand
23  that?
24     A.  Yes.
25     Q.  Okay.  What, if anything, did you do to prepare

ROBERT GONZALES   APRIL 04, 2018

9

1  for today's deposition?
2  **A. Met with our attorneys and reviewed the file.**
3  Q. And when you say you "met" with your attorneys,
4  I don't what to know what was discussed with your
5  attorneys, but I can ask details about when you met
6  with them, how long you met with them, who was there.
7  So how many times did you meet with your
8  attorneys to prepare for today?
9  **A. For today, it would have been three times.**
10  Q. And your deposition was previously scheduled
11  and then was pushed off. So I take it from your answer
12  you probably met with your attorneys before, when you
13  were going to be deposed, before; is that right?
14  **A. Correct.**
15  Q. Okay. So with respect to today's deposition,
16  you met with your attorneys three times?
17  **A. Correct.**
18  Q. And then with respect to a prior scheduled
19  iteration of your deposition, how many times did you
20  meet with your attorneys then?
21  **A. I believe twice.**
22  Q. So with respect to your testimony today, you've
23  have met with your attorneys at different times, five
24  different times, right?
25  MS. BRADHAM: Form.

10

1  MR. POLI: No, three plus two would be
2  four -- five, excuse me.
3  MS. BRADHAM: Form.
4  Go ahead.
5  Q. BY MR. POLI: Sir, I thought you said a minute
6  ago --
7  MR. POLI: First of all, let's get
8  something straight right away. The testimony is his,
9  not yours. You should limit your objections to form.
10  You don't need to coach the witness, I assume you know
11  that. You're an experienced attorney, so I assume
12  that's not going to happen.
13  MS. BRADHAM: Mike, I'm a little confused
14  about what you've said. I said the word "form."
15  That's an appropriate objection --
16  MR. POLI: Oh, I thought you said "four."
17  Okay.
18  MS. BRADHAM: I said the word "form."
19  And then I --
20  MR. POLI: That is an appropriate
21  objection.
22  MS. BRADHAM: And then I asked the witness
23  to go ahead in case he was confused about whether he
24  could.
25  MR. POLI: No. I thought you were asking

11

1  four, which would be a substantive answer for him.
2  MS. BRADHAM: No.
3  MR. POLI: So I take that back.
4  Q. BY MR. POLI: Okay. So you've met with your
5  attorneys five different times to prepare for your
6  testimony today?
7  **A. As far as I recall, yes, I believe that's the**
8  **time.**
9  Q. Okay. When's the most -- first of all, what
10  attorneys did you meet with? Was it always
11  Ms. Bradham?
12  **A. It was Erin, Floyd and then our corporate**
13  **counsel was there via Skype or whatever system we use.**
14  Q. And who is the corporate counsel?
15  **A. Linette Wright, I believe is her last name.**
16  Q. During the five times you met with your
17  attorneys, is that always who you met with, namely
18  Floyd Bienstock, Erin Bradham and Linette Wright?
19  MS. BRADHAM: Form.
20  THE WITNESS: Yes.
21  Q. BY MR. POLI: Okay. And when's last time you
22  had a meeting with these three attorneys?
23  **A. Yesterday.**
24  Q. How long did you spend with them, yesterday?
25  **A. A couple of hours.**

12

1  Q. Okay. Two hours?
2  **A. Yes.**
3  Q. And let's go further back in time on these five
4  different meetings to prepare for today. So you spent
5  two hours with the three attorneys yesterday. When's
6  the prior time you would have met with the three
7  attorneys to prepare for your testimony today?
8  MS. BRADHAM: Form.
9  THE WITNESS: Monday.
10  Q. BY MR. POLI: Okay. And how long did you spend
11  with them on Monday, approximately?
12  **A. About five hours.**
13  Q. Five hours. And that takes us through two of
14  the meetings, out of five. Prior to Monday, when would
15  the time before that have been that you met with the
16  three attorneys for State Farm to prepare for today?
17  MS. BRADHAM: Form.
18  THE WITNESS: Last Wednesday.
19  Q. BY MR. POLI: And approximately how long did
20  you spend with three attorneys last Wednesday?
21  **A. About five hours again.**
22  Q. Okay. Now, those three meetings totaling 12
23  hours, approximately, would have been with respect to
24  the deposition that was scheduled for today?
25  **A. Yes.**

ROBERT GONZALES   APRIL 04, 2018

13

1    Q.  But, as we discussed, there was a prior
2   scheduling of your deposition where you would have had
3   other meetings with the same lawyers, correct?
4    **A.  Correct.**
5    Q.  Okay.  And that's further back in time, so I
6   wouldn't expect you to remember the exact date.  Do you
7   remember the exact date?
8    **A.  No, I don't.**
9    Q.  Okay.  You just remember that you had two other
10  meetings, right?
11   **A.  Correct.  Yes.**
12   Q.  Okay.  All right.  Can you tell me
13  approximately how long you spent with the three
14  attorneys to get ready for your testimony in those
15  other two meetings collectively?
16   **A.  I would have to guess, I wouldn't know.  I**
17  **couldn't recall exact time.**
18   Q.  Okay.  Well, this goes back to a ground rule,
19  okay.  There's a distinction between a guess and an
20  estimate.  There's a distinction between a guess and
21  your best recollection.  I could spend time trying to
22  hone in on this, like a mortar attack and it would just
23  waste a bunch of your time and my time.
24       You should feel free to answer the
25  question with whatever answer you feel most comfortable

14

1   with.  If you want to give a range, for instance, the
2   meetings last week and this week, you have good memory,
3   because it was recent.  With respect to the prior two
4   meetings, you might want to give range of five to ten
5   hours or two to four hours.  I'm just giving you
6   examples.
7        Whatever estimate you're most comfortable
8   with.  Obviously, you spent more than a minute in those
9   meetings.  Obviously, you didn't spend a hundred hours
10  in those meetings.  Those would be true statements,
11  right?
12   **A.  Correct.**
13   Q.  Somewhere in between a minute and a hundred
14  hours would be an estimate of how long you spent in
15  those two meetings, correct?
16   **A.  Correct.**
17   Q.  Okay.  Whatever range or estimate you feel most
18  comfortable with, go ahead and give it to me for those
19  first two meetings that you had with the lawyers to get
20  ready for today's testimony?
21   **A.  I would say between three and six hours.**
22   Q.  Okay, that's fine.
23       So that means the total of meetings you've
24  had with your attorneys, based on your best estimate to
25  get ready to give testimony today, would 15 to 18

15

1   hours, correct?
2        MS. BRADHAM:  Form.
3        THE WITNESS:  Yes.
4    Q.  BY MR. POLI:  Okay.  Now, I assume, and don't
5   get into what you looked -- well, I guess I can ask you
6   what you looked at.  Did the meetings just involve
7   verbal conversation or did they also involve actual
8   reviewing documents?
9    **A.  Reviewing documents.**
10   Q.  Any particular -- let's take the three meetings
11  within the last week, okay, or eight days, I guess;
12  nine days.
13       Did any of the documents you reviewed in
14  those last three meetings, totaling about 12 hours, do
15  any of the documents stick out in your mind right now?
16       MS. BRADHAM:  Form.
17       THE WITNESS:  Yes.
18   Q.  BY MR. POLI:  Okay.  What sticks out in your
19  mind, in terms of docs?
20   **A.  The 360Value document that I saw.**
21   Q.  And that's an Xactware or Xactimate white
22  paper?
23   **A.  I don't think it's a --**
24       MS. BRADHAM:  Foundation.
25       THE WITNESS:  Yeah, I don't believe it's a

16

1   white paper.  I think it's a separate document.  It's a
2   360Value.
3    Q.  BY MR. POLI:  Okay.  And it's a document issued
4   by Xactware with respect to Xactimate, the program
5   known as Xactimate; is that right?
6        MS. BRADHAM:  Form.
7        THE WITNESS:  I don't know if it's
8   related -- I don't believe it's related to Xactimate.
9   I think it's a separate -- so it's a separate document
10  regarding 360Value.
11   Q.  BY MR. POLI:  Is it a document that talks about
12  when to use -- let's define a couple of terms.
13       You've heard the word "Xactimate," right?
14   **A.  Correct.**
15   Q.  And you're aware Xactimate is developed and
16  sold by a company called Xactware?
17   **A.  Correct.**
18   Q.  Okay.  What is, to use your understanding of
19  the term, what is Xactimate?
20   **A.  It's a product that Xactware developed.**
21   Q.  Good.  Can you be a little more detailed about
22  what Xactimate is?
23   **A.  It's an estimating platform.**
24   Q.  So it's a software program?
25   **A.  Correct.**

ROBERT GONZALES   APRIL 04, 2018

17

1    Q.  And it's a software program for estimating the
2  cost to repair property damage, correct?
3    **A.  Correct.**
4    Q.  Okay.  So if I refer to Xactimate, I'll be
5  referring to it in the way we just described it.  Do
6  you understand that?
7    **A.  Yes.**
8    Q.  And Xactware --
9        MR. POLI:  By the way, that's X-a, Donna,
10  on both those words.
11    Q.  BY MR. POLI:  Xactware is the company that
12  produces and markets Xactimate, correct?
13    **A.  Correct.**
14    Q.  And if I refer to reconstruction pricing, are
15  you familiar with that term, as it's in the context of
16  Xactimate?
17        MS. BRADHAM:  Form.
18        THE WITNESS:  Reconstruction is not in
19  Xactimate.
20    Q.  BY MR. POLI:  How about remodel?
21    **A.  Remodel is, yes.**
22    Q.  Do they use the term reconstruction at all?
23    **A.  No.**
24    Q.  Okay.  So what's remodel?
25    **A.  Well, from what I know of it, it's the**

18

1  **restoration remodel, that's how it lists it.  I don't**
2  **ever remember seeing reconstruction within Xactimate.**
3    Q.  You don't remember the word "reconstruction"?
4    **A.  In Xactimate?**
5        MS. BRADHAM:  Form.
6    Q.  BY MR. POLI:  Yeah.
7    **A.  Not in the terms that you're talking about.**
8    Q.  How about the 360Value document that you used,
9  was it this one new construction versus reconstruction?
10    **A.  But that's not Xactimate.**
11    Q.  Okay.  So when did you review the --
12        MR. POLI:  Let me just mark this for you.
13        Exhibit 17.
14        (Whereupon, Deposition Exhibit Number 17 was
15  marked for identification.)
16    Q.  BY MR. POLI:  Okay.  Take a minute to look at
17  Exhibit 17.  Can you identify that as the document you
18  looked at recently when you spent 12 hours in the last
19  week or so getting ready for your testimony today?
20        MS. BRADHAM:  Form.
21        THE WITNESS:  Yes, this is the document.
22    Q.  BY MR. POLI:  Okay.  And you refer to the
23  document as 360Value.  That's what the title of this
24  document is, correct, Exhibit 17?
25    **A.  Correct.**

19

1    Q.  And the actual title is 360Value and New
2  Construction versus Reconstruction.  That's the title
3  of this document, correct?
4    **A.  Correct.**
5    Q.  Can you see that this document's issued by
6  Xactware, the company that markets Xactimate?
7        MS. BRADHAM:  Form.
8        THE WITNESS:  I see their name down here.
9    Q.  BY MR. POLI:  Right.
10    **A.  I don't know if there's anything like a**
11  **letterhead.**
12        **Yeah, Xactware at the bottom.  It's a**
13  **copyright.**
14    Q.  Right.  Okay.  I mean -- so you looked at this
15  document -- is this the only document that stands out
16  in the 12 hours that you spent in the last week or so,
17  to get ready for today?
18        MS. BRADHAM:  Form.
19        THE WITNESS:  Yes.
20    Q.  BY MR. POLI:  You must have looked at a lot of
21  documents during those 12 hours, right?
22    **A.  Yes.**
23    Q.  But the only that really stands out in your
24  mind, as you sit here today, with respect to the 12
25  hours you spent looking at documents in the last week

20

1  is this document Exhibit 17?
2    **A.  Yes.**
3    Q.  You must have spent a fair amount of time on
4  this document?
5        MS. BRADHAM:  Form.
6        THE WITNESS:  Not necessarily.
7    Q.  BY MR. POLI:  Give me an estimate, out of those
8  12 hours that you spent to get ready for today, how
9  many of those hours or minutes, if you will, was spent
10  looking at and analyzing Exhibit 17?
11        MS. BRADHAM:  And just to stop for a
12  second, I think it is fine for you to ask him how long
13  he spent looking at Exhibit 17.
14        MR. POLI:  That's what I just asked him.
15        MS. BRADHAM:  It's not fine for you to ask
16  him how long he spent talking with us about --
17        MR. POLI:  I didn't ask that.
18        MS. BRADHAM:  -- any document.
19        MR. POLI:  I didn't ask that.
20        MS. BRADHAM:  And so I'm, for the record,
21  making clear because your question was a little
22  unclear.  You asked not just about looking but about
23  analyzing.  And so I want to make clear for the record
24  that your question, it sounds like you agree with me,
25  is not asking -- is asking about the amount of time he

ROBERT GONZALES   APRIL 04, 2018

21

1 spent looking at the document and not about any amount
2 of time spent talking with us about any particular
3 subject?
4    Q.  BY MR. POLI:  I not asking about communications
5 you had with your lawyers.  Those are privileged.  You
6 know that, right?
7    **A.  Yes.**
8    Q.  You know better than to answer any of these
9 questions by getting into communications with your
10 lawyers, right?
11   **A.  Yes.**
12   Q.  Because you're a very experienced witness,
13 you've given plenty of depositions and you even
14 testified at trial three times on behalf of State Farm,
15 correct?
16       MS. BRADHAM:  Form.
17       THE WITNESS:  Yes.
18   Q.  BY MR. POLI:  Okay.  So guideline, parameter,
19 whatever you want to call it, I'm not asking about
20 communications you had with your lawyers in any of
21 these five meetings, totaling 15 to 18 hours, all to
22 get ready to give truthful testimony today.
23 Understood?
24   **A.  Understood.**
25       MS. BRADHAM:  Form.

22

1    Q.  BY MR. POLI:  You do understand your obligation
2 is to give truthful testimony today, right?
3    A  Yes.
4    Q.  And that is what you will do, right,
5 Mr. Gonzales?
6    **A.  Yes.**
7    Q.  Okay.  So, this document, Exhibit 17, out of
8 the 12 hours you spent in the last week or so to get
9 ready to give truthful testimony today, how much did
10 you spend reviewing, looking at, however you want to
11 describe it, how much time did you spend with this
12 document, which is the only document that sticks out in
13 your mind?
14       MS. BRADHAM:  Form.
15       THE WITNESS:  Ten minutes.
16   Q.  BY MR. POLI:  Ten minutes.  Okay, that's fair.
17       What's your understanding of what this
18 document is, this Exhibit 17?
19   **A.  It's a document that is defining for 360Value**
20 **new construction versus reconstruction.**
21   Q.  Does it give some indication of when
22 reconstruction pricing should be used versus new
23 construction pricing?
24       MS. BRADHAM:  Form.
25       THE WITNESS:  Well, I need clarification.

23

1 So because I'm want to make sure we're talking about
2 the same thing, so are we talking Xactimate or are we
3 talking 360?
4    Q.  BY MR. POLI:  Is there a difference?
5    **A.  Yes.**
6    Q.  What is 360 and how does it vary from
7 Xactimate?
8    **A.  360Value is an agency underwriting tool, not an**
9 **estimating tool.  Xactimate is an estimating tool.**
10   Q.  So your position is that 360Value is used by
11 agents to figure out how much coverage someone needs to
12 rebuild their home if it's destroyed, is that your
13 position?
14       MS. BRADHAM:  Form and foundation.
15       THE WITNESS:  That's my understanding.
16   Q.  BY MR. POLI:  And in contrast, Xactimate is a
17 tool that is used to figure out the cost to repair a
18 home after it's already been damaged?
19   **A.  That's my understanding.**
20   Q.  So your position or your understanding, I
21 should say, is 360 is before the fact; in other words,
22 what coverage does someone have so that if their home
23 is destroyed it can be rebuilt?
24   **A.  I'm not familiar with how 360 is used, so if**
25 **that's what the agents do then --**

24

1    Q.  I'm just following up on your testimony.  You
2 just gave us an understanding that you had as to how
3 360 is different than Xactimate.  Do you remember that
4 testimony?
5    **A.  Yes.**
6    Q.  I'm trying to flesh out that understanding?
7    **A.  Okay.**
8    Q.  You said 360 is some sort of system that
9 Xactware puts out that agents can use before the fact
10 to figure out what it will take to rebuild a home if it
11 is ever damaged in the future.  Is that your -- my
12 understanding of what you said?
13       MS. BRADHAM:  Form.
14       THE WITNESS:  That's my understanding.
15   Q.  BY MR. POLI:  So it's before the fact.  It's
16 before any damage occurs?
17   **A.  Correct.**
18   Q.  In contrast, Xactimate is after the fact.
19 Xactimate is used to figure out the cost to repair a
20 home or another building after the damage has already
21 occurred?
22       MS. BRADHAM:  Form.
23       THE WITNESS:  Correct.
24   Q.  BY MR. POLI:  So one difference is before the
25 fact, before the loss, versus after the loss, that's

25

1  your understanding of one distinction, right?
2     **A. Correct.**
3     Q. But if -- they're put out by the same company,
4  as you understand it, right?
5     **A. Yes.**
6     Q. Both systems should be aimed at the same idea
7  in part.  Namely, let's say a building is destroyed,
8  what's it going to cost to rebuild it, whether you're
9  trying to figure that out beforehand or after the fact,
10  hopefully you should reach similar numbers with both
11  systems pushed out by the same company, right?
12       MS. BRADHAM:  Form and foundation.
13       THE WITNESS:  I wouldn't have that answer,
14  I have no idea.
15     Q. BY MR. POLI:  Okay.  So now, in addition to
16  Exhibit 17, you guys actually have a claims handling
17  guideline on new construction pricing versus what you
18  guys call restoration pricing; isn't that right?
19     **A. No.**
20       MS. BRADHAM:  Form.
21       MR. POLI:  Okay.  Let's mark Exhibit 18.
22       (Whereupon, Deposition Exhibit Number 18 was
23  marked for identification.)
24     Q. BY MR. POLI:  Can you identify Exhibit 18?
25     **A. Yes.  It's our OG, our claim handing operation**

26

1  **guide.**
2     Q. Okay.  Is this a -- I mean, you must be, I
3  forgot to get into your background, why don't we
4  quickly do it.
5       You've been a claims handler a long time,
6  right?
7     **A. Yes.**
8     Q. How long have you worked in insurance claims
9  total?
10     **A. 29 years.**
11     Q. A long time.  Have you been with State Farm the
12  whole time?
13     **A. Yes.**
14     Q. Gee, you must be getting close to retirement,
15  aren't you?
16     **A. No.**
17     Q. You've got to keep working, huh?
18     **A. Yes.**
19     Q. Okay.  So 29 years doing insurance claims with
20  State Farm, have they all been property claims?
21     **A. Yes.**
22     Q. At some point, did you move to large loss
23  claims?
24     **A. I left our catastrophe services and came into**
25  **large loss claims.**

27

1     Q. So how long have you been in large loss claims,
2  large property losses, how many years?
3     **A. I did it while I was on cat also, so probably**
4  **16 years, 16, 17 years.**
5     Q. Okay.  And these are approximate numbers, but
6  give me your best estimate, about how long were you
7  working so-called catastrophe or cat claims?
8     **A. Eight years.**
9       MS. BRADHAM:  Form.
10     Q. BY MR. POLI:  And it's always been State Farm.
11  29 years with State Farm, you have to be pretty
12  familiar with your operation guides, right?
13     **A. Yes.**
14     Q. This excerpt that I just handed you, Exhibit
15  18, it's something that you're very familiar with,
16  correct?
17     **A. Yes.**
18     Q. It's something that you use on a routine, if
19  not daily basis, at least a routine basis, right?
20     **A. Yes.**
21       MR. POLI:  Okay.  Mark it.
22     Q. BY MR. POLI:  Okay.  Are you aware that -- if
23  you turn to -- you know what Bates numbers are, right?
24     **A. Yes.**
25     Q. So I'm just going to use the last four digits.

28

1       Turn to Bates Number 1223.
2     **A. (Witness complies.)**
3     Q. Tell me when you're there.
4     **A. Yes.**
5     Q. So 1223 has a section, Section F, Labor
6  Efficiencies, New Construction and Restoration, slash,
7  Service, slash, Remodel?
8     **A. Yes.**
9     Q. So those three words are too much to keep
10  repeating over and over again in this deposition, so
11  I'm going to collapse them into a single word, I'll use
12  the first one, restoration.  You see that word there,
13  right?
14     **A. Yes.**
15     Q. So I'll define another couple of terms.  If I
16  refer to new construction pricing, I'll be referring to
17  the option in Xactimate to set the software program to
18  issue an estimate based on so called new construction
19  pricing.  If I use that term, do you know what I mean
20  by it?
21       MS. BRADHAM:  Form.
22       THE WITNESS:  Yes.  But I don't know if I
23  necessarily agree with it, but, yes.
24     Q. BY MR. POLI:  Well, let's explore that.  I mean
25  you -- I mean, how long have you used Xactimate as a

ROBERT GONZALES   APRIL 04, 2018

---

29

1  software program, how many years?
2    **A.** **As long as it's been around. I have no idea**
3  **when State Farm started using it. So when State Farm**
4  **started using it.**
5    Q. Okay. Well, give me your best estimate. It's
6  certainly been more than 10 years, right?
7    **A. Yes.**
8    Q. It's probably approaching 15 or 20 years,
9  right?
10      MS. BRADHAM: Foundation.
11      THE WITNESS: Yeah, I do believe it was on
12  catastrophe, so, yeah, it's been a while.
13    Q. BY MR. POLI: So what's your best estimate of
14  how many years you've been using the Xactimate software
15  system, would it be -- and you can use a range, if you
16  want. 15 to 20 years, is that a fair estimate?
17      MS. BRADHAM: Foundation.
18      THE WITNESS: I think that's a fair
19  estimate.
20    Q. BY MR. POLI: Okay. And in terms of the number
21  of times you've gotten in and generated an Xactimate
22  estimate, that must be at least hundreds, probably
23  thousands, right?
24    **A. Correct.**
25    Q. Okay. So you're aware of the fact that the

---

30

1  Xactimate system has an option to use new construction
2  pricing versus restoration pricing when preparing an
3  Xactimate estimate, right?
4    **A. I'm going to agree, but I don't know if I**
5  **necessarily -- with what you said, but I don't know if**
6  **I necessarily agree with how you're using it.**
7    Q. Well, tell me what your disagreement is so we
8  explore it.
9    **A. So it's not new construction and restoration**
10  **and remodel is the environment in which the work is**
11  **being done. So if you look at Xactimate, it doesn't**
12  **change the labor rate and it doesn't change the**
13  **material price, what it changes is the amount of work**
14  **that you can do in that time. So it doesn't really**
15  **change -- when you say new construction pricing, it**
16  **doesn't change those labor rates or material costs,**
17  **what it does is just say this person can work in this**
18  **environment quicker.**
19      **So I kind of struggle with your**
20  **terminology and I just want to make sure that when**
21  **we're talking the same thing that we are on the**
22  **same. . .**
23    Q. Let's see if we can clear up any ambiguity.
24      When Xactimate is used to produce an
25  estimate, and we'll look at your estimate in this case,

---

31

1  it produces dollar amounts, right?
2    **A. Correct.**
3    Q. It produces -- assuming it's an RCV policy and
4  you know what RCV means, right?
5    **A. Correct.**
6    Q. Replacement cost value, right?
7    **A. Correct.**
8    Q. And so the concept of a replacement cost value
9  policy is you calculate what it would take to replace
10  the structure as if it was new, and then you depreciate
11  it to get what's called actual cash value, correct?
12    **A. Yes.**
13    Q. And those terms are often shorthand references
14  for those terms are, RCV, replacement cost value and
15  ACV, namely, actual cost value, right?
16    **A. Yes.**
17    Q. And the delta, the difference between them, is
18  called depreciation, correct?
19    **A. Correct.**
20    Q. So you figure out the cost to replace the
21  building new, as if it was new. You deduct
22  depreciation for how worn out it might be and you end
23  up with ACV, actual cash value, correct?
24    **A. Correct.**
25      MR. POLI: Okay. Mark it.

---

32

1    Q. BY MR. POLI: So when you produce an Xactimate
2  estimate, it's going to give you a dollar amount for
3  RCV. It will give a dollar amount for depreciation,
4  depending on the input into the system. And then it's
5  also going to give you a dollar amount for ACV, right?
6    **A. Yes.**
7    Q. If you use the new construction setting, those
8  dollar amounts are going to be lower, in all cases,
9  right?
10      MS. BRADHAM: Foundation.
11    Q. BY MR. POLI: As a 29-year claims handler, I
12  would assume you realize that, right?
13      MS. BRADHAM: Form and foundation.
14      THE WITNESS: Yes. But I don't -- it's
15  not about looking at the dollar, it's looking at the
16  efficiency.
17    Q. BY MR. POLI: Great. But I'm asking about the
18  dollars right now?
19    **A. Okay.**
20    Q. So based on your testimony, Mr. Gonzales, when
21  you're doing one of these Xactimate estimates, if you
22  use the new construction setting in Xactimate, in
23  contrast to using the restoration setting, in all
24  instances the new construction setting will produce
25  lower dollar amounts, right?

---

ROBERT GONZALES   APRIL 04, 2018

---

33

1    MS. BRADHAM:  Form.
2    THE WITNESS:  Yes.  Because the
3 productivity is higher.
4    Q.  BY MR. POLI:  Right.  Okay.  So if I refer
5 to -- I don't think you like the word pricing.  Why
6 don't I use the word setting.  If I refer to the new
7 construction setting in Xactimate, I mean that whoever
8 is using the system to produce an estimate has chosen
9 the option to use new construction, the new
10 construction option, with whatever efficiencies that
11 are gained from that.  If I use the phrase new
12 construction setting, that's what I mean.  Do you
13 understand that?
14    **A.  Yes, I understand that.**
15    Q.  I mean I think we got off base because I was
16 using new construction pricing?
17    **A.  Right.  And even the setting, I mean, I don't**
18 **know if you're --**
19    Q.  Well--
20    **A.  -- object to just using environment, as far as**
21 **new construction environment versus restoration remodel**
22 **environment.**
23    Q.  I mean Xactimate is a database, right?
24    **A.  Yes.**
25    Q.  You understand, I'm sure you understand because

---

34

1 you probably know a lot more about it than I do,
2 Xactimate updates its database both geographically and
3 based on time periods all over the country and they
4 update it every month, right?
5    **A.  Yes.  We get new price guides, yes.**
6    Q.  So, in other words, if I own a house and it
7 burns down in Central Phoenix, if you want to figure
8 out through Xactimate what it will cost to repair that
9 house, you look at the appropriate month and year for
10 when it happened, and you look at the geographic
11 database for that portion of Phoenix, correct?
12    **A.  Correct.**
13    Q.  If two people or three people or ten people,
14 put in those same parameters, namely, a home repair in
15 a particular location at a particular time, if they use
16 the same settings, new construction versus restoration,
17 they should get essentially the same number, if they
18 use the same scope, right?
19    MS. BRADHAM:  Form; foundation.
20    THE WITNESS:  Essentially, yes, if the
21 scopes are the same.
22    Q.  BY MR. POLI:  Because the first thing, before
23 you do the estimate, you have to figure out what needs
24 to be done for the repair, correct?
25    **A.  Correct.**

---

35

1    Q.  If you and the public adjuster have the same
2 scope, in other words, you agree on what needs to be
3 done to repair the home and if you both use Xactimate
4 and if you both use the same database in terms of the
5 time and the geographic location, you should get the
6 same number?
7    **A.  If we're on the same -- if we're using the same**
8 **environment, yes.**
9    Q.  And by environment, you're referring to the new
10 construction versus restoration?
11    **A.  Correct.**
12    Q.  Okay.  Is that term you prefer as compared to
13 setting or pricing?
14    **A.  Yes.**
15    Q.  Okay.  Why don't we use that term to
16 accommodate your preference.  So if I refer to new
17 construction environment, I guess that -- I'll use them
18 interchangeably.
19    If I refer to new construction setting or
20 new construction environment, I will be referring to
21 the option that is available in Xactimate, to, as you
22 would put it, build in the efficiencies associated with
23 a new construction project.  Are we on the same page
24 there?
25    **A.  Yes.**

---

36

1    Q.  And if I refer to the restoration setting or
2 the restoration environment, I'll be referring to the
3 alternative option in Xactimate to not build in those
4 supposed extra efficiencies, where the estimate is
5 going to have a higher dollar amount.  Are we on the
6 same page with those two defined terms?
7    **A.  Yes.**
8    Q.  Okay.  So I'll keep going back to those as we
9 go through the deposition.  One option, it will be new
10 construction setting or new construction environment.
11 The other option under Xactimate will be a restoration
12 setting or the restoration environment, at least we
13 know what we each mean by that, right?
14    **A.  Yes.**
15    Q.  Okay.  So we've established that any time
16 anyone uses Xactimate, if they use the new construction
17 setting, instead of the restoration setting, the
18 numbers will always be lower, right?
19    **A.  I would suspect, yes.**
20    Q.  Well, you didn't say you suspected before, you
21 said based on your 29 years of experience and you've
22 been using Xactimate for 15 to 20 years, you said that
23 every time anyone does an estimate using the new
24 construction setting versus the restoration setting,
25 the numbers will be lower, correct?

ROBERT GONZALES   APRIL 04, 2018

37

1    MS. BRADHAM: Form.
2    THE WITNESS: Based on what I've done,
3 yes.
4    Q. BY MR. POLI: Okay. Do you know how much? I
5 mean, how much the average delta would be?
6    MS. BRADHAM: Foundation.
7    Q. BY MR. POLI: You know what I mean by "delta,"
8 the difference?
9    **A. Yeah. I mean, I would put a range, probably --**
10    Q. Give me --
11    MS. BRADHAM: Foundation objection.
12    Q. BY MR. POLI: I'm sorry, go ahead, give me the
13 range that you would put on it?
14    **A. Probably 8 to 12%.**
15    Q. Have you ever seen anything at State Farm that
16 evaluates how much money can be saved by the use of the
17 new construction setting?
18    **A. No.**
19    Q. Okay. Have you ever had any conversations with
20 State Farm or anyone at State Farm about the
21 generalized or accumulative savings that can be added
22 up from the use of the new construction setting in
23 Xactimate?
24    MS. BRADHAM: Form.
25    THE WITNESS: No.

38

1    Q. BY MR. POLI: Okay. So let's go back to
2 Exhibit 18. Do you still have it in front of you?
3    **A. Yes.**
4    Q. Okay. Is this -- there must be other
5 documents -- well, first of all, this page, Bates 1223,
6 it deals with what we've been talking about, namely,
7 when to use the new construction setting and when to
8 use the restoration setting, right?
9    **A. It gives examples, yes.**
10    Q. And it says that the new construction setting,
11 should only be used if it's a "ground up rebuild"; is
12 that what it says?
13    MS. BRADHAM: Form.
14    THE WITNESS: No.
15    Q. BY MR. POLI: Really. Well, let's read it.
16 See where it says "new construction"?
17    **A. Yes.**
18    Q. Read the first two sentences into -- why don't
19 I do it for you. Will you follow along while I do it?
20    **A. Yes.**
21    Q. I'm at the spot that begins "The New
22 Construction option." Do you see that?
23    **A. Yes.**
24    Q. That's just another way of saying the new
25 construction setting, right?

39

1    **A. Yes.**
2    Q. Okay. Here's what it says, quote, "The New
3 Construction option provides a cost for each line item
4 based upon the most efficient labor productivity
5 available. This option is intended to be used for
6 true," emphasize that word, sir, "true new construction
7 applications or for jobs in which a total," quote,
8 "'ground up,'" unquote, "rebuild is necessary."
9    Did I read that correctly?
10    **A. Yes.**
11    Q. Now, by definition, true new construction, is
12 where there's never been a structure on the property
13 that's what that means, right?
14    **A. I would agree with that.**
15    Q. Okay. So with respect to the Phillips' home,
16 that obviously doesn't apply to the Phillips' home,
17 right?
18    **A. Correct.**
19    Q. They had a home in a sub -- it was in a
20 subdivision, you understand that, right?
21    **A. Yes.**
22    Q. The homes are fairly close together in that
23 subdivision, correct?
24    **A. Define "fairly close." I don't know what you**
25    **define --**

40

1    Q. Well, it's not like Paradise Valley with
2 one-acre lots. That's not the Phillips' subdivision,
3 correct?
4    **A. Correct.**
5    Q. Okay. It's a more traditional subdivision with
6 a lot of homes, relatively spaced close together and
7 it's a fully developed subdivision, right?
8    **A. Yes.**
9    Q. Okay. All right. So clearly the idea of true
10 or new construction, that would not apply to the
11 Phillips' loss, right?
12    **A. I would agree.**
13    Q. Okay. So let's see if the Phillips' loss would
14 be so-called, quote, total ground up rebuild, unquote.
15 You see that I'm referring to the language in State
16 Farm's own policy, do you see that?
17    **A. Yes.**
18    Q. Was the Phillips' project what you would
19 consider, quote, a total ground up rebuild, unquote?
20    **A. No.**
21    Q. Well, then I guess you're admitting here right
22 now, that it was improper to use new construction
23 pricing or I guess what you would call a new
24 construction setting on the Phillips' claim; is that
25 right?

ROBERT GONZALES   APRIL 04, 2018

41

1      MS. BRADHAM:  Form.
2      THE WITNESS:  No.
3      Q.  BY MR. POLI:  Okay.  Well, if you want to
4  comply with this policy and procedure, Exhibit 18, this
5  is a policy and procedure of your employer, right?
6      A.  Yes.
7      Q.  You must -- I assume you do your best to comply
8  with it at all material times, right?
9      A.  Yes.
10     Q.  Is there something else that gives guidance to
11  you that -- from State Farm that says that it was
12  appropriate to use the new construction setting on the
13  Phillips' project?
14     MS. BRADHAM:  Form.
15     Q.  BY MR. POLI:  Besides what we're looking at,
16  Exhibit 18?
17     **A.  Well, you didn't finish reading, so I'm not**
18  **sure exactly how -- why you stopped reading.  There's**
19  **an additional part, so I'm not sure exactly how we**
20  **stopped there.**
21     Q.  Okay.  Well, let's read the rest.
22  "Additionally, it is possible that some portions of a
23  large partial loss may be addressed using this
24  efficiency setting.  For example, as the rebuild
25  process progresses, it is possible that a certain

42

1  phase," that's what it says, "certain phase may be
2  reached in which the remaining portions of the repair
3  are more in line with a new construction scenario."
4      Did I read that correctly?
5      A.  Yes.
6      Q.  Now I've read the whole section, right?
7      A.  Yes.
8      MS. BRADHAM:  Form.
9      Q.  BY MR. POLI:  Let's look at the next section
10  and put them in context.
11     Restoration pricing or the restoration
12  option, the next paragraph, here's what it says.
13  Quote, "The restoration," slash, "Service," slash,
14  "Remodel option is for jobs other than total losses or
15  new construction."
16     Did I read that correctly?
17     A.  Yes.
18     Q.  Is there something else I should read in that
19  paragraph to get a context, in your view?
20     MS. BRADHAM:  Form.
21     THE WITNESS:  No.  I just think, you know,
22  to read the whole thing, just so it. . .
23     Q.  BY MR. POLI:  So looking at the two paragraphs
24  together, what this seems to say, is that if it's
25  not -- let's look at Paragraph 2, restoration pricing.

43

1      If it's not a total loss or new
2  construction, it says you should use restoration
3  pricing, that's what Paragraph 2 says, right?
4      MS. BRADHAM:  Form.
5      THE WITNESS:  I don't interpret it the way
6  you interpret it.
7      Q.  BY MR. POLI:  Okay.  All right.  So is there
8  other written guidance at State Farm that deals with
9  the last half of Paragraph 1, namely, it's not true new
10  construction, certainly we agree the Phillips' loss was
11  not what we would call true new construction, correct?
12     A.  Correct.
13     Q.  Just to be clear, we've defined true new
14  construction, which is a phrase out of the State Farm
15  policy, as where a structure is put on land for the
16  very first time, that's true new construction, right?
17     A.  Yes.
18     Q.  Okay.  So clearly the Phillips loss is not
19  that, it was a fire at a home in a subdivision, of a
20  developed built out subdivision, right?
21     A.  Yes.
22     Q.  Okay.  So the other thing in Paragraph 1, it
23  says that the new construction pricing can be used if
24  it's a "ground up rebuild."  I'm quoting from the State
25  Farm policy, a "ground up rebuild."

44

1      Do you see that phrase?
2      A.  Yes.
3      Q.  Tell me how you, as a 29-year State Farm
4  professional, what would be involved in a "ground up
5  rebuild," quote, unquote?
6      **A.  My understanding of a total ground up would be**
7  **we're removing the slab, taking it down to the dirt.**
8      Q.  Boy, not just building on a new slab, take out
9  the slab and go all the way down to the dirt?
10     A.  Correct.
11     Q.  That would be a ground up rebuild?
12     A.  Yes.  That's what --
13     Q.  And that's based on 29 years as a claims
14  handler doing property claims at State Farm, right?
15     MS. BRADHAM:  Form.
16     THE WITNESS:  Yes.
17     Q.  BY MR. POLI:  Clearly the Phillips' project
18  comes nowhere near the definition that State Farm uses
19  for a ground up rebuild, right?
20     MS. BRADHAM:  Form.
21     THE WITNESS:  Well, that was what I
22  defined as a ground up.
23     Q.  BY MR. POLI:  Okay.  Well, is your definition,
24  I mean, you've been at State Farm 29 years, you would
25  be the classic example of a lifer, I guess.  That's not

ROBERT GONZALES   APRIL 04, 2018

45

1  meant in a pejorative sense.
2        You must have a pretty good sense that
3  when State Farm use the phrase ground up rebuild, do
4  you have some sense of whether your understanding of
5  that term is the same as the rest of the people you
6  deal with at State Farm?
7        MS. BRADHAM:  Form.
8        THE WITNESS:  In our unit, I would believe
9  that that would be the case.
10       Q.  BY MR. POLI:  What unit are you in?
11       **A.  At the time of loss, I was in the large loss**
12  **unit.**
13       Q.  Are you in a different unit now?
14       **A.  Yes.**
15       Q.  And the large loss unit -- what unit are you in
16  now?
17       **A.  Just in the proximity.  So just the assigned**
18  **claim handler unit proximity.**
19       Q.  What's proximity?
20       **A.  Handle just the normal everyday claims that we**
21  **get now.**
22       Q.  The smaller claims, you mean?
23       **A.  Yes.**
24       Q.  Why did you move from -- I mean, large loss I
25  would think is more of a prestigious area in the claims

46

1  environment.  Why did you move from the --
2        **A.  I don't know about that.**
3        Q.  Or maybe it's more hassle, I don't know.  Why
4  did you move from large loss to more routine claims?
5        **A.  It's my understanding -- I didn't move, it was**
6  **my understanding -- in the large loss unit we have**
7  **transitioned people in and out of that department or in**
8  **and out of that unit, just so that other people could**
9  **start getting experience dealing with large losses and**
10 **getting comfortable with those type of claims.**
11       Q.  But you were doing large loss or in the large
12  loss unit for, what did you say, 15 or 20 -- I forget,
13  let me look my notes.  A long time, 16 years?
14       **A.  Of which some of it was in our catastrophe**
15  **service.  So locally I was doing it for 13.**
16       Q.  Okay.  Well, within your large loss unit for
17  the 13 to 16 years that you were doing those kind of
18  claims, was it always your understanding that the
19  people you interacted with treated ground up rebuild
20  the same way you've told us, namely, all the way down
21  to the dirt?
22       MS. BRADHAM:  Form.
23       THE WITNESS:  I would -- yeah, that would
24  be safe to say.  Yes.
25       Q.  BY MR. POLI:  And with respect to what you told

47

1  us about what true new construction, quote, unquote,
2  means which is building a structure on land for the
3  very first time, is it during the 13 to 16 years that
4  you've either been in the large loss unit at State Farm
5  or worked on those kind of claims, is it your
6  understanding that that's the way true new construction
7  was treated --
8        MS. BRADHAM:  Form.
9        Q.  BY MR. POLI:  -- by the people you worked with?
10       MS. BRADHAM:  Form and foundation.
11       THE WITNESS:  I have never handled a claim
12  that it was true new construction, as we defined it.
13       Q.  BY MR. POLI:  Yeah.  I guess you wouldn't?
14       **A.  No.**
15       Q.  Because your job is to come along after some
16  damage has occurred to an existing structure?
17       **A.  Correct.**
18       Q.  You have to know what the heck the term means,
19  but you've never handled it as part of your claim,
20  because -- as part of your job, because your job is to
21  deal with existing structures that have been damaged,
22  right?
23       **A.  Correct.**
24       Q.  Okay.  Now let's get maybe to the meat of the
25  matter, this last part of Paragraph 1, talking about

48

1  using the new construction pricing on certain phases
2  that may be reached, what -- I mean, you're a 29-year
3  claims professional at State Farm, what does that mean?
4        MS. BRADHAM:  Form.
5        THE WITNESS:  As far as -- can you restate
6  that question again, on the --
7        Q.  BY MR. POLI:  Yeah.  I mean, I'm talking about
8  the last half of Paragraph 1, that says a large partial
9  loss, maybe we can use this, quote, efficiency setting,
10 and it's possible that a certain phase may be reached
11 in which the remaining portions are more in line with
12 new construction.  You see the language I'm talking
13 about, right?
14       **A.  Yes.**
15       Q.  What the heck does that mean?
16       **A.  I can give you an example, if you would like.**
17       Q.  Well, I'm trying to -- if you can tell me in
18  layman's terms, because I'm not a claims professional,
19  I'm just a dumb lawyer, but if you can tell me in
20  layman's terms how to flesh that out, what it means,
21  that would be helpful?
22       MS. BRADHAM:  Form.
23       THE WITNESS:  Well, I'm going to have to
24  refer to a claim that I handled, that this type of
25  situation did come up.

ROBERT GONZALES  APRIL 04, 2018

49

1        So in that situation, we had the whole
2   house in the new construction environment and then in
3   dealing with the public adjuster, it was then indicated
4   to me, because this house was attached to another home,
5   it was a townhome, that the efficiencies that were
6   going to be gained for the stucco, for the framing, for
7   the exterior painting, for the demo, was not going to
8   be there because they were going to have to deal with
9   the neighbor.  So -- but once we walked into the front
10  door then those new construction efficiencies would be
11  gained the minute that the subcontractors were able to
12  walk through the front door.
13       So with that, we, I, allowed some
14  additional labor hours under the new construction
15  environment to allow those tradespeople that were doing
16  the exterior work the lack of efficiency, the
17  productivity they were going to lose, because they were
18  going to be dealing with a neighbor, dealing with, I
19  think that the PA brought up the fact that the driveway
20  was smaller, the streets were narrower and so in that
21  situation, we addressed those with additional labor
22  hours because they were not going to be as efficient.
23       But we agreed that once they walked
24  through the front door, those efficiencies would be
25  gained because the house was gutted.

50

1   Q.  BY MR. POLI:  Have you ever worked
2   construction?
3   A.  No.
4   Q.  I did as a kid.  I assume you know that when
5   someone's building a brand new subdivision, there are
6   economies of scale and efficiencies because there are
7   no existing homeowners in that subdivision.  Do you
8   realize that?
9        MS. BRADHAM:  Form.
10       THE WITNESS:  I don't believe economy of
11  scale has to do with whether somebody's in -- if
12  there's the -- if the street is occupied or not.
13  Q.  BY MR. POLI:  Those are two different issues.
14  When you're building -- when someone's building a new
15  subdivision, they go out and they have some parcel of
16  land.  They'll like send in a framing crew or a block
17  laying crew or a roofing crew, they'll like -- whatever
18  that crew is, will come in and do a whole section,
19  blocks at a time of that subdivision all at once.
20  That's the way it works, you do realize that, right?
21       MS. BRADHAM:  Form and foundation.
22       THE WITNESS:  In the two homes I
23  purchased, that's not the way it worked.
24  Q.  BY MR. POLI:  Do you realize there are
25  efficiencies gained by building a brand new subdivision

51

1   that would not be there if you're doing a restoration
2   project on a home in an existing subdivision?
3        MS. BRADHAM:  Form and foundation.
4        THE WITNESS:  What efficiencies -- I don't
5   know what you're talking about.  What efficiencies?
6   Q.  BY MR. POLI:  Yeah.  There's no other neighbors
7   to worry about.  There's no other houses right near
8   the -- I mean the Phillips' home was -- how many homes
9   were in that subdivision, can you estimate?
10  **A.  No, I couldn't estimate.**
11  Q.  Certainly dozens, right?
12  **A.  I can't even picture, as far as that**
13  **neighborhood, so I don't know.**
14  Q.  Did you ever go out there?
15  **A.  Yes.**
16  Q.  Okay.  You know it was a subdivision and you
17  know it was fully built out, right?
18  **A.  Correct.**
19  Q.  As far as how many homes there were -- by the
20  way, the Phillips' home -- the homes in that
21  subdivision had block walls, right?
22  **A.  Are talking about the perimeter yard?**
23  Q.  The homes, the exterior walls of the homes were
24  block?
25       MS. BRADHAM:  Form.

52

1        THE WITNESS:  I want to make sure we're
2   talking about the same thing.  When you're saying the
3   exterior parts of the home, are you talking about the
4   exterior perimeter of the home?  Or are you talking
5   about the yard -- the enclose of the yard?
6   Q.  BY MR. POLI:  Well, let's take each.  The
7   fencing, the homes in the Phillips' subdivision had
8   fencing between them, right?
9   **A.  Block walls, correct.**
10  Q.  And those were block walls?
11  **A.  Correct.**
12  Q.  Okay.  How close were Phillips' homes in that
13  subdivision to each other?  Give me an approximation as
14  best you can.
15  **A.  20 feet.**
16  Q.  So roughly 20 feet separating the Phillips'
17  home from the homes on each side?
18       Mr. Skipton just handed me a note saying
19  he thinks it's six feet.  Could it be six feet?
20  **A.  That would almost be a zero lot line.  I would**
21  **believe that the neighbor, if I remember correctly, the**
22  **neighbor on the right, you have the home, you would**
23  **have 10 feet to the next fence and then another 10 feet**
24  **to where the home was located, so between the two, 20**
25  **feet.**

ROBERT GONZALES   APRIL 04, 2018

53

1    Q.  Oh, between the structures?
2    **A.  Exactly.**
3    Q.  In other words, from the Philips' home to the
4  lot line, the fence in between the Phillips home and
5  the next home is only 10 feet?
6    **A.  If I remember correctly, on the right side,**
7  **yes.  On the left side, I don't believe they had a**
8  **neighbor on the left side.**
9    Q.  Okay.  The point is --
10    **A.  Or a neighbor behind them.**
11    Q.  -- do you recognize that when there's a
12  restoration or a repair project in an existing
13  subdivision like that, there are inefficiencies
14  associated with rebuilding a home in such an
15  established built out subdivision, do you realize that?
16       MS. BRADHAM:  Form and foundation.
17       THE WITNESS:  I'm unaware of any
18  inefficiencies that that would cause.
19    Q.  MR. POLI:  Okay.  So what I just said to you,
20  that's something that's never occurred to you, right?
21    **A.  I don't believe that there's any**
22  **inefficiencies.**
23    Q.  Okay.  All right.  So there must be other
24  guide --
25       MS. BRADHAM:  I would like to take a

54

1  break, if we could.
2       MR. POLI:  That's okay.
3       MS. BRADHAM:  Are we at a point where we
4  can take a break?
5       MR. POLI:  Sure you can take a break.
6       MS. BRADHAM:  Thanks very much.
7       MR. POLI:  Yeah, we'll do that.
8       THE VIDEOGRAPHER:  The time is 10:38 a.m.
9  We're now going off record, ending Media 1.
10       (Whereupon, a brief recess ensued from
11  10:38 a.m. to 10:51 a.m.)
12       (Mr. Stephen Silverman was not present in the
13  deposition.)
14       THE VIDEOGRAPHER:  The time is 10:51 a.m.
15  We're now back on record, beginning Media 2.
16    Q.  BY MR. POLI:  Now, you've dealt with
17  Mr. Skipton, who's in this deposition, as a public
18  adjuster, you've dealt with him for many, many years,
19  right?
20    **A.  Yes.**
21    Q.  You've probably done claims with Mr. Skipton
22  for 20 years or so, right?
23    **A.  Since I returned to the Phoenix area, probably**
24  **more along the lines of -- yeah, maybe.  Yeah, I don't**
25  **know quite 20, but it would be right along there.**

55

1    Q.  Okay.  And you've had many claims with
2  Mr. Skipton over the years where there was serious
3  damage, even though it wasn't a so-called ground up
4  rebuild, correct?
5    **A.  Yes.**
6    Q.  And until the last couple of years, there was
7  never any question of using the new construction
8  database to lower the dollar amount of the estimate,
9  correct?
10       MS. BRADHAM:  Form.
11    Q.  BY MR. POLI:  In your claims with Mr. Skipton?
12    **A.  I don't know exactly when we started using the**
13  **new construction environment.  But it may have been**
14  **longer than a couple of years.**
15    Q.  When did you guys, as best you know, start
16  using what you refer to as the new construction
17  environment, when did that happen, roughly?  Two years?
18  Three years?
19    **A.  Maybe six, seven, I'm thinking 2011, 2012.  I**
20  **don't remember exactly.**
21    Q.  So it could be as long as six to seven years?
22    **A.  Yeah, I don't remember exactly.**
23    Q.  Now, you actually had a conversation with
24  Mr. Skipton where he challenged you on the use of the
25  new construction pricing or new setting or environment

56

1  or whatever the heck you want to call it, and you told
2  him you didn't have any choice, that it was a mandate
3  from corporate headquarters, right?
4       MS. BRADHAM:  Form.
5       THE WITNESS:  I believe that's what I
6  said.
7    Q.  BY MR. POLI:  Okay.  So tell me about that.
8  Let's flesh that out.  When you told Mr. Skipton that
9  you had no choice about using the new construction
10  pricing, that it was a mandate or an order from on high
11  from corporate headquarters, how did that order come
12  about?
13       MS. BRADHAM:  Form.
14       THE WITNESS:  In a unit -- not even a
15  unit -- yeah, it was a unit meeting.  Abel, my team
16  manager at the time, explained to us that on our large
17  losses we would start using the new construction
18  environment.
19    Q.  BY MR. POLI:  On all large losses?
20    **A.  All our large losses fit that partial loss,**
21  **yeah, on all of them.  I mean, it's all -- every one is**
22  **handled on its own merits.  But some large losses that**
23  **came into our unit were, very rarely, were water**
24  **claims.  But for the majority of them, they're**
25  **significantly damage by fire, as far the claims that we**

ROBERT GONZALES   APRIL 04, 2018

57

1  received.
2      Q.  And what's Mr. Abel's full name?
3      **A.  Abel Costales.**
4      Q.  How do you spell the last name?
5      **A.  C-o-s-t-a-l-e-s.**
6      Q.  So somewhere around six or seven years ago,
7  Mr. Costales called your whole large loss team
8  together?
9      **A.  From what I recall, yes.**
10      Q.  And he said that on virtually on all large
11  losses with limited exceptions, you would start using,
12  from that time forward, what you would refer to as the
13  new construction environment; is that right?
14          MS. BRADHAM:  Form.
15          THE WITNESS:  I don't think I phrased it
16  that way.  But you indicated --
17      Q.  BY MR. POLI:  No, I'm paraphrasing what you
18  said, yes.
19      **A.  So I don't know.  He didn't say virtually**
20  **every, he just said in our large loss claims we would**
21  **be using the new construction environment.**
22      Q.  And I wrote down what you said, in our large
23  loss claims, we will be using --
24      **A.  And I'm paraphrasing that.**
25      Q.  Sure.  I mean, we're both paraphrasing each

58

1  other and you're paraphrasing Mr. Costales.  But as
2  best you can recall, what you were told in this meeting
3  six or seven years ago is that on a going forward
4  basis, in the unit's large loss claims "we," being you
5  and your other fellow adjusters, will be using the
6  so-called new construction environment.  Is that the
7  way he put it, new construction environment?
8          MS. BRADHAM:  Form and foundation.
9      Q.  BY MR. POLI:  Or did he use a different term?
10      **A.  I don't recall what he used -- what he said.**
11  **But that's what the gist of the conversation was.**
12      Q.  Okay.
13      **A.  That we would be using the new construction**
14  **environment.**
15      Q.  And it's my observation, doing these kind of
16  cases, big insurance companies generate a lot of paper,
17  policies, procedures and the like, as far as, you know,
18  following up on meetings like you described.
19          After this meeting -- or before this
20  meeting, was there any documentation generated from
21  corporate headquarters about the use of the new
22  construction database?
23          MS. BRADHAM:  Form.
24      Q.  BY MR. POLI:  For large losses?
25      **A.  Not that I'm aware of.**

59

1      Q.  How about after the meeting.  We've looked at
2  one thing that addresses the use of new construction,
3  the new construction database.  Another way to refer to
4  new construction versus restoration, there are
5  different databases within the Xactimate software
6  system, correct?
7          MS. BRADHAM:  Form and foundation.
8          THE WITNESS:  I would disagree with you on
9  that.
10      Q.  BY MR. POLI:  Well, in any event, after
11  Mr. Costales had this meeting with you and how many
12  other adjusters in your unit at that time roughly?
13          MS. BRADHAM:  Form.
14          THE WITNESS:  There was probably four of
15  us in there, I believe.
16      Q.  BY MR. POLI:  You and four other adjusters?
17      **A.  A total of four.**
18      Q.  So you and three other adjusters?
19      **A.  Correct.**
20      Q.  I mean, are you aware of whether or not what --
21  I mean, you're not the only large loss unit, you guys,
22  four people in that unit, you're one of many, many
23  large loss units in State Farm, right?
24      **A.  I'm not aware of how other areas set up their**
25  **large losses.**

60

1      Q.  Well, when you -- you admit that you told
2  Mr. Skipton, when he challenged your use of the new
3  construction setting for a loss that was not a true
4  ground up rebuild, and you told him you didn't have any
5  choice, this was an order or a mandate or whatever you
6  put it as, from corporate headquarters, you admitted
7  that's what you told Mr. Skipton, right?
8          MS. BRADHAM:  Form.
9          THE WITNESS:  Yes.
10      Q.  BY MR. POLI:  So apart from Mr. Costales
11  telling you in a meeting that we're going to start
12  using new construction pricing or new construction
13  settings or whatever you want to call it for large
14  losses, did you see documentation from State Farm
15  corporate headquarters or any documentation from State
16  Farm at all to the same effect?
17      **A.  No.**
18          MS. BRADHAM:  Form.
19      Q.  BY MR. POLI:  So that meeting with Mr. Costales
20  was anywhere from six to seven years ago, correct?
21      **A.  Yes.**
22      Q.  And since then, you've tried to follow the
23  orders that Mr. Costales -- Costales, how do I say it?
24      **A.  Costales.**
25      Q.  Okay.  I didn't want to screw it up.

ROBERT GONZALES   APRIL 04, 2018

61

1    Since then, that meeting, you've done your
2  best, I mean, you're a loyal employee of State Farm,
3  correct?
4    **A. Yes.**
5    Q. Your job is to follow the orders that are given
6  to you by your superiors at State Farm, right?
7      MS. BRADHAM:  Form.
8      THE WITNESS:  Yes.
9    Q. BY MR. POLI:  When Mr. Costales told you to
10  start using the new construction setting on large
11  losses, that's what you've done from that time forward,
12  correct?
13      MS. BRADHAM:  Form.
14      THE WITNESS:  Yes.
15    Q. BY MR. POLI:  And as far as you know, that's
16  what the other people in your unit have done, based on
17  your observations, correct?
18      MS. BRADHAM:  Form and foundation.
19      THE WITNESS:  As far as I know, yes.
20    Q. BY MR. POLI:  And that's not just guessing, I
21  mean, you have close interaction with the other people
22  in the large loss unit that you can kind of see what
23  they're doing and what you're doing, you guys probably
24  talk about claims together, right?
25    **A. No.  I don't -- so we were on separate teams**

62

1  **and so I didn't -- the other two, so we were in**
2  **partners, so the other two, I wouldn't know what they**
3  **put in their estimates or didn't.**
4    Q. Okay.  But you must work routinely with the
5  other person on your team?
6    **A. Yes.**
7    Q. Who was the other person on your team?  And it
8  may have changed during the last six or seven years,
9  who was the other person on your large loss team in the
10  last six to seven to years?
11    **A. I have worked with Mark Johnson.**
12    Q. Mark Johnson?
13    **A. Steven Vaughn.**
14    Q. B-o-n-d?
15    **A. V-a-u-g-h-n.**
16    Q. V-a-u-g-h-n, I saw him on this claim, Steven.
17      Who else?
18    **A. I don't know if Mike Meehan and I were -- I**
19  **don't think we were partners.  I don't remember as far**
20  **as -- before Mark who my partner was -- oh, Mike**
21  **Donner.**
22    Q. D-o-n-n-e-r?
23    **A. Yes.  I think that's -- those are the three**
24  **that I worked with the most.**
25    Q. Okay.  The point is it's clear from your

63

1  interaction with those three people over the last six
2  or seven years, that just like you were following the
3  orders from Mr. Costales, so were they with respect to
4  using the new construction setting on large losses?
5      MS. BRADHAM:  Form and foundation.
6      THE WITNESS:  Yes.  Because we looked at
7  each other's estimates, correct.
8    Q. BY MR. POLI:  Okay.  And how many -- I mean
9  gosh, six or seven years, you must have done -- and I
10  mean all you're doing is large losses, right?
11    **A. Yes.**
12    Q. For that -- I mean, I realize recently you
13  moved to a different unit.  But until recently, for six
14  or seven years, you were doing all large losses?
15    **A. Yes.**
16    Q. And consistent with the orders you were given,
17  all the large losses with maybe very limited exceptions
18  were done with the new construction setting, right?
19      MS. BRADHAM:  Form.
20      THE WITNESS:  As far as I recall, yes.
21    Q. BY MR. POLI:  And that's also the way the three
22  people that you interacted with on your team at
23  different times.  They were doing the same thing, they
24  were following the same orders?
25      MS. BRADHAM:  Form and foundation.

64

1      THE WITNESS:  I'm going to struggle with
2  the word "order."  I'm going to say direction.
3    Q. BY MR. POLI:  Directive.
4    **A. Okay.**
5    Q. Let's use directive.
6    **A. Okay.**
7    Q. The same people that you interacted with over
8  those six or seven years, you know, Mr. Johnson,
9  Mr. Vaughn and Mr. Donner, where you were looking at
10  each other's work, looking at each other's estimates,
11  just like you, they were following the directive from
12  Mr. Costales about using, with only very, very limited
13  exceptions using the new construction setting on large
14  losses, correct?
15    **A. Yes.**
16      MS. BRADHAM:  Form.
17      MR. POLI:  Mark it.
18    Q. BY MR. POLI:  And that's why you told
19  Mr. Skipton when he challenged you on the new
20  construction setting, now look you didn't have a
21  choice, whether you want to call it an order, a
22  mandate, a directive, whatever term you want to use,
23  you were told to do this and that's what you did?
24    **A. That was the directive, as far as the large**
25  **loss claims.**

ROBERT GONZALES   APRIL 04, 2018

65

1    Q.  Do you know what gave rise to this directive in
2  any way?  I mean, was it something to do with
3  Xactimate?  Was it something to do with internal State
4  Farm workings?  Or do you have any idea?
5        MS. BRADHAM:  Foundation.
6        THE WITNESS:  I have no idea.
7    Q.  BY MR. POLI:  Do you know whether other
8  carriers are doing this or is State Farm kind of an
9  outlier?
10       MS. BRADHAM:  Foundation.
11       THE WITNESS:  I have no idea.
12   Q.  BY MR. POLI:  Let's talk about the ease of --
13 let's say we wanted to look at a hundred, or a thousand
14 or 10,000 claims and we wanted to figure out the
15 difference between the new construction setting versus
16 the restoration setting.  It's like flipping a -- I
17 mean, if we use your estimate, the State Farm estimate
18 on a large loss that was done using the new
19 construction setting, if we want to figure out the
20 dollar amount of difference between that and the
21 restoration setting, it's like flipping a switch and
22 running another estimate, right?
23       MS. BRADHAM:  Foundation.
24       THE WITNESS:  Yes.  It's just a matter of
25 toggling off a -- on or off a -- yeah, a heading or a

66

1  switch, yes.
2    Q.  BY MR. POLI:  In other words, I think you just
3  answered it, but just to pin it down, to figure out the
4  damages associated with the Phillips' claim or a
5  hundred similar claims or a thousand similar claims, or
6  10,000 similar claims, as you put it, it would be like
7  flipping a switch and running the same estimate with
8  the restoration setting instead of the new construction
9  setting, correct?
10       MS. BRADHAM:  Form and foundation.
11       THE WITNESS:  Well, you wouldn't have to
12 write an estimate.
13   Q.  BY MR. POLI:  Yeah.
14   **A.  You would just click it off and it just would
15 recalculate everything.**
16   Q.  Right.  I mean, exactly.  My point is if you
17 use the same estimate that was done by you or whoever
18 else at State Farm, that was done using the new
19 construction setting, if you use that same exact
20 estimate, literally you flip a switch and the system
21 will run a new estimate with larger dollar amounts
22 using the restoration setting, correct?
23       MS. BRADHAM:  Form and foundation.
24       THE WITNESS:  Correct.
25   Q.  BY MR. POLI:  So my point is, if there was ever

67

1  a need to calculate the damages associated with,
2  however many number of claims there might be, if there
3  was a need to figure it out, the delta on a hundred, a
4  thousand, 5,000 claims, it's a very simple
5  administerial process to figure those numbers out,
6  correct?
7        MS. BRADHAM:  Form and foundation.
8        THE WITNESS:  Yes, it's just switching a
9  toggle on or off.
10   Q.  BY MR. POLI:  Okay.  And that testimony you
11 just gave is based on your, you know, many, many years
12 of experience both at State Farm and with the use of
13 Xactimate, right?
14   **A.  Yes.**
15       MS. BRADHAM:  Form and foundation.
16       MR. POLI:  Okay.  Mark it.
17   Q.  BY MR. POLI:  So I was asking you questions
18 about the second half of Paragraph 1 in Exhibit 18, at
19 Bates 1223, you're still at that page, it looks like,
20 right?
21   **A.  Yes.**
22   Q.  And that's the part after it talks about true
23 new construction, we know we don't have that with
24 Phillips, and then it goes on to talk about total
25 ground up builds, we know we don't have that with

68

1  Phillips, right?
2    **A.  Correct.**
3    Q.  I mean, first of all, let's take the issue of
4  true new construction, because you're a claims handler
5  where existing structures have been damaged, you've
6  never had in your -- I mean, let me ask you this:  How
7  many claims have you handled over the years in large
8  loss, it must be thousands, right?
9        13 to 16 years?
10   **A.  Yeah.  I mean, right around a thousand
11 probably.  Yeah, I don't know.  Yes, I would agree.**
12   Q.  So you would estimate that you've handled a
13 thousand large loss claims during the 13 to 16 years
14 you've worked such claims?
15   **A.  Yeah, I think on average we got about 60 a
16 year.  So, yeah, it would be right around that.**
17   Q.  So the average is about 60 per year, you said?
18   **A.  Yes.**
19   Q.  So in the last six or seven years when you were
20 told to use the new construction setting for large loss
21 claims, if we take 60 a year, times either six or seven
22 years, that would be the number, correct?
23       MS. BRADHAM:  Form; foundation.
24       THE WITNESS:  I will clarify, when I say
25 "60."  So we worked in a team.  So I would receive 30

ROBERT GONZALES   APRIL 04, 2018

69

1  and my partner would receive 30.
2    Q. BY MR. POLI:  Okay.
3    **A. So together, we would be working together a**
4  **total of 60 claims.**
5      MS. BRADHAM:  Form and foundation.
6    Q. BY MR. POLI:  Okay.  So on a yearly basis, your
7  personal claims, although you and your team member
8  would oversee each other, check each other, check each
9  other out in terms of what you're doing.  But your
10  claims would actually be around 30 a year, right?
11    **A. Correct.**
12      MS. BRADHAM:  Form and foundation.
13    Q. BY MR. POLI:  SO that means in terms of your
14  personal claims, if we take six years, that would be
15  180 claims roughly?
16    **A. Roughly.**
17    Q. Over the last six years, correct?
18    **A. Yes.**
19      MS. BRADHAM:  Form and foundation.
20    Q. BY MR. POLI:  And if we take seven years, that
21  would be around 210 claims over the last seven years,
22  correct?
23      MS. BRADHAM:  Form and foundation.
24      THE WITNESS:  Yes.
25    Q. BY MR. POLI:  And using those approximate

70

1  numbers, how many exceptions have there been where
2  you've actually not used the new construction setting?
3  I mean, one, two?
4      MS. BRADHAM:  Form and foundation.
5    Q. BY MR. POLI:  In that six or seven year time
6  span?
7      MS. BRADHAM:  Form and foundation.
8      THE WITNESS:  So in that six or seven year
9  time period, there was a time when we were getting
10  public adjuster claims no matter what, so they were --
11  those would not have been new construction.  We would
12  get water claims, because they were significantly large
13  water claims, that would not be new construction.
14    Q. BY MR. POLI:  But I take it all fire large loss
15  projects would be new construction during that six to
16  seven years, right?
17      MS. BRADHAM:  Form and foundation.
18      THE WITNESS:  No.  I know I used it,
19  restoration remodel, on a handful of estimates.
20    Q. BY MR. POLI:  A handful being, what, two or
21  three?
22    **A. Less than five, I would think.**
23    Q. Okay.  Let's parse that out a little bit.
24  We're talking about the last six to seven years where
25  after this meeting where you were given a directive to

71

1  use the new construction setting on large losses, and
2  we would estimate that in that six to seven years you
3  personally handled 180 to 210 large loss claims,
4  correct?
5    **A. Correct.**
6      MS. BRADHAM:  Form.
7    Q. BY MR. POLI:  And then meanwhile, through
8  working with your partner, whoever that partner was at
9  any given time, you also had direct contact with
10  another 180 to 210 claims using average numbers, right?
11    **A. Yes.**
12    Q. And with respect to the use of the new
13  construction setting, on those 2- to 400 claims,
14  roughly, you said at least until some point, if there
15  was a PA involved, you said, quote, those would not be
16  new construction, I wrote it down.  Is that what you
17  said?
18    **A. Well, let me clarify that.  Because even if**
19  **there was a non-large loss fire, if it was just a**
20  **public adjuster represented, we would get those claims.**
21    Q. Okay.
22    **A. There was a point in time where we received**
23  **them and it may not necessarily be a large loss claim,**
24  **it was a claim that was represented by a public**
25  **adjuster and those for a while were coming into that**

72

1  unit.
2    Q. Okay.  So during that six to seven years, if a
3  PA claim came to your unit and it was also a large
4  loss, did it fit within the directive to use new
5  construction pricing?
6      MS. BRADHAM:  Form.
7      THE WITNESS:  I mean, I would have to
8  remember every single claim, but, again, most of the --
9  for the most part, any claim that came into our unit
10  that was a fire-related large loss, it was a
11  significant -- there was significant damage to the
12  home.
13    Q. BY MR. POLI:  So to use your term, during the
14  last six to seven years, any, quote, fire-related large
15  loss, would automatically trigger the new construction
16  pricing?
17      MS. BRADHAM:  Form.
18      THE WITNESS:  The environment of that
19  structure would trigger that.
20    Q. BY MR. POLI:  So the answer is yes?
21    **A. Yes.**
22      MS. BRADHAM:  Form.
23    Q. BY MR. POLI:  Okay.  Water claims were treated
24  differently; is that right?
25      MS. BRADHAM:  Form.

ROBERT GONZALES   APRIL 04, 2018

73

1     THE WITNESS:  They weren't treated
2  differently.  The environment's different.
3     Q.  BY MR. POLI:  Well, I mean, obviously the point
4  of my question is the use of the new construction
5  setting or environment or whatever you want to call it,
6  is the new construction setting used for some large
7  loss water claims?
8     MS. BRADHAM:  Form.
9     Q.  BY MR. POLI:  Or is it not used for those at
10  all?
11     MS. BRADHAM:  Form and foundation.
12     Q.  BY MR. POLI:  Is it just fire?
13     MS. BRADHAM:  Form and foundation.
14     THE WITNESS:  I personally don't recall
15  using new construction environment for large water
16  claims.
17     Q.  BY MR. POLI:  Okay.  So when you were given the
18  directive by Mr. Costales, six or seven years ago, was
19  it your understanding that the directive was aimed at
20  large loss fire claims, not large loss water claims?
21     MS. BRADHAM:  Form.
22     THE WITNESS:  Correct.  It was related to
23  the environment in a fire loss.
24     Q.  BY MR. POLI:  Okay.  And that's the way you got
25  the directive six to seven years ago, correct?

74

1     A.  Correct.
2     Q.  And that's the way you've tried to follow that
3  directive for these 2- to 400 claims over the last six
4  to seven years between you and whoever your teammate
5  was, right?
6     A.  Correct.
7     Q.  Is Costales still at State Farm?
8     A.  Yes.
9     Q.  Is he still in the large loss group?
10     A.  Yes.
11     Q.  And is he like, what, a team leader?
12     A.  Team manager, yes.
13     Q.  TM, I saw that.  TM, team manager?
14     A.  Yes.
15     Q.  Okay.  I'm sure we'll get around to deposing
16  him.
17     So as far as how common it was for you and
18  the people you worked with to use the new construction
19  setting, on what you refer to as, quote, any
20  fire-related large loss, that's your phrase, it was
21  with what you referred to as a handful of exceptions,
22  it was universal to use the new construction setting or
23  you might want to call it new construction environment
24  if you wish, for any fire-related large loss, for the
25  last six to seven years, right?

75

1     MS. BRADHAM:  Form and foundation.
2     THE WITNESS:  Yeah.  I would agree with
3  that statement.
4     Q.  BY MR. POLI:  And the handful of exceptions,
5  you know it's less than five, that's what you said,
6  right?
7     A.  Correct.
8     Q.  The handful of exceptions might actually be way
9  less than five.  It might be as few one or two, right?
10     MS. BRADHAM:  Form and foundation.
11     THE WITNESS:  I'm, again, I'm saying a
12  handful.  So, you know, I'm giving a range.
13     Q.  BY MR. POLI:  And that handful, so one to five,
14  I guess that would be the range you're giving us,
15  right?
16     A.  Close to --
17     Q.  Or I guess you said less than five?
18     A.  Yeah.
19     Q.  One to four.
20     So the handful of exceptions that come to
21  your mind where new construction pricing was not used
22  on a, quote, fire-related large loss, unquote, that
23  handful, that one to four, is between the 400 or more
24  claims that you either worked or had direct involvement
25  with through your team member?

76

1     MS. BRADHAM:  Form and foundation.
2     THE WITNESS:  No, that's just mine.
3     Q.  BY MR. POLI:  Okay.  Well, what about the -- so
4  if we take the last six to seven years, that's anywhere
5  from 180 to 210 claims that you've worked, are most of
6  those claims fire related?
7     MS. BRADHAM:  Foundation.
8     THE WITNESS:  I mean, I couldn't put a
9  percentage, but it's a high number of those would be
10  fire-related losses.
11     Q.  BY MR. POLI:  Well, so 180 to 210 claims that
12  you've worked in the last six to seven years, it would
13  be an equivalent number that whoever your teammate
14  worked, right?
15     A.  Yes, we split.  So, yes.
16     Q.  If they were going to draw an exception to this
17  virtually universal rule of using the new construction
18  setting for fire-related large losses, you would
19  probably be aware of that, from working intimately with
20  your teammate, right?
21     MS. BRADHAM:  Form and foundation.
22     THE WITNESS:  So if you'll allow me to
23  explain how it worked, I can --
24     Q.  BY MR. POLI:  Sure, go ahead.
25     A.  So we worked in a team environment.  So at a

77

1   point in time I would own the claim and my partner,
2   whoever that may have been at the time, would write the
3   estimate for me and then I would be responsible for the
4   estimate as far as it getting approved and authority
5   and issue settlement.
6          And then we would flip roles and then I
7   would write the estimate and then hand it off to my
8   partner.  And then at that point, it would be beyond
9   them and Abel as far as getting any authority or
10  whoever the team manager was at the time, as far as the
11  estimate review authority and issuing payment.  So once
12  I wrote the estimate, I was done with it.  So beyond
13  that, yeah, I don't -- I wasn't in their files at that
14  point.
15       Q.  Okay.  So I think I understand, let me make
16  sure I understand.  If it's one of your particular
17  claims, then, as you put it, you own the claim,
18  correct?
19       A.  Correct.
20       Q.  But as some sort kind maybe quality check, your
21  teammate would initially write the estimate, right?
22       A.  It wasn't a quality check.  It was based on the
23  fact that just I was handling contents and housing.
24  And then they would at that point take the structure
25  part and write the estimate for me while I was handling

78

1   contents, housing and dealing with our insured.  Or if
2   in the case that they were represented, the public
3   adjuster, and I would answer all letters and all that.
4   And then we would then flip while he's handling the
5   contents and housing, I would then be writing the
6   estimate for him and then getting that to him when I
7   was done.
8        Q.  I want to make sure I understand because I'm a
9   little confused right now.
10          When you're working with one of your
11  teammates, it sounds like one person is handling
12  so-called Coverage A and the structure and the other
13  person is handling contents and other issues; is that
14  right?
15       A.  They weren't handling it, they were just
16  writing the estimate for it.  There was a point in time
17  that that was the case.  Large loss has evolved and so
18  at the time of this claim, that's the way it was.
19          And then at one point where we moved to
20  then the -- my partner at the time would then -- they
21  would handle all of A and I would just stick with B and
22  C.  So during this process of large loss, the roles
23  kind evolved or changed and so there's varying degrees
24  of involvement, based on just where we were at the
25  time.

79

1        Q.  Okay.  Well, let's go back to the claims that,
2   as you put it, you owned.
3          Over six to seven years from the time of
4   this -- if I refer to the new construction pricing
5   directive, I'll just call it the new construction
6   directive.
7          If I refer to the new construction
8   directive, I'll be referring to the directive, we can
9   call it an order, we can call it a mandate, we can call
10  it whatever.  I'll just call it directive, since you
11  seem more comfortable with that term.  And if I refer
12  to the new construction directive, I'll be referring to
13  the directive or the marching orders or whatever you
14  want to call it that you got from Mr. Costales about
15  six to seven years ago, okay?
16       A.  Okay.
17          MS. BRADHAM:  Form.
18       Q.  BY MR. POLI:  And, specifically, I'll be
19  referring to what you've described which is on a going
20  forward basis you were directed, along with the other
21  people on your team, to use the new construction
22  setting, on all, to use your phrase, fire-related large
23  losses, quote, unquote?
24          MS. BRADHAM:  Form.
25          THE WITNESS:  I thought I said

80

1   significant.  But if that's -- I would add the
2   significant fire losses.
3        Q.  BY MR. POLI:  Is there such a thing as an
4   insignificant fire loss that would come to the large
5   loss unit?
6          MS. BRADHAM:  Form.
7        Q.  BY MR. POLI:  I'm assuming not?
8          MS. BRADHAM:  Form.
9          THE WITNESS:  There's been times that we
10  took things just because it was slow.
11       Q.  BY MR. POLI:  Yeah.
12       A.  And Abel took something that may have been just
13  smoked, as far as inside of the home and not a lot of
14  fire damage.  And he took it just because we were in a
15  place that we were maybe a little light on claims and
16  maybe slow.
17       Q.  Right.  But those wouldn't be a large loss,
18  they would just be you taking overload work from
19  another unit because you had extra time?
20       A.  Right.  But so -- when I talk about that, I'm
21  looking at large loss, because we were a large loss
22  unit.  Then it's a large loss --
23       Q.  I'm trying to focus on the claims that are
24  meant to come to a unit like yours?
25       A.  Okay.

ROBERT GONZALES   APRIL 04, 2018

---

**81**

1    Q.  The unit you were in was a so-called large loss
2  unit, correct?
3    **A.  Correct.**
4    Q.  There's a dollar threshold that causes the
5  claim to be a, quote, large loss, I assume, right?
6    **A.  I'm not real sure about the criteria.  All I**
7  **know is Abel assigns.  So that's -- when we got them,**
8  **we got them.**
9    Q.  Okay.  Your understanding is there might be
10  situations where your unit takes overload from regular
11  claims units because you have extra time, that might
12  have occurred here and there, correct?
13    **A.  Yeah, that occurred often, as far as that goes.**
14    Q.  Okay.  But as far as the losses that are
15  supposed to go to you, supposed to go to your unit, the
16  people in your unit, the fire losses are by definition
17  supposed to be so-called large loss fire losses,
18  correct?
19    **A.  Yes.**
20        MS. BRADHAM:  Form.
21    Q.  BY MR. POLI:  The phrase you used was, you kind
22  of reversed the order, the phrase you used when you
23  were answering a question earlier was, quote,
24  fire-related large losses, unquote, that's the phrase
25  you used, right?

---

**82**

1    **A.  Okay.**
2    Q.  Do you remember that phrase?
3    **A.  Yeah.  And like I said, I thought I added the**
4  **significant part.**
5    Q.  I don't think it was in there.  But in any
6  event, the point is we're talking the same thing.
7        What the directive you got and the other
8  members of your unit got six years ago was
9  that unless there was some reason to vary from the
10  directive, you were supposed to use new construction
11  pricing on all, quote, fire-related large losses,
12  unquote, right?
13        MS. BRADHAM:  Form.
14        THE WITNESS:  Yes.
15    Q.  BY MR. POLI:  And the only time you sought to
16  vary from that, in the last six to seven years, would
17  be anywhere from one to four times, out of the
18  approximate 210 files you handled over the last six to
19  seven years, right?
20    **A.  So, again, that number you have includes all**
21  **those other smaller claims.  So when you say out of**
22  **that total number, you're counting the entire amount,**
23  **when that entire amount includes the non-fire-related**
24  **or the PA-repped claims.**
25    Q.  Okay.

---

**83**

1    **A.  And so --**
2    Q.  All right.  Well, let's figure that out.  Out
3  of the 210 claims you think you've handled in the last
4  six to seven years, I take it from your testimony a
5  little while ago, Mr. Gonzales, the vast majority of
6  those would be what you referred to as, quote,
7  fire-related large losses, unquote, right?
8    **A.  Yes, the vast majority would be those.**
9    Q.  So give me some estimate.  Out 210 claims over
10  six to seven years, if the vast majority would be
11  fire-related large losses, give me some sort of number,
12  so I can get an idea.  What would be that be 180, 190,
13  what would it be?
14        MS. BRADHAM:  Form and foundation.
15        THE WITNESS:  I would think it would be in
16  the 160 range, I would think, if I had to put a number
17  on it.
18    Q.  BY MR. POLI:  So 160, do you want to do a range
19  or do you just want to pick a number?
20    **A.  Around 160.**
21    Q.  Okay.  160 plus or minus?
22    **A.  Yeah.**
23    Q.  So out of 210 claims, in the last six to seven
24  years, 160, plus or minus, would be the estimate of
25  those claims that were, as you put it, quote,

---

**84**

1  fire-related large losses, unquote, right?
2    **A.  Yes.**
3    Q.  And every single one of those would have been
4  priced using the new construction setting with the
5  possibility that there was anywhere from one to four
6  situations, a handful as you put it, where you went to
7  your boss and said:  Can we do it differently?
8        MS. BRADHAM:  Form and foundation.
9        THE WITNESS:  Yeah.  I mean, I -- you're
10  going one to four.  I'm going, you know, a handful,
11  give or take five.  So you need to clarify
12  that since we're going to use --
13    Q.  BY MR. POLI:  How easy would it be to figure
14  out where those -- where that handful of exceptions
15  occurred?  You could probably remember, sitting here
16  right now, maybe, can you?
17        MS. BRADHAM:  Foundation and form.
18        THE WITNESS:  I remember two of them.
19    Q.  BY MR. POLI:  Okay.  Let's talk about the two
20  you remember.  So limited exceptions, what you call a
21  handful of exceptions.  What's the first one you
22  remember?
23    **A.  I remember the first one that, if I remember**
24  **correctly, it was outside of Kingman.  Between Kingman**
25  **and Vegas, out in the middle of nowhere.  And the**

---

ROBERT GONZALES   APRIL 04, 2018

85

1 efficiencies that were going to be gained under new
2 construction would not apply since it literally was
3 probably an hour and a half outside of Kingman, that
4 there would be no efficiencies gained because of the
5 drive time for the subcontractors, contractor in that
6 area. Just it was on a dirt road. There was no
7 efficiencies that were going to be gained in that loss.
8    Q. Now, in order not to use the new construction
9 pricing on that, you could not make that decision on
10 your own, I assume, correct?
11        MS. BRADHAM: Form.
12        THE WITNESS: Yes.
13    Q. BY MR. POLI: Oh, you could?
14    A. Yeah.
15    Q. Would you have to go to your -- who did you
16 report to? You reported to a team manage?
17    A. Abel.
18    Q. Okay. Mr. Costales, again, right?
19    A. Correct.
20    Q. So on this Kingman project, when you concluded
21 that contrary to the directive, you wanted to use
22 restoration pricing, did you have to run that by your
23 team manager, Mr. Costales?
24    A. No. I just had to put a note as to why I was
25 deviating.

86

1    Q. Okay. All right. So the point is if you -- in
2 whatever this handful of cases were, where you wanted
3 to deviate from the new construction directive, you had
4 note that in the claims file?
5    A. Correct.
6    Q. And I assume that note would go among others or
7 would be read among others, by your team manager?
8    A. Correct.
9    Q. And this is consistent with the concept that we
10 all know about in claims handling, everything that
11 happens in the claim that's at all substantive or
12 significant, should be documented in the claims file
13 and/or the claims log, right?
14        MS. BRADHAM: Form.
15        THE WITNESS: Yes.
16    Q. BY MR. POLI: Okay. So when you put a note
17 like that in -- and what are you putting it in, your
18 claims log?
19    A. So I'm going to have to recall this. I don't
20 know because we were close to each other, so it may be
21 a situation and I'm going to -- because I don't recall
22 exactly how it was. But it may be a situation of just
23 talking to Abel or walking by his office and say: Hey,
24 you're getting this -- because he reviewed every
25 estimate. Hey, just to let you know, this is under

87

1 restoration remodel because of X, Y, Z.
2    Q. Okay.
3    A. So I don't know if it may have been in a file
4 note or if it was an authority request or if it was
5 just a walk by his office: Hey, you're getting a copy
6 of the estimate and here's why it's different.
7    Q. But the point is you wouldn't handle something
8 like that just verbally. It will always be documented
9 in the claims log or the claims file, correct?
10    A. That's what I'm saying, I don't know if that
11 necessarily is the case because I could have walked by
12 Abel's office and said: Hey, you're getting the
13 estimate. Just so you know, it's under restoration
14 remodel or I could be sitting in his office and going:
15 Hey, I just got back from this loss, you know. So it
16 may not be in a file note, as far as that goes.
17    Q. Okay. That's a little contrary to the way -- I
18 always thought one of the accepted standards for claims
19 handling is anything that is substantive or significant
20 regarding the processing of the claim, should be
21 documented in the claims file and/or the claims log.
22 Is that something you've learned over your 29-year
23 career?
24        MS. BRADHAM: Form.
25        THE WITNESS: I would agree. But I don't

88

1 know if that's necessarily significant or substantive,
2 as far as that --
3    Q. BY MR. POLI: It produces a, according to you,
4 an 8 to 12% difference in the dollar amount, right?
5    A. Again, I don't know if that's -- I wouldn't
6 define that as -- I don't go through every single
7 estimate and go Abel, I'm including this much drywall;
8 or Abel, I'm including this much electrical; or Abel --
9 we don't do that as far as that goes.
10    Q. Okay. Well, the point is, it is readily -- if
11 we looked -- I mean, the approximate 160 fire-related
12 large losses that you've handled in the last six to
13 seven years, there will be an Xactimate estimate in
14 each of those files, right?
15    A. Yes.
16    Q. And if we looked at those 160 estimates, it
17 would be immediately apparent, just from looking at the
18 estimate, whether it was done using the new
19 construction setting or the restoration setting,
20 correct?
21    A. Yeah. Because it's on the cover page, it
22 indicates it.
23    Q. Right.
24    A. Yes.
25    Q. So the ease of figuring out, out of your 160,

ROBERT GONZALES   APRIL 04, 2018

89

1  plus or minus, fire-related large losses in the last
2  six to seven years, since the new construction
3  directive was issued, it would be very, very easy to
4  figure out how much times you've varied from that
5  directive.  We just have to run those 160 estimates and
6  look at the first page of each one, right?
7       MS. BRADHAM:  Form and foundation.
8       THE WITNESS:  Yes.  I would agree with
9  that.
10      Q.  BY MR. POLI:  That's a rather simple process to
11  go through to figure out how many times, in your case,
12  the new construction directive has been departed from,
13  correct?
14      MS. BRADHAM:  Form and foundation.
15      THE WITNESS:  I mean, you say simple, but
16  I assume it would be simple.
17      Q.  BY MR. POLI:  Yeah.  But you say you assume it
18  would be simple, you say that based on your 29 years of
19  experience at State Farm doing property claims, and
20  your experience knowing how easy it is to run one of
21  these estimates, whether it's a current one or a
22  historical one?
23      MS. BRADHAM:  Form and foundation.
24      THE WITNESS:  Yes.
25      Q.  BY MR. POLI:  If you go to a particular claims

90

1  file and you want to run an estimate from that
2  particular claims file, whether it's now or from a year
3  ago or from three years ago, you punch a button and you
4  run the estimate and print it out on a copy machine,
5  right?
6       MS. BRADHAM:  Form and foundation.
7       THE WITNESS:  I'm not familiar with exact
8  analysis and how that all gets stored.  So I would
9  assume that all of that stuff is stored.  And I know
10  for sure the Xactimate estimates are within the
11  estimate.  But to run it, I'm not clear how easy that
12  is.
13      Q.  BY MR. POLI:  Well, let's say you don't want to
14  run a copy.  Let's say you just want to look at it on
15  the screen.  If you pull it up on a computer screen and
16  look at the first page of the estimate, you will know
17  in moments whether it was done using the new
18  construction setting or the restoration setting by
19  looking at page 1, right?
20      A.  Yes.
21      MS. BRADHAM:  Form and foundation.
22      Q.  BY MR. POLI:  And that same ease of figuring
23  that out, would, based on your knowledge of State Farm
24  systems, that would be the same for anyone else in your
25  unit?

91

1       MS. BRADHAM:  Form; foundation.
2       Q.  BY MR. POLI:  Right?
3       **A.  As far as I know, yes.**
4       MR. POLI:  Let's take a quick break.
5       THE VIDEOGRAPHER:  The time is 11:30 a.m.
6  We're now going off record, ending Media 2.
7       (Whereupon, a brief recess ensued from 11:30
8  a.m. to 11:48 a.m.)
9       THE VIDEOGRAPHER:  The time is 11:48 a.m.
10  We're now back on record, beginning Media 3.
11      Q.  BY MR. POLI:  So with respect to the Phillips'
12  home, you did inspect it at one point, right?
13      A.  Yes.
14      Q.  There was a major fire at the Phillips' home,
15  correct?
16      **A.  Yes.**
17      Q.  But the exterior walls were still standing,
18  right?
19      **A.  Correct.**
20      Q.  The interior walls were still standing, right?
21      **A.  Yes.**
22      Q.  What was the repair?  What did it involve?  Was
23  it mostly like roofing and drywall?
24      **A.  From what I recall from the estimate, it was we**
25  **were going to take the entire truss system off, which**

92

1  **would then take all the roofing material off.  Gutting**
2  **the interior and removing all the stucco around the**
3  **exterior of the house.  And then I think some windows**
4  **and all the flooring.  So, yeah, it was just going to**
5  **be down to sticks.**
6       Q.  But you left the exterior and interior walls in
7  place?
8       **A.  Correct.  They weren't damaged.**
9       Q.  All right.  I'm about ready to go on from this
10  document.  But go back to Exhibit 18 and I think you're
11  at the right page, the page about new construction
12  versus restoration pricing, page Bates 1223.  Are you
13  still on that page?
14      **A.  Yes.**
15      Q.  We've asked you quite a few questions about
16  Paragraph 1, new construction.  I want to ask you some
17  questions about the language in Paragraph 2,
18  restoration.
19      It says that restoration, the restoration
20  option, quote, "is for jobs other than total losses or
21  new construction," do you see that language, unquote?
22      **A.  Yes.**
23      Q.  Let's take each of those.  Total losses, based
24  on your training and experience with State Farm, you
25  have an understanding of what that would refer to,

93

1  right, total losses?
2          MS. BRADHAM:  Form.
3          THE WITNESS:  No, I don't use this term.
4      Q. BY MR. POLI:  Well, it's in this guideline from
5  your company, right?
6      A. Yes.
7      Q. And this is a guideline that you use, if not
8  daily, routinely, right?
9      A. Correct.
10     Q. And this particular page of this guideline,
11 specifically relates to what we've defined as the new
12 construction directive, that you received from your
13 boss six to seven years ago, right?
14     A. Correct.
15     Q. And when you received that new construction
16 directive from your boss, your understanding was that
17 that was a directive that was issued from State Farm
18 headquarters, right?
19         MS. BRADHAM:  Foundation.
20         THE WITNESS:  My understanding.
21     Q. BY MR. POLI:  And that's why you said that to
22 Mr. Skipton in a conversation where he challenged the
23 new construction pricing.  You said this was a
24 directive from corporate headquarters, right?
25     A. Correct.

94

1      Q. Because that's what you understood from that
2  meeting six to seven years ago when your boss told you
3  about the new construction directive, correct?
4      A. Correct.
5          MR. POLI:  Mark it.
6      Q. BY MR. POLI:  So since you're familiar on a
7  daily or at least a routine basis with this particular
8  guideline, on this particular page in this guideline,
9  Exhibit 18, would total losses be the same as a total
10 ground up rebuild?
11         MS. BRADHAM:  Form.
12         THE WITNESS:  Again, I'm going --
13         MS. BRADHAM:  Foundation.
14         THE WITNESS:  -- to restate, I don't use
15 the terminology total losses.
16     Q. BY MR. POLI:  I mean, since this a guideline
17 you're obligated to follow, did you ever go to someone
18 and say:  I don't know what total losses means?
19     A. No.
20     Q. Okay.  Clearly the Phillips' loss would not be
21 considered by any layman's use of the word total loss
22 as the Phillips' loss would not be a total loss, right?
23         MS. BRADHAM:  Form.
24         THE WITNESS:  Again, I don't use those
25 terms, so I wouldn't describe theirs as a total loss.

95

1      Q. BY MR. POLI:  Right.
2      A. So I don't use that terminology.
3      Q. We just discussed the fact that the Phillips'
4  claim, the interior and exterior walls were usable,
5  they weren't damaged, correct?
6      A. Correct.
7      Q. That would clearly -- the Phillips' claim would
8  clearly not be a total loss?
9      A. Again, I don't use that terminology, so when
10 you ask me, that clearly wouldn't be a total loss.  I
11 don't use that terminology.
12     Q. Well, you have 29 years with State Farm and
13 you've used this -- if I understand this correctly, you
14 use this guideline on a daily or routine basis, it must
15 be weekly anyway, right?
16         MS. BRADHAM:  Form.
17         THE WITNESS:  Not weekly.
18     Q. BY MR. POLI:  How often do you use this
19 guideline?  How times have you used this guideline over
20 the years that we've marked as Exhibit 18, during the
21 decade and half you worked large losses.  How many
22 times do you refer to this guideline?
23     A. Oh, I couldn't put a number on it.  I mean,
24 there's so many things --
25     Q. It would be dozens of times, right?

96

1      A. Within the document there so many different
2  things as far as claims handling practices, yeah, I
3  don't -- I couldn't tell you.  I couldn't put a number
4  on it.
5      Q. Well, until I just pointed out the reference to
6  total loss, had you ever read it before?  Somewhere
7  where over the decade and a half you have been using
8  these guidelines?
9      A. Yes.
10     Q. Did you ever say:  I don't know what that
11 means.  I better figure out what that means so I can
12 properly follow this guideline.  Did you ever do that?
13     A. No.  I was following the guideline above it.
14     Q. Well, it's rather obvious, that Paragraphs 1
15 and 2 are meant to be read in context with each other;
16 isn't that clear, Mr. Gonzales?
17     A. No.  Because on Two it doesn't mention anything
18 about large partial losses.
19     Q. Yeah.  That's kind of the point I'm making,
20 sir.  It's pretty clear that if you're going to
21 understand when to use the new construction setting
22 versus the restoration setting, you shouldn't just read
23 Paragraph 1 for new construction, maybe you want to
24 read Paragraph 2 dealing with restoration; isn't that
25 obvious?

ROBERT GONZALES   APRIL 04, 2018

97

1        MS. BRADHAM:  Form.
2        THE WITNESS:  No, I would disagree with
3  you.
4    Q.  BY MR. POLI:  Okay.  So in your view, as a
5  representative of State Farm, a 29-year representative
6  of State Farm, it's perfectly okay to make this
7  decision about new construction versus restoration
8  pricing by only reading one of the two paragraphs that
9  addresses the issue; is that your testimony?
10        MS. BRADHAM:  Form.
11        THE WITNESS:  No.  I'm saying that in this
12  case Mr. Phillips, it fit, Number 1, new construction.
13    Q.  BY MR. POLI:  Great.  That's not my question so
14  let me rephrase it so you understand what my question
15  is.
16        As a 29-year representative of State Farm,
17  looking at this page in Exhibit 18 that has two
18  paragraphs dealing with the new construction versus
19  restoration issue, Paragraph 1 is entitled "New
20  construction."  Paragraph 2 is entitled "Restoration."
21        Is it your testimony that on behalf of
22  State Farm, that you can look at one paragraph and
23  ignore the other in terms of figuring this issue out?
24        MS. BRADHAM:  Form.
25        THE WITNESS:  I don't believe that I'm

98

1  ignoring one.
2    Q.  BY MR. POLI:  Okay.  You wouldn't do that,
3  would you?
4    **A.  No.  I'm not ignoring it.**
5    Q.  Okay.  I mean, obviously, if you've got two
6  related paragraphs, One and Two, dealing with the exact
7  same issue, you're not going to ignore one and pay only
8  sole attention to the other, right?
9    **A.  Well, I don't know as far as that goes.  It's**
10  **almost like an if then type of situation.  So if it**
11  **doesn't meet new construction, then can we go down to**
12  **restoration remodel?  But based on this OG and the**
13  **guide, it was a large partial loss.  So if it fits in**
14  **One, why would I then go to Two.**
15    Q.  Maybe because they're right next to each other
16  and they address the exact same issue in a converse
17  fashion so it would seem logical to look at both
18  paragraphs, that might be one reason to look at both of
19  them?
20    **A.  I would disagree with you.**
21    Q.  All right.  I just want to know what
22  your position is.  You're here as a representative of
23  State Farm.  You're a 29-year career professional for
24  State Farm.  It's your position that on this new
25  construction pricing issue, it's perfectly okay to look

99

1  at Paragraph 1 on Bates 1223, and pay little or no
2  regard to Paragraph 2, this is all in Exhibit 18.  Have
3  I understood your testimony correctly?
4        MS. BRADHAM:  Form.
5        And, Mike, I need to clarify something
6  here for the record.  You've said a couple of times
7  that Robert is here as a representative of State Farm
8  testifying on behalf of State Farm.  This is not a Rule
9  30(b)(6) deposition.
10        MR. POLI:  I think I'm aware of that.
11    Q.  BY MR. POLI:  Are you here --
12        MS. BRADHAM:  And I need to clarify that
13  because you've said it a number of times.
14    Q.  BY MR. POLI:  Are you here doing your best to
15  represent the company you've spent 29 years working
16  for?
17        MS. BRADHAM:  Form.
18        THE WITNESS:  Yes.
19    Q.  BY MR. POLI:  Are you loyal to your company?
20    **A.  Yes.**
21    Q.  Do you try to put forth the best possible
22  representation of your company, whether it's in this
23  deposition or any other time acting on behalf of your
24  company?
25    **A.  Yes.**

100

1        MR. POLI:  Okay.  All right.  Now see if
2  can find the question I asked before, Donna, and let's
3  pose it back so we get an answer.
4        (Whereupon, the question was read.)
5        MS. BRADHAM:  Form.
6        THE WITNESS:  Yes.
7        MR. POLI:  Mark it.
8    Q.  BY MR. POLI:  So in Paragraph 2, where it
9  refers to new construction, you can tell us what that
10  means, right?
11        Or do you not know what that means either?
12    **A.  Again, looking at it, right, so they use true**
13  **new construction versus new construction down at the**
14  **bottom.  I mean, for me to look at it, you know, I look**
15  **at Number 1, just looking at the environment, is it the**
16  **most efficient labor available, the productivity.  So**
17  **if that's the case, then restoration remodel is not**
18  **most effective or the most efficient labor productivity**
19  **available.  And in this situation it was most efficient**
20  **productivity available.  So why would I then go to**
21  **Number 2 is my question.  So they're separate.  I don't**
22  **see how they're together.**
23    Q.  Okay.  Now, let's return to my question.
24        Where Paragraph 2 refers to new
25  construction, do you have an understanding of what that

ROBERT GONZALES   APRIL 04, 2018

101

1  means or not?  If you don't, tell me.
2    **A.  Yes, new construction.**
3    Q.  Okay.  What's new construction?  Putting a new
4  structure on land where there was no structure, that's
5  what new construction is, right?
6        MS. BRADHAM:  Form.
7        THE WITNESS:  I probably would agree with
8  that.
9    Q.  BY MR. POLI:  You probably would agree with
10  that.  Okay.  Clearly the Phillips' loss is not a new
11  construction situation, right?
12        MS. BRADHAM:  Form.
13        THE WITNESS:  Correct.
14    Q.  BY MR. POLI:  Okay.  But in Paragraph 2, where
15  it refers to a so-called, quote, total losses, unquote,
16  apparently you don't have any idea what this State Farm
17  guideline means when it refers to total losses; is that
18  right?
19    **A.  As I stated, I don't talk in that verbiage.**
20    Q.  I didn't ask you whether you talked --
21    **A.  So I don't know then.**
22    Q.  Those are two different issues if I asked you
23  do you use that term as a routine part of your
24  language, then you can say that I don't talk in that
25  language.  That's not the question I'm posing.  I'm

102

1  posing a different question.
2        This guideline that you've referred to,
3  God only knows how many times, it's an official State
4  Farm guideline in Paragraph 2 refers to, quote, total
5  losses, unquote.
6        As a 29-year professional at State Farm,
7  do you have an understanding of what that means?
8        MS. BRADHAM:  Form.
9        THE WITNESS:  No, I do not know what that
10  means.
11        MR. POLI:  Okay.  Mark it.
12    Q.  BY MR. POLI:  When you start a claim, do you
13  start out by reviewing the policy?
14    **A.  I think reviewing policy limits and coverages,**
15  **correct.**
16    Q.  Well, I mean, that could be reviewing a summary
17  like on a computer of the policy.  Do you actually
18  review the policy?
19    **A.  No, I'm pretty familiar with the policy.**
20    Q.  Okay.  Would it be fair that pretty much all
21  the claims you get for property claims would be on
22  essentially the same form of State Farm policy?
23        MS. BRADHAM:  Form.
24        THE WITNESS:  Yes.
25    Q.  BY MR. POLI:  Okay.  So you've reviewed that

103

1  form of policy so many times over the years you
2  probably pretty much know it by heart.  Would that be
3  fair?
4        MS. BRADHAM:  Form.
5        THE WITNESS:  Yes.
6        (Whereupon, Deposition Exhibit Number 19 was
7  marked for identification.)
8    Q.  BY MR. POLI:  Okay.  And we're actually done
9  with 18 now, so you can set that aside.
10        So you've been handed Exhibit 19.  Can you
11  identify -- and, obviously, when I hand you a document,
12  you can take time to review it, skim it, whatever.
13        Can you identify Exhibit 19?
14    **A.  It's the certified policy.**
15    Q.  And it's the State Farm form of policy that was
16  issued to my clients, Mr. and Mrs. Phillips?
17    **A.  Yes, that's what it has on the declaration**
18  **page.**
19    Q.  Is this the form of policy that you are talking
20  about being so familiar with, because you've looked at
21  it, you know, hundreds or thousands of times over the
22  years?
23        MS. BRADHAM:  Form.
24        THE WITNESS:  Yes.
25    Q.  BY MR. POLI:  Okay.  Let's turn to Bates 4318.

104

1        Tell me when you're there.
2        Is this the portion of the State Farm form
3  that deals with so-called loss settlement?
4    **A.  Yes.**
5    Q.  By the way, with respect to policies, have you
6  ever heard the acronym DICE?
7    **A.  No.**
8    Q.  It's a handy way to think of the components
9  that most policies have.  DICE:  Declarations, insuring
10  agreement, conditions and exclusions.  Those four
11  things are found in all or pretty much all policies,
12  right?
13    **A.  Yes.**
14    Q.  Okay.  This loss settlement page at Bates 4318
15  in Exhibit 19, is this a portion of the State Farm form
16  that you're intimately familiar with, from using it
17  over the years?
18    **A.  Yes.**
19    Q.  Are you aware that when State Farm issues
20  policies in particular states, they have to comply with
21  whatever the laws and requirements are in that
22  particular state or jurisdiction, right?
23    **A.  In my understanding, yes.**
24    Q.  And so they often issue endorsements.  An
25  endorsement is just a fancy word for an amendment to

ROBERT GONZALES   APRIL 04, 2018

105

1 the policy, right?
2 **A. I'm aware of endorsements.**
3 Q. Well, I didn't ask you if you were aware of
4 endorsements.
5 What's an endorsement?  In your 29 years
6 of experience, when someone refers to an endorsement to
7 an insurance policy, what is an endorsement?
8 **A. It's an addition to the policy.**
9 Q. It's an amendment to the policy, right?
10 **A. Okay.**
11 Q. Well, I'm asking you, is that right or not?  If
12 you don't agree, please tell me you don't agree.
13 MS. BRADHAM:  Foundation.
14 THE WITNESS:  It's added to the policy.
15 Yeah, I guess then at that point, what you're saying an
16 amendment.  It's added as part of the policy.  It
17 becomes part of the policy.
18 Q. BY MR. POLI:  Okay.  And if there's a contrast,
19 a distinction, a contradiction between the core policy
20 and the endorsement, do you have an understanding,
21 based your 29 years, of what governs?
22 **A. The endorsement.**
23 Q. Right.  That's why I wouldn't let you call it
24 an amendment, right?
25 **A. If that's what you say.**

106

1 Q. Okay.  All right.  So are you aware that this
2 particular form of policy, because it was issued to the
3 Phillips and because they live in Arizona has an
4 endorsement for Arizona, did you know that?
5 **A. I saw the endorsements up front.**
6 Q. Okay.  Why don't you turn to Bates 4333 in
7 Exhibit 19.  Is that the beginning of the so-called
8 Arizona endorsement?
9 **A. Okay.**
10 Q. Is that right?
11 **A. That's -- yes.**
12 Q. Okay.  And then if we turn to Bates 4337, is
13 that the Arizona variation on the loss settlement
14 provision?
15 **A. Yes.**
16 Q. And so looking at the general loss settlement
17 provision on Bates 4318, versus the Arizona version of
18 that same provision on Bates 4337, based on your
19 training and experience, because this policy was issued
20 to the Phillips who live in Arizona, the Arizona
21 provision on loss settlement would apply, right?
22 **A. Correct.**
23 Q. Okay.  And that's consistent with your entire
24 training and experience over 29 years, right?
25 **A. Yes.**

107

1 Q. Okay.  Let's see what the Arizona provision on
2 loss settlement says.
3 First of all, we already talked about an
4 ACV and an RCV calculation in an RCV policy.  Do you
5 remember that?
6 **A. Yes.**
7 Q. Okay.  So the policy governs the calculation of
8 the ACV amount and the payment of the same, that's what
9 the policy, among other things, addresses, right?
10 **A. Yes.**
11 Q. And if we look at the Arizona endorsement,
12 Bates 4337, it says that it addresses the payment of
13 ACV on the lower right portion of that page at
14 paragraph 2-A2 where it says "until actual repair."  Do
15 you see that language?
16 The lower right.
17 **A. The lower right.**
18 Q. Paragraph 2-A2.  It begins, "Until actual
19 repair or replacement is completed"?
20 **A. I don't believe they have the A2.**
21 Q. Are you on Bates 4337?
22 **A. Yes.**
23 Q. Can I see it, please?  Maybe it didn't get
24 copied right.
25 Yeah, it is.  Do you see right here?

108

1 **A. Right.  But they didn't have the A2 policy.**
2 Q. Oh, so you're saying this endorsement that's
3 part -- this Arizona endorsement that's part of their
4 policy, doesn't apply?
5 **A. Correct.  They didn't have an A2 policy, they**
6 **had an A1.**
7 Q. They had A1?
8 **A. Correct.**
9 Q. Okay.  So I stand corrected then.
10 And what's the difference between an A1
11 policy and an A2 policy?
12 **A. The A1 is similar construction.  A2 is common**
13 **construction.**
14 Q. Okay.  It looks like the language, whether it's
15 A1 policy or an A2 policy, it appears that the language
16 that govern the payment of an ACV amount is identical.
17 And I'm looking on Bates 4337, on the lower left,
18 Paragraph 1, beginning, "Until actual repair or
19 replacement," that language seems to be identical to
20 the paragraph on the lower right, Paragraph 2-A2.  Do
21 you see that?
22 **A. Yes.  It's similar.**
23 Q. Well, it looks identical unless I'm missing it.
24 Do you see any changes?
25 **A. Yeah, on the second page it goes -- it**

ROBERT GONZALES   APRIL 04, 2018

109

1  **continues.  So that's not included.**
2  Q.  Okay.  You're right.  There's a little bit of
3  difference.  All right.  Well, let's take the one that
4  you think applies.
5      So with respect to the Phillips, they had
6  a replacement cost insurance policy that promised them
7  similar construction, correct?
8  **A.  Correct.**
9  Q.  Okay.  That means if their house burns down or
10  is otherwise destroyed, when it gets rebuilt it should
11  be rebuilt with similar construction, right?
12  **A.  Correct.**
13  Q.  Okay.  So let's take that provision.  So the
14  ACV payment would be governed by paragraph 1-A1 on the
15  lower left of Bates 4337 in Exhibit 19; is that right?
16  **A.  Yes.**
17  Q.  So let's look at what it says.  Quote, "Until
18  actual repair or replacement is completed, we will pay
19  only the amount it would cost to repair or replace
20  damaged property, less depreciation, at the time of the
21  loss of the damaged part of the property, up to the
22  applicable limit of liability shown in the
23  Declarations, not to exceed the cost to repair or
24  replace the damaged part of the property," unquote.
25      That's what it says, right?

110

1  **A.  Yes.**
2  Q.  Did you follow along while I read that?
3  **A.  Yes.**
4  Q.  Did I read it accurately, I hope?
5  **A.  Yes.**
6  Q.  So it only talks about deducting one thing from
7  the RCV number.  It just says deduct depreciation,
8  that's all it says, as far as a deduction from RCV to
9  get ACV; is that right?
10  **A.  Yes.**
11  Q.  Now, an insurance policy is a contract, in
12  essence, between the insurance company and the insured,
13  based on your training and experience, right?
14  **A.  Yes.**
15  Q.  You've been a 29 year claims handler.  You must
16  be intimately familiar with the policies and standards
17  and rules that govern the handling of a claim, right?
18      MS. BRADHAM:  Form.
19      THE WITNESS:  Yes.
20  Q.  BY MR. POLI:  I've got, somewhere in this pile
21  of paper, four or five examples of testimony that
22  you've given, both at trial through Mr. Silverman and a
23  deposition, including with Kelly Jo, where you've
24  talked about the standards for the processing of
25  claims.  You remember giving those depositions and

111

1  testifying at trial with Mr. Silverman, right?
2  **A.  Yes.**
3  Q.  Sometimes those standards for claims handling
4  are sometimes referred to by people like me as the
5  rules of the road.  You've heard that idea, right?
6  **A.  Yes.**
7  Q.  And that means that we analogize the standards
8  for proper claims handling to the rules that we all
9  have to comply with when we're driving a car down the
10  road.  You understand that analogy, that idea, right?
11  **A.  Yes.**
12  Q.  And when we drive cars down the road, because
13  we're diving this big dangerous, at least potentially
14  dangerous machine, we have to comply with speed limits,
15  we've got to not drink and drive, we shouldn't text and
16  drive, pay attention to traffic signals; those would be
17  considered the so-called rules of the road when we
18  drive our motor vehicles, right?
19  **A.  Yes.**
20  Q.  Similarly, or by analogy if you want to call it
21  that, when a 29-year professional like yourself handles
22  a claim, there are rules of the road, if you will, for
23  how you should handle such a claim, right,
24  Mr. Gonzales?
25  **A.  Yes, there are.**

112

1      MR. POLI:  Mark it.
2  Q.  BY MR. POLI:  And one of the rules is that
3  there is a duty, a duty, on the part of the insurance
4  company to process the claim in a prompt, thorough, and
5  fair manner, right?
6  **A.  Yes.**
7  Q.  Another duty that you've certainly been exposed
8  to over your 29-year career, is that there's a duty of
9  so-called good faith and fair dealing, you've heard
10  that phrase many times over the years, right?
11  **A.  Yes.**
12  Q.  Because insurance isn't like a lot of other
13  products we buy, if you go out and buy a car or a
14  television, you pay your money and you get your car or
15  television.  In contrast, insurance, when someone buys
16  it, they pay a premium and they get nothing at that
17  time except a promise that if they ever have a loss
18  they'll be dealt with fairly and in good faith.  Do you
19  understand that distinction, given your 29-year career,
20  right?
21  **A.  Yes.**
22  Q.  And so because of the unique nature of
23  insurance as a product, when people pay all this money,
24  they hope they never need it, but they get a promise
25  that if they do they'll be treated fairly.  Because of

113

1 that the law imposes, based on your training and
2 experience as a 29-year claims handler, the law imposes
3 extra special duties on insurance companies and their
4 claims handlers; isn't that right?
5     A. Yes.
6     Q. If a policy like this, based on your training,
7 if a policy like this is unclear, or is ambiguous,
8 you've always been trained that the insured gets the
9 benefit of the doubt, right?
10        MS. BRADHAM: Form.
11        THE WITNESS: Yes.
12     Q. BY MR. POLI: If it's a close call of any sort
13 in the handling of a claim, whether there's coverage or
14 something else, you've always been trained that, again,
15 the insured should get the benefit of the doubt because
16 of the unique nature of insurance as a product, right?
17        MS. BRADHAM: Form.
18        THE WITNESS: Yes.
19     Q. BY MR. POLI: Looking at this loss settlement
20 provision in Exhibit 19 at Bates 4337, the only
21 deduction from RCV that is spelled out in the policy is
22 for depreciation, that's the only deduction, right?
23     A. Correct.
24     Q. If anything else is deducted from the RCV, in
25 order to reduce the ACV, that would be contrary to the

114

1 expressed language that we're looking at in this
2 policy, right?
3        MS. BRADHAM: Form.
4        THE WITNESS: Yeah, that's the only thing
5 I take that would be depreciation, correct.
6     Q. BY MR. POLI: Well, the reason I'm asking that
7 is I looked at a couple of your estimates, and I'll
8 show them to you in a moment, but after you deduct
9 depreciation, then you deduct another 20% of the
10 depreciation for contractor's overhead and profit. Do
11 you remember doing that?
12        MS. BRADHAM: Form.
13        THE WITNESS: I would have to look at the
14 estimate to see what you're talking about.
15     Q. BY MR. POLI: Well, let me show you.
16        (Whereupon, Deposition Exhibit Number 20 was
17 marked for identification.)
18        MR. SKIPTON: It's the same.
19        MR. POLI: Exhibit 20? It's a different
20 version of the same thing.
21     Q. BY MR. POLI: Okay. Do you have Exhibit 20 in
22 front of you?
23     A. Yes, I do.
24     Q. And take a minute to look at it. Can you
25 identify what Exhibit 20 is?

115

1     A. It's my cover letter, a copy of the payment
2 issued, and then my Xactimate estimate.
3     Q. And so the cover letter would have been
4 prepared by you?
5     A. Yes.
6     Q. And the Xactimate would have also been prepared
7 by you, right?
8     A. I would be responsible. Again, like I
9 explained earlier --
10     Q. Your teammate prepared it?
11     A. So I was ultimately responsible for this, yes.
12     Q. Okay. Well, turn to the fourth page of this
13 document, which is noted as page 2 of what I believe is
14 the Xactimate estimate.
15        Are you there?
16     A. Yes.
17     Q. And as an example of how easy it is to tell
18 that you prepared this estimate using new construction
19 pricing, if you look at the upper right on that page,
20 it says, quote, new construction, unquote, right?
21     A. That's the environment I used, correct.
22     Q. Right. If you had used restoration pricing, it
23 would have said instead of new construction, it would
24 have said restoration, right?
25     A. Correct.

116

1     Q. Okay. Let's look at the deductions.
2        So you came up on this page, you've got a
3 summary of your calculations and it's a summary for
4 Coverage A. Do you see that?
5     A. Yes.
6     Q. And in these policies, Coverage A is the
7 insurance coverage for structure, for the building,
8 right?
9     A. Correct.
10     Q. There's other coverages for things like
11 personal property and loss of use but, Coverage A is
12 for the actual building, right?
13     A. Correct.
14     Q. And so on this page that we're looking at,
15 there's a summary of replacement costs, various
16 deductions and then net actual cash value payment, do
17 you see that?
18     A. Yes.
19     Q. And the replacement cost that you calculated or
20 I guess your teammate calculated and you eventually
21 owned it, as you put it, was $153,759.64, right?
22     A. Oh, yes, because you're taking in the $1,000
23 deductible. It doesn't say 153, but, yes, it's 153.
24     Q. No, it says 153. It says -- I'm looking at the
25 line?

ROBERT GONZALES   APRIL 04, 2018

117

1    A. Oh, I'm sorry, I was looking at the bottom.
2  Yes, I see at the top where you put it, 153.
3    Q. Yeah.
4    A. I'm sorry, okay.
5    Q. I'm looking at the summary part --
6    A. Well, that's where I was, I was down here at
7  the bottom where it says 152. I see the 153. I see
8  what you're saying.
9    Q. There's a title that says "Summary for Coverage
10  A Dwelling," do you see that?
11    A. Yes.
12    Q. And then there's about, I don't know, 10 or 12
13  line items below that, below that title, right?
14    A. Correct.
15    Q. And if we go five line items down, it lists
16  replacement cost value including general contractor
17  overhead and profit. It lists a line item for that
18  calculation, right?
19    A. Yes.
20    Q. And the calculation that you and your teammate,
21  came up with, is $153,759.64, right?
22    A. Yes.
23    Q. And then there's a deduction for depreciation,
24  right?
25    A. Yes.

118

1    Q. And that's an appropriate deduction because
2  it's expressly called out in the insurance policy that
3  we just looked at, Exhibit 19, right?
4    A. Yes.
5    Q. But then there's other deductions. The next
6  deduction is less contractor overhead and profit on
7  recoverable and non-recoverable depreciation. That's
8  the next line item, right?
9    A. Yes.
10    Q. And so there was a deduction, in other words,
11  money that was not sent to my clients of $3.309.96 for
12  that line item, right?
13      MS. BRADHAM: Form.
14      THE WITNESS: Yes.
15    Q. BY MR. POLI: Where in the policy, since you've
16  dealt with it, you know it intimately, where in the
17  policy, Exhibit 19, does it give any hint that there
18  could be a deduction like that?
19      MS. BRADHAM: Form.
20    Q. BY MR. POLI: If it's there?
21      MS. BRADHAM: Form.
22      THE WITNESS: Because it's part of the
23  depreciation.
24    Q. BY MR. POLI: No, no, try and focus on my
25  question. Point me to where in this policy that you're

119

1  so intimately familiar with --
2    A. Less depreciation.
3    Q. -- where it says you cannot only deduct
4  depreciation, but you can then deduct an extra 20%,
5  where in the policy does it say that? And in
6  particular, I would like you to point the exact
7  language to me.
8      MS. BRADHAM: Form and asked and answered.
9      THE WITNESS: Well, first of all, I don't
10  know where you got the 20%, so the additional 20%.
11    Q. BY MR. POLI: Well, let's figure that out.
12      Contractor's overhead and profit is
13  normally considered to be 10% and 10%, right?
14    A. Yes.
15    Q. So 10% and 10% total 20%, right?
16    A. Correct.
17    Q. And it's not exactly precise, but do you have
18  your phone handy with your calculator?
19    A. No.
20    Q. I'll get a calculator.
21      MR. POLI: Will you turn on your
22  calculator, David?
23    Q. BY MR. POLI: So can you tell that the $3,300
24  deduction is approximately 20% of the $17,000
25  deduction? You can probably eyeball that number.

120

1    A. Oh, yeah, I can eyeball that, yes.
2    Q. And it's not quite right. At least, I don't
3  think it is, because I tried this morning. But --
4  here, here's a calculator.
5      Okay. So take your deduction for
6  depreciation, 17,441.93, times .2 and what do you come
7  up with?
8    A. 3,488 and some change.
9    Q. So the deduction you made is almost, but not
10  exactly, 20% on top of the depreciation; is that right?
11      MS. BRADHAM: Form.
12      THE WITNESS: Yes.
13    Q. BY MR. POLI: Was it a -- I mean, did you
14  intend it to be 20% and there was a calculation error?
15    A. No.
16    Q. How do you come up with this additional
17  deduction for contractor's overhead and profit? Is it
18  meant to be 10% and 10% of the depreciation?
19      MS. BRADHAM: Form.
20      THE WITNESS: That's all calculated within
21  Xactimate. I don't have anything to do with that.
22    Q. BY MR. POLI: You're saying that every time
23  you've ever done an Xactimate estimate, not only is
24  there a deduction for depreciation, but there's another
25  approximate 20% deduction on top of that?

ROBERT GONZALES   APRIL 04, 2018

121

1          MS. BRADHAM:  Form.
2     Q.  BY MR. POLI:  For contractor's overhead and
3  profit?
4          MS. BRADHAM:  Form.
5          THE WITNESS:  Can you restate the
6  question?
7          MR. POLI:  I'll have her repeat it back
8  and you tell me what you don't understand.
9          (Whereupon, the question was read.)
10          MS. BRADHAM:  Form; foundation.
11          THE WITNESS:  I have no idea as far as the
12  percentage.  I mean, I've never put numbers to it.
13     Q.  BY MR. POLI:  Well, I mean, we ran the
14  calculation.  The number you deducted in your estimate,
15  3,300 and change, is almost but not exactly, 20% of the
16  depreciation.  You just proved that to yourself, right?
17     A.  Yes.
18     Q.  So this deduction, it's $3,300 and a bit more
19  of money that did not go to my clients, that's pretty
20  clear, right?
21          MS. BRADHAM:  Form.
22          THE WITNESS:  Yes.
23     Q.  BY MR. POLI:  So where does this extra
24  deduction come from?  It's just part of the system, the
25  software?

122

1          MS. BRADHAM:  Form and asked and answered.
2          THE WITNESS:  It's part of the
3  depreciation.
4     Q.  BY MR. POLI:  Part of the depreciation.
5          How do you come up with the 17,441.93
6  amount for depreciation?
7          MS. BRADHAM:  Form.
8          THE WITNESS:  That's based off of age,
9  condition, that all gets inputted into Xactimate.
10     Q.  BY MR. POLI:  So you've done thousands of these
11  Xactimate estimates, right?
12     A.  Yes.
13     Q.  Not every estimate included contractor's
14  overhead and profit, would that be true?
15     A.  That would be true.
16     Q.  Some projects don't need a general contractor,
17  correct?
18     A.  On rare occasions, yes.
19     Q.  It would be rare for you, because you're doing
20  large loss, mostly large loss fires, virtually all
21  those losses will need a general contractor, right?
22     A.  Yes.
23     Q.  And so almost all, virtually all of your
24  losses, would include 10% for overhead and 10% for
25  profit for the use of a general contractor, right?

123

1     A.  Yes.
2     Q.  Now, let's say you had some project somewhere
3  that was simple enough that there was no need for a
4  general contractor, then there would not be a line item
5  for overhead and profit, 10% and 10%, correct?
6     A.  Correct.
7     Q.  If you had an estimate for a project where
8  there was no need for a general contractor, so there
9  was no addition for overhead and profit, would there
10  still be a deduction for an extra 20% of the
11  depreciation?
12          MS. BRADHAM:  Form and foundation.
13          THE WITNESS:  No.  No.  Because there
14  would not be overhead and profit as part of the repair
15  process.
16     Q.  BY MR. POLI:  Okay.  That's what I thought you
17  were going to say.  So, in other words, any time you've
18  ever done an estimate, over the years, where there was
19  the need for a general contractor, one thing you would
20  do is add 10% for overhead and 10% for profit in order
21  to come up with the RCV number, correct?
22     A.  Correct.
23     Q.  But also any time you've ever done one of these
24  estimates, hundreds or thousands of times, when you've
25  added in contractor's overhead and profit, you've also

124

1  not only deducted depreciation, but you've deducted an
2  additional amount for overhead and profit on top of the
3  depreciation; is that right?
4          MS. BRADHAM:  Form.
5          THE WITNESS:  I haven't deducted it.
6     Q.  BY MR. POLI:  But the system does?
7     A.  The system does.
8     Q.  The system that you make use of at State Farm?
9     A.  Correct.
10     Q.  And it's the same system that these three
11  teammates that you've worked with over the years have
12  used, right?
13     A.  Correct.
14     Q.  So every estimate you've done for your -- I
15  mean, the way it worked for at least years is if it was
16  a claim owned by one of your teammates, you did the
17  initial estimate, right?
18     A.  Correct.
19     Q.  And if it was a claim owned by you, your
20  teammate did the initial estimate, right?
21     A.  Correct.
22     Q.  So between you and your various teammates
23  you've generated thousands.  I mean we've talked about,
24  you know, 400 or more in the last six or seven years.
25  But you've been in large loss a lot longer than that.

ROBERT GONZALES   APRIL 04, 2018

125

1  You've done thousands of these claims where you either
2  owned the estimate or you actually prepared the
3  estimate, right?
4    **A. Correct.**
5    Q. In every single one of these thousands of
6  estimates, wherever contractor's overhead and profit
7  was figured into the RCV number, there was also a
8  deduction, not only for depreciation, but on top of
9  that for contractor's overhead and profit, right?
10     MS. BRADHAM:  Form.
11     THE WITNESS:  The depreciation on that
12  overhead and profit, yes.
13    Q. BY MR. POLI:  Yeah, the depreciation -- in
14  other words, the extra deduction for contractor's
15  overhead and profit is based on or related to the
16  amount of the depreciation, right?
17     MS. BRADHAM:  Form.
18     THE WITNESS:  Right.  Because the
19  depreciation that is listed here is not based off of
20  the line item total.  It's depreciated -- it's based
21  off of the total repair cost.  So this 17,000 is not
22  based off the 121.  This 17,000 is based off the 153.
23  So this depreciation is not just for the 121.
24    Q. BY MR. POLI:  Now, depreciation, and I'll have
25  to look for it, but I've got testimony where you've

126

1  talked about depreciation, depreciation is for things
2  that wear out, right?
3    **A. Correct.**
4      MS. BRADHAM:  Form.
5    Q. BY MR. POLI:  If I build a house and it's got
6  walls and roofs -- and a roof, and flooring and all
7  these other tangible things that go into that house,
8  they wear out over time, that's what depreciation is
9  for, right?
10    **A. Yes.**
11    Q. Now, in contrast, some things that go into a
12  loss like this, simply don't wear out.  Labor does not
13  wear out over time, correct?
14     MS. BRADHAM:  Form and foundation.
15     THE WITNESS:  Yeah.  I would agree with
16  that.
17    Q. BY MR. POLI:  Contractor's overhead and profit
18  does not wear out over time, correct?
19     MS. BRADHAM:  Form.
20     THE WITNESS:  Correct.
21    Q. BY MR. POLI:  Depreciation is meant for and
22  it's only meant for tangible items that go into the
23  structure that wear out over time, that's what it's
24  meant for, right?
25     MS. BRADHAM:  Form and foundation.

127

1      THE WITNESS:  Again, it would be for that
2  entire line item.
3    Q. BY MR. POLI:  Focus on my question.  I think
4  I'm reiterating something you not only said a minute
5  ago, when I show you your other testimony, I think I'm
6  reiterating that.  And I've also got State Farm
7  guidelines that say the same thing.  But let me return
8  to my question right now.
9      Depreciation is meant and is only meant
10  for tangible things that went into the structure, like
11  a roof, and walls, and flooring, that sort of thing,
12  tangible items that wear out over time, that's what
13  depreciation is meant for, correct?
14     MS. BRADHAM:  Form and foundation.
15     THE WITNESS:  Yes.
16     MR. POLI:  Mark it.
17    Q. BY MR. POLI:  So --
18     MS. BRADHAM:  I would like to take a
19  break.  If you've got a few more minutes on this topic,
20  I'm happy to do it.  But I think --
21     MR. POLI:  Yeah.  I'll just go a few more
22  minutes and then we'll take our lunch break.
23     MS. BRADHAM:  Good.
24    Q. BY MR. POLI:  And so, Mr. Gonzales, you're
25  telling us that the system that State Farm uses to

128

1  generate estimates like this automatically, not only
2  depreciates -- not only deducts for depreciation, but
3  it automatically adds an extra, and it looks like an
4  approximate 20% on top of that, for what is called,
5  quote, "General Contractor Overhead and Profit on
6  Recoverable and Non-Recoverable Depreciation," unquote;
7  is that right?
8      MS. BRADHAM:  Form.
9      THE WITNESS:  Yes.
10     MR. POLI:  All right.  Let's take a lunch
11  break.  How long do you guys want to take?
12     THE VIDEOGRAPHER:  The time is 12:32 p.m.
13  We're now going off record, ending Media 3.
14     (Whereupon, a lunch recess ensued from
15  12:32 p.m. to 1:26 p.m.)
16     THE VIDEOGRAPHER:  The time is 1:26 p.m.
17  We're now back on record, beginning Media 4.
18    Q. BY MR. POLI:  All right.  Let's go back to the
19  new construction directive and that whole issue, if you
20  will.
21     It was clearly your understanding in that
22  meeting six to seven years ago, where the new
23  construction directive was given to you and other
24  members of your team, that it was a directive from
25  State Farm's corporate headquarters, correct, based on

ROBERT GONZALES   APRIL 04, 2018

---

129

1  your earlier testimony, I take it?
2      A. That was my understanding.
3          MS. BRADHAM: Form; foundation.
4      Q. BY MR. POLI: Okay. Now, you must talk to
5  other people within the company, I mean, you must have
6  interaction with, you know, compatriots in other units,
7  in other geographic locations and such?
8      A. No.
9      Q. No. You don't have get-togethers where all the
10  State Farm people hang out and talk business?
11      A. No.
12      Q. Do you have any reason to believe that the way
13  your unit has been handling the new construction
14  pricing issue for the last six to seven years, do you
15  have any hint or any reason to believe that somehow
16  it's being handled differently by other large loss
17  units in State Farm or around the country?
18          MS. BRADHAM: Foundation.
19          THE WITNESS: No.
20      Q. BY MR. POLI: You would assume, since you were
21  told when you got the new construction directive, that
22  it was a policy, a new policy being issued from
23  corporate headquarters, you would naturally assume it's
24  being done on all over the country the same way,
25  correct?

---

130

1          MS. BRADHAM: Foundation.
2          THE WITNESS: I don't know if I actually
3  thought of it that way.
4      Q. BY MR. POLI: Well, clearly based on your
5  testimony, when you got what we've defined as the new
6  construction directive from your boss to you and your
7  other members of your team, six to seven years ago, you
8  clearly have the understanding it was a mandate, an
9  order, a directive, whatever you might want to call it,
10  from State Farm's corporate headquarters; that's
11  clearly the impression you had way back then, as of six
12  to seven years ago, right?
13      A. My understanding, yes.
14      Q. And that's what you, in fact, told Mr. Skipton
15  when he challenged you on the new construction pricing
16  issue, right?
17      A. Yes.
18      Q. Okay. So given that understanding that you've
19  had for six to -- I mean, nothing's ever changed in the
20  last six to seven years to alter that understanding; is
21  that right?
22      A. For our local office, no, nothing's changed.
23      Q. Okay. So clearly, since you've had the same
24  understanding for the last six to seven years, that the
25  new construction directive is a new policy, a new

---

131

1  procedure issued by State Farm's corporate
2  headquarters, you clearly have no reason to believe it
3  would just be issued to your unit, your large loss
4  unit, it should be the same for all the large loss
5  units all over the country, right?
6          MS. BRADHAM: Foundation.
7          THE WITNESS: I wouldn't know. I don't
8  know.
9      Q. BY MR. POLI: What is the geographic scope of
10  your large loss unit?
11      A. Arizona.
12      Q. There should be a similar large loss unit or
13  units in all of the different geographic locations
14  where State Farm operates, right?
15          MS. BRADHAM: Foundation.
16          THE WITNESS: I am unaware of that.
17      Q. BY MR. POLI: You're unaware of that. Do you
18  think that somehow State Farm doesn't have a need for
19  large loss units in all the different 49 states other
20  than Arizona?
21          MS. BRADHAM: Foundation.
22          THE WITNESS: I'm unaware of how the other
23  states work.
24      Q. BY MR. POLI: Okay. Your assumption would be
25  that when you were told State Farm corporate

---

132

1  headquarters is issuing a new edict, a new mandate,
2  namely the new construction directive, your assumption
3  would be that would be a corporatewide directive,
4  right?
5          MS. BRADHAM: Foundation; asked and
6  answered.
7          THE WITNESS: I wouldn't assume.
8      Q. BY MR. POLI: You wouldn't assume?
9      A. No.
10      Q. Do you have any reason to doubt that idea?
11          MS. BRADHAM: Foundation.
12          THE WITNESS: I never thought of those
13  things, no.
14      Q. BY MR. POLI: Do you have a reason to doubt it
15  or not? If so, tell me the reason, okay.
16          MS. BRADHAM: Foundation.
17          Foundation; asked and answered.
18      Q. BY MR. POLI: If you've got a reason to think
19  that when you're told there's a new corporate mandate,
20  if you've got some reason to think that it would just
21  be limited to Arizona, which seems kind of implausible,
22  then tell me what that reason is.
23          MS. BRADHAM: Form and foundation and
24  asked and answered.
25          THE WITNESS: Again, I have no idea how

---

ROBERT GONZALES   APRIL 04, 2018

133

1   other areas are set up.  I have no idea if they have
2   large loss teams, if they don't have large loss teams.
3   I have no idea what anybody else is doing.
4        Q.  BY MR. POLI:  Have you ever heard any comments,
5   statements, scuttlebutt, whatever you want to call it,
6   call it hearsay even, from anyone that, hey, this is
7   the way it's being done all over the country or this
8   is the way it's being done in State A or State B?
9        A.  No.
10       Q.  The principles, let's take the principles,
11  you've gone on wonderful great length about the
12  efficiencies that justify the use of new construction
13  pricing if you've got a large fire loss.  Do you
14  remember that testimony?
15       A.  Yes.
16            MS. BRADHAM:  Form.
17       Q.  BY MR. POLI:  It's just easier to do the
18  project and, you know, it's just more efficient to do
19  the project.  I'll call that -- why don't I define
20  that.  I'll call that the efficiency rationale, okay.
21  You know what I mean by the word "rationale," right?
22       A.  Yes.
23       Q.  Okay.  I'll call that the efficiency rationale.
24            You've told us at great length about the
25  efficiency rationale for the use of new construction

134

1   pricing on what you've referred to as fire-related
2   large losses, okay.  And you remember that testimony,
3   correct?
4        A.  Yes.
5        Q.  If that rationale really makes sense, that same
6   rationale would apply not only to Arizona, but to every
7   single location where State Farm does business,
8   correct?
9            MS. BRADHAM:  Form and foundation.
10           THE WITNESS:  Based on what I said, it
11  would make sense, yes.
12       Q.  BY MR. POLI:  Okay.  So let's see if we can
13  summarize where we are on the new construction pricing
14  issue.  And then we can kind of wrap this up and let
15  you get out of here early.
16           What we've defined as the new construction
17  directive was a directive or you could call it a
18  mandate, an order, whatever you want to call it, that
19  was issued to you and other members of your team,
20  somewhere around six or seven years ago, and the
21  directive was to use new construction pricing or what
22  you would call the new construction environment, the
23  new construction setting, if you will, on all Xactimate
24  estimates for fire-related large losses, correct?
25           MS. BRADHAM:  Form.

135

1            THE WITNESS:  Yes.
2        Q.  BY MR. POLI:  You received that directive from
3   your team manager in that meeting six to seven years
4   ago, Abel Costales, correct?
5        A.  Correct.
6        Q.  When you received that directive, that new
7   construction directive, your understanding from your
8   team manager back then, six to seven years ago, is that
9   it was a new change of corporate policy by the
10  corporate headquarters of State Farm, correct?
11       A.  I don't know if I said it was a new change in
12  policy.  I don't believe I used those terms.
13       Q.  Well, we asked you about that, until that new
14  construction directive came down six to seven years
15  ago, the normal routine for you and the other people
16  that you worked with on your team, was to use
17  restoration pricing on large loss fire claims, right?
18       A.  Yes.
19       Q.  So the new construction directive was indeed a
20  change.  It was a difference from the way it had been
21  done previously, correct?
22       A.  Yes.
23       Q.  Okay.  And when you were told about that change
24  in this meeting six to seven years ago by Mr. Costales,
25  you were left with the clear impression that this

136

1   change, this new directive, what we've defined as the
2   new construction directive, came from State Farm's
3   corporate headquarters, correct?
4        A.  That was my understanding, yes.
5        Q.  And based on that understanding, that's why
6   after that, some years after that, when you had a claim
7   with Mr. Skipton, he challenged you on the use of new
8   construction pricing because that's not what had been
9   done before, you essentially told Mr. Skipton this is
10  out of my hands, this is a directive or order or
11  whatever word you used, this comes from State Farm
12  corporate headquarters, correct?
13       A.  Correct.
14            MS. BRADHAM:  Form.
15       Q.  BY MR. POLI:  In terms of the breadth or the
16  commonality of the new construction directive, out of
17  the hundreds of claims that you've handled in the last
18  six to seven years, the vast majority of which would be
19  fire-related large losses, you've, with a handful of
20  exceptions, you've done all of those claims using the
21  new construction pricing, the new construction setting,
22  correct?
23       A.  Correct.
24       Q.  In other words, every one of those hundreds of
25  claims that were fire-related large losses, you've

ROBERT GONZALES   APRIL 04, 2018

137

1  complied with the directive as it was given to you six
2  to seven years ago by Mr. Costales, right?
3      **A. Correct.**
4      Q. The only exceptions you can think of where you
5  haven't followed that directive, one involved a claim
6  in Kingman --
7      **A. Outside of Kingman.**
8      Q. Outside of Kingman. And you recommended not
9  following the new construction directive in that matter
10  because of the unique nature of the claim where it was
11  out in the middle of nowhere and a long distance away
12  from any populated area, right?
13      **A. Correct.**
14      Q. And you said you -- if there had been more than
15  two, you said you only remembered one other instance in
16  the last six to seven years, in your hundreds of
17  claims, where you also departed from, a recommended
18  departing, from the new construction directive, right?
19      **A. Correct.**
20      Q. What was that second example?
21      **A. The house was on the side of a hill and it had**
22  **no driveway, no walkway, the only way they could get**
23  **the materials to the house was to walk it up or to do a**
24  **pulley system to get it up the hill to the property.**
25      Q. So the only two instance in the last six to

138

1  seven years where you recommended departing from the
2  new construction directive have been two pretty unusual
3  circumstances where both losses were highly
4  inaccessible?
5      **A. Correct.**
6      Q. And that's why you recommended to whoever you
7  reported to a departure from the new construction
8  directive in those two limited circumstances, correct?
9      **A. Correct.**
10      Q. Okay. Next, in terms of figuring out the
11  damages, where the financial difference if you want to
12  put it that way, from implementing the new construction
13  directive over the last six to seven years, the
14  calculation of that financial delta would be, could be
15  done with a high degree of ease and simplicity, simply
16  by looking at the estimates for each of the
17  fire-related large losses, that would be the first
18  thing, right?
19      **A. Yes.**
20      Q. Second, confirming that those estimates were
21  prepared using new construction, because it will say
22  right on the top of the first page, right?
23      **A. Correct.**
24          MS. BRADHAM: Form and foundation.
25      Q. BY MR. POLI: And in terms of the ease of

139

1  figuring out the financial difference, the delta, to
2  use the phrase you used, you would simply toggle a
3  switch and run the same estimates again using the
4  restoration pricing, correct?
5          MR. BRADHAM: Form and foundation.
6          THE WITNESS: Correct.
7      Q. BY MR. POLI: And it's clear to you that in all
8  instances where you and the other people that you've
9  worked with in your unit have used the new construction
10  pricing for a fire-related large loss, the eventual
11  dollar amounts in that estimate will always be lower
12  than if restoration pricing was used, correct?
13      **A. Yes.**
14      Q. So as I just covered a moment ago, calculating
15  that delta, that difference, which you estimate, what
16  did you say, 8 to 12% you think would be a guesstimate?
17      **A. Yes, I think that's what I said.**
18      Q. Okay. Anyway, calculating that actual dollar
19  amount, whether we're dealing -- doing it for your 160
20  fire claims plus or minus over the last six to seven
21  years or whether we're doing it for the 160 similar
22  claims by your team members, or whether we're doing it
23  for thousands of such claims, for whoever is doing the
24  same thing pursuant to the same directive, the point is
25  calculating that dollar amount has simplicity and ease,

140

1  based on the points that you've already made. You look
2  at the estimate, you change the toggle switch and you
3  run a new estimate, correct?
4          MS. BRADHAM: Form and foundation.
5          THE WITNESS: Correct.
6      Q. BY MR. POLI: Finally, with respect to the
7  Phillips' claim, the Phillips' claim is very similar to
8  all of the other hundreds of fire-related large losses
9  that you've handled in the last six to seven years
10  where, consistent with the new construction directive,
11  you've used the new construction pricing, correct?
12          MS. BRADHAM: Form.
13          THE WITNESS: Yes.
14      Q. BY MR. POLI: Another way to put it, the
15  Phillips' claim is typical of the other hundreds of
16  claims that you have handled and not only your claims
17  but the ones with your teammates, where they were
18  fire-related large losses, and consistent with the
19  directive new construction pricing was used, correct?
20          MS. BRADHAM: Form.
21          THE WITNESS: Yes.
22          MR. POLI: Mark it, please.
23          Let me take a break. I might be about
24  done.
25          THE WITNESS: Okay.

ROBERT GONZALES   APRIL 04, 2018

141

1       THE VIDEOGRAPHER:  The time is 1:43 p.m.
2  We're now going off record, ending Media 4.
3       (Whereupon, a brief recess ensued from 1:43
4  p.m. to 1:49 p.m.)
5       THE VIDEOGRAPHER:  The time is 1:49 p.m.
6  We're now back on record, beginning Media 5.
7  Q.  BY MR. POLI:  Yeah.  I've got a couple -- a
8  few -- a limited number of other questions on the new
9  construction pricing issue and what we've referred to
10 as the new construction directive.
11      After this, what you understood was a
12 corporate policy by State Farm, was given to you and
13 the other members of your team six to seven years ago,
14 the way it's always been implemented by the members of
15 your team is that any fire-related large loss, would be
16 subject to the new construction directive with the very
17 handful or limited exceptions that you mentioned
18 before, the two that you can think of; is that right?
19      MS. BRADHAM:  Form and foundation.
20      THE WITNESS:  Yes.
21 Q.  BY MR. POLI:  Now, in terms of documentation,
22 we looked at, and you've probably still got it,
23 Exhibit 18 was the operation guide from State Farm.
24 **A.  Okay.**
25 Q.  And if you turn to Bates 1223, and there's some

142

1  documentation regarding the new construction pricing
2  issue or new construction environment issue, whatever
3  you want to call it, correct?
4       MS. BRADHAM:  Form.
5       THE WITNESS:  Yes.
6  Q.  BY MR. POLI:  Other than this document, this
7  page or couple of pages, am I understanding that you've
8  never seen anything in writing, other than this page or
9  two related to what we've defined as the new
10 construction directive; is that right?
11      MS. BRADHAM:  Form.
12      THE WITNESS:  Correct.
13 Q.  BY MR. POLI:  I mean, they must -- State Farm
14 must sometimes send out claims advisories, claims
15 memos, claims advice.  Do they use things like that at
16 State Farm?
17 **A.  I don't know what it's called, but, yeah, we'll**
18 **get something that just shows --**
19 Q.  Guidance?
20 **A.  -- guidance.  But -- or changes.  But I don't**
21 **sit here and recall -- can't sit here and recall**
22 **anything that came across as far as that goes.**
23 Q.  As far as the new construction directive?
24 **A.  Correct.**
25 Q.  Okay.  Now, your unit that you're in, and as of

143

1  six to seven years ago when you received the new
2  construction directive, and you were in there until
3  when, how recently, like six months ago?
4  **A.  March of last year.**
5  Q.  March of last year.  Okay.  All right.  So up
6  until about a year ago you were in that unit, correct?
7  **A.  Yes.**
8  Q.  The point is that unit has, what, four claims
9  handlers and a team manager, is that the way the unit
10 is structured?
11 **A.  Not now or when I was there a year ago, it was**
12 **down to two of us that handled the structure and two**
13 **that handled contents and housing.**
14 Q.  So what was the size -- well, first of all,
15 that unit just for Arizona large losses?
16 **A.  Correct.**
17 Q.  And whether there's similar units like that all
18 over the country, you just don't know one way or the
19 other, right?
20 **A.  I have no idea.**
21 Q.  But you do agree with me that the rationale
22 that you've given us today for the why the new
23 construction directive might be appropriate, namely
24 efficiency, in terms of the repairs, that same
25 rationale would not be unique to Arizona, if it's a

144

1  valid rationale, it would apply all over the country,
2  correct?
3       MS. BRADHAM:  Form.
4       THE WITNESS:  Yeah, I would think so.
5  Yes.
6  Q.  BY MR. POLI:  Okay.  So am I correct that while
7  you were in that large loss unit, six or seven years,
8  you know, after the directive came down, all of the
9  fire -- you might have gotten some other claims
10 occasionally, but all the fire-related large losses
11 would have gone, for Arizona, would have gone into your
12 unit, based on your understanding?
13 **A.  Based on my understanding, yes.**
14      MR. POLI:  That's all I have.  Thanks a
15 lot for your time.
16      THE WITNESS:  Okay.
17      MS. BRADHAM:  And we'll read and sign.
18      THE VIDEOGRAPHER:  The time is 1:53 p.m.
19 This concludes the deposition with Media 5.
20      (Whereupon, the videotaped deposition was
21 concluded at 1:53 p.m.)
22            * * * * * *
23
24
25

ROBERT GONZALES   APRIL 04, 2018

145

1
2
3
4
5
6
7        I, the undersigned, say that I have read
8    the foregoing transcript of testimony taken April 4,
9    2018, and I declare, under penalty of perjury, that the
10   foregoing is a true and correct transcript of my
11   testimony contained therein.
12
13        EXECUTED this _____ day of
14   _____, 2018.
15
16
17        _____

                    ROBERT GONZALES

18
19
20
21
22
23
24
25

146

1   STATE OF ARIZONA      ) SS.
                          )
2   COUNTY OF MARICOPA    )
3
4        BE IT KNOWN that the foregoing proceedings
     were taken before me, DONNA DELAVINA, Certified
5    Reporter No. 50468, that the witness before testifying
     was duly sworn by me to testify to the whole truth;
6    that the foregoing 145 pages are a full, true and
     accurate record of the proceedings, all done to the
7    best of my skill and ability; that the proceedings were
     taken down by me in shorthand and thereafter reduced to
8    print under my direction.
9        [X]  Review and signature was requested.
10       [ ]  Review and signature was waived.
11       [ ]  Review and signature not required.
12       I CERTIFY that I am in no way related to any
     of the parties thereto nor am I in any way interested
13   in the outcome hereof.
14       I FURTHER CERTIFY that I have complied with
     the ethical obligations set forth in ACJA 7-206.  DATED
15   at Phoenix, Arizona, this 17th day of April, 2018.
16
        _____
17      Donna DeLaVina, RPR
        Certified Reporter
18      Certificate No. 50468
19
              *   *   *   *   *
20
21       I CERTIFY that SEYMOUR REPORTING SERVICES has
     complied with the ethical obligations set forth in ACJA
22   7-206.
23
        _____
24      Rosina Seymour, RPR, Owner
        Seymour Reporting Services
25      Arizona RRF No. R1000

Exhibit 9

**DECLARATION**
**OF**
**DAVID FIX**

I, DAVID FIX, declare:

1.      I am the owner of ADANAC Builders Corporation.

2.      ARDNAC Builders Corporation was the general contractor who repaired the fire damage to the Anderson and Jasmine Philips' property after the December 2015 fire.

3.      ARDNAC Builders Corporation completed the authorized repairs to the property.

4.      At the present time, Anderson and Jasmine Philips still owe ADANAC Builders Corporation $50,984.96 plus accrued interest at 1.5% per month in the amount of $16,060.38 for a total of $67,045.34.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this Declaration was executed by me on this 24th day of May, 2019 in Phoenix, Arizona.

David Fix



# Invoice

| DATE | INVOICE # |
|---|---|
| 10/29/18 | 30343 |

17505 N. 79th Ave. Ste 401 Peoria, AZ 85308
PH:623-266-2761 FAX: 623-328-5186
ROC #189034-KB01

| BILL TO | INVOICE DESCRIPTION |
|---|---|
| Mr. Anderson Phillips<br>214 W. Desert Lane<br>Phoenix, AZ 85041 | Account Reconcilliation |

| Notes | | PROJECT | P.O. NO. | TERMS |
|---|---|---|---|---|
| | | Structure -01 | | Net 60 |

| ITEM | DESCRIPTION | Prior A... | Prior % | QTY | RATE | Curr % | Total % | PRIOR... | Est Amt | AMOU... |
|---|---|---|---|---|---|---|---|---|---|---|
| General...<br>General...<br>General... | Original Contract Amount<br>Less Payments Received<br>1.5% Interest Rate per Month<br>on Balance Due September<br>2017 to May 2019<br><br>Below reflects total<br>outstanding balance | | | <br><br>1 | 213033.18<br>-162048.22<br>16,060.38 | | | | | 213033.18<br>-162048.22<br>16060.38 |

| | Total | $67,045.34 |
|---|---|---|

Clerk of the Superior Court
*** Electronically Filed ***
05/31/2019 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2016-013572                                    05/30/2019


HON. SHERRY K. STEPHENS                    CLERK OF THE COURT
                                                T. DeRaddo
                                                 Deputy


ANDERSON PHILLIPS, et al.              JEFFREY GREGORY ZANE

v.

STATE FARM FIRE AND CASUALTY           ROBERT THOMAS SULLIVAN
COMPANY


                                       MICHAEL N POLI
                                       STEVEN B. SILVERMAN
                                       JUDGE STEPHENS


MINUTE ENTRY


East Court Building - Courtroom 712

        10:30 a.m.  This is the time set for Oral Argument regarding Plaintiffs' Motion for Leave
to Amend Complaint to Class Action, filed January 25, 2019.  Appearing on behalf of Plaintiffs
are counsel, Michael Poli and Steve Silverman.  Appearing on behalf of Defendant are counsel,
Robert Thomas Sullivan and Alice Jones.

        A record of the proceedings is made digitally in lieu of a court reporter.

        The Court has read and considered all briefing on Plaintiffs' Motion for Leave to Amend
Complaint to Class Action.

        The parties present argument on Plaintiffs' Motion.

        IT IS ORDERED taking this matter under advisement.

        11:47 a.m.  Matter concludes.

Docket Code 005                    Form V000A                          Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2016-013572                                    05/30/2019

**LATER:**

**UNDER ADVISEMENT RULING**

The Court has considered Plaintiffs' Motion for Leave to Amend Complaint to Class Action filed January 25, 2019, the proposed First Amended Class Action Complaint, State Farm's Response to Plaintiffs' Motion for Leave to Amend Complaint to Class Action filed April 15, 2019, Plaintiffs' Reply in Support of Plaintiffs' Motion for Leave to Amend Complaint to Class Action (with exhibits) filed May 24, 2019, Plaintiffs' Motion for Leave to Exceed Page Limit Re: Plaintiffs' Reply to Their Motion for Leave to Amend Complaint to Class Action filed May 24, 2019, and the oral argument conducted on May 30, 2019. The Court granted Defendant State Farm's motion to exceed page limits on this matter by separate minute entry dated April 9, 2019.

In December 2016, Plaintiffs' residence was damaged by fire. Plaintiffs were insured by Defendant State Farm. Plaintiffs allege that Defendant refused to make payment for the full amount of loss due and owing to them based upon an unreasonable, incomplete, and incompetent evaluation of their loss. Defendant used a software program called Xactimate to prepare an estimate of Plaintiffs' loss. Xactimate provides cost data for new construction and restoration/service/remodels. The new construction database provides for shorter labor times than the restoration/service/remodel database, resulting in lower replacement cost values by 10% or more. Plaintiffs allege that when using Xactimate, Defendant improperly used new construction pricing when estimating their loss. The amended complaint alleges Defendant State Farm routinely uses the Xactimate software program for new construction for claims involving restoration. As a result, since the replacement cost values is the basis for claims, when the insured does not rebuild or replace property, the insured is underpaid by 10% or more. Plaintiffs contend this is a breach of Defendants' policy provision and Arizona law which prohibits an insurance company from misrepresenting the policy terms to an insured.

In this motion, Plaintiffs request leave of court to file a first amended class action complaint under Rule 15(a), Ariz.R.Civ.P., converting this case to a class action against Defendant State Farm Fire and Casualty Company. Plaintiffs will serve as the class representative. Plaintiffs estimate there are over 500 policy holders who filed large loss property claims with Defendant in Arizona over the past six years. Those policy holders would be in two classes: (1) the ACV class (those who received an actual cash value payment on a large loss using an estimate prepared with Xactimate's new construction pricing and did not request a replacement cost value payment; and (2) the RCV class (those who received the full replacement cost value for a large loss based on Xactimate's new construction pricing where the loss was not true grounds up reconstruction. For purposes of Rule 23, Ariz.R.Civ.P., Plaintiffs contend: (1) there is commonality of a question of fact for the proposed class, specifically whether it was improper to use the new construction pricing in the Xactimate database; (2) the alleged claims

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2016-013572                                          05/30/2019

are typical of the claims of the proposed class (Plaintiffs incurred a loss because Defendant improperly used the new construction database and not the restoration database and thus they received a lower payment and were not fully compensated); (3) adjudication by individual class members/ policy holders are not practical because the damages for individual class member/policy holders would be insufficient to enable the policy holder to bring a separate claim; (4) injunctive relief is necessary because Defendant continues to use new construction pricing on restoration losses thereby obtaining profits they are not entitled to receive; and (5) the proposed classes are sufficiently cohesive to warrant adjudication by representation because the common question is a significant aspect of the case and can be resolved for all class members in a single adjudication.

Defendant opposes the amendment arguing: (1) Plaintiffs delayed filing their motion to amend which comes 2 ½ years into the case and after the parties have substantially completed discovery; (2) Defendant will be prejudiced by adding a substantial number of new class members and two new claims (unjust enrichment and misrepresentation/false disclosures under A.R.S. § 20-443) since significant additional discovery will be required, exponentially expanding the scope and costs of litigation; and (3) amending the complaint would be futile since the purported class members cannot state a claim for which relief could be granted for unjust enrichment and misrepresentation/false disclosures under A.R.S. § 20-443. The class members' claims are not typical or common as required for class action certification and thus Plaintiffs cannot meet the requirements of Rule 23, Ariz.R.Civ.P., citing to *Martin v. State Farm Mut. Auto. Ins. Co.,* 809 F.Supp.2d 496 (2011) (a party cannot establish commonality where resolution of the claims presented by the class will require intensive, individual fact-finding). Here, whether Defendant paid what was owed under each policy is not dependent upon the method used for creating an initial estimate. It is not a breach of policy to inaccurately estimate the value of a loss. The issue is whether the proper amount was paid under the policy. Thus the individual issues outweigh any common ones. Further, injunctive relief will not address the alleged harm since the class members have already been paid by Defendant, citing to *McDonnell-Douglas Corp. v. U.S. Dist. Court for Cent. Dist. of California*, 523 F.2d 1083, 1087 (9th Cir. 1975).

Rule 15, Ariz.R.Civ.P., provides in part:

**(a) Amendments Before Trial.**

(2) *Other Amendments*. In all other instances, a party may amend its pleading only with leave of court or with the written consent of all opposing parties who have appeared in the action. Leave to amend must be freely given when justice requires.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2016-013572                                      05/30/2019

**(c) Relation Back of Amendments.**

(1) *Amendment Adding Claim or Defense.* An amendment relates back to the date of the original pleading if the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set forth, or attempted to be set forth, in the original pleading.

(2) ⬚ *Amendment Changing Party.* An amendment changing the party against whom a claim is asserted relates back if:
(A) Rule 15(c)(1) is satisfied; and
(B) within the applicable limitations period--plus the period provided in Rule 4(i) for the service of the summons and complaint--the party to be brought in by amendment:
(i) has received such notice of the institution of the action that it will not be prejudiced in maintaining a defense on the merits; and
(ii) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Rule 23, Ariz.R.Civ.P., provides in part:

**(a) Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

**(b) Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:
(1) prosecuting separate actions by or against individual class members would create a risk of:
(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede the other members' ability to protect their interests;

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2016-013572                                     05/30/2019

(2) the party opposing the class has acted or refused to act on grounds that apply
generally to the class, so that final injunctive relief or corresponding declaratory relief is
appropriate for the class as a whole; or
(3) the court finds that the questions of law or fact common to class members
predominate over any questions affecting only individual members, and that a class
action is superior to other available methods for fairly and efficiently adjudicating the
controversy. The matters pertinent to these findings include:
(A) the class members' interests in individually controlling the prosecution or defense of
separate actions;
(B) the extent and nature of any litigation concerning the controversy already begun by or
against class members;
(C) the desirability or undesirability of concentrating the litigation of the claims in the
particular forum; and
(D) the likely difficulties in managing a class action.

The Court finds amendment of the complaint is proper under Rule 15(a)(2), Ariz.R.Civ.P.
Plaintiffs did not unreasonably delay filing the motion to amend and Defendant will not be
unduly prejudiced by the amendments. Based upon the record before the Court, the Court cannot
conclude that the amendments proposed would be futile. In granting this motion, the Court is not
indicating that this case meets the requirements of Rule 23, Ariz.R.Civ.P. The Court agrees with
Plaintiffs that such a determination would be premature at this time. Also, the Court is not
determining whether the new claims in the amended complaint relate back to the date of the
original complaint (Rule 15(c), Ariz.R.Civ.P.) or whether such claims are sufficient under Rule
12(b)(6), Ariz.R.Civ.P. The Court does not currently have sufficient information to make those
determinations. Counsel for Defendant noted he had just received some of the information on
which Plaintiffs rely to establish damages. Additional time will be needed for the parties to fully
develop the record on these issues.

For the reasons stated:

**IT IS ORDERED** granting Plaintiffs' Motion for Leave to Amend Complaint to Class
Action filed January 25, 2019.

**IT IS FURTHER ORDERED** granting Plaintiffs' Motion for Leave to Exceed Page
Limit Re: Plaintiffs' Reply to Their Motion for Leave to Amend Complaint to Class Action filed
May 24, 2019.

Clerk of the Superior Court
*** Electronically Filed ***
M. King, Deputy
6/3/2019 8:37:00 AM
Filing ID 10515282

1  Michael N. Poli (State Bar No. 006431)
   mpoli@merlinlawgroup.com
2  Michael Ponzo (State Bar No. 028092)
   mponzo@merlinlawgroup.com
3  MERLIN LAW GROUP P.A.
   2999 North 44th Street, Suite 520
4  Phoenix, Arizona 85018
   Telephone:  (480) 315-9980
5  Facsimile:  (480) 315-9984
   *Counsel for Plaintiffs*
6
   Stephen Silverman
7  steve@stephensilvermanlaw.com
   Stephen Silverman Law
8  6945 E Sahuaro Drive, Suite 125
   Scottsdale, Arizona 85254
9  Telephone:  (480) 747-0850
   Fax:  (480) 400-1065
10 *Counsel for Plaintiffs*

11              **ARIZONA SUPERIOR COURT**

12                **MARICOPA COUNTY**

13 ANDERSON PHILLIPS and JASMINE
   PHILLIPS, husband and wife,
14                                              No. CV2016-013572
                Plaintiffs,
15
        vs.                                     **FIRST AMENDED CLASS ACTION
16                                              COMPLAINT**
   STATE FARM FIRE AND CASUALTY
17 COMPANY, an Illinois corporation,
18              Defendant.
19

20        Plaintiffs Anderson and Jasmine Phillips (the "Phillips"), on behalf of themselves

21 and all others similarly situated (collectively, "Plaintiffs" or the "Class" bring this class

22 action complaint against Defendant State Farm Fire and Casualty Company ("State Farm").

23           <u>**JURISDICTION AND VENUE ALLEGATIONS**</u>

24        1.     Anderson Phillips and Jasmine Phillips are a married couple who reside in

25 Maricopa County, Arizona.

26        2.     Defendant State Farm is an Illinois corporation engaged in the business of

27 insurance in Maricopa County, Arizona.

28

T2232101.DOCX;1

3.     The property insurance agreement that is the subject of this action was sold to the Phillips in Maricopa County, Arizona, by Defendant State Farm.

4.     This Court has jurisdiction over the subject matter of this action and the parties to this action.   The amount of damages sought by the Plaintiffs exceeds the minimum jurisdictional amount established for filing in this Court.   Venue is proper in this Court.

## FACTUAL ALLEGATIONS COMMON TO PHILLIPS

5.     At all relevant times hereto, the Phillips resided at 614 West Desert Lane, Phoenix Arizona, 85041 (the "Residence").   The Residence and its contents were insured by State Farm under an insurance policy issued by State Farm and assigned the policy number 03-J4-4660-2 (the "Policy").

6.     On or about December 6, 2016, a fire occurred within the Residence, causing significant damage to the Residence and to the Phillips' personal property that was in the Residence at the time (collectively, the "Loss")

7.     At the time of the fire, the Policy was in full force and effect.

8.     The Phillips timely submitted a claim to State Farm regarding the Loss (collectively, the "Claim") and they performed all of their obligations and responsibilities under the Policy with respect to the Claim.

9.     State Farm assigned the Phillips' Claim the number 03-43H7-730.

10.     On December 14, 2016, State Farm inspected the Residence and the Phillips' personal property.

11.     The Phillips have timely responded to all reasonable inquiries and requests from State Farm and State Farm's agents regarding the Claim.

12.     The Phillips have also taken timely action to respond to all inquiries and requests from State Farm.

13.     The Phillips also retained the services of a public adjuster, Skipton & Associates, Inc. ("SAI").   SAI inspected the Property on December 28, 2015.

14. On or about January 8, 2016, SAI submitted a scope of loss reflecting the cost to repair the Residence pursuant to the Policy, which is $203,114.69 (RCV).

15. On or about January 22, 2016, State Farm conveyed its own estimate of repair costs, which was $153,759.64 (RCV).

16. State Farm refuses to make payment of the full amount due and owing for the Phillips' insurance claim in bad faith.

17. State Farm knows or should know that its failure to provide full payment to the Phillips for the Loss is not justified in light of the obvious damage to the Residence as a result of the fire.

18. State Farm knows, or should know, that its unreasonable, incomplete and incompetent evaluation of the Loss is a breach of the duty and obligation of good faith and fair dealing owed to the Phillips under the Policy.

19. State Farm's conduct complained of herein was, and continues to be, intentional, willful and wanton, and/or taken in conscious and deliberate disregard of the Plaintiff's rights, thus justifying the imposition of punitive damages.

20. With respect to the events giving rise to this lawsuit, at various times and in various ways, State Farm acted through other agents and employees.

21. State Farm's conduct complained of herein was intentional, willful and wanton, and/or taken in conscious and deliberate disregard of the Phillips' rights, thus justifying the imposition of punitive damages.

## FACTUAL ALLEGATIONS COMMON TO ALL CLASS MEMBERS

22. Xactimate sells a structure damage estimate program that is used by contractors, insurance companies and public adjusters.

23. State Farm utilizes the Xactimate estimating tool to adjust residential and commercial property loss claims.

24. State Farm accepts the list from Xactimate as an accurate predictor or property loss estimates.

T2232101.DOCX;1         3

25.     The Xactimate estimating tool has two different data bases: a restoration database and new construction database.

26.     The new construction database is utilized when the property damage is so extensive that a ground up rebuild is required.

27.     The restoration database us utilized when the property damage required renovation or repairs, but not a ground up reconstruction.

28.     The new construction data base includes efficiencies in labor cost associated with ground up construction and produces a lower cost estimate than the "Renovation/Repair Pricing" data base would produce for the same scope of work.

29.     The State Farm Adjuster selects which of the two databases to utilize when adjusting a claim.

30.     State Farm is aware the insured would not be aware that Xactimate had two data bases,

31.     State Farm is aware the insured would not be aware that an Xactimate estimate using the new construction database produces a lower estimate than an estimate using the restoration database.

32.     State Farm utilized the new construction database on claims that did not require a ground up rebuild.

33.     State Farm paid numerous claims requiring restoration based upon the new construction database.

34.     State Farm knowingly and intentionally utilized the new construction database to fraudulently lower the amount paid on Replacement Cost Value Claims.

35.     State Farm knowingly and intentionally underpaid on Replacement Cost Value Claims to the detriment of the insured and benefit of State Farm.

36.     State Farm was unjustly enriched by retaining an illicit profit from resulting from utilizing the new construction database.

37.     State Farm misrepresented the replacement cost value the class members

were entitled to by using the new construction database for restoration property claims.

38.     State Farm knew the replacement cost value, based upon the new construction database for renovation losses, misstated the actual amount necessary to make the covered repairs, harming the Class Members and unjustly enriching State Farm.

39.     State Farm knew the insured was ignorant of the impact of the new construction database on the renovation losses, and resultant paid replacement cost value.

40.     State Farm intended the insured to rely on the replacement cost value estimate based upon the new construction database.

41.     The Class Members reasonably relied upon State Farm's representations as to replacement cost values.

42.     The Class Members were ignorant to the fact State Farm's representations as to replacement cost values based upon new construction databases undervalued the claim.

43.     The Class Members sustained consequent and proximate damage based upon the misrepresentations made by State Farms.

**CLASS ALLEGATIONS**

**A.  Class Definition**

44.     Plaintiffs bring this action against Defendants pursuant to Rule 23 of the Arizona Rules of Civil Procedure on behalf of themselves and all other persons similarly situated. Plaintiffs seek to represent the following class:

Statewide Class:

All persons or entities, within the applicable statutes of limitation, who purchased a commercial or residential property insurance policy from State Farm or its affiliates, entities, or subsidiaries, who suffered a covered property loss requiring repair or renovation, for whom State Farm provided Xactimate estimates for RCV or ACV using New Construction labor pricing date.

62.     Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

63.     Defendants subjected Plaintiffs and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

**B.     Numerosity**

64.     The proposed class is so numerous that joinder of all members would be impracticable. State Farm sold and serviced hundreds of commercial and residential property insurance policies though out Arizona where the insured incurred a covered loss and were provided estimates and settlement payments based upon a lower labor cost data base. The individual Class members are ascertainable, as the names and addresses of all Class members can be identified in the business records maintained by State Farm.  The precise number of Class members for the Class is at least in the hundreds and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring a suit individually. Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

**C.     Commonality**

65.     There are questions of law and fact that are common to Plaintiffs' and Class members' claims. These common questions predominate over any questions that go particularly to any individual member of the Class. Among such common questions of law and fact are the following:

    a.  Whether State Farm engages in the fraudulent practice of underestimating either repair or renovation losses, for covered losses, by utilizing a cost model associated with a new builds data base and not repairs or renovations data base;

    e.  Whether State Farm concealed the fraudulent nature of the Xactimate cost estimating program using a new build data base on repairs and renovations;

    f.  Whether State Farm had a duty to disclose material facts to the Class about the fraudulent nature of the Xactimate cost estimating program using a new build data base on repairs and renovations;

h.  Whether Defendants have been unjustly enriched at the expense of Plaintiffs and the Class members;

i.  Whether Plaintiffs and the Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, or other relief;

j.  The amount and nature of such relief to be awarded to Plaintiffs and the Class; and

k.  Whether any applicable statute of limitations should be tolled due to Defendants' concealment of the fraudulent nature of the Xactimate cost estimating program using a new build data base on repairs and renovations.

**D.    Typicality**

66.    Plaintiffs are members of the Class they seeks to represent. Plaintiffs' claims are typical of the Class members' claims because of the similarity, uniformity, and common purpose of the Defendants' unlawful conduct. Each Class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of Defendants' wrongful conduct.

**E.    Adequacy of Representation**

67.    Plaintiffs are adequate representatives of the Class they seek to represent and will fairly and adequately protect the interests of the Class. Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them. There is no hostility between Plaintiffs and the unnamed Class members. Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

68.    To prosecute this case, Plaintiffs have chosen the undersigned law firms, which are very experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

**F.    Requirements of Ariz. R. Civ. P. 23(b)(3)**

69.     The questions of law or fact common to Plaintiffs' and each Class members' claims predominate over any questions of law or fact affecting only individual members of the class. All claims by Plaintiffs and the unnamed Class members are based on Defendants' scheme regarding use of the Xactimate cost estimating program using a new build data base on repairs and renovations and their deceptive and egregious actions involved in fraudulently underpaying insurance claims.

70.     Common issues predominate where, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

71.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

**G.     Superiority**

72.     A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

(a)     Joinder of all class members would create extreme hardship and inconvenience for the affected customers as they reside all across the states;

(b)     Individual claims by class members are impractical because the costs to pursue individual claims exceed the value of what any one class member has at stake. As a result, individual class members have no interest in prosecuting and controlling separate actions;

(c)     There are no known individual class members who are interested in individually controlling the prosecution of separate actions;

(d)     The interests of justice will be well served by resolving the common disputes of potential class members in one forum;

(e)     Individual suits would not be cost effective or economically maintainable as individual actions; and

(f)     The action is manageable as a class action.

T2232101.DOCX;1                                          8

H.     **Requirements of Ariz. R. Civ. P. 23(b)(1) & (2)**

73.     Prosecuting separate actions by or against individual Class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

74.     Defendants have acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## COUNT I

## BREACH OF INSURANCE CONTRACT; IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

45.     The foregoing allegations are hereby incorporated by reference.

46.     State Farm agreed to provide property insurance coverage for the  Plaintiffs.

47.     State Farm was paid premiums in exchange for its indemnity obligations to the Plaintiffs.

48.     The Policies, like all contracts within the State of Arizona, contains an implied covenant of good faith and fair dealing.

49.     The Plaintiffs fulfilled all of their obligations under the Policies.

50.     State Farm failed to perform its obligations pursuant to the Policies.

51.     By wrongfully failing to process the claim in good faith and pay the Claim in full, State Farm breached the Policies, including the implied covenant of good faith and fair dealing in that agreement, thereby depriving the Plaintiffs of the benefits they were to have received under the contract.

52.     State Farm failed to handle the Plaintiffs' Claims in a reasonable manner and failed to make payments owed under the Policies.

53.     As a direct and proximate result of State Farm's breach of contract and breach of the implied covenant of good faith and fair dealing, the Plaintiffs sustained reasonably foreseeable damages, and continue to sustain such damages, in an amount to be proven at

trial.

54.    The Plaintiffs are entitled to an award of attorneys' fees under A.R.S. § 12-341.01.

## COUNT II

## TORTIOUS BAD FAITH CLAIMS HANDLING

55.    The foregoing allegations are hereby incorporated by reference

56.    In Arizona, "the tort of bad faith arises when the insurer 'intentionally denies, fails to process of pay a claim without a reasonable basis.'" *Zilisch v. State Farm Mutual Auto. Ins. Co.*, 196 Ariz. 234, ¶20 995 P.2d 276, 279 (2000) )(quoting *Noble v. National Am. Life Ins. Co.*, 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981)). "An insurance contract is not an ordinary commercial bargain; 'implicit in the contract and the relationship is the insurer's obligation to play fairly with its insured.'" *Id.* (quoting *Rawlings v. Apodaca*, 151 Ariz. 149, 154, 726 P.2d 565, 570 (1986)). "The insurer has 'some duties of a fiduciary nature,' including '[e]qual consideration, fairness and honesty.'" *Id.* (quoting *Rawlings*, 151 Ariz. at 155, 726 P.2d at 571). "[T]he insurer's eventual performance of the express covenant — by paying the claim — does not release it from liability for 'bad faith.'" *Id.* (citing *Rawlings*, 151 Ariz. at 156, 726 P.2d at 572). "Thus, if an insurer acts unreasonably in the manner in which it processes a claim, it will be held liable for bad faith 'without regard to its ultimate merits.'" *Id.* (quoting *Deese v. State Farm Mutual Auto. Ins. Co.*, 172 Ariz. 504, 508, 838 P.2d 1265, 1270 (1992)). "The carrier has an obligation to immediately conduct an adequate investigation, act reasonably in evaluating the claim and act promptly in paying a legitimate claim." *Id.* at ¶ 21.

57.    State Farm owed and continues to owe the Plaintiffs a duty of good faith and fair dealing.

58.    Pursuant to the terms of the Policy, State Farm is obligated to pay the Plaintiffs for the Losses associated with and arising from the fire.

59.    Without any reasonable justification for doing so, State Farm has failed to

T2232101.DOCX;1                                                10

make payments to the Plaintiffs for the full amount due under the Policy for the loss sustained as a result of the fire.

60.     State Farm has breached its contractual obligation to Plaintiffs and State Farm has refused to perform its duty to cooperate with the Plaintiffs to, *inter alia*, adjust and negotiate the insurance claim fairly and in good faith.

61.     As described herein, State Farm breached its contractual and quasi-fiduciary obligations to the Plaintiffs.

62.     Upon information and belief, State Farms' conduct has been self-serving and a ploy to protect State Farm's own financial interests, at the expense of the Plaintiffs' rights.

63.     Also upon information and belief, State Farm has consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others. Furthermore, State Farm acted to serve their own interests, rather than the interests of Plaintiffs.  Thus, Plaintiffs are entitled to an appropriate award of punitive damages.

64.     State Farm committed the above acts and omissions intentionally, maliciously, and fraudulently, and acted to further their own economic interests, at Plaintiffs' expense.

65.     As a result of State Farm's unjustified failure to pay for the Loss, in full, the Plaintiffs have suffered and continue to suffer significant consequential losses, including but not limited to, expense and losses arising from items that should have been paid for or covered by the Policies.

**COUNT III**

**UNJUST ENRICHMENT**

66.     The foregoing allegations are hereby incorporated by reference.

67.     Plaintiffs and each member of the Class conferred a direct benefit on State Farm through payments for the Property Insurance Policies allowing State Farm to enrich itself to the determent of Plaintiffs and the Class.

68.     State Farm appreciated, accepted, and retained this benefit, as it garnered

profits by virtue of its scheme to use new construction costing on renovation losses, allowing State Farm to unjustly enrich itself.

69.     Under the circumstances, it would be unjust and inequitable to allow State Farm to retain this benefit.

70.     Plaintiffs and the Class suffered damages as a result of State Farm's unjust enrichment

**WHEREFORE**, on this claim, the Plaintiffs, in behalf of themselves and the Class, demand an award against State Farm in the amounts by which it has been unjustly enriched at Plaintiffs' and the Class members' expense, costs incurred to bring this action, and any other relief as this Court deems just and proper.

## COUNT IV

## MISREPRESENTATIONS AND FALSE DISCLOSURES - A.R.S.20-443

71.     The foregoing allegations are hereby incorporated by reference.

72.     State Farm made false and misleading statements as to the benefits available to the Plaintiff and Class Members under the policy.

73.     State Farm made these false and misleading statements to induce the Plaintiffs and Class Members to accept settlement payments for RCV or ACV based upon false labor costs.

74.     State Farm made, issued, circulated or caused to be made or circulated estimated, illustrations, circulars, sales material or statements misrepresenting the terms of the policy issued.

75.     Plaintiffs and the Class suffered damages as a result of State Farm's misrepresentations and false disclosures resulting in State Farm obtaining illicit profits.

**WHEREFORE**, on this claim, the Plaintiffs, in behalf of themselves and the Class, demand an award against State Farm in the amounts by which it improperly benefited at Plaintiffs' and the Class members' expense, costs incurred to bring this action, and any other relief as this Court deems just and proper.

## PRAYER FOR RELIEF

**Plaintiffs accordingly respectfully request the Court enter its Orders and Judgment:**

A.   Certify this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2) or Rule 23(b)(3), Arizona Rules of Civil Procedure, and appointing Plaintiffs as representatives of the Class(es), and appointing undersigned as counsel as Class Counsel:

B.   Enjoining State Farm from continuing the acts and practices challenged by the Plaintiff, including an order requiring State Farm to make full disclosure to all insureds who received settlements based upon new construction pricing versus renovation pricing for either Replacement Cost Value Settlements or Actual Cost Value Settlements.

C.   Awarding Plaintiffs and the Class damages, injunctive relief, declaratory relief, attorneys' fees, and costs;

D.   Awarding pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

E.   Awarding Plaintiffs and Class members costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class Counsel and experts, and reimbursement of expenses;

F.   Awarding such other relief as the Court deems just, equitable and proper;

G.   Awarding compensatory damages in a just and reasonable amount (including both contractual damages and extra-contractual or consequential damages);

H.   Awarding punitive or exemplary damages in a just and reasonable amount;

I.   For taxable costs pursuant to A.R.S. §12-341; and

J.   For such other relief as the Court deems just and proper.

DATED this 3rd day of June, 2019.

/ / /

T2232101.DOCX;1                                      13

MERLIN LAW GROUP, P.A.


By  */s/ Michael N. Poli*
　　Michael N. Poli
　　Michael J Ponzo
　　2999 North 44th Street, Suite 520
　　Phoenix, Arizona 85018
　　*Counsel for Plaintiffs*


STEPHEN SILVERMAN LAW


By  *Stephen E. Silverman*
　　Stephen E. Silverman
　　6945 E Sahuaro Drive, Suite 125
　　Scottsdale, Arizona 85254
　　*Counsel for Plaintiffs*


COPY of the foregoing emailed / mailed
This 3rd day of June, 2019, to:

Robert Sullivan
Alicyn Freeman
BROENING OBERG WOODS & WILSON
2800 N. Central Avenue, Suite 1600
Phoenix, AZ  85004
*Attorneys for Defendant State Farm Fire*
*And Casualty Company*


 */s/ Linda Gundelach*